## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTHWESTERN CORPORATION, | ) | Bankruptcy Case No. 03-12872 (JLP) |
| | ) | |
| Reorganized Debtor. | ) | |
| | ) | |
| | ) | |
| MAGTEN ASSET MANAGEMENT | ) | |
| CORPORATION, | ) | |
| | ) | |
| Appellant, | ) | CA 04-1389-JJF |
| | ) | |
| v. | ) | |
| | ) | |
| NORTHWESTERN CORPORATION, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

---

## DEBTOR'S MEMORANDUM OF LAW  IN SUPPORT OF MOTION TO DISMISS CONSOLIDATED APPEALS OF MAGTEN ASSET MANAGEMENT CORPORATION

---

**PAUL, HASTINGS, JANOFSKY & WALKER LLP**
Jesse H. Austin, III
Karol K. Denniston
Carolyn Chayavadhanangkur
600 Peachtree Street
Suite 2400
Atlanta, GA 30308
Telephone: (404) 815-2400

- and -

**GREENBERG TRAURIG, LLP**

Adam D. Cole
885 Third Avenue
New York, NY 10022
Telephone: (212) 801-2100

- and -

**GREENBERG TRAURIG, LLP**
Scott D. Cousins (No. 3079)
William E. Chipman, Jr. (No. 3818)
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, DE 19801
Telephone: (302) 661-7000

*Co-Counsel for NorthWestern Corporation*

Dated:  March 10, 2005
Wilmington, Delaware

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND PRELIMINARY STATEMENT ............................................................. 1

II.   STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS .......................... 6

III.  SUMMARY OF ARGUMENT .......................................................................... 9

IV.   STATEMENT OF FACTS .............................................................................. 10

    A.    Creditor Support of Debtor's Plan ......................................................... 10

    B.    The Confirmation Hearings and Ruling on Confirmation .................................. 11

        1.    The Confirmation Order .................................................................. 12

        2.    The Bankruptcy Court Order Denying Stay Pending Appeal ............................ 12

        3.    This Court's Denial of the Stay Pending Appeal ...................................... 12

    C.    Magten's Claims and Treatment Under the Plan ......................................... 13

        1.    Magten's Claims .......................................................................... 13

        2.    Legal Remedies Provided to QUIPS Holders Under the Plan ......................... 13

        3.    QUIPS Litigation Claims ................................................................ 14

            (a)    Initiation of the Adversary Proceeding ......................................... 14

            (b)    The Motion to Dismiss ........................................................... 15

            (c)    Magten's Confirmation Objections Overruled in Their Entirety ................. 16

    D.    The Memorandum of Understanding ..................................................... 17

        1.    Approval of the Memorandum of Understanding ..................................... 17

        2.    Treatment of Claims Related to Class Action Under the Plan ......................... 18

        3.    Magten's Objections to the MOU ...................................................... 19

        4.    Issues Raised by the Appeal of the MOU Order are Identical to the Appeal of the Confirmation Order ..................................................... 20

    E.    The Debtor Has Substantially Consummated the Plan ................................... 21

V.    ARGUMENT AND CITATION OF LEGAL AUTHORITY ...................................... 23

    A.    Magten's Appeal Should be Dismissed as Being Equitably Moot ...................... 23

        1.    Substantial Consummation ............................................................. 25

        2.    Whether a Stay Has Been Obtained .................................................... 29

        3.    Reliance by Third Parties ............................................................... 33

## TABLE OF CONTENTS
(continued)

**Page**

|  |  |  |  |
|---|---|---|---|
| | 4. | Whether the Relief Requested Would Affect the Success of the Plan | 37 |
| | 5. | The Public Policy of Affording Finality to Bankruptcy Judgments | 39 |
| B. | | Magten's Statement of Issues to be Presented on Appeal | 41 |
| | 1. | Magten's Issues Presented on Appeal of Confirmation Order | 42 |
| | 2. | Magten's Issues Presented on Appeal of MOU Order | 48 |
| VI. | CONCLUSION | | 50 |

## TABLE OF AUTHORITIES

### CASES

In re AOV Industrial,
 792 F.2d 1140 (D.C. Cir. 1986).................................................................24

In re Block Shim Development Co. - Irving,
 939 F.2d 289 (5th Cir. 1991) ..................................................................35

Central States, Southeast & Southwest Areas Pension Fund v. Central Transport
 Inc.,
 841 F.2d 92 (4th Cir. 1988) ...............................................................24, 35

In re Chateaugay Corp.
 988 F.2d 322 (2d Cir. 1993) ...................................................................24

In re Club Associates,
 956 F.2d 1065 (11th Cir. 1992) ................................................................23

In re Continental Airlines,
 91 F.3d 553 (3d Cir. 1996)..........................................................23, 24, 25, 26,
                   29, 33, 34, 38, 40

In re Continental Airlines,
 203 F.3d 203 (3d Cir. 2000)..............................................................10, 24

In re Ellingsen MacLean Oil Co.,
 834 F.2d 599 (6th Cir. 1987), cert. denied, 488 U.S. 817 (1988) ..................35

In re Envirodyne Industrial,
 29 F.3d 301 (7th Cir. 1994) ....................................................................35

In re Exide Techs,
 2004 WL 1465760 ..........................................................................41, 42

Krasnov v. Dinan,
 465 F.2d 1298 (3d. Cir. 1972)..................................................................42

In re Manges,
 29 F.3d 1034 (5th Cir. 1994), cert. denied, 513 U.S. 1152 (1995).........23, 33, 34, 37

Miami Ctr. Ltd. Partnership v Bank of New York,
 820 F.2d 376 (11th Cir. 1987), cert. denied, 488 U.S. 823 (1988)....................35

Nordhoff Investments v. Zenith Electric Corp.,
 258 F.3d 180 (3d Cir. 2001)..........................................................24, 25, 33, 38

     -iii-      DEBTOR'S MEMORANDUM OF LAW

# TABLE OF AUTHORITIES
### (Continued)

In re PWS Holding Corp.,
    228 F.3d 224 (3d Cir. 2000)........................................................................24, 25, 38

In re Public Serv. Co.,
    963 F.2d 469 (1st Cir. 1992), cert. denied, 506 U.S. 908 (1992) ...............................23, 35

In re Roberts Farms Inc.,
    652 F.2d 793 (9th Cir. 1981) .........................................................................................24

In re Specialty Equip Cos.,
    3 F.3d 1043 (7th Cir. 1993) ...........................................................................................23

In re Stein,
    314 B.R. 306 (D.N.J. 2004) ...........................................................................................42

In re UNR Industrial,
    20 F.3d 766 (7th Cir. 1994) ...........................................................................29, 30, 36

United States v. U.S. Gypsum Co.,
    333 U.S. 364, 68 S. Ct. 525 (1948)...............................................................................42

In re Zenith Electronics Corporation,
    250 B.R. 207 (D. Del 2000), aff'd, 258 F.3d 180 (3d Cir., 2001)..................26, 27, 30, 37,
                                                 39, 40

In re Zepecki,
    277 F.3d 1041 (8th Cir. 2002) .......................................................................................42

## STATUTES

11 U.S.C. §§ 101-1330 .......................................................................................................2

11 U.S.C. § 1101(2) .......................................................................................................2, 25

11 U.S.C. § 1127(b) (2000) .................................................................................................25

15 USC. §§ 79-79z-6 ("PUHCA").....................................................................................2, 16

# I.     INTRODUCTION AND PRELIMINARY STATEMENT[1]

The appellee NorthWestern Corporation (**"NorthWestern"** or the **"Reorganized Debtor"**) hereby moves the Court, pursuant to Bankruptcy Rule 8011 of the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**), for an order dismissing the appeal of Magten Asset Management Corporation (**"Magten"**)[2] of: (i) the Order dated October 19, 2004 (the **"Confirmation Order"**) of the United States Bankruptcy Court for the District of Delaware (the **"Bankruptcy Court"**) Confirming the Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code dated August 18, 2004 (as modified, the **"Plan"**)[3] [Magten, Exh. 163];[4] and (ii) the Order

---

[1]     On or about December 30, 2004, the Court entered its Order Granting Motion of NorthWestern Corporation and Magten Asset Management Corporation to Consolidate the Appeals. Under the order, the appeal of the Confirmation Order has been consolidated with Magten's appeal of the Memorandum of Understanding under Civ. No. 04-1389. In addition, under the Court's Standing Order dated July 23, 2004, a special master/mediator, Collins J. Seitz, was appointed to conduct the mandatory mediation of Magten's appeals. While NorthWestern understands that parties are not required to respond to the motion and the appeals cannot be decided until the mandatory mediation has occurred, NorthWestern hopes that this Memorandum of Law in Support of Motion to Dismiss Consolidated Appeals of Magten Asset Management Corporation will be of assistance to the mediator and all parties involved in the anticipated mediation.

[2]     In January 2005 NorthWestern negotiated the terms of a proposed settlement with Magten and Law Debenture (as defined below) that was reduced to writing in a settlement letter dated as of January 27, 2005. Following the announcement of the proposed settlement, NorthWestern received objections from the Plan Committee and holders of Classes 7 and 9 Claims regarding the proposed terms of the settlement. NorthWestern determined that it could not continue to pursue the proposed settlement because, absent the consent of the Plan Committee and certain holders of Classes 7 and 9 Claims, the proposed settlement was fatally flawed structurally from a legal basis to the extent it nonconsensually altered the substantially consummated Plan's distribution scheme. Magten and Law Debenture filed a motion pursuant to Bankruptcy Rule 9019 seeking approval of the proposed settlement. The Bankruptcy Court held a hearing on the motion on March 8, 2005 and on March 10, 2005 entered an order denying the motion based, in part, on the fact that the Plan had been substantially consummated and could not now be modified.

[3]     Any capitalized terms used herein but not otherwise defined shall have the meaning ascribed to such term in the Plan.

[4]     Exhibit references related to items identified in Magten Asset Management Corporation's Amended Designation of Items to be Included in the Record on Appeal and Statement of Issues to be Presented on Appeal from the Order Confirming the Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Docket No. 2335] are referred to herein as "Magten, Exh. ___." Exhibit references related to the exhibits identified in the Reorganized Debtor's

(continued on next page)

dated October 14, 2004, approving Memorandum of Understanding (the **"MOU Order"**)[5] [Magten, Exh. 201].

Magten's appeal of the Confirmation Order and MOU Order is now moot for several reasons. First, on November 1, 2004, the Effective Date, the Plan was substantially consummated within the meaning of Section 1101(2) of The Bankruptcy Reform Act of 1978, as codified in title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (the **"Bankruptcy Code"**). On November 1, 2004, the Debtor filed its Notice of (A) Entry of Order Confirming the Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code and (B) the Occurrence of the Effective Date (the **"Effective Date Notice"**) [Magten, Exh. 217]. The Effective Date Notice was served on November 8, 2004 via first class mail to holders of Class 9 and 12 claims and on the 2002 service list in the Debtor's bankruptcy proceeding. See Affidavit of Service of Christopher R. Schepper dated December 1, 2004 (the **"Schepper Affidavit"**). On or about November 11, 2004, the Effective Date Notice was sent via overnight delivery to the Record Holders (as defined in the Schepper Affidavit) for distribution to the beneficial holders of the Debtor's debt and equity securities in Classes 7, 8(a), 8(b) and 13, who held securities as of October 20, 2004. See Schepper Affidavit, ¶¶5-6. In addition, the Effective Date Notice was published on November 11, 2004 in the

---

(continued from previous page)

Designation of Additional Documents for the Record and Objection to Statement of Issues on Appeal [Docket No. 2364] are referred to herein as "Debtor, Exh. ___."

[5]     The issues to be presented on appeal of the MOU Order, as set forth in Magten's Designation of Items to be Included in the Record on Appeal from the Order Approving the Memorandum of Understanding Entered on October 18, 2004, dated November 5, 2004, are directly related to the Plan and involve many of the same issues presented by Magten in connection with its appeal of the Confirmation Order. As the appeal of the MOU Order is directly tied to the Plan and Magten's appeal of the Confirmation Order, the arguments set forth herein apply equally to the appeal of the MOU Order. As set forth in greater detail below, Magten's appeal of both the Confirmation Order and the MOU Order is moot.

following publications: (i) the Argus Leader; (ii) the Billings Gazette; (iii) the Great Falls Tribune; (iv) the Missoulian; (v) the New York Times; (vi) the Rapid City Journal; (vii) USA Today; and (viii) the Wall Street Journal.

Second, Magten attempted but failed to obtain a stay of the consummation of the Plan despite its knowledge that the Effective Date for the Plan was scheduled to occur on November 1, 2004.[6] Specifically, Magten failed not once but twice to stay the Confirmation Order because it was wholly unable to satisfy any of the requirements for the issuance of a stay pending appeal in connection with its Emergency Motion of Magten Asset Management Corporation for a Stay Pending Appeal of the Confirmation Order (the **"Emergency Motion for Stay"**).[7] Transcript of Telephone Conference Before The Honorable Charles G. Case, II, United States Bankruptcy Judge (Bankr. D. Del., Oct. 25, 2004) at 30 (**"October 25 Transcript"**) ("in my view they have not satisfied the likelihood of success prong or the irreparable harm prong. And further, I think the public interest prong also fails in favor of the Debtors and the other proponents of the Plan in order to promote the reorganization of this company."). Transcript of

---

[6]    See Debtor's Brief in Opposition to the Emergency Motion of Magten Asset Management Corporation for a Stay Pending Appeal of the Order Confirming the Debtor's Second Amended and Restated Plan of Reorganization (D. Del., Oct. 27, 2004) at pp. 1, 9, 12, 15, 27 and 30; Amended Affidavit of Brian Bird (the **"Initial Bird Affidavit"**) dated October 25, 2004 at ¶ 8 ("To obtain the funding of the notes to exit Chapter 11 by November 1, the Debtor must price the senior secured notes pursuant to this schedule.") [Magten, Exh. 215]; Stay Pending Appeal Ruling at 42 (statement of Irena Goldstein, counsel for exit financing banks, "We plan to close on Monday and [the granting of a stay pending appeal would be] a significant development."); Objection of the Debtor to the Emergency Motion of Magten Asset Management Corporation for a Stay Pending Appeal of the Order Confirming the Debtor's Second Amended and Restated Plan of Reorganization (Bankr. D. Del., Oct. 25, 2004) at pp. 4, 6, 10 and 20 [Magten, Exh. 208]; Transcript of Telephone Conference Before The Honorable Charles G. Case, II, United States Bankruptcy Judge (Bankr. D. Del., Oct. 25, 2004) at 17 (statement of Jesse H. Austin, III, counsel for the Reorganized Debtor "As our papers have pointed out and is supported by Brian Bird's affidavit, the Chief Financial Officer, the Debtor has been and continues to work diligently to go effective on its Plan on November the 1st. The Debtor will meet this goal, assuming no stay is issued.") [Magten, Exh. 218].

[7]    Magten did not even attempt to obtain a stay of the MOU Order.

Proceedings Before the Honorable Kent A. Jordan, U.S.D.C.J., dated October 29, 2004 at 46 (the **"Stay Pending Appeal Ruling"**) ("it's my finding that Magten hasn't satisfied any of the four factors on the showing of the likelihood of success on the merits.") (emphasis added) [Debtor, Exh. 22].

On or about December 29, 2004, the Debtor filed its Notice of Substantial Consummation of the Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "**Notice of Substantial Consummation**") [Docket No. 2519].[8]  As set forth in the Notice of Substantial Consummation, as of November 1, 2004, the Debtor transferred substantially all of the property proposed by the Plan to be transferred including delivery of all the Trust Assets to the D&O Trust.  In addition, as of November 1, 2004, the Reorganized Debtor assumed substantially all of the property dealt with by the Plan.  Also, on the Effective Date, all Allowed CSFB Financing Claims and Bank One DIP Financing Claims were paid pursuant to the Debtor's exit financing facility.  Moreover, as of December 29, 2004, the Debtor had substantially completed distribution to holders of allowed claims under the Plan.  In implementing the Plan, the Reorganized Debtor made distributions to holders of allowed Class 7, 8(a), 8(b) and 9 claims, as set forth in greater detail below.

Third, the reversal of the Confirmation Order and/or the MOU Order on appeal, whether in whole or in part, would severely affect the rights of creditors and interest

---

[8]      The Notice of Substantial Consummation was sent via first class mail to holders of Class 9 and Class 12 claims and to parties-in-interest who have requested service pursuant to Bankruptcy Rule 2002 on or about January 6, 2005.  The Notice of Substantial Consummation was sent via overnight to the brokerage firms, agents and banks to distribute to the Beneficial Holders of the Debtor's debt and equity in Classes 7, 8(a), 8(b) and 13 as of October 20, 2004 on January 10, 2005.  On January 11, 2005, sufficient copies of the Notice of Substantial Consummation were sent to the brokerage firms, agents and banks to distribute to the Beneficial Holders of the Debtor's debt and equity in Classes 7, 8(a), 8(b) and 13 as of the Record Date.

holders not before the Court who have received their distributions under the Plan. The reversal of either order would deny the creditors and interest holders of the Reorganized Debtor the benefits they negotiated and have received under the terms of the Plan. As was true when this Court found that there would be "substantial harm" inflicted on the Reorganized Debtor and its creditors if this Court were to grant the Emergency Motion for Stay, Stay Pending Appeal Ruling at 47-48, so too would there be substantial harm to parties not before this Court if this Court were to reverse the Confirmation Order on appeal. Any reversal – even if possible now that the Plan has been substantially consummated – would have a deleterious effect on the Plan and call into question the conversion of approximately $1.2 billion in senior and subordinated unsecured public debt obligations and other claims for New Common Stock in the Reorganized Debtor, not to mention the issuance of New Common Stock to unsecured creditors in Classes 7, 8(a), 8(b) and 9, and payment of cure amounts and convenience class claims.

Fourth, the relief requested by Magten in the appeal, if granted, would negatively affect the success of the Plan. Through its appeal, Magten seeks to rewrite the Plan by ultimately removing a substantial portion of the estate's assets under a variety of theories that have been flatly rejected by the Bankruptcy Court.

Finally, for the reasons noted above, the relief requested by Magten, if granted, in light of the Reorganized Debtor's substantial consummation, would undermine the public policy of affording finality to bankruptcy orders and would be contrary to all notions of equity, fairness and due process. Accordingly, the Reorganized Debtor respectfully requests that this Court dismiss Magten's consolidated appeal in its entirety.

## II.    STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS

NorthWestern was incorporated in 1923 and is a publicly traded Delaware corporation.  NorthWestern and its direct and indirect energy subsidiaries comprise one of the largest providers of electricity and natural gas in the upper Midwest and Northwest regions of the United States, serving approximately 608,000 customers throughout Montana, South Dakota and Nebraska.  The Reorganized Debtor, a transmission and distribution regulated utility entity, has generated and distributed electricity in South Dakota and has distributed natural gas in South Dakota and Nebraska through its energy division, NorthWestern Energy, since the Reorganized Debtor's formation in 1923.  As a regulated utility, the Reorganized Debtor is regulated by the Federal Energy Regulatory Commission and the public service commissions of Montana, South Dakota and Nebraska.  See Affidavit of William M. Austin in Support of First Day Motions filed with the Bankruptcy Court on September 14, 2003 [Magten, Exh. 1].

On September 14, 2003 (the **"Petition Date"**), NorthWestern filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the **"Chapter 11 Case"**).  In the Chapter 11 Case, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors in the Debtor's bankruptcy proceeding (the **"Committee"**) on September 30, 2003.

On the Effective Date, the Reorganized Debtor substantially consummated the Plan thereby effectuating its exit from the Chapter 11 Case.  See Effective Date Notice. On or about the Effective Date, the Reorganized Debtor finalized its senior credit agreement and offering memorandum for the $225 million senior secured notes portion of its exit financing.  In addition, Reorganized Debtor effectuated the registration of its common stock on the NASDAQ Stock Market Exchange.  The Debtor also paid all

Allowed CSFB Financing Claims and Bank One DIP Financing Claims pursuant to the
Debtor's exit financing facility on the Effective Date.

In connection with implementation of the Plan, the Reorganized Debtor made the
following distributions:

a.    Class 7 Distributions.  On or about November 1, 2004, consistent with
      Section 4.7 of the Debtor's Plan, 28,250,900 shares of New Common
      Stock were issued to the Depository Trust Company ("**DTC**") for credit in
      book-entry form to the accounts of the DTC participants representing
      holders of Class 7 Allowed Claims.  On or about November 5, 2004, these
      shares were credited by DTC to the accounts of the above-referenced DTC
      participants.

b.    Class 8(a) Distributions.

      (a)    On or about November 1, 2004, consistent with Section 4.8(a) of
             the Debtor's Plan, 2,278,769 shares were issued to DTC for credit
             in book entry form to the accounts of the DTC participants
             representing holders of Class 8(a) Allowed Claims.  On or about
             November 5, 2004, these shares were credited by DTC to the
             accounts of the above-referenced DTC participants.

      (b)    On or about November 1, 2004, consistent with Section 4.8(a) of
             the Debtor's Plan, 4,366,092 warrants were issued to DTC for
             credit in book-entry form to the accounts of the DTC participants
             representing holders of Class 8(a) Allowed Claims.  On or about
             November 5, 2004, these warrants were credited by DTC to the
             accounts of the above-referenced DTC participants.

      (c)    On November 1, 2004, consistent with Section 5.18 of the
             Debtor's Plan, 55,640 shares were issued to DTC for credit to
             Wilmington Trust Company pursuant to its exercise of its
             Indenture Trustee Charging Lien.

c.    Class 8(b) Distributions.  On or about December 23, 2004, mindful of its
      obligations to deliver shares of Common Stock and Warrants to holders of
      Class 8(b) claims who elected, or were deemed to have elected, Option 1
      under Section 4.8(b) of the Debtor's Plan and Law Debenture Trust
      Company of New York's ("**Law Debenture**") exercise of its Indenture
      Trustee Charging Lien, the Debtor authorized its transfer agent, LaSalle
      Bank National Association, to transfer (i) physical stock certificates issued
      in the name of "Law Debenture Trust Company of New York"
      representing 136,965 shares of Common Stock and (ii) physical warrant

certificate in the name of "Law Debenture Trust Company of New York" representing 254,241 Warrants to purchase shares of Common Stock pursuant to Section 4.8(b) and Section 5.18 of the Debtor's Plan.

d.    Class 9 Distributions.    The following actions have been taken by the Debtor with respect to Allowed Class 9 claims:

(a)    Issuance of a physical certificate to Comanche Park LLC in the amount of 23,620 shares for its Allowed Class 9 Claim;

(b)    Establishment of a Disputed Claims Reserve.    Consistent with Section 7.5 of the Debtor's Plan, the Debtor reserved 4,409,100 shares for potential future distribution to holders of Allowed Class 9 Claims. This Disputed Claims Reserve includes specific reserves as follows: (i) shares of Common Stock equal to the value of $50,000,000, valued as of the Effective Date, in connection with PPL Montana LLC's disputed claim; and (ii) a $25,000,000 Class 9 claim in connection with the disputed QUIPS Litigation Claims.

(c)    Issuance to DTC of 614,125 shares for credit to the account of CRT Capital Group LLC, in resolution of the $19,500,000 allowed Class 9 claims of the Cornerstone Propane entities.

e.    Class 10 Distribution.  The Debtor made 100% of the payments to holders of Allowed Convenience Class Claims pursuant to Section 4.10 of the Debtor's Plan.  The Debtor has paid approximately $954,443.89 to holders of Allowed Convenience Class Claims.

f.    Cure Payments in Connection with Assumed Contracts.  The Debtor made 100% of the undisputed cure payments in connection with assumed contracts pursuant to Section 8.1 of the Debtor's Plan.  The Debtor has paid approximately $2,170,341.64 in undisputed cure payments in connection with assumed contracts.

g.    Special Recognition Grants.  On or about December 7, 2004, consistent with Section 9.3 of the Debtor's Plan in connection with the Special Recognition Grants, physical certificates in the amount of (i) 103,360 shares of Common Stock were issued to certain executive officers, members of the extended leadership team and executive-level key managers (not subject to tax withholding at that time); and (ii) 7,630 shares of Common Stock were issued to non-executive-level key managers (subject to tax withholding at that time).  The Debtor withheld 3,174 shares of Common Stock to satisfy the tax withholding liability of the individuals comprising the non-executive-level key manager group resulting from the stock issuance.

See Notice of Substantial Consummation.

Under Section 4.8(b)(ii) of the Plan, any New Common Stock which otherwise would have been distributable to a holder of a Class 8(b) Claim if such holder had chosen Option 1 shall be distributed pro rata to Class 7 and Class 9, and the Warrants which otherwise would have been distributable will be canceled. On February 16, 2005, NorthWestern issued instructions to its transfer agent regarding the distribution of 368,626 shares of Common Stock which otherwise would have been distributable to a holder of a Class 8(b) Claim if such holder had chosen Option 1. The transfer agent was instructed that the pro rata share of the Common Stock allocated to holders of Allowed Class 7 Claims were to be issued to DTC for credit in book entry form to the accounts of the DTC Participants representing holders of Class 7 Allowed Claims as of the Record Date. The transfer agent was further instructed that 44,492 shares of Common Stock to be distributed to holders of Allowed Class 9 Claims were to be deposited in the Disputed Claims Reserve for future issuance in connection with Class 9 claims. In connection with these instructions, the 684,265 Warrants, which otherwise would have been distributable to a holder of a Class 8(b) Claim if such holder had chosen Option 1, were to be cancelled.

## III.    SUMMARY OF ARGUMENT

Because the Plan has been substantially consummated, Magten is not entitled to and cannot be granted any relief on appeal even if Magten is successful. Even if any relief could conceivably be fashioned, implementation of that relief would be inequitable because: (1) Magten failed to obtain a stay pending appeal; (2) the Plan has been substantially consummated; (3) the relief requested would adversely impact the material rights of creditors and other third parties under the Plan terms who are not before the Court and who have received their Plan distributions; and (4) the relief requested would

negatively affect the success of the Plan and undermine the public policy of affording finality to bankruptcy orders.    Accordingly, Magten's consolidated appeal should be dismissed because it is equitably moot.  See In re Continental Airlines, 203 F.3d 203 (3d Cir. 2000).

## IV.    STATEMENT OF FACTS[9]

### A.    Creditor Support of Debtor's Plan

As the voting tabulation set forth below shows, an overwhelming majority of the Debtor's creditors voted in support of the Plan.  Even Class 8(b), of which Magten is a part, voted in support of the Plan. This Class reached the numerosity requirement but failed on dollar amount as Magten held approximately 40% of the total class.

As illustrated below, the results of voting in connection with the Plan showed the overwhelming acceptance of the Plan in both number and amount by all classes entitled to vote, except Class 8(b):

[remainder of page intentionally blank]

---

[9]      The facts are drawn from documents filed of record in the Debtor's bankruptcy case.

| | | | | | | |
|---|---|---|---|---|---|---|
| Class 7 Unsecured Note Claims | 580 | 568 (97.93%) | 12 (2.07%) | N/A | $681,067,015.00 (99.17%) | $5,712,815.00 (0.83%) |
| Class 8a Unsecured Subordinated Note Claims | 2761 | 2160 (78.23%) | 601 (21.77%) | N/A | 5,475,271 shares (90.42%) | 580,141 shares (9.58%) |
| Class 8b Unsecured Subordinated Note Claims | 734 | 604 (82.29%) | 130 (17.71%) | N/A | 730,310 shares (36.16%) | 1,289,548 shares (63.84%) |
| Class 9 General Unsecured Claims | 41 | 32 (78.05%) | 9 (21.95%) | 0 | $5,955,802.22 (80.46%) | $1,446,645.57 (19.54%) |
| Class 12 D&O Trust Claims | 28 | 28 (100.00%) | 0 (0.00%) | 0 | $28.00 (100.0%) | $0.00 (0.0%) |

Affidavit of Christopher R. Schepper Regarding Tabulation of Votes in Connection with the Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code at ¶ 16 [Magten, Exh. 192].

**B.    The Confirmation Hearings and Ruling on Confirmation**

On August 25, 2004 and again on October 6, 2004, the Bankruptcy Court held hearings to consider, among other things, confirmation of the Plan (the **"Confirmation Hearing"**). Significantly, at the Confirmation Hearing Magten presented no evidence and failed to examine or cross-examine any witnesses in its opposition of the Plan. On October 8, 2004, the Bankruptcy Court orally issued its findings of fact and conclusions of law confirming the Plan in all respects and overruling all objections to confirmation not otherwise withdrawn or resolved, specifically including Magten's objections. Transcript of Proceedings Before the Honorable Charles G. Case, II, United States Bankruptcy Judge, dated October 8, 2004 at 27 (**"Confirmation Ruling"**) [Magten, Exh.

213]. In confirming the Plan, the Confirmation Ruling specifically found that: the Plan is a "gift plan" and that Magten as a subordinated unsecured creditor was afforded an adequate remedy at law for its claims, including the QUIPS Litigation discussed below.

### 1.    The Confirmation Order

On October 19, 2004, the Bankruptcy Court entered an Order Confirming Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code. A copy of the Confirmation Order is attached hereto as Exhibit A.

### 2.    The Bankruptcy Court Order Denying Stay Pending Appeal

Following an emergency teleconference with the Bankruptcy Court on October 25, 2004, on October 26, 2004, the Bankruptcy Court entered its Order Denying Emergency Motion of Magten Asset Management Corporation for a Stay Pending Appeal of the Order Confirming the Debtor's Second Amended and Restated Plan of Reorganization (the **"Bankruptcy Court Order Denying Stay Pending Appeal"**) [Docket No. 2274]. In denying the Emergency Motion for Stay, the Bankruptcy Court found "There has been no new evidence to suggest – or new arguments to suggest that the decisions that were decided adversely to Magten at the time of the confirmation hearing are likely to be reversed on appeal." October 25 Transcript at 29-30 [Magten, Exh. 218].

### 3.    This Court's Denial of the Stay Pending Appeal

This Court also denied Magten's request for a stay pending appeal on October 29, 2004 finding that Magten failed to satisfy any of the four factors on the showing of the likelihood of success on the merits. Stay Pending Appeal Ruling at 46.

C.    **Magten's Claims and Treatment Under the Plan**

1.    **Magten's Claims**

Magten is a distress investor that acquired a substantial position in certain of the Debtor's 8.45% Quarterly Income Preferred Securities (the **"QUIPS"**) long after and with the knowledge of the Going Flat Transaction (as defined below). The QUIPS were issued by Montana Power Capital I (the **"Trust"**), a business trust established pursuant to the Delaware Business Trust Act. The Trust's sole assets are the 8.45% Junior Subordinated Debentures due 2036.

2.    **Legal Remedies Provided to QUIPS Holders Under the Plan**

QUIPS holders are provided for in Class 8(b) of the Plan.[10] Because of the existence of an adversary proceeding (the **"QUIPS Litigation"**) described below, the Debtor's Plan provided QUIPS holders with two options. QUIPS holders electing "Option 1" received, or will receive when Law Debenture, the QUIPS indenture trustee, distributes the shares that have been transferred to it by the Debtor's transfer agent, a pro rata share of 505,591 shares of the New Common Stock (such 505,591 shares representing 1.4% of the New Common Stock issued and outstanding on the Effective Date prior to any dilution resulting from shares of New Common Stock issued pursuant to a new incentive plan and exercise of the Warrants), plus Warrants exercisable for an additional 2.3% of the New Common Stock. QUIPS holders electing Option 1 were required to release any claims arising out of or related to the QUIPS Litigation. See Plan, §4.8(b).

---

[10]    The structure of the Plan is simple – conversion of approximately $1.2 billion of senior and subordinated unsecured debt claims in exchange for 35.5 million shares of newly issued common stock (the **"New Common Stock"**). The QUIPS represent only $69.0 million of the debt being exchanged for equity.

QUIPS holders electing "Option 2" received a Class 9 general unsecured claim and a pro rata share of recoveries, if any, upon resolution of the QUIPS Litigation. The QUIPS holders electing Option 2 also received the benefit of the Class 9 Reserve for Disputed Claims established pursuant to Section 7.5 of the Plan.[11] Option 1 and Option 2 allowed QUIPS Claims holders to (1) choose a distribution of New Common Stock and Warrants, or (2) preserve their litigation claims as part of the QUIPS Litigation and be treated as Class 9 unsecured claimants for any damages ultimately awarded to claimants participating in the QUIPS Litigation. See Plan, §4.8(b).

### 3.    QUIPS Litigation Claims

(a)    Initiation of the Adversary Proceeding

On April 16, 2004, just over eight months after initiation of the Debtor's Chapter 11 case and after the Debtor had timely filed its initial proposed reorganization plan, Magten and Law Debenture (Law Debenture together with Magten, the **"Plaintiffs"**) initiated the QUIPS Litigation, challenging a pre-petition transfer of certain energy and natural gas transmission and distribution assets (the **"Montana Utility Assets"**) by a wholly-owned subsidiary of the Debtor, to the Debtor as part of the Debtor's acquisition of The Montana Power Company's transmission and distribution assets. The Plaintiffs assert that the transfer, sometimes referred to as the **"Going Flat Transaction,"** was a fraudulent conveyance and that the assets transferred to the Debtor are not property of the

---

[11]    On or about November 3, 2004, the Bankruptcy Court entered an order approving the Stipulation and Order Establishing a Disputed Claims Reserve between NorthWestern and Law Debenture which provided that the Reorganized Debtor shall set aside a portion of its initial reserve of 13.5% of New Common Stock solely to satisfy in full a $25 million Class 9 claim of the QUIPS Litigation Claims holders. Any claim by a QUIPS Litigation claimant is to be afforded the treatment accorded Class 9 General Unsecured Claims, as set forth in the Plan [Debtor, Exh. 6].

Debtor's estate. The Plaintiffs further assert that a constructive trust should be imposed on the transferred assets.

The Debtor vehemently denies all of the Plaintiffs' allegations. As the Bankruptcy Court held, simply asserting the existence of a fraudulent conveyance claim and a constructive trust does not make them so. Moreover, Magten made no effort to enforce its wholly unsubstantiated allegations into any form of legal remedy either pre-petition or post-bankruptcy filing. As reflected by the Bankruptcy Court's Confirmation Ruling, the Going Flat Transaction was nothing more than the last stage of the Debtor's acquisition of The Montana Power Company assets, an acquisition that was initiated in February 2002 and completed with the closing of the Going Flat Transaction in November 2002. The Bankruptcy Court found:

> in reviewing all of the underlying transaction documents in connection with the going-flat transaction, it is clear to me – and the applicable law, it is clear to me that this was really all one transaction.

See Confirmation Ruling at 33.

(b)    The Motion to Dismiss

On May 14, 2004, Northwestern filed its Motion and Supporting Brief to Dismiss the Complaint for Failure to State a Claim Upon Which Relief Can Be Granted (the **"Motion to Dismiss"**) [Magten, Exh. 225]. On August 20, 2004, the Bankruptcy Court issued its Under Advisement Decision re: Motion to Dismiss (the **"Opinion"**) granting in part and denying in part the Debtor's Motion to Dismiss. In its Opinion, the Bankruptcy Court held that in order to pursue a recovery Magten and Law Debenture would need to prove under applicable law that one of the releases given in connection with the Going

Flat Transaction <u>was obtained through actual fraud or as part of a fraudulent scheme</u>. Confirmation Ruling at 26 (emphasis added).[12]

      (c)    Magten's Confirmation Objections Overruled in Their Entirety

On August 9, 2004, Magten filed objections to confirmation of the Plan (**"Magten Confirmation Objections"**) [Magten, Exh. 110]. On September 21, 2004, Magten filed supplemental objections to confirmation of the Plan (**"Magten Supplemental Confirmation Objections,"** and together with the Magten Confirmation Objections, the **"Magten Objections"**) [Magten, Exh. 180]. In the Magten Objections, Magten argued that the Plan could not be confirmed because the principal assets of the Debtor's estate, the Montana Utility Assets, were being held by NorthWestern in constructive trust for the benefit of the QUIPS holders. Magten also argued that the Montana Utility Assets were not the property of the Debtor's estate. Finally, Magten claims that because Debtor's PUHCA exemption application was not allegedly filed in good faith that certain senior debt obligations incurred by the Debtor after February 14, 2002 were void.

As set forth in the Confirmation Ruling and Confirmation Order, Magten's Objections were overruled in their entirety. The Bankruptcy Court held that "all objections not previously resolved in accordance with my opening comments are overruled in accordance with this oral ruling." <u>See</u> Confirmation Ruling at 45 and Confirmation Order at 33-47. In particular, the Court ruled that

---

[12]     On October 4, 2004, the Plaintiffs amended the Complaint (the **"Amended Complaint"**). The Amended Complaint added a count seeking a declaration that all documents executed in furtherance of the alleged fraudulent transfer are void under the Public Utility Holding Company Act of 1935, as codified in title 15 of the United States Code, 15 U.S.C. §§ 79-79z-6 (**"PUHCA"**). The Debtor has moved to dismiss this portion of the Amended Complaint.

there was not a shred of evidence presented by Law Debenture or Magten on this [PUHCA issues], and there's no basis to determine, no evidentiary basis at all to determine that the senior debt should be voided or subordinated. So, that objection is overruled.

Confirmation Ruling at 42.

### D.    The Memorandum of Understanding

#### 1.    Approval of the Memorandum of Understanding

On or about April 28, 2004, NorthWestern filed its Motion for Order pursuant to Bankruptcy Rule 9019 Approving Memorandum of Understanding requesting entry of an order approving the Memorandum of Understanding (the **"MOU"**) providing for settlement (the **"Settlement"**) and dismissal with prejudice of all claims against all parties in the consolidated securities class action styled In re NorthWestern Corporation Securities Litigation, Case No. CIV-03-4049, including Golman Family Trust v. NorthWestern Corp., Case No. CIV-03-4226 (collectively, the **"Securities Litigation"**) and In re NorthWestern Derivative Litigation, Case No. 03-4091 (the **"Derivative Litigation"**, collectively with the Securities Litigation, the **"Class Action"**), all pending in the United States District Court for the District of South Dakota (the **"Class Action District Court"**) [Magten, Exh. 32].

Under the Settlement, a settlement fund was established in the amount of $41 million, $37 million of which was contributed by certain D&O Policies and $4 million of which was contributed by other persons and parties. NorthWestern's only obligations under the Settlement were to cause its insurers under the D&O Policies to deliver $37 million in full settlement and compromise of the Class Action and to provide the releases set forth in the Settlement documents.

On or about October 7, 2004, the Bankruptcy Court issued its memorandum decision overruling objections and finding that the proposed settlement of the Class Action met the requirement of approval under Bankruptcy Rule 9019 and the applicable case law (the **"MOU Memorandum Decision"**) [Magten, Exh. 194].   On or about October 14, 2004, the Bankruptcy Court entered the MOU Order.  On or about October 26, 2004, Magten filed its notice of appeal of the MOU Order.

On or about January 14, 2005, the Class Action District Court entered its Final Judgment and Order of Dismissal with Prejudice of the Securities Litigation.  On or about January 14, 2005, the Class Action District Court also entered its order in the Derivative Litigation holding that the approval of the Settlement would be held in abeyance until a bankruptcy court order is obtained vacating the order preliminarily enjoining prosecution of the Derivative Action.  On or about February 15, 2005, the Bankruptcy Court entered the Stipulation and Order Terminating the Preliminary Injunction and the Automatic Stay in connection with the Derivative Action.   The Bankruptcy Court order has been submitted to the District Court and the parties are currently waiting for entry of an order approving the Settlement in the Derivative Litigation by the Class Action District Court.

### 2.    Treatment of Claims Related to Class Action Under the Plan

Under Section 4.14 of the Plan, Class 14 Claims, claims of holders of claims pursuant to the Settlement, will be discharged and the holders thereof shall be barred from seeking to recover any payment on their Securities Claims from the Debtor, the Reorganized Debtor, or the Released Parties.[13]

---

[13]    The Plan provides that in the event the Settlement was not approved and does not become effective: (a) the Plan and any proposed Order confirming the Plan (i) will not release any non-Debtor for that matter from the claims asserted or to be asserted in the Securities Litigation and (ii) will not affect, in

(continued on next page)

Under Sections 4.14 and 4.15 of the Plan, holders of Securities Claims who elect to refuse to accept the proposed treatment provided in the Settlement preserved their rights to proceed against the Debtor in the Class Action District Court in accordance with the Settlement. Upon receipt of a Final Order, such holders of Securities Claims shall be channeled to the D&O Trust.

### 3.    Magten's Objections to the MOU

Magten objected to the MOU, asserting that any distribution under the Settlement would violate the absolute priority rule by making distributions to junior stakeholders while paying less than 100% of the claims of more senior creditors. In its MOU Memorandum Decision, the Bankruptcy Court overruled Magten's objection in its entirety. In particular, the Bankruptcy Court, focusing on the use of the Debtor's interest in insurance policies to effectuate the settlement, ruled that:

> Here, the primary purpose of the policies is to protect the directors and officers from claims such as those asserted by the plaintiffs . . . payment of the proceeds to the plaintiffs on account of claims against the directors and officers does not implicate property of the estate.

MOU Memorandum Decision, pp. 4-5. The Bankruptcy Court also held:

> Resolution of this complex and expensive litigation at no direct cost to the estate is fair and reasonable, is in the best interests of the estate and its creditors, significantly enhances the Debtor's ability to emerge from these proceedings with a confirmed plan of reorganization, and is the result of arm's length negotiation.

MOU Memorandum Decision, p. 6.

---

(continued from previous page)

any way, the Class Claimants' rights to obtain relief for their claims in the Securities Litigation; (b) the lead Plaintiffs and the Class Claimants shall retain their rights to pursue their claims and access the proceeds of any available D&O policies that provide coverage for the claims asserted in the Securities Litigation; and (c) the Debtor's current and former officers and directors, financial advisors, accountants, auditors, agents or professionals will not be released and discharged from any cause of action in connection with the Class Action.

Magten also objected to the MOU, asserting that the proceeds of the D&O Policies were not property of the Debtor's estate where the derivative actions belong to the Debtor. The Bankruptcy Court held:

> The critical issue raised by Magten's objection is whether the settlement payments made from the D&O Policies are in fact distributions of estate property in the first instance. The Court concludes they are not.

MOU Memorandum Decision, p. 5 (footnote omitted).

In connection with the derivative actions, the Bankruptcy Court held as follows:

> Any claims that the Debtor may have (for example, derivative claims brought on behalf of the company) are not covered by these policies because of the "insured versus insured" exception contained in them . . . Thus, whether the Debtor could or could not prevail is not relevant to this settlement because the policies at issue would not provide a source of recovery even if successfully prosecuted.

MOU Memorandum Decision, p. 5.

**4.    Issues Raised by the Appeal of the MOU Order are Identical to the Appeal of the Confirmation Order**

The issues raised by Magten in its appeal are identical to the issues raised in its appeal of the Confirmation Order. Magten asserts two issues to be presented to the Court in its appeal of the MOU Order:

> a.    Whether the Bankruptcy Court erred in approving a settlement that provides for payment of equity interests when more senior creditors are not being paid in full and are only receiving a minimal recovery under the Debtor's Second Amended and Restated Plan of Reorganization.

> b.    Whether the Bankruptcy Court erred in finding that the proceeds of the D&O Insurance Policy are not property of the Debtor's estate when the derivative actions belong to the Debtor and not the shareholders and all damages awarded in a derivative suit inure directly to the corporation.

The issues presented by Magten in the appeal of the MOU Order are directly related to the confirmation and implementation of NorthWestern's Plan. As discussed above, the Bankruptcy Court overruled Magten's objections to the approval of the MOU holding that the payment of the proceeds to the plaintiffs in the Class Action on account of claims against the directors and officers does not implicate property of the estate. See MOU Memorandum Decision, pp. 4-5. In addition, the Bankruptcy Court held that the "[a]ny claims that the Debtor may have (for example, derivative claims brought on behalf of the company) are not covered by these policies because of the "insured versus insured" exception contained in them." Id. at 5.

In its Confirmation Ruling, the Bankruptcy Court held that "the proceeds [from the policies] are not property of the estate so that does not implicate, therefore, the absolute priority rule." See Confirmation Ruling, p. 39. The Bankruptcy Court also specifically held that "consistent with applicable law the D&O channeling trust injunction and the releases are appropriate and do not require that the plan not be confirmed." See Confirmation Ruling, p. 41. The issues presented by Magten in its appeal of the MOU Order are identical to issues presented in its appeal of the Confirmation Order and were decided adversely to Magten not once, but twice, by the Bankruptcy Court.

### E.     The Debtor Has Substantially Consummated the Plan

As set forth in the Notice of Substantial Consummation, the Debtor has substantially consummated its Plan, thereby effectuating its exit from Chapter 11. As set forth in the Notice of Substantial Consummation, the Debtor: (i) transferred substantially all of the property proposed by the Plan to be transferred including delivery of the Trust

Assets to the D&O Trust; (ii) assumed substantially all of the property dealt with by the Plan; and (iii) completed distributions to holders of allowed claims under the Plan, including distributions to holders of Class 7, 8(a), 8(b) and 9 allowed claims.[14]

On or about the Effective Date, the Reorganized Debtor finalized its senior credit agreement and issued the $225 million senior secured notes portion of its exit financing. On the Effective Date, the Reorganized Debtor also paid all Allowed CSFB Financing Claims (approximately $390 million) and Bank One DIP Financing Claims (approximately $15.0 million in letters of credit and terminated unfunded financing commitments of approximately $35 million) pursuant to the Debtor's exit financing facility. In addition, the Reorganized Debtor effectuated the registration of its common stock on the NASDAQ Stock Market Exchange. Pursuant to the Plan, on the Effective Date, the Reorganized Debtor established a trust to which indemnification claims of certain of the Debtor's current and former directors and officers (the "**Protected Parties**") will be channeled and paid by available insurance under the Debtor's Plan (the "**D&O Trust**").

Moreover, pursuant to Section 7.5 of the Plan, the Reorganized Debtor established a Disputed Claim Reserve equal to the aggregate New Common Stock equal to the relevant percentage of the Distributions to which holders of Disputed Claims would be entitled under this Plan if such Disputed Claims were Allowed Claims in the amount of such Disputed Claim or such lesser amount as required by a Final Order. To the extent that the MOU Order was overturned, the Securities Claims would be treated as Class 12 D&O Trust Claims under the Plan and subject to the first in, first out distributions

---

[14]     The MOU has also been substantially consummated. As set forth above, the District Court has now approved the MOU in the Securities Litigation and the Settlement is being implemented.

provided for under the D&O Trust. Any such reversal would adversely affect third parties not before the Court, including, but not limited to, parties seeking to recover from the D&O Trust.

## V.    ARGUMENT AND CITATION OF LEGAL AUTHORITY

Because the Plan has been substantially consummated, Magten is not entitled and cannot be granted the very relief it now seeks. First, the Plan has been substantially consummated and what is done cannot now be undone. Second, if such relief could conceivably be fashioned, the requested relief is not supported by controlling authority and implementation of any such relief granted would be wholly inequitable. In short, Magten is not entitled to any of the relief it now seeks because: (1) the Plan has been substantially consummated; (2) Magten failed to obtain a stay pending appeal; (3) the relief requested would adversely impact the material rights of creditors and third parties not before the Court; and (4) the relief requested would negatively affect the success of the Plan and undermine the public policy affording finality to bankruptcy orders. See In re Continental Airlines, 91 F.3d 553, 560 (3d Cir. 1996).

### A.    Magten's Appeal Should be Dismissed as Being Equitably Moot

The Third Circuit Court of Appeals adopted the doctrine of equitable mootness in In re Continental Airlines, 91 F.3d 553 (3d Cir. 1996) (en banc). After conducting a survey of case law from other circuits,[15] the court described the equitable mootness doctrine as follows:

---

[15]    Indeed, virtually every circuit court of appeals has recognized this doctrine. See In re Manges, 29 F.3d 1034, 1038-39 (5th Cir. 1994), cert. denied, 513 U.S. 1152 (1995) (doctrine of equitable mootness "is a recognition by the appellate courts that there is a point beyond which they cannot order fundamental changes in reorganization actions."); In re Specialty Equip Cos., 3 F.3d 1043, 1048 (7th Cir. 1993); In re Public Serv. Co., 963 F.2d 469, 471-72 (1st Cir. 1992), cert. denied, 506 U.S. 908 (1992); In re Club
(continued on next page)

> Under this widely recognized and accepted doctrine, the
> courts have held that '[a]n appeal should . . . be dismissed
> as moot when, even though effective relief could
> conceivably be fashioned, implementation of that relief
> would be inequitable.'

Id. at 558-559 (quoting In re Chateaugay Corp., 988 F.2d 322, 325 (2d Cir. 1993)); see also In re Continental Airlines, 203 F.3d at 209 ("Under the doctrine of equitable mootness, an appeal should be dismissed, even if the court has jurisdiction and could fashion relief, if the implementation of that relief would be inequitable."). The equitable mootness doctrine provides "a vehicle whereby the court can prevent substantial harm to numerous parties." Id. at 209.

In Continental, the en banc Court identified five factors other courts had considered in determining whether the merits of a bankruptcy appeal should be considered: "(1) whether the reorganization plan has been substantially consummated, (2) whether a stay has been obtained, (3) whether the relief requested would affect the rights of parties not before the court, (4) whether the relief requested would affect the success of the plan, and (5) the public policy of affording finality to bankruptcy judgments." Id. at 560 (citations omitted), accord, e.g., Nordhoff Invs. v. Zenith Elec. Corp., 258 F.3d 180, 185 (3d Cir. 2001); In re PWS Holding Corp., 228 F.3d 224, 236 (3d Cir. 2000). Applying these factors, the Continental court concluded that the district court did not abuse its discretion by dismissing the appeal before it on equitable mootness grounds. See Continental, 91 F.3d at 566-567.

---

(continued from previous page)

Assocs., 956 F.2d 1065, 1069 (11th Cir. 1992); Central States, Southeast & Southwest Areas Pension Fund v. Central Transp. Inc., 841 F.2d 92, 95-6 (4th Cir. 1988); In re AOV Indus., 792 F.2d 1140, 1147 (D.C. Cir. 1986); In re Roberts Farms Inc., 652 F.2d 793, 796-97 (9th Cir. 1981).

The "foremost consideration," of course, "is whether the reorganization plan has been substantially consummated." PWS Holding, 228 F.3d at 236. As the Third Circuit has stated, "the equitable mootness doctrine prevents a court from unscrambling complex bankruptcy reorganizations when the appealing party should have acted before the plan became extremely difficult to retract." Nordhoff, 258 F.3d at 185.

## 1.    Substantial Consummation

Substantial consummation is specifically defined in the Bankruptcy Code as follows:

> (a) transfer of all or substantially all of the property proposed by the plan to be transferred; (b) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan, and (c) commencement of distribution under the plan.

11 U.S.C. § 1101(2). The issue of "substantial consummation" is to be decided under the definition set forth in Section 1102(2) of the Bankruptcy Code. Continental, 91 F.3d at 561.[16]

In Continental, the court noted that this factor is typically the "foremost consideration" in an equitable mootness analysis. Id. at 560. This is particularly true when the plan "involves intricate transactions . . . or where outside investors have relied on the confirmation of the plan." Id. at 560-561. Substantial consummation may include such acts as the infusion of cash into the post-confirmation estate and/or completion of all elements of the plan, without considering the pay-out of unsecured creditors. Id. at 561.

---

[16]    Equitable mootness is a judicially-created doctrine; it is not statutory. The definition of "substantial consummation" provided in Section 1101 is applicable to the determination of whether a plan proponent or reorganized debtor may seek to modify a confirmed plan of reorganization. See 11 U.S.C. § 1127(b) (2000). This same definition has been incorporated into the equitable mootness inquiry. See Continental, 91 F.3d at 561.

In <u>Continental</u>, the court noted that "numerous irrevocable transactions [had] been completed as a result of the consummation of the Plan." <u>Id.</u> at 566-567. Those transactions included the merging of 53 other debtors with and into Continental, the investment of $110 million in cash by two outside investors, and the transfer by foreign governments of various route authorities. <u>Id.</u> at 567.

Similarly, in <u>In re Zenith Electronics Corporation</u>, 250 B.R. 207 (D. Del 2000), <u>aff'd</u>, 258 F.3d 180 (3d Cir. 2001), the district court granted the debtor's motion to dismiss an equity holder's appeal as equitably moot. In comparing the facts of its case with the facts in <u>Continental</u>, the <u>Zenith</u> court observed the following:

> By contrast, Zenith is still Zenith. It did not merge with any other entity. Though an assembly plant was transferred to LGE—formerly Zenith's majority shareholder and now its only shareholder—there does not appear to be any reason why, if need be, ownership of the plant could not be transferred back to Zenith. Similarly, LGE's exchange of debt for stock could be reversed if necessary. And it appears that Citicorp was a major creditor before, during, and after the bankruptcy proceedings. Thus, "reversal" of the Citicorp refinancing appears to be feasible. The exchange of the bonds, however, would seem to present a more difficult problem. The bonds are publicly traded. Many of these bonds may have already been sold, perhaps more than once since consummation. It would likely be difficult to "reverse" the bond exchange, and such "reversal" would almost certainly impact the rights of investors that were not involved in the bankruptcy proceedings. Still, reversal of these transactions would not likely be quite as daunting a task as the "unmerging" of 54 debtors and the return of the outside investors' investments in Continental.

<u>Id.</u> at 214.[17]

---

[17]    The same analysis applies in NorthWestern's case. Prior to the Effective Date, the "Debtor anticipates pricing the notes after the close of the financial markets on Monday, October 25. To obtain the funding of the notes to exit Chapter 11 by November 1, the Debtor must price the senior secured notes pursuant to this schedule. Further, once pricing of the senior secured notes occurs, the Debtor must then fund the notes within a limited period, but in any event no later than five business days following the pricing." Initial Bird Affidavit, ¶8. At this time, the notes have been funded and investors, including

(continued on next page)

Notwithstanding the apparent unwindable nature of the transactions effected through consummation of the plan, the court went on to state that, "[a]lthough some of the Plan transactions could conceivably be 'reversed,' this would not be easy to accomplish, and other transactions may not be reversible at all.  This factor, therefore, weighs heavily in favor of dismissal, at least to the extent that the court could not fashion relief that would not result in the dismantling of the Plan," and went on to find that indeed the plan had been substantially consummated.  Id.  The Zenith court went on to analyze the remaining factors from Continental and find the following:  (1) the plan had been substantially consummated, (2) no stay was obtained, (3) the relief requested would affect parties not before the appellate court, (4) the relief requested would adversely affect the success of the plan, and (5) the facts supported the policy of finality in bankruptcy judgments.  Id. at 214-20.

In this case, following the Confirmation Ruling, the Debtor undertook to complete the offering memorandum for the $225 million senior secured notes portion of the proposed exit financing.  The offering memorandum was completed on October 14, 2004 and the roadshow to sell the senior secured notes to appropriate investors began on October 18, 2004. As of October 25, 2004, the roadshow was completed and the senior secured notes offering was over subscribed.  The notes were priced on October 25, 2004 and, following the Effective Date, the Debtor funded the notes.  The funds generated from the issuance of the senior secured notes were used to repay Credit Suisse First Boston in connection with Allowed CSFB Financing Claims.    The senior notes are

---

(continued from previous page)

Credit Suisse First Boston LLC, Lehman Brothers Inc. and Deutsche Bank Securities Inc., have relied on the finality of the transactions which closed on the Effective Date.

currently publicly traded. In addition to the senior notes, a syndicated $225 million credit facility involving approximately ten lenders was entered into by the Reorganized Debtor. In light of the transactions implementing the Plan, it is clear that a significant number of outside investors, including, but not limited to, Lehman Brothers Inc., Credit Suisse First Boston LLC and Deustche Bank Securities Inc., as initial purchasers of the notes and the syndicate of lenders under the senior credit facility, are now relying on the confirmation of the Plan. See Initial Bird Affidavit, ¶ 8 [Magten, Exh. 215] and Statement of Exit Finance Banks in Connection with Emergency Motion of Magten Asset Management Corporation for a Stay Pending Appeal of the Order Confirming the Debtor's Second Amended and Restated Plan of Reorganization [Docket No. 10].

Following these transactions and as set forth in the Notice of Substantial Consummation, the Debtor has substantially consummated its Plan, thereby effectuating its exit from Chapter 11. With regard to the Plan, the Debtor has: (i) transferred substantially all of the property proposed by the Plan to be transferred including delivery of the Trust Assets to the D&O Trust; (ii) assumed substantially all of the property dealt with by the Plan; and (iii) completed distributions to holders of allowed claims under the Plan, including distributions to holders of Class 7, 8(a), 8(b) and 9 allowed claims. In addition, the Reorganized Debtor has paid all Allowed Bank One DIP Financing Claims and Allowed CSFB Financing Claims pursuant to the Debtor's exit financing facility.

As discussed above, with regard to actions taken by the Debtor necessary to implement the Plan, numerous underwriters and investors were involved in Plan transactions on the Effective Date. These transactions cannot possibly be reversed. In addition, Reorganized Debtor effectuated the registration of its common stock on the

NASDAQ Stock Market Exchange. Pursuant to the Plan, on the Effective Date, the Reorganized Debtor established the D&O Trust to which indemnification claims of the Protected Parties will be channeled and paid by available insurance under the Debtor's Plan.

Finally, as required by Section 7.5 of the Plan, the Reorganized Debtor established a Disputed Claim Reserve equal to the aggregate of New Common Stock equal to the relevant percentage of the Distributions to which holders of Disputed Claims would be entitled under this Plan if such Disputed Claims were Allowed Claims in the amount of such Disputed Claim or such lesser amount as required by a Final Order.[18]

### 2.    Whether a Stay Has Been Obtained

Denial of a stay request is a factor that weights in favor of dismissal for equitable mootness when a plan has been substantially consummated. The court in Zenith stated as to this factor:

> To the extent that this is viewed as a "prudential" factor, it would seem to be largely duplicative of the "substantial consummation" factor already discussed. That is, it would seem that a Plan would typically be "substantially consummated" only if the appellant had failed to obtain a stay. Further, as a "prudential" factor, it is difficult to distinguish between a stay not sought and a stay sought but not obtained. See Continental, 91 F.3d at 562 (noting that seeking a stay may not be enough to prevent an appeal from becoming equitably moot because "'a stay not sought, and a stay sought and denied, lead equally to the implementation of the plan'") (quoting In re UNR Indus., 20 F.3d 766, 770 (7th Cir. 1994)). . . . As an "equitable" factor, however, the failure to even

---

[18]    On or about November 3, 2004, the Bankruptcy Court entered an order approving the Stipulation and Order Establishing a Disputed Claims Reserve between NorthWestern and Law Debenture which provided that the Reorganized Debtor shall set aside a portion of its initial reserve of 13.5% of New Common Stock solely to satisfy in full a $25 million Class 9 claim of the QUIPS Litigation Claims holders. Any claim by a QUIPS Litigation claimant is to be afforded the treatment accorded Class 9 General Unsecured Claims, as set forth in the Plan [Debtor, Exh. 6].

> seek a stay would seem to have significance beyond the mere failure to obtain a stay.

Zenith, 250 B.R. 207, 215.[19]

Magten tried, not once but twice, to obtain a stay, and was flatly rejected each time by the Bankruptcy Court and the District Court.[20]    The Bankruptcy Court determined that Magten has

> not satisfied the likelihood of success prong or the irreparable harm prong. And further, I think the public interest prong also falls in favor of the Debtors and the other proponents of the Plan in order to promote the reorganization of this company.

October 25 Transcript, p. 30.  This Court properly denied Magten's attempt to obtain a stay finding that that "Magten hasn't satisfied any of the four factors on the showing of the likelihood of success on the merits."  Stay Pending Appeal Ruling at 46 (emphasis added) [Debtor, Exh. 22].

On the next business day following this Court's denial of Magten's stay request, the Debtor made the Plan effective, formally noticed the Effective Date and implemented the Plan.  The Plan was substantially consummated shortly thereafter.  On the Effective Date, the Debtor and/or the Reorganized Debtor took the following actions:

> (i)    transferred of all of the property proposed by the Plan to be transferred, including delivery of all the Trust Assets to the D&O Trust;

---

[19]    Magten failed to seek any stay of the MOU. Notably, however, the Zenith court held that "in particular, the Appellants' failure to even seek a stay as the Plan was being substantially — if not entirely — consummated outweighs the court's concerns." 250 B.R. at 222. While the absence of a stay certainly is included within the Continental factors, the appropriate question is not whether a stay was requested, but whether the reorganization plan was stayed. In re UNR Indus., Inc., 20 F.3d 766, 769-70 (7th Cir. 1994) ("requesting a stay is not a mandatory step" and "[a] stay not sought, and a stay sought and denied, lead equally to the implementation of the plan"), cert. denied, 513 U.S. 999 (1994).  "The significance of an application for a stay lies in the opportunity it affords to hold things in stasis, to prevent reliance on the plan of reorganization while the appeal proceeds." Id.

[20]    As to the MOU Order, Magten did not even attempt to obtain a stay.

    (ii)      assumed substantially all of the property dealt with by the Plan;

    (iii)     closed a $225 million exit financing facility and issuance of the accompanying new first mortgage bonds;

    (iv)     issued $225 million senior secured notes portion of the exit financing facility;

    (v)      registered its newly issued stock with NASDAQ;

    (vi)     paid all Allowed CSFB Financing Claims pursuant to the exit financing facility (approximately $390 million); and

    (vii)    paid all Allowed Bank One DIP Financing Claims (approximately $15 million of letter of credit and terminating approximately $35 million of unfunded credit availability).

Shortly after the Effective Date: the following distributions completed the substantial consummation of the Debtor's Plan:

    (i)      Class 7 Distributions. On or about November 1, 2004, consistent with Section 4.7 of the Debtor's Plan, 28,250,900 shares of New Common Stock were issued to DTC for credit in book-entry form to the accounts of the DTC participants representing holders of Class 7 Allowed Claims. On or about November 5, 2004, these shares were credited by DTC to the accounts of the above-referenced DTC participants.[21]

    (ii)     Class 8(a) Distributions.

        (a)     On or about November 1, 2004, consistent with Section 4.8(a) of the Debtor's Plan, 2,278,769 shares were issued to DTC for credit in book entry form to the accounts of the DTC participants representing holders of Class 8(a) Allowed Claims. On or about November 5, 2004, these shares were credited by DTC to the accounts of the above-referenced DTC participants.

---

[21]    Under Section 4.8(b)(ii) of the Plan, any New Common Stock which otherwise would have been distributable to a holder of a Class 8(b) Claim if such holder had chosen Option 1 shall be distributed pro rata to Class 7 and Class 9, and the Warrants which would have been otherwise distributable will be cancelled. On February 16, 2005, NorthWestern issued instructions to its transfer agent regarding the distribution of 368,626 shares of Common Stock which otherwise would have been distributable to a holder of a Class 8(b) Claim if such holder had chosen Option 1 under the Plan. The transfer agent was instructed that the pro rata share of the Common Stock allocated to holders of Allowed Class 7 Claims were to be issued to DTC for credit in book-entry form to the accounts of the DTC Participants representing holders of Class 7 Allowed Claims as of the Record Date.

(b)     On or about November 1, 2004, consistent with Section 4.8(a) of the Debtor's Plan, 4,366,092 warrants were issued to DTC for credit in book-entry form to the accounts of the DTC participants representing holders of Class 8(a) Allowed Claims. On or about November 5, 2004, these warrants were credited by DTC to the accounts of the above-referenced DTC participants.

(c)     On November 1, 2004, consistent with Section 5.18 of the Debtor's Plan, 55,640 shares were issued to DTC for credit to Wilmington Trust Company pursuant to its exercise of its Indenture Trustee Charging Lien.

(iii)    Class 8(b) Distributions. On or about December 23, 2004, mindful of its obligations to deliver shares of Common Stock and Warrants to holders of Class 8(b) claims who elected, or were deemed to have elected, Option 1 under Section 4.8(b) of the Debtor's Plan and Law Debenture Trust Company of New York's exercise of its Indenture Trustee Charging Lien, the Debtor authorized its transfer agent, LaSalle Bank National Association, to transfer (i) physical stock certificates issued in the name of "Law Debenture Trust Company of New York" representing 136,965 shares of Common Stock and (ii) physical warrant certificate in the name of "Law Debenture Trust Company of New York" representing 254,241 Warrants to purchase shares of Common Stock pursuant to Section 4.8(b) and Section 5.18 of the Debtor's Plan.

(iv)    Class 9 Distributions. The following actions have been taken by the Debtor with respect to Allowed Class 9 claims:

(a)     Issuance of a physical certificate to Comanche Park LLC in the amount of 23,620 shares for its Allowed Class 9 Claim;

(b)     Establishment of a Disputed Claims Reserve. Consistent with Section 7.5 of the Debtor's Plan, the Debtor reserved 4,409,100 shares for potential future distribution to holders of Allowed Class 9 Claims. This Disputed Claims Reserve includes specific reserves as follows: (i) shares of Common Stock equal to the value of $50,000,000, valued as of the Effective Date, in connection with PPL Montana LLC's disputed claim; and (ii) a $25,000,000 Class 9 claim in connection with the disputed QUIPS Litigation Claims.

(c)     Issuance to DTC of 614,125 shares for credit to the account of CRT Capital Group LLC, in resolution of the $19,500,000 allowed Class 9 claims of the Cornerstone Propane entities.

(v)     Class 10 Distribution. The Debtor made 100% of the payments to holders of Allowed Convenience Class Claims pursuant to Section 4.10 of the

Debtor's Plan. The Debtor has paid approximately $954,443.89 to holders of Allowed Convenience Class Claims.

(vi)    Cure Payments in Connection with Assumed Contracts. The Debtor made 100% of the undisputed cure payments in connection with assumed contracts pursuant to Section 8.1 of the Debtor's Plan. The Debtor has paid approximately $2,170,341.64 in undisputed cure payments in connection with assumed contracts.

(vii)   Special Recognition Grants. On or about December 7, 2004, consistent with Section 9.3 of the Debtor's Plan in connection with the Special Recognition Grants, physical certificates in the amount of (i) 103,360 shares of Common Stock were issued to certain executive officers, members of the extended leadership team and executive-level key managers (not subject to tax withholding at that time); and (ii) 7,630 shares of Common Stock were issued to non-executive-level key managers (subject to tax withholding at that time). The Debtor withheld 3,174 shares of Common Stock to satisfy the tax withholding liability of the individuals comprising the non-executive-level key manager group resulting from the stock issuance.

See Notice of Substantial Consummation.

Implementation of the Plan was not stayed and NorthWestern has now substantially consummated the Plan preventing this Court from "unscrambling" the actions taken by the Debtor, its creditors, investors and others in connection with implementing the Plan consistent with its terms. Nordhoff, 258 F.3d at 185.

### 3.    Reliance by Third Parties

"High on the list of prudential considerations taken into account by courts considering whether to allow an appeal following a consummated reorganization is the reliance by third parties, in particular investors, on the finality of the transaction." Continental, 91 F.3d at 562 (citing In re Manges, 29 F.3d 1034, 1039 (5th Cir. 1994), cert. denied, 513 U.S. 1152 (1995)). "The concept of 'mootness' from a prudential standpoint protects the interests of non-adverse third parties who are not before the reviewing court but who have acted in reliance on the plan as implemented." Id. (quoting Manges, 29

F.3d at 1039)).  This is particularly important here as numerous underwriters, investors, and banks, including Bank One, N.A., Credit Suisse First Boston, through its Cayman Islands Branch, as agent under the CSFB Facility, Lehman Brothers Inc., Deutsche Bank Securities, and Credit Suisse First Boston LLC,  are now relying on the finality of their respective transactions which closed on the Effective Date.

In Continental, the reliance interests of the two outside investors weighed heavily in the court's equitable mootness analysis.  See Continental, 91 F.3d at 562-565.  The court accepted the district court's findings that the outside investors relied on the unstayed confirmation order in making their $450 million investment, and that the relief requested by the appellants would undermine the grounds upon which the investors relied.  Id. at 564 ("By the time the district court ruled on the appeal, it was no longer possible to restore the parties to their earlier positions because the investment had been made, and the option to withdraw was no longer available to the Investors").

Unlike the situation in Continental where distributions to unsecured creditors had not yet been completed at the time of the appeal, 91 F.3d at 561, here NorthWestern has substantially completed its distributions to holders of allowed Class 7, 8(a), 8(b) and 9 claims but for distributions to be made from the Disputed Claims Reserve as and when Disputed Claims are determined.  In addition, NorthWestern has paid the obligations owed and terminated commitments outstanding under the Bank One, N.A. DIP Financing Order and the DIP Loan Documents and have paid the debt owed to the lenders under the CSFB Facility, each of which thereby released liens against the Reorganized Debtor's assets.  In addition, the Reorganized Debtor has completed distributions to holders of Class 10 Convenience Class Claims and made all undisputed cure payments in

connection with the assumption of contracts pursuant to Section 8.1 of the Debtor's Plan[22].

Moreover, courts have been particularly hesitant to grant relief which would "adversely affect investors in the reorganized [company] who acted in legitimate reliance on the order of confirmation in the absence of a stay." In re Public Serv Co., 963 F.2d 469, 475 (1st Cir.), cert. denied, 506 U.S. 908 (1992) (dismissing appeal as moot in part based upon investors' reliance upon unstayed confirmation order). See also In re Envirodyne Indus., 29 F.3d 301, 304 (7th Cir. 1994) (court must consider "effects of the relief on innocent third parties . . . if modification of a plan of reorganization would upset legitimate expectations, it may be refused" (citations omitted)); In re Block Shim Dev. Co. - Irving, 939 F.2d 289, 291 (5th Cir. 1991) (dismissing as moot bankruptcy appeal seeking relief which would adversely "affect third parties' rights"); Central States, Southeast & Southwest Areas Pension Fund v. Central Transp., Inc., 841 F.2d 92, 96 (4th Cir. 1988); Miami Ctr. Ltd. P'ship v Bank of New York, 820 F.2d 376, 380 (11th Cir. 1987), cert. denied, 488 U.S. 823 (1988).

Particularly in large cases such as this Chapter 11 Case, Chapter 11 debtors often require outside investors to reorganize. Yet there is often a "natural reluctance to deal with a bankrupt firm." In re Ellingsen MacLean Oil Co., 834 F.2d 599, 604 (6th Cir. 1987), cert. denied, 488 U.S. 817 (1988). If investors (or asset purchasers or lenders) cannot rely upon an unstayed confirmation order, this reluctance will be magnified. Third party investors as well as creditors will be unwilling to commit to transactions and

---

[22]    In connection with the MOU, the Class Action District Court has approved the Settlement and issued orders dismissing the Securities Litigation with prejudice. The Debtor has also filed substantially all of its claim objections. The only remaining claim objections are subject to ongoing settlement negotiations.

make concessions that are essential for a successful reorganization until every unresolved issue has been finally decided by a court of appeals or the Supreme Court. As the Seventh Circuit has explained:

> [I]t is the reliance interests engendered by the plan, coupled with the difficulty of reversing the critical transactions, that counsels against attempts to unwind things on appeal. Every incremental risk of revision on appeal puts a cloud over the plan of reorganization, and derivatively over the assets of the reorganized firm. People pay less for assets that may be snatched back or otherwise affected by subsequent events. Self protection through the adjustment of prices may affect the viability of the reorganization . . . . By protecting the interests of persons who acquire assets in reliance on a plan of reorganization, a court increases the price the estate can realize ex ante, and thus produces benefits for creditors in the aggregate.

In re UNR Indus., Inc., 20 F.3d at 770. On the Effective Date, a number of third parties were involved, including, but not limited to, Bank One, N.A., Credit Suisse First Boston, through its Cayman Islands Branch, as agent under the CSFB Facility, Credit Suisse First Boston LLC, Lehman Brothers Inc. and Deutsche Bank Securities Inc., in the $225 million exit financing facility provided by new lenders and the Debtor's issuance of $225 million in new senior secured notes. All of the parties involved in each of the transactions closed and implemented on the Effective Date relied on the unstayed Confirmation Order.

Third parties have also relied on the MOU Order as has the Class Action District Court in subsequently approving the MOU and permitting the Settlement to be implemented. The claims administrator in the Securities Litigation provided notice of the Settlement and mailed proofs of claim to appropriate persons in connection with the January 18, 2005 bar date. The Class Action District Court issued orders dismissing with prejudice the Securities Litigation. In this case, the parties to the Class Action relied on

the unstayed MOU Order in moving forward with implementing the Settlement and dismissal of the Class Action. Any reversal of the Confirmation Order or the MOU Order would adversely affect the interests of the MOU claimants and possibly impair their right to receive the settlement payments to which they are entitled under the terms of the MOU.

Because the Debtor implemented the Plan on the Effective Date, creditors, investors and others have relied to their detriment on the finality of both the unstayed Confirmation Order and the MOU Order. It would be "nothing short of a disaster for the bankruptcy court and the parties before it" for this Court to grant relief in connection with Magten's appeal of either the Confirmation Order or the MOU Order. Manges, 29 F.3d at 1043.

### 4.    Whether the Relief Requested Would Affect the Success of the Plan

Additional harm may come to third parties because the reversal of the Plan would prohibit its success. This is certainly the case here as reversal would cause the Plan to fail and the Reorganized Debtor's and the Debtor's creditors and interest holders to suffer irreparable injury. When considering the harm to the success of a plan, courts are to consider whether any alternate plan provisions, or even a new plan, is offered by the appellant. See Zenith, 250 B.R. at 218. As a result, an appellant must be prepared to demonstrate alternatives to the disputed plan because reversal and possible conversion are insufficient because of the irreparable injury that would be caused to third party creditors, investors and interest holders. Id.

To be sure, as set forth more fully in the Notice of Substantial Consummation, if this Court permits the Magten appeal to go forward, this could have the affect of

"knock[ing] the props out from under the authorization for every transaction that has

taken place and creat[ing] an unmanageable, uncontrollable situation" with respect to the

Plan. PWS Holding, 228 F.3d at 236. These transactions include:

(i)    the transfer of all the property proposed by the Plan to be transferred, including delivery of all the Trust Assets to the D&O Trust;

(ii)    the assumption of substantially all of the property dealt with by the Plan;

(iii)    the closing of a $225 million exit financing facility and issuance of the accompanying new first mortgage bonds;

(iv)    the issuance of the $225 million senior secured notes portion of the exit financing facility;

(v)    the registration of the Reorganized Debtor's newly issued stock with NASDAQ;

(vi)    its payment of all Allowed CSFB Financing Claims pursuant to the exit financing facility (approximately $390 million); and

(vii)    its payment of all Allowed Bank One DIP Financing Claims (approximately $15 million of letter of credit and terminating approximately $35 million of unfunded credit availability).

As in Continental, the reversal of the order confirming the Plan likely would land

the Reorganized Debtor "back into bankruptcy," Continental, 91 F.3d at 561, and require

the Reorganized Debtor to attempt to "unscramble" the complex transactions that

transpired on the Effective Date. Nordhoff, 258 F.3d at 185. In this case, on or shortly

after the Effective Date, the Debtor entered into an exit financing facility, issued senior

secured notes and accompanying new first mortgage bonds, established the D&O Trust,

distributed shares to holders of allowed Class 7, 8(a), 8(b) and 9 claims, and paid all

Allowed CSFB Financing Claims and Allowed Bank One DIP Financing Claims. Each

of the parties or beneficiaries to the transactions would be irreparably injured were the

Plan to be unscrambled, and the injury would be so great as to likely prevent any future

reorganization.    Moreover, the Class Action District Court has entered an order dismissing the Securities Litigation with prejudice.    To attempt to "unscramble" such transactions would substantially harm any reorganization of the Reorganized Debtor because the financing implemented on the Effective Date is no longer available, and the senior notes would have to be recalled without any realistic possibility of reissuance – much less reissuance on the same terms and conditions.

### 5.    The Public Policy of Affording Finality to Bankruptcy Judgments

The public policy of affording finality to bankruptcy judgments is "better described as the lens through which the other equitable mootness factors should be viewed." <u>Zenith</u>, 250 B.R. at 219.

In <u>Continental</u>, the court discussed this public policy in the context of explaining the proper inquiry under the third factor — third party reliance on the Plan.    After accepting the district court's finding that outside investors had committed to investing $450 million in the reorganized debtor in reliance on the unstayed confirmation order, the court rejected the proposition that the court should focus on whether such reliance was "reasonable."    The court explained:

> Our inquiry should not be about the "reasonableness" of the Investors' reliance or the probability of either party succeeding on appeal.    Rather, we should ask whether we want to encourage or discourage reliance by investors and others on the finality of bankruptcy confirmation orders.    The strong public policy in favor of maximizing debtors' estates and facilitating successful reorganization, reflected in the Code itself, clearly weighs in favor of encouraging such reliance.    Indeed, the importance of allowing approved reorganizations to go forward in reliance on bankruptcy court confirmation orders may be the central animating force behind the equitable mootness doctrine.    Where, as here, investors and other third parties consummated a massive reorganization in reliance on an unstayed confirmation order that, explicitly and as a condition of feasibility, denied the claim for which appellate

> review is sought, the allowance of such appellate review would
> likely undermine public confidence in the finality of bankruptcy
> confirmation orders and make successful completion of large
> reorganizations like this more difficult. This is true regardless of
> whether the Investors' reliance was "reasonable" or based on a
> 30%, 60%, or 100% probability of success on appeal . . . .

Continental, 91 F.3d at 565 (citations omitted).

In Zenith, noting that the majority shareholder was not an "outside investor" that could have chosen not to "walk away from the deal" without incurring substantial losses and, in fact, had financial incentives to take steps to facilitate a successful reorganization, the court stated:

> Nevertheless, the Plan does substantially reduce Zenith's debt
> burden. And, it cannot be disputed that Zenith had been incurring
> substantial losses for many years, and that it would have had great
> difficulty meeting its obligations to creditors without a financial
> restructuring of some sort. Thus, while LGE does stand to benefit
> under the Plan, the Plan did facilitate a successful reorganization.
> Further, the implementation of the Plan has affected LGE's
> operations . . . . Thus, refusing to respect LGE's reliance on the
> unstayed confirmation order in this case would be contrary to the
> public policy of encouraging actions — by outsiders and investors
> alike — that facilitate successful reorganizations. Moreover,
> public policy is furthered by encouraging Zenith's customers,
> vendors, and employees to continue their relationships with Zenith
> in reliance on an unstayed confirmation order.

Zenith, 250 B.R. at 220.

Both Continental and Zenith apply here. One has only to consider the exit financing and senior note issuance, each involving numerous third parties to appreciate how devastating a reversal would be on the Debtor, the Reorganized Debtor and their collective creditors, investors and interest holders.

**B.**    **Magten's Statement of Issues to be Presented on Appeal**

Magten presents nine issues to be presented on appeal.  See Magten Asset Management Corporation's Amended Designation of Items to be Included in the Record on Appeal and Statement of the Issue to be Presented on Appeal from the Order Confirming Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code Entered in October 19, 2004 [Docket No. 2238], at pp. 17-19 ("**Magten's Issues Presented on Appeal**").[23]

Magten's nine issues to be presented on appeal cannot overcome the Bankruptcy Court's findings of fact and conclusions of law.[24]  See NorthWestern Corporation's Designation of Additional Documents for the Record and Objection to Statement of the Issues on Appeal, pp. 3-9.[25]  On their face, the Bankruptcy Court's findings of fact and conclusions of law preclude any argument that the findings of fact are clearly erroneous or that the Bankruptcy Court erred in its rulings as a matter of law.[26]

Most, if not all, of Magten's issues to be presented on appeal challenge specific findings of fact made by the Bankruptcy Court in its Confirmation Ruling, MOU

---

[23]    On November 5, 2004, Magten filed its Designation of Items to be Included in the Record on Appeal from the Order Approving the Memorandum of Understanding Entered on October 18, 2004 [Docket No. 2333] ("**Magten's Issues Presented on Appeal of MOU Order**").  On or about November 15, 2004, NorthWestern filed its Designation of Additional Documents for the Record and Objection to Statement of the Issues on Appeal [Docket No. 2364].  NorthWestern's Designation of Additional Documents for the Record and Objection to Statement of the Issues on Appeal in connection with the MOU Order is summarized below.

[24]    The two issues presented in Magten's Issues Presented on Appeal of MOU Order are substantially similar to the issues presented in Magten's Issues Presented on Appeal.

[25]    NorthWestern's Designation of Additional Documents for the Record and Objection to Statement of the Issues on Appeal in connection with the Confirmation Order is summarized below.

[26]    See Confirmation Ruling; see also In re Exide Techs, 2004 WL 1465760, at *1 (on appeal, district court applies clearly erroneous standard to bankruptcy court's findings of fact and plenary standard to legal conclusions).

Memorandum Decision, and Confirmation Order.  See Magten's Issues Presented on Appeal, Nos. 1-9.  In order for a District Court to disturb a bankruptcy court's factual findings, the district court must find the findings to be "clearly erroneous." In re Exide Techs., No. 02-11125-KJC, 2004 WC1465760, at *1 (D. Del. June 25, 2004).  Moreover, a "finding of fact is clearly erroneous 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'"  Id. (citing United States v. U.S. Gypsum Co., 333 U.S. 364, 365, 68 S.Ct. 525 (1948).  Indeed, a finding of fact "is clearly erroneous if it is either 'completely devoid of minimum evidentiary support displaying some hue of credibility or . . . bears no rational relationship to the supportive evidentiary data.'" In re Stein, 314 B.R. 306, 309 (D.N.J. 2004) (citing Krasnov v. Dinan, 465 F.2d 1298, 1302-03 (3d. Cir. 1972)).

Magten cannot overcome the clear and precise findings of fact set forth in the Bankruptcy Court's Confirmation Ruling.  See, e.g., In re Zepecki, 277 F.3d 1041, 1045 (8th Cir. 2002) (In order to be clearly erroneous, "a decision must strike us as wrong with the force of a five-week-old, unrefrigerated dead fish.") (citations omitted).  In addition, when reviewing a mixed question of law and fact, the court should apply the clearly erroneous standard to all findings of fact and exercise plenary review over the bankruptcy court's choice and interpretation of the law.  In re Exide, 2004 WL 1465760, at *1.

### 1.    Magten's Issues Presented on Appeal of Confirmation Order

As shown below, each of Magten's nine issues to be presented on appeal are either based on  mischaracterizations of the Bankruptcy Court's rulings or ignores the substance of those rulings.  Moreover, the language of the Bankruptcy Court's rulings shows that there is no error at issue.

1.    Magten's first statement of issues to be presented is as follows:

> Whether the Bankruptcy Court erred in determining that the Montana Utility Assets (the "*Montana Utility Assets*"), which were transferred to the Debtor from Clark Fork and Blackfoot LLC ("*Clark Fork*"), the Debtor's non-debtor subsidiary, are not held in constructive trust for the creditors of Clark Fork even though creditors of Clark Fork have brought an action seeking to set aside the transfer of the Montana Utility Assets as a fraudulent conveyance and have sought recognition that a constructive trust has been imposed over those assets.

In its Confirmation Ruling, the Bankruptcy Court clearly explains its examination and conclusions concerning whether assets should be held in constructive trust. The Bankruptcy Court specifically held:

> There's <u>nothing in the remedy section</u> that I found of the Montana fraudulent conveyance law that gives rise to an automatic constructive trust upon the mere filing of a lawsuit, and as my colloquy with counsel during the course of the proceeding indicated, I would find that to be an extraordinary provision indeed. <u>That would put at risk virtually every transaction that was ever done until such time as the statute of limitations would run.</u>

Confirmation Ruling, p. 28 (emphasis added).

The Bankruptcy Court goes on to hold that:

> [T]he imposition of any constructive trust is contrary to basic principles of ratable distribution and <u>is generally disfavored in the bankruptcy context because of the adverse impact on other creditors</u>, particularly where there are ways of fashioning remedies that would protect the plaintiffs or those asserting fraudulent conveyance theories.

<u>Id.</u> at p. 29.

2.    Magten's second statement of issues to be presented is as follows:

> Whether the Bankruptcy Court erred in finding that the right to recover on account of the fraudulent conveyance cause of action is a "claim" under section 101(5) of the Bankruptcy Code when (i) the exclusive remedy sought as a result of the fraudulent transfer of the Montana Utility Assets is an equitable remedy that does not "give rise to a right to payment" and, (ii) §31-2-339 of the

Montana Code Annotated, which governs the remedies available to creditors in seeking to set aside a fraudulent conveyance, only provides for remedies that are equitable in nature and does not provide for any form of monetary relief.

In its Confirmation Ruling, the Bankruptcy Court shows its ruling to be well-founded under existing law and further indicates the absence of law to the contrary. The Bankruptcy Court specifically held:

> There's been no Montana case cited to support this interpretation, and indeed there was no case from any other jurisdiction with a similarly situated or structured law. And upon closer examination, there is nothing arcane or extraordinary about the remedies available under Montana law. Montana has, similarly to most jurisdictions around the country, adopted the Uniform Fraudulent Transfer Act of which the section in question, which is 31 to 339, is Section 7. . . . And, specifically, Section 7(a) which is 339(a) provides that remedy is the avoidance, quote, "to the extent necessary to satisfy the creditor's claim", close quote. That clearly contemplates money damages.

Confirmation Ruling, p. 28 (emphasis added).

3.      Magten's third statement of issues to be presented is as follows:

> Whether the Bankruptcy Court erred in finding that that Plan complies with sections 1122 and 1129(a)(1) of the Bankruptcy Code where there was no legitimate business reason for separately classifying the claims of the holders of the TOPrS and the QUIPS for principal plus interest.

In its Confirmation Ruling, the Bankruptcy Court shows its ruling to be well-founded under existing law and shows a clear application of the facts of this case to that law. The Bankruptcy Court specifically held:

> Section 1122 does not require that all claims of similar priority be placed in the same class, rather only if claims are placed in the same class that they have to be substantially similar. The case law was developed to limit excessive classes primarily because of attempts to create a consenting impaired class to satisfy 1129(a)(10) so that a non-consenting and usually much larger class of similar priority may be crammed down. That's not what's happening here. Indeed, a ballot report suggests that if 8-A and 8-

B were aggregated the class would accept the plan, and we wouldn't have a cram-down situation at all. Here the separate classification protects the rights of the Quips, which is the smaller debt issue rather than adversely effecting those rights by allowing a larger debt issue to Toppers to dominate. There are many essential differences. These are different issues of debt, different issuers, different trustees, and more importantly there are different litigation rights.

Confirmation Ruling, p. 34-35 (emphasis added).

4.    Magten's fourth statement of issues to be presented is as follows:

Whether the Bankruptcy Court erred in finding that it is appropriate to force the holders of the QUIPS to forego their right to pursue the fraudulent conveyance litigation in order to receive their rightful recovery for principal plus interest on account of their QUIPS notes, while other creditors with claims of equal rank were not required to relinquish their litigation claims.

By applying the facts of the case, the Bankruptcy Court shows the clear underlying reasoning behind its decision on this issue, holding:

The question here is whether these two claims can in fact co-exist. . . . The two particular kinds of remedies are in fact completely inconsistent. And it is consistent with election of remedies law that you have to choose which path you're going to go down. In addition here, where a class does not have a vested right to a certain treatment, the 8 percent, it is not unreasonable or unfair to make it pay for the option of seeking a higher return based upon a legal theory which if correct would disqualify them even from getting the gift.

Confirmation Ruling, p. 31-32.

5.    Magten's fifth statement of issues to be presented is as follows:

Whether the Court erred in determining that the Plan did not discriminate unfairly against holders of the QUIPS because the distributions to the QUIPS holders were a "gift" from senior creditors despite the fact that there is no authority under the Bankruptcy Code to support this line of reasoning and it is the Debtor, not the creditors, making the distributions pursuant to the Plan.

The Bankrkuptcy Court explained and supported its decision concerning gift status, as follows:

> with the hurdle rates that I have found, that would leave both the equity and the sub-debt out of the market - - excuse me, out of the money, and that even at the high end of the Houlihan analysis, which does include the non-core assets, the sub-debt remains out of the money by over $200 million.

Confirmation Ruling, p. 25-26. The Bankruptcy Court goes on to hold:

> Well, I've already found that based upon the valuation that this is indeed what can be fairly called a gift case, that is to say that there is not an absolute entitlement to the 8 percent or the 13 percent in warrants that has been set aside here for Class 8, but rather that is money that is money that is coming out of the recoveries that would otherwise be available to Class 7 and 9 as non-subordinated unsecured creditors.

Confirmation Ruling, p. 31.

      6.     Magten's sixth statement of issues to be presented is as follows[27]:

> Whether the Court erred in determining that the Plan is "fair and equitable" when subordinated holders of equity interests receive a distribution under the Plan while more senior creditors are not being paid in full and are only receiving a minimal recovery under the Plan.

Again, the Bankruptcy Court provides clear reasoning on this issue, stating:

> the proceeds[from the policies] are not property of the estate so that does not implicate, therefore, the absolute priority rule.

Confirmation Ruling, p. 39.

      7.     Magten's seventh statement of issues to be presented is as follows[28]:

---

[27]    The first statement of issues set forth in Magten's Issues Presented on Appeal of MOU Order is substantially similar to this item and states as follows: "Whether the Court erred in approving a settlement that provides for payment of holders of equity interests when more senior creditors are not being paid in full and are only receiving a minimal recovery under the Debtor's Second Amended and Restated Plan of Reorganization."

[28]    The second statement of issues set forth in Magten's Issues Presented on Appeal of MOU Order is identical to this statement.

> Whether the Court erred in finding that the proceeds of the D&O
> Insurance Policy are not property of the Debtor's estate when the
> derivative actions belong to the Debtor and not the shareholders
> and all damages awarded in a derivative suit inure directly to the
> corporation.

The Bankruptcy Court's decision on this matter shows that Magten mischaracterizes the nature of the Bankruptcy Court's ruling as well as the underlying issue:

> Where the coverage focuses on third parties, here the directors and
> officers, the proceeds are not property of the estate. . . . Here, the
> primary purpose of the policies is to protect the directors and
> officers from claims such as those asserted by the plaintiffs.

MOU Memorandum Decision, p. 4.

In connection with derivative actions, the Bankruptcy Court also held as follows:

> any claims that the Debtor may have (for example, derivative
> claims brought on behalf of the company) are not covered by these
> policies because of the "insured versus insured" exception
> contained in them . . . . Thus, whether the Debtor could or could
> not prevail is not relevant to this settlement because the policies at
> issue would not provide a source of recovery even if successfully
> prosecuted.

MOU Memorandum Decision, p.5.

8.    Magten's eighth statement of issues to be presented is as follows:

> Whether the Court erred in determining that the Debtor is not
> relinquishing value to the estate when the Debtor, through its
> release and waiver of all "Causes of Action of any nature," is
> abandoning every potential colorable claim and cause of action
> that may ultimately result in substantial value to the Debtor's
> estate.

Magten's statement of issue notwithstanding, the Bankruptcy Court provides clear support and reasoning behind its treatment of the releases provided for in the Plan:

> As established at the hearing on the MOU Motion, each of the
> Debtor's D&O Policies includes an express "insured versus
> insured" exclusion.  It is clear that in the absence of any insurance

coverage, any claims the Debtor may have against its Officers and Directors would be essentially valueless.  The Court hereby finds that the releases provided for in the Plan, including, but not limited to, the D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction are appropriate, necessary and consistent with the Bankruptcy Code and all applicable law.

Confirmation Order, p. 42-43.

9.      Magten's ninth statement of issues to be presented is as follows:

Whether the Bankruptcy Court erred in finding that the senior debt should not be voided or subordinated despite the fact that the Debtor's application for exemption from the Public Utility Holding Company Act ("PUHCA") was not filed in good faith and, under PUHCA, the rights of a party to a contract made while there was a PUHCA violation – including lack of good faith filing in an application for a PUHCA exemption – are void.

As the Bankruptcy Court explains, Magten asserts this issue on appeal despite an absolute failure to present any evidence support its PUHCA contention:

there was not a shred of evidence presented by Law Debenture or Magten on this, and there's no basis to determine, no evidentiary basis at all to determine that the senior debt should be voided or subordinated.

Confirmation Ruling, p. 42.

## 2.      Magten's Issues Presented on Appeal of MOU Order

1.      Magten's first statement of issues to be presented is as follows:

Whether the Court erred in approving a settlement that provides for payment of holders of equity interest when more senior creditors are not being paid in full and are only receiving a minimal recovery under the Debtor's Second Amended and Restated Plan of Reorganization.

The Bankruptcy Court held as follows:

Here, the primary purpose of the policies is to protect the directors and officers from claims such as those asserted by the plaintiffs. . . payment of the proceeds to the plaintiffs on account of claims against the directors and officers does not implicate property of the estate.

MOU Memorandum Decision, p. 4-5.  The Bankruptcy Court also held that:

> resolution of this complex and expensive litigation at no direct cost
> to the estate is fair and reasonable, is in the best interests of the
> estate and its creditors, significantly enhances the Debtor's ability
> to emerge from these proceedings with a confirmed plan of
> reorganization, and is the result of arm's length negotiation.

MOU Memorandum Decision, p. 6.

2.    Magten's second statement of issues to be presented is as follows:

> Whether the Court erred in finding that the proceeds of the D&O
> Insurance Policy are not property of the Debtor's estate when the
> derivative actions belong to the Debtor and not the shareholders
> and all damages awarded in a derivative suit inure directly to the
> corporation.

On the issue of the proceeds of the insurance policies, the Bankruptcy Court stated as

follows:

> The critical issue raised by Magten's objection is whether the
> settlement payments made from the D&O policies are in fact
> distributions of estate property in the first instance.  The Court
> concludes they are not.

MOU Memorandum Decision, p. 4 (footnote omitted).  In connection with derivative

actions, the Bankruptcy Court also held as follows:

> any claims that the Debtor may have (for example, derivative
> claims brought on behalf of the company) are not covered by these
> policies because of the "insured versus insured" exception
> contained in them . . . . Thus, whether the Debtor could or could
> not prevail is not relevant to this settlement because the policies at
> issue would not provide a source of recovery even if successfully
> prosecuted.

MOU Memorandum Decision, p. 5.

[concluded on next page]

## VI.    CONCLUSION

Magten cannot satisfy the significant burden it must overcome when challenging the Bankruptcy Court's findings of fact and law as to the Confirmation Order or the MOU Order.   For the reasons set forth herein, NorthWestern requests that this Court grant its Motion to Dismiss the Consolidated Appeals of Magten Asset Management Corporation and dismiss Magten's appeal of both the Confirmation Order and the MOU Order in their entirety.

Dated:  March _10_ 2005                        Respectfully submitted,
       Wilmington, Delaware

PAUL, HASTINGS, JANOFSKY &                     GREENBERG TRAURIG, LLP
    WALKER LLP
Jesse H. Austin, III                           Adam D. Cole
Karol K. Denniston                             885 Third Avenue
600 Peachtree Street                           New York, NY 10022
Suite 2400                                     Telephone: (212) 801-2100
Atlanta, GA 30308
Telephone: (404) 815-2400                      - and -

- and -                                        GREENBERG TRAURIG, LLP

 

 

Scott D. Cousins (No. 3079)
William E. Chipman, Jr. (No. 3818)
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, DE 19801
Telephone: (302) 661-7000

*Co-Counsel for NorthWestern*
*Corporation*