## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NORTHWESTERN CORPORATION, | : | |
| | : | Case No. 03-12872 (JLP) |
| Debtor. | : | |
| | : | |
| | : | |
| MAGTEN ASSET MANAGEMENT CORP. | : | |
| | : | |
| Appellant, | : | |
| v. | : | CA NO. 04-1389 (JJF) |
| | : | |
| NORTHWESTERN CORPORATION, | : | |
| | : | |
| Appellee. | : | |

**MEMORANDUM OF LAW OF MAGTEN ASSET MANAGEMENT CORPORATION IN SUPPORT OF OPPOSITION TO (I) NORTHWESTERN CORPORATION'S MOTION TO DISMISS THE CONSOLIDATED APPEALS AND (II) JOINDER OF PLAN COMMITTEE TO NORTHWESTERN CORPORATION'S MOTION TO DISMISS**

**FRIED, FRANK, HARRIS, SHRIVER
    & JACOBSON LLP**
Bonnie Steingart
Gary L. Kaplan                    -and-
One New York Plaza
New York, NY 10004
Telephone: (212) 859-8000

**BLANK ROME LLP**
Mark J. Packel (DE No. 4048)
Elio Battista, Jr. (DE No. 3814)
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 425-6400

Counsel for Magten Asset Management Corporation

Dated: June 30, 2005
Wilmington, Delaware

# TABLE OF CONTENTS

Table of Authorities ................................................................................................................. ii

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF THE CASE ................................................................................................ 4

    A.  Chapter 11 Proceeding ........................................................................................... 4

    B.  Recovery to QUIPS Holders Under the Plan .................................................... 8

    C.  The Fraudulent Conveyance Proceeding.......................................................... 9

ARGUMENT ......................................................................................................................... 11

    I.   The Appeals Are Not Equitably Moot ............................................................... 11

        A.  Substantial Consummation Does Not Moot the Appeals............................. 12

        B.  Failure to Obtain a Stay is Not Dispositive ............................................... 14

        C.  The Court Can Fashion Effective Relief Without Affecting the Success
            of the Plan................................................................................................... 16

        D.  The Court Can Fashion Effective Relief Without Affecting the Rights of
            Third Parties ............................................................................................... 17

        E.  Public Policy Supports the Conclusion that the Appeals are Not Moot...... 18

    II.  The Plan Committee Does Not Have Standing to Join in the Appeals ............ 19

CONCLUSION ...................................................................................................................... 21

# TABLE OF AUTHORITIES

## FEDERAL CASES

In re 183 Lorraine St. Associate,
    198 B.R. 16 (E.D.N.Y. 1996) ........................................................................ 17

In re ANC Rental Corp.,
    57 Fed. Appx. 912, (3d Cir. 2003) .............................................................. 19

In re AOV Industrial Inc.,
    792 F.2d 1140 (D.C. Cir. 1986) ............................................ 12, 13, 14, 18

Bartel v. Bar Harbor Airways,
    196 B.R. 268 (S.D.N.Y. 1995) ................................................................... 20

In re Best Products,
    68 F.3d 26 (2d Cir. 1995) ............................................................................ 14

In re Block Shim Development Company-Irving,
    113 B.R. 256 (N. D. Tex. 1990) ................................................................. 18

Central States v. Central Transport, Inc.,
    841 F.2d 92 (4th Cir. 1988) ....................................................................... 13

In re Chateaugay,
    167 B.R. 776 (S.D.N.Y. 1994) ............................................................ 14, 17

Chateaugay Corp. v. LTV Steel Co. (In re Chateaugay Corp.),
    10 F.3d 944 (2d Cir. 1993) ................................................................ passim

City of Covington v. Covington Landing Ltd.,
    71 F.3d 1221 (6th Cir. 1995) ..................................................................... 15

In re Club Associate,
    956 F.2d 1065 (11th Cir. 1992) ................................................................ 15

In re Cont'l Airlines,
    91 F.3d 553 (3d Cir. 1996) ................................................................ passim

In re Cosmopolitan Aviation Corp.,
    763 F. 2d 507 (2d Cir. 1985) ..................................................................... 20

In re Dykes,
    10 F.3d 184 (3d Cir. 1993) .................................................................. 19, 20

In re Fondiller,
    707 F.2d 441, 443 (9th Cir., 1983)) .............................................................. 20

Gillman v. Continental,
    203 F.3d 211 (3d. Cir. 2000) ................................................................. 13, 18

In re Ionosphere Clubs, Inc.,
    184 B.R. 648 (S.D.N.Y. 1995) .................................................................. 13

Nordhoff Investments v. Zenith Electrics Corp. (In re Zenith Electrics Corp.),
    250 B.R. 207 (D. Del. 2000) ............................................................ 11, 15, 18

In re O'Brien Environmental Energy, Inc.,
    181 F.3d 527 (3d Cir. 1999) .................................................................... 20

In re PWS Holding Corp.,
    228 F.3d at 224 (3d Cir. 2000) ...................................................... 14, 19, 20, 21

In re Lafayette Hotel Partnership,
    No.96-7476, 1997 WL 599386 (S.D.N.Y. Sept. 29, 1997) ..................... 15, 17, 18

RTC v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.),
    16 F.3d 552, 560 (3d Cir. 1994) ............................................................... 16

In re Sun Valley Ranches, Inc.,
    823 F.2d 1373 (9th Cir. 1987) ................................................................. 15

Travelers Insurance Co. v. H.K. Porter Co.,
    45 F.3d 737 (3d Cir. 1995) ..................................................................... 19

In re UNR Industrial Inc.,
    20 F.3d 766 (7th Cir. 1994) ................................................................. 11, 15

In re Zenith Electrics Corp.,
    329 F.3d 338 (3d Cir. 2003) ......................................................... 11, 13, 17, 18

## Statutes and Rules

11 U.S.C. § 11 .......................................................................................... 6

11 U.S.C. § 1109(b) ............................................................................... 20, 21

Appellant Magten Asset Management Corporation ("Magten"), by and through its undersigned counsel, hereby submits this opposition and memorandum of law (the "Opposition") to (i) the motion (the "Motion to Dismiss") filed by NorthWestern Corporation ("NorthWestern"), to dismiss the consolidated appeals (the "Appeals"), and (ii) the joinder (the "Joinder") of the Plan Committee to the Motion to Dismiss. In support of this Opposition, Magten respectfully states as follows:[1]

## PRELIMINARY STATEMENT

Since August 2002, NorthWestern sought to deprive the creditors of its wholly-owned subsidiary, Clark Fork & Blackfoot LLC ("Clark Fork"), of any remedy for the fraudulent conveyance of the utility assets of Clark Fork to NorthWestern (the "Transfer"). At the time of the Transfer, NorthWestern hid its financial condition by using fraudulent financial statements (which it subsequently restated). Following the Transfer, NorthWestern filed for chapter 11 and tried to use the chapter 11 process to prevent the creditors of Clark Fork from obtaining an appropriate remedy. NorthWestern's Motion to Dismiss, which was filed while briefing was stayed pending a court ordered mediation, is simply the latest attempt by NorthWestern to deprive creditors of Clark Fork of their right to a full recovery.

By way of background, in August 2002, only 13 months before commencing its chapter 11 case, NorthWestern, as the sole member of Clark Fork, caused Clark Fork to transfer its utility assets (valued at between $1.15 billion and $1.4 billion) (the "Montana Utility Assets") to NorthWestern for no cash and only approximately $700 million of liabilities. At the time of the Transfer, NorthWestern's public financial statements overstated NorthWestern's revenue by

---

[1]    Pursuant to the Court's order dated June 6, 2005, the parties will be briefing the Motion to Dismiss and the merits of the Appeals separately. As such, in accordance with this Court's order, Magten, in this Opposition, does not address the merits of the Appeals. Magten will be submitting a separate brief with respect to the merits of the Appeals on or before July 15, 2005, in accordance with the stipulation and briefing schedule agreed to by the parties and approved by the Court.

$878 million and NorthWestern was not financially capable of performing its obligations under

the indenture governing the QUIPS notes. The public, however, was not apprised of

NorthWestern's true financial condition until eight months after the Transfer when

NorthWestern publicly admitted that (i) the financials used in connection with the transfer were

materially misleading[2] and (ii) NorthWestern was insolvent. Thus, holders of the Series A

8.45% Quarterly Income Preferred Securities (the "QUIPS") went from being creditors of a

solvent entity to being creditors of an overleveraged insolvent entity. Due to NorthWestern's

insolvency and false financials, holders of the QUIPS were denied their right to seek a full

recovery against the transferred assets.

Throughout NorthWestern's chapter 11 case, Magten, on behalf of the trust holding the

QUIPS, has sought to avoid the fraudulent conveyance of the Montana Utility Assets, and

Magten and Law Debenture Trust Company of New York ("Law Debenture"), as Indenture

Trustee for the Indenture governing the QUIPS, filed a complaint (the "Complaint") seeking to

avoid the fraudulent transfer of the Montana Utility Assets (the "Fraudulent Conveyance

Proceeding"). The Complaint survived a motion to dismiss and the bankruptcy court

acknowledged that the claims in the Complaint "may have legs." Magten Ex. 231, p.9.

The Motion to Dismiss devotes nearly 50 pages to why this Court should dismiss the

Appeals as equitably moot and attempts to characterize NorthWestern's Second Amended and

Restated Plan of Reorganization (the "Plan") as a complicated series of transactions all of which

---

[2]     On April 16, 2003, NorthWestern issued a press release concerning the $878 million in negative charges.
        Magten Ex. 227, Ex. 4. Shortly thereafter, NorthWestern announced that the SEC has begun an ongoing
        investigation into these issues.
        References to items identified in Magten's Amended Designation of Items to be Included in the Record on
        Appeal and Statement of Issues to be Presented on Appeal from the Order Confirming Debtor's Second
        Amended and Restated Plan of Reorganization under Chapter 11 of the Bankruptcy Code Entered on
        October 19, 2004 [Bankr. Docket No. 2335], are referred to as *"Magten Ex. __"*.   References to items
        identified in NorthWestern's Designation of Additional Documents for the Record and Objection to
        Statement of Issues on Appeal [Bankr. Docket No. 2365], are referred to as *"NorthWestern Ex. __"*.

would have to be unwound to fashion relief in the Appeals. Although Magten does not dispute that the Plan has been substantially consummated, NorthWestern can feasibly provide Magten with a recovery on the full value of its claim – a $50 million allowed claim on account of the fraudulent conveyance – without unwinding the Plan. Magten and the holders of the QUIPS that chose to pursue the Fraudulent Conveyance Proceeding hold a disputed Class 9 Claim such that, if successful in the Fraudulent Conveyance Proceeding, the maximum recovery Magten can receive is $31.5 million (a $.63 recovery). Since NorthWestern has an enterprise value of nearly $1.8 billion, the additional $18.5 million ($.37 recovery) required to make Magten "whole" is negligible and can easily be satisfied by other sources of value without upsetting the Plan. NorthWestern can provide Magten with stock from the Class 9 disputed claims reserve (the "Disputed Claims Reserve"), issue new stock, and/or pay cash to satisfy the full value of Magten's claim. None of these options would prejudice any other creditors and none require the unraveling of the Plan. In light of the feasibility with which this Court can grant Magten relief, Magten should not be denied its appellate rights to pursue the merits of the Appeals.

Lastly, the Plan Committee has filed a Joinder to the Motion to Dismiss, however, the Plan Committee is not a "party aggrieved" by the Appeals and thus lacks standing to appear in this matter.

3

## STATEMENT OF THE CASE

A. Chapter 11 Proceeding

NorthWestern is a publicly traded Delaware corporation that was incorporated in 1923. NorthWestern, together with its direct and indirect non-debtor subsidiaries, comprise one of the largest providers of electricity and natural gas in the upper Midwest and Northwest regions of the United States, serving approximately 608,000 customers throughout Montana, South Dakota and Nebraska.

Magten holds in excess of 40% of the QUIPS issued by Montana Capital I (the "Trust"). The Trust is a business trust established pursuant to the Delaware Business Trust Act. The Trust was established by The Montana Power Company ("Montana Power"), predecessor in interest to Clark Fork (f/k/a NorthWestern Energy, LLC), as a financing vehicle. The only assets of the Trust are the 8.45% Junior Subordinated Debentures due 2036 issued by Montana Power.

On September 29, 2000, Montana Power entered into a unit purchase agreement with NorthWestern pursuant to which NorthWestern agreed to purchase the Montana Utility Assets. In order to facilitate the assets sale to NorthWestern, Montana Power created a subsidiary, Montana Power Company LLC.

On November 15, 2002, NorthWestern orchestrated the transfer of substantially all of the utility assets of its directly owned subsidiary, Clark Fork to NorthWestern for inadequate consideration. Though the Clark Fork assets had a value well in excess of $1 billion, the total consideration received for the Transfer was the assumption of approximately $700 million of liabilities by NorthWestern. As a result of this Transfer, Clark Fork was rendered insolvent.

At the time of the Transfer, NorthWestern's public filings contained misleading statements with respect to, among other things, loans totaling approximately $200 million made by NorthWestern to its non-utility subsidiary, Expanets Inc. ("Expanets"). Magten Ex. 227, Ex.

4

4. Although a portion of these loans were made as early as December 31, 2001, NorthWestern did not disclose these loans until September 2002, when it restated its financials for the fiscal year of 2001 and the first and second quarters of 2002.  In October of 2002, despite knowing that it should have written down the value of its loans to Expanets, NorthWestern completed a common stock offering and failed to disclose this information in its prospectus in connection with its securities offerings.

NorthWestern's failure to appropriately disclose the loans is made worse by the fact that both NorthWestern and its counsel signed its 10K for 2001 and 10Q's for the first three quarters of 2002 under certification that the financials fully complied with the Sarbanes Oxley Act.  On April 16, 2003, NorthWestern reported its financial results for the fiscal year ended ("FYE") 2002 – the year in which the Transfer occurred – and finally restated its previously unaudited quarterly results for the first three quarters of FYE 2002.  Appx. Ex. A (NorthWestern's 10K for the fiscal year ended Dec. 31, 2002).[3]  NorthWestern's restated financials indicated an additional $878.5 million in previously unreported "negative charges." Magten Ex. 227, Ex. 4, and Appx. Ex. A .  Specifically, NorthWestern publicly admitted that it was aware that its non-utility businesses, including its investment in Expanets, had for some time been underperforming, thereby resulting in the write down of the $205.7 million in loans to Expanets.  Appx. Ex. A. Immediately thereafter, the United States Securities and Exchange Commission (the "SEC") launched an informal investigation into NorthWestern's financial restatements.  This investigation became a formal investigation in December 2003, and is continuing.  Magten Ex. 164, p. 47.

---

[3]    Magten has contacted counsel to NorthWestern regarding the filing of a joint motion to designate additional items cited in the Motion to Dismiss and the Opposition that may not have originally been included in the record of the Appeals.  All references to items not specifically listed in Magten's or NorthWestern's designation of record, are included in the appendix and referred to as *"Appx. Ex __"*.

On September 14, 2003, NorthWestern filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

In January 2004, Magten timely filed a proof of claim asserting, among other things, claims against NorthWestern for damages resulting from the fraudulent transfer of certain Montana utility assets to NorthWestern. Magten Ex. 219.

On March 11, 2004, NorthWestern filed its initial plan of reorganization and disclosure statement with the Bankruptcy Court, as well as its motion in support of the Disclosure Statement. Magten Exs. 13 and 14, respectively.

On May 14, 2004, NorthWestern filed its First Amended Plan and Disclosure Statement with the Bankruptcy Court (Magten Exs. 49 and 50, respectively), and on May 25, 2004, NorthWestern filed its revised First Amended Plan and Disclosure Statement. Magten Exs. 57 and 58, respectively. On May 26, 2004, the Bankruptcy Court approved the revised First Amended Disclosure Statement. Magten Ex. 59.

On August 9, 2004, Magten filed an objection to NorthWestern's First Amended Plan of Reorganization. Magten Ex. 110.

On August 19, 2004, four business days before the scheduled confirmation hearing, NorthWestern filed its Second Amended Plan and Disclosure Statement. Magten Exs. 128 and 129, respectively. On August 25, 2004, Magten filed an objection to the Second Amended Plan and Disclosure Statement. Magten Ex. 158. Due to this eleventh hour filing, which included substantive changes including the re-classification of the claims of the QUIPS – Magten sought and was granted an extension of time to object to the Plan. That same day, over the objections of Magten and Law Debenture, the Bankruptcy Court held a hearing with respect to NorthWestern's disclosure statement and began the confirmation hearing.

6

On August 31, 2004, NorthWestern filed its revised Plan and revised Second Amended and Restated Disclosure Statement (Magten Exs. 163 and 164, respectively), and on September 2, 2004, the Bankruptcy Court entered an order approving the Second Amended and Restated Disclosure Statement. Magten Ex. 167.

On September 21, 2004, Magten filed an objection to the Plan (Magten Ex. 180), and on October 6, 2004, the Bankruptcy Court continued the confirmation hearing with respect to the Plan. Magten Ex. 202. Subsequently, on October 8, 2004, the Bankruptcy Court held a teleconference during which the Bankruptcy Court confirmed the Plan over Magten and Law Debenture's objections. Magten Ex. 213.

On October 19, 2004, the Bankruptcy Court entered the Confirmation Order. Magten Ex. 203. Upon entry of the Confirmation Order, on October 22, 2004, Magten filed with the Bankruptcy Court an emergency motion for a stay pending appeal of the Confirmation Order to prevent the Plan from becoming effective. Magten Ex. 205. On October 25, 2004, the Bankruptcy Court held a hearing on the Emergency Motion and denied Magten's Emergency Motion. Magten Ex. 218. On October 25, 2004, Magten filed a notice of appeal of the Confirmation Order with the Bankruptcy Court. Magten Ex. 209.

Immediately thereafter, on October 26, 2004, Magten filed with this Court a motion to be heard on an emergency basis seeking to stay the Confirmation Order. Appx. Ex. B (Emergency Motion for Stay Pending Appeal of the Order Confirming the Debtor' `s Second Amended and Restated Plan of Reorganization, filed Oct. 26, 2004). On October 29, 2004, after oral argument, this Court denied Magten's motion for a stay.

On November 1, 2004, NorthWestern's Plan became effective (Magten Ex. 217), and on December 29, 2004, NorthWestern filed a Notice of Substantial Consummation of the Debtor's

Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy

Code. Appx. Ex. C (Notice of Substantial Consummation, Bankr. Dkt. No. 2519).

   B.   Recovery to QUIPS Holders Under the Plan

   Under the Plan, holders of the QUIPS did not receive the same recovery as the holders of

NorthWestern's other junior subordinated debt, but instead were required to choose between (i) a

recovery on account of their QUIPS holdings and forego any claim or right with respect to the

Fraudulent Conveyance Proceeding ("Option 1"), or (ii) a recovery in the Fraudulent

Conveyance Proceeding and receive no distribution on account of their QUIPS holdings

("Option 2"). Although the right to recover in the Fraudulent Conveyance Proceeding is separate

and apart from the right to be compensated in bankruptcy on account of the QUIPS claims,

NorthWestern forced the QUIPS holders to choose between two recoveries to which they are

rightfully entitled. This was a choice other similarly situated creditors were not required to

make.

   Magten elected Option 2 and received a Class 9 general unsecured claim and a pro rata

share of recoveries, if any, upon resolution of the Fraudulent Conveyance Proceeding. Pursuant

to Section 7.5 of the Plan, the QUIPS holders electing Option 2 received the benefit of the Class

9 Reserve established for disputed claims established.[4] In order to provide a mechanism to

protect the holders of disputed claims and to ensure that such holders were not prejudiced by

confirmation of the Plan prior to the final resolution of all disputed claims, NorthWestern was

---

[4]   On or about November 3, 2004, the Bankruptcy Court entered an order approving the Stipulation and Order
Establishing a Disputed Claims Reserve (the "Stipulation") between NorthWestern and Law Debenture
which provided that the Reorganized Debtor shall set aside a portion of its initial reserve of 13.5% of New
Common Stock solely to satisfy in full a $25 million Class 9 claim of the QUIPS litigation claims holders.
NorthWestern Ex. 6. Any claim by a QUIPS litigation claimant is to be afforded the treatment accorded
Class 9 General Unsecured Claims, as set forth in the Plan. By its express terms, the Stipulation did not
cap the recovery on account of the QUIPS Litigation Claim at $25 million claim. The Stipulation provided
that an Allowed Claim in excess of $25 million would be satisfied from the Disputed Claims Reserve.
NorthWestern Ex. 6.

8

required to assume (unless otherwise agreed or estimated by this Court) that the full amount of a disputed claim would become an allowed claim. Specifically, to accomplish this, the Plan required that NorthWestern set aside sufficient new common stock to ensure that once disputed claims are allowed, they would receive the same distribution as claims that were allowed at the time of confirmation.

Upon confirmation of the Plan, NorthWestern determined to set aside 13.5% of new common stock in the Disputed Claims Reserve to satisfy the requirements of the Plan.[5] Magten Ex. 210.

C. The Fraudulent Conveyance Proceeding

After NorthWestern filed its chapter 11 petition, the extent of the harm to the creditors of Clark Fork became clear. Instead of receiving a full recovery on account of their claim as they would have had the Transfer never occurred, it became clear that holders of the QUIPS would receive a minimal recovery under NorthWestern's Plan.

On March 17, 2004, Magten filed its motion for relief from the automatic stay to commence an adversary proceeding seeking to avoid the fraudulent transfer. Magten Ex. 17. On April 8, 2004, the Bankruptcy Court granted Magten's motion, thereby allowing Magten and Law Debenture to commence this adversary proceeding against NorthWestern. Magten Ex. 56,

---

[5]    As this Court is aware, the parties attempted to settle all outstanding litigation, however, NorthWestern rescinded the settlement agreement. Magten and Law Debenture filed a motion with the bankruptcy court seeking approval of the settlement agreement and the bankruptcy court ultimately determined not to approve the settlement, in part, because the Disputed Claims Reserve did not contain sufficient stock to pay Magten the full amount contemplated by the settlement agreement. NorthWestern's failure to adequately fund the Disputed Claims Reserve has led to further litigation in the bankruptcy court. Appx. Ex. D (Complaint to Revoke Order of Confirmation Pursuant to Section 1144 of the Bankruptcy Code and Rule 7001(5) of the Federal Rules of Bankruptcy Procedure and for Breach of Fiduciary Duty, Bankr. Case No. 05-50866, Docket No. 1). NorthWestern, in an effort to defend itself, has now stated that "the total amount in the Disputed Claims Reserve is sufficient to cover all disputed claims which are currently pending against the estate." Appx. Ex. E, p. 34 (Defendants' Motion to Stay Adversary Proceeding Pending Resolution of Appeal of Confirmation Order or, in the Alternative, to Dismiss Complaint, Bankr. Case No. 05-50866, Docket No. 7).

9

pp. 85-87.

On April 16, 2004, after this Court granted Magten and the Indenture Trustee relief from

the automatic stay, Magten, together with the Indenture Trustee, filed a complaint against

NorthWestern in the Bankruptcy Court on behalf of the holders of the QUIPS seeking to set

aside the fraudulent conveyance of the Montana utility assets. Magten Ex. 224.  The Fraudulent

Conveyance Proceeding contends that Northwestern wrongfully appropriated certain assets of a

subsidiary and that the holders of the QUIPS (as direct creditors of that subsidiary as well as

NorthWestern) had the right to have their claims paid in full before those assets could be made

available to satisfy the claims of NorthWestern's other creditors.

On May 14, 2004, NorthWestern filed a motion to dismiss the Complaint (Magten Ex.

225), and on June 16, Magten and Law Debenture submitted an objection to that motion and a

memorandum of law in support of its objection. Magten Ex. 227. On June 28, 2004,

NorthWestern filed a reply in further support of its motion to dismiss the Complaint. Magten Ex.

228.

On August 20, 2004, the Bankruptcy Court entered a decision denying in part the motion

to dismiss on the ground that Magten and Law Debenture have standing as creditors of Clark

Fork if Magten and Law Debenture can prove under applicable law that the release provided in

Section 1102 of the Indenture was obtained through actual fraud or as part of a fraudulent

scheme. Magten Ex. 231.

On October 4, 2004, Magten filed an amended complaint in the Fraudulent Conveyance

Proceeding.  Magten Ex. 232. Then, on November 17, 2004, Magten filed a motion with this

Court seeking to withdraw the reference with respect to the Fraudulent Conveyance Proceeding

(the "Withdrawal Motion").  The Withdrawal Motion is currently pending in this Court and the

10

bankruptcy court has stayed the Fraudulent Conveyance Proceeding because it determined that it had been divested of jurisdiction as a result of the filing of the Appeals. As such, at the time the Plan was filed (and later confirmed), the Fraudulent Conveyance Proceeding had not been resolved and, as a result, the QUIPS litigation claim was treated as a disputed claim.

## ARGUMENT

### I.  The Appeals Are Not Equitably Moot

NorthWestern argues that the Appeals should be dismissed on grounds of equitable mootness, asserting that implementation of Magten's requested relief "would be wholly inequitable." Motion to Dismiss, p. 23. The equitable mootness doctrine, which NorthWestern is seeking to invoke, should not be invoked lightly but rather should be "limited in scope" and must be "cautiously applied." In re Cont'l Airlines, 91 F.3d 553, 559 (3d Cir. 1996) ("Continental I"). As the Third Circuit has explicitly noted, "the equitable mootness doctrine is to be applied only in order to 'prevent[] a court from unscrambling complex bankruptcy reorganizations when the appealing party should have acted before the plan became extremely difficult to retract.'" In re Zenith Elecs. Corp., 329 F.3d 338, 340 (3d Cir. 2003) (quoting Nordhoff Invs. v. Zenith Elecs. Corp. 258 F.3d 180, 185 (3d Cir. 2001)). In turn, courts have mandated that equitable mootness should be applied sparingly and, specifically, in circumstances where prudential reasons dictate that the court cannot provide some means of effective relief for the appealing party. See generally, Zenith Elecs. Corp. 329 F.3d at 340; Continental I, 91 F.3d at 559; In re UNR Indus. Inc., 20 F.3d 766, 769 (7th Cir. 1994).

Moreover, "a claimant should not be out of court on grounds of mootness solely because its injury is too great for the debtor to satisfy in full." Chateaugay Corp. v. LTV Steel Co. (In re Chateaugay Corp.), 10 F.3d 944, 954 (2d Cir. 1993) ("Chateaugay II"). Although courts "recognize the value of finality in bankruptcy proceedings and the need to afford reorganized

11

[debtors] a 'fresh start,' those considerations are not sufficient to moot this issue on appeal." Id. "In exercising its discretionary power to dismiss an appeal on mootness grounds, a court cannot avoid its obligation to scrutinize each individual claim, testing the feasibility of granting the relief against its potential impact on the reorganization scheme as a whole." In re AOV Indus. Inc., 792 F.2d 1140, 1148 (D.C. Cir. 1986). In that regard, courts are reluctant to dismiss an appeal on grounds of equitable mootness when a remedy can be fashioned. Because this Court can "equitably" provide Magten with effective relief without upsetting the Plan, the distributions made to creditors and NorthWestern's successful emergence as a reorganized entity, the equitable mootness doctrine is wholly inapplicable in this case.

In applying the doctrine of equitable mootness, the Third Circuit has enumerated five factors for determining whether the merits of a bankruptcy appeal should be considered. Continental I, 91 F.3d 553 at 560. These factors include:

> (1) whether the reorganization plan has been substantially consummated; (2) whether a stay has been obtained; (3) whether the relief requested would affect the rights of parties not before the court; (4) whether the relief requested would affect the success of the plan; and (5) the public policy of affording finality of bankruptcy judgments.

Id.

A review of these factors makes clear that these Appeals should not be dismissed as equitably moot.

## A. Substantial Consummation Does Not Moot the Appeals

While Magten does not dispute that NorthWestern has taken actions to complete distributions to holders of allowed claims under the Plan and thus has substantially consummated the Plan, this factor does not automatically render the Appeals moot nor does it preclude the Court from fashioning appropriate relief. Courts recognize that "substantial consummation of a

12

reorganization plan is a momentous event, but it does not necessarily make it impossible or

inequitable for an appellate court to grant effective relief." Chateaugay II, 10 F.3d at 952. See

also AOV Indus. 792 F.2d at 1148 (substantial consummation is "not a blanket discharge" of

"judicial duty to examine carefully each request for relief"); In re Ionosphere Clubs, Inc., 184

B.R. 648, 651 (S.D.N.Y. 1995) ("substantial consummation of a plan does not necessarily make

it impossible or inequitable for a reviewing court to grant relief."). "Orders confirming plans of

reorganization do not become immune from appellate review upon their partial, or even

substantial, implementation." Cent. States v. Cent. Transp., Inc., 841 F.2d 92, 96 (4th Cir.

1988)(citing In re AOV Indus., Inc. 792 F.2d at 1148-50).

    Although NorthWestern heavily relies on Continental I to support its argument that relief

cannot be granted in light of the substantial consummation of the Plan, NorthWestern's ignores

the fact that in Continental I, the court recognized

> More significant to the Court's determination that the appeal was
> equitably moot, however, was the fact that 'a reversal of the order
> confirming the Plan likely would put Continental back into
> bankruptcy.' The Court's decision in that case, therefore, was
> based not merely on the fact that the plan had been substantially
> consummated in a definitional sense, but rather on the probability
> that granting the appeal would unravel the plan, upon which
> numerous parties were at that point in reliance.

In re Zenith Elecs. Corp., 329 F.3d at 344 (quoting Continental I, 91 F.3d at 561).[6]

    Where relief can be granted without "unraveling" the plan, substantial consummation

does not render an appeal moot. For example, in Chateaugay II, the Second Circuit found that

despite the fact that the debtor's plan had been substantially consummated, the court could

---

[6]    Although the Court in Continental I determined that it could not fashion a limited remedy for the
appellants, in Gillman v. Cont'l Airlines, 203 F.3d 203 (3d Cir. 2000) ("Continental II"), the court
examined the merits of the appeal after determining that limited relief could be granted as it would not
necessitate the reversal or unraveling of the entire plan of reorganization. In fact, in Continental II, the
Court acknowledged that "even if successful, Plaintiffs' appeal should not threaten the entire
reorganization."

"fashion effective relief ... to the extent that can be done manageably and without imperiling [the debtor's] fresh start." Chateaugay II, 10 F.3d at 953. The Second Circuit went on to explain that although full relief may no longer be available after substantial consummation, "we are convinced that at least some effective relief could be granted." Id. at 954. Similarly, in In re PWS Holding Corp., 228 F.3d 224, 236 (3d Cir. 2000) (quoting In re Chateaugay Corp., 167 B.R. 776, 780 (S.D.N.Y. 1994)), despite affirming the confirmation order on the merits, the Third Circuit determined that because a successful appeal would not "'knock the props out from under the authorization for every transaction that has taken place,'" and there were "intermediate options" short of undoing the entire plan, it declined to dismiss the appeal as equitably moot.

Here, the Court can fashion relief that does not require unraveling the Plan. As discussed above, Magten currently holds a Class 9 Claim, which entitles Magten to a $.63 recovery on account of its claim. The delta between the $.63 recovery Magten is due to receive as a Class 9 claimant and the full recovery it would receive on account of the fraudulent conveyance is merely $.37 – a total of $18.5 million. Since emerging from chapter 11, NorthWestern has settled some of its largest claims and has approximately $77 million of cash on hand. In addition, pursuant to the Plan, NorthWestern is authorized to issue 200 million shares of stock of which, to date, it has issued less than 40 million shares. Magten Ex. 163, p. 46. NorthWestern can readily provide Magten with the value of its claim through a variety of available sources of value.

B.    Failure to Obtain a Stay is Not Dispositive

The second Continental I factor – whether a stay has been obtained – does not preclude the Court from granting relief. It is widely recognized that even when a plan has been substantially consummated, failure to obtain a stay does not automatically render any subsequent appeal moot. In re Best Prods., 68 F.3d 26, 29-30 (2d Cir. 1995); See, e.g., In re AOV Indus.

14

Inc., 792 F.2d at 1147 ("It is equally evident . . . that failure to secure a stay is not per se dispositive of all the issues before us."); City of Covington v. Covington Landing Ltd., 71 F.3d 1221, 1225-26 (6th Cir. 1995) ("The failure to seek a stay . . . is not necessarily fatal to the appellant's ability to proceed."); In re UNR Indus., 20 F.3d at 769-70 (the failure to seek a stay is not "a censurable event to be punished by refusal to adjudicate the merits"), cert. denied, 130 L. Ed. 2d 416, 115 S. Ct. 509 (1994); In re Club Assoc., 956 F.2d 1065, 1070 (11th Cir. 1992) ("the absence of a stay does not compel a finding of mootness in all cases."); In re Sun Valley Ranches, Inc., 823 F.2d 1373, 1375 (9th Cir. 1987) ("a debtor's failure to obtain a stay . . . followed by the sale of debtor's property, did not moot the debtor's subsequent appeal because the creditor-purchaser was before the court").

While Magten was unable to obtain a stay of the Confirmation Order, it is both significant and important to note that Magten *did seek* to stay the Confirmation Order both through emergency motions before the bankruptcy court and this Court. Courts have recognized that this Continental I factor "merely requires that the appellant seek a stay, not that she secure one." In re Lafayette Hotel Partnership, No.96-7476, 1997 WL 599386, at *5 (S.D.N.Y. Sept. 29, 1997). See also Chateaugay II, 10 F.3d at 954; Nordhoff Invs. v. Zenith Elecs. Corp. (In re Zenith Elecs. Corp.), 250 B.R. 207, 215 (D. Del. 2000) ("[a]s an 'equitable' factor . . . the failure to even seek a stay would seem to have significance beyond the mere failure to obtain a stay"). Accordingly, although Magten did not prevail in securing a stay, the "result certainly cannot be attributed to any lack of initiative." Chateaugay II, 10 F.3d at 954.

Furthermore, since, as discussed above, this Court can easily fashion appropriate relief for Magten without unraveling the Plan, Magten's failure to obtain the stay that it sought has not created an inequitable situation.

C.    The Court Can Fashion Effective Relief Without Affecting the Success of the Plan

As explained above, the doctrine of equitable mootness is narrowly tailored to apply in limited circumstances where it would be inequitable to fashion *any* kind of relief. Continental I, 91 F.3d at 559. An appeal is not moot "merely because a court cannot restore the parties to the status quo ante. Rather, when a court can fashion 'some form of meaningful relief,' even if it only partially redresses the grievances of the prevailing party, the appeal is not moot." Continental I, 91 F.3d at 558 (quoting RTC v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.), 16 F.3d 552, 560 (3d Cir. 1994) (in banc)). In that regard, the fourth Continental I factor weighs in favor of the Appeals not being equitably mooted because the Court can provide appropriate relief without affecting the success of the Plan.

NorthWestern is a $1.8 billion dollar enterprise with approximately $77 million of cash on hand. As previously noted, pursuant to the Plan, NorthWestern is authorized to issue 200 million shares of common stock and has issued less than 40 million shares to date. Magten Ex. 163, p.46. Thus, NorthWestern has more than an adequate number of shares to satisfy its obligations to Magten. Moreover, since consummation of the Plan, NorthWestern has used cash to pay down its debt, issued additional stock to its senior management under an employee incentive plan, and declared and issued dividends for its common stock – all without affecting the rights of third parties. Accordingly, while the Disputed Claims Reserve should have sufficient stock to provide Magten with a $31.5 million recovery on account of its $50 million claim, the remaining $18.5 million can be satisfied, with minimal consequence, through the issuance of a *de minimus* amount of stock, cash or any other available sources of value.

As the Second Circuit in Chateaugay II noted:

> It is difficult to conceive how a potential liability of, at most,
> several million dollars could unravel the Debtors' reorganization,

16

> which involved the transfer of billions of dollars, and which has
> resulted in the revival of Debtors into a multibillion dollar
> operation with $200 million in working capital . . . appellees have
> made no showing that it would 'knock the props out from under
> the authorization for every transaction that has taken place and
> create an unmanageable uncontrollable situation for the
> Bankruptcy Court.'

In re Chateaugay, 167 B.R. 776, 780 (S.D.N.Y. 1994) (citing Chateaugay II 10 F.3d at 953). See also In re Zenith Elecs. Corp., 329 F.3d 338 (3d Cir. 2003) (finding that the amount of relief sought was "tiny" in the context of a reorganization of a company valued at $300 million, and thus the relief sought could be granted without unraveling the Plan). Similarly, in this case, it is clear that the Court can render effective relief without unraveling the entire Plan and creating an unmanageable and uncontrollable situation.

### D.    The Court Can Fashion Effective Relief Without Affecting the Rights of Third Parties

While courts must consider the effects of any relief on third parties, the dollar amount needed to satisfy Magten's claim is immaterial in the context of NorthWestern's reorganization. In that regard, in accordance with the third Continental I factor, and as explained in detail above, Magten can be afforded relief without any effect on parties not before the Court.[7] Specifically, to satisfy Magten's claim, NorthWestern can use its available cash on hand, issue new stock or provide the value from any other available source. In light of NorthWestern's financially sound condition, the Court has no reason to believe that the additional $18.5 million needed to make Magten "whole" will have any impact on the rights of third parties that may have relied on the Confirmation Order. Hence, as demonstrated above, the Court can easily fashion relief for Magten without unraveling intricate transactions or disrupting the distributions already made.

---

[7]    Where all relevant parties are before the court and have had the opportunity to be heard on the issues, courts have held the fourth Chateaugay II factor to be satisfied. See Lafayette Hotel 1997 WL 599386 at *4; In re 183 Lorraine St. Assoc., 198 B.R. 16, 25 (E.D.N.Y. 1996).

120087.01600/40154918v1

E.    Public Policy Supports the Conclusion that the Appeals are Not Moot

"While courts should always be conscious of the impact their rulings will have on the development of the law, the Court's role is to decide the matters before it, based on the record before it." Lafayette Hotel, 1997 WL 599386 at *5.   NorthWestern, in asserting that public policy favors finality of bankruptcy orders, once again heavily relies on Continental I and Zenith – two cases in which the facts and circumstances made it impossible for the Court to fashion effective relief without unwinding the Plan.  However, when a form of effective relief can be fashioned, as is the case here, such relief should be granted rather than have an appellant "suffer the mootness of its appeal as a whole." Chateaugay II, 10 F.3d at 954 (citations omitted).  Essentially, when relief is possible without unraveling the entire plan, plaintiffs or appellants, who have "never had their day in court" should not be "forced to forfeit their claims against non-debtors with no consideration." Continental II, 203 F.3d 211 ("In balancing the policy favoring finality of bankruptcy court judgments – particularly reorganization plans – against other considerations, we note as well that the equities here would not dictate dismissal."). See also In re Block Shim Dev. Company-Irving, 113 B.R. 256, 258 (N. D. Tex. 1990) ("The mootness doctrine is not to be applied in an uncritical manner, sweeping aside all claims on the basis of some that may be incapable of prompting effective appellate relief").

Because a holding in which this Court grants Magten the relief it is entitled to will be limited to the facts of this case, it is highly unlikely that such decision will "contribute to the gradual erosion of reliance on Bankruptcy Court orders." Lafayette 1997 WL 599386 at *5.  Rather, "[i]n exercising its discretionary power to dismiss an appeal on mootness grounds, a court cannot avoid its obligation to scrutinize each individual claim, testing the feasibility of granting the relief against its potential impact on the reorganization scheme as a whole." In re AOV Indus., 792 F.2d at 1148.

18

II.   **The Plan Committee Does Not Have Standing to Join in the Appeals**

On June 10, 2005, the Plan Committee filed a Joinder to NorthWestern's Motion to

Dismiss Appeals.  The Plan Committee lacks standing to be heard and its Joinder should be

disregarded.

Section 7.9 of NorthWestern's Plan creates the Plan Committee for "the purpose of

overseeing the remaining Claims reconciliation and settlement process."  Unlike the Official

Committee of Unsecured Creditors that is a statutorily created body to protect the interests of

creditors appointed by the United States Trustee, the Plan Committee is merely created by the Plan

and is not vested with statutory duties to protect the rights and interests of creditors.  Section 7.9

of the Plan specifically grants rights to the Plan Committee *only* with respect to the settlement

process and does not grant the Plan Committee such a broad sweeping role in the administration of

NorthWestern's estate.  The Plan Committee's role is limited by section 7.9 of the Plan and it has

no right to be heard in these appeals.

Even if the role of the Plan Committee fell within the scope of protecting the interests of

creditors, the Third Circuit has established that appellate standing is generally limited to parties

that are "aggrieved" by a bankruptcy court's decision.  With the intentions of limiting third party

standing for appeals in bankruptcy cases, the Third Circuit stated that

> We consider a person to be aggrieved only if the bankruptcy
> court's order "diminishes their property, increases their burdens, or
> impairs their rights." Thus, only those "whose rights or interests
> are directly and adversely affected pecuniarily" by an order of the
> bankruptcy court may bring an appeal.

In re PWS Holding Corp, 228 F.3d at 249 (quoting In re Dykes, 10 F.3d 184, 187 (3d Cir. 1993))

(internal citations omitted).  See also In re ANC Rental Corp., 57 Fed. Appx. 912, 914 (3d Cir.

2003) ("appellate standing in bankruptcy cases is limited to 'persons aggrieved'"); Travelers Ins.

19

Co. v. H.K. Porter Co., 45 F.3d 737, 741 (3d Cir. 1995) ("'Efficient judicial administration requires that appellate review be limited to those persons whose interests are directly affected.'") (quoting In re Fondiller, 707 F.2d 441, 443 (9th Cir., 1983)); In re Dykes, 10 F.3d 184, 188 (3d Cir. 1993) ("we are satisfied that an appellant must qualify as a person aggrieved to be eligible for appellate review of a bankruptcy court order .... To appeal from an order of a bankruptcy court one must show that the order diminishes one's property, increases one's burdens or impairs one's rights."); Bartel v. Bar Harbor Airways, 196 B.R. 268, 271 (S.D.N.Y. 1995) ("To be a 'person aggrieved', the appellant must be 'directly and adversely affected pecuniarily by the challenged order'") (quoting In re Cosmopolitan Aviation Corp., 763 F. 2d 507, 513 (2d Cir. 1985), cert. denied 474 U. S. 1032 (1985)). The Third Circuit further noted that when considering appellant standing, "the 'person aggrieved' standard is more stringent than the constitutional test for standing." In re PWS Holding Corp., 228 F. 3d at 249. See also, In re O'Brien Envtl. Energy, Inc., 181 F. 3d 527, 530 (3d Cir. 1999).

The Plan Committee is not a "party aggrieved" such that its rights and interests are directly and adversely affected by the relief that can be afforded Magten in the Appeals. As previously noted, the Plan Committee is not an individual creditor nor is it a fiduciary for a creditor constituency.

Furthermore, the Plan Committee incorrectly asserts its right to submit the Joinder as a "party in interest" pursuant to section 1109(b) of the Bankruptcy Code.[8] Magten does not believe that the Plan Committee, with the very limited role it has been granted under the Plan, was intended to be a "party in interest" within the meaning in section 1109(b), with the right to raise,

---

[8]    Section 1109(b) of the Bankruptcy Code provides, in relevant part:
       [a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity securities holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter.

20

appear and be heard on any issue in NorthWestern's chapter 11 case. Nonetheless, even if the Plan Committee is a "party in interest," as noted above, only a "party aggrieved" is conferred standing in an appeal, not a mere "party in interest." As the Third Circuit has made clear, although "[t]itle 11 U.S.C § 1109(b) . . . confers broad standing at the trial level . . . courts do not extend that provision to appellate standing." In re PWS Holding Corp., 228 F.3d at 248-249. For this reason, the Plan Committee's reliance on section 1109(b) is improper and the Plan Committee does not have a right to be heard in the Appeals.

## CONCLUSION

As set forth in this Response, the Appeals are not equitably moot as this Court can fashion effective relief without unwinding the Plan. Therefore, for the reasons stated herein, Magten respectfully requests that the Motion to Dismiss be denied.

Dated: Wilmington, Delaware
       June 30, 2005

                                                BLANK ROME LLP

                                                Mark J. Packel (DE No. 4048)
                                                Elio Battista, Jr. (DE No. 3814)
                                                1201 Market Street, Suite 800
                                                Wilmington, DE 19801
                                                Telephone:   (302) 425-6400

                                                            -and –

                                                FRIED, FRANK, HARRIS, SHRIVER &
                                                     JACOBSON LLP
                                                Bonnie Steingart, Esq.
                                                Gary L. Kaplan, Esq.
                                                One New York Plaza
                                                New York, NY 10004
                                                Telephone:  (212) 859-8000

                                                Counsel for Magten Asset Management
                                                     Corporation

21

ATTACHMENT "1"

Westlaw.

Not Reported in F.Supp.

1997 WL 599386 (S.D.N.Y.)

**(Cite as: 1997 WL 599386 (S.D.N.Y.))**

▷

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
In re: LAFAYETTE HOTEL PARTNERSHIP,
Debtor.
WHBA Real Estate Limited Partnership, Appellant,
v.
Lafayette Hotel Partnership, Debtor-Appellee.
**Nos. 96 Civ. 7476 HB, 95 B 40682 BRL.**

Sept. 29, 1997.

Harvey A. Strickon, Paul, Hastings, Janofsky & Walker, LLP, New York City, for appellant.

Martin F. Brecker, Anderson, Kill & Olick, P.C., New York City, for debtor-appellee.

**OPINION AND ORDER**

BAER, J.

**\*1** WHBA Real Estate Limited Partnership ("WHBA") appeals from an Order of the bankruptcy court, Lifland, B.J., confirming Debtor-Appellee Lafayette Hotel Partnership's ("Debtor") reorganization plan. Debtor has moved to dismiss the appeal as moot. Oral argument on the motion to dismiss was held on July 11, 1997. For the reasons discussed below, the motion to dismiss is **DENIED**.

**BACKGROUND**

On February 16, 1995, the Debtor filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. Debtor owned a Ramada hotel, an adjacent restaurant and some vacant land. Until it filed for bankruptcy, Debtor leased the hotel to

API and ran the restaurant under a franchise agreement with Damon's Management ("Damon's"). WHBA had a $3.3 million claim against Debtor, secured by two mortgages on Debtor's property. WHBA had commenced a foreclosure action against Debtor before Debtor filed for bankruptcy protection.

The Bankruptcy Court made a factual finding that Debtor's property was worth $2.4 million and therefore determined that WHBA had a $2.4 million secured claim against Debtor, and a $900,000 unsecured deficiency claim. On July 31, 1996, the Bankruptcy Court entered an order ("Confirmation Order") confirming the Debtor's First Amended Plan ("Plan"), based upon the above findings regarding WHBA's claims and over WHBA's objection. The Plan called for: (i) a balloon payment of the principal of WHBA's $2.43 million secured claim in seven years, with interest payments due over the seven year period; (ii) payment of *pro rata* shares of $65,000 to all unsecured claimants, the largest of which is WHBA, in each of the seven years following confirmation; (iii) present payment of administrative fees, priority claims, and convenience creditors; (iv) payment of priority tax claims plus interest over a six-year period; and (v) execution of a new lease agreement between Debtor and API for seven years, increasing API's rental payments from their pre-petition levels. The Plan also called for Debtor to lease to API both the hotel and the restaurant, whereas only the hotel had been leased previously. The substantive appeal by WHBA relates to whether the Bankruptcy Court properly classified various creditors in determining whether the "cramdown" plan could be approved.

The Debtor and API entered into the seven-year lease contemplated by the Plan. The parties disagree as to whether this lease was entered into prior or subsequent to the entry of the Confirmation Order. Subsequently (on an unspecified date), the Debtor and API jointly settled claims with Damon's.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 2

1997 WL 599386 (S.D.N.Y.)

**(Cite as: 1997 WL 599386 (S.D.N.Y.))**

Pursuant to this settlement, Damon's dropped its objections to the Plan, Debtor rejected its existing franchise agreement with Damon's, and API and Damon's entered into a franchise agreement which provided for API to pay Debtor's pre-petition defaults under the old franchise agreements.

Since Confirmation, the Debtor has also commenced interest payments on WHBA's secured claim (totalling $178,200 as of oral argument) and made other payments due under the Plan (convenience creditors, taxes, unsecured claims and attorneys' fees) totalling over $150,000. Furthermore, API has taken possession of the hotel and restaurant, made rental payments to the Debtor, spent in excess of $138,000 to finance improvements to the restaurant and approximately $146,000 in renovating the hotel (as of December 1996) and paid Damon's pursuant to the franchise agreement.

*2 On August 9, 1996, nine days after the Confirmation Order was entered by Judge Lifland, WHBA appealed from the Confirmation Order. WHBA, however, neither sought nor obtained a stay of enforcement of the Confirmation Order pending an appeal from either the Bankruptcy Court or this Court. On December 11, 1996, the Debtor moved to dismiss the appeal as moot and API, a party to the bankruptcy proceeding and this appeal, has joined in the motion.

## DISCUSSION

The mootness doctrine in bankruptcy involves both constitutional and equitable concerns. *In re Best Products,* 68 F.3d 26, 29 (2d Cir.1995). The constitutional requirement of a "case or controversy" requires that an appeal be dismissed as moot when post-confirmation events makes it impossible to grant effective relief. *In re Chateaugay Corporation,* 988 F.2d 322, 325 (2d Cir.1993) ("Chateaugay I"). Equitable considerations, by contrast, require that an appeal be dismissed as moot "when 'even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable.' " *Id.* (citations omitted). Thus, an appeal must be

dismissed as moot if effective relief is impossible to grant or if effective relief, though possible, would be inequitable. Most cases holding an appeal moot involve significantly more transactions than those at issue here or the distribution of assets to numerous non-parties. *See Chateaugay I,* 988 F.2d at 326 (appeal moot where funds distributed to pension plan beneficiaries); *Bartel v. Bar Harbor Airways,* 196 B.R. 268, 273 (appeal moot where assets liquidated and distributed); *In Re Best Products,* 177 B.R. 791, 805 (S.D.N.Y.1995) (appeal moot where debtor entered into thousands of transactions with third parties), *aff'd on other grounds,* 68 F.2d 26 (2d Cir.1995); *In Re Revere Copper and Brass, Inc.,* 78 B.R. 17, 21 (S.D.N.Y.1987) (appeal moot where debtor issued millions of shares of stock). Debtor does not contend that the appeal is constitutionally moot. Rather, the issue before the Court relates to equitable considerations only.

## A. *Substantial Consummation*

The Debtor contends that the appeal from the Confirmation Order is moot because the Plan has been "substantially consummated." Substantial consummation is defined in the Bankruptcy Code as:

(A) transfer of all or substantially all the property proposed by the plan to be transferred;

(B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; *and*

(C) commencement of distribution under the plan.

11 U.S.C. § 1101(2) (emphasis added).

Whether a plan has been substantially consummated is a question of fact. 7 *Collier on Bankruptcy* at 1101-7 to 1101-8 (15th ed. revised 1997). Contrary to Debtor's contention, substantial consummation requires that all three § 1101(2) criteria be satisfied. *Id.* at ¶ 1102.02[2], at 1101-7. Here, the second and third criteria for substantial consummation are clearly met. API has assumed the management of the hotel and restaurant--the only property owned by the Debtor--and the Debtor has begun distributions under the Plan as described above.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

1997 WL 599386 (S.D.N.Y.)

(Cite as: 1997 WL 599386 (S.D.N.Y.))

**\*3** Whether the first criterion--transfer of substantially all the property proposed by the plan to be transferred--has been met is a more difficult question. Most cases addressing the mootness question have assumed that the plan at issue was substantially consummated, *e.g., Bartel,* 196 B.R. at 272; *Best Products,* 177 B.R. at 796, and thus do not discuss what qualifies as a transfer of substantially all property. If the Plan is viewed as requiring only the transfer of a leasehold interest, then this requirement is met. If the $2.43 million balloon payment to WHBA is considered a transfer of property, however, the Plan has not been substantially consummated, as this amount has not been paid. An interpretation of the term "property" in § 1101(2)(A) to include the balloon payment, however, would render § 1101(2)(C), which requires merely the "commencement of distribution under the plan", redundant and meaningless. Such a statutory interpretation is not favored, and the plan must therefore be deemed "substantially consummated" as that term is defined in the Bankruptcy Code.

**B. *Equitable Concerns***

While a finding of "substantial consummation" raises a strong presumption in favor of dismissing an appeal as moot, *Best Products,* 177 B.R. at 803, it alone does not render relief impossible or inequitable. *In re Chateaugay Corporation,* 10 F.3d 944, 952 (2d Cir.1993) ("*Chateaugay II* "); *see also* 7 *Collier* at ¶ 1101.02[1][b], at 1101-6 to 1101-7. Rather, the Second Circuit has held that substantial consummation of a reorganization plan will not render an appeal moot if *all* of the following five requirements are met: (a) the court can still order some effective relief; (b) the relief will not affect the reemergence of the debtor as a corporate entity; (c) such relief will not unravel intricate transactions and create an unmanageable situation for the Bankruptcy Court; (d) the parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings; and (e) the appellant sought a stay of execution with all diligence if the failure to do so creates a situation rendering it inequitable to reverse the Order.

*Chateaugay II,* 10 F.3d at 952-53; *see also Best Products,* 177 B.R. at 803-04; *Bartel,* 196 B.R. at 272.

An analysis of these five factors supports denial of the motion to dismiss, but only barely and with the limitations described below . [FN1] The first, third and fourth *Chateaugay II* factors are met here. The Court can still grant effective relief by reversing the Confirmation Order and either permitting WHBA to foreclose or remanding for implementation of a new reorganization plan. Any such reversal of the Confirmation Order would not unravel intricate transactions as this is a rather simple case involving few parties, a lease and a franchise agreement. Finally, the parties potentially affected by any reversal or modification of the Confirmation Order are the Debtor, API and Damon's. They are hereby invited to participate in the briefing and any oral argument on the merits of the appeal. [FN2]

> FN1. The parties did not bother to conduct such an analysis, focusing instead solely on the fifth factor, requiring that a stay be sought.

> FN2. API is a party to the appeal and filed a memorandum of law and affidavit in support of the motion to dismiss.

**\*4** The second and fifth *Chateaugay II* factors, however, are more troubling. The second *Chateaugay II* factor looks to whether effective relief would affect "the reemergence of the debtor as a corporate entity." The Court first notes that this factor should have less weight where, as here, the "corporate entity" is in reality an investment partnership, and not a major industrial corporation. Nevertheless, *Chateaugay II* requires that the Debtor's continued viability not be affected. Whether Debtor would continue to function as a corporate entity depends on the nature of relief granted if the Confirmation Order were to be reversed. An order allowing foreclosure would almost certainly affect Debtor's continued viability. On the other hand, a new reorganization plan allowing for expedited repayment of (possibly) more of WHBA's claim would not so affect Debtor.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 599386 (S.D.N.Y.)

**(Cite as: 1997 WL 599386 (S.D.N.Y.))**

Accordingly, though the Court holds the appeal is not moot, it does so with the explicit understanding that should the Confirmation Order ultimately be reversed, any new reorganization plan cannot affect the Debtor's "reemergence as a corporate entity." That is, even should WHBA succeed on its appeal, it is unlikely to succeed in its foreclosure efforts.

The fifth *Chateaugay II* factor requires the appellant to seek a stay of execution if the failure to do so creates a situation rendering it inequitable to reverse the Confirmation Order. WHBA never sought a stay. The Court's inquiry is thus focused on the equitable issue. WHBA contends that its failure to seek a stay should be excused because of the simple nature of the Plan, arguing that the parties' knowledge of the appeal negates any claims of detrimental reliance. It does not offer any convincing rationale for its unexcusable failure to seek a stay.

Since the Confirmation Order was entered, API has invested over $384,000 in reliance on the Confirmation Order (this number has likely grown since oral argument) and entered into the lease and franchise agreements. API estimates that in the event of foreclosure or rejection of its lease its losses would run in excess of "several hundred thousand dollars". As noted above with respect to the Debtor's reemergence, the Court will keep this equitable consideration in mind should the Confirmation Order be reversed and a new reorganization plan be necessary. Other courts have allowed appeals to proceed where the appellant agreed to certain conditions rendering continuation of the appeal equitable under the circumstances. *See Bank of America, Illinois v. 203 N. LaSalle Street Partnership,* 195 B.R. 692, 699 (N.D.Ill.1996) (appeal not moot where appellant agrees not to disturb lease). *See Chateaugay II,* 10 F.3d at 954 (appeal not moot where appellant willing to accept "fractional recovery that does not impair feasibility or affect the parties before [the] Court, rather than suffer mootness of its appeal as a whole"). Although WHBA has not made such an offer to the Court, the Court, in furtherance of its equitable powers, adopts such limitations on the ultimate scope of relief to be

granted. Therefore, although the motion to dismiss is denied and the appeal will be heard on its merits, it is with the understanding that, should the Confirmation Order be reversed, any subsequent reorganization plan will (i) ensure the continued viability of the Debtor and (ii) protect API and Damon's interests. This is not to say that the Debtor, API and Damon's can suffer no adverse consequences as a result of any new reorganization plan, but merely that any such plan should recognize and accommodate the substantial investments they have made in reliance on the unstayed Confirmation Order.

**\*5** At oral argument, Debtor listed a parade of horribles that would befall bankruptcy law should this Court allow the appeal to proceed notwithstanding Appellant's failure to seek a stay. Specifically, Debtor argued that allowing this appeal to proceed would "tremendously chill the ability of debtors to do business and to get financing when somebody just files an appeal with impunity and doesn't face the issue of proving why there should be a stay." Tr. at 17. While Debtor's argument has merit it fails here for two reasons. First, *Chateaugay II* merely requires that the appellant *seek* a stay, not that she secure one. Pursuant to Debtor's logic, the appellant who sought but did not receive a stay should also be barred from pursuing an appeal, lest the concept of finality in bankruptcy cases be forever undone. Second, and more importantly, while courts should always be conscious of the impact their rulings will have on the development of the law, the Court's role is to decide the matters before it, based on the record before it. My holding here is limited to the facts of this case and is unlikely to contribute to the gradual erosion of reliance on Bankruptcy Court orders.

### CONCLUSION

Ultimately, this motion presents the Court with a question of fairness. Is it fair to allow the appeal to proceed on the merits even though certain parties have made investments in reliance on the unstayed Confirmation Order? I answer that question, hesitantly, in the affirmative, with the explicit caveats described above to protect the equitable

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 6 of 6

Not Reported in F.Supp.                                                     Page 5

1997 WL 599386 (S.D.N.Y.)

**(Cite as: 1997 WL 599386 (S.D.N.Y.))**

interests of Debtor, API, Damon's and other unsecured creditors. The reorganization plan at issue here is a simple matter and, notwithstanding its unexcused failure to seek a stay, appellant is entitled to have the Bankruptcy Court's Confirmation Order reviewed on its merits. The parties should work out a briefing schedule among themselves so that fully-briefed motions are filed, and curtesy copies delivered to Chambers, no later than November 26, 1997.

**SO ORDERED.**

1997 WL 599386 (S.D.N.Y.)

   **Motions, Pleadings and Filings (Back to top)**

• 1:96CV07476  (Docket)
                          (Oct. 02, 1996)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.