nine remaining coupon payments on the five-year notes, the amortization of the gain equates to a $1.9 million interest savings per coupon payment, effectively lowering the annual interest rate on the five-year notes to 6.3%.

- On October 8, 2002, we completed a 10 million share common stock offering. The offering raised $81.0 million of net proceeds, after expenses and commissions. The net proceeds were used for general corporate purposes, including reducing amounts drawn under our credit facility.

Capital expenditures for property, plant and equipment for the years ended December 31, 2002, 2001 and 2000, were $115.9 million, $163.9 million, and $61.4 million, respectively. We estimate that our capital expenditures for 2003 will be approximately $60 million for our regulated business and $23 million for our unregulated businesses. Our capital expenditures are continually examined and evaluated and may be revised in light of changing business operating conditions, variation in sales and other business factors. Our future investment in any non-utility entity, including Blue Dot, CornerStone or Expanets, is limited to $10 million without the approval of the MPSC, pursuant to an order issued in connection with approval of our senior secured term loan. With the approval of the MPSC, we may make secured loans of up to $30 million for Expanets and $20 million for Blue Dot under the order, but we do not intend to do so. We expect our capital expenditures for our regulated business to approximate $60 million in each of years 2004 through 2007.

As of December 31, 2002, NorthWestern had long-term borrowings of approximately $2.1 billion. Through March 31, 2003, we have:

- Repaid $15.0 million aggregate principal amount of maturing Montana Secured Medium Term Notes.
- Repaid approximately $11.2 million on Expanets' credit facility with Avaya. The remaining outstanding balance on this facility of approximately $27.1 million was formally extended by Avaya and is due in three equal installments of approximately $9.0 million on each of January 1, April 1 and July 1, 2004.
- Agreed with Avaya to cancel the Expanets subordinated note in the face amount of $35.0 million due 2005 that was issued as partial consideration in the GEM acquisition. The subordinated note was non-interest bearing and had a carrying value of approximately $27.0 million as of December 31, 2002.
- Repaid and terminated our $280 million credit facility, of which the outstanding balance at December 31, 2002 was approximately $255.0 million and which was fully drawn, including back-up letters of credit, on the date of repayment, with net proceeds received on a $390 million secured term loan closed during February 2003.

After such repayments, as of March 31, 2003, we now have approximately $2.2 billion in long-term borrowings, with maturities during the balance of 2003 of approximately $9.0 million, which excludes $16 million related to the Blue Dot credit facility, currently in default, which is non-recourse to us. In 2004, we have approximately $42.3 million in maturities, including approximately $27.1 million under Expanets' credit agreement with Avaya, for which we have an obligation to purchase inventory and receivables in an amount equal to the outstanding balance in the event of a default by Expanets.

---

The following table shows our contractual cash obligations and commercial commitments as of December 31, 2002:

| | Total | 2003 | 2004 | 2005 | 2006 | 2007 | Thereafter |
|---|---|---|---|---|---|---|---|
| **Payment Due By Period Year Ending December 31,** | | | | | | | |

(in thousands)

| | Total | | | | | | |
|---|---|---|---|---|---|---|---|
| **Debt:** | | | | | | | |
| Senior Notes, 7⁷/₈% and 8³/₄% | $ 720,000 | $ — | $ — | $ — | $ — | $ 250,000 | $ 470,000 |
| Discount on Senior Notes | (802) | — | — | — | — | — | (802) |
| Senior Unsecured Debt, 6.95% | 105,000 | — | — | — | — | — | 105,000 |
| Credit Facility(1) | 255,000 | 3,900 | 3,900 | 3,900 | 243,300 | — | — |
| South Dakota Mortgage Bonds, 7.00% and 7.10% | 115,000 | — | — | 60,000 | — | — | 55,000 |
| South Dakota Pollution Control Obligations, 5.85% and 5.90% | 21,350 | — | — | — | — | — | 21,350 |
| Montana First Mortgage Bonds, 7.00%, 7.30%, 8.25% and 8.95% | 157,197 | — | — | 5,386 | 150,000 | 365 | 1,446 |
| Discount on Montana First Mortgage Bonds | (3,226) | — | — | — | — | — | (3,226) |
| Montana Pollution Control Obligations, 6.125% and 5.90% | 170,205 | — | — | — | — | — | 170,205 |
| Montana Secured Medium Term Notes, 7.23% and 7.25% | 28,000 | 15,000(2) | — | — | — | — | 13,000 |
| Montana Unsecured Medium Term Notes, 7.07%, 7.96 and 7.875% | 40,000 | — | — | — | 15,000 | — | 25,000 |
| Montana Natural Gas Transition Bonds, 6.20% | 50,866 | 4,364 | 4,052 | 4,744 | 4,712 | 5,248 | 27,746 |
| Expanets credit facility(3) | 38,299 | 11,199(4) | 27,100(4) | — | — | — | — |
| Blue Dot credit facility | 16,000 | 16,000 | — | — | — | — | — |
| Other debt, various(4) | 29,733 | 795 | 1,170 | 27,308 | 221 | 239 | — |
| Capital leases(5) | 19,272 | 6,620 | 6,081 | 3,312 | 2,177 | 708 | 374 |
| **Total Debt** | 1,761,894 | 57,878 | 42,303 | 104,650 | 415,410 | 256,560 | 885,093 |
| **Mandatorily Redeemable Preferred Securities of Subsidiary Trusts:** | | | | | | | |
| 8.125% mandatorily redeemable preferred securities of subsidiary trust | 32,500 | — | — | — | — | — | 32,500 |
| 7.20% mandatorily redeemable preferred securities of subsidiary trust | 55,000 | — | — | — | — | — | 55,000 |
| 8.45% mandatorily redeemable preferred securities of subsidiary trust | 65,000 | — | — | — | — | — | 65,000 |
| 8¹/₄% mandatorily redeemable preferred securities of subsidiary trust | 106,750 | — | — | — | — | — | 106,750 |
| 8.10% mandatorily redeemable preferred securities of subsidiary trust | 111,000 | — | — | — | — | — | 111,000 |
| | 370,250 | — | — | — | — | — | 370,250 |
| **Future minimum operating lease payments(5)** | 342,086 | 59,891 | 54,461 | 48,379 | 41,405 | 36,004 | 101,946 |
| **QF Facilities(6)** | 143,606 | 9,395 | 8,075 | 7,908 | 2,811 | 3,804 | 111,613 |
| **Power Purchase Contracts(7)** | 1,694,561 | 306,293 | 291,984 | 269,869 | 231,096 | 162,384 | 432,935 |
| **Interest payments on existing debt and preferred securities** | 2,168,988 | 174,471 | 171,110 | 169,270 | 161,771 | 108,540 | 1,383,826 |
| **Total Commitments** | $ 6,481,565 | $ 608,108 | $ 567,933 | $ 600,076 | $ 852,493 | $ 567,292 | $ 3,285,663 |

(1) In addition, as of December 31, 2002, NorthWestern had letters of credit totaling $20.4 million outstanding under its $280 million revolving credit facility. This facility was terminated and repaid in full on February 10, 2003. This facility was repaid with a portion of the proceeds from our new $390 million senior secured term loan, which we drew down on February 10, 2003 and which matures on December 1, 2006. We have adjusted the maturity schedule of the amounts outstanding under our $280 million revolving credit facility at December 1, 2002 to match the maturity schedule under our new $390 million senior secured term loan. The entire outstanding balance under the senior secured term loan matures on December 31, 2006, expected to be approximately $378 million, net of scheduled amortization. We have also included the interest payments on our senior secured

term loan in the interest payments reflected in this table.

(2)   These Montana Secured Medium Term Notes matured and were repaid in their entirety on January 27 and 28, 2003.

(3)   This facility had an outstanding balance of $27.1 million as of March 31, 2003. Amounts repaid under this facility may not be reborrowed. If Expanets defaults under this facility, we may be obligated to purchase inventory and accounts from Avaya in an amount equal to the outstanding balance of the facility.

*(Footnotes continued on the next page.)*

61

---

*(Footnotes continued from the preceding page.)*

(4)   Subsequent to December 31, 2002, we reached an agreement with Avaya to settle certain claims and to restructure the terms of Avaya's investments in Expanets' equity and debt securities. In connection with such agreement, Expanets paid down the balance of its credit facility to approximately $27.1 million, which was deferred until 2004 and will be repaid in equal payments on January 1, 2004, April 1, 2004 and July 1, 2004. Further, Expanets' non-interest bearing note in the face amount of $35.0 million which was carried on Expanets' books at a value of approximately $27.0 million at December 31, 2002 and is included in Other debt, various, was forgiven by Avaya. See Item 1. "Business—Communications, Network Services and Data Solutions Business—Expanets—Operating Developments" for further details of this agreement.

(5)   The capital lease obligations are principally used to finance equipment purchases. These leases have various implicit interest rates, which range from 2.0% to 16.1%. NorthWestern has a financial commitment related to certain vehicles under operating leases by Expanets and Blue Dot, in the event of default and subsequent failure to cure such default. At December 31, 2002 the amount of this financial commitment is approximately $24.7 million.

(6)   As discussed in "Utility Regulation—Electric Operations—Montana", with the acquisition of our Montana operations we assumed a liability for expenses associated with certain *Qualifying Facilities Contracts, or QFs. The QFs require* us to purchase minimum amounts of energy at prices ranging from $65 to $138 per megawatt hour through 2029. Our gross contractual obligation related to the QFs is approximately $1.9 billion. A portion of the costs incurred to purchase this energy is recoverable through rates authorized by the MPSC, totaling approximately $1.5 billion. We have established a liability as of the date of the acquisition of $134.3 million, which represents the net present value, utilizing a discount rate of 8.75%, of the difference between our obligations under the QFs and the related amount recoverable in rates. The obligation and payments reflected on this schedule represent the amortization of this liability.

(7)   As discussed in "Electric Operations—Electric Supply" and "Natural Gas Operations—Natural Gas Supply", we have entered into various power purchase commitments, largely purchased power, coal and natural gas supply, electric generation construction and natural gas transportation contracts. These commitments range from one to thirty years.

Each of the debt agreements, mandatorily redeemable preferred securities of subsidiary trust and capital and operating leases described in the above-referenced table, as well as other contractual obligations including the Blue Dot exchange agreements and the obligations under the Defined Benefit Pension and Postretirement Benefit Plan are described under the caption "Description of Indebtedness and Other Contractual Obligations."

For our utility only operations, which excludes Blue Dot, Expanets, and all other unregulated entities, and absent proceeds from the sale of non-core assets, we estimate the following for the years 2003 and 2004 ($ are approximate and in millions):

|  | 2003 | 2004 |
|---|---|---|
| Cash flows from operating activities(1) | $    30 | $    80 |
| Cash flows used in investing activities(2) | (60) | (60) |
| Cash flows provided (used) in financing activities(3) | 32 | (39) |
| Increase (decrease) in cash and cash equivalents | $     2 | $   (19) |

(1) The 2003 amount includes a net decrease in working capital of approximately $45 million and interest payments of approximately $140 million. The 2004 amount includes a net decrease in working capital of approximately $15 million and interest payments of approximately $140 million.

(2) These amounts are comprised of capital expenditures.

62

(3) The 2003 amount represents the net total of our currently anticipated financing activities for 2003 and is comprised of the following:

| | | |
|---|---|---|
| Net proceeds—Senior secured term loan | $ | 366 |
| Repayment of outstanding debt and retirement of letters-of-credit with proceeds from senior secured loan | | (280) |
| Trust preferred dividend payments | | (30) |
| Other debt payments | | (24) |
| Cash flows provided by financing activities | $ | 32 |

We have the right to defer payment of our trust preferred dividend payments for up to 20 consecutive quarters. The 2004 amount includes trust preferred dividend payments of approximately $30 million, and other debt payments of approximately $9 million.

Based on our current plans and business conditions, we expect that our available cash, cash equivalents and investments, together with amounts generated from operations, will be sufficient to meet our cash requirements for at least the next twelve months. However, due to a decrease in cash and cash equivalents during 2004, we believe that we may need additional funding sources or proceeds from the sale of non-core assets, by the end of 2004 or early in 2005. Commencing in 2005, we face substantial debt reduction payments. Absent the receipt of significant proceeds from the sale of non-core assets, the raising of additional capital or a restructuring of our debt, we will not have the ability to reduce our debt or meet our maturing debt obligations. Even if we are successful in selling some or all of our non-core assets, we will have to restructure our debt or seek new capital.

The principal elements of our turnaround plan will be to focus on our core electric and natural gas utility businesses and to commit to reduce our debt. In that regard,

- We do not intend to make any additional significant investments in, or commitments to, Expanets and Blue Dot while we examine strategic alternatives for these businesses, including the sale or disposition of each of these businesses or their assets;

- We are seeking to enforce a contract for the sale of our Colstrip Transmission line, and we propose to sell certain of our non-core assets, including our Montana First Megawatts project;

- We intend to review all corporate overhead and significantly reduce expenditures; and

- We have departed from our historical practice of paying dividends on our common stock.

**Description of Indebtedness and Other Contractual Obligations**

*Senior Notes.*  The Senior Notes are two series of unsecured notes that we issued in 2002 in connection with our acquisition of NorthWestern Energy LLC. These senior notes mature in 2007 and 2012.

*Senior Unsecured Debt.*  The Senior Unsecured Debt is a general obligation that matures in 2028. We issued this debt in November 1998, and the proceeds were used to repay short-term indebtedness and for general corporate purposes.

*Senior Secured Term Loan.*  In February 2003, we closed and received funds from a $390 million senior secured term loan, which is secured by $280 million of First Mortgage Bonds secured by substantially all of our Montana utility assets and $110 million of First Mortgage Bonds secured by substantially all of our South Dakota and Nebraska utility assets. The net proceeds from this facility were used to repay $260 million outstanding plus approximately $20 million in letters of credit and terminate our prior working capital facility, which had a $280 million revolving line of credit, and provided ongoing liquidity to the Company. Our prior credit facility, which bore interest at a variable

63

rate tied to the London Interbank Offered Rate plus a spread of 1.5% based on our credit ratings and accrued interest at 2.88% per annum as of December 31, 2002, was repaid and terminated on February 10, 2003.

Our new senior secured term loan bears interest at a variable rate tied to the Eurodollar rate, with a floor of 3.0%, plus a spread of 5.75% or at the prime rate, with a floor at 4.00%, plus a spread of 4.75%. Our new senior secured term loan expires on December 1, 2006, although we must make quarterly amortization payments equal to $975,000 commencing on March 31, 2003. The credit agreement with respect to our senior secured term loan contains a number of representations and warranties and imposes a number of restrictive covenants that, among other things, limit our ability to incur indebtedness and make guarantees, create liens, make capital expenditures, pay dividends and make investments in other entities.

In addition, we are required to maintain certain financial ratios for NorthWestern and its subsidiaries, excluding Blue Dot, Expanets and CornerStone (the "Borrower"), including:

- net worth, as defined, on the last day of each fiscal quarter of at least $616.0 million plus 50% of cumulative net income (but not losses) from each quarter commencing with the quarter ending March 31, 2003 ($785.1 million at December 31, 2002);

- a funded debt to total capital ratio, as defined, on the last day of each fiscal quarter of no greater than 72.5% (69.1% at December 31, 2002);

- a ratio of utility business earnings before interest, taxes, depreciation and amortization, or EBITDA(1), to consolidated recourse interest expense (which excludes non-cash interest expense) for the prior four fiscal quarters of at least 1.40 to 1.00 (2.25 at December 31, 2002);

---

(1)  EBITDA is a non-GAAP financial measure and as such, we have not used it in describing our results of operations. We have used EBITDA in this section specifically to show compliance with our debt covenants and we do not refer to EBITDA for any other purpose herein.

- a ratio of Montana utility business EBITDA to interest expense on the Montana First Mortgage Bonds for the trailing four fiscal quarters of at least 3.00 to 1.00 (7.52 at December 31, 2002);

- a ratio of South Dakota utility business EBITDA to interest expense on the South Dakota First Mortgage Bonds for the trailing four fiscal quarters of at least 2.50 to 1.00 (6.11 at December 31, 2002);

- a ratio of funded debt outstanding on the last day of each fiscal quarter to utility business EBITDA for the trailing four fiscal quarters of less than 8.75 to 1.00 prior to January 1, 2004, less than 8.25 to 1.00 during 2004 and less than 7.50 to 1.00 thereafter (7.68 at December 31, 2002);

- a ratio of the aggregate amount of Montana First Mortgage Bonds outstanding on the last day of each fiscal quarter to Montana utility business EBITDA for the trailing four fiscal quarters of less than 4.25 to 1.00 prior to January 1, 2005 and less than 3.75 to 1.00 thereafter (1.99 at December 31, 2002); and

- a ratio of the aggregate amount of South Dakota First Mortgage Bonds outstanding on the last day of each fiscal quarter to South Dakota utility business EBITDA for the trailing four fiscal quarters of less than 4.75 to 1.00 prior to January 1, 2005 and less than 4.25 to 1.00 thereafter (2.32 at December 31, 2002);

For purposes of determining compliance with these covenants, "net worth" is defined as the sum of shareholders' equity and preferred stock (including mandatorily redeemable preferred stock of subsidiary trusts), preference stock and preferred securities of the Borrower on September 30, 2002, with said total specified as $770 million, plus any gain in (or minus any loss in) the sum of

64

shareholders' equity and preferred stock (including mandatorily redeemable preferred stock of subsidiary trusts), preference stock and preferred securities of the Borrower (excludes losses of subsidiaries Expanets, Blue Dot and CornerStone) after September 30, 2002. Total capital is defined as funded debt on any such date plus net worth (as defined) as of the end of the most recent fiscal quarter. The table below shows the components used to determine net worth (as defined), and the respective amounts of each component, at December 31, 2002:

| | |
|---|---:|
| Shareholders' deficit at December 31, 2002 (in thousands) | $ (456,076) |
| Add back losses of Excluded Subsidiaries (as defined): | |
| Loss on discontinued operations | 101,655 |
| Expanets loss for the quarter ended December 31, 2002 | 447,636 |
| Blue Dot loss for the quarter ended December 31, 2002 | 321,602 |
| Company obligated mandatorily redeemable preferred securities of subsidiary trusts | 370,250 |
| Net Worth (as defined) | $ 785,067 |

In January 2003, in connection with executing the new senior secured term loan, we applied to the MPSC for authorization to issue up to $280 million aggregate principal amount of First Mortgage Bonds secured by Montana utility assets as security for our new senior secured term loan facility. In granting its approval, the MPSC placed the following conditions on the approval of the First Mortgage Bonds:

- We must apply all proceeds from the sale of non-utility assets, specifically including Blue Dot and Expanets, to debt reduction;

- We must commit to fully funding the operation, maintenance, repair and replacement of our public utility infrastructure in Montana and to file a required maintenance plan and budget with the MPSC, which we have filed;

- We may not provide more than an additional $10 million in the aggregate in capital to any non-utility entity without the prior approval of the MPSC;

- We must report all advances to non-utility companies to the MPSC within 5 business days of such advance; and

- if the existing credit agreements for Blue Dot or Expanets are terminated, we may file an application with the MPSC seeking approval to provide secured loans of up to $20 million to Blue Dot and up to $30 million to Expanets.

Our turnaround plan is dependent upon receiving proceeds from the sale of our non-core assets, in order to reduce our debt. We are generally prohibited from selling our assets, other than sales of our Colstrip transmission system, sales of assets of, or capital stock in, Montana Megawatts I, LLC and other entities formed for the Montana First Megawatts Project, or sales of other assets that do not exceed, in the aggregate, 10% of the value of our consolidated tangible assets for our utility business as of the reference date for the senior secured term loan, or December 17, 2002. All of the net proceeds from a permitted sale or series of sales of utility assets of at least $10 million as well as 50% of the net proceeds of any equity offering of at least $10 million, must first be offered to the lenders to pay principal and accrued interest on the secured term loan. If such first offer is not accepted, we may use an amount not more than the remaining net proceeds of such transactions not accepted by the lenders to prepay other debt. We do not intend to sell any of our core utility assets. Depending upon the price at which Blue Dot, Expanets or other assets may be sold, we may be required to obtain a waiver from the lenders to sell their stock. While Expanets and Blue Dot are not prohibited from selling their assets and distributing the proceeds to their equity holders, the net proceeds would have to be offered for prepayment to the lenders before prepaying any other debt.

65

We may also offer to prepay, not more than once every three months, all on a portion of the senior secured term loan, which payment maybe accepted or rejected by the lenders. However, unlike mandatory prepayment offers required for the disposition of stock or assets or the issuance of equity, as described above, voluntary prepayment amounts declined by the lenders may not be used to prepay other indebtedness unless waived by the lenders.

***Other Mortgage Bonds.***    We have also issued other mortgage bonds under our South Dakota indenture that mature in 2005 and 2023, including our South Dakota Pollution Control Obligations. All of such bonds are secured by substantially all of our South Dakota and Nebraska electric and natural gas assets.

We have also issued other mortgage bonds under our Montana indenture that mature in 2005, 2006, 2007 and 2022. The Montana Pollution Control Obligations are three obligations that The Montana Power Company issued that mature in 2023. The Montana Secured Medium Term Notes are two obligations that The Montana Power Company issued that mature in 2003 and 2008. The Montana Natural Gas Transition Bonds were issued by The Montana Power Company and mature in 2012. All of these obligations are secured by substantially all of our Montana electric and natural gas assets. The series of Montana Secured Medium Notes that matured in January 2003 bore interest at 7.23% per annum and were repaid at their maturity on January 27-28, 2003.

The Montana Unsecured Medium Term Notes are three general obligations issued by The Montana Power Company that mature in 2006 and 2026.

*Blue Dot's Credit Facility.*   On August 30, 2002, Blue Dot entered into a working capital credit facility with a commercial bank that provides $20 million of available credit for general corporate purposes and matures on August 31, 2005. The facility bears interest at a variable rate (5.0% as of December 31, 2002 tied to the prime rate as announced from time to time by the bank under the credit facility or LIBOR plus in each case a variable margin. The margin can range from .25% to 1.00% above the prime rate or 2.75% to 3.50% above LIBOR. The facility is collateralized by substantially all assets of Blue Dot and contains restrictive covenants prohibiting, among other things, the use of cash by Blue Dot for various purposes including acquisitions, dividend payments to NorthWestern, acquiring outstanding shares of Blue Dot equity, as well as any capital expenditures unless funded by NorthWestern. The facility also prohibits the sale of certain assets, such as the non-core locations, without consent of the bank and provides that a default will occur in the event that NorthWestern ceases to control Blue Dot. The facility is nonrecourse to NorthWestern, but subordinates certain indebtedness owed to NorthWestern by Blue Dot to the obligations owed by Blue Dot under the credit facility. In addition, the facility requires Blue Dot to maintain minimum EBITDA requirements and fixed charge coverage ratios, as defined in the facility documents. As of December 31, 2002, $16.0 million was outstanding on the facility and Blue Dot was in default of certain covenants as a result of its failure to meet its minimum EBITDA requirement for the four quarters ending on December 31, 2002, fund capital expenditures with funds provided by NorthWestern in advance as required under the facility and deliver certain reports. In addition, as of March 31, 2002, the credit facility was fully drawn in the amount of $20 million and Blue Dot was in default on certain other covenants as a result of (i) its failure to meet the minimum EBITDA requirement for the four quarters ending on March 31, 2003, (ii) its failure to fund certain additional capital expenditures with funds provided by NorthWestern in advance as required under the facility, (iii) its failure to pay up to $4.1 million in redemption obligations to certain holders of Series A Preferred Stock and Class C Common Stock and (iv) making certain interest payments on subordinated debt which were prohibited by the terms of the credit facility. These defaults permit the bank at its election to, among other things, increase the interest rates to prime plus 4.00% and LIBOR plus 6.00%, suspend any further LIBOR borrowings, refuse to make any additional loans, terminate the credit facility and require the immediate repayment of all outstanding loans. In addition, the existence of these defaults prevent Blue Dot from making payments under certain subordinated debt, which will result in Blue Dot being in default under

66

---

these instruments. Blue Dot is currently attempting to obtain a waiver of the existing defaults and modify various financial and other covenants of the facility to prevent further potential defaults under the facility and under certain other obligations of Blue Dot. As of December 31, 2002, the facility has been classified as current in our consolidated Balance Sheet.

*Expanets' Credit Facility.*   The Expanets facility represents a short-term line of credit that was provided to Expanets by Avaya for the purpose of financing purchases of Avaya products and services. The remaining outstanding principal balance on the line of credit of approximately $27 million has been extended and is now due in three equal installments of approximately $9 million on each of January 1, April 1 and July 1, 2004. If Expanets defaults on this facility, we may be obligated to purchase inventory and accounts from Avaya in an amount equal to the then outstanding balance of the facility. As of December 31, 2002, the effective interest rate of this loan was 15%. No new borrowings are permitted under the facility and our repurchase obligation will remain in place until the balance is fully paid.

Expanets must achieve financial independence from NorthWestern and is in the process of seeking an asset-based commercial credit facility to replace the Avaya line of credit and to provide operating capital to fund its day-to-day operations. Expanets will incur additional expenses on systems to enhance internal controls.

The Other Debt includes a $35.0 million subordinated note payable to Avaya. In April 2000, Expanets completed a transaction to purchase the Lucent GEM business and, as part of the transaction, Expanets issued Avaya a $35.0 million subordinated note and a $15.0 million convertible note. The $15.0 million note converted into Series D Preferred Stock of Expanets prior to the end of 2001. On March 13, 2003, Avaya cancelled the $35.0 million subordinated note due 2005 and the $15 million Series D Preferred Stock. The subordinated note was non-interest bearing and had a carrying value of $27 million as of December 31, 2002.

***Mandatorily Redeemable Preferred Securities of Subsidiary Trust.***   We have established four wholly owned, special-purpose business trusts, NWPS Capital Financing I, NorthWestern Capital Financing I, NorthWestern Capital Financing II and NorthWestern Capital Financing III, to issue common and preferred securities and hold subordinated debentures that we issue and The Montana Power Company established Montana Power Capital I (Trust) as a wholly owned business trust to issue common and preferred securities and hold subordinated debentures that it issued. We assumed the obligations of The Montana Power Company under the subordinated debentures that it issued to Montana Power Capital I on November 15, 2002. The sole assets of these trusts are the investments in our subordinated debenture obligations. The trusts use the interest payments received on the subordinated debentures to make quarterly cash distributions on the preferred securities. These subordinated debentures are unsecured and subordinated to all of our other liabilities and rank equally with the guarantees related to the other trusts. We guarantee payment of the dividends on the preferred securities only if we have made the required interest payments on the subordinated debentures held by the trusts. We have also agreed to pay all of the expenses of the trusts. In addition, we own all of the common securities of each trust, equivalent to approximately 3% of the capital of each trust. Five years from the date of each issuance, and earlier in some circumstances if changes in law occur, we have the option to redeem some or all of the subordinated debentures at 100% of their principal amount plus any accrued interest to the date of redemption. All of the subordinated debentures have maturities in excess of 20 years.

We have the right, on one or more occasions, to defer interest payments in the subordinated debentures for up to 20 consecutive quarterly periods unless a default under the subordinated debentures has occurred and is continuing. If we defer interest payments on the subordinated debentures, cash distributions on our trust preferred securities will also be deferred. During this deferral period, distributions will continue to accumulate on both the trust preferred securities and deferred distributions at their respective annual rates. During any period in which we defer interest

payments on the subordinated debentures, we will not, with some exceptions, be permitted to pay any dividends or distributions in respect of our capital stock; redeem, purchase or make liquidation payments on our capital stock; make principal, premium or interest payments or repurchase or redeem any of our debt securities that rank equal with or junior to the subordinated debentures; or make any payments with respect to any guarantee of debt securities of any of our subsidiaries, including other guarantees, if such guarantee ranks equal with or junior to the subordinated debentures. Given our significant debt, our board of directors will review the appropriateness of each periodic interest payment under the subordinated debentures in light of, among other factors, the progress of our turnaround plan and our liquidity needs.

At December 31, 2002, NWPS Capital Financing I, NorthWestern Capital Financing I, NorthWestern Capital Financing II, NorthWestern Capital Financing III and Montana Power Capital I had 1.3 million, 2.2 million, 4.27 million, 4.44 million and 2.6 million shares of preferred securities outstanding, respectively, accrued distributions at the annual rate of 8.125%, 7.2%, 8.25%, 8.1% and 8.45%, respectively, of their liquidation preference value of $25 per security, and had assets of approximately $33.5 million, $56.7 million, $110.1 million, $114.4 million and $67 million of our subordinated indebtedness, respectively.

***Other Contractual Obligations.***   Many of Blue Dot's acquisitions have involved the issuance of Blue Dot

capital stock to the sellers of the acquired businesses. In connection with certain acquisitions, the sellers can elect under certain circumstances to exchange their shares for cash at a predetermined rate. The aggregate amount of exchange obligations as of December 31, 2002 was $3.9 million, of which $2.1 million was presented for exchange on March 31, 2003 and remains unpaid.

For certain other acquisitions, Blue Dot entered into call option agreements giving Blue Dot the right to repurchase these shares at a price that will vary, and may be greater or less than the original issue price, based upon the performance of the designated business unit over a specified time. Certain of these agreements grant the holder the right to put such shares to Blue Dot at their adjusted book value if there has not been an initial public offering of Blue Dot by a specified date or at the lesser of the initial public offering price and the current market price shortly after the public offering occurs. For certain agreements, if the shareholder has not exercised his put or has been subject to the exercise of a put or call, the shareholder may be entitled to receive certain payments under earnout arrangements. These earnouts will vary depending upon the performance of the designated business unit over time. The maximum aggregate obligation in respect of these arrangements was approximately $50.0 million as of December 31, 2002, of which $2 million and $4.4 million was due as of March 31, 2003 and June 30, 2003, respectively. Our subsidiary, NorthWestern Growth Corporation, may be required to provide support for certain of the exchange, call option and earnout obligations by providing, at its election, either cash and/or shares of our registered common stock in an amount equal to such obligation in the event Blue Dot fails to perform. Blue Dot is prohibited under its credit agreement from making such payments with its own funds. We have advised Blue Dot that no additional funds will be provided to support such obligations. Blue Dot is attempting to negotiate extensions or other arrangements to satisfy these obligations. Blue Dot's failure to pay these obligations, and NorthWestern Growth's failure to provide support, may result in liability to such shareholders and additional defaults under Blue Dot's credit agreement.

Similar to Blue Dot, many of Expanets' acquisitions involved the issuance of Expanets capital stock to sellers of acquired businesses. In connection with certain of these acquisitions, the sellers can elect to exchange their Expanets stock for cash at a predetermined exchange rate. NorthWestern Growth Corporation may be required to support Expanets' repurchase obligations. As of March 31, 2003 exchange obligations totaling $6.0 million had been presented to Expanets for payment and $0.8 million of such obligations have been paid. Unless Expanets or NorthWestern Growth satisfies the payment obligations to shareholders under the exchange agreements, such shareholders may pursue enforcement

68

---

of the obligations, including through litigation. NorthWestern has subsequently indicated that no additional funds will be provided to Expanets or NorthWestern Growth for these purposes.

As discussed in "Critical Accounting Policies and Estimates—Minority Interest in Consolidated Subsidiaries", Blue Dot had exchange obligations totaling $3.9 million and Expanets had exchange agreement obligations totaling $6.0 million that are reflected as Minority Interests at December 31, 2002 and may be required to be paid during 2003.

We are required to provide audited financial statements under several of our debt instruments, pension plans and other instruments and arrangements within 90 days after the end of our fiscal year. We have not provided audited financials as of the date of this report and are, therefore, in technical default of these requirements. We intend to satisfy our financial statement delivery requirements promptly following filing of this report.

**_Employment Contracts._**    Several, but not all, of our senior executive officers have comprehensive employment agreements with terms through 2004 to 2006. For information about these employment contracts, see "Employment Contracts" at Item 11 of this Report.

*Defined Benefit Pension and Postretirement Benefit Plans.*   With the acquisition of our Montana operations, our pension and other postretirement benefit obligations significantly increased. Our reported costs of providing pension and other postretirement benefits, as described in Note 13 of "Notes to the Consolidated Financial Statements" contained in Item 8, are dependent upon numerous factors resulting from actual plan experience and assumptions of future experience.

Pension and other postretirement benefit costs, are impacted by actual employee demographics, including age and compensation levels, the level of contributions we make to the plan, earnings on plan assets, and health care cost trends. Changes made to the provisions of such plans may also impact current and future benefit costs. Benefit costs may also be significantly affected by changes in key actuarial assumptions, including anticipated rates of return on plan assets and the discount rates used in determining the postretirement benefit obligation and postretirement costs.

As a result of the factors listed above, significant portions of pension and other postretirement benefit costs recorded in any period do not reflect, and are generally greater than, the actual benefits provided to plan participants.

Our pension and other postretirement benefit plan assets are primarily made up of equity and fixed income investments. Fluctuations in actual equity market returns as well as changes in general interest rates may result in increased or decreased pension and other postretirement benefit costs in future periods. Likewise, changes in assumptions regarding current discount rates and expected rates of return on plan assets could also increase or decrease recorded pension and other postretirement benefit costs.

Due to the sharp declines in United States equity markets since the third quarter of 2000, the value of the assets held in the plans' trusts to satisfy the obligations of the other postretirement plans has decreased significantly. At December 31, 2002 our accumulated benefit obligation exceeded plan assets by approximately $119.1 million for our pension plans. In addition, our projected benefit obligation for other postretirement benefit plans exceeded plan assets by $98.6 million; however, we have life insurance contracts on certain employees with cash surrender values totaling approximately $30 million to partially offset this $98.6 million obligation. Additional contributions may be required in the near future to meet the requirements of the plan to pay benefits to plan participants. To the extent such additional contributions are reflected in the ratemaking process to determine the rates billed to customers, such amounts will be treated as regulatory assets. For the year ended December 31, 2002, contributions to our pension and other postretirement benefit plans were $7.4 million. No contributions were made during 2001. The increase in contributions for fiscal 2002 was the result of the acquisition of The Montana Power, LLC and the excess of our accumulated benefit obligations over plan assets in

69

2001. We expect contributions for pension and other postretirement benefit plans to be at least $17.4 million in 2003.

## NEW ACCOUNTING STANDARDS

In June 2001, the Financial Accounting Standards Board issued SFAS No. 143, *Accounting for Asset Retirement Obligations,* which was effective January 1, 2003. The statement provides accounting and disclosure requirements for retirement obligations associated with long-lived assets. The statement requires the present value of future retirement costs for which the Company has a legal obligation be recorded as liabilities with an equivalent amount added to the asset cost and depreciated over the asset life.

We have completed an assessment of the specific applicability and implications of SFAS No. 143. We have identified, but have not recognized, asset retirement obligation, or ARO, liabilities related to our electric and

natural gas transmission and distribution assets. Many of these assets are installed on easements over property not owned by the Company. The easements are generally perpetual and only require retirement action upon abandonment or cessation of use of the property for the specified purpose. The ARO liability is not estimable for such easements as we intend to utilize these properties indefinitely. In the event we decide to abandon or cease the use of a particular easement, an ARO liability would be recorded at that time.

Our regulated utility operations have, however, previously recognized removal costs of transmission and distribution assets as a component of depreciation in accordance with regulatory treatment. To the extent these amounts do not represent SFAS No. 143 legal retirement obligations, they are to be disclosed as regulatory liabilities upon adoption of the statement. As of December 31, 2002, we have estimated accrued removal costs related to our Montana transmission and distribution operations in the amount of $111.0 million and $4.5 million, for our South Dakota and Nebraska operations, respectively, all of which are included in accumulated depreciation.

For our generation properties, we are in the process of evaluating the associated retirement costs as defined by SFAS No. 143 and what the prescribed accounting treatment will be under FERC rules. We have accrued decommissioning costs since the generating units were first put into service in the amount of $11.4 million, which is classified as an other noncurrent liability. Preliminary estimates indicate that this amount would be sufficient to cover the legally required retirement obligations.

SFAS No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets,* was issued in October 2001 and establishes a single accounting model for long-lived assets to be disposed of by sale. SFAS No. 144 requires that long-lived assets to be disposed of by sale be measured at the lower of the carrying amount or fair value less cost to sell, whether reported in continuing operations or discontinued operations. SFAS No. 144 also expands the reporting of discontinued operations to include components of an entity that have been or will be disposed of rather than limiting such discontinuance to a segment of a business. Our accounting for the discontinued operations of CornerStone as described in Note 6, "Discontinued Operations", followed the provisions of SFAS No. 144. We adopted SFAS No. 144 effective January 1, 2002. The adoption of SFAS No. 144 did not have a material impact on our consolidated results of operations, financial position, or cash flows as the long-lived asset impairment provisions of SFAS No. 144 effectively carried over the provisions of SFAS No. 121.

SFAS No. 145, *Rescission of FASB Statements No. 4, 44, and 64, Amendment of FASB Statement No. 13, and Technical Correction*s, was issued in April 2002. SFAS No. 145 eliminates the requirement that gains and losses from the extinguishments of debt be aggregated and classified as extraordinary items, net of the related income tax. It also requires sale-leaseback treatment for certain modifications of a capital lease that result in the lease being classified as an operating lease. We will adopt SFAS No. 145 on January 1, 2003. As a result of the adoption, effective January 1, 2003, we will be required

70

to reflect the extraordinary loss on debt extinguishments of $13.5 million, net of tax, incurred in 2002 as part of continuing operations.

SFAS No. 146, *Accounting for Costs Associated with Exit or Disposal Activities*, was issued in June 2002. SFAS No. 146 requires companies to recognize costs associated with exit or disposal activities when they are incurred rather than at the date of a commitment to an exit or disposal plan, including lease termination costs and certain employee termination benefits that are associated with a restructuring, discontinued operation, plant closing or other exit or disposal activity. SFAS No. 146 will be applied prospectively and is effective for exit or disposal activities that are initiated after December 31, 2002. We will adopt SFAS No. 146 on January 1, 2003.

FASB Interpretation No. 45, *Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others* (FIN 45), was issued in November 2002. FIN 45 elaborates on the

existing disclosure requirements for most guarantees. It also clarifies that at the time a company issues a guarantee, the company must recognize an initial liability for the fair market value of the obligations it assumes under that guarantee and must disclose that information in its interim and annual financial statements. The initial recognition and measurement provisions of the FIN 45 apply on a prospective basis to guarantees issued or modified after December 31, 2002. The disclosure requirements of FIN 45 have been included in Note 19, Guarantees, Commitments and Contingencies.

SFAS No. 148, *Accounting for Stock-Based Compensation—Transition and Disclosure—an Amendment of FASB Statement No. 123*, was issued in December 2002. It provides alternative methods of transition for a voluntary change to the fair value based method of accounting for stock-based employee compensation. SFAS No. 148 is effective for fiscal years beginning after December 15, 2003. The impact of the statement on our results of operations and financial position is currently under review by management.

FASB Interpretation No. 46, *Consolidation of Variable Interest Entities* (FIN 46), was issued in January 2003. This interpretation changes the method of determining whether certain entities, including securitization entities, should be included in a company's Consolidated Financial Statements. An entity is subject to FIN 46 and is called a variable interest entity, or VIE, if it has equity that is insufficient to permit the entity to finance its activities without additional subordinated financial support from other parties, or equity investors that cannot make significant decisions about the entity's operations, or that do not absorb the expected losses or receive the expected returns of the entity. All other entities are evaluated for consolidation in accordance with SFAS No. 94, *Consolidation of All Majority-Owned Subsidiaries*. A VIE is consolidated by its primary beneficiary, which is the party involved with the VIE that has a majority of the expected losses or a majority of the expected residual returns or both. The provisions of the interpretation are to be applied immediately to VIEs created after January 31, 2003, and to VIEs in which an enterprise obtains an interest after that date. For VIEs in which an enterprise holds a variable interest that it acquired before February 1, 2003, FIN 46 applies in the first fiscal period beginning after June 15, 2003. For any VIEs that must be consolidated under FIN 46 that were created before February 1, 2003, the assets, liabilities and non-controlling interest of the VIE would be initially measured at their carrying amounts with any difference between the net amount added to the balance sheet and any previously recognized interest being recognized as the cumulative effect of an accounting change. If determining the carrying amounts is not practicable, fair value at the date FIN 46 first applies may be used to measure the assets, liabilities and non-controlling interest of the VIE. FIN 46 also mandates new disclosures about VIEs, some of which are required to be presented in financial statements issued after January 31, 2003. We have evaluated the impact of FIN 46 to determine if we have any investments qualifying as VIEs and do not believe we have any VIEs. The rules are recent and, accordingly, they contain provisions that the accounting profession continues to analyze.

71

---

## RISK FACTORS

You should carefully consider the risk factors described below, as well as other information included in this Annual Report on Form 10-K, before making an investment in our common stock or other securities. The risks and uncertainties described below are not the only ones facing our company. Additional risks and uncertainties not presently known or that we currently believe to be less significant may also adversely affect us.

**We have substantial indebtedness, which could adversely affect our financial condition.**

We had total consolidated indebtedness, including indebtedness with respect to mandatorily redeemable preferred securities of subsidiary trusts, of approximately $2.2 billion outstanding as of March 31, 2003.

Our indebtedness could have important consequences to you. For example, it could:

- increase our vulnerability to general adverse economic and industry conditions;

- require us to dedicate a substantial portion of our cash flow from operations to payments on our indebtedness, thereby reducing the availability of cash flow to fund working capital, capital expenditures and other general corporate purposes;

- limit our flexibility in planning for, or reacting to, changes in our business and the industries in which we operate;

- result in vendors requiring additional credit support, such as letters of credit, in order for us to utilize trade credit;

- place us at a competitive disadvantage compared to our competitors that have less debt; and

- limit our ability to borrow additional funds.

In addition, our failure to comply with any of the covenants contained in the instruments governing our indebtedness could result in an event of default which, if not cured or waived, could result in the acceleration of other outstanding indebtedness. We may not have sufficient working capital to satisfy our debt obligations in the event of an acceleration of all or a significant portion of our outstanding indebtedness.

**Our ability to implement our turnaround plan is subject to many impediments and uncertainties. A failure to completely implement our turnaround plan could have a material adverse affect on our results of operations and liquidity.**

Management is implementing a turnaround plan that includes these principal elements:

- focus on our core utility business;

- reduce our indebtedness; and

- sale or dispositions of our non-core assets.

Absent proceeds from the sale of non-core assets or significant improvements in the operating results of our non-energy businesses, we will not have the ability to materially reduce our debt. Therefore, our ability to implement this plan is subject to many impediments and uncertainties including:

- even if we receive offers from buyers, whether we will be able to sell these assets at a price that would enable us to pay down our debt after accounting for related liabilities; and

72

---

- whether we will be able to generate sufficient interest among buyers for our non-core assets under current market conditions.

The success of our turnaround plan is dependent upon reducing our debt. Absent the receipt of significant proceeds from the sale of non-core assets, the raising of additional capital or a restructuring of our debt, we will not have the ability to reduce our debt or meet our significant maturing debt obligations beginning in 2005. Our senior secured term loan contains restrictions on the sale or disposition of assets, including non-core assets, and on the prepayment of the senior secured term loan and other indebtedness. Therefore, even if we are able to generate funds

through the sale of non-core assets or equity, or cash flow from operations, we may not be able to prepay any of the debt in a timely manner.

**We will need significant additional capital to refinance our indebtedness as it matures. If we cannot sell sufficient assets or borrow new indebtedness sufficient to repay our indebtedness as it matures in future periods, our ability to fund our operations and service our substantial indebtedness will be adversely affected, and we will default on such maturing indebtedness as well as all other indebtedness that is cross-defaulted to such indebtedness thereby materially and adversely affecting our financial condition and results of operations.**

We will be required to obtain significant additional capital to meet debt obligations maturing in 2005 and beyond. Absent proceeds from the sale of non-core assets or significant improvements in the operating results of our non-energy businesses, which historically have not been cash flow contributors, we will have limited ability to reduce our debt. To the extent we do not sell sufficient assets to pay down debt as it matures, we will need to borrow money. The market for indebtedness is volatile and our ability to raise capital is dependent on a number of factors including our creditworthiness, legal proceedings we are and may be involved in, the ratings of our indebtedness, the cash flow we have available to service the interest expense relating to any new borrowings, and our ability to implement our turnaround. If we are unable to refinance our indebtedness as it matures we will default on such indebtedness and all other indebtedness that is cross-defaulted to such indebtedness. Blue Dot is in default under its credit agreement. If such defaults continue or new defaults by any of our subsidiaries occur under applicable debt instruments, then such entity could seek protection under the bankruptcy law, or its creditors could institute involuntary proceedings against such entities, and we could lose our remaining investment in such entity. Any default by us on our indebtedness will have a material and adverse affect on our financial condition and results of operations.

In addition, we may not be able to generate enough cash flow to fund our operations and meet our debt service obligations. If we can not obtain additional capital to meet such obligations, we will default on such indebtedness and all other indebtedness that is cross-defaulted to such indebtedness.

**Our internal controls and procedures need to be improved.**

We have advised our Audit Committee that, in the course of preparing our financial statements for the year ended December 31, 2002 and in connection with the corresponding audit, we noted deficiencies in internal controls relating to:

- internal accounting controls relating to the EXPERT system, including the evaluation of appropriate reserves for accounts receivable and billing adjustments at Expanets;

- supervision, staffing and training of accounting personnel;

- timely evaluation and substantiation of material account balances;

- inconsistent application of and adherence to our policies and procedures by certain personnel;

73

- absence of a functioning internal auditing department and integrated information systems limiting our ability to adequately review subsidiary financial information; and

- the inadequacy of systems integration and data reconciliation.

These weaknesses led to the restatement of our financial statements for the first three quarters of 2002. In addition, we have experienced weaknesses in procedures and documentation relating to intercompany transactions, including lapses in documenting loans or advances to our subsidiaries which could adversely affect our ability to collect such amounts and could force us to subordinate the collection of such amounts in certain circumstances. If we are unable to substantially improve our internal controls our ability to report our financial results on a timely and accurate basis will continue to be adversely affected which could have a substantial adverse affect on our ability to operate our business.

**We are one of several defendants in a class action lawsuit brought in connection with dispositions of energy assets by The Montana Power Company, including the acquisition of our Montana utility. If we do not successfully resolve this lawsuit, or enforce our indemnification claims against The Montana Power Company, our operations and financial condition may be materially harmed.**

We are one of several defendants in a class action lawsuit entitled McGreevey, et al. v. The Montana Power Company, et al. The lawsuit, which was filed by shareholders of TouchAmerica Holdings, Inc., the successor to The Montana Power Company, in connection with the disposition of energy assets by The Montana Power Company, contends, among other things, that the shareholders of The Montana Power Company have dissenters' rights under applicable state law and are entitled to damages. We believe our substantive and procedural defenses are meritorious, but we cannot predict the outcome of any such litigation. If we are held liability for any damages in this lawsuit, our operations and financial condition may be severely and materially harmed.

**The impact of ongoing class action litigation may be material. We are also subject to the risk of additional litigation and regulatory action in connection with the restatement of our 2002 quarterly financial statements, and the potential liability from any such litigation or regulatory action could harm our business.**

On April 1, 2003, we announced that we would restate our consolidated financial statements for the fiscal quarters ended March 31, 2002, June 30, 2002, and September 30, 2002. We have recorded significant charges in our full-year 2002 results.

We, and certain of our present and former officers and directors, are defendants in a purported class action litigation pending in the United States District Court for the Central District of South Dakota, Southern Division, entitled *Dana Ross, et al. v. Merle D. Lewis, et al.*; Case No. CIV03-4049, brought on behalf of shareholders of NorthWestern. The plaintiffs are seeking unspecified compensatory damages, rescission, and attorneys fees and costs as well as accountants and experts fees based on allegations that the defendants misrepresented NorthWestern's business operations and financial performance, overstated NorthWestern's revenue and earnings by, among other things, maintaining insufficient reserves for accounts receivables at Expanets, failing to disclose billing problems and lapses and data conversion problems, and failing to make full disclosures of problems (including the billing and data conversion issues) arising from the implementation of Expanets' EXPERT system. The lawsuit was recently filed and has not yet been served. We cannot currently predict the impact or resolution of this litigation, which could be material, and the initiation of this lawsuit may harm our business and financial condition. See "Item 3. Legal Proceedings" for more information.

As a result of the restatement of our quarterly results for the first three quarters of 2002, we could become subject to additional class action or other securities litigation. In addition, regulatory agencies,

74

---

such as the SEC, the FERC, the MPSC, and/or the New York Stock Exchange could commence a formal investigation relating to the restatement of our quarterly results. As of the date hereof, we are not aware of any additional litigation or investigation having been commenced against us related to these matters, but we cannot predict whether or not any such litigation or regulatory investigation will be commenced or, if it is, the outcome of

any such litigation or investigation. If any such investigation were to result in a regulatory proceeding or action against us, our business and financial condition could be materially adversely affected. The initiation of any additional securities litigation, together with the lawsuit described above, may also harm our business and financial condition. Until such investigation, proceeding or litigation is resolved, it may be more difficult to raise additional capital or favorably refinance or restructure our debt or other obligations. If an unfavorable result occurred in any such action, our business and financial condition could be further harmed. In addition, we are likely to incur substantial expenses in connection with any such litigation or investigation, including substantial fees for attorneys and other professional advisors. We may also be obligated to indemnify officers and directors named as defendants in such action. These expenses, to the extent not covered by available insurance, would adversely affect our cash position.

**There are a number of business challenges Expanets must address during 2003. If Expanets is not able to resolve these issues effectively, its performance will continue to be adversely affected.**

The downturn in the economy has impacted the telecommunications sector in particular. Expanets continues to see a soft market for the communications and Information Technology product industry. At the same time, Expanets plans to market a number of new solutions based on Internet protocol, or IP, technology, which is gaining more general acceptance and momentum in the market. However, Expanets can provide no specific assurance that the market will accept these solutions, which could adversely affect its performance.

Expanets believes that its relationship with Avaya as currently structured is positive for both companies. However, a change in its relationship with Avaya or a change in Avaya's competitive position could adversely affect Expanets' performance.

Expanets must address and resolve negative customer satisfaction issues stemming from the performance deficiencies and billing inaccuracies of the EXPERT system, which has contributed significantly toward higher than anticipated erosion of Expanets' maintenance revenue and customer base. Further delays in this process could have a significant negative effect on Expanets' operations and cash flow. In addition, management has made its best estimates of billing adjustments on which our current and ongoing reserves for accounts receivable write-offs are based. If these estimates are not accurate, and our reserves are not sufficient, our results of operations or financial condition could be harmed. If the estimates are not accurate, it could have a material effect on the business, the accuracy of periodic financial reporting and negatively impact its ability to obtain third party financing or accomplish a sale of the business.

Expanets believes that it has identified many of the numerous performance and reporting deficiencies of the EXPERT system and has established alternative procedures and processes to rely on. However, there are several modules and system information flows in the EXPERTS system that have not yet been studied as a result of more pressing issues with the EXPERT system, the study of which may lead to the identification of additional material weaknesses within the EXPERT system. Expanets currently does not have the capital resources and may not have the ability to analyze these systems and processes and make necessary improvements, which could have an adverse effect on operations and negatively impact its ability to obtain third party financing or accomplish a sale of the business.

The EXPERT system continues to require additional improvement and expense to fully realize the cost savings and functionality designed into the system. Expanets' management and consultants have identified a number of system, process and procedure improvements needed to enhance internal controls and assure functional performance and reporting accuracy. Expanets currently does not have the capital resources and ability to make these improvements. Further delays in resolving performance issues of the EXPERT system and the costs of system repairs, or the delays and costs of adopting an alternative information management system, could have a material adverse effect on Expanets' operations and cash flow and could impede NorthWestern's efforts to pursue strategic alternatives for Expanets, including the sale or disposition of the business or its assets.

**If the MPSC disallows the recovery of the costs incurred in entering into default supply portfolio contracts while we are required to act as the "default supplier," we may not be able to fully recover the costs incurred in procuring default supply contracts, which could adversely affect our net income and financial condition.**

The 1997 Montana Restructuring Act provided that customers be able to choose their electricity supplier during a transition period ending on June 30, 2007. NorthWestern Energy is required to act as the "default supplier" for customers who have not chosen an alternate supplier. The Restructuring Act provided for full recovery of costs incurred in procuring a default supply portfolio of electric power and required the default supplier to propose a "cost recovery mechanism" for electrical supply procurement costs before March 30, 2002. On October 29, 2001, the former owner of NorthWestern Energy LLC filed with the MPSC its initial default supply portfolio, containing a mix of long and short-term contracts from new and existing generators. On April 25, 2002, the MPSC approved NorthWestern Energy LLC's proposed "cost recovery mechanism" in the form filed.

On June 21, 2002, the MPSC issued a final order approving contracts meeting approximately 60% of the default supply winter peak load and approximately 93% of the annual energy requirements. As a result of the order, NorthWestern Energy has implemented a procurement strategy that involves supplying the remainder of the default supply portfolio through open market purchases. Currently,

---

NorthWestern Energy is making short-term purchases to fill intermediate and peak electricity needs. These short-term purchases, along with the MPSC-approved base load supply, are being fully recovered through our annual electricity cost tracking process pursuant to which rates are based on estimated electricity loads and electricity costs for the upcoming tracking period and are annually reviewed and adjusted by the MPSC for any differences in the previous tracking year's estimates to actual information. This process is similar to the cost recovery process that has been successfully utilized for more than 20 years in Montana, South Dakota and other states for natural gas purchases for residential and commercial customers. The MPSC further stated that NorthWestern Energy has an ongoing responsibility to prudently administer its supply contracts and the energy procured pursuant to those contracts for the benefit of ratepayers. The MPSC could, in any particular year, disallow the recovery of a portion of the default supply costs if it makes a determination that NorthWestern Energy acted imprudently with respect to implementation of its open market purchase strategy or that the approved supply contracts were not prudently administered. A failure to recover such costs could adversely affect our net income and financial condition.

**We are subject to extensive governmental regulations that could impose significant costs or change rates of our operations and changes in existing regulations and future deregulation may have a detrimental effect on our business and could increase competition.**

Our operations and the operations of our subsidiary entities are subject to extensive federal, state and local laws and regulations concerning taxes, service areas, tariffs, issuances of securities, employment, occupational health and safety, protection of the environment and other matters. In addition, we are required to obtain and comply with a wide variety of licenses, permits and other approvals in order to operate our facilities. In the course of complying with these requirements, we may incur significant costs. If we fail to comply with these requirements, we could be subject to civil or criminal liability and the imposition of liens or fines. In addition, existing regulations may be revised or reinterpreted, new laws and regulations may be adopted or become applicable to us or our facilities and future changes in laws and regulations may have a detrimental effect on our business.

Our utility businesses are regulated by certain state commissions. As a result, these commissions have the ability to access the regulated utility's books and records. This ability to review our books and records could result in prospective negative adjustments to our rates.

The United States electric utility and natural gas industries are currently experiencing increasing competitive pressures as a result of consumer demands, technological advances, deregulation, greater availability of natural gas-fired generation and other factors. Competition for various aspects of electric and natural gas services is being introduced throughout the country that will open these markets to new providers of some or all of traditional electric utility and natural gas services. Competition is likely to result in the further unbundling of electric utility and natural gas services as has occurred in Montana for electricity and Montana, South Dakota and Nebraska for natural gas. Separate markets may emerge for generation, transmission, distribution, meter reading, billing and other services currently provided by electric utility and natural gas providers as a bundled service. As a result, significant additional competitors could become active in the generation, transmission and distribution segments of our industry.

Proposals have been introduced in Congress to repeal the Public Utility Holding Company Act of 1935, or PUHCA. To the extent competitive pressures increase and the pricing and sale of electricity assume more characteristics of a commodity business, the economics of domestic independent power generation projects may come under increasing pressure.

---

**We may not be able to fully recover transition costs, which could adversely affect our net income and financial condition.**

Montana law required the Montana Public Service Commission, or the MPSC, determine the value of net unmitigable transition costs associated with the transformation of the former The Montana Power Company utility business from a vertically integrated electric service company to a utility providing only default supply and transmission and distribution services. The MPSC was also obligated to set a competitive transition charge, or CTC, to be included in distribution rates to collect those net transition costs. The majority of these transition costs relate to out-of-market power purchase contracts, which run through 2032, that the former owner of NorthWestern Energy LLC was required to enter into with certain "qualifying facilities" as established under the Public Utility Regulatory Policies Act of 1978. The former owner of NorthWestern Energy LLC estimated the pre-tax net present value of its transition costs over the approximate 30 year period to be approximately $304.7 million in a filing with the MPSC on October 29, 2001. On January 31, 2002, the MPSC issued an Order establishing a CTC that would recover $244.7 million on a net present value basis. While the CTC is designed to adjust and compensate for future changes in sales volumes or other factors affecting actual cost recoveries, the CTC runs through the year 2029 and therefore we cannot predict with certainty the actual recovery of transition costs. Changes in the recovery of transition costs could affect our net income and financial condition.

**Further downgrades in our credit rating could negatively affect our ability to access capital.**

S&P, Moody's and Fitch rate our senior, unsecured debt at "BB+" on CreditWatch with negative implications, "Ba1" with a negative outlook and "BB+," respectively. Credit ratings are dependent on a number of quantitative and qualitative factors. Although we are not aware of any current plans of S&P, Moody's or Fitch to further lower their respective ratings on our debt, we cannot assure you that our credit ratings will not be downgraded if we do not reduce our leverage. Although none of our debt instruments contain acceleration and repayment provisions in the event of a downgrade in our debt ratings by S&P, Moody's or Fitch, if such a downgrade were to occur, our ability to access the capital markets and utilize trade credit may be adversely affected and our borrowing costs would increase which would adversely impact our results and condition. We may also be required to provide credit support for certain major purchases (*e.g.*, electricity supply contracts, natural gas supply contracts, etc.) In addition, we would likely be required to pay a higher interest rate in future financings and our potential pool of investors and funding sources could decrease.

**We are subject to risks associated with a changing economic environment.**

In general, the financial markets have been weak and the availability and cost of capital for our business and that of our competitors has been adversely affected. Events such as the bankruptcy of several large energy and telecommunications companies have specifically contributed to this weak environment. Such economic environment, if sustained, could constrain the capital available to our industry and would adversely affect our access to funding for our operations, including the funding necessary to refinance or restructure our substantial indebtedness. In addition, the disruption on the capital markets due, in large part, to the capital structure of energy companies, could adversely impact our ability to realize cash from the sale of the Montana First Megawatts project. If our ability to access capital becomes significantly constrained, our financial condition and future results of operations could be significantly adversely affected.

**Our revenues and results of operations are subject to risks that are beyond our control, including but not limited to future terrorist attacks or related acts of war.**

The cost of repairing damage to our facilities due to storms, natural disasters, wars, terrorist acts and other catastrophic events, in excess of reserves established for such repairs, may adversely impact

78

---

our results of operations, financial condition and cash flows. Generation and transmission facilities, in general, have been identified as potential terrorist targets. The occurrence or risk of occurrence of future terrorist activity may impact our results of operations, financial condition and cash flows in unpredictable ways. These actions could also result in adverse changes in the insurance markets and disruptions of power and fuel markets. The availability of insurance covering risks we and our competitors typically insure against may decrease. In addition, the insurance we are able to obtain may have higher deductibles, higher premiums and more restrictive policy terms. In addition, our electric transmission and distribution, electric generation, natural gas distribution and pipeline and gathering facilities could be directly or indirectly harmed by future terrorist activity.

The occurrence or risk of occurrence of future terrorist attacks or related acts of war could also adversely affect the United States economy. A lower level of economic activity could result in a decline in energy consumption, which could adversely affect our revenues and margins and limit our future growth prospects. Also, these risks could cause instability in the financial markets and adversely affect our ability to access capital.

**Our operating results may fluctuate on a seasonal and quarterly basis.**

Our electric and gas utility business and, to a lesser extent, Blue Dot's HVAC business are seasonal businesses and weather patterns can have a material impact on their operating performance. Because natural gas is heavily used for residential and commercial heating, the demand for this product depends heavily upon weather patterns throughout our market areas and a significant amount of natural gas revenues are recognized in the first and fourth quarters related to the heating season. Demand for electricity is often greater in the summer and winter months associated with cooling and heating. Similarly, Blue Dot's business is subject to seasonal variations in certain areas of its service lines, with demand for residential HVAC services generally higher in the second and third quarters. Accordingly, our operations have historically generated less revenues and income when weather conditions are milder in the winter and cooler in the summer. In the event that we experience that unusually mild winters or summers in the future, our results of operations and financial condition could be adversely affected.

**Our announcement that we are considering strategic alternatives for, and do not intend to make additional significant investments in, Blue Dot or Expanets, together with other liquidity issues confronting Blue Dot and Expanets, may materially and adversely affect the operations and value of those entities.**

We are considering strategic alternatives for Blue Dot and Expanets, including a sale or disposition of such businesses or their assets, and we do not intend to make additional significant investments in Blue Dot or Expanets

while we examine strategic alternatives for these businesses. In connection with approval of our $390 million senior secured term loan, the Montana Public Service Commission has restricted our ability to make additional investments or commitments to our non-regulated businesses to $10 million in the aggregate unless we obtain prior approval. These initiatives, together with other liquidity issues confronting Blue Dot and Expanets, present a substantial risk of serious disruption to the businesses of Blue Dot and Expanets and may materially and adversely affect the value of those entities.

Each of Blue Dot and Expanets has limited cash to meet its obligations and will have to locate its own independent source of funds should it require additional financing. If either company is unable to obtain necessary financing or to maintain adequate bonding capacity, it may default on one or more of its obligations, which could result in a serious disruption in its business and materially and adversely impair its value. Neither of those companies has sufficient working capital to satisfy its debt obligations as they mature, or in the event of an acceleration of all or a significant portion of its outstanding indebtedness. In addition, Blue Dot is currently in default under its existing credit facility and certain

79

---

other material payment obligations to its minority stockholders and is prohibited as a result of the defaults under its credit facility from paying certain other outstanding obligations. NorthWestern Growth Corporation may be required to purchase or cause the purchase of certain shares of Blue Dot stock in an amount sufficient to permit Blue Dot to effect its exchange obligations under its exchange agreements with respect to its Series A Preferred Stock and honor its payment obligations under certain call and put option agreements and certain related earnout obligations with respect to its Class C Common Stock under certain circumstances; however, NorthWestern subsequently indicated that no additional funds will be provided to Blue Dot while NorthWestern pursues strategic alternatives for Blue Dot, including the sale or disposition of the business or its assets. Blue Dot's credit facility prohibits the Blue Dot from performing its obligations under its exchange agreements or any call and put agreements unless the funds or stock used to satisfy such obligations are provided to Blue Dot by NorthWestern. The existing defaults under the credit facility also prevent Blue Dot from making payments of principal and interest on certain subordinated debt and may result in defaults under other indebtedness that is cross defaulted to the credit facility. As a result of these events, Blue Dot defaulted on up to $4.1 million of the obligations under its exchange and call and put option agreements on March 31, 2003. Approximately $4.4 million is required to be paid under call and put option agreements on June 30 2003, approximately $.5 million may be required to be paid under exchange agreements on September 30, 2003. In addition, approximately $0.5 million in principal payments plus related interest on subordinated indebtedness is scheduled to become due in 2003. Blue Dot is attempting to negotiate extensions, repayment terms or other arrangements to satisfy these obligations with certain of the involved parties. Blue Dot's failure to pay these obligations has resulted in additional defaults under its credit facility, which is non-recourse to us.

These defaults and the failure of Blue Dot to pay these obligations could result in a serious disruption in Blue Dot's business and materially and adversely impact Blue Dot's value. The impacted key managers and other personnel from the impacted units might leave Blue Dot and certain stockholders may institute securities or other litigation against Blue Dot and NorthWestern Growth Corporation seeking immediate payment of these or similar obligations or other damages. In addition, other key managers from other operating units, including managers who are under similar arrangements, may leave Blue Dot or become disengaged and cause further significant disruption of the organization.

Substantial uncertainty and concern may also develop on the part of the employees, suppliers and customers of Blue Dot and Expanets. Existing employees, including key managers, and customers may elect to leave those businesses because of these issues or in anticipation of a sale of the business or its assets and it may be difficult to attract replacements. In some cases we may not have non-competition agreements or only limited ability to enforce such agreements with respect to such departing employees. Certain key employees of Blue Dot may, in particular,

be dissatisfied because of the deferrals of certain incentive compensation payments. Suppliers may elect to eliminate, restrict, reduce or impose more burdensome terms on credit, which would increase Blue Dot's and Expanets' cost of goods and create additional liquidity issues.

**Changes in commodity prices and availability of supply may increase our cost of producing and distributing electricity and distributing natural gas or decrease the amount we receive from selling electricity and natural gas, adversely affecting our financial performance and condition.**

To the extent not covered by long-term fixed price purchase contracts, we are exposed to changes in the price and availability of coal because most of our generating capacity is coal-fired. Changes in the cost of coal and changes in the relationship between those costs and the market prices of power may affect our financial results. In addition, natural gas and electricity are commodities; the market price of which can be subject to volatile changes in response to changes in the world crude oil market, refinery operations, power plant outages, weather conditions, supply or other market conditions.

Because state regulatory authorities set the rates at which we sell electricity and natural gas, and may modify the costs that we may pass through the fuel and gas cost adjustments, we may not be able to immediately pass on to our retail customers rapid increases in the wholesale cost of coal and natural gas, which could reduce our profitability.

We do not own any natural gas reserves and do not own electric generation assets to service our Montana operations. We own interests in generation assets that substantially cover our electric supply requirements in South Dakota. As a result, we are required to procure our entire natural gas supply and all of our Montana electricity supply pursuant to contracts with third party suppliers. In light of this reliance on third party suppliers, we are exposed to certain risks in the event a third party supplier is unable to satisfy its contractual obligation.

**We do not intend to pay dividends on our common stock, and our ability to pay dividends on our common stock is limited.**

Consistent with our turnaround plan to increase liquidity and reduce debt, the Board of Directors decided to terminate the historical practice of paying an annual cash dividend. We do not anticipate paying any cash dividends for the foreseeable future.

In addition, we are currently prohibited from paying dividends on our common stock under Delaware law. The Delaware General Corporation Law, or the DGCL, allows the Company to pay dividends only out of its surplus (as defined and computed in accordance with the provisions of the DGCL) or if the Company has no such surplus, out of its net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year. We will be unable to pay dividends on or redeem any of our capital stock until such time as we again have available surplus or net profits.

Our senior credit facility also prohibits the payment of dividends during any period of default under the agreement. To the extent that payment of a cash dividend on our common stock becomes permissible under Delaware law, we would only be able to pay a cash dividend on our common stock to the extent that all required distributions on our mandatorily redeemable preferred securities of trusts had been made.

See "Market for Registrant's Common Equity and Related Stockholder Matters" included in Item 5 hereof for additional information about our ability to pay dividends on our common stock.

**Our utility business is subject to extensive environmental regulations and potential environmental liabilities, which could result in significant costs and liabilities.**

Our utility business is subject to extensive regulations imposed by federal, state and local government authorities in the ordinary course of day-to-day operations with regard to the environment, including environmental regulations relating to air and water quality, solid waste disposal and other environmental considerations. Many of these environmental laws and regulations create permit and license requirements and provide for substantial civil and criminal fines which, if imposed, could result in material costs or liabilities. We regularly monitor our operations to prevent adverse environmental impacts and to assess potential environmental liabilities. We may be required to make significant expenditures in connection with the investigation and remediation of alleged or actual spills and the repair and upgrade of our facilities in order to meet future requirements under environmental laws.

Environmental laws and regulations require NorthWestern to incur certain costs, which could be substantial, to operate existing facilities, construct and operate new facilities, and mitigate or remove the effect of past operations on the environment. Governmental regulations establishing environmental protection standards are continually evolving, and, therefore, the character, scope, cost and availability of the measures NorthWestern may be required to take to ensure compliance with evolving laws or regulations cannot be predicted. However, NorthWestern believes that an appropriate amount of costs

81

---

have been accrued and potential costs related to such environmental regulation and cleanup requirements are timely estimated and recorded. To this extent that our environmental liabilities are greater than our reserves or we are unsuccessful in recovering anticipated insurance proceeds under the relevant policies, our results of operations and financial condition could be adversely affected.

**Certain subsidiaries may be subject to potential rescission rights held by their minority shareholders.**

Over the past several years, Expanets and Blue Dot issued shares of their capital stock as part of the consideration offered to owners of various companies that they acquired. None of these shares were registered under the Securities Act of 1933, as amended, in the belief that the issuance of these shares was exempt from the registration requirements of the Securities Act. It is possible that the exemptions from registration on which Expanets and Blue Dot relied were not available, and that these shares may have been issued in violation of the Securities Act. As a result, the persons who received these shares upon the sale of their companies to Expanets or Blue Dot may have the right to seek recovery from Expanets or Blue Dot damages as prescribed by applicable securities laws.

**Expanets may be ordered by the Securities and Exchange Commission or a court to register one or more classes of its capital stock under the Securities Exchange Act of 1934 and may be unable to do so. As a result we and/or Expanets may be subject to liability under the Securities Exchange Act and this may materially and adversely affect our financial position and results of operations.**

Expanets has not registered under the Securities Exchange Act of 1934, as amended, one or more classes of its capital stock issuable pursuant to certain options granted over the past several years. Expanets may be ordered to register one or more classes of stock under the Securities Exchange Act by the Securities and Exchange Commission or a court and be unable to comply or have potential liability with respect to any shares of its capital stock, if any, issued with respect to such options. The failure to comply with any order for registration could subject Expanets and us to liability under the Securities Exchange Act and materially and adversely affect our financial position and results of operations.

**In the event stockholders have derivative claims against Arthur Andersen, it is unlikely that they will be able to exercise effective remedies or collect judgments against Arthur Andersen and we may incur material expenses or delays in financings or SEC filings because we changed auditors.**