Arthur Andersen LLP served as our independent accountants since 1932. On March 14, 2002, Arthur Andersen was indicted by a federal grand jury on obstruction of justice charges arising from the government's investigation of Enron Corp. We dismissed Arthur Andersen as our independent public accounting firm and retained Deloitte & Touche LLP in their stead on May 16, 2002, although Arthur Andersen has audited consolidated financial statements for the year ended December 31, 2000 contained in this Annual Report on Form 10-K. Deloitte & Touche LLP has audited our consolidated financial statements for the fiscal years ended December 31, 2001 and 2002, which are included in this Annual Report on Form 10-K. On June 15, 2002, a jury in Houston, Texas found Arthur Andersen LLP guilty of obstructing justice. In light of the jury verdict and the underlying events, Arthur Andersen has ceased practicing before the SEC. Because it is unlikely that Arthur Andersen will survive, stockholders are unlikely to be able to exercise effective remedies or collect judgments against them.

## ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURE ABOUT MARKET RISK

We are exposed to the impact of market fluctuations associated with commodity prices and interest rates. We have policies and procedures to assist in controlling these market risks and we may utilize derivatives to manage a portion of our risk.

Our policy allows the use of derivative instruments as part of an overall energy price and interest rate risk management program to efficiently manager and minimize commodity price interest rate risk. We do not enter into financial instruments for speculative or trading purposes.

### Interest Rate Risk

We use fixed and variable rate long-term debt to partially finance capital expenditures and mandatory debt retirements. These debt agreements expose us to market risk related to changes in interest rates. We manage this risk by taking advantage of market conditions when timing the placement of long-term or permanent financing. We have also historically used interest rate swap agreements to manage a portion of out interest rate risk and may take advantage of such agreements in the future to minimize such risk. As of December 31, 2002, we also have outstanding 14,810,000 shares of mandatorily redeemable preferred securities with various fixed interest rates. All of our debt has fixed interest rates, with the exception of our new senior secured term loan which bears interest at a variable rate tied to the Eurodollar rate, with a minimum floor of 3.0%. As of April 7, 2003, the applicable Eurodollar rate was 1.31%. See "—Summary of Contractual Obligations" in Item 7 hereto for additional information regarding amounts outstanding, interest rates and maturities.

The fair value of fixed-price commodity contracts were estimated based on market prices of commodities covered by the contracts. The net differential between the prices in each contract and market prices for future periods has been applied to the volumes stipulated in each contract to arrive at an estimated future value. Two contracts at December 31, 2002 existed with estimated future benefits of $0.2 million.

## ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

The consolidated financial information, including the reports of independent accountants, the quarterly financial information, and the financial statement schedules, required by this Item 8 is set forth on pages F-1 to F-58 of this Annual Report on Form 10-K and is hereby incorporated into this Item 8 by reference.

## ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

In light of events concerning Arthur Andersen LLP, on May 16, 2002, we dismissed Arthur Andersen LLP as our independent public accounting firm and retained Deloitte & Touche LLP. Arthur Andersen LLP's audit report on our consolidated financial statements as of December 31, 2001 and 2000 and for each of the three years then ended, respectively, did not contain any adverse opinion or disclaimer of opinion, nor was the report qualified or modified as to uncertainty, audit scope, or accounting principles. We have requested Arthur Andersen LLP to furnish a letter addressed to the Commission stating whether it agrees with the above statements and, if not, stating the respects in which it does not agree. A representative of Arthur Andersen LLP has informed us that Arthur Andersen LLP is no longer furnishing such letters. The decision to dismiss Arthur Andersen LLP as our independent public accounting firm was made by the audit committee of our board of directors. During our two most recent fiscal years and through the date of the dismissal, there were no disagreements between NorthWestern Corporation and Arthur Andersen LLP on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which disagreement(s), if not resolved to the satisfaction of Arthur Andersen LLP, would have caused such independent public accountants to make reference to the subject matter of the disagreement(s) in connection with their reports.

83

---

**Part III**

## ITEM 10. DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT

Information regarding the executive officers of NorthWestern Corporation is included in Item 1A of Part I of this Annual Report on Form 10-K.

The following information is furnished with respect to the directors in Class I whose terms will expire in May 2004:

| Director | Principal Occupation or Employment | Director Since | Age on March 1, 2003 |
|---|---|---|---|
| Randy G. Darcy | Senior Vice President, Operations of General Mills, Inc. (NYSE: GIS) a consumer foods company, since 1987. | 1998 | 52 |
| Gary G. Drook | Chief Executive Officer of NorthWestern since January 2003; formerly President and Chief Executive Officer and Director of AFFINA, The Customer Relationship Company (formerly Ruppman Marketing Technologies, Inc.), a provider of customer services programs, since 1997; formerly President of Network Services (1994-1995) for Ameritech Corporation, a communications services provider. | 1998 | 58 |
| Bruce I. Smith | Attorney and partner in the law firm of Leininger, Smith, Johnson, Baack, Placzek, Steele & Allen since 1978. | 1989 | 61 |

The following information is furnished with respect to directors in Class II whose terms will expire in May 2005:

| Director | Principal Occupation or Employment | Director Since | Age on March 1, 2003 |
|---|---|---|---|
| Richard R. Hylland | President and Chief Operating Officer of NorthWestern since May 1998; Vice Chairman of NorthWestern Growth Corporation (a NorthWestern subsidiary) since January 1999; formerly Executive Vice President of NorthWestern (1995-1998) and formerly Chief Executive Officer (1998) and President & Chief Operating Officer (1994-1998) of NorthWestern Growth Corporation; Member of the Boards of Directors of LodgeNet Entertainment Corporation (NASD: LNET), a provider of entertainment, information and marketing services to the lodging industry; MDC Corporation, Inc. (NASD: MDCA), a provider of secure transaction products and services, and communications and marketing services; and Cornerstone Propane GP, Inc. (managing General partner for Cornerstone Propane Partners, L.P. (OTC: CNPP.PK), a retail propane supplier. | 1995 | 42 |

84

| Director | Principal Occupation or Employment | Director Since | Age on March 1, 2003 |
|---|---|---|---|
| Jerry W. Johnson | Visiting Scholar, Congressional Budget Office, U.S. Congress since June 2002; former Dean Emeritus (2001-2002), Dean and Professor of Economics (1990-2001), School of Business, University of South Dakota; Member of the Boards of Directors of Citibank (S.D.), N.A., Citibank FSB and Citibank USA. | 1994 | 62 |
| Larry F. Ness | Chairman and Chief Executive Officer of First Dakota Financial Corp., a bank holding company, and of First Dakota National Bank since 1996; formerly Vice Chairman and Chief Executive Officer of that bank (1993-1996). | 1991 | 57 |

The following information is furnished with respect to the nominee to Class III of the Board for a three-year term expiring in May 2006:

| Nominee | Principal Occupation or Employment | Director Since | Age on March 1, 2003 |
|---|---|---|---|
| Marilyn R. Seymann | Interim Chairman of the NorthWestern Board of Directors since January 2003; President and Chief Executive Officer of M ONE, Inc., a financial services consulting firm, since 1991; Member of the Boards of Directors of Beverly Enterprises, Inc. (NYSE: BEV), a healthcare service provider; and Community First Bankshares, a financial institution. | 2000 | 60 |

## Audit Committee

The Audit Committee is composed of three non-employee directors who are financially literate in financial and auditing matters and are "independent" as defined by the Securities and Exchange Commission (the "SEC") and the New York Stock Exchange. The members of the Audit Committee are Chairman Bruce I. Smith, Jerry W. Johnson,

and Larry F. Ness. The Company's Board of Directors has determined that the Company has at least one audit committee financial expert, as defined in Item 401(h)(2) of Regulation S-K, serving on its Audit Committee, namely, Jerry W. Johnson. Mr. Johnson is independent as that term is used in Item 7(d)(3)(iv) of Schedule 14A under the 1934 Act. The Audit Committee held fifteen meetings during 2002. The functions of the Audit Committee are to oversee the integrity of NorthWestern's financial statements, NorthWestern's compliance with legal and regulatory requirements, the independent public accountant's qualifications and independence, the performance of NorthWestern's internal audit function and independent auditors, and preparation of this report and the financial statement and notes included herein, and all other reports required under the Securities Exchange Act.

## Section 16(a) Beneficial Ownership Reporting Compliance

Based solely upon a review of reports on Forms 3, 4 and 5 and any amendments thereto furnished to NorthWestern pursuant to Section 16 of the Securities Exchange Act of 1934, as amended, and written representations from the executive officers and directors that no other reports were required, NorthWestern believes that all of such reports were filed on a timely basis by executive officers and directors during 2002, except that the following transactions were not timely made on Form 4 for these non-employee director transactions in May 2002: (a) non-qualified stock option grants of 4,000 shares each, at an exercise price of $20.30 per share, to Randy Darcy, Gary Drook, Jerry Johnson, Larry Ness,

85

Marilyn Seymann, and Bruce Smith, and (b) phantom stock unit plan payouts of $10,418.64 each for 507 units to Jerry Johnson, Larry Ness, and Bruce Smith.

## ITEM 11. EXECUTIVE COMPENSATION

### Compensation of Directors and Executive Officers

We are required by the SEC to disclose compensation earned during the last three fiscal years by (i) our Chief Executive Officer; (ii) our four most highly compensated executive officers, other than the Chief Executive Officer, who were serving as executive officers at the end of fiscal 2002; and (iii) up to two additional individuals for whom such disclosure would have been provided under clause (i) and (ii) above but for the fact that the individual was not serving as an executive officer at the end of fiscal 2002; provided, however, that no disclosure need be provided for any executive officer, other than the Chief Executive Officer, whose total annual salary and bonus does not exceed $100,000.

Accordingly, the following sections disclose information regarding compensation earned during the last three fiscal years by (i) Merle D. Lewis, our former Chief Executive Officer; and (ii) Richard R. Hylland, Michael J. Hanson, Eric R. Jacobsen and Daniel K. Newell, the four most highly-compensated executive officers, other than the Chief Executive Officer, who were serving as executive officers at the end of fiscal 2002 and whose salary and bonus exceeded $100,000. All of these officers are referred to in this Form 10-K as the "Named Executive Officers."

### Summary Compensation Table

The following table sets forth the compensation earned during the fiscal years indicated for services in all capacities by the Named Executive Officers in 2002:

| Name and Principal Position | Year | Annual Compensation | | Long Term Compensation | | |
|---|---|---|---|---|---|---|
| | | Salary $ | Bonus (1)$ | Awards (Securities Underlying Options)(2) | LTIP Payouts (3)($) | All Other Compensation(4) ($) |
| Merle D. Lewis | 2002 | 786,000 | 0 | 295,000(5) | 321,712 | 57,918 |
| Former Chairman & Chief | 2001 | 786,000 | 150,000 | 177,511(5) | 1,284,746 | 58,680 |
| Executive Officer(5) | 2000 | 734,208 | 247,000 | 278,442(5) | 80,676 | 57,764 |
| Richard R. Hylland | 2002 | 550,583 | 0 | 154,600 | 130,562 | 32,080 |
| President & Chief Operating | 2001 | 511,000 | 100,000 | 86,469 | 925,537 | 30,044 |
| Officer | 2000 | 483,042 | 158,000 | 119,827 | 30,129 | 28,495 |
| Michael J. Hanson | 2002 | 345,833 | 540,000 | 29,000 | 0 | 14,063 |
| President & CEO of | 2001 | 323,750 | 635,914 | 9,000 | 0 | 19,684 |
| NorthWestern Energy division | 2000 | 293,583 | 390,370 | 8,035 | 0 | 19,319 |
| Eric R. Jacobsen | 2002 | 304,791 | 400,000 | 44,000 | 0 | 16,447 |
| Senior Vice President, General | 2001 | 280,416 | 150,000 | 28,000 | 430,757 | 17,491 |
| Counsel & Chief Legal Officer | 2000 | 257,042 | 44,189 | 32,831 | 0 | 13,465 |
| and Chief Operating Officer of | | | | | | |
| NorthWestern Growth Corp. | | | | | | |
| Daniel K. Newell | 2002 | 354,000 | 0 | 36,000 | 42,979 | 19,541 |
| Sr. Vice President; President & | 2001 | 347,333 | 80,000 | 44,500 | 861,346 | 21,600 |
| CEO of Blue Dot | 2000 | 311,917 | 118,000 | 39,481 | 0 | 19,170 |
| Services, Inc. & Managing | | | | | | |
| Director & CEO of | | | | | | |
| NorthWestern Growth Corp. | | | | | | |

(1)  The amounts in this column are cash awards pursuant to NorthWestern's annual incentive plans, which are described under the "Report on Executive Compensation" which were earned in the year shown and paid in the following year.

*(Footnotes continued on the next page.)*

86

---

*(Footnotes continued from the preceding page.)*

(2)  For 2000 and 2002 for all named executives, and for Mr. Hanson, Mr. Jacobsen, and Mr. Newell, in 2001, these awards are solely incentive stock options. For Mr. Lewis and Mr. Hylland in 2001, the awards included 155,000 and 75,500 incentive stock options, and 22,511 and 10,969 restricted stock awards, respectively, with the restricted stock awards accruing quarterly dividends as declared. As of December 31, 2002, Mr. Hylland's restricted stock award was valued at $64,904. As explained above, the restrictions on Mr. Lewis' restricted stock award shares were removed as part of his retirement agreement.

(3)  For 2000 and 2002, the amounts in this column represent the cash payouts from NorthWestern's former phantom stock long-term incentive compensation plan at the end of the five-year periods following the dates of the awards. The payout in 2002 represents the last phantom stock units held under this former long-term

incentive plan. For 2001, the amounts represent such former phantom stock plan payouts for Messrs. Lewis, Hylland, and Newell in the following amounts: Lewis, $146,695; Hylland, $95,161; and Newell, $30,970, with the remainder of the 2001 distributions for those three executives and the distribution for Mr. Jacobsen representing vested interests in the NorthWestern Growth Corporation private equity plan.

(4)     The amounts in this column include NorthWestern's contributions on behalf of the named executive officers to the Team Member Savings Plans and to the ESOP as well as the amounts paid by NorthWestern with respect to life insurance for the benefit of the executives. For the executives named in this table, for 2002 such amounts under the Team Member Savings Plans, ESOP, and life insurance under the NorthWestern term life and Family Protector Plan, respectively, were as follows: Mr. Lewis: $25,466, $27,490, and $4,962; Mr. Hylland: $17,954, $9,073, and $5,053; Mr. Hanson: $7,656, $1,746, and $4,661; Mr. Jacobsen: $10,501, $1,558, and $4,388; and Mr. Newell: $12,121, $2,999, and $4,421.

(5)     Mr. Lewis retired, effective December 31, 2002. All ISOs and NQSOs granted to Mr. Lewis were forfeited as part of the terms of his retirement agreement, described elsewhere in this Report.

**Information on Options**

## Option Grants in Last Fiscal Year

| | Individual Grants | | | | Potential Realizable Value At Assumed Annual Rates of Stock Price Appreciation for Option Term(3)($) | |
| Name | No. of Securities Underlying Options Granted (#) | Percent of Total Options Granted to Team Members in Fiscal Year | Exercise or Base Price ($/Sh)(2) | Expiration Date | At 5% ($35.66 Stock Price) | At 10% ($56.66 Stock Price) |
|---|---|---|---|---|---|---|
| Merle D. Lewis | 295,000 | 37.5 | 20.70 | (4) | 0 | 0 |
| Richard R. Hylland | 154,600 | 19.7 | 20.70 | 2/6/2012 | 5,216,204 | 8,288,106 |
| Michael J. Hanson | 29,000 | 3.7 | 20.70 | 2/6/2012 | 978,460 | 1,554,690 |
| Eric R. Jacobsen | 44,000 | 5.6 | 20.70 | 2/6/2012 | 1,484,560 | 2,358,840 |
| Daniel K. Newell | 36,000 | 4.6 | 20.70 | 2/6/2012 | 1,214,640 | 1,929,960 |

(1)     All options granted in 2002 become exercisable in annual cumulative installments of 25%, commencing on the first anniversary of the date of grant, with full vesting occurring on the fourth anniversary date of the grant. Vesting is accelerated in the event of a change in control of NorthWestern.

(2)     All options were granted at market value (the closing price of the Common Stock on the New York Stock Exchange as reported in the Midwest Edition of The Wall Street Journal) on the date of grant.

(3)     The hypothetical potential gains (reported net of exercise price) are based entirely on assumed annual growth rates of 5% and 10% in the value of NorthWestern's stock price over the 10-year

life of the options (which would equal a total increase in stock price of 63% and 159%, respectively). These assumed rates of growth are mandated by rules of the Securities and Exchange Commission for illustration purposes only and are not intended to predict future stock price.

(4)     All ISOs and NQSOs granted to Mr. Lewis were forfeited as part of the terms of his retirement agreement, described elsewhere in this Report.

**Fiscal Year-End Option Values**

| Name | Number of Securities Underlying Unexercised Options at Fiscal Year-End (#) | | Value of Unexercised In-the-Money Options At Fiscal Year-End ($)(1) | |
| --- | --- | --- | --- | --- |
| | Exercisable | Unexercisable | Exercisable | Unexercisable |
| Merle D. Lewis | 0(2) | 0(2) | 0 | 0 |
| Richard R. Hylland | 47,968 | 407,962 | 0 | 0 |
| Michael J. Hanson | 5,811 | 51,841 | 0 | 0 |
| Eric R. Jacobsen | 833 | 126,872 | 0 | 0 |
| Daniel K. Newell | 19,293 | 146,567 | 0 | 0 |

(1) Represents the difference between $5.08 (the closing price of the Common Stock on the New York Stock Exchange as reported in the Midwest Edition of The Wall Street Journal for the close on December 31, 2002) and the option exercise price.

(2) All ISOs and NQSOs previously held by Mr. Lewis were forfeited as part of the terms of his retirement agreement, described elsewhere in this Report.

**Employment Contracts**

A number of executives, including Messrs. Hylland, Hanson, Jacobsen and Newell, have comprehensive employment agreements. Mr. Hylland's agreement was entered into on March 1, 2001 and terminates on the last day of February 2006. Mr. Hylland is entitled to receive a base salary that is subject to annual increases based on a median of comparable companies and a discretionary bonus. Mr. Hylland is also eligible to participate in NorthWestern's annual short-term cash incentive plans and long-term cash and stock incentive plans tied to the success of the organization. These long-term incentive plans include, among other things, options to purchase shares of NorthWestern common stock and the right to participate in private equity incentive plans which hold minority investments in or are otherwise tied to the performance of NorthWestern's non-regulated subsidiaries. Mr. Hylland is also entitled to participate in NorthWestern benefit plans available to executives, including, among other things, health, retirement, disability and life insurance benefits as well as an automobile allowance and country club dues. The agreement provides for the payment of accrued salary and termination benefits if Mr. Hylland's employment is terminated by NorthWestern for any reason other than Cause, due to Mr. Hylland's death or by Mr. Hylland due to a "fundamental change." A fundamental change generally occurs if there is a diminution in Mr. Hylland's responsibilities or compensation, NorthWestern relocates its primary offices more than 30 miles or there is a change in control or major transaction involving NorthWestern (each as defined in the agreement). The termination benefits include a lump sum payment equal to (1) the sum of (a) base salary, (b) the higher of either Mr. Hylland's most recent bonuses and short-term incentive awards or the average of such bonuses and awards over the preceding three calendar years and (c) the higher of either the value of Mr. Hylland's most recent options, long-term incentive awards and private equity investment returns or the average value of such options, awards and returns over the preceding three calendar years, multiplied by (2) the remaining term of the agreement plus one year. The termination benefits also include lump sum payments equal to the fair market value of Mr. Hylland's private equity interests and interests under NorthWestern's benefit plans. The payments calculated with respect to Mr. Hylland's private equity investment returns and the fair market value of his private equity interests are grossed up by an

88

---

amount sufficient to put him in the position in which he would be were such payments subject to income tax only at long-term capital gains rates. Mr. Hylland has the right to defer receipt of certain of these termination benefits

rather than receiving them as a lump sum. All equity awards granted to Mr. Hylland accelerate in full upon termination of the agreement (other than for Cause) and remain exercisable in accordance with their terms. NorthWestern has agreed to make gross-up payments to Mr. Hylland to the extent that termination benefits would be subject to the excise tax on excess "parachute payments" following a change of control. The termination benefits under these agreements are to be provided regardless of whether Mr. Hylland is able to obtain other employment. The agreement contains provisions requiring Mr. Hylland to maintain the confidentiality of NorthWestern proprietary information and restricts Mr. Hylland from competing with NorthWestern or soliciting NorthWestern employees, suppliers and customers for a period of two years following termination. NorthWestern has agreed, pursuant to the agreement, to indemnify Mr. Hylland to the fullest extent permitted by law.

Messrs. Hanson, Jacobsen and Newell entered into employment agreements as of March 1, 2001. Mr. Hanson's agreement terminates on the last day of February 2005. Mr. Jacobsen's agreement terminates on the last day of February 2004. Mr. Newell's agreement terminates on the last day of February 2005. Messrs. Hanson, Jacobsen and Newell are entitled to receive a base salary that is subject to annual increases based on the median of comparable companies and a discretionary bonus. They are also eligible to participate in NorthWestern's annual short-term cash incentive plans and long-term cash and stock incentive plans tied to the success of the organization. These long-term incentive plans include, among other things, options to purchase shares of NorthWestern common stock and the right to participate in private equity incentive plans which hold minority investments in or are otherwise tied to the performance of NorthWestern's non-regulated subsidiaries. They are also entitled to participate in NorthWestern benefit plans available to executives, including, among other things, health, retirement, disability and life insurance benefits as well as an automobile allowance and country club dues. The agreements provide for the payment of accrued salary and termination benefits if employment is terminated by NorthWestern on substantiall the same terms as described above for Mr. Hylland's agreement. The agreements contain provisions requiring them to maintain the confidentiality of NorthWestern proprietary information and restricts them from competing with NorthWestern or soliciting NorthWestern's employees, suppliers and customers for a period of two years following termination. NorthWestern has agreed, pursuant to the agreement, to indemnify each of Messrs. Hanson, Jacobsen and Newell to the fullest extent permitted by law.

The total remaining obligation under employment agreements in the ordinary course, excluding a change in control, with Messrs. Hylland, Hanson, Jacobsen and Newell are approximately $3.8 million, $1.8 million, $0.7 million and $1.9 million, respectively.

Merle Lewis retired from his employment with the Company and its subsidiaries and affiliates and resigned as the Company's Chief Executive Officer and Chairman and from all trustee, administrator or similar positions in which he served on behalf of the Company or any of its subsidiaries or affiliates, effective December 31, 2002. Mr. Lewis concurrently resigned as a member of the Board, and as an officer and director of each of the Company's subsidiaries and affiliates (other than as a member of the board of directors of CornerStone Propane G.P., Inc.) for which he served. In connection with his retirement, Mr. Lewis entered into a retirement agreement with the Company and terminated the Comprehensive Employment Agreement and Investment Program, dated June 1, 2000, which was scheduled to expire February 28, 2006. Under the Retirement Agreement, Mr. Lewis received the following, which total an aggregate of approximately $3.5 million: (1) a cash severance payment, the equivalent of one year's base salary and target annual incentive compensation for a total of $1,711,000, (2) a cash payment of $73,000 from the Company, representing his interest in the 1998 NorthWestern Energy Corporation Equity Ownership Incentive Plan, (3) full vesting of the 22,511 shares of restricted stock granted to him on March 1, 2001, originally scheduled to vest on February 4, 2005 (and all additional shares purchased with dividends declared thereon) under the Company's Stock Option and Incentive Plan (as amended on January 16, 2001), (4) payments of $500 per month until age 65 toward

the cost of retiree health insurance, (5) retention of the company provided leased automobile through the end of the such lease at an estimated cost of $1,000 per month, and (6) age and service credits toward benefit determination in NorthWestern's qualified and nonqualified pension plan as if he were to continue to be employed through June 30,

2006, the value of which is approximately $1.7 million on a present value basis as determined by NorthWestern's actuaries. Based upon Mr. Lewis' years of service, and the benefit elections he made under the provisions of the NorthWestern Pension Plan and Supplemental Executive Retirement Plan, with the enhanced pension benefit, Mr. Lewis began in January 2003 to receive a pension benefit of $29,470 per month. The Company agreed to insure the payment of such subsidy in the event of a change of control of the Company by obtaining a letter of credit or other financial instrument.

Mr. Lewis waived or cancelled all other rights or interests he may have had under the Stock Option and Incentive Plan, including all vested and unvested incentive stock options, non-qualified stock options and phantom stock units (including all dividends accrued thereon) granted to him under the plan. Mr. Lewis waived all of his rights and interests in the Company's short-term and long-term disability insurance coverages, term life insurance coverages and annual incentive plans for 2002. He also waived his rights and interests in the equity ownership incentive plans of NorthWestern Growth Corporation, NorthWestern Services Group, Inc., NorthWestern Public Service, NorthWestern Services Corporation, and NorCom Advanced Technologies, Inc. and assigned his rights in the membership interests of NorthWestern Capital Partners, LLC, a Delaware limited liability company, to the Company. Mr. Lewis retained all benefits vested or earned as of the date of his retirement in the Company's benefit and retirement plans in which he participated (and he waived all post retirement vesting or interests), and the Company agreed to subsidize his pension benefit payments such that his pension benefit will be calculated as if Mr. Lewis' term of service or employment with the Company terminated on June 30, 2006, notwithstanding the actual date of retirement and regardless of the date of payment of such benefits.

Mr. Lewis released the company and its affiliates and subsidiaries and their agents from all know and unknown claims that he may have in connection with his employment with the Company or as a stockholder of the Company, other than (a) his right to enforce the retirement agreement, (b) any rights or claims that arise after the date of his retirement, and (c) any claims for indemnification from the Company or any claims under the Company's Directors and Officers insurance policies, in either case, for actions or omissions in his capacity as an officer or director of the Company.

**Retirement Plan**

NorthWestern has two retirement plans, with one applicable to its Montana NorthWestern Energy team members and one applicable to its South Dakota and Nebraska NorthWestern Energy and all NorthWestern Corporation team members. All of the named executives participate in the latter plan. For that plan, effective January 1, 2000, NorthWestern offered its team members two alternatives with regard to its retirement plan. A team member could convert his or her existing accrued benefit from the existing plan into an opening balance in a hypothetical account under a new cash balance formula, or that team member could continue under the existing defined benefit formula. All team members hired after January 1, 2000 participate in the cash balance formula. The beginning balance in the cash balance account for a converting team member was determined based on the team member's accrued benefit, age and service as of January 1, 2000, 2000 eligible pay, and a conversion interest rate of 6%. Under the cash balance formula a participant's account grows based upon (1) contributions by NorthWestern made once per year, and (2) by annual interest credits based on the average Federal 30-year Treasury bill rate for November of the preceding year (6.15% for 2000). Contribution rates were determined on January 1, 2000, based on the participant's age and years of service on that date. They range from 3%-7.5% (3% for all new team members) for compensation below the taxable wage base and are doubled for compensation above the taxable wage base. Upon termination of employment with NorthWestern, a team member, or if deceased, his or her beneficiary, receives the cash balance in the account paid in a lump sum or in other permitted annuity forms of payment.

90

To be eligible for the retirement plan, a team member must be 21 years of age and have worked at least one year for NorthWestern, working at least 1,000 hours in that year. Non-employee Directors are not eligible to participate. Benefits for team members who chose not to convert to the cash balance formula will continue to be part of the defined benefit formula, which provides an annual pension benefit upon normal retirement at age 65 or

earlier (subject to benefit reduction). Under this formula, the amount of the annual pension is based upon average annual earnings for the sixty consecutive highest paid months during the 10 years immediately preceding retirement. Upon retirement on the normal retirement date, the annual pension to which an eligible team member becomes entitled under the formula amounts to 1.34% of average annual earnings up to the Covered Compensation base plus 1.75% of such earnings in excess of the Covered Compensation base, multiplied by all years of credited service.

The named executives also participate in a supplemental excess retirement plan related to both of the pension formulas, which provides benefits based on those formulas but with respect to compensation which exceeds the limits under the Code. In addition, NorthWestern has agreed to assure Mr. Hanson a pension benefit equivalent to that which would be provided by the Retirement Plan if he were given credit for his 17 years of prior service with another utility company in addition to his years of service with NorthWestern. As a result, he was credited with those additional years of service under the supplemental excess retirement plan.

Assuming the named executives reach the normal retirement age of 65, the projected annual life annuity benefits for the named executives would be: Mr. Hylland, $246,477; Mr. Hanson, $156,773; Mr. Jacobsen, $54,336; Mr. Newell, $97,279. In 2002 the cash balance accounts for the named executive officers, other than Mr. Lewis, were as follows: Mr. Hylland $376,367, Mr. Hanson $355,290, Mr. Jacobsen $60,693; and Mr. Newell $160,005.

## Other Benefits

NorthWestern currently maintains a variety of benefit plans and programs, which are generally available to all NorthWestern team members, including executive officers, such as the 401(k) Retirement Plan under which a team member may contribute up to 13% of his or her salary (with NorthWestern matching up to $3\frac{1}{2}$% of the first 6% contributed by the team member), a Supplemental Variable Investment Plan (a non-qualified Supplemental 401(k) plan available to the extent participation in the 401(k) is limited by the Internal Revenue Code), a Team Member Stock Purchase Plan (Section 423 Plan) approved by shareholders and instituted in 1999, under which a team member may contribute up to $3,000 per year for the purchase of NorthWestern Common Stock (at a discount of up to 15% of market value), term life and supplemental life (Family Protector Plan) insurance coverage, the NorthWestern Employee Stock Ownership Plan (ESOP), long-term disability plan, and other general employee benefits such as emergency personal leave and educational assistance.

## Salary Continuation Plan

NorthWestern has a non-qualified salary continuation plan for directors and selected management team members (the Supplemental Income Security Plan). In 2002, a total of 35 active team members and non-employee directors participated in this plan. The plan provides for certain amounts of salary continuation in the event of death before or after retirement or, in the alternative, certain supplemental retirement benefits in lieu of any death benefits after age 65. Generally, death benefits will vary from 45% to 75% of salary for up to 15 years, and supplemental retirement benefits from 25% to 40% of current salary. Life insurance is carried on each plan participant in favor of NorthWestern to indirectly fund future benefit payments. Part of the cost of the life insurance carried by NorthWestern is paid by team member participants in the plan. The program was designed so that if assumptions made as to mortality experience, policy dividends or credits, and other actuarial factors are realized, NorthWestern should more than recover its cost of this program. Consequently, the cost of any one individual participant cannot be properly allocated or determined because of the overall actuarial plan assumptions and the cost recovery feature of the plan. Therefore, no amount attributable to this plan has been included in the summary compensation table above.

## Compensation Committee Interlocks and Insider Participation

The Compensation Committee is composed of not less than three non-employee directors. The members of the Compensation Committee are Chairman Randy G. Darcy, Marilyn R. Seymann, and Larry F. Ness. None of the persons who served as members of the Compensation Committee of the Board during fiscal year 2002 are officers or employees or former employees of NorthWestern or any of its subsidiaries.

## Director Compensation

Non-employee Directors annually receive 1,200 shares of Common Stock of NorthWestern, are paid $2,500 each quarter for serving on the Board, and receive an attendance fee of $4,000 for attendance at each regular or special meeting of the Board. Directors are also paid $1,700 for each meeting of a committee on which such director serves and $500 for each quarter during which they serve as chairman of a committee of the Board. Directors receive one-half of the meeting fee for telephonic conference board or committee meetings. In addition, non-employee directors received stock options for 4,000 shares of Common Stock in 2002. Directors who are also officers are not separately compensated for services as a director on NorthWestern's Board.

Directors may elect to defer receipt of their cash compensation as directors until they cease to be directors. The deferred compensation may be invested in (1) an account which earns interest at the same rate as accounts in the team member savings plan or (2) a deferred compensation unit account in which the deferred compensation is converted into deferred compensation units on the basis that each unit is at the time of investment equal in value to the fair market value of one share of NorthWestern's Common Stock, sometimes referred to as "phantom stock units." Additional units based on the dividends paid on NorthWestern's Common Stock are added to the director's deferred compensation unit account. Following the director's retirement, the value of the deferred compensation is paid in cash to the former director within a period of five years.

## ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

### Security Ownership by Certain Beneficial Owners and Management

The following table sets forth information, as of March 1, 2003, with respect to the beneficial ownership of shares of NorthWestern's Common Stock owned by the directors, nominees for director, the "Named Executive Officers" of NorthWestern, as described below, and by all directors and executive officers of NorthWestern as a group. Except under special circumstances, NorthWestern's Common Stock is the only class of voting securities. There are no persons known to NorthWestern who own more than 5% of the outstanding shares of Common Stock.

The "Named Executive Officers" include NorthWestern's (a) Chief Executive Officer; (b) its four most highly compensated executive officers, other than the Chief Executive Officer, who were serving as executive officers at the end of fiscal year 2002; and (c) up to two additional individuals for whom such disclosure would have been provided under clause (a) and (b) above but for the fact that the individual was not serving as an executive officer of NorthWestern at the end of fiscal year 2002; provided, however, that no disclosure need be provided for any executive officer, other than the CEO, whose total annual salary and bonus does not exceed $100,000.

Accordingly, NorthWestern's Named Executive Officers include (a) Gary G. Drook, its Chief Executive Officer; (b) Merle D. Lewis, former Chairman and Chief Executive Officer and (c) Richard R. Hylland, Daniel K. Newell, Michael J. Hanson and Eric R. Jacobsen, the four most highly-compensated executive officers, other than the Chief Executive Officer, who were serving as executive officers at the end of fiscal year 2002 and whose salary and bonus exceeded $100,000.

92

---

Except as otherwise noted, the persons or entities in this table have sole voting and investing power with

respect to all the shares of NorthWestern's Common Stock beneficially owned by them subject to community property laws, where applicable. The information with respect to each person specified is as supplied or confirmed by such person, based upon statements filed with the SEC, or based upon the actual knowledge of NorthWestern.

| Name of Beneficial Owner | Amount and Nature of Beneficial Ownership(1) | |
| --- | --- | --- |
| | Shares of Common Stock Beneficially Owned | Percent of Common Stock |
| Randy G. Darcy | 5,811 | * |
| Gary G. Drook | 5,610 | * |
| Jerry W. Johnson | 11,326 | * |
| Larry F. Ness | 12,407 | * |
| Marilyn R. Seymann | 4,106 | * |
| Bruce I. Smith | 15,025 | * |
| Merle D. Lewis(2) | 202,079 | * |
| Richard R. Hylland | 30,221 | * |
| Daniel K. Newell | 32,009 | * |
| Michael J. Hanson | 13,146 | * |
| Eric R. Jacobsen | 8,676 | * |
| All directors & executive officers | 348,071 | 1% |

\*    Less than 1%.

(1)    Shares shown represent both record and beneficial ownership, including shares held in the team member's (employee's) account with the Trustees of NorthWestern's Employee Stock Ownership Plan ("ESOP") and in various plans (NorthWestern's 401(k) Retirement Plan, Supplemental Variable Investment Plan, and Team Member Stock Purchase Plan, collectively the "Team Member Savings Plans"). Mr. Hanson's shares include 4,316 shares in an Individual Retirement Account. The address of each person is 125 S. Dakota Ave., Sioux Falls, SD 57104.

(2)    Mr. Lewis retired as Chairman and Chief Executive Officer as of December 31, 2002.

Information regarding equity compensation plans required by this Item 12 is included in Item 5 of Part II of this report and is incorporated into this Item 12 by reference.

## ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

Gary G. Drook became our new chief executive officer on January 5, 2003. Mr. Drook does not have a written employment agreement with us. Mr. Drook received a cash payment of $600,000 on his date of hire. He will be required to repay all of that amount if his employment with us terminates before January 5, 2004 and 50% if his employment terminates before January 5, 2005. Mr. Drook also received an initial option to purchase 233,333 shares of our common stock at $4.90 per share. The option vests in three equal annual installments on the anniversary of his hire date. Mr. Drook's base salary in 2003 will be $565,000 per year and his target annual bonus is $423,750, or 75% of his base salary. His bonus will be determined by our board of directors. Mr. Drook also received long-term incentive compensation in 2003 consisting of additional options to purchase up to 339,000 shares of common stock at $4.90 per share. These options also vest in three equal annual installments on the anniversary of his hire date. We believe that Mr. Drook's cash compensation in 2003 will be approximately $988,750. As part of his compensation arrangements, Mr. Drook is also entitled to use aircraft owned by us to commute to and from our corporate offices in Sioux Falls, South Dakota and his home in Florida. We anticipate that

he will use the aircraft approximately 26 times per year, at an

93

annual cost to us of approximately $450,000. The approximate cost to the company of Mr. Drook's usage of the aircraft as of April 15, 2003 was $115,000. The cost to us related to Mr. Drook's use of our aircraft for commuting is treated as income to him. We have agreed to provide Mr. Drook with a tax gross up payment for all income related to personal aircraft usage. Mr. Drook is also eligible to participate in our health, welfare and retirement programs and relocation assistance.

## ITEM 14. CONTROLS AND PROCEDURES

(a) Within the 90-day period prior to the date of this report, we carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures pursuant to Rule 13a-14 of the Securities Exchange Act of 1934 (the "Exchange Act"). As a result of this review and evaluation, which was conducted in the course of preparing our financial statements for the year ended December 31, 2002 and in connection with the corresponding audit by our independent auditors, Deloitte & Touche LLP, management determined that our internal controls have not meet our expectations and goals.

In particular, the EXPERT enterprise software system used by our subsidiary, Expanets, has significantly failed to provide the intended functionality and information. We were unable to identify billing problems and related accounting problems in a timely manner during 2002. Expanets experienced severe complications with its EXPERT enterprise software system throughout 2002, including order entry and customer fulfillment, billing and collection functions, an inability to provide timely and complete billing detail for a majority of Expanets' customers, numerous reporting deficiencies that prevented management from receiving critical accounts receivable and cash application data in a timely manner and problems relating to data migration from Avaya's system, some of which were due to underlying problems with the Avaya database and faulty data migration scripting performed by Expanets. Expanets was forced to resort to manual journal entries in many instances. Throughout 2002, Expanets has made continuing efforts to correct deficencies in the EXPERT system. As a result of these efforts, which are ongoing, Expanets identified certain maintenance billing problems with its EXPERT system that required reversal of previously recorded maintenance revenue. Further, we determined that additional revenues, accounts receivable reserves and write-offs and billing adjustments reserves were not correctly stated in previously reported unaudited quarterly results. In the course of preparing our financial statements for the year ended December 31, 2002 and in connection with the corresponding audit, we also determined that certain costs related to the EXPERT system were inappropriately capitalized and that certain accounting procedures being used with respect to revenue recognition and account receivable reserve methodology were not appropriate for Expanets.

In addition, our financial reporting infrastructure has been significantly challenged as a result of our dramatic growth, from annual revenues of approximately $200 million in 1997 to annual revenues of approximately $2 billion in 2002. We have experienced a lack of continuity and retention of qualified accounting personnel, and have had difficulties in hiring an adequate number of qualified replacements on a timely basis. We have determined that the absence of a functioning internal auditing department and integrated information systems have limited our ability to adequately review subsidiary financial information. We may have experienced inconsistent application of and adherence to our policies and procedures by certain personnel. These factors have made it clear to management that the depth and training of its accounting staff needs improvement.

We have advised our Audit Committee of our Board of Directors that, in the course of preparing our year-end 2002 financial statements and in undergoing our 2002 audit, we noted the deficiencies in internal controls described above relating to:

- the evaluation of appropriate reserves for accounts receivable and billing adjustments specifically at Expanets;

94

- timely evaluation and substantiation of material account balances; and

- supervision, staffing and training of accounting personnel.

Our independent auditors, Deloitte & Touche LLP, has advised the Audit Committee that these internal control deficiencies constitute reportable conditions and, collectively, a material weakness as defined in Statement on Auditing Standards No. 60. Immediately prior to the filing of this Annual Report on Form 10-K, we filed amended Quarterly Reports on Form 10-Q/A for the periods ended March 31, 2002, June 30, 2002, and September 30, 2002. The amended Quarterly Reports principally restate prior reported results and include additional disclosures in the appropriate period as a result of the foregoing weaknesses in our internal controls.

With the assistance of our advisors, we continue to evaluate methods to improve our internal controls and procedures. We have taken or plan to take corrective actions, such as the following, as necessary:

- Retained an outside consulting firm to review many aspects of the EXPERT system;

- Retained outside legal counsel and a consulting firm to evaluate the Company's existing internal controls and disclosure controls and make suggestions for improvements;

- Hired a Vice President, Audit and Controls, reporting directly to our chief executive officer, to monitor and review our internal controls;

- Improving the communication to all employees of our corporate code of conduct in a form and content complying with the Sarbanes-Oxley Act;

- Further addition of personnel to the accounting department at Expanets to provide resources to perform additional manual reconciliations, data tracking, and reporting until EXPERT system enhancements and improvements can be developed and installed;

- Adoption of improved accounting policies, procedures and internal controls for the periodic consolidated financial closing process including closer management review of subsidiary financial information, prioritization and clarification of enterprise-wide risk management responsibilities, and documentation of inter-company transactions;

- Improving the communication between operating, financial and management functions, and expanding our formal reporting procedures;

- Addition of personnel in our accounting and internal audit departments as well as more clearly defining responsibilities, supervision and training of existing personnel; and

- Performance evaluations of all members of our internal financial staff and, if deemed necessary, the taking of prompt disciplinary action as well as other appropriate action regarding our employees so as to strengthen compliance with our Sarbanes-Oxley compliance procedures.

We have also performed substantial additional procedures designed to ensure that these disclosure and internal control deficiencies did not result in material misstatements in our consolidated financial statements contained in this Annual Report on Form 10-K and do not result in material misstatements in our future consolidated financial results.

(b)  Other than as described above, there have been no significant changes in our internal controls or in other factors that could significantly affect these controls subsequent to the date we carried out our evaluation.

95

---

**Part IV**

## ITEM 15. EXHIBITS, FINANCIAL STATEMENTS AND REPORTS ON FORM 8-K

a)  **The following documents are filed as part of this report:**

(1)     Financial Statements.

The following items are included in Part II, Item 8 of this annual report on Form 10-K:

*FINANCIAL STATEMENTS:*

Report of Independent Public Accountants

Consolidated Statements of Income for the Three Years Ended December 31, 2002

Consolidated Statements of Cash Flows for the Three Years Ended December 31, 2002

Consolidated Balance Sheets as of December 31, 2002 and 2001

Consolidated Statement of Shareholders' Equity for the Three Years Ended December 31, 2002

Notes to Consolidated Financial Statements

Quarterly Unaudited Financial Data for the Two Years Ended December 31, 2002

(2)     Financial Statement Schedules.

Schedule II. Valuation and Qualifying Accounts and the related report of independent public accountants

Schedule II, Valuation and Qualifying Accounts, is included in Part III, Item 8 of this annual report on Form 10-K. All other schedules are omitted because they are not applicable or the required information is shown in the Financial Statements or the Notes thereto.

(3)     Exhibits.

The exhibits listed below are hereby filed with the U.S. Securities and Exchange Commission, or the Commission, as part of this annual report on Form 10-K. Certain of the following exhibits have been previously filed with the Commission pursuant to the requirements of the Securities Act of 1933 or the Securities Exchange Act of 1934. Such exhibits are identified by the parenthetical references following the

listing of each such exhibit and are incorporated by reference. We will furnish a copy of any exhibit upon request, but a reasonable fee will be charged to cover our expenses in furnishing such exhibit.

| Exhibit Number | Description of Document |
| --- | --- |
| 2.1(a)* | Unit Purchase Agreement, dated as of September 29, 2000, among NorthWestern Corporation, Touch America Holdings, Inc. and The Montana Power Company with respect to all outstanding membership interests in The Montana Power, L.L.C. (incorporated by reference to Exhibit (10)(a)(1) of NorthWestern Corporation's Current Report on Form 8-K, dated August 21, 2001, Commission File No. 0-692). |
| 2.1(b)* | Amendment No. 1 to the Unit Purchase Agreement, dated as of June 21, 2001 (incorporated by reference to Exhibit (10)(a)(2) of NorthWestern Corporation's Current Report on Form 8-K, dated August 21, 2001, Commission File No. 0-692). |

96

| | |
| --- | --- |
| 3.1* | Restated Certificate of Incorporation of NorthWestern Corporation, dated November 9, 2000 (incorporated by reference to Exhibit 3(a) of NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2000, Commission File No. 0-692). |
| 3.2** | By-Laws of NorthWestern Corporation, as amended, dated January 5, 2003. |
| 4.1(a)* | General Mortgage Indenture and Deed of Trust, dated as of August 1, 1993, from NorthWestern Corporation to The Chase Manhattan Bank (National Association), as Trustee (incorporated by reference to Exhibit 4(a) of NorthWestern Corporation's Current Report on Form 8-K, dated August 16, 1993, Commission File No. 0-692). |
| 4.1(b)* | Supplemental Indenture, dated as of August 15, 1993, from NorthWestern Corporation to The Chase Manhattan Bank (National Association), as Trustee (incorporated by reference to Exhibit 4(b) of NorthWestern Corporation's Current Report on Form 8-K, dated August 16, 1993, Commission File No. 0-692). |
| 4.1(c)* | Supplemental Indenture, dated as of August 1, 1995, from NorthWestern Corporation to The Chase Manhattan Bank (National Association), as Trustee (incorporated by reference to Exhibit 4(b) of NorthWestern Corporation's Current Report on Form 8-K, dated August 30, 1995, Commission File No. 0-692). |
| 4.1(d)* | Supplemental Indenture, dated as of February 1, 2003, from NorthWestern Corporation to JPMorgan Chase Bank, as Trustee (incorporated by reference to Exhibit 4.3 of NorthWestern Corporation's Current Report on Form 8-K, dated February 10, 2003, Commission File No. 0-692). |
| 4.2(a)* | Preferred Securities Guarantee Agreement, dated as of August 3, 1995, between NorthWestern Corporation and Wilmington Trust Company (incorporated by reference to Exhibit 1(d) of NorthWestern Corporation's Current Report on Form 8-K, dated August 30, 1995, Commission File No. 0-692). |

4.2(b)*    Declaration of Trust of NWPS Capital Financing I (incorporated by reference to Exhibit 4(d) of NorthWestern Corporation's Current Report on Form 8-K, dated August 30, 1995, Commission File No. 0-692).

4.2(c)*    Amended and Restated Declaration of Trust of NWPS Capital Financing I (incorporated by reference to Exhibit 4(e) of NorthWestern Corporation's Current Report on Form 8-K, dated August 30, 1995, Commission File No. 0-692).

4.2(d)*    Preferred Securities Guarantee Agreement, dated as of November 18, 1998, between NorthWestern Corporation and Wilmington Trust Company (incorporated by reference to Exhibit 4(g) of NorthWestern Corporation's Registration Statement on Form 8-A (Amendment No. 1), dated December 3, 1998, Commission File No. 001-14623).

4.2(e)*    Certificate of Trust of NorthWestern Capital Financing I (incorporated by reference to Exhibit 4(b)(11) of NorthWestern Corporation's Registration Statement on Form S-3, dated July 2, 1998, Commission File No. 333-58491).

4.2(f)*    Amended and Restated Declaration of Trust of NorthWestern Capital Financing I (incorporated by reference to Exhibit 4(e) of NorthWestern Corporation's Registration Statement on Form 8-A (Amendment No. 1), dated December 3, 1998, Commission File No. 001-14623).

97

---

4.2(g)*    Preferred Securities Guarantee Agreement, dated as of December 21, 2001, between NorthWestern Corporation and Wilmington Trust Company (incorporated by reference to Exhibit 4.7 of NorthWestern Corporation's Registration Statement on Form 8-A, dated December 21, 2001, Commission File No. 001-16843).

4.2(h)*    Restated Certificate of Trust of NorthWestern Capital Financing II (incorporated by reference to Exhibit 4(b)(12) of NorthWestern Corporation's Registration Statement on Form S-3, dated July 2, 1998, Commission File No. 333-58491).

4.2(i)*    Amended and Restated Declaration of Trust of NorthWestern Capital Financing II (incorporated by reference to Exhibit 4.4 of NorthWestern Corporation's Registration Statement on Form 8-A, dated December 21, 2001, Commission File No. 001-16843).

4.2(j)*    Preferred Securities Guarantee Agreement, dated as of January 31, 2002, between NorthWestern Corporation and Wilmington Trust Company (incorporated by reference to Exhibit 4.6 of NorthWestern Corporation's Registration Statement on Form 8-A, dated February 1, 2002, Commission File No. 001-31229).

4.2(k)*    Restated Certificate of Trust of NorthWestern Capital Financing III (incorporated by reference to Exhibit 4(b)(13) of NorthWestern Corporation's Registration Statement on Form S-3, dated July 2, 1998, Commission File No. 333-58491).

4.2(l)*    Amended and Restated Declaration of Trust of NorthWestern Capital Financing III (incorporated by reference to Exhibit 4.3 of NorthWestern Corporation's Registration Statement on Form 8-A, dated February 1, 2002, Commission File No. 001-16843).

4.2(m)*     Form of Guarantee Agreement, between The Montana Power Company and The Bank of New York, as trustee (incorporated by reference to Exhibit 4(d) of The Montana Power Company's Registration Statement on Form S-3, dated October 18, 1996, Commission File No. 333-14369).

4.2(n)**    Assumption of Guarantee Agreement, dated as of February 13, 2002, by The Montana Power, L.L.C. in favor of The Bank of New York, as trustee.

4.2(o)**    Assumption Agreement (QUIPs Guarantee), dated as of November 15, 2002, by between NorthWestern Energy, L.L.C., as assignor, and NorthWestern Corporation, as assignee.

4.2(p)*     Form of Trust Agreement of Montana Power Capital I (incorporated by reference to Exhibit 4(a) of The Montana Power Company's Registration Statement on Form S-3, dated October 18, 1996, Commission File No. 333-14369).

4.2(q)**    Assignment and Assumption Agreement (QUIPs Agreements), dated as of November 15, 2002, by between NorthWestern Energy, L.L.C., as assignor, and NorthWestern Corporation, as assignee.

4.2(r)*     Form of Amended and Restated Trust Agreement of Montana Power Capital I (incorporated by reference to Exhibit 4(b) of The Montana Power Company's Registration Statement on Form S-3, dated October 18, 1996, Commission File No. 333-14369).

4.2(s)*     Subordinated Debt Securities Indenture, dated as of August 1, 1995, between NorthWestern Corporation and The Chase Manhattan Bank, as Trustee (incorporated by reference to Exhibit 4(f) of the Company's Current Report on Form 8-K, dated August 30, 1995, Commission File No. 0-692).

98

---

4.2(t)*     First Supplemental Indenture to the Subordinated Debt Securities Indenture, dated as of August 1, 1995 (incorporated by reference to Exhibit 4(g) of NorthWestern Corporation's Current Report on Form 8-K, dated August 30, 1995, Commission File No. 0-692).

4.2(u)*     Second Supplemental Indenture to the Subordinated Debt Securities Indenture, dated as of November 15, 1998 (incorporated by reference to Exhibit 4(f) of NorthWestern Corporation's Registration Statement on Form 8-A (Amendment No. 1), dated December 3, 1998, Commission File No. 001-14623).

4.2(v)*     Third Supplemental Indenture to the Subordinated Debt Securities Indenture, dated as of December 21, 2001 (incorporated by reference to Exhibit 4.6 of NorthWestern Corporation's Registration Statement on Form 8-A, dated December 21, 2001, Commission File No. 001-16843).

4.2(w)*     Fourth Supplemental Indenture to the Subordinated Debt Securities Indenture, dated as of January 31, 2002 (incorporated by reference to Exhibit 4.6 of NorthWestern Corporation's Registration Statement on Form 8-A, dated February 1, 2002, Commission File No. 001-31229).

4.2(x)*      Form of Indenture, between The Montana Power Company and The Bank of New York, as Trustee (incorporated by reference to Exhibit 4(c) of The Montana Power Company's Registration Statement on Form S-3, dated October 18, 1996, Commission File No. 333-14369).

4.2(y)**     First Supplemental Indenture to the Indenture, dated as of February 13, 2002, between The Montana Power, L.L.C. and The Bank of New York, as trustee.

4.2(z)**     Second Supplemental Indenture to the Indenture, dated as of August 13, 2002, between The Montana Power, L.L.C. and The Bank of New York, as trustee.

4.2(aa)**    Third Supplemental Indenture to the Indenture, dated as of November 15, 2002, between NorthWestern Corporation (successor to NorthWestern Energy, L.L.C., formerly known as The Montana Power, L.L.C.) and The Bank of New York, as trustee.

4.3(a)*      Indenture, dated as of November 1, 1998, between NorthWestern Corporation and The Chase Manhattan Bank, as Trustee (incorporated by reference to Exhibit 4(b)(8) of NorthWestern Corporation's Registration Statement on Form S-3, dated July 12, 1999, Commission File No. 333-82707).

4.3(b)*      First Supplemental Indenture to the Indenture, dated as of November 1, 1998 (incorporated by reference to Exhibit 4(b)(9) of NorthWestern Corporation's Registration Statement on Form S-3, dated July 12, 1999, Commission File No. 333-82707).

4.3(c)*      Second Supplemental Indenture to the Indenture, dated as of March 13, 2002 (filed as Exhibit 4(f)(3) to NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2001, Commission File No. 0-692).

4.4(a)*      Sale Agreement, dated as of June 1, 1993, between NorthWestern Corporation and Mercer County, North Dakota, related to the issuance of Pollution Control Refunding Revenue Bonds (Northwestern Public Service Company Project) Series 1993 (incorporated by reference to Exhibit 4(b)(1) of NorthWestern Corporation's Quarterly Report on Form 10-Q for the quarter ending June 30, 1993, Commission File No. 0-692).

99

---

4.4(b)*      Loan Agreement, dated as of June 1, 1993, between NorthWestern Corporation and Grant County, South Dakota, related to the issuance of Pollution Control Refunding Revenue Bonds (Northwestern Public Service Company Project) Series 1993A (incorporated by reference to Exhibit 4(b)(2) of NorthWestern Corporation's Quarterly Report on Form 10-Q for the quarter ending June 30, 1993, Commission File No. 0-692).

4.4(c)*      Loan Agreement, dated as of June 1, 1993, between NorthWestern Corporation and Grant County, South Dakota, related to the issuance of Pollution Control Refunding Revenue Bonds (Northwestern Public Service Company Project) Series 1993B (incorporated by reference to Exhibit 4(b)(3) of NorthWestern Corporation's Quarterly Report on Form 10-Q for the quarter ending June 30, 1993, Commission File No. 0-692).

4.4(d)*     Loan Agreement, dated as of June 1, 1993, between NorthWestern Corporation and the City of
            Salix, Iowa, related to the issuance of Pollution Control Refunding Revenue Bonds
            (Northwestern Public Service Company Project) Series 1993 (incorporated by reference to
            Exhibit 4(b)(4) of NorthWestern Corporation's Quarterly Report on Form 10-Q for the quarter
            ending June 30, 1993, Commission File No. 0-692).

4.4(e)**    Loan Agreement, dated as of May 1, 1993, between The Montana Power Company and the City
            of Forsyth, Montana, related to the issuance of City of Forsyth Pollution Control Revenue Bonds
            Series 1993A due 2023.

4.4(f)**    1993A First Supplemental Loan Agreement, dated as of September 21, 2001, between The
            Montana Power Company and the City of Forsyth, Montana, related to the issuance of City of
            Forsyth Pollution Control Revenue Bonds Series 1993A due 2023.

4.4(g)**    Assumption Agreement of The Montana Power, L.L.C. to Bank One, as Trustee, dated as of
            February 13, 2002, related to the City of Forsyth Pollution Control Revenue Bonds Series 1993A
            due 2023.

4.4(h)**    Assignment and Assumption Agreement (PCRB 1993A Loan Agreement), between
            NorthWestern Energy, L.L.C., as Assignor, and NorthWestern Corporation, as Assignee, dated as
            of November 15, 2002, related to the City of Forsyth Pollution Control Revenue Bonds
            Series 1993A due 2023.

4.4(i)**    Loan Agreement, dated as of December 1, 1993, between The Montana Power Company and the
            City of Forsyth, Montana, related to the issuance of City of Forsyth Pollution Control Revenue
            Bonds Series 1993B due 2023.

4.4(j)**    1993B First Supplemental Loan Agreement, dated as of September 21, 2001, between The
            Montana Power Company and the City of Forsyth, Montana, related to the issuance of City of
            Forsyth Pollution Control Revenue Bonds Series 1993A due 2023.

4.4(k)**    Assumption Agreement of The Montana Power, L.L.C. to Bank One, as Trustee, dated as of
            February 13, 2002, related to the City of Forsyth Pollution Control Revenue Bonds Series 1993B
            due 2023.

4.4(l)**    Assignment and Assumption Agreement (PCRB 1993B Loan Agreement), between
            NorthWestern Energy, L.L.C., as Assignor, and NorthWestern Corporation, as Assignee, dated as
            of November 15, 2002, related to the City of Forsyth Pollution Control Revenue Bonds
            Series 1993A due 2023.

100

4.5(a)*     First Mortgage and Deed of Trust, dated as of October 1, 1945, by The Montana Power Company
            in favor of Guaranty Trust Company of New York and Arthur E. Burke, as trustees (incorporated
            by reference to Exhibit 7(e) of The Montana Power Company's Registration Statement,
            Commission File No. 002-05927).

4.5(b)*    Thirteenth Supplemental Indenture to the Mortgage and Deed of Trust, dated as of December 1, 1991 (incorporated by reference to Exhibit 4(a)-14 of The Montana Power Company's Registration Statement on Form S-3, dated December 16, 1992, Commission File No. 033-55816).

4.5(c)*    Fourteenth Supplemental Indenture to the Mortgage and Deed of Trust, dated as of January 1, 1993 (incorporated by reference to Exhibit 4(c) of The Montana Power Company's Registration Statement on Form S-8, dated June 17, 1993, Commission File No. 033-64576).

4.5(d)*    Fifteenth Supplemental Indenture to the Mortgage and Deed of Trust, dated as of March 1, 1993 (incorporated by reference to Exhibit 4(d) of The Montana Power Company's Registration Statement on Form S-8, dated June 17, 1993, Commission File No. 033-64576).

4.5(e)*    Sixteenth Supplemental Indenture to the Mortgage and Deed of Trust, dated as of May 1, 1993 (incorporated by reference to Exhibit 99(a) of The Montana Power Company's Registration Statement on Form S-3, dated September 13, 1993, Commission File No. 033-50235).

4.5(f)*    Seventeenth Supplemental Indenture to the Mortgage and Deed of Trust, dated as of December 1, 1993 (incorporated by reference to Exhibit 99(a) of The Montana Power Company's Registration Statement on Form S-3, dated December 5, 1994, Commission File No. 033-56739).

4.5(g)*    Eighteenth Supplemental Indenture to the Mortgage and Deed of Trust, dated as of August 5, 1994 (incorporated by reference to Exhibit 99(b) of The Montana Power Company's Registration Statement on Form S-3, dated December 5, 1994, Commission File No. 033-56739).

4.5(h)*    Nineteenth Supplemental Indenture to the Mortgage and Deed of Trust, dated as of December 16, 1999 (incorporated by reference to Exhibit 99 of The Montana Power Company's Annual Report on Form 10-K for the year ended December 31, 2000, Commission File No. 001-04566).

4.5(i)*    Twentieth Supplemental Indenture to the Mortgage and Deed of Trust, dated as of November 1, 2001 (incorporated by reference to Exhibit 4(u) of NorthWestern Energy, L.L.C.'s Annual Report on Form 10-K for the year ended December 31, 2001, Commission File No. 001-31276).

4.5(j)*    Twenty-first Supplemental Indenture to the Mortgage and Deed of Trust, dated as of February 13, 2002 (incorporated by reference to Exhibit 4(v) of NorthWestern Energy, L.L.C.'s Annual Report on Form 10-K for the year ended December 31, 2001, Commission File No. 001-31276).

4.5(k)*    Twenty-second Supplemental Indenture to the Mortgage and Deed of Trust, dated as of November 15, 2002 (incorporated by reference to Exhibit 4.1 of NorthWestern Corporation's Current Report on Form 8-K, dated February 10, 2003, Commission File No. 0-692).

101

4.5(l)*    Twenty-third Supplemental Indenture to the Mortgage and Deed of Trust, dated as of February 1, 2002 (incorporated by reference to Exhibit 4.2 of NorthWestern Corporation's Current Report on Form 8-K, dated February 10, 2003, Commission File No. 0-692).

4.6(a)*     Form of Indenture, dated as of December 1, 1989, between The Montana Power Company and Citibank, N.A., as Trustee (incorporated by reference to Exhibit 4-A to The Montana Power Company's Registration Statement on Form S-3, dated November 24, 1989, Commission File No. 033-32275).

4.6(b)**     First Supplemental Indenture to the Indenture, dated as of February 13, 2002.

4.6(c)**     Second Supplemental Indenture to the Indenture, dated as of November 15, 2002.

4.7(a)**     Natural Gas Funding Trust Indenture, dated as of December 22, 1998, between MPC Natural Gas Funding Trust, as Issuer, and U.S. Bank National Association, as Trustee.

4.7(b)**     Natural Gas Funding Trust Agreement, dated as of December 11, 1998, among The Montana Power Company, Wilmington Trust Company, as trustee, and the Beneficiary Trustees party thereto.

4.7(c)**     Transition Property Purchase and Sale Agreement, dated as of December 22, 1998, between MPC Natural Gas Funding Trust and The Montana Power Company.

4.7(d)**     Transition Property Servicing Agreement, dated as of December 22, 1998, between MPC Natural Gas Funding Trust and The Montana Power Company.

4.7(e)**     Assumption Agreement regarding the Transition Property Purchase Agreement and the Transition Property Servicing Agreement, dated as of February 13, 2002, by The Montana Power, L.L.C. to MPC Natural Gas Funding Trust.

4.7(f)**     Assignment and Assumption Agreement (Natural Gas Transition Documents), dated as of November 15, 2002, by and between NorthWestern Energy, L.L.C., as assignor, and NorthWestern Corporation, as assignee.

4.8(a)*     Rights Agreement, dated as of December 11, 1996, between NorthWestern Corporation and Norwest Bank Minnesota, N.A. as Rights Agent (incorporated by reference to Exhibit 4(c)(5) of NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 1999, Commission File No. 0-692).

4.8(b)*     First Amendment to Rights Agreement, dated as of August 21, 2000, between NorthWestern Corporation and Wells Fargo Bank Minnesota, N.A., (formerly Norwest Bank Minnesota, N.A.), as Rights Agent (incorporated by reference to Exhibit 4(c)(6) of NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2000).

10.1(a)†*     NorthWestern Corporation Traditional Pension Equalization Plan, as amended and restated, effective as of January 1, 2000 (incorporated by reference to Exhibit 10(a)(2) of NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 1999, Commission File No. 0-692).

10.1(b)†*     NorthWestern Corporation Cash Balance Supplemental Executive Retirement Plan, effective as of January 1, 2000 (incorporated by reference to Exhibit 10(a)(3) of NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 1999, Commission File No. 0-692).

102

10.1(c)†*  NorthSTAR Annual Incentive Plan, for all eligible employees, as amended as of May 4, 1999 (incorporated by reference to Exhibit 10(a)(4) of NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 1999, Commission File No. 0-692).

10.1(d)†*  NorthWestern Executive Performance Plan, effective as of May 2, 2000 (incorporated by reference to Exhibit 10(a)(5) of NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2000, Commission File No. 0-692).

10.1(e)†*  NorthWestern Stock Option and Incentive Plan, as amended as of January 16, 2001 (incorporated by reference to Exhibit 10(a)(6) of NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2000, Commission File No. 0-692)

10.1(f)†*  Deferred Compensation Plan for Non-employee Directors, adopted as of November 6, 1985 (incorporated by reference to Exhibit 10(g)(2) of NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 1988, Commission File No. 0-692).

10.1(g)†*  Supplemental Variable Investment Plan, as amended and restated as of January 1, 2000 (filed as Exhibit 10(a)(7) to NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2001, Commission File No. 0-692).

10.1(h)†*  Comprehensive Employment Agreement and Investment Program for Merle D. Lewis, dated as of June 1, 2000 (incorporated by reference to Exhibit 10.1 of NorthWestern Corporation's Current Report on Form 8-K/A (Amendment No. 1), dated December 14, 2001, Commission File No. 0-692).

10.1(i)†**  Retirement Agreement, effective as of December 31, 2002, by and between NorthWestern Corporation and Merle D. Lewis.

10.1(j)†*  Comprehensive Employment Agreement and Equity Plan Participation Program for Richard R. Hylland, dated as of March 1, 2001 (incorporated by reference to Exhibit 10.2 of NorthWestern Corporation's Current Report on Form 8-K/A (Amendment No. 1), dated December 14, 2001, Commission File No. 0-692).

10.1(k)†*  Comprehensive Employment Agreement and Equity Plan Participation Program for Daniel K. Newell, dated as of March 1, 2001 (incorporated by reference to Exhibit 10.3 of NorthWestern Corporation's Current Report on Form 8-K/A (Amendment No. 1), dated December 14, 2001, Commission File No. 0-692).

10.1(l)†*  Comprehensive Employment Agreement and Equity Plan Participation Program for Michael J. Hanson, dated as of March 1, 2001 (incorporated by reference to Exhibit 10.4 of NorthWestern Corporation's Current Report on Form 8-K/A (Amendment No. 1), dated December 14, 2001, Commission File No. 0-692).

10.1(m)†*  Comprehensive Employment Agreement and Equity Plan Participation Program for Eric R. Jacobsen, dated as of March 1, 2001 (incorporated by reference to Exhibit 10.7 of NorthWestern Corporation's Current Report on Form 8-K/A (Amendment No. 1), dated December 14, 2001, Commission File No. 0-692).

10.1(n)†*    Supplemental Income Security Plan for Directors, Officers and Managers, as amended and restated effective as of July 1, 1999 (incorporated by reference to Exhibit 10.8 of NorthWestern Corporation's Current Report on Form 8-K/A (Amendment No. 1), dated December 14, 2001, Commission File No. 0-692).

103

---

10.1(o)†*    Form of "Tier 1" Termination Benefits Upon Change in Control Agreement (incorporated by reference to Exhibit 10(a) of The Montana Power Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2001, Commission File No. 1-4566).

10.1(p)†*    Form of "Tier 2" Termination Benefits Upon Change in Control Agreement (incorporated by reference to Exhibit 10(b) of The Montana Power Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2001, Commission File No. 1-4566).

10.1(q)†*    Form of "Tier 3" Termination Benefits Upon Change in Control Agreement (incorporated by reference to Exhibit 10(c) of The Montana Power Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2001, Commission File No. 1-4566).

10.1(r)†**    NorthWestern Capital Partners LLC Limited Liability Company Agreement, dated as of September 30, 1999.

10.1(s)†**    Form of Put Option Agreement, dated as of September 30, 1999.

10.2(a)*    Credit Agreement, dated as of January 14, 2002, among NorthWestern Corporation, Credit Suisse First Boston, ABN AMRO Bank N.V., CIBC Inc. and Barclays Capital Inc., as co-arrangers, Credit Suisse First Boston, as administrative agent, lead arranger and sole book runner, and the banks and other financial institutions parties thereto (filed as Exhibit 10(b)(1) to NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2001, Commission File No. 0-692).

10.2(b)*    Amendment No. 1 to Credit Agreement, dated as of June 20, 2002, among NorthWestern Corporation, Credit Suisse First Boston, ABN AMRO Bank N.V., CIBC Inc. and Barclays Capital Inc., as co-arrangers, Credit Suisse First Boston, as administrative agent, lead arranger and sole book runner, and the banks and other financial institutions parties thereto (incorporated by reference to Exhibit 10.2(c) of Amendment No. 1 to NorthWestern Corporation's Registration Statement on Form S-4, dated July 12, 2002, Commission File No. 333-86888).

10.2(c)*    Amendment No. 2 to Credit Agreement, dated as of August 13, 2002, among NorthWestern Corporation, Credit Suisse First Boston, ABN AMRO Bank N.V., CIBC Inc. and Barclays Capital Inc., as co-arrangers, Credit Suisse First Boston, as administrative agent, lead arranger and sole book runner, and the banks and other financial institutions parties thereto (incorporated by reference to Exhibit 10.1 of NorthWestern Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2002, Commission File No. 0-692.)

10.2(d)*    Credit Agreement, dated as of December 17, 2002, between NorthWestern Corporation and Credit Suisse First Boston, as administrative agent, lead arranger and sole book runner (incorporated by reference to Exhibit 99.2 of NorthWestern Corporation's Current Report on

Form 8-K, dated February 10, 2003, Commission File No. 0-692).

10.2(e)* Amendment No. 1 to Credit Agreement, dated as of January 8, 2003, between NorthWestern Corporation and Credit Suisse First Boston, as administrative agent, lead arranger and sole book runner (incorporated by reference to Exhibit 99.3 of NorthWestern Corporation's Current Report on Form 8-K, dated February 10, 2003, Commission File No. 0-692).

104

---

10.2(f)* Amendment No. 2 to Credit Agreement, dated as of February 10, 2003, among NorthWestern Corporation, Credit Suisse First Boston, as administrative agent, lead arranger and sole book runner, and the banks and other financial institutions parties thereto (incorporated by reference to Exhibit 99.4 of NorthWestern Corporation's Current Report on Form 8-K, dated February 10, 2003, Commission File No. 0-692).

10.2(g)* Bond Collateral Agreement, dated as of February 10, 2003, between NorthWestern Corporation and Credit Suisse First Boston, acting through its Cayman Islands Branch, as collateral agent (incorporated by reference to Exhibit 99.5 of NorthWestern Corporation's Current Report on Form 8-K, dated February 10, 2003, Commission File No. 0-692).

10.3(a)* Credit and Security Agreement, dated as of March 31, 2001, between Expanets, Inc. and Avaya Inc. (and NorthWestern Corporation with respect to Section 7.3 only) (filed as Exhibit 10(d)(1) to NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2001 Commission File No. 0-692).

10.3(b)* First Amendment to Credit and Security Agreement, dated as of August 1, 2001, between Expanets, Inc. and Avaya Inc. (acknowledged by NorthWestern Corporation) (filed as Exhibit 10(d)(2) to NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2001. Commission File No. 0-692).

10.3(c)* Second Amendment to Credit and Security Agreement; Amendment to Collateral Agreements, dated as of March 5, 2002, between Expanets, Inc. (and several affiliates of Expanets) and Avaya Inc. (and NorthWestern Corporation with respect to Sections 1(h) and 7 only) (filed as Exhibit 10(d)(3) to NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2001, Commission File No. 0-692).

10.3(d)** Third Amendment to Credit and Security Agreement, dated as of March 5, 2003, between Expanets, Inc. (and several affiliates of Expanets) and Avaya Inc. (and NorthWestern Corporation with respect to Sections 1 and 6 only)

10.4(a)** Credit and Security Agreement, dated as of August 30, 2002, between Blue Dot Services Inc. and U.S. Bank, N.A.

12.1** Statement Regarding Computation of Earnings to Fixed Charges.

21** Subsidiaries of NorthWestern Corporation.

23.1** Consent of Independent Public Accountants

23.2**  Notice Regarding Consent of Arthur Andersen LLP

24**    Power of Attorney (included on the signature page of this Annual Report on Form 10-K)

99.1*** Certification Pursuant to 18 United States Code Section 1350, As Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

99.2*** Certification Pursuant to 18 United States Code Section 1350, As Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

---

†     Management contract or compensatory plan or arrangement.

*     Incorporated by reference.

**    Filed herewith.

***   Pursuant to Commission Release No. 33-8212, this certification will be treated as "accompanying" this Annual Report on Form 10-K and not "filed" as part of such report for purposes of

105

---

Section 18 of the Exchange Act, or otherwise subject to the liability of Section 18 of the Exchange Act and this certification will not be deemed to be incorporated by reference into any filing under the Securities Act of 1933, as amended, or the Exchange Act, except to the extent that the registrant specifically incorporates it by reference.

All schedules for which provision is made in the applicable accounting regulations of the SEC are not required under the related instructions or are not applicable, and, therefore, have been omitted.

**(b) Reports on Form 8-K**

We filed a Current Report on Form 8-K with the SEC on October 8, 2002, to disclose under Item 5 of the Report that on October 2, 2002, we agreed to sell up to 11,500,000 shares of our common stock in an underwritten public offering and to file as an exhibit with the SEC the underwriting agreement pursuant to which such sale occurred.

We filed a Current Report on Form 8-K with the SEC on October 21, 2002, to disclose under Item 5 of the Report that we had extended the period of time during which we would issue $250 million aggregate principal amount of our $7^7/8\%$ Notes due March 15, 2007 and $470 million aggregate principal amount of our $8^3/4\%$ Notes due March 15, 2012 which were registered under the Securities Act of 1933, as amended, in exchange for $250 million aggregate principal amount of our $7^7/8\%$ Notes due March 15, 2007 and $470 million aggregate principal amount of our $8^3/4\%$ Notes due March 15, 2012, respectively, which were offered and sold on March 13, 2002 in a transaction exempt from registration under the Securities Act.

We filed a Current Report on Form 8-K with the SEC on November 7, 2002, to disclose under Item 5 of the Report a press release discussing third quarter 2002 results and a press release disclosing that Lionel W. Nowell III had resigned as a director of NorthWestern Corporation.

We filed a Current Report on Form 8-K with the SEC on November 20, 2002, to disclose under Item 5 of the

Report that we had completed the final phase of our acquisition of the Montana operations of our NorthWestern Energy LLC subsidiary by transferring substantially all of the assets and related liabilities to NorthWestern Corporation, and to cause the Asset and Stock Transfer Agreement effecting such transfer to be filed with the Securities and Exchange Commission.

We filed a Current Report on Form 8-K with the SEC on December 13, 2002, to disclose under Item 5 of the Report that we had lowered our earnings guidance for 2002 and to disclose certain year-end charges that we took relating to our implementation of SFAS No. 142.

We filed a Current Report on Form 8-K with the SEC on December 20, 2002, to disclose under Item 5 of the Report that we had entered into our new $390 million senior secured credit facility.

106

---

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this Annual Report on Form 10-K to be signed on its behalf by the undersigned, thereunto duly authorized.

**NORTHWESTERN CORPORATION**

Dated: **April 15, 2003**                    By: /s/  GARY G. DROOK
                                           _____
                                           Gary G. Drook
                                           *Chief Executive Officer*

## POWER OF ATTORNEY

We, the undersigned directors and/or officers of NorthWestern Corporation, hereby severally constitute and appoint Gary G. Drook and Eric R. Jacobsen, and each of them with full power to act alone, our true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution and revocation, for each of us and in our name, place, and stead, in any and all capacities, to sign any and all amendments to this Annual Report on Form 10-K, and to file or cause to be filed the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, and hereby grant unto such attorneys-in-fact and agents, and each of them, the full power and authority to do each and every act and thing requisite and necessary to be done in and about the foregoing, as fully to all intents and purposes as each of us might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, or their respective substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this Annual Report on Form 10-K has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
| --- | --- | --- |

| | | |
|---|---|---|
| /s/ MARILYN R. SEYMANN | Chairman of the Board | **April 15, 2003** |
| Marilyn R. Seymann | | |
| /s/ GARY G. DROOK | Chief Executive Officer and Director (Principal Executive Officer) | **April 15, 2003** |
| Gary G. Drook | | |
| | President, Chief Operating Officer and Director | **April 15, 2003** |
| Richard R. Hylland | | |
| /s/ KIPP D. ORME | Vice President and Chief Financial Officer (Principal Financial Officer) | **April 15, 2003** |
| Kipp D. Orme | | |
| /s/ KURT D. WHITESEL | Controller and Treasurer (Principal Accounting Officer) | **April 15, 2003** |
| Kurt D. Whitesel | | |

107

| | | |
|---|---|---|
| /s/ RANDY G. DARCY | Director | **April 15, 2003** |
| Randy G. Darcy | | |
| /s/ JERRY W. JOHNSON | Director | **April 15, 2003** |
| Jerry W. Johnson | | |
| /s/ LARRY F. NESS | Director | **April 15, 2003** |
| Larry F. Ness | | |
| /s/ BRUCE I. SMITH | Director | **April 15, 2003** |
| Bruce I. Smith | | |

108

**CERTIFICATION PURSUANT TO
17 CFR 240, 13a-14
PROMULGATED UNDER
SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Gary G. Drook, certify that:

1.    I have reviewed this annual report on Form 10-K of NorthWestern Corporation;

2.    Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.    Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:

    (a)    designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

    (b)    evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

    (c)    presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.    The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

    (a)    all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

    (b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6.    The registrant's other certifying officers and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Date: **April 15, 2003**

/s/ GARY G.
DROOK
_____

Gary G. Drook
*Chief Executive Officer*

109

---

## CERTIFICATION PURSUANT TO
## 17 CFR 240. 13a-14
## PROMULGATED UNDER
## SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Kipp D. Orme, certify that:

1.  I have reviewed this annual report on Form 10-K of NorthWestern Corporation;

2.  Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.  Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.  The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:

    (a)  designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

    (b)  evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

    (c)  presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.  The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

    (a)  all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

    (b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6.  The registrant's other certifying officers and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.


Date: **April 15, 2003**

/s/  KIPP D. ORME
_____

Kipp D. Orme
*Chief Financial Officer*

110

## INDEX TO FINANCIAL STATEMENTS AND FINANCIAL STATEMENT SCHEDULES

|  | Page |
|---|---|
| *Financial Statement* | |
| Reports of independent public accountants | F-2 |
| Consolidated statements of income (loss) for the years ended December 31, 2002, 2001 and 2000 | F-4 |
| Consolidated statements of cash flows for the years ended December 31, 2002, 2001 and 2000 | F-5 |
| Consolidated balance sheets as of December 31, 2002 and 2001 | F-6 |
| Consolidated statements of common shareholders' equity (deficit) for the years ended December 31, 2002, 2001 and 2000 | F-7 |
| Notes to consolidated financial statements | F-8 |
| *Financial Statement Schedules* | |
| Report of Independent Public Accountants | F-57 |
| Schedule II. Valuation and Qualifying Accounts | F-58 |

F-1

## REPORT OF INDEPENDENT AUDITORS

To the Shareholders and Board of Directors
of NorthWestern Corporation:

We have audited the accompanying consolidated balance sheets of NORTHWESTERN CORPORATION (a Delaware corporation) AND SUBSIDIARIES as of December 31, 2002 and 2001, and the related consolidated statements of income (loss), common shareholders' equity (deficit), and cash flows for the years then ended. These financial statements are the responsibility of the NorthWestern Corporation management. Our responsibility is to express an opinion on these financial statements based on our audits. The consolidated financial statements of NorthWestern Corporation and Subsidiaries as of December 31, 2000, and for the year ended December 31, 2000,

were audited by other auditors who have ceased operations. Those auditors expressed an unqualified opinion on those consolidated financial statements in their report dated May 16, 2002 and included explanatory paragraphs that described the adoption of the provisions of Statement of Financial Accounting Standards No. 133, *Accounting for Derivative Instruments and Hedging Activities*, effective July 1, 2000 and the revision of the consolidated financial statements to reflect the interest in CornerStone Propane Partners, L.P. as a discontinued operation.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of NorthWestern Corporation and Subsidiaries as of December 31, 2002 and 2001, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note 4 to the consolidated financial statements, NorthWestern Corporation and Subsidiaries changed its method of accounting for goodwill and other intangible assets in 2002.

/s/ DELOITTE & TOUCHE LLP

Minneapolis, Minnesota
April 4, 2003

F-2

---

**[In accordance with the Securities and Exchange Commission's amendment of Rule 2-02 of Regulation S-X, the following report is a copy of a report previously issued by Arthur Andersen LLP, our former independent public accountants, who have ceased operations.**

### REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

To the Shareholders and Board of Directors
of NorthWestern Corporation:

We have audited the accompanying consolidated balance sheets of NORTHWESTERN CORPORATION (a Delaware corporation) AND SUBSIDIARIES as of December 31, 2001 and 2000, and the related consolidated statements of income, cash flows and shareholders' equity for each of the three years in the period ended December 31, 2001. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of NorthWestern Corporation and Subsidiaries as of December 31, 2001 and 2000, and the results of their

operations and their cash flows for each of the three years in the period ended December 31, 2001, in conformity with accounting principles generally accepted in the United States.

As discussed in Note 1 to the consolidated financial statements, NorthWestern Corporation adopted the provisions of Statement of Financial Accounting Standards No. 133, Accounting for Derivative Instruments and Hedging Activities, effective July 1, 2000.

As discussed in Note 6, the consolidated financial statements have been revised to reflect the Company's interest in CornerStone Propane Partners, LP as a discontinued operation.

/s/ ARTHUR ANDERSEN LLP

Minneapolis, Minnesota
May 16, 2002

F-3

# NORTHWESTERN CORPORATION

## CONSOLIDATED STATEMENTS OF INCOME (LOSS)

|  | YEAR ENDED DECEMBER 31 | | |
|---|---|---|---|
|  | **2002** | **2001** | **2000** |
|  | (in thousands except per share amounts) | | |
| OPERATING REVENUES | $ 1,991,509 | $ 1,723,978 | $ 1,709,474 |
| COST OF SALES | 1,095,409 | 1,069,356 | 1,100,484 |
| GROSS MARGIN | 896,100 | 654,622 | 608,990 |
| OPERATING EXPENSES |  |  |  |
| Selling, general and administrative | 771,626 | 642,379 | 536,437 |
| Goodwill and other impairment charges | 626,123 | — | — |
| Depreciation | 98,567 | 41,036 | 32,762 |
| Amortization of goodwill and other intangibles | 29,418 | 43,161 | 35,481 |
| Restructuring charge | — | 24,916 | — |
| TOTAL OPERATING EXPENSES | 1,525,734 | 751,492 | 604,680 |
| INCOME (LOSS) FROM CONTINUING OPERATIONS | (629,634) | (96,870) | 4,310 |
| Interest Expense | (129,536) | (49,248) | (37,982) |
| Investment Income and Other | (5,382) | 8,023 | 8,981 |
| Loss From Continuing Operations Before Income Taxes and Minority Interests | (764,552) | (138,095) | (24,691) |
| Benefit for Income Taxes | 798 | 42,470 | 6,467 |
| Loss From Continuing Operations Before Minority Interests | (763,754) | (95,625) | (18,224) |
| Minority Interests in Net Loss of Consolidated Subsidiaries | 14,914 | 141,448 | 67,820 |
| Income (Loss) From Continuing Operations | (748,840) | 45,823 | 49,596 |
| Discontinued Operations, Net of Taxes and Minority Interests | (101,655) | (1,291) | (43) |
| Net Income (Loss) before Extraordinary Item | (850,495) | 44,532 | 49,553 |

| | 2002 | 2001 | 2000 |
|---|---|---|---|
| Extraordinary Item, Net of Tax of $7,241 | (13,447) | — | — |
| | | | |
| Net Income (Loss) | (863,942) | 44,532 | 49,553 |
| Minority Interests on Preferred Securities of Subsidiary Trusts | (28,610) | (6,827) | (6,601) |
| Dividends and Redemption Premium on Preferred Stock | (391) | (191) | (191) |
| | | | |
| Earnings (Losses) on Common Stock | $ (892,943) | $ 37,514 | $ 42,761 |
| | | | |
| Average Common Shares Outstanding | 29,726 | 24,390 | 23,141 |
| | | | |
| Basic Earnings per Average Common Share: | | | |
| Continuing operations | $ (26.17) | $ 1.59 | $ 1.85 |
| Discontinued operations | (3.42) | (.05) | |
| Extraordinary Item | (0.45) | — | — |
| | | | |
| Basic | $ (30.04) | $ 1.54 | $ 1.85 |
| | | | |
| Diluted Earnings per Average Common Share: | | | |
| Continuing operations | $ (26.17) | $ 1.58 | $ 1.83 |
| Discontinued operations | (3.42) | (.05) | |
| Extraordinary Item | (0.45) | — | — |
| | | | |
| Diluted | $ (30.04) | $ 1.53 | $ 1.83 |
| | | | |
| Dividends Declared per Average Common Share | $ 1.27 | $ 1.21 | $ 1.13 |

See Notes to Consolidated Financial Statements

F-4

---

## NORTHWESTERN CORPORATION

## CONSOLIDATED STATEMENTS OF CASH FLOWS

| | YEARS ENDED DECEMBER 31 | | |
|---|---|---|---|
| | 2002 | 2001 | 2000 |
| | (in thousands) | | |
| **Operating Activities:** | | | |
| Net Income (Loss) | $ (863,942) | $ 44,532 | $ 49,553 |
| Items not affecting cash: | | | |
| Depreciation | 98,567 | 41,036 | 32,762 |
| Amortization | 29,418 | 43,161 | 35,481 |
| Impairment charges | 626,123 | — | — |
| Provision for uncollectible accounts | 44,764 | 13,972 | 6,844 |
| Loss on discontinued operations, net of taxes | 101,655 | — | — |
| Extraordinary item, net of taxes | 13,447 | — | — |
| Deferred income taxes | 35,643 | (33,661) | 1,877 |

| | | | |
|---|---:|---:|---:|
| Minority interests in net losses of consolidated subsidiaries | (14,914) | (141,448) | (67,821) |
| Loss on disposal of other assets | 17,783 | — | — |
| Changes in current assets and liabilities, net of acquisitions: | | | |
| Restricted cash | 4,288 | (2,369) | — |
| Accounts receivable | 41,991 | 6,353 | (149,172) |
| Inventories | 5,931 | (15,989) | (15,293) |
| Other current assets | 35,819 | (19,046) | (7,294) |
| Accounts payable | (50,694) | 50,965 | 138,247 |
| Accrued expenses | 18,349 | 63,555 | 96,813 |
| Changes in regulatory assets and liabilities | (80,629) | (369) | — |
| Other, net | 30,600 | 197 | (17,269) |
| | | | |
| Cash flows provided by continuing operations | 94,199 | 50,869 | 104,728 |
| Change in net assets of discontinued operations | (60,156) | 32,318 | (69,994) |
| | | | |
| Cash flows provided by operating activities | 34,043 | 83,187 | 34,734 |
| | | | |
| **Investment Activities:** | | | |
| Property, plant, and equipment additions | (115,939) | (163,857) | (61,444) |
| Proceeds from sale of assets | 33,760 | — | — |
| Sale (purchase) of noncurrent investments and assets, net | 2,199 | (433) | 2,873 |
| Acquisitions, net of cash received | (574,322) | (18,767) | (105,280) |
| | | | |
| Cash flows used in investing activities | (654,302) | (183,057) | (163,851) |
| | | | |
| **Financing Activities:** | | | |
| Dividends on common and preferred stock | (38,081) | (29,956) | (26,312) |
| Minority interest on preferred securities of subsidiary trusts | (28,610) | (6,827) | (6,601) |
| Redemption of preferred stock | (4,028) | — | — |
| Proceeds from issuance of common stock | 81,031 | 74,868 | — |
| Proceeds from exercise of warrants | — | — | 182 |
| Issuance of long term debt | 738,149 | 2,884 | 166,002 |
| Repayment of long-term debt | (313,536) | (23,766) | (11,816) |
| Line of credit borrowings, net | 123,000 | 16,931 | 53,300 |
| Repayment of discontinued operations debt | (26,059) | — | — |
| Treasury stock activity | 121 | — | — |
| Financing costs | (25,813) | — | — |
| Issuance of preferred securities of subsidiary trusts | 117,750 | 96,833 | — |
| Subsidiary repurchase of minority interests | (4,586) | (57,768) | (20,773) |
| Line of credit (repayments) borrowings of subsidiaries, net | (13,197) | (35,528) | 21,670 |
| Short-term borrowings of subsidiaries, net | — | 53,603 | (14,700) |
| Commercial paper repayments, net | — | — | (11,000) |
| Proceeds from termination of hedge | 24,898 | — | — |
| | | | |
| Cash flows provided by financing activities | 631,039 | 91,274 | 149,952 |
| | | | |
| Increase (Decrease) in Cash and Cash Equivalents | 10,780 | (8,596) | 20,835 |
| Cash and Cash Equivalents, beginning of period | 34,789 | 43,385 | 22,550 |

| | | | | | |
|---|---|---|---|---|---|
| Cash and Cash Equivalents, end of period | | $ | 45,569 | $ | 34,789 | $ | 43,385 |

See Notes to Consolidated Financial Statements

F-5

---

# NORTHWESTERN CORPORATION

## CONSOLIDATED BALANCE SHEETS

| | December 31, | |
|---|---|---|
| | **2002** | **2001** |
| | **(in thousands)** | |
| **ASSETS** | | |
| **Current Assets:** | | |
| Cash and cash equivalents | $ 45,569 | $ 34,789 |
| Restricted cash | 28,081 | 2,369 |
| Accounts receivable, net | 281,447 | 260,486 |
| Inventories | 86,650 | 79,719 |
| Regulatory assets | 15,430 | — |
| Other | 56,516 | 69,486 |
| Assets held for sale | 42,665 | 50,800 |
| Current assets of discontinued operations | — | 181,697 |
| **Total current assets** | 556,358 | 679,346 |
| **Property, Plant, and Equipment, Net** | 1,253,746 | 445,441 |
| **Goodwill** | 400,095 | 405,734 |
| **Other Intangible Assets, Net** | 118,144 | 234,856 |
| **Other:** | | |
| Investments | 85,236 | 71,419 |
| Regulatory assets | 201,075 | 8,447 |
| Deferred tax asset | — | 17,374 |
| Other assets | 58,271 | 83,871 |
| Noncurrent assets of discontinued operations | — | 695,197 |
| **Total assets** | $ 2,672,925 | $ 2,641,685 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT)** | | |
| **Current Liabilities:** | | |
| Current maturities of long-term debt | $ 57,878 | $ 356,445 |
| Accounts payable | 101,779 | 122,266 |
| Accrued expenses | 345,602 | 216,345 |
| Regulatory liabilities | 32,236 | — |
| Current liabilities of discontinued operations | — | 230,070 |

| | | |
|---|---:|---:|
| **Total current liabilities** | 537,495 | 925,126 |
| | | |
| **Long-term Debt** | 1,704,016 | 411,349 |
| **Deferred Income Taxes** | 173 | — |
| **Noncurrent Regulatory Liabilities** | 23,614 | 6,950 |
| **Other Noncurrent Liabilities** | 483,113 | 75,040 |
| **Noncurrent Liabilities and Minority Interests of Discontinued Operations** | — | 605,325 |
| | | |
| **Total liabilities** | 2,748,411 | 2,023,790 |
| | | |
| **Commitments and Contingencies** | | |
| **Minority Interests** | 10,340 | 30,067 |
| **Preferred Stock and Preferred Securities:** | | |
| Preferred stock—4$^1$/2 series | — | 2,600 |
| Redeemable preferred stock—6$^1$/2 series | — | 1,150 |
| Company obligated mandatorily redeemable preferred securities of subsidiary trusts | 370,250 | 187,500 |
| | | |
| **Total preferred stock and preferred securities** | 370,250 | 191,250 |
| | | |
| **Common Shareholders' Equity (Deficit):** | | |
| Common stock, par value $1.75; authorized 50,000,000 shares; issued and outstanding 37,396,762 and 27,396,762 | 65,444 | 47,942 |
| Paid-in capital | 304,781 | 240,797 |
| Treasury stock, 174,016 and 155,943 shares at cost | (3,560) | (3,681) |
| Retained earnings (deficit) | (818,604) | 112,307 |
| Accumulated other comprehensive income (loss) | (4,137) | (787) |
| | | |
| **Total shareholders' equity (deficit)** | (456,076) | 396,578 |
| | | |
| **Total liabilities and shareholders' equity (deficit)** | $ 2,672,925 | $ 2,641,685 |

See Notes to Consolidated Financial Statements

F-6

---

## NORTHWESTERN CORPORATION

## CONSOLIDATED STATEMENTS OF COMMON SHAREHOLDERS' EQUITY (DEFICIT)

| | Number of Common Shares | Number of Treasury Shares | Common Stock | Paid in Capital | Treasury Stock | Retained Earnings | Accumulated Other Comprehensive Income (Loss) | Total Shareholders' Equity (Deficit) |
|---|---:|---:|---:|---:|---:|---:|---:|---:|
| | | | | (in thousands) | | | | |
| **Balance at December 31, 1999** | 23,109 | — | $ 40,438 | $ 160,028 | — | $ 94,715 | $ 5,190 | $ 300,371 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Comprehensive Income:** | | | | | | | |
| Net income | — | — | — | — | — | 49,553 | — | 49,553 |
| Other comprehensive income (loss), net of tax: | | | | | | | |
| Unrealized loss on marketable securities net of reclassification adjustment | — | — | — | — | — | — | (3,896) | (3,896) |
| Issuances of common stock | 292 | — | 512 | 5,740 | — | — | — | 6,252 |
| Proceeds from exercise of warrants | 10 | — | 18 | 164 | — | — | — | 182 |
| Distributions on minority interests in preferred securities of subsidiary trusts | — | — | — | — | — | (6,601) | — | (6,601) |
| Dividends on preferred stock | — | — | — | — | — | (191) | — | (191) |
| Dividends on common stock | — | — | — | — | — | (26,121) | — | (26,121) |
| **Balance at December 31, 2000** | 23,411 | — | $ 40,968 | $ 165,932 | — | $ 111,355 | $ 1,294 | $ 319,549 |
| **Comprehensive Income:** | | | | | | | |
| Net income | — | — | — | — | — | 44,532 | — | 44,532 |
| Other comprehensive income (loss), net of tax: | | | | | | | |
| Unrealized loss on marketable securities net of reclassification adjustment | — | — | — | — | — | — | (2,081) | (2,081) |
| Issuances of common stock | 3,714 | — | 6,498 | 68,370 | — | — | — | 74,868 |
| Cashless exercise of warrants | 272 | — | 476 | 6,321 | — | (6,797) | — | — |
| Amortization of unearned restricted stock compensation | — | — | — | 174 | — | — | — | 174 |
| Treasury stock activity | — | 156 | — | — | (3,681) | — | — | (3,681) |
| Distributions on minority interests in preferred securities of subsidiary trusts | — | — | — | — | — | (6,827) | — | (6,827) |
| Dividends on preferred stock | — | — | — | — | — | (191) | — | (191) |
| Dividends on common stock | — | — | — | — | — | (29,765) | — | (29,765) |
| **Balance at December 31, 2001** | 27,397 | 156 | $ 47,942 | $ 240,797 | $ (3,681) | $ 112,307 | $ (787) | $ 396,578 |
| **Comprehensive Income:** | | | | | | | |
| Net loss | — | — | — | — | — | (863,942) | — | (863,942) |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Other comprehensive income (loss), net of tax: | | | | | | | | |
| Unrealized gain on marketable securities net of reclassification adjustment | — | — | — | — | — | — | 1,139 | 1,139 |
| Foreign currency translation adjustments | — | — | — | — | — | — | 5 | 5 |
| Gain on hedge termination | — | — | — | — | — | — | 5,072 | 5,072 |
| Amortization of hedge gain | — | — | — | — | — | — | (807) | (807) |
| Minimum pension liability | — | — | — | — | — | — | (8,759) | (8,759) |
| Issuances of common stock | 10,000 | — | 17,502 | 63,529 | — | — | — | 81,031 |
| Amortization of unearned restricted stock compensation | — | — | — | 455 | — | — | — | 455 |
| Treasury stock activity | — | 18 | — | — | 121 | — | — | 121 |
| Distributions on minority interests in preferred securities of subsidiary trusts | — | — | — | — | — | (28,610) | — | (28,610) |
| Dividends on preferred stock | — | — | — | — | — | (112) | — | (112) |
| Redemption premium on preferred stock | — | — | — | — | — | (278) | — | (278) |
| Dividends on common stock | — | — | — | — | — | (37,969) | — | (37,969) |
| **Balance at December 31, 2002** | 37,397 | 174 $ | 65,444 $ | 304,781 $ | (3,560) $ | (818,604) $ | (4,137) $ | (456,076) |

See Notes to Consolidated Financial Statements

F-7

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### 1.  Nature of Operations and Recent Developments

NorthWestern Corporation (the "Company" or "we") is one of the largest providers of electricity and natural gas in the Upper Midwest and Northwest, serving more than 598,000 customers in Montana, South Dakota and Nebraska. We have generated and distributed electricity in South Dakota and distributed natural gas in South Dakota and Nebraska since 1923 through our energy division, NorthWestern Energy, formerly NorthWestern Public Service. On February 15, 2002, we completed the acquisition of the electric and natural gas transmission and distribution business of The Montana Power Company, or Montana Power. As a result of the acquisition, from February 15, 2002 through November 15, 2002, we distributed electricity and natural gas in Montana through our wholly owned subsidiary, NorthWestern Energy LLC. Effective November 15, 2002, we transferred the energy and natural gas transmission and distribution operations of NorthWestern Energy LLC to NorthWestern Corporation and since that date, we have operated its business as part of our NorthWestern Energy division. We are operating our utility business under the common name "NorthWestern Energy" in all our service territories. The former NorthWestern Energy LLC has been renamed "Clark Fork and Blackfoot, L.L.C."

We also have made significant investments in three primary non-energy businesses, Expanets, Inc., or Expanets, a leading provider of networked communications and data services and solutions to small to mid-sized businesses nationwide, and Blue Dot Services Inc., or Blue Dot, a nationwide provider of air conditioning, heating, plumbing and related services. Through November 1, 2002, we held an economic equity interest in a subsidiary that serves as the managing general partner of CornerStone Propane Partners, L.P., or CornerStone, a publicly traded limited partnership that is a retail propane and wholesale energy related commodities distributor.

At December 31, 2002, we have a common shareholder's deficit of $456.1 million and approximately $2.1 billion in debt and trust preferred instruments outstanding. During 2002, our communications and HVAC business segments reported operating losses of $392 million and $311 million, respectively, which has severely and adversely impacted our financial performance and financial condition.

For our utility only operations, which excludes Blue Dot, Expanets, and all other unregulated entities, and absent proceeds from the sale of non-core assets, we estimate the following for the years 2003 and 2004 ($ are approximate and in millions):

|                                                          | 2003 |      | 2004 |      |
|----------------------------------------------------------|------|------|------|------|
| Cash flows from operating activities(1)                  | $    | 30   | $    | 80   |
| Cash flows used in investing activities(2)               |      | (60) |      | (60) |
| Cash flows provided (used) in financing activities(3)    |      | 32   |      | (39) |
| Increase (decrease) in cash and cash equivalents         | $    | 2    | $    | (19) |

(1)   The 2003 amount includes a net decrease in working capital of approximately $45 million and interest payments of approximately $140 million. The 2004 amount includes a net decrease in working capital of approximately $15 million and interest payments of approximately $140 million.

(2)   These amounts are comprised of capital expenditures.

F-8

(3)   The 2003 amount represents the net total of our currently anticipated financing activities for 2003 and is comprised of the following:

|                                                                                                       |     |       |
|-------------------------------------------------------------------------------------------------------|-----|-------|
| Net proceeds—Senior secured term loan                                                                 | $   | 366   |
| Repayment of outstanding debt and retirement of letters-of-credit with proceeds from senior secured loan |     | (280) |
| Trust preferred dividend payments                                                                     |     | (30)  |
| Other debt payments                                                                                   |     | (24)  |
| Cash flows provided by financing activities                                                           | $   | 32    |

We have the right to defer payment of our trust preferred dividend payments for up to 20 consecutive quarters. The 2004 amount includes trust preferred dividend payments of approximately $30 million, and other debt payments of approximately $9 million.

Based on our current plans and business conditions, we expect that our available cash, cash equivalents and

investments, together with amounts generated from operations, will be sufficient to meet our cash requirements for at least the next twelve months. However, due to a decrease in cash and cash equivalents during 2004, we believe that we may need additional funding sources or proceeds from the sale of non-core assets, by the end of 2004 or early in 2005. Commencing in 2005, we face substantial debt reduction payments. Absent the receipt of significant proceeds from the sale of non-core assets, the raising of additional capital or a restructuring of our debt, we will not have the ability to reduce our debt or meet our maturing debt obligations. Even if we are successful in selling some or all of our non-core assets, we will have to restructure our debt or seek new capital prior to 2005.

Consistent with our turnaround plan to increase liquidity and reduce debt, the Board of Directors decided to terminate the historical practice of paying an annual cash dividend on our common stock. We do not anticipate paying any cash dividends for the foreseeable future. In addition, we are currently prohibited from paying dividends on our common stock under Delaware law. Our senior credit facility also prohibits the payment of dividends during any period of default under the agreement. We are not currently in default under our senior credit facility. To the extent that payment of a cash dividend on our common stock becomes permissible under Delaware law, we would only be able to pay a cash dividend on our common stock to the extent that all required distributions on our mandatorily redeemable preferred securities of trusts had been made.

We are taking steps to improve the financial position of the Company, including a focus on our core electric and natural gas utility business and a commitment to reduction of our debt. We have suspended the declaration and payment of common stock dividends, which represented approximately $38 million in distributions in 2002. Future dividend obligations will be evaluated on an ongoing basis as part of our commitment to restoring long-term financial strength. We have decided to sell certain of our non-core assets, including our Montana First Megawatts project and the Colstrip Transmission line, and we are reviewing strategic options for Expanets and Blue Dot, including the sale or disposition of each of these businesses or their assets. We will not make any additional significant investments in, or commitments to, Expanets and Blue Dot while we examine strategic alternatives for the two businesses. In addition, the Montana Public Service Commission (MPSC) has restricted our ability to make additional investments or commitments to our non-regulated businesses to $10 million in the aggregate unless we obtain prior approval. We intend to use any proceeds from sales of non-core assets and surplus cash, if any, from operations to pay down debt. We will continue to focus efforts on improving

F-9

the operating performance of Expanets and Blue Dot, including the sale or closure of certain non-core Blue Dot locations.

In February 2003, we closed and received funds from a $390.0 million senior credit term loan. The net proceeds of $366.0 million, after payment of financing costs and fees, were used to repay $259.6 million outstanding under the existing $280.0 million bank credit facility. The remaining proceeds of the term loan will be utilized to provide working capital and for other general corporate purposes. In addition, our new $390.0 million credit facility does not include any adverse rating triggers, and its covenants are linked to the performance of our core utility operations and generally excludes all of our non-energy businesses.

**2. Significant Accounting Policies**

**Basis of Consolidation**

The accompanying consolidated financial statements include our accounts together with those of our wholly and majority-owned or controlled subsidiaries. The financial statements of Expanets, Blue Dot and CornerStone (CornerStone is only through November 1, 2002) are included in the accompanying consolidated financial statements by virtue of the voting and control rights, and therefore included in referencing to "subsidiaries". All significant intercompany balances and transactions have been eliminated from the consolidated financial

statements. The operations of CornerStone and our interest in CornerStone have been reflected in the consolidated financial statements as Discontinued Operations (see Note 6 for further discussion).

**Minority Interests in Consolidated Subsidiaries**

Substantially all acquisitions at Expanets and Blue Dot have involved the issuance of common and preferred stock in those subsidiaries to the sellers of the acquired businesses. Our investments in Expanets and Blue Dot are principally in the form of senior preferred stock with voting control and a liquidation preference over the common stock. We are required to consolidate the financial results of Expanets and Blue Dot because of our voting control. The common and preferred stock issued to third parties in connection with acquisitions creates minority interests which are junior to our preferred stock interests and against which operating losses have been allocated.

In connection with certain acquisitions of Expanets and Blue Dot, the sellers can elect to exchange the stock of Expanets or Blue Dot for cash at a predetermined exchange rate. Alternatively, Blue Dot, in certain circumstances, may, at its election, purchase the stock directly from the seller based on certain call or put arrangement using their choice of cash or, in certain cases, NorthWestern common stock. During 2002, Blue Dot paid $18.7 million in cash and accrued an additional $6.0 million for the purchase of Blue Dot stock issued in prior acquisitions. During 2001, Expanets paid $20.3 million in cash for the purchase of Expanets stock issued in prior acquisitions and Blue Dot paid $37.5 million in cash for Blue Dot stock issued in prior acquisitions. As of December 31, 2002, exchange agreements totaling $6.0 million for Expanets and $3.9 million for Blue Dot remained outstanding and are included in Minority Interests.

At December 31, 2002, Expanets had 120 offices located across the United States. Our investment in Expanets at December 31, 2002, consisted of $363.6 million of 12% coupon convertible and nonconvertible mandatorily . redeemable Preferred Stock and $0.5 million of convertible Class B Common Stock. In addition, as of December 31, 2002 we had outstanding intercompany advances and

loans to Expanets of $205.7 million. As of December 31, 2002, our Class B Common Stock of Expanets was convertible into 40% of the originally issued Class A Common Stock equivalents of Expanets, which comprise all of the shares of Class A Common Stock ever issued, plus the shares of Class A Common Stock issuable upon the conversion of the other Common Stock of Expanets and the Preferred Stock of Expanets held by Avaya (see Note 22, "Subsequent Events", which describes our settlement discussions with Avaya that resulted in Avaya's relinquishment of its Preferred Stock). In addition, two of the series of our Preferred Stock of Expanets are convertible into shares of Class A Common Stock from time to time at our option and are redeemable at our option prior to an initial public offering or sale of Expanets and two other of the series of our Preferred Stock of Expanets are mandatorily redeemable upon an initial public offering or sale of Expanets. All of the other outstanding Preferred and Common Stock of Expanets held by third parties will be automatically converted into shares of Class A Common Stock upon an initial public offering or sale of Expanets. The aggregate percentage of Class A Common Stock of Expanets into which our holdings of Common and Preferred Stock is convertible is approximately 50% of the Class A Common Stock of Expanets on a fully-diluted basis, assuming the conversion of all other outstanding convertible securities of Expanets, other than employee options, based on the originally issued value of the Class A Common Stock of Expanets. We controlled approximately 99% of the total voting power of Expanets' issued and outstanding capital stock as of December 31, 2002. At December 31, 2002, the net recorded book value of our aggregate investment in and advances to Expanets was $89.7 million after recognition of historical net losses.

At December 31, 2002, Blue Dot provided services from over 50 subsidiary entities that provide services from locations that are primarily situated in or near major metropolitan areas across the United States. Our investment in Blue Dot at December 31, 2002, consisted of $384.3 million of 11% coupon Preferred Stock and $0.5 million of