convertible Class B Common Stock. As of December 31, 2002, our Class B Common Stock of Blue Dot was convertible into approximately 40% of the originally issued Class A Common Stock equivalents of Blue Dot, which comprise all of the shares of Class A Common Stock ever issued, excluding any shares of Class A Common Stock issued or issuable upon the conversion of the Class B Common Stock, Class C Common Stock or Series A Preferred Stock of Blue Dot. The series of our Preferred Stock of Blue Dot is mandatorily redeemable upon an initial public offering of Blue Dot. The other outstanding series of Preferred Stock of Blue Dot held by third parties will be automatically converted into shares of Class A Common Stock upon an initial public offering of Blue Dot and Blue Dot has entered into agreements with the holders of the other outstanding class of Common Stock of Blue Dot for the conversion of such Common Stock into Class A Common Stock upon an initial public offering. The aggregate percentage of Class A Common Stock of Blue Dot into which our holdings of Blue Dot Common Stock is convertible is approximately 34% of the Class A Common Stock of Blue Dot on a fully-diluted basis assuming the conversion of all other outstanding convertible securities of Blue Dot, based on the originally issued value of the Class A Common Stock of Blue Dot. However, this percentage will vary substantially based upon the initial public offering price of the Class A Common Stock and in the event the initial public offering price is substantially below the $7.50 original issued value of the Class A Common Stock, this percentage would be substantially lower. We controlled approximately 96% of the total voting power of Blue Dot's issued and outstanding capital stock as of December 31, 2002. At December 31, 2002, the net recorded book value of our aggregate investments in and advances to Blue Dot was $12.6 million after recognition of historical net losses.

F-11

The income or loss allocable to minority interests will vary depending on the underlying profitability of the consolidated subsidiaries. Losses allocable to minority interests, which include the effect of dividends on the outstanding preferred stock that we owned and applicable allocations from us, are charged to minority interests. Corporate allocations relate to certain services we provide to our subsidiaries for management services, including insurance, administrative support for employee benefits, transaction structuring, financial analysis, tax services and information technology. Corporate allocations to Blue Dot were $2.1 million, $3.0 million and $2.3 million for the years ended December 31, 2002, 2001 and 2000, respectively. Corporate allocations to Expanets were $4.2 million, $8.0 million and $4.3 million for the years ended December 31, 2002, 2001 and 2000, respectively. The decreases reflect decreased services provided by NorthWestern, which are now performed and directly expensed by each entity. Losses are allocated to minority interests to the extent they do not exceed the minority interest in the equity capital of the subsidiary, after giving effect for any exchange agreements. Losses in excess of the minority interests are allocated to us.

Losses allocated to Minority Interests were $14.9 million, $141.4 million, and $67.8 million for the fiscal years ended December 31, 2002, 2001, and 2000, respectively. Minority Interests balances were $10.3 million and $30.1 million at December 31, 2002 and 2001, respectively. We will recognize future losses of the subsidiaries to the extent these losses exceed the Minority Interest balance after the effect of exchange agreements. Accordingly, based on the capital structures of Expanets and Blue Dot at December 31, 2002, all future losses at Expanets and Blue Dot will be allocated to us.

**Use of Estimates**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America required the Company to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Estimates are used for such items as long-lived asset values and impairment charges, long-lived asset useful lives, tax provisions, uncollectible accounts, billing adjustments, environmental costs, unbilled revenues and actuarially determined benefit costs. We revise the recorded estimates when we get better information or when we can determine actual amounts. Those revisions can affect operating results. Each year we also review the depreciable lives of certain

plant assets and revise them if appropriate.

F-12

Significant estimates impacting our current year financial statements include:

- Estimating the billing adjustments and allowance for uncollectible accounts at Expanets;

- Estimating impairment charges related to goodwill and long-lived assets;

- And estimating our deferred tax asset valuation allowance.

**Revenue Recognition**

For our South Dakota and Nebraska operations, as prescribed by the respective regulatory authorities, electric and natural gas utility revenues are based on billings rendered to customers. For our Montana operations, as prescribed by the MPSC, operating revenues are recorded monthly on the basis of consumption or services rendered. Customers are billed monthly on a cycle basis. Communications and HVAC revenue is recognized as services are performed and products are shipped with the exception of maintenance, construction, and installation contracts. Maintenance contract revenues are recognized over the life of the respective contracts.

Construction and installation contract revenues are generally recognized on the percentage-of-completion method, under which the amount of contract revenue recognizable at any given time during a contract is determined by multiplying the total estimated contract costs incurred at any given time to total estimated contract costs. Accordingly, contract revenues recognized in the statement of operations can and usually do differ from the amounts that can be billed or invoiced to the customer at any given point during the contract. Expanets uses the completed contract method of accounting for certain material and installation contracts due to an inability to adequately estimate gross margins for those contracts which is consistent with historical experience.

Changes in contract performance, conditions, estimated profitability, and final contract settlements may result in revisions to estimated costs and, therefore, revenues. Such revisions are frequently based on estimates and subjective assessments. The effects of theses revisions are recognized in the period in which the revisions are determined. When such revisions lead to a conclusion that a loss will be recognized on the contract, the full amount of the estimated ultimate loss is recognized in the period such conclusion is reached, regardless of what stage of completion the contract has reached. Depending on the size of a particular contract, variations from estimated project costs could have significant impact on operating results. Costs in excess of billings at Expanets were $12.8 million and $19.4 million at December 31, 2002 and 2001, respectively. Billings in excess of costs at Expanets were $2.4 million and $3.0 million at December 31, 2002 and 2001, respectively. Costs in excess of billings at Blue Dot were $6.8 million and $4.0 million at December 31, 2002 and 2001, respectively. Billings in excess of costs at Blue Dot were $4.1 million and $1.5 million at December 31, 2002 and 2001, respectively.

**Cash Equivalents**

We consider all highly liquid investments with maturities of three months or less at the time of purchase to be cash equivalents.

**Restricted Cash**

Restricted cash consists primarily of funds held in trust accounts to satisfy the requirements of certain stipulation agreements and insurance reserve requirements.

F-13

**Accounts Receivable, Net**

Accounts receivable are net of $15.3 million and $11.4 million of allowances for uncollectible accounts at December 31, 2002 and 2001. Receivables include accrued unbilled revenues of $30.5 million at December 31, 2002 related to our Montana operations.

**Inventories**

Natural gas inventories for the regulated energy business are stated at the lower of cost or market, using the first-in, first-out ("FIFO") method. Materials and supplies for the regulated energy business are stated at the lower of cost or market, with cost determined using the average cost method. Inventories for Expanets consist of voice and data equipment, parts and supplies held for use in the ordinary course of business and are stated at the lower of cost (weighted average) or market. Inventories for Blue Dot consist of air conditioning units and parts and supplies held for use in the ordinary course of business and are stated at the lower of cost or market using the FIFO method. Inventory by segment at December 31 is as follows (in thousands):

|  | 2002 | 2001 |
|---|---|---|
| Expanets | $  46,803 | $  39,085 |
| Blue Dot | 13,940 | 15,791 |
| Utility | 25,907 | 24,843 |
|  | $  86,650 | $  79,719 |

**Regulatory Assets and Liabilities**

Our regulated operations are subject to the provisions of Statement of Financial Accounting Standards No. 71, *Accounting for the Effects of Certain Types of Regulations* (SFAS No. 71). Regulatory assets represent probable future revenue associated with certain costs, which will be recovered from customers through the ratemaking process. Regulatory liabilities represent probable future reductions in revenues associated with amounts that are to be credited to customers through the ratemaking process.

If all or a separable portion of our operations becomes no longer subject to the provisions of SFAS No. 71, an evaluation of future recovery of the related regulatory assets and liabilities would be necessary. In addition, we would determine any impairment to the carrying costs of deregulated plant and inventory assets.

**Investments**

Investments consist primarily of fixed income municipal securities, corporate preferred stock and life insurance contracts. In addition, we have investments in various money market accounts and other items. Fixed income securities and preferred stocks are carried at market value, which approximates cost at December 31, 2002 and 2001. Life insurance contracts are carried at their cash surrender value. Approximately $30 million and $27.8 million of our fixed income securities and preferred stock investments are restricted as collateral for letters of credit as of December 31, 2002 and 2001, respectively. Investments in life insurance contracts of $22.2 million are held in trust and restricted for postretirement benefits.

F-14

Investments consisted of the following at December 31 (in thousands):

| | | |
|---|---|---:|
| **December 31, 2002** | | |
| Preferred stocks | $ | 19,692 |
| Fixed Income securities | | 27,548 |
| Life insurance contracts & other investments | | 37,996 |
| | $ | 85,236 |
| **December 31, 2001** | | |
| Preferred stocks | $ | 31,460 |
| Fixed Income securities | | 28,855 |
| Life insurance contracts & other investments | | 11,104 |
| | $ | 71,419 |

We use the specific identification method for determining the cost basis of our investments in available-for-sale securities. Realized gains and (losses) on our available-for-sale securities were $(7.5) million, $2.3 million and $3.2 million in 2002, 2001 and 2000, respectively.

**Derivative Financial Instruments**

We manage risk using derivative financial instruments for changes in electric and natural gas supply prices and interest rate fluctuations.

We periodically use commodity futures contracts to reduce the risk of future price fluctuations for electric and natural gas contracts. Increases or decreases in contract values are reported as gains and losses in our Consolidated Statements of Income unless the commodities are specifically subject to supply tracking mechanisms within the regulatory environment.

The fair value of fixed-price commodity contracts were estimated based on market prices of commodities covered by the contracts. The net differential between the prices in each contract and market prices for future periods has been applied to the volumes stipulated in each contract to arrive at an estimated future value. Two contracts at December 31, 2002 existed with estimated future benefits of $0.2 million.

On March 28, 2002, we entered into two fair value hedge agreements, each of $125.0 million, to effectively swap the fixed interest rate on our $250 million five-year original notes to floating interest rates at the three-month LIBOR plus spreads of 2.32% and 2.52% effective as of April 3, 2002. These fair value hedge agreements were settled on September 17, 2002 resulting in $17.0 million proceeds and a deferred gain to the Company. The deferred gain is recorded in Other Noncurrent Liabilities and is being recognized as a reduction of interest expense over the remaining life of the notes.

On March 8, 2002, we settled a cash flow hedge agreement related to an interest rate swap instrument. The settlement resulted in $7.9 million, and a deferred gain to the Company. The deferred gain is recorded in Other Comprehensive Income and is being recognized as a reduction of interest expense over the remaining life of the same notes discussed above.

We are exposed to credit loss in the event of nonperformance by counter parties. Credit risk is minimized on these transactions by only dealing with leading, credit-worthy financial institutions having long-term credit ratings of "A" or better and, therefore, we do not anticipate nonperformance. In

F-15

addition, the contracts are distributed among several financial institutions, thus minimizing credit risk concentration.

**Property, Plant and Equipment**

Property, plant and equipment are stated at cost. Depreciation is computed using the straight-line method based on the estimated useful lives of the various classes of property, ranging from 3 to 40 years. We include in property, plant and equipment external and incremental internal costs associated with computer software developed for use in the businesses. Capitalization begins when the preliminary design stage of the project is completed. These costs are amortized on a straight-line basis over the project's estimated useful life once the installed software is ready for its intended use. During 2002, 2001 and 2000, we capitalized costs for internally developed software of $3.1 million, $60.7 million and $1.8 million. Internal labor and overhead costs capitalized for other property, plant and equipment were $37.6 million, $16.2 million and $8.3 million which are all in the regulated utility segment.

Depreciation rates include a provision for our share of the estimated costs to decommission three coal-fired generating plants at the end of the useful life of each plant. The annual provision for such costs is included in depreciation expense, while the accumulated provisions are included in other noncurrent liabilities. (See "New Accounting Standards" in this Note 2 regarding our asset retirement obligation and amounts collected in the rate-making process for costs of removal of regulated utility property.

All expenditures for maintenance and repairs of utility property, plant and equipment are charged to the appropriate maintenance expense accounts. A betterment or replacement of a unit of property is accounted for as an addition and retirement of utility plant. At the time of such a retirement, the accumulated provision for depreciation is charged with the original cost of the property retired and also for the net cost of removal.

When property for the communications or HVAC interests are retired or otherwise disposed, the cost and related accumulated depreciation is removed from the accounts, and the resulting gain or loss is reflected in operations. Property, plant and equipment at December 31 consisted of the following (in thousands):

|  | 2002 | 2001 |
|---|---|---|
| Land and improvements | $      33,403 | $        3,159 |
| Building and improvements | 114,582 | 57,709 |
| Storage, distribution, transmission and generation | 1,665,400 | 381,910 |
| Construction work in process | 23,100 | 19,225 |
| Other equipment | 270,450 | 249,457 |
|  | 2,106,935 | 711,460 |
| Less accumulated depreciation | (853,189) | (266,019) |
|  | $  1,253,746 | $     445,441 |

F-16

We capitalize the cost of plant additions and replacements, including an allowance for funds used during construction (AFUDC) of utility plant. We determine the rate used to compute AFUDC in accordance with a formula established by the Federal Energy Regulatory Commission, or FERC. This rate averaged 8.7% for Montana and 6.6%, 6.9% and 6.6% for South Dakota for 2002, 2001 and 2000, respectively. Interest capitalized totaled $0.7 million in 2002 for Montana and South Dakota combined. Interest capitalized was not significant in 2001 and

2000.

We record provisions for depreciation at amounts substantially equivalent to calculations made on a straight-line method by applying various rates based on useful lives of properties determined from engineering studies. As a percentage of the depreciable utility plant at the beginning of the year, our provision for depreciation of utility plant was approximately 3.4%, 3.3% and 3.3% for 2002, 2001 and 2000 respectively.

As a result of the significant downturn in the communications technology industry and considerable declines in profitability from our Communications and HVAC segments, we reviewed the recoverability of long-lived assets. We applied the provisions of SFAS No. 144 to the property, plant and equipment of our Communications and HVAC segments and determined the carrying value of certain assets to be impaired. Accordingly, Expanets and Blue Dot recorded impairment charges of $69.6 million and $11.3 million, respectively, based on the fair value of those assets in the fourth quarter of 2002.

We also recorded a $35.7 million charge related to our construction of a 260-megawatt natural gas-fired generation project located in Great Falls, MT. Based on certain events occurring during the fourth quarter of 2002, we decided to divest of this project and the assets have been written down to expected salvage value. The remaining assets of this project have been classified as Assets Held For Sale on the Consolidated Balance Sheets. The remaining investment in this project was $42.7 million at December 31, 2002.

**Other Noncurrent Liabilities**

Other noncurrent liabilities as of December 31 consisted of the following (in thousands):

|  | 2002 | 2001 |
|---|---|---|
| Pension and other postretirement benefit liability | $ 196,521 | $ — |
| Future QF obligation, net | 143,515 | — |
| Environmental liability | 36,505 | 3,214 |
| Deferred revenue | 22,866 | — |
| Customer advances | 21,996 | — |
| Other | 61,710 | 71,826 |
|  | $ 483,113 | $ 75,040 |

**Stock-based Compensation**

At December 31, 2002 we have a nonqualified stock option plan, as described more fully in Note 17. We apply the intrinsic value based method of Accounting Principles Board (APB) Opinion No. 25, *Accounting for Stock Issued to Employees*, and related interpretations in accounting for our stock option plan. No compensation cost is recognized as the option exercise price is equal to the market price of the underlying stock on the date of grant. Our pro forma net income and earnings per

F-17

share would have been as indicated below had the fair value of option grants been charged to compensation expense in accordance with SFAS No. 123 (in thousands except per share amounts):

|  | 2002 | 2001 | 2000 |
|---|---|---|---|

| Earnings (losses) on common stock | | | | | |
|---|---|---|---|---|---|
| As reported | $ | (892,943) | $ 37,514 | $ | 42,761 |
| Less: Total stock-based employee compensation expense determined under fair value based method for all awards, net of related tax effects | | (409) | (633) | | (396) |
| Pro forma | | (893,352) | 36,881 | | 42,365 |
| Diluted earnings per share | | | | | |
| As reported | $ | (30.04) | $ 1.53 | $ | 1.83 |
| Pro forma | | (30.05) | 1.51 | | 1.82 |

## Insurance Subsidiary

Risk Partners, Inc. is a wholly owned non-United States insurance subsidiary established in 2001 to insure worker's compensation, general liability and automobile liability risks. At December 31, 2002, Expanets and Blue Dot were insured through Risk Partners, Inc. In addition, NorthWestern Energy was insured through Risk Partners, Inc. for automobile liability risks at December 31, 2002. Reserve requirements are established based on actuarial projections of ultimate losses. Any losses estimated to be paid within one year from the balance sheet date are classified as accrued expenses, while losses expected to be payable in later periods are included in other long-term liabilities. Risk Partners, Inc. has purchased reinsurance policies through a third-party reinsurance company to transfer a portion of the insurance risk. Restricted cash related to this subsidiary was $10 million at December 31, 2002.

## Income Taxes

Deferred income taxes relate primarily to the difference between book and tax methods of depreciating property, amortizing tax deductible goodwill, the difference in the recognition of revenues and expenses for book and tax purposes, certain natural gas costs, which are deferred for book purposes but expensed currently for tax purposes, and net operating loss carryforwards.

## Environmental Costs

We record environmental costs when it is probable we are liable for the costs and we can reasonably estimate the liability. We may defer costs as a regulatory asset based on our expectation that we will recover these costs from customers in future rates. Otherwise, we expense the costs. If an environmental expense is related to facilities we currently use, such as pollution-control equipment, we capitalize and depreciate the costs over the life of the plant, assuming the costs are recoverable in future rates or future cash flow.

We record estimated remediation costs, excluding inflationary increases and probable reductions for insurance coverage and rate recovery. The estimates are based on our experience, our assessment of the current situation and the technology currently available for use in the remediation. We regularly adjust the recorded costs as we revise estimates and as remediation proceeds. If we are one of several designated responsible parties, we estimate and record only our share of the cost. We treat any future costs of restoring sites where operation may extend indefinitely as a capitalized cost of plant retirement.

F-18

The depreciation expense levels we can recover in rates include a provision for these estimated removal costs.

## Accounting for Business Combinations

In July 2001, the FASB issued Statements of Financial Accounting Standards No. 141, *Business*

*Combinations,* and No. 142, *Goodwill and Other Intangible Assets* (SFAS No. 142). These standards change the accounting for business combinations by, among other things, prohibiting the prospective use of pooling-of-interests accounting and requiring companies to stop amortizing goodwill and certain intangible assets with an indefinite useful life. Instead, goodwill and intangible assets deemed to have an indefinite useful life will be subject to an annual review for impairment. The new standards generally were effective for us in the first quarter of 2002 and for purchase business combinations consummated after June 30, 2001. For additional discussion on intangible assets and the adoption of SFAS No. 142, see Note 4.

**New Accounting Standards**

In June 2001, the Financial Accounting Standards Board issued SFAS No. 143, *Accounting for Asset Retirement Obligations,* which was effective January 1, 2003. The statement provides accounting and disclosure requirements for retirement obligations associated with long-lived assets. The statement requires the present value of future retirement costs for which the Company has a legal obligation be recorded as liabilities with an equivalent amount added to the asset cost and depreciated over the asset life.

We have completed an assessment of the specific applicability and implications of SFAS No. 143. We have identified, but have not recognized, asset retirement obligation, or ARO, liabilities related to our electric and natural gas transmission and distribution assets. Many of these assets are installed on easements over property not owned by the Company. The easements are generally perpetual and only require retirement action upon abandonment or cessation of use of the property for the specified purpose. The ARO liability is not estimable for such easements as we intend to utilize these properties indefinitely. In the event we decide to abandon or cease the use of a particular easement, an ARO liability would be recorded at that time.

Our regulated utility operations have, however, previously recognized removal costs of transmission and distribution assets as a component of depreciation in accordance with regulatory treatment. To the extent these amounts do not represent SFAS No. 143 legal retirement obligations, they are to be disclosed as regulatory liabilities upon adoption of the statement. As of December 31, 2002, we have estimated accrued removal costs related to our Montana transmission and distribution operations in the amount of $111.0 million and $4.5 million, for our South Dakota and Nebraska operations, respectively, all of which are included in accumulated depreciation.

For our generation properties, we are in the process of evaluating the associated retirement costs as defined by SFAS No. 143 and what the prescribed accounting treatment will be under FERC rules. We have accrued decommissioning costs since the generating units were first put into service in the amount of $11.4 million, which is classified as an other noncurrent liability. Preliminary estimates indicate that this amount would be sufficient to cover the legally required retirement obligations.

SFAS No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets,* was issued in October 2001 and establishes a single accounting model for long-lived assets to be disposed of by sale.

F-19

SFAS No. 144 requires that long-lived assets to be disposed of by sale be measured at the lower of the carrying amount or fair value less cost to sell, whether reported in continuing operations or discontinued operations. SFAS No. 144 also expands the reporting of discontinued operations to include components of an entity that have been or will be disposed of rather than limiting such discontinuance to a segment of a business. Our accounting for the discontinued operations of CornerStone as described in Note 6, "Discontinued Operations", followed the provisions of SFAS No. 144. We adopted SFAS No. 144 effective January 1, 2002. The adoption of SFAS No. 144 did not have a material impact on our consolidated results of operations, financial position, or cash flows as the long-lived asset impairment provisions of SFAS No. 144 effectively carried over the provisions of SFAS No. 121.

SFAS No. 145, *Rescission of FASB Statements No. 4, 44, and 64, Amendment of FASB Statement No. 13, and Technical Corrections*, was issued in April 2002. SFAS No. 145 eliminates the requirement that gains and losses from the extinguishments of debt be aggregated and classified as extraordinary items, net of the related income tax. It also requires sale-leaseback treatment for certain modifications of a capital lease that result in the lease being classified as an operating lease. We will adopt SFAS No. 145 on January 1, 2003. As a result of the adoption, effective January 1, 2003, we will be required to reflect the extraordinary loss on debt extinguishments of $13.4 million, net of tax, incurred in 2002 as part of continuing operations.

SFAS No. 146, *Accounting for Costs Associated with Exit or Disposal Activities*, was issued in June 2002. SFAS No. 146 requires companies to recognize costs associated with exit or disposal activities when they are incurred rather than at the date of a commitment to an exit or disposal plan, including lease termination costs and certain employee termination benefits that are associated with a restructuring, discontinued operation, plant closing or other exit or disposal activity. SFAS No. 146 will be applied prospectively and is effective for exit or disposal activities that are initiated after December 31, 2002. We will adopt SFAS No. 146 on January 1, 2003.

FASB Interpretation No. 45, *Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others* (FIN 45), was issued in November 2002. FIN 45 elaborates on the existing disclosure requirements for most guarantees. It also clarifies that at the time a company issues a guarantee, the company must recognize an initial liability for the fair market value of the obligations it assumes under that guarantee and must disclose that information in its interim and annual financial statements. The initial recognition and measurement provisions of the FIN 45 apply on a prospective basis to guarantees issued or modified after December 31, 2002. The disclosure requirements of FIN 45 have been included in Note 19, Guarantees, Commitments and Contingencies.

SFAS No. 148, *Accounting for Stock-Based Compensation—Transition and Disclosure—an Amendment of FASB Statement No. 123*, was issued in December 2002. It provides alternative methods of transition for a voluntary change to the fair value based method of accounting for stock-based employee compensation. SFAS No. 148 is effective for fiscal years beginning after December 15, 2003. The impact of the statement on our results of operations and financial position is currently under review by management.

FASB Interpretation No. 46, *Consolidation of Variable Interest Entities* (FIN 46), was issued in January 2003. This interpretation changes the method of determining whether certain entities, including securitization entities, should be included in a company's Consolidated Financial Statements. An entity is subject to FIN 46 and is called a variable interest entity, or VIE, if it has equity that is insufficient to permit the entity to finance its activities without additional subordinated financial support from other

F-20

---

parties, or equity investors that cannot make significant decisions about the entity's operations, or that do not absorb the expected losses or receive the expected returns of the entity. All other entities are evaluated for consolidation in accordance with SFAS No. 94, *Consolidation of All Majority-Owned Subsidiaries*. A VIE is consolidated by its primary beneficiary, which is the party involved with the VIE that has a majority of the expected losses or a majority of the expected residual returns or both. The provisions of the interpretation are to be applied immediately to VIEs created after January 31, 2003, and to VIEs in which an enterprise obtains an interest after that date. For VIEs in which an enterprise holds a variable interest that it acquired before February 1, 2003, FIN 46 applies in the first fiscal period beginning after June 15, 2003. For any VIEs that must be consolidated under FIN 46 that were created before February 1, 2003, the assets, liabilities and non-controlling interest of the VIE would be initially measured at their carrying amounts with any difference between the net amount added to the balance sheet and any previously recognized interest being recognized as the cumulative effect of an accounting change. If determining the carrying amounts is not practicable, fair value at the date FIN 46 first applies may be used to measure the assets, liabilities and non-controlling interest of the VIE. FIN 46 also mandates new disclosures about VIEs, some of

which are required to be presented in financial statements issued after January 31, 2003. We have evaluated the impact of FIN 46 to determine if we have any investments qualifying as VIEs and do not believe we have any VIEs. The rules are recent and, accordingly, they contain provisions that the accounting profession continues to analyze.

## Related Party Transactions

### Long-Term Incentive Program to Key Executives

In order to provide a recruitment and retention incentive, we adopted a long-term equity incentive program in September 1999 in which certain of our key executives and key team members of NorthWestern Growth Corporation, which initiates strategic investments for us, were provided the opportunity to make personal investments. The investment entity was structured as a limited liability company, was controlled and substantially owned by us, and enabled the investors to participate in long-term capital appreciation resulting from increases in the value of our interests in Blue Dot, Expanets and CornerStone above benchmark rates of return to us approved by the independent Compensation Committee of our Board of Directors. Participants would benefit in any such capital appreciation on a pro rata basis with the other holders of equity interests in such entities after achievement of the benchmark rate of return to us. The interests of our executives in the limited liability company upon formation collectively represented a less than .05% interest in each of Blue Dot, Expanets and CornerStone. The limited liability company had no indebtedness and was consolidated in our financial statements. In the year ended December 31, 2002, there were no distributions to any of our executive officers, and in the year ended December 31, 2001, the following executive officers received distributions in respect of the transfer to us of a portion of their vested interests relating to the performance of certain entities acquired in 1998, 1999 and 2000, each of which exceeded target performance benchmarks during the 12 month period following the date of acquisition: M. Lewis, then chief executive officer, $1.1 million; R. Hylland, president, $0.8 million; D. Newell, senior vice president, $0.8 million; E. Jacobsen, senior vice president, $0.4 million; and K. Orme, chief financial officer, $0.1 million. This limited liability company was terminated and dissolved in March 2003 pursuant to a plan of dissolution and liquidation. In connection with the winding up of the entity, four participants received final liquidation payments, one of which was a named executive officer, E. Jacobsen, who received a final payment of $41,960.

F-21

### Other

The Chief Executive Officer for Qwest Cyber Solutions ("QCS") was also a director of the Company in 2001. During that year, Expanets entered into an agreement with QCS, following a competitive bidding process, in which QCS was the lowest qualifying bidder, to provide application hosting services, consisting of computer servers and related support services. The agreement was originally valued at $52 million over a five year term. Qwest sold the QCS business unit to Corio in 2002, and the subject agreement as assigned to Corio has been substantially reduced in scope. Prior to the Corio transaction, in order to accept a position as Chief Executive Officer of NorthWestern Communications Group, the director resigned from his position at QCS and from his position on the Company's board. He now serves as Expanets' Chief Executive Officer.

## Reclassifications

Certain 2000 and 2001 amounts have been reclassified to conform to the 2002 presentation. Such reclassifications had no impact on net income or shareholders' equity as previously reported.

## Supplemental Cash Flow Information

|  | 2002 | 2001 | 2000 |
| --- | --- | --- | --- |

(in thousands)

|  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|
| Cash paid (received) for |  |  |  |  |  |  |
| Income taxes | $ | (15,723) | $ | 7,297 | $ | 7,306 |
| Interest |  | 176,203 |  | 55,648 |  | 39,937 |
| Noncash transactions for |  |  |  |  |  |  |
| Exchange of warrants for common stock |  | — |  | 6,797 |  | — |
| Issuance of restricted stock |  | — |  | 760 |  | — |
| Issuance of common stock for acquisitions and repurchases of subsidiary stock |  | — |  | — |  | 6,252 |
| Assets acquired in exchange for current liabilities and debt |  | 463 |  | 21,712 |  | 65,118 |
| Subsidiary stock issued to third parties for acquisitions, debt, earn-outs and notes receivable |  | 13,475 |  | 28,738 |  | 176,252 |
| Inventory purchased using short-term debt |  | — |  | 125,000 |  | — |
| Debt and preferred securities assumed in acquisitions |  | 511,100 |  | — |  | — |
| Discount on subordinated note |  | 3,017 |  | — |  | — |

## 3. Acquisitions

### The Montana Power, L.L.C.

On February 15, 2002, we completed the asset acquisition of Montana Power's energy transmission and distribution business for $478.0 million in cash and the assumption of $511.1 million in existing debt and mandatorily redeemable preferred securities of subsidiary trusts (net of cash received). Acquisition costs were approximately $24.8 million. We completed this acquisition to expand our presence in the energy market. As a result of the acquisition, we are now a provider of natural gas and electricity to approximately 598,000 customers in Montana, South Dakota, and Nebraska and have the capacity to provide service to wider regions of the country. For accounting convenience, due to the burden of a mid-month closing, both parties agreed to an effective date for the sale of January 31,

F-22

---

2002. We obtained the services of a third-party to perform valuations and assist with the allocation of the purchase price. During the second quarter of 2002, we had preliminarily recorded the property, plant and equipment at fair value and no portion was allocated to goodwill. During the fourth quarter of 2002 we determined, based on certain regulatory considerations, the property, plant and equipment should be kept at historical book value less adjustments which reduce these assets to the amount included in utility rate base. These adjustments included a net deferred tax liability of $135 million and deferred investment tax credits of $12.7 million that existed as of the acquisition date. We also adjusted to fair value various other assets and liabilities, such as pension and other postretirement benefit obligations, the qualifying facilities liability, and regulatory assets and liabilities. The remaining excess purchase price was allocated to goodwill. Goodwill of $354.4 million is deductible for income tax purposes.

Results of operations of Montana Power have been included in the accompanying consolidated financial statements since the effective date of acquisition. The following table summarizes the final fair values of the assets acquired and liabilities assumed in connection with our acquisition of Montana Power:

(in thousands)

| | | |
|---|---|---:|
| Cash | $ | 70,601 |
| Restricted cash | | 30,000 |
| Other current assets | | 109,094 |
| Property, plant and equipment—net of deferred taxes of $147.7 million | | 908,544 |
| Regulatory assets | | 172,917 |
| Other | | 49,149 |
| Goodwill | | 400,095 |
| Total assets acquired | $ | 1,740,400 |
| Current Liabilities | $ | 218,772 |
| Regulatory liabilities | | 94,301 |
| Long-term debt | | 427,711 |
| Mandatorily redeemable preferred securities of subsidiary trusts | | 65,000 |
| Other | | 355,974 |
| Total liabilities assumed | | 1,161,758 |
| Net assets acquired | $ | 578,642 |

**Other**

During the second and third quarters of 2002, Blue Dot completed five acquisitions. Consideration paid to the sellers in these acquisitions included cash consideration of $15.6 million and the issuance of Blue Dot common stock. The initial recording of the acquisitions consummated in the second quarter included a preliminary assigned value of $8.1 million to the common stock issued to the former owners. Losses of Blue Dot were allocated to these shareholders during the second quarter based on the preliminary value of the stock. During the fourth quarter of 2002, Blue Dot completed the purchase price allocation for these acquisitions and the entire value assigned to the common stock was reversed. The losses originally allocated to minority shareholders based on the preliminary value of the common stock have since been recognized by NorthWestern. Maximum contingent payments totaling $15.9 million associated with our 2002 acquisitions may be required based on earnings contingencies

F-23

over an extended period. To the extent these payments occur, they will be considered an additional cost of the acquired entity. The assets acquired and liabilities assumed have been recorded at their fair values as of the dates of acquisitions. The excess of the purchase price over the fair value of identifiable net assets acquired of approximately $9.7 million was recognized as goodwill and subsequently fully impaired. Blue Dot also recognized additional goodwill of $20.5 million related to prior acquisitions with earnings contingencies related to stock issued to sellers of acquired businesses. This goodwill was subsequently impaired as a result of our required analysis under SFAS No. 142 (see Note 4).

The following unaudited pro forma results of consolidated operations for the years ended December 31, 2002 and 2001 give effect as if all acquisitions noted above had occurred as of January 1, 2001 (in thousands except per share amounts):

|                                          | 2002 |            | 2001 |            |
|------------------------------------------|------|------------|------|------------|
| Revenues                                 | $    | 2,078,875  | $    | 2,455,582  |
| Income (Loss) from Continuing Operations |      | (738,177)  |      | 97,383     |
| Net Income (Loss)                        | $    | (853,279)  | $    | 93,077     |
| Diluted earnings per share               | $    | (28.70)    | $    | 3.82       |

The pro forma results are not necessarily indicative of what actually would have occurred if the acquisition had been completed as of the beginning of each fiscal year presented, nor are they necessarily indicative of future consolidated results.

## 4.  Goodwill and Other Intangibles

We adopted the provisions of SFAS No. 142 effective January 1, 2002 and with the assistance of an independent appraiser, determined that no impairment charge was necessary upon adoption. Under SFAS No. 142, goodwill impairment is deemed to exist if the net book value of a reporting unit exceeds its estimated fair value. This methodology differs from our previous policy, as permitted under previous accounting standards, of using undiscounted cash flows on an enterprise wide basis to determine if goodwill is recoverable. Our reporting units are consistent with the operating segments underlying the segments identified in Note 23—Segment and Related Information.

We have selected October 1 as the date for our annual impairment review. For our Communications and HVAC segments, updated valuations were completed with the assistance of the same independent appraiser that was utilized during our initial review as of January 1, 2002 using a discounted cash flow approach based on forward-looking information regarding market share, revenues and costs for each reporting unit. Lower than expected performance and revised growth rate and holding period assumptions negatively impacted the fair value of our Communications and HVAC reporting units. As a result, we recorded a goodwill impairment charge of $436.6 million. Our Communications segment also recorded an impairment charge of $46.8 million related to a dealer agreement intangible asset having an indefinite life.

For our Electric and Natural Gas segments, an internal valuation completed using a discounted cash flow approach based on forward-looking information regarding revenues and costs resulted in no goodwill impairment.

F-24

A summary of changes in our goodwill for the year ended December 31, 2002 by business segment, is as follows (in thousands):

|                                   | Communications |           | HVAC |           | Electric and Natural Gas |         | Total |           |
|-----------------------------------|------|-----------|------|-----------|------|---------|------|-----------|
| Balance as of December 31, 2001   | $    | 146,291   | $    | 259,443   | $    |         | $    | 405,734   |
| Goodwill acquired                 |      | 688       |      | 30,183    |      | 400,095 |      | 430,966   |
| Impairments                       |      | (146,979) |      | (289,626) |      |         |      | (436,605) |
| Balance as of December 31, 2002   | $    | —         | $    | —         | $    | 400,095 | $    | 400,095   |

As of December 31, 2002 and 2001, our intangible assets, other than goodwill, and related accumulated amortization consisted of the following (in thousands):

|  | December 31, 2002 | December 31, 2001 |
|--|-------------------|-------------------|

| | Gross | Accumulated Amortization | Net | Gross | Accumulated Amortization | Net |
|---|---|---|---|---|---|---|
| Amortized intangible assets: | | | | | | |
| Customer lists and other | $ 205,113 | $ (86,969) | $ 118,144 | $ 235,448 | $ (57,564) | $ 177,884 |
| Unamortized intangible assets: | | | | | | |
| Other, primarily Dealer Agreements | — | — | — | 60,821 | (3,849) | 56,972 |
| Total Intangible Assets | $ 205,113 | $ (86,969) | $ 118,144 | $ 269,269 | $ (61,413) | $ 234,856 |

As a result of the significant downturn in the communications technology industry and considerable declines in revenue and profitability generated by Expanets, as well as the significant decline in the profitability of Blue Dot along with reduced holding period assumptions for both Expanets and Blue Dot, we reviewed the recoverability of our other intangible assets. We applied the provisions of SFAS No. 144 to our intangible assets with definite lives and determined the carrying value of certain assets to be impaired. Accordingly, Expanets and Blue Dot recorded impairment charges of $25.4 million and $0.7 million, respectively, based on the fair value of certain intangible assets.

Other amortizable intangibles primarily consist of customer lists and assembled workforce resulting from an asset acquisition of Expanets, which are amortized over their estimated periods of benefit.

Intangible asset amortization expense for the years ended December 31, 2002, 2001, and 2000 was $29.4 million, $34.6 million and $29.2 million, respectively. Based on the current amount of intangible assets subject to amortization, estimated amortization expense for each of the succeeding 5 years is as follows: 2003—$29.0 million; 2004—$26.2 million; 2005—$17.5 million; 2006—$12.1 million; 2007—$10.5 million.

F-25

The following table presents pro forma financial information assuming that SFAS No. 142 had been in effect for the years ended December 31, 2001 and 2000 (in thousands, except for per share data):

| | 2001 | 2000 |
|---|---|---|
| Reported earnings on common stock | $ 37,514 | $ 42,761 |
| Add: Goodwill amortization, net of taxes and minority interests | 8,619 | 6,271 |
| Adjusted net income | $ 46,133 | $ 49,032 |
| Basic earnings per share | $ 1.54 | $ 1.85 |
| Add: Goodwill amortization, net of taxes and minority interests | 0.35 | 0.27 |

| | | | |
|---|---|---|---|
| Adjusted basic earnings per share | $ | 1.89 | $ 2.12 |

| | | | |
|---|---|---|---|
| Diluted earnings per share | $ | 1.53 | $ 1.83 |
| Add: Goodwill amortization, net of taxes and minority interests | | 0.36 | 0.27 |
| Adjusted diluted earnings per share | $ | 1.89 | $ 2.10 |

## 5.  Restructuring Charge

The restructuring charge of $24.9 million recognized in the fourth quarter of 2001 related to certain cost savings initiatives. The Board of Directors approved these initiatives in November 2001. The employee-related termination benefits include severance costs for 474 employees. Facility closure costs include lease payments for remaining lease terms of unused facilities after closure as well as any early exit costs that we are contractually liable for.

At December 31, 2002, $3.4 million remained as part of Accrued Expenses on the Consolidated Balance Sheet. The activity in the restructuring reserve was as follows for the year ended December 31, 2002 (in thousands):

| | December 31, 2001 | Payments | December 31, 2002 |
|---|---|---|---|
| Employee termination benefits | $ 11,932 | $ (10,142) | $ 1,790 |
| Facility closure costs | 4,745 | (3,120) | 1,625 |
| Other | 2,662 | (2,662) | — |
| | $ 19,339 | $ (15,924) | $ 3,415 |

## 6.  Discontinued Operations

Effective November 1, 2002, we relinquished our direct and indirect equity interests in CornerStone Propane Partners, L.P. and CornerStone Propane, L.P. We do however own a non-economic voting interest in a limited liability company which owns 100 percent of the stock of the managing general partner of CornerStone. As a result, the assets and liabilities of CornerStone are no longer included in our Consolidated Balance Sheets subsequent to November 1, 2002. Effective November 1, 2002, we no longer reflect the results of CornerStone's operations in the Consolidated

F-26

Income Statements. The results for CornerStone's operations and impairments related to our investments in and advances to CornerStone through November 1, 2002, and the years ended December 31, 2001 and 2000, respectively, have been presented as discontinued operations in the Consolidated Income Statements.

On August 20, 2002, we purchased the lenders' interest in short-term debt and letters of credit of CornerStone outstanding under CornerStone's credit facility, which we had previously guaranteed. No further drawings may be

made under this facility. As of December 31, 2002, we have a note receivable from and letters of credit exposure related to CornerStone with a carrying value of $21.1 million included in other noncurrent assets.

The following is summarized financial information for the discontinued CornerStone operations (in thousands). Revenues are only for nine months ended September 30, 2002.

|  | December 31, 2001 |
|---|---|
| Accounts receivable, net | $ 121,843 |
| Other current assets | 59,854 |
| Current assets of discontinued operations | $ 181,697 |
| Property, plant and equipment, net | $ 322,126 |
| Goodwill and other intangibles, net | 339,058 |
| Other noncurrent assets | 34,013 |
| Noncurrent assets of discontinued operations | $ 695,197 |
| Accounts payable | $ 142,578 |
| Other current liabilities | 87,492 |
| Current liabilities of discontinued operations | $ 230,070 |
| Long-term debt | $ 424,524 |
| Minority interests | 153,245 |
| Other noncurrent liabilities | 27,556 |
| Noncurrent liabilities and minority interest of discontinued operations | $ 605,325 |

|  | 2002 | 2001 | 2000 |
|---|---|---|---|
| Revenues | $ 398,969 | $ 2,513,777 | $ 5,422,616 |
| Loss from operations of CornerStone, net of minority interests | (19,987) | (6,201) | (1,904) |
| Loss on disposal | (97,055) | — | — |
| Income tax benefit | 15,387 | 4,910 | 1,861 |
| Loss from discontinued operations, net of income taxes, minority interests and intercompany charges | $ (101,655) | $ (1,291) | $ (43) |

## 7.  Long-Term Debt

Long-term debt at December 31 consisted of the following (in thousands):

| | Due | 2002 | 2001 |
|---|---|---|---|
| Senior Unsecured Notes—7.875% | 2007 | $ 250,000 | |
| Senior Unsecured Notes—8.75% | 2012 | 470,000 | |
| Senior unsecured debt—6.95% | 2028 | 105,000 | $ 105,000 |
| Bank credit facility | 2003 | 255,000 | 132,000 |
| Mortgage bonds— | | | |
| South Dakota—6.99% | | — | 5,000 |
| South Dakota—7.10% | 2005 | 60,000 | 60,000 |
| South Dakota—7.00% | 2023 | 55,000 | 55,000 |
| Montana—7.30% | 2006 | 150,000 | — |
| Montana—8.25% | 2007 | 365 | — |
| Montana—8.95% | 2022 | 1,446 | — |
| Montana—7.00% | 2005 | 5,386 | — |
| Pollution control obligations— | | | |
| South Dakota—5.85% | 2023 | 7,550 | 7,550 |
| South Dakota—5.90% | 2023 | 13,800 | 13,800 |
| Montana—6.125% | 2023 | 90,205 | — |
| Montana—5.90% | 2023 | 80,000 | — |
| Secured medium term notes— | | | |
| 7.23% | 2003 | 15,000 | — |
| 7.25% | 2008 | 13,000 | — |
| Unsecured medium term notes— | | | |
| 7.07% | 2006 | 15,000 | — |
| 7.875% | 2026 | 20,000 | — |
| 7.96% | 2026 | 5,000 | — |
| Montana Natural Gas Transition Bonds | 2012 | 50,866 | — |
| Floating rate notes | | — | 150,000 |
| Blue Dot Credit Facility | 2005 | 16,000 | 12,950 |
| Expanets Credit Facility | 2004 | 38,299 | 125,000 |
| Expanets subordinated note | 2005 | 26,966 | 23,743 |
| Other term debt | Various | 22,039 | 77,751 |
| Discount on Notes and Bonds | | (4,028) | — |
| | | 1,761,894 | 767,794 |
| Less current maturities | | (57,878) | (356,445) |
| | | $ 1,704,016 | $ 411,349 |

The Senior Notes are two series of unsecured notes that we issued in 2002 in connection with our acquisition of NorthWestern Energy LLC. Proceeds were used for the acquisition and for general corporate purposes.

The Senior Unsecured Debt is a general obligation that we issued this debt in November 1998. The proceeds

were used to repay short-term indebtedness and for general corporate purposes.

Our Credit Facility bore interest at a variable rate tied to the London Interbank Offered Rate plus a spread of 1.5% based on our credit ratings and accrued interest at 2.88% per annum as of

F-28

---

December 31, 2002. This facility was repaid and terminated on February 10, 2003 from a portion of the proceeds from our new $390 million senior secured term loan, which is secured by $280 million of First Mortgage Bonds secured by substantially all of our Montana utility assets and $110 million of First Mortgage Bonds secured by substantially all of our South Dakota and Nebraska utility assets.

Our new senior secured term loan bears interest at a variable rate tied to the Eurodollar rate, with a minimum floor of 3.0%, plus a spread of 5.75% or at the greater of the prime rate and 4.00% plus a spread of 4.75%. Our new senior secured term loan expires on December 1, 2006, although we must make quarterly amortization payments equal to $975,000 commencing on March 31, 2003. The credit agreement with respect to our senior secured term loan contains a number of representations and warranties and imposes a number of restrictive covenants that, among other things, limit our ability to incur indebtedness and make guarantees, create liens, make capital expenditures, pay dividends and make investments in other entities. In addition, we are required to maintain certain financial ratios, including:

- net worth (as defined) on the last day of each fiscal quarter of at least $616.0 million plus 50% of cumulative net income (but not losses and excluding net income or losses of CornerStone, Blue Dot and Expanets) from each quarter commencing with the quarter ending March 31, 2003;

The table below shows the components used to determine net worth (as defined) at December 31, 2002:

| | |
|---|---:|
| Shareholders' deficit at December 31, 2002 | $ (456,076) |
| Add back losses of Excluded Subsidiaries (as defined): | |
| Loss on discontinued operations | 101,655 |
| Expanets loss for the quarter ended December 31, 2002 | 447,636 |
| Blue Dot loss for the quarter ended December 31, 2002 | 321,602 |
| Company obligated mandatorily redeemable preferred securities of subsidiary trusts | 370,250 |
| Net Worth (as defined) | $ 785,067 |

- a funded debt to total capital (as defined) ratio on the last day of each fiscal quarter of no greater than 72.5% (69.1% at December 31, 2002);
- a ratio of utility business earnings before interest, taxes, depreciation and amortization, or EBITDA(1), to consolidated recourse interest expense (which excludes non-cash interest expense) for the prior four fiscal quarters of at least 1.40 to 1.00 (2.25 at December 31, 2002);
- a ratio of Montana utility business EBITDA to interest expense on the Montana First Mortgage Bonds for the trailing four fiscal quarters of at least 3.00 to 1.00 (7.52 at December 31, 2002);
- a ratio of South Dakota utility business EBITDA to interest expense on the South Dakota First Mortgage Bonds for the trailing four fiscal quarters of at least 2.50 to 1.00 (6.11 at December 31, 2002);

(1)    EBITDA is a non-GAAP financial measure and as such, we have not used it in describing our results of operations. We have used EBITDA in this section specifically to show compliance with our debt covenants and we do not refer to EBITDA for any other purpose herein

F-29

- a ratio of funded debt outstanding on the last day of each fiscal quarter to utility business EBITDA for the trailing four fiscal quarters of less than 8.75 to 1.00 prior to January 1, 2004, less than 8.25 to 1.00 during 2004 and less than 7.50 to 1.00 thereafter (7.68 at December 31, 2002);

- a ratio of the aggregate amount of Montana First Mortgage Bonds outstanding on the last day of each fiscal quarter to Montana utility business EBITDA for the trailing four fiscal quarters of less than 4.25 to 1.00 prior to January 1, 2005 and at least 3.75 to 1.00 thereafter (1.99 at December 31, 2002); and

- a ratio of the aggregate amount of South Dakota First Mortgage Bonds outstanding on the last day of each fiscal quarter to South Dakota utility business EBITDA for the trailing four fiscal quarters of less than 4.75 to 1.00 prior to January 1, 2005 and at least 4.25 to 1.00 thereafter (2.32 at December 31, 2002);

For purposes of determining compliance with these covenants, "net worth" is defined as the sum of shareholders' equity and preferred stock (including mandatorily redeemable preferred securities of subsidiary trusts), preference stock and preferred securities of NorthWestern and its subsidiaries on September 30, 2002, with said total specified as $770 million, plus any gain in (or minus any loss in) the sum of shareholders' equity and preferred stock (including mandatorily redeemable preferred securities of subsidiary trusts), preference stock and preferred securities of NorthWestern and its subsidiaries (excluding Blue Dot, CornerStone and Expanets) after September 30, 2002. Total capital is defined as funded debt on any such date plus net worth (as defined) as of the end of the most recent fiscal quarter.

In January 2003, in connection with executing the new senior secured term loan facility, we applied to the MPSC for authorization to issue up to $280 million aggregate principal amount of First Mortgage Bonds secured by Montana utility assets as security for our new senior secured term loan facility. In granting its approval, the MPSC placed the following conditions on the approval of the First Mortgage Bonds:

- We must apply all proceeds from the sale of non-utility assets, specifically including Blue Dot and Expanets, to debt reduction;

- We must commit to fully funding the operation, maintenance, repair and replacement of our public utility infrastructure in Montana and we were required to file a maintenance plan and budget with the MPSC by March 13, 2003;

- We may not provide more than an additional $10 million in aggregate in capital to any non-utility entity without the prior approval of the MPSC;

- We must report all advances to non-utility companies to the MPSC within 5 business days of such advance; and

- if the existing credit agreements for Blue Dot or Expanets are terminated, we may file an application with the MPSC seeking approval to provide secured loans of up to $20 million to Blue Dot and up to $30 million to Expanets.

The South Dakota Mortgage Bonds are two series of general obligation bonds we issued under our South Dakota indenture and the South Dakota Pollution Control Obligations are three obligations under our South Dakota indenture. All of such bonds are secured by substantially all of our South Dakota and Nebraska electric and natural gas assets.

F-30

The Montana First Mortgage Bonds are four series of bonds that The Montana Power Company issued. The Montana Pollution Control Obligations are obligations that The Montana Power Company issued that mature in 2023. The Montana Secured Medium Term Notes are obligations that The Montana Power Company issued. The Montana Natural Gas Transition Bonds were issued by The Montana Power Company. All of these obligations are secured by substantially all of our Montana electric and natural gas assets. The series of Montana Secured Medium Term Notes that matured in January 2003 bore interest at 7.23% per annum and were repaid at their maturity on January 27-28, 2003.

The Montana Unsecured Medium Term Notes are general obligations issued by The Montana Power Company.

On August 30, 2002, Blue Dot entered into a working capital credit facility with a commercial bank that provides $20 million of available credit for general corporate purposes and matures on August 31, 2005. The facility bears interest at a variable rate (5.0% as of December 31, 2002) tied to the prime rate as publicly announced by the bank or LIBOR plus a variable margin. The margin can range from .25% to 1.00% above prime rate or 2.75% to 3.50% above LIBOR. The facility is collateralized by substantially all assets of Blue Dot and contains restrictive covenants on the use of cash by Blue Dot for various purposes including acquisitions, dividend payments to NorthWestern, acquiring outstanding shares of Blue Dot equity, as well as any capital expenditures unless funded by NorthWestern. The facility is nonrecourse to NorthWestern, but subordinates certain indebtedness owed to NorthWestern by Blue Dot to the obligations owed by Blue Dot under the credit facility. In addition, the facility requires Blue Dot to maintain minimum annual EBITDA requirements and fixed charge coverage ratios, as defined. As of December 31, 2002, $16.0 million was outstanding on the facility. As of December 31, 2002, Blue Dot was in default of certain covenants. Subsequently, additional advances were made to Blue Dot resulting in $20 million being outstanding on the facility and various additional defaults occurred. Blue Dot is currently attempting to obtain a waiver of the existing defaults and modify various financial and other covenants of the facility. As of December 31, 2002, the facility has been classified as current in our consolidated Balance Sheet.

The Expanets facility represents a short-term line of credit provided to Expanets by Avaya for the purpose of financing purchases of Avaya products and services. Approximately $11.2 million was repaid in February 2003. The remaining principal balance of approximately $27.1 million has been extended and is due in three equal installments of approximately $9.0 million on each of January 1, April 1 and July 1, 2004. This facility is collateralized by all accounts receivable and inventory of Expanets. If Expanets defaults on this facility, we may be obligated to purchase inventory from Avaya in an amount equal to the outstanding balance of the facility. As of December 31, 2002, the effective interest rate of this loan was 15%. Our repurchase obligation will remain in place until the balance is fully paid.

The Expanets subordinated note is a non-interest bearing note, maturing in 2005. The subordinated note had a face amount of $35.0 million and a carrying value of $27.0 million as of December 31, 2002. On March 13, 2003, Avaya cancelled this $35.0 million subordinated note (see Note 22, Subsequent Events).

Annual scheduled consolidated retirements of long-term debt including the $16 million 2003 maturity under the Blue Dot facility currently in default as discussed above during the next five years are $57.9 million in 2003, $42.3 million in 2004, $104.7 million in 2005, $415.4 million in 2006 and $256.6 million in 2007.

F-31

## 8. Comprehensive Income (Loss)

Comprehensive income (loss) is the sum of net income as reported and other comprehensive income (loss). Our other comprehensive income (loss) primarily resulted from gains and losses on derivative instruments qualifying as hedges, a minimum pension liability adjustment and unrealized gains and losses on available-for-sale investment securities.

The components of other comprehensive income (loss) and their related tax effects for the years ended December 31, 2002, 2001 and 2000 were as follows (in thousands):

|  | 2002 | 2001 | 2000 |
|---|---|---|---|
| Net income (loss) | $ (863,942) | $ 44,532 | $ 49,553 |
| Other comprehensive income: | | | |
| —Net unrealized gain (loss) on available-for-sale securities, net of tax of $713, $(1,303) and $(2,439) in 2002, 2001 and 2000, respectively | $ 1,139 | $ (2,081) | $ (3,896) |
| —Net unrealized gain on derivative instruments qualifying as hedges, net of tax of $2,757 in 2002 | 4,265 | — | — |
| —Minimum pension liability adjustment, net of tax of $4,717 in 2002 | (8,759) | — | — |
| —Foreign currency translation adjustment | 5 | — | — |
| —Total other comprehensive income (loss) | $ (3,350) | $ (2,081) | $ (3,896) |
| Total comprehensive income (loss) | $ (860,592) | $ 42,451 | $ 45,657 |

The after tax components of accumulated other comprehensive income (loss) for the years ended December 31, 2002, 2001 and 2000 were as follows (in thousands):

|  | 2002 | 2001 | 2000 |
|---|---|---|---|
| **Balance at December 31,** | | | |
| Net unrealized gain (loss) on available-for-sale securities | $ 352 | $ (787) | $ 1,294 |
| Unrealized gain (loss) on derivative instruments qualifying as hedges | 4,265 | — | — |
| Minimum pension liability adjustment | (8,759) | — | — |
| Foreign currency translation adjustment | 5 | — | — |
| Accumulated other comprehensive income (loss) | $ (4,137) | $ (787) | $ 1,294 |

## 9. Financial Instruments

The following disclosure of the estimated fair value of financial instruments is made in accordance with the requirements of SFAS No. 107, "Disclosures About Fair Value of Financial Instruments." The estimated fair-value amounts have been determined using available market information and appropriate valuation methodologies.

However, considerable judgment is necessarily required in interpreting market data to develop estimates of fair value. Accordingly, the estimates presented herein are not necessarily indicative of the amounts that we would realize in a current market exchange.

The following methods and assumptions were used to estimate the fair value of each class of financial instruments for which it is practicable to estimate that value:

- The carrying amounts of cash and cash equivalents, restricted cash and investments approximate fair value due to the short maturity of the instruments. The fair value of life insurance contracts is based on cash surrender value.

F-32

- Fair values for debt were determined based on interest rates that are currently available to us for issuance of debt with similar terms and remaining maturities, except for publicly traded debt, which is based on market prices.

- The fair value of preferred securities of subsidiary trusts is based on current market prices.

- The fair-value estimates presented herein are based on pertinent information available to us as of December 31, 2002. Although we are not aware of any factors that would significantly affect the estimated fair-value amounts, such amounts have not been comprehensively revalued for purposes of these financial statements since that date, and current estimates of fair value may differ significantly from the amounts presented herein.

The estimated fair value of financial instruments at December 31 is summarized as follows (in thousands):

| | 2002 | | 2001 | |
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
|---|---|---|---|---|
| Assets: | | | | |
| Cash and cash equivalents | $ 45,569 | $ 45,569 | $ 34,789 | $ 34,789 |
| Restricted Cash | 28,081 | 28,081 | 2,369 | 2,369 |
| Investments | 85,236 | 85,236 | 71,419 | 71,419 |
| Liabilities: | | | | |
| Long-term debt (including due within one year) | 1,761,894 | 1,438,475 | 767,794 | 749,422 |
| Company obligated mandatorily redeemable preferred securities of subsidiary trusts | 370,250 | 248,094 | 187,500 | 182,245 |
| Preferred Stock | — | — | 3,750 | 2,731 |

## 10.  Income Taxes

Income tax expense (benefit) applicable to continuing operations before minority interests for the years ended December 31 is comprised of the following (in thousands):

| | 2002 | 2001 | 2000 |
|---|---|---|---|

| Federal | | | |
|---|---|---|---|
| Current | $ (36,874) | $ (6,374) | $ (3,749) |
| Deferred | 35,643 | (31,708) | (2,009) |
| Investment tax credits | (535) | (535) | (539) |
| State | 968 | (3,853) | (170) |
| | $ (798) | $ (42,470) | $ (6,467) |

F-33

The following table reconciles our effective income tax rate to the federal statutory rate:

| | 2002 | 2001 | 2000 |
|---|---|---|---|
| Federal statutory rate | (35.0)% | (35.0)% | (35.0)% |
| State income, net of federal provisions | 0.1 | (2.8) | (4.0) |
| Amortization of investment tax credit | (0.1) | (0.4) | (2.0) |
| Taxable dividends from subsidiaries | — | — | 13.0 |
| Nondeductible goodwill amortization | — | 4.0 | 20.0 |
| Nondeductible goodwill impairments | 17.3 | — | — |
| Dividends received deduction and other investments | (0.1) | (0.5) | (15.0) |
| Valuation allowance | 20.4 | 8.1 | — |
| Other, net | (2.7) | (4.2) | (3.0) |
| | (0.1)% | (30.8)% | (26.0)% |

The components of the net deferred income tax asset (liability) recognized in our Consolidated Balance Sheets are related to the following temporary differences at December 31 (in thousands):

| | 2002 | 2001 |
|---|---|---|
| Excess tax depreciation | $ (43,670) | $ (62,909) |
| Regulatory assets | (3,327) | 4,189 |
| Regulatory liabilities | 2,664 | (3,138) |
| Unbilled revenue | 3,540 | 2,304 |
| Unamortized investment tax credit | 2,375 | 2,205 |
| Compensation accruals | 1,517 | 8,010 |
| Reserves and accruals | 48,075 | 29,192 |
| Goodwill impairment/amortization | 59,767 | — |
| Net operating loss carryforward (NOL) | 65,368 | 48,712 |
| AMT credit carryforward | 1,577 | 1,577 |
| Valuation allowance on net operating loss | (160,572) | (11,035) |
| Deferred revenue | 26,463 | — |
| Other, net | (3,950) | (1,733) |
| | $ (173) | $ 17,374 |

Realization of deferred tax assets associated with the NOL and the deferred tax assets of Expanets and Blue Dot is dependent upon generating sufficient taxable income. Accordingly, a valuation allowance of $160.6 million has been recorded as of December 31, 2002 as it is more likely than not that these assets will not be realized.

As of December 31, 2002, we have a total NOL carryforward of $166.5 million. Of this amount, $70.2 million will expire in the year 2021 and $96.2 will expire in the year 2022.

Our federal income tax returns for 1996 through 1999 are under audit by the IRS. Certain state income and franchise tax returns are also under audit by various state agencies. Management believes that the final results of these audits will not have a material adverse effect on our financial position or results of operations.

F-34

---

## 11.  Jointly Owned Plants

We have an ownership interest in three electric generating plants, all of which are coal fired and operated by other utility companies. We have an undivided interest in these facilities and are responsible for our proportionate share of the capital and operating costs while being entitled to our proportionate share of the power generated. Our interest in each plant is reflected in the Consolidated Balance Sheets on a pro rata basis and our share of operating expenses is reflected in the Consolidated Statements of Income. The participants each finance their own investment.

Information relating to our ownership interest in these facilities at December 31, 2002, is as follows:

|  | Big Stone (S.D.) | Neal #4 (Iowa) | Coyote I (N.D.) |
|---|---|---|---|
| Ownership percentages | 23.4% | 8.7% | 10.0% |
| Plant in service | $  47,802 | $  28,081 | $  41,957 |
| Accumulated depreciation | $  30,644 | $  16,025 | $  20,796 |

## 12.  Operating Leases and Sale-Leaseback Transactions

The Company, Expanets and Blue Dot lease vehicles, office equipment and office and warehouse facilities under various long-term operating leases. In connection with the purchase of Montana Power, we have eight years remaining under an operating lease agreement to lease generation facilities. At December 31, 2002, future minimum lease payments under noncancelable lease agreements are as follows (in thousands):

| | |
|---|---|
| 2003 | $   59,891 |
| 2004 | 54,461 |
| 2005 | 48,379 |
| 2006 | 41,405 |
| 2007 | 36,004 |
| Thereafter | 101,946 |

Lease and rental expense incurred were $74 million, $23.7 million and $16.5 million in 2002, 2001 and 2000, respectively.

In May and June 2002, Blue Dot, under sale-leaseback agreements, sold certain vehicles with a net book value of $16.4 million for $22.1 million cash. The gross gain of $6.5 million is being amortized over the expected lease terms while the gross loss of $0.8 million was recognized during the period the sale occurred. In August and

September 2002, Expanets, under sale-leaseback agreements, sold certain vehicles with a net book value of $0.3 million for $0.8 million cash. The gain of $0.5 million is being amortized over the expected lease terms. In December 2002, Blue Dot, under sale-leaseback agreements, sold certain vehicles with a net book value of $1.2 million for $1.6 million in cash. The gain of $0.4 million is being amortized over the expected lease terms.

At December 31, 2002, the unamortized portion of the deferred gains totaled $5.4 million. The gains to be amortized beyond one year, are included in other noncurrent liabilities.

### 13. Team Member Benefit Plans

We sponsor and/or contribute to pension and postretirement health care and life insurance benefit plans for team members of the corporate and regulated utility division. In addition, we also sponsor

F-35

nonqualified, unfunded defined benefit pension plans for certain officers and other employees. With the acquisition of Montana Power, we assumed their pension and postretirement health care plans. These plans are reflected in the 2002 columns of the tables below.

Net periodic cost for our pension and other post-retirement plans consists of the following (in thousands):

| | Pension Benefits | | | Other Postretirement Benefits |
|---|---|---|---|---|
| | 2002 | 2001 | 2000 | 2002 |
| Components of Net Periodic Benefit Cost (Income) | | | | |
| Service cost | $ 4,821 | $ 891 | $ 922 | $ 3,068 |
| Interest cost | 19,315 | 3,421 | 3,805 | 10,044 |
| Expected return on plan assets | (18,737) | (4,738) | (6,318) | (405) |
| Amortization of transitional obligation | 155 | 155 | 155 | 1,350 |
| Amortization of prior service cost | 626 | 626 | 457 | — |
| Recognized actuarial (gain) loss | 28 | (225) | (729) | 161 |
| | $ 6,208 | $ 130 | $ (1,708) | $ 14,218 |
| Additional (income) or loss recognized: | | | | |
| Curtailment | $ 833 | — | — | — |
| Special termination benefits | 5,858 | — | 4,613 | 168 |
| Settlement cost | — | — | (3,067) | — |
| Net Periodic Benefit Cost (Income) | $ 12,899 | $ 130 | $ (162) | $ 14,386 |

The prior service costs are amortized on a straight-line basis over the average remaining service period of active participants. Gains and losses in excess of 10% of the greater of the benefit obligation or the market-related value of assets are amortized over the average remaining service period of active participants.

F-36

Following is a reconciliation of the changes in plan benefit obligations and fair value and a statement of the funded status as of December 31 (in thousands):

| | Pension Benefits | | Other Postretirement Benefits |
|---|---|---|---|
| | 2002 | 2001 | 2002 |
| **Reconciliation of Benefit Obligation** | | | |
| Obligation at January 1 | $ 50,527 | $ 48,136 | $ 33,303 |
| Purchased obligation—Montana Power | 251,370 | — | 55,888 |
| Service cost | 4,821 | 891 | 3,068 |
| Interest cost | 19,315 | 3,421 | 10,044 |
| Actuarial loss | 17,147 | 2,721 | 9,219 |
| Plan amendments | 56 | — | — |
| Curtailments | (368) | — | — |
| Settlement cost | — | — | — |
| Special termination benefits | 5,858 | — | 168 |
| Gross benefits paid | (18,746) | (4,642) | (8,338) |
| Benefit obligation at end of year | $ 329,980 | $ 50,527 | $ 103,352 |
| | | | |
| **Reconciliation of Fair Value of Plan Assets** | | | |
| Fair value of plan assets at January 1 | $ 48,871 | $ 58,438 | $ 6,344 |
| Actual loss on plan assets | (25,147) | (4,925) | (646) |
| Purchased assets—Montana Power | 196,223 | — | — |
| Employer contributions | 1 | | 7,435 |
| Settlements | — | — | — |
| Gross benefits paid | (18,746) | (4,642) | (8,338) |
| Fair value of plan assets at end of year | $ 201,202 | $ 48,871 | $ 4,794 |

The total projected benefit obligation and fair value of plan assets for the pension plans with projected benefit obligations in excess of plan assets were $330 million and $201.2 million, respectively as of December 31, 2002. The total accumulated benefit obligation and fair value of plan assets for the pension plans with accumulated benefit obligations in excess of plan assets were $320.3 million and $201.2 million, respectively as of December 31, 2002. The total projected benefit obligation and fair value of plan assets for the pension plans with projected benefit obligations in excess of plan assets were $2.4 million and $0, respectively as of December 31, 2001. The total accumulated benefit obligation and fair value of plan assets for the pension plans with accumulated benefit obligations in excess of plan assets were $1.6 million and $0, respectively as of December 31, 2001.

F-37

The accrued pension and other post-retirement benefit obligations recognized in the accompanying

Consolidated Balance Sheets are computed as follows (in thousands):

| | Pension Benefits | | Other Postretirement Benefits |
|---|---|---|---|
| | 2002 | 2001 | 2002 |
| Funded Status | $ (128,778) | $ (1,656) | $ (98,558) |
| Unrecognized transition amount | 464 | 618 | 18,350 |
| Unrecognized net actuarial loss (gain) | 65,484 | 3,113 | 8,018 |
| Unrecognized prior service cost | 1,793 | 3,195 | — |
| (Accrued) Prepaid benefit cost | $ (61,037) | $ 5,270 | $ (72,190) |
| | | | |
| Prepaid benefit cost | 5,251 | $ 6,067 | — |
| Accrued benefit cost | (66,288) | (797) | (72,190) |
| Additional minimum liability | (58,043) | (801) | — |
| Intangible asset | 2,257 | 801 | — |
| Regulatory asset | 42,696 | — | — |
| Accumulated other comprehensive income | 13,090 | — | — |
| Net amount recognized | $ (61,037) | $ 5,270 | $ (72,190) |

The weighted-average assumptions used in calculating the preceding information are as follows:

| | Pension Benefits | | | Other Postretirement Benefits |
|---|---|---|---|---|
| | 2002 | 2001 | 2000 | 2002 |
| Discount rate | 6.50% | 7.00% | 7.50% | 6.0-6.75% |
| Expected rate of return on assets | 8.50% | 8.50% | 8.50% | 8.5% |
| Long-term rate of increase in compensation levels (non-union) | 4.00% | 3.50% | 3.00% | 4.0% |
| Long-term rate of increase in compensation levels (union) | 3.50% | 3.50% | 3.00% | 3.5% |

The rate of increase in per capita costs of covered health care benefits is assumed to be 12 percent in 2003, decreasing gradually to 5 percent by the year 2009. The following table sets forth the sensitivity of retiree welfare results (in thousands):

| | |
|---|---|
| Effect of a one percentage point increase in assumed health care cost trend | |
| on total service and interest cost components | $ 154 |
| on postretirement benefit obligation | 1,351 |
| Effect of a one percentage point decrease in assumed health care cost trend | |
| on total service and interest cost components | $ (134) |
| on postretirement benefit obligation | (1,194) |

Pension costs in Montana and other postretirement benefit costs in South Dakota are included in rates on a pay as you go basis for regulatory purposes. Pension costs in South Dakota and other postretirement benefit costs in Montana are included in rates on an accrual basis for regulatory purposes. (See Note 15, "Regulatory Assets and Liabilities", for the regulatory assets related to our pension and other post-retirement benefit plans.)

F-38

During 2002 and 2000, we made available to select team members an early retirement program. The impact of that reduction in participants resulted in the Settlement Costs and Special Termination Benefits presented in the above table.

The Company, Expanets and Blue Dot provide various team member savings plans, which permit team members to defer receipt of compensation as provided in Section 401(k) of the Internal Revenue Code. Under the Plans, the team member may elect to direct a percentage of their gross compensation to be contributed to the Plans. We contribute up to a maximum of 3.5% of the team member's gross compensation contributed to the Plan. Expanets contributes up to 66.67% of the first 6% of team member contributions. Blue Dot contributes 25% of the first 6% of team member contributions. Costs incurred under all of these plans were $8.7 million, $8.0 million and $5.3 million in 2002, 2001 and 2000, respectively.

We have a deferred compensation trust available to all team members of corporate and the regulated utility division who are participants in the team member savings plan and whose maximum elective contribution permissible under that plan could be limited by any provision of the Internal Revenue Code. Trust participants may invest contributions in our common stock or other diversified investments available in the plan. Any investment elections in our common stock are presented as Treasury Stock; other investments as part of Investments ($1.3 million as of December 31, 2002); and an offsetting liability ($2.2 million as of December 31, 2002) for both as part of Other Noncurrent Liabilities in the Consolidated Balance Sheets. Our contributions to the plan were $713,000, $64,000 and $56,000 in 2002, 2001 and 2000, respectively.

## 14.  Employee Stock Ownership Plan

We provide an Employee Stock Ownership Plan ("ESOP") for full-time team members of corporate and the regulated utility division. The ESOP acquired the majority of its shares through leveraged loans from a financial institution. The ESOP is funded primarily with federal income tax savings which arise from the deductibility of dividends, as allowed by the tax laws applicable to such team member benefit plans. Active team members enrolled in the plan prior to 1989 receive annual cash dividend payments, and may voluntarily contribute back to the plan a percentage of these dividends subject to discrimination rules of the IRS and ERISA. We then contribute a matching contribution equal to two times the voluntary contribution. Any excess after payment of the match is allocated pro rata to all participants. All dividends received on unallocated shares of participants enrolling subsequent to 1989 are used to repay the loans of the leveraged loan segment of the Plan. Shares on this leveraged portion of the plan are released as principal and interest on the loans are made. Certain Company contributions and shares of stock acquired by the ESOP are allocated to participants' accounts in proportion to the compensation of team members during the particular year for which the allocation is made subject to certain IRS limits. At December 31, 2002 and 2001, the ESOP had an outstanding loan balance of $5.9 million and $7.0 million, respectively, which is secured by the unallocated assets of the ESOP and guarantees of future minimum debt funding payments we make to the ESOP.

Due to the recent suspension of our common stock dividend and the declining stock price, at December 31, 2002 we accrued $5.9 million to satisfy the ESOP loan requirement. Costs incurred under the plan were $6.7 million, $0.8 million and $1.0 million in 2002, 2001 and 2000, respectively.

The shares held by the plan are included in the number of average shares outstanding when computing our

basic and diluted earnings per share and any dividends paid to the plan are included in

F-39

the common dividend totals. The number, classification and fair value of shares held by the plan at December 31 are as follows:

|  | 2002 | | 2001 | |
|---|---|---|---|---|
|  | **Allocated** | **Unallocated** | **Allocated** | **Unallocated** |
| Number of shares | 668,617 | 226,883 | 677,769 | 387,447 |
| Fair value | $ 3,396,574 | $ 1,152,566 | $ 14,267,037 | $ 8,155,759 |

## 15.  Regulatory Assets and Liabilities

Our regulated businesses prepares their financial statements in accordance with the provisions of SFAS No. 71, as discussed in Note 2 to the Financial Statements. Pursuant to this pronouncement, certain expenses and credits, normally reflected in income as incurred, are recognized when included in rates and recovered from or refunded to the customers. Accordingly, we have recorded the following major classifications of regulatory assets and liabilities that will be recognized in expenses and revenues in future periods when the matching revenues are collected or refunded. We have specific orders to cover approximately 97% of our regulatory assets and approximately 98% of our regulatory liabilities.

|  | Note Ref. | Remaining Amortization Period | 2002 | 2001 |
|---|---|---|---|---|
| Pension | 13 | Undetermined | $ 92,739 | $ — |
| Competitive transition charges |  | 10 Years | 44,809 | — |
| SFAS No. 106 purchase obligation | 13 | Undetermined | 28,951 | — |
| Income taxes | 10 | Plant lives | 35,102 |  |
| Other |  | Various | 14,904 | 8,447 |
| Total regulatory assets |  |  | $ 216,505 | $ 8,447 |
| Utility sale stipulation agreement |  | 1 Year | 16,254 | — |
| Gas storage sales |  | 37 Years | 15,456 | — |
| Proceeds from oil & gas sale |  | 1 Year | 15,982 | — |
| Income taxes | 10 | Plant lives | 6,921 | — |
| Other |  | Various | 1,237 | 6,950 |
| Total regulatory liabilities |  |  | $ 55,850 | $ 6,950 |

A pension regulatory asset has been recognized upon the purchase of Montana Power for the obligation that will be included in future cost of service. Pension costs in Montana are recovered in rates on a cash basis. Competitive transition charges relate to natural gas properties and earn a rate of return sufficient to meet the debt service requirements of the Montana natural gas transition bonds. No other significant regulatory assets earn a return. A regulatory asset has been recognized for the SFAS No. 106 purchase obligation upon the purchase of Montana Power. The MPSC allows recovery of SFAS No. 106 costs on an annual basis. Tax assets and liabilities