# EXHIBIT "D"

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTHWESTERN CORPORATION, | ) | Case No. 03-12872 (JLP) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| MAGTEN ASSET MANAGEMENT CORPORATION | ) | |
| AND LAW DEBENTURE TRUST COMPANY | ) | |
| OF NEW YORK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. No. 05-_____ |
| | ) | |
| NORTHWESTERN CORPORATION, GARY G. | ) | |
| DROOK, MICHAEL J. HANSON, BRIAN B. BIRD, | ) | |
| THOMAS J. KNAPP and ROGER P. SCHRUM. | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT TO REVOKE ORDER OF CONFIRMATION PURSUANT TO SECTION 1144 OF THE BANKRUPTCY CODE AND RULE 7001(5) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND FOR BREACH OF FIDUCIARY DUTY

Magten Asset Management Corporation ("Magten"), together with Law Debenture Trust Company of New York ("Law Debenture" and collectively with Magten the "Plaintiffs"), in its capacity as Trustee under the Indenture for the Unsecured Subordinated Debt Securities Relating to Trust Securities dated November 1, 1996, for this complaint (the "Complaint") alleges as follows:

- 1 -

## INTRODUCTION

1.    This adversary proceeding has been commenced because the order confirming NorthWestern Corporation's Second Amended and Restated Plan of Reorganization, entered by this Court on October 19, 2004, was procured by fraud, with the aid and complicity of certain of the senior management of NorthWestern Corporation ("NorthWestern") (collectively, the "Defendants").

2.    In the haste to usher NorthWestern out of chapter 11 in the shortest possible time, many Claims[1] were left unresolved on the Effective Date. However, in order to provide a mechanism to protect the holders of Disputed Claims, and to ensure that such holders were not prejudiced by NorthWestern's Second Amended and Restated Plan of Reorganization (the "Plan"), NorthWestern was required to assume, unless otherwise agreed or estimated by this Court, that the full amount of a Disputed Claim would become an Allowed Claim. Specifically, to ensure the protection of holders of Disputed Claims, the Plan required that NorthWestern set aside sufficient New Common Stock to ensure that once Disputed Claims are Allowed, they would receive the same distribution as claims that were allowed at the time of confirmation. In other words, in order to proceed with the confirmation of the Plan before all of the Claims against NorthWestern had been Allowed, NorthWestern promised to place a sufficient amount of New Common Stock in the Disputed Claims Reserve to provide the holders of Disputed Claims with the full recovery to which they were entitled once such Disputed claims became Allowed.

3.    If NorthWestern had not agreed to set aside an adequate reserve of New Common Stock, NorthWestern would not have been able to obtain confirmation of its Plan.

---

[1]    All capitalized terms not expressly defined herein shall have the meaning ascribed to them in the Plan.

- 2 -

4.    Upon confirmation of the Plan, NorthWestern determined to set aside 13.5% of New Common Stock in the Disputed Claims Reserve to satisfy the requirements of the Plan, which amount is now known to be insufficient to satisfy all Disputed claims as Allowed Claims.

5.    On March 2, 2005, only four months after the Plan became effective and only two months after filing notice of substantial confirmation of the Plan, NorthWestern advised this Court that contrary to its obligation under the Plan and this Court's direction in the order confirming the Plan (the "Confirmation Order"), it placed insufficient stock in the Disputed Claims Reserve.  In addition, this Court found that although NorthWestern had estimated Disputed Claims to total $140 million, this amount was insufficient to satisfy even NorthWestern's largest Disputed Claims, no less the approximately 190 other Disputed Claims still unresolved.

6.    In acknowledgement of this fraudulent conduct, this Court, counsel for the Creditors' Committee, counsel for the ad hoc committee of Class 7 claimants and NorthWestern have recognized that although only 2 of the approximately 200 Disputed Claims have been settled, there is insufficient New Common Stock in the Disputed Claims Reserve to satisfy the Disputed Claims in full, as required by the Plan.

7.    NorthWestern obtained the Confirmation Order on the basis that it was reserving sufficient stock to satisfy all Disputed Claims in full.  Instead, NorthWestern has knowingly and willfully underfunded the Disputed Claims Reserve and, in doing so, committed a fraud upon this Court in the procurement of that Order.  Therefore, Plaintiffs seek the entry of an order (i) revoking the Confirmation Order and NorthWestern's discharge or, in the alternative, requiring NorthWestern to adequately fund the Disputed Claims Reserve in accordance with the

- 3 -

terms of the Plan and declaring that because of the gross negligence or willful misconduct in underfunding the Disputed Claims Reserve, no party or entity is entitled to exoneration or exculpation pursuant to Section 10.1 of the Plan; (ii) finding that the Defendants breached their fiduciary and other duties to Plaintiffs; (iii) awarding Plaintiffs damages, costs and reasonable attorney's fees; and (iv) granting such other relief as this Court deems just and proper.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334.

9.     This proceeding constitutes a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (J), and (L).

10.     Venue properly lies in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

11.     Magten is a corporation validly organized and doing business under the laws of the State of Delaware.

12.     Magten holds in excess of 33% of the Series A 8.45% Quarterly Income Preferred Securities (the "QUIPS").

13.     Law Debenture is a limited purpose trust company duly organized under the laws of the State of New York.

14.     On September 14, 2003, NorthWestern filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

15.     NorthWestern is a corporation validly organized under the laws of the State of Delaware, with its headquarters and principal place of business in South Dakota.

16.     NorthWestern owns and operates utility companies in the United States. The Debtor and its direct and indirect nondebtor energy subsidiaries comprise one of the largest providers of electricity and natural gas in the upper Midwest and Northwest regions of the United States, serving approximately 600,000 customers throughout Montana, South Dakota and Nebraska.

17.     Gary G. Drook ("Drook") was Chief Executive Officer of NorthWestern from January 2003 until March 2005.  Drook was also the President of NorthWestern from August 2003 until March 2005.

18.     Michael J. Hanson ("Hanson") was the Chief Operating Officer of NorthWestern from August 2003 until March 2004.  Beginning in March 2004, Hanson became President of NorthWestern.

19.     Brian B. Bird ("Bird") has been the Chief Financial Officer of NorthWestern since December 2003.

20.     Thomas J. Knapp ("Knapp") has been General Counsel of NorthWestern since November 2004.

21.     Roger P. Schrum ("Schrum") has been NorthWestern's Vice-President of Human Resources and Communications since December 2003.

## BACKGROUND

### The Fraudulent Conveyance Proceeding

22.     In January 2004, Plaintiffs each timely filed proofs of claim asserting, among other things, claims against NorthWestern for damages resulting from the fraudulent transfer of certain Montana utility assets to NorthWestern.

23.     On April 16, 2004, after this Court granted Plaintiffs relief from the automatic stay, they filed a complaint against NorthWestern in the Bankruptcy Court on behalf

- 5 -

of the holders of the QUIPS seeking to set aside the fraudulent conveyance of the Montana utility assets to NorthWestern (the "Fraudulent Conveyance Proceeding").

24.     On May 14, 2004, NorthWestern filed a motion to dismiss the Fraudulent Conveyance Proceeding. Following completion of briefing, on August 20, 2004, the Court, denied NorthWestern's motion to dismiss. At the time the Plan was filed (and later confirmed), the Fraudulent Conveyance Proceeding had not been resolved and, as a result, the QUIPS Litigation Claim was treated as a Disputed Claim.

**The Establishment of the Disputed Claims Reserve**

25.     On August 31, 2004, NorthWestern filed the Plan and disclosure statement in support of the Plan (the "Disclosure Statement"). In the Plan, NorthWestern required that the holders of the QUIPS choose between (i) a 14.3% recovery and forfeit their right to pursue the Fraudulent Conveyance Proceeding or (ii) pursuing the Fraudulent Conveyance Proceeding, which, if successful, would result in those holders receiving an Allowed Class 9 Claim to be satisfied from the Disputed Claims Reserve. Plan at p. 37, § 4.8(b)(ii).

26.     Section 7.5 of the Plan, entitled "Establishment and Maintenance of Reserve for Disputed Claims" required NorthWestern to "maintain the Disputed Claims Reserve equal to the aggregate of any distributable amount of Cash and New Common Stock equal to the relevant percentage of Distributions to which holders of Disputed Claims would be entitled under this Plan if such Disputed Claims were Allowed Claims in the amount of such Disputed Claim or such lesser amount as required by Final Order." The Plan further provided that the only method by which an amount less than the full amount of a Disputed Claim could be reserved by NorthWestern was if either the Bankruptcy Court estimated the amount of such Disputed Claim or NorthWestern and the holder of a Disputed Claim agreed in writing. Plan at p. 59, § 7.5.

- 6 -

27.    In papers filed with this Court, NorthWestern specifically represented that the Plan met the requirements of the Bankruptcy Code and did not unfairly discriminate against those holders of the QUIPS that chose to pursue the Fraudulent Conveyance Proceeding. See Memorandum of Law in Further Support of Confirmation of Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code and in Response to Supplemental Objections to Confirmation, at p. 13.    For a plan of reorganization not to discriminate against a dissenting class, the members of the dissenting class must be provided with the value provided to all other similarly situated classes.    Thus, the holders of the QUIPS that chose to pursue the Fraudulent Conveyance Proceeding hold a Disputed Class 9 Claim such that, if successful in the Fraudulent Conveyance Proceeding, the holders of the QUIPS Litigation Claims must be provided with the same value as the other holders of Allowed Class 9 Claims.

28.    During the confirmation hearing on October 6, 2004, counsel for NorthWestern represented to this Court that consistent with its obligation under the Plan, it would "put into the Class 9 reserve an amount for the claim that would hold back a certain level of the stock for the eventuality that the litigation may well result in a favorable judgment for those QUIP holders that are pursuing the litigation." Transcript of October 6, 2004 Hearing at pp. 233-234.

29.    In its oral ruling confirming the Plan held on October 8, 2004 (the "Oral Ruling"), this Court found that the QUIPS Litigation Claim was an disputed unsecured claim that was entitled to a reserve consistent with Section 7.5 of the Plan, such that if the Fraudulent Conveyance Proceeding is successful, holders of the QUIPS Litigation Claim will receive the distribution provided to holders Allowed Class 9 Claims. See Transcript of Hearing Held on October 8, 2004 at pp. 30, 39.

- 7 -

30.     On October 13, 2004, counsel for NorthWestern submitted a certification of counsel and draft confirmation order to this court (the "Draft Confirmation Order"). This Draft Confirmation Order, required NorthWestern to "establish an initial reserve of 13.5% of New Common Stock allocated to Class 7 and Class 9 for the Disputed Claims Reserve. . .pursuant to Section 7.5 of the Plan." Draft Confirmation Order at ¶ 27. At all times during the confirmation hearing and the confirmation process, the information regarding the methodology for establishing the reserve and the sufficiency of the reserve was solely in NorthWestern's possession and control.

31.     The 13.5% reserve proposed by NorthWestern in the Draft Confirmation Order was predicated on representation that 13.5% of the stock was an amount equal to the relevant percentage of Distributions to which the holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in the amount of such Disputed Claim or such lesser amount as required by Final Order, as required by Section 7.5 of the Plan.

32.     On October 19, 2004, this Court entered the Confirmation Order, which like the Draft Confirmation Order suggested by NorthWestern, required NorthWestern to "establish an initial reserve of 13.5% of New Common Stock allocated to Class 7 and Class 9 for the Disputed Claims Reserve. . .pursuant to Section 7.5 of the Plan." Confirmation Order at ¶ 27.

33.     Only four months after confirmation, counsel for NorthWestern disclosed that the 13.5% reserve did not represent an amount sufficient to comply with Section 7.5 of the Plan. Despite NorthWestern's promise in the plain language of Section 7.5 of the Plan and despite its repeated representations to this Court, NorthWestern did not set the Disputed Claims Reserve at 100%. Instead, the Disputed Claims Reserve was set based on NorthWestern's

- 8 -

general estimation of "all contingent, unliquidated claims at 50% of the face amount of the stated claim" and the placing of New Common Stock sufficient to satisfy an Allowed Claim in that amount in the Disputed Claims Reserve.  9019 Objection at ¶ 66 (as defined in ¶ 46, below).

34.    Upon entry of the Confirmation Order, Magten sought a stay pending appeal to prevent the Plan from becoming effective.  In denying Magten's motion for a stay pending appeal, this Court again found that "just like any other Creditor of claimant of an unsecured nature in class 9, that [the QUIPS Litigation Claims holders] would be entitled to have a disputed claim reserve amount determined, either by stipulation or by the Court in accordance with Section 7.5 of the Plan." Transcript of Hearing Held on October 25, 2004, at p. 28.

35.    This Court also went on to find that because the holders of the QUIPS Litigation Claims were being protected by being included in the Disputed Claims Reserve, Magten and the other holders of the QUIPS were being treated fairly and "for that reason there is – there has been an inadequate showing of irreparable harm…" Transcript of Hearing Held on October 25, 2004, at p. 29.  Thus, this Court expressly relied on NorthWestern's assertions that a 13.5% reserve was sufficient to fully fund the Disputed Claims reserve in accordance with the Plan not only when it entered the Confirmation Order, but also when it denied Magten's motion for a stay pending appeal.

36.    On October 25, 2004, NorthWestern filed its Notice of Establishment of Claim Reserve Pursuant to Section 7.5 of Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code and Paragraph 27 of the Confirmation Order (the "Notice of Claim Reserve").  In the Notice of Claim Reserve, NorthWestern acknowledged that pursuant to Section 7.5 of the Plan and Paragraph 27 of the Confirmation Order, NorthWestern was required to "maintain a Disputed Claim Reserve equal to the aggregate

- 9 -

of any distributable amounts of New Common Stock equal to the relevant percentage of the Distributions to which holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in the amount of such Disputed Claim or such lesser amount as required by Final Order." Notice of Claim Reserve at p. 1.

37.     On October 29, 2004, in connection with Magten's further pursuit of a stay pending appeal, counsel for NorthWestern represented to the United States District Court for the District of Delaware that "there is more than enough reserve being set aside in the Class 9 reserve pool for Class 9 unsecured claims." See Transcript of District Court Hearing Held on October 29, 2004 at p. 35.

38.     Also, on October 29, 2004, NorthWestern and Law Debenture entered into the Stipulation, whereby NorthWestern agreed to set aside a portion of the Disputed Claims Reserve "solely to satisfy in full a $25 million Class 9 claim of the QUIPS Litigation Claims holders (the "QUIPS Claims Reserve")" and set forth the rights of the QUIPS Litigation Claims holders to recover on account of an Allowed Claim in excess of that amount. Stipulation at p. 2 ¶ 1. By its express terms, the Stipulation did not cap the recovery on account of the QUIPS Litigation Claim at $25 million claim. The Stipulation provided that an Allowed Claim in excess of $25 million would be satisfied from the Disputed Claims Reserve.

39.     Law Debenture entered into the Stipulation in reliance on NorthWestern's assertions that the Disputed Claims Reserve was sufficiently funded to comply with the terms of the Plan and the Confirmation Order and provide the holders of the QUIPS Litigation Claims with the same recovery accorded to holders of Allowed Class 9 Claims.

40.     The Plan became effective on November 1, 2004.

- 10 -

**The Disclosure of the Fraud**

41.    On December 29, 2004, NorthWestern filed a <u>Notice of Substantial</u> <u>Consummation of the Debtor's Second Amended and Restated Plan of Reorganization Under</u> <u>Chapter 11 of the Bankruptcy Code</u> (the "Substantial Consummation Notice"). In Section 4(b) of the Substantial Consummation Notice, NorthWestern claims to have reserved 4,409,100 shares of New Common Stock in accordance with Section 7.5 of the Plan.

42.    On January 27, 2005, Magten, Law Debenture as Indenture Trustee for the QUIPS and NorthWestern executed a settlement agreement whereby the Fraudulent Conveyance Proceeding and all other litigation between the parties would come to an end (the "Settlement Agreement"). Pursuant to the terms of the Settlement Agreement, the holders of the QUIPS were to receive (i) 382,732 shares of common stock at the reorganization plan value of $20.00 per share ("Plan Value") and the 710,449 warrants and (ii) the shares segregated as the QUIPS Claims Reserve plus an additional $300,000 of common stock of reorganized NorthWestern at Plan Value. The Settlement Agreement provided the holders of the QUIPS with a less than they would be entitled to recover if the Fraudulent Conveyance Proceeding is successful.

43.    Based on the terms of the Settlement Agreement, if approved, the holders of the QUIPS Litigation Claims would have received a total of 1,252,732 shares of New Common Stock (excluding warrants), with a Plan Value of $25,054,640. This amount represents a 50.1% recovery on account of the QUIPS Litigation Claim, significantly below the 63% recovery that the holders of such claims would recover if their Disputed Claims were Allowed in full.[2] The Settlement Agreement not only provided the holders with the QUIPS with a recovery significantly less than the full $50 million Allowed Claim to which they would have been

---

[2]    Although the Disclosure Statement in support of the Plan (the "Disclosure Statement") estimated that holders of Allowed Claims would likely receive a 68% recovery on account of those claims, ultimately, holders of Allowed Claims actually received an approximately 63% recovery on account of those claims.

120087.01600/40152516v1

entitled if the Fraudulent Conveyance Proceeding was successful, but also settled nine other outstanding litigations between NorthWestern, Plaintiffs, and related parties.

44.    After NorthWestern disavowed the Settlement Agreement, Plaintiffs filed a joint motion seeking this Court's approval of the Settlement Agreement pursuant to Bankruptcy Rule 9019 (the "9019 Motion"), in order to enforce the terms of the Settlement Agreement.

45.    On March 8, 2005, this Court held a hearing on the 9019 Motion (the "9019 Hearing") wherein the Debtor acknowledged that it has approximately 200 claims that are seeking recovery from the Disputed Claims Reserve such that the 382,732 shares of common stock that were the primary subject of NorthWestern's 9019 Objection could not be allocated to the holders of the QUIPS from the Disputed Claims Reserve. Transcript of 9019 Hearing at p. 44.

46.    Based upon NorthWestern's objection to the 9019 Motion (the "9019 Objection") and the arguments presented at the hearing, it became apparent that in establishing and funding the Disputed Claims Reserve, NorthWestern failed to reserve the maximum claim amount asserted by holders of Disputed Claims, as required by the Plan. Specifically, NorthWestern acknowledged at the hearing that there were over 200 Disputed Claims awaiting resolution. As of the Confirmation Date, 2 holders of Claims had agreed to estimate their Claims at approximately 50% for the purposes of setting up the reserve, resulting in segregated disputed claims reserves within the total $140 million Disputed Claims Reserve of $25 million and $70 million, respectively. Other significant Claims against NorthWestern included Mr. Hylland's $30 million Claim and rejected pension plans Claims of approximately $15 million. Thus, for

- 12 -

those 4 claims alone, the disputed claims Reserve should have held $140 million. That does not account for the 196 or so remaining Disputed claims.[3]

47.    Thus, without accounting for the more than 190 other Disputed Claims, on the Effective Date, the Disputed Claims Reserve should have contained sufficient New Common Stock to satisfy $295 million of Disputed Claims. Instead, upon information and belief, the Disputed Claims Reserve contained only enough New Common Stock to satisfy $140 million of Disputed Claims. Thus, it appears that in blatant violation of the Plan, NorthWestern fraudulently "estimated all contingent, unliquidated claims. . . at 50% of the face amount of the stated claim" and only placed enough New Common Stock sufficient to satisfy half of the Allowed Claims in the Disputed Claims Reserve, not the 100% promised by the Plan and in open Court. 9019 Objection at ¶ 66.

48.    The inadequacy of the Disputed Claims Reserve led to counsel for the ad hoc committee of Class 7 Claimants to state that it was apparent that "there just isn't enough stock in Class 9." Transcript of 9019 Hearing at p. 74.

49.    On March 10, 2004 this Court denied the 9019 Motion, in part, because the Disputed Claims Reserve, as established by NorthWestern, did not contain enough stock to distribute any stock in excess of a $25 million claim to the holders of the QUIPS, despite the clear language of the Plan and the Confirmation Order, resulting in a "financial dilemma" that led to the failure of the Settlement Agreement. 9019 Opinion at p. 6.

---

[3]    In addition, on the Effective Date of the Plan, Cornerstone Propane, L.P. ("Cornerstone") held a Disputed Claim in the amount of $130 million. Although NorthWestern had filed a motion to approve a settlement between NorthWestern and Cornerstone whereby Cornerstone would receive an Allowed Claim of $19.5 million, this settlement was not approved until after the Effective Date. As a result, because Section 7.5 of the Plan permits NorthWestern to reserve an amount less than the full amount of a Disputed Claim only by Order of this Court or by written agreement of the parties, on the Effective Date, the Disputed Claims Reserve should have contained sufficient New Common Stock to satisfy Cornerstone's asserted Claim of $130 million.

- 13 -

50.    Specifically, this Court found that the Stipulation recognized the $50 million QUIPS Litigation Claim and reserved 50% of that claim, or a $25 million claim of Class 9 reserved shares. This Court further found that pursuant to the Stipulation, "to the extent that the [QUIPS] litigation claim exceeded $25 million, 'the holders of such claims shall have any deficiency satisfied out of the general Disputed Claims Reserve' described in the Plan." 9019 Opinion at p. 4-5 (citing the Stipulation).

### FIRST CAUSE OF ACTION

**(NorthWestern Procured the Confirmation Order by Fraud by Knowingly
and Wilfully Failing to Properly Fund the Disputed Claims Reserve in
Accordance with the Provisions of the Plan and the Confirmation Order)**

51.    Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 50 as if fully set forth here.

52.    Section 1144 of the Bankruptcy Code provides as follows:

On request of a party in interest at any time before 180 days after the date of the entry of the order of confirmation and after notice and a hearing, the court may revoke such order if and only if such order was procured by fraud. An order under this section revoking an order of confirmation shall –

(1) contain such provisions as are necessary to protect an entity acquiring such rights in good faith and on reliance on the order of confirmation ; and

(2) revoke the discharge of the debtor.

11 U.S.C. § 1334.

53.    Plaintiffs, parties in interest to NorthWestern's chapter 11 case, have filed this complaint within 180 days of the entry of the Confirmation Order.

54.    In order to procure this Court's approval of the Plan, NorthWestern represented to this Court that it would establish a Disputed Claims Reserve with a sufficient amount of New Common Stock to satisfy all Disputed Claims as if those claims were allowed.

- 14 -

55.    In establishing the Disputed Claims Reserve, NorthWestern asserted that by setting aside 13.5% of New Common Stock, the Disputed Claims Reserve would contain sufficient New Common Stock to ensure that the holders of Disputed Claims would receive a 63% recovery once such claim became an Allowed Claim, as required by the Plan.

56.    On March 2, 2005, in its 9019 Objection, NorthWestern admitted that, contrary to the requirements of the Plan and the Confirmation Order, the Disputed Claims Reserve may not contain enough New Common Stock to satisfy the relevant percentage of recovery to which the holder of a QUIPS Litigation Claim would be entitled if such claim were found to be an Allowed Claim.

57.    On March 8, 2005, at the 9019 Hearing, NorthWestern and other parties in interest made known that contrary to the requirements of the Plan and the Confirmation Order, the Disputed Claims Reserve does not contain enough New Common Stock to satisfy the relevant percentage of recovery to which the holder of a QUIPS Litigation Claim would be entitled if such claim were found to be an Allowed Claim.

58.    On March 10, 2005, this Court acknowledged that NorthWestern faced a "financial dilemma" because the Disputed Claims Reserve may not contain enough New Common Stock to satisfy the relevant percentage of recovery to which the holder of a QUIPS Litigation Claim would be entitled if such claim were found to be an Allowed Claim.

59.    NorthWestern made fraudulent misrepresentations in the Plan and in the Confirmation Order submitted by it and entered by this Court, that the Disputed Claims Reserve was funded in accordance with the requirements of Section 7.5 of the Plan.    These misrepresentations were made with the intent that this Court (and NorthWestern's creditors) rely

- 15 -

on them to the Court's and the creditors' detriment. The approval of the Plan and the entering of

the Confirmation Order were based on intentionally false and misleading information.

      60.    The Court and NorthWestern's creditors, including Plaintiffs, relied upon

NorthWestern's representations and were damaged as a result.

## SECOND CAUSE OF ACTION

### (Breach of Fiduciary Duty)

      61.    Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 60

as if fully set forth here.

      62.    NorthWestern owed fiduciary duties of loyalty, good faith and candor this

Court and to NorthWestern's creditor constituency.

      63.    Drook, Hanson, Bird, Knapp and Schrum owed fiduciary duties of loyalty,

good faith and candor to NorthWestern's creditor constituency.

      64.    The Defendants breached their duties when they grossly underfunded the

Disputed Claims Reserve, thereby violating the terms of the Plan.

      65.    NorthWestern's creditor constituency, including Plaintiffs, were damaged

as a result of Defendants' failure to fully fund the Disputed Claims Reserve with sufficient stock

to satisfy the QUIPS Litigation Claim as an Allowed Claim.

## THIRD CAUSE OF ACTION

### (For Declaratory Judgment)

      66.    Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 65

as if fully set forth here.

      67.    Pursuant to Section 10.1 of the Plan "none of the [Exculpated Parties]

shall have to incur any liability to any holder of the Claim or Equity Interest for any act or

omission in connection with, related to, or arising out of, the Chapter 11 Case, the preparation or

formulation of the Plan, the pursuit of confirmation of this Plan, the consummation of this Plan or the administration of this Plan or the property to be distributed under this Plan, <u>except for willful misconduct or gross negligence</u>..." (emphasis added).

68.    The actions and omissions detailed above could only have occurred because willful misconduct or gross negligence in either failing to adequately fund the Disputed Claims or failing to adequately supervise the establishment of the Disputed Claims Reserve.

69.    Upon information and belief, the Exculpated Persons do not and will not concede that their actions and omissions were the product of willful misconduct or gross negligence. Accordingly, a controversy exists between the parties as to whether such parties are entitled to exculpation.

70.    Plaintiffs are entitled to a declaratory judgment resolving whether the Exculpated Parties have acted with willful misconduct or gross negligence with respect to the controversy surrounding the adequacy of the Disputed Claims Reserve.

71.    Because the Confirmation Order was intentionally procured by acts of fraud, Plaintiffs are entitled to a declaratory judgment permitting Plaintiffs to seek damages for the fraud from the Exculpated Parties.

### PRAYER FOR RELIEF

*WHEREFORE,* Plaintiffs respectfully request that the Court enter judgment as follows:

(a)    Revoking the Confirmation Order and NorthWestern's discharge, or in the alternative, requiring NorthWestern to adequately fund the  Disputed Claims Reserve in accordance with the terms of the Plan and declaring that because of the gross negligence or willful misconduct in underfunding the Disputed Claims Reserve, the Exculpated Parties are not entitled to exoneration or exculpation pursuant to Section 10.1 of the Plan;

- 17 -

(b)    Finding that the Defendants breached their fiduciary and other duties to

Plaintiffs;

(c)    Awarding Plaintiffs damages, costs, and reasonable attorneys fees; and

(d)    Awarding such other relief as may be just and proper.

Dated: Wilmington, Delaware
          April 15, 2005

**BLANK ROME LLP**

Mark J. Packel (DE No. 4048)
Elio Battista, Jr. (DE No. 3814)
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone:  (302) 425-6400
Facsimile:   (302) 425-6464

- and -

**FRIED, FRANK, HARRIS, SHRIVER &
        JACOBSON LLP**
Bonnie Steingart
Gary Kaplan
One New York Plaza
New York, NY 10004
Telephone:  (212) 859-8000
Facsimile:   (212) 859-4000

Counsel for Magten Asset Management
        Corporation
                - and -

**SMITH, KATZENSTEIN & FURLOW, LLP**


_/s/ Kathleen M. Miller_
Kathleen M. Miller (DE No. 2898)
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE  19899
Telephone: (302) 652-8400
Facsimile:  (302) 652-8405

- 18 -

120087.01600/40152516v1

- and -

**NIXON PEABODY LLP**
Amanda D. Darwin (BBO No. 547654)
John V. Snellings (BBO No. 548791)
Lee Harrington (DE No. 4046)
100 Summer Street
Boston, MA  02110
Telephone: (617) 345-1000
Facsimile:  (617) 345-1300

Attorneys for Law Debenture Trust Company of
New York

120087.01600/40152516v1