# EXHIBIT "E"

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | X<br>)<br>) | Chapter 11 |
| NORTHWESTERN CORPORATION, | )<br>) | Case No.: 03-12872 (JLP) |
| Debtor. | )<br>)<br>X |  |
| MAGTEN ASSET MANAGEMENT<br>CORPORATION AND LAW DEBENTURE<br>TRUST COMPANY OF NEW YORK, | )<br>)<br>)<br>) |  |
| Plaintiffs, | )<br>) | Adv. Pro. No. 05-50866 (JLP) |
| v. | )<br>) |  |
| NORTHWESTERN CORPORATION,<br>GARY G. DROOK, MICHAEL J. HANSON,<br>BRIAN B. BIRD, THOMAS J. KNAPP AND<br>ROGER P. SCHRUM, | )<br>)<br>)<br>)<br>) |  |
| Defendants. | )<br>X |  |

### DEFENDANTS' MOTION TO STAY ADVERSARY PROCEEDING PENDING RESOLUTION OF APPEAL OF CONFIRMATION ORDER OR, IN THE ALTERNATIVE, TO DISMISS COMPLAINT

Defendants NorthWestern Corporation, Gary G. Drook, Michael J. Hanson, Brian

B. Bird, Thomas J. Knapp and Roger P. Schrum (collectively, "Defendants"), in the above-

captioned adversary proceeding (the "Adversary Proceeding"), by and through their undersigned

counsel, hereby move, pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, as made

applicable herein by Rule 7012 of the Federal Rules of Bankruptcy Procedure, for an order

staying the Adversary Proceeding pending resolution of the Appeal in the United States District

Court for the District of Delaware, styled Magten Asset Management Corp. v. NorthWestern

<u>Corp.</u>, 04-CV-01389 (JJF) (the "Confirmation Order Appeal"), or, in the alternative, dismissing the complaint herein in its entirety, with prejudice.

The grounds for this motion are set forth more fully in Defendants' Memorandum of Law in Support of Motion To Stay Adversary Proceeding Pending Resolution of Appeal of Confirmation Order or, in the Alternative, Dismissing Complaint, dated June 13, 2005, and filed concurrently herewith.

Dated: June 13, 2005
        Wilmington, Delaware

                            Respectfully submitted,

                            CURTIS, MALLET-PREVOST,
                               COLT & MOSLE LLP
                            Joseph D. Pizzurro
                            Steven J. Reisman
                            Nancy E. Delaney
                            Miriam K. Harwood
                            101 Park Avenue
                            New York, New York 10178
                            Telephone: (212) 696-6000
                            Facsimile: (212) 697-1559

                            -and-

                            GREENBERG TRAURIG, LLP

                            By: _____
                            Scott D. Cousins (No. 3079)
                            William E. Chipman, Jr. (No. 3818)
                            Dennis A. Meloro (No. 4435)
                            The Brandywine Building
                            1000 West Street, Suite 1540
                            Wilmington, Delaware 19801
                            Telephone: (302) 661-7000
                            Facsimile: (302) 661-7360

                            ***Co-Counsel for Defendants***

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| NORTHWESTERN CORPORATION, | ) |
| | ) Case No.: 03-12872 (JLP) |
| Debtor. | ) |

|  |  |
|---|---|
| MAGTEN ASSET MANAGEMENT CORPORATION AND LAW DEBENTURE TRUST COMPANY OF NEW YORK, | ) |
| | ) |
| Plaintiffs, | ) Adv. Pro. No. 05-50866 (JLP) |
| | ) |
| v. | ) |
| | ) |
| NORTHWESTERN CORPORATION, GARY G. DROOK, MICHAEL J. HANSON, BRIAN B. BIRD, THOMAS J. KNAPP AND ROGER P. SCHRUM, | ) |
| | ) |
| Defendants. | ) |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STAY ADVERSARY PROCEEDING PENDING RESOLUTION OF APPEAL OF CONFIRMATION ORDER OR, IN THE ALTERNATIVE, TO DISMISS COMPLAINT

**CURTIS, MALLET-PREVOST, COLT & MOSLE LLP**

Joseph D. Pizzurro
Steven J. Reisman
Nancy E. Delaney
Miriam K. Harwood
101 Park Avenue
New York, New York 10178
Telephone: (212) 696-6000
Facsimile: (212) 697-1559


Dated: June 13, 2005
Wilmington, Delaware

**GREENBERG TRAURIG, LLP**

Scott D. Cousins (No. 3079)
William E. Chipman, Jr. (No. 3818)
Dennis A. Meloro (No. 4435)
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, Delaware 19801
Telephone: (302) 661-7000
Facsimile: (302) 661-7360

*Co-Counsel for Defendants*

2354514v8

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ................................................................................................ 5

The Going Flat Transaction .............................................................................. 5

The NorthWestern Bankruptcy Case .................................................................. 6

The Fraudulent Transfer Proceeding .................................................................. 7

Confirmation of the Plan ................................................................................... 8

Magten's Appeal of the Confirmation Order ....................................................... 9

The Debtor's Efforts to Estimate the Amount of Disputed
Claims and the Establishment of the Disputed Claims Reserve ............................ 11

Substantial Consummation of the Plan ............................................................... 14

Plaintiffs' 9019 Motion to Enforce the Proposed Settlement
with NorthWestern and the Court's March 10, 2005 Order Denying the Motion ........ 15

The April 15, 2005 Complaint to Revoke the Confirmation Order ........................ 18

ARGUMENT ...................................................................................................... 20

I.    THIS ACTION SHOULD BE STAYED BECAUSE THE BANKRUPTCY
      COURT IS DIVESTED OF JURISDICTION DUE TO MAGTEN'S
      PENDING APPEAL OF THE CONFIRMATION ORDER, WHICH IS
      CURRENTLY UNDER APPELLATE REVIEW IN THE DISTRICT
      COURT ..................................................................................................... 20

II.   THE COMPLAINT SHOULD BE DISMISSED ON THE GROUNDS OF
      EQUITABLE MOOTNESS BECAUSE THE PLAN HAS ALREADY BEEN
      SUBSTANTIALLY CONSUMMATED ......................................................... 22

III.  THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE
      A CLAIM UNDER SECTION 1144 OF THE BANKRUPTCY CODE ............... 28

IV.   PLAINTIFFS HAVE WAIVED ANY CLAIMS REGARDING THE
      FUNDING OF THE DISPUTED CLAIMS RESERVE AND ARE
      ESTOPPED FROM ALLEGING "FRAUD" IN THIS ACTION ....................... 35

V.    ALL CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS NAMED IN
      THIS PROCEEDING MUST BE DISMISSED ............................................. 37

CONCLUSION .................................................................................................. 1

2354514v8

## TABLE OF AUTHORITIES

<u>Cases</u>

*Almeroth v. Innovative Clinical, Ltd. (In re Innovative Clinical, Ltd.)*, 302 B.R.
  136 (Bankr. D. Del. 2003) ................................................................. 23, 24, 25, 29

*Bialac v. Harsh Inv. Corp. (In re Bialac)*, 694 F.2d 625 (9th Cir. 1982) ..................................... 22

*Geyer v. Ingersoll Publ. Co.*, 621 A.2d 784 (Del. Ch. 1992) ........................................................ 38

*Griggs v. Provident Consumer Discount Co.*,
  459 U.S. 56 (1982)...................................................................................................................... 21

*In re Circle K. Corp.*,
  171 B.R. 666 (Bankr. D. Ariz. 1994), *aff'd*, 242 F.3d 380 (9th Cir. 2000) ............ 23, 24, 27, 37

*In re Continental Airlines*,
  91 F.3d 553 (3d Cir. 1996) ...................................................................... 24, 25, 26, 27, 28

*In re PWS Holding Corp.*,
  228 F.3d 224 (3d Cir. 2000). ..................................................................................................... 25

*In re Zolner*,
  249 B.R. 287 (N.D. Ill. 2000). ................................................................................................... 31

*Longardner & Assocs., Inc.*,
  855 F.2d 455 (7th Cir. 1998). ....................................................................................... 29, 30, 31

*Main Line Fed. Sav. & Loan Ass'n v. Tri-Kell, Inc.*,
  721 F.2d 904 (3d Cir. 1983) ...................................................................................................... 21

*Nordhoff Invs., Inc. v. Zenith Elecs. Corp., (In re Zenith Elecs. Corp.)*,
  250 B.R. 207 (D.Del. 2000), aff'd 258 F.3d 180 (3d Cir. 2001) ............................ 25, 26, 27, 28

*Official Comm. of Hechinger Inv. Co. of Del. v. Fleet Retail Finance Group (In re
  Hechinger Inv. Co. of Del.)*,
  274 B.R. 71 (Bankr.D.Del. 2002)............................................................................................... 38

*Official Comm. Of Unsecured Creditors v. Forman (In re Forman Enters.)*, 273
  B.R. 408 (Bankr. D. Pa. 2002)................................................................................................... 38

*Official Comm. of Unsecured Creditors v. Credit Swiss First Boston (In re Exide
  Technologies, Inc.)*,
  299 B.R. 732 (Bankr. D. Del. 2003). ......................................................................................... 29

*Prod. Res. Group, L.L.C. v NCT Group, Inc.*,
  863 A.2d 772 (Del. Ch. 2004) ................................................................................................... 38

ii

*Seminole Tribe of Florida v. Florida,*
    517 U.S. 44 (1996)........................................................................................................... 21

*Tenn-Fla Partners v. First Union Nat'l Bank of Florida (In re Tenn-Fla Partners),*
    226 F.3d 746 (6th Cir. 2000). ........................................................................................ 30

*Yonkers Contracting Co. v. General Star Nat. Ins.,* 14 F. Supp.2d 365 (S.D.N.Y.
    1998) ................................................................................................................................ 38

*Z.A.K. Constr. v. Port Liberte Partners (In re Port Liberte Partners),* 1995 W.L.
    11186 (D.N.J. 1995). ....................................................................................................... 30

## Statutes

11 U.S.C. § 105.................................................................................................................... 37

11 U.S.C. § 1127(b) ............................................................................................................. 18

11 U.S.C. § 1144 ............................................................................. 3, 4, 18, 19, 23, 24, 28, 30

Fed. R. Bankr. Pro. 7012..................................................................................................... 1

Fed. R. Bankr. Pro. 9019................................................................................................ 15, 16

Fed. R. Civ. Pro. 12(b)........................................................................................................ 1

## Treatises

*Collier on Bankruptcy* (15th ed. 2005), ¶8001.04, at p. 8001-9 ............................................ 22, 29

## LIST OF EXHIBITS

Exhibit A    Complaint, *Magten Asset Management Corp. and Law Debenture Trust Company of New York v. NorthWestern Corp., et al.,* Adv. Pro. No. 05-50866 (Bankr. D.Del.) (JLP)

Exhibit B    Order, dated December 7, 2004, Staying *Magten Asset Management Corp. and Law Debenture Trust Company of New York v. NorthWestern Corp.,* Adv. Pro. No. 04-53324 (Bankr. D.Del.) (JLP)

Exhibit C    Order Confirming Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated October 19, 2004 ("Confirmation Order")

Exhibit D    Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated August 18, 2004

Exhibit E    Notice of Appeal of Confirmation Order to United States District Court for the District of Delaware, filed by Magten Asset Management Corp., with certificate of service dated October 25, 2004

Exhibit F    Emergency Motion of Magten Asset Management Corp. for a Stay Pending Appeal of the Order Confirming the Debtor's Second Amended and Restated Plan of Reorganization, dated October 26, 2004

Exhibit G    Transcript (Excerpts) of October 29, 2004 Hearing on Magten Emergency Motion to Stay Confirmation Order Pending Appeal

Exhibit H    Debtor's Memorandum of Law in Support of Motion to Dismiss Consolidated Appeals of Magten Asset Management Corp., dated March 10, 2005

Exhibit I    Debtor's Motion for Estimation of Magten Asset Management's Claim and to Establish Disputed Claim Reserve, dated August 20, 2004

Exhibit J    Debtor's Motion for Estimation of Claims of Law Debenture Trust Company of New York and to Establish Disputed Claim Reserve, dated September 17, 2004

Exhibit K    Notice of Establishment of Claim Reserve Pursuant to Section 7.5 of Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code and Paragraph 27 of the Confirmation Order, dated October 25, 2004 ("Notice of Reserve")

Exhibit L    Objection of Magten Asset Management Corp. to Debtor's Notice of Reserve, dated October 28, 2004

Exhibit M    Stipulation and Order Establishing a Disputed Claims Reserve, executed by NorthWestern Corp. and Law Debenture Trust Company of New York, Dated October 29, 2004 ("So-Ordered" November 3, 2004)

iv

Exhibit N    Notice of Substantial Consummation of the Debtor's Second Amended and
             Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code,
             dated December 29, 2004

Exhibit O    Transcript of March 8, 2005 Hearing on Joint Motion of Magten Asset
             Management Corp. and Law Debenture Trust Company of New York for
             Approval of Proposed Settlement Agreement with Northwestern Corp.
             pursuant to Bankruptcy Rule 9019 ("9019 Motion")

Exhibit P    Memorandum Opinion Denying 9019 Motion, dated March 10, 2005

v

Defendants NorthWestern Corporation ("NorthWestern" or the "Debtor"), Gary

G. Drook, Michael J. Hanson, Brian B. Bird, Thomas J. Knapp and Roger P. Schrum

(collectively, "the Individual Defendants" and, together with NorthWestern, "Defendants"),

hereby submit this Memorandum of Law in support of their motion pursuant to Rule 12(b) of the

Federal Rules of Civil Procedure ("Fed.R.Civ.P."), as made applicable herein by Rule 7012 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for an Order staying the

above-captioned adversary proceeding (the "Adversary Proceeding") filed by Magten Asset

Management Corporation ("Magten") and Law Debenture Trust Company of New York ("Law

Debenture") (collectively, "Plaintiffs"), pending resolution of Magten's Appeal of the Order

Confirming NorthWestern's Second Amended and Restated Plan of Reorganization (the "Plan")

or, in the alternative, for an Order dismissing the complaint herein (the "Complaint") in its

entirety, with prejudice.

PRELIMINARY STATEMENT

This Adversary Proceeding is but the latest battle in Plaintiffs' relentless crusade

against the Debtor, in which they have seized every means at their disposal to obstruct, hinder

and forestall NorthWestern's successful emergence from Chapter 11. Plaintiffs have pursued

one objective all along: to extract the largest possible payout on their disputed claims against the

estate -- claims which narrowly survived complete dismissal by the Bankruptcy Court, and which

barely remain alive on the most tenuous of legal theories.

Since the commencement of NorthWestern's Chapter 11 case, Plaintiffs have

filed every imaginable objection, opposition and accusation against the Debtor, its management

and other parties. Plaintiffs vigorously opposed the Plan, which was approved by an

overwhelming majority of creditors. After the Bankruptcy Court confirmed the Plan, Magten

filed an Appeal of the Confirmation Order to the District Court (the "Confirmation Order

Appeal"), which remains pending. Both the Bankruptcy Court and the District Court denied

Magten's requests to stay the Confirmation Order, and the Plan became Effective on November

1, 2004. NorthWestern's $1 billion Plan of Reorganization was thereafter substantially

consummated.

Undaunted by their repeated lack of success and determined in their efforts to

keep the pressure on NorthWestern, Plaintiffs have commenced multiple actions over the last 18

months pertaining to their underlying claims against the estate, which stem from NorthWestern's

acquisition of the assets of one of its non-debtor subsidiaries nearly a year prior to the

bankruptcy filing.[1]  While lacking in legal merit, Plaintiffs' litigation tactics have forced the

Debtor to expend enormous resources defending an ever-widening circle of claims and

accusations. Accordingly, the Debtor has actively engaged in efforts to resolve Plaintiffs'

claims, and the parties reached an agreement in principle on a global settlement of the claims and

outstanding litigation in late January 2005. However, this Court denied approval of the proposed

global settlement by Order dated March 10, 2005, after the vigorous objections of other creditors

and Plan representatives, who argued that the proposed settlement violated the express terms of

the Plan and gave a windfall to Plaintiffs which was unwarranted given both the dubious nature

of Plaintiffs' disputed claims against the estate and the outstanding claims of other creditors

which would be unfairly prejudiced by the Plaintiffs' recovery.

After the denial of the proposed settlement, frustrated once again and true to form,

Plaintiffs resumed their warfare against NorthWestern and filed this Adversary Proceeding on

April 15, 2005. This time, Plaintiffs seek revocation of the Confirmation Order and

---

[1]    To date, Plaintiffs have filed the following actions relating to the transfer of assets by NorthWestern's
subsidiary:  a Proof of Claim for damages arising from the transfer; an Adversary Proceeding against
NorthWestern to avoid the transfer; an action against the officers of NorthWestern's subsidiary for "enabling"
the transfer; an action against the Trustee of the interests for "acquiescing" to the transfer; an action against
NorthWestern's attorneys for "aiding and abetting" fraud in connection with the transfer; an appeal of the
Confirmation Order to the District Court; and an appeal of the Bankruptcy Court's denial of their 9019 motion
concerning a proposed settlement with the Debtor, also in the District Court.

2

NorthWestern's discharge under Section 1144 of the Bankruptcy Code, alleging that the Debtor "defrauded" the Bankruptcy Court in procuring the Confirmation Order. It is plain to see that the motive behind this latest retaliatory attack by Plaintiffs, coming just after the denial of the proposed settlement, is to keep the pressure on by attempting to unravel the already-consummated Plan.

It is against this backdrop that the claims asserted in this Adversary Proceeding must be viewed. Beyond the bluster, the allegations of "fraud" are nothing more than an illusion. Once again, however, the Debtor will be put to the task of defending claims which seek to dismantle the entire reorganization which has been fully effectuated for over six months. Once again, these disgruntled Plaintiffs will attempt to hold hostage the billion-dollar reorganization plan of a public utility and thousands of innocent third parties who have relied upon it.

For the reasons set forth below, this Adversary Proceeding must be stayed pending resolution of the Confirmation Order Appeal, or, in the alternative, dismissed in its entirety.

First, by Order dated December 7, 2004, this Court has already ruled that Magten's pending appeal of the Confirmation Order in the District Court has divested the Bankruptcy Court of jurisdiction to determine any matters relating to the Confirmation Order while that order is under appellate review. Plaintiffs seek essentially the same relief in this Adversary Proceeding as in the Confirmation Order Appeal -- that is, nullifying the Confirmation Order and NorthWestern's discharge. NorthWestern has filed a Motion to Dismiss the Confirmation Order Appeal on the grounds of equitable mootness, given that the Plan has been substantially consummated, which motion remains pending. If the District Court grants NorthWestern's motion, that decision would likely mandate dismissal of this Adversary Proceeding as well. It is simply beyond dispute that this Court lacks jurisdiction to adjudicate

3

the claims presented in this Adversary Proceeding while the very Confirmation Order that is the subject matter of this suit is under appellate review in the District Court. This action must be stayed pending the District Court's decision on the Confirmation Order Appeal.

In addition to the clear jurisdictional infirmity, there are compelling grounds for dismissal of this Adversary Proceeding. Given the fact that the Plan went into effect after the Confirmation Order and has already been substantially consummated -- involving the completion of complex transactions involving hundreds of millions of dollars, the issuance of common stock that has been publicly traded for six months, and innumerable third parties who have relied upon the Confirmation Order and subsequent implementation of the Plan -- it would be impossible as well as inequitable for Plaintiffs to obtain the relief they seek in this Adversary Proceeding. The doctrine of equitable mootness requires dismissal of this action to revoke the Confirmation Order.

Moreover, even under the most generous reading, Plaintiffs' allegations fail to state a claim under Section 1144 of the Bankruptcy Code, which applies solely if the Debtor engaged in actual intentional fraud upon the Bankruptcy Court in procuring the Confirmation Order. Plaintiffs have not alleged and cannot allege facts that would show that the Debtor engaged in conduct constituting intentional fraud on the Bankruptcy Court. Moreover, Plaintiffs have waived and are estopped from challenging the manner in which the Debtor funded the Disputed Claims Reserve, given that the reserve for Plaintiffs' claims were established by stipulation between the parties and no objection was made thereafter.

Finally, Plaintiffs fail to state any claim for relief against the Individual Defendants. Beyond merely naming them as defendants, the Complaint does not contain a single factual allegation concerning their role or specific conduct.

4

2354514v8

In short, Plaintiffs' discontent throughout the course of NorthWestern's bankruptcy case has been evident to all, and their latest attempt to conjure up malfeasance and fraud on the part of the Defendants is entirely spurious. Although it is clear that Plaintiffs have not run out of the energy or funds to keep up the chase on NorthWestern, this latest, meritless attempt to undercut the reorganization once again must be wholly rejected.

## BACKGROUND

1.      NorthWestern is a publicly traded Delaware corporation, incorporated in 1923, with its headquarters and principal place of business in South Dakota.

2.      NorthWestern owns and operates a utility in the United States. Together with its direct and indirect subsidiaries, NorthWestern comprises one of the largest providers of electricity and natural gas in the upper Midwest and Northwest regions of the United States, serving over 600,000 customers throughout Montana, South Dakota and Nebraska.

3.      Magten is a Delaware corporation, and is the holder of approximately 33% of the Series A 8.45% Quarterly Income Preferred Securities (the "QUIPs"), issued by Montana Power Capital I (the "Trust").

4.      Law Debenture, a limited purpose trust company organized under the laws of New York, is presently the Trustee of the Trust, as successor Trustee to the Bank of New York.

5.      The Trust was established in or around November 1996 by The Montana Power Company ("Montana Power").

### The Going Flat Transaction

6.      On or about September 29, 2000, NorthWestern entered into an agreement with Montana Power by which NorthWestern was to purchase substantially all of Montana Power's remaining electric, and natural gas transmission and distribution assets, and its propane

2354514v8

utility assets (the "Montana Assets"). This purchase closed on February 15, 2002 (the "Acquisition"). As part of the Acquisition, NorthWestern intended to place the Montana Assets in a division of NorthWestern, rather than a wholly-owned subsidiary, in a part of the transaction that has been referred to as a "going flat" transaction (the "Going Flat Transaction").

7.     NorthWestern disclosed its intention to effect the Going Flat Transaction in joint applications filed by NorthWestern and Montana Power with the Federal Energy Regulatory Commission ("FERC") in 2001 and with the Montana Public Service Commission ("MPSC") in 2001 and 2002 for approval of the Acquisition. The Going Flat Transaction in connection with the Acquisition was approved by FERC in February 2001 and by MPSC in January 2002, and was disclosed in NorthWestern's April 1, 2002 10-K filing with the Securities and Exchange Commission.

8.     The Montana Assets, including the QUIPs, were initially transferred by Montana Power to a newly-created subsidiary, Montana Power-LLC ("MP-LLC"), which unit interest was then purchased by NorthWestern. MP-LLC was later renamed NorthWestern Energy, L.L.C. ("NorthWestern Energy"). NorthWestern Energy was later renamed Clark Fork and Blackfoot LLC ("CFB").

9.     As part of the Going Flat Transaction, CFB transferred substantially all of its assets and liabilities, including the QUIPs, to NorthWestern on or about November 15, 2002, and NorthWestern fully and unconditionally assumed the obligations relating to the QUIPs.

10.     Magten acquired the QUIPs after the Going Flat Transaction was completed.

**The NorthWestern Bankruptcy Case**

11.     On September 14, 2003 (the "Petition Date"), NorthWestern filed a voluntary petition for relief in the United States Bankruptcy Court for the District of Delaware

6

(the "Bankruptcy Court") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

12.     Both Magten and Law Debenture were appointed as members of the Official Committee of Unsecured Creditors (the "Creditors' Committee") by the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee").

13.     In January 2004, both Magten and Law Debenture filed multiple Proofs of Claim against the Debtor's estate for the face amount of the QUIPs as well as damages resulting from the Going Flat Transaction.

### The Fraudulent Transfer Proceeding

14.     On April 16, 2004, Plaintiffs commenced an Adversary Proceeding against NorthWestern,[2] seeking to set aside the transfer of assets which occurred in the Going Flat Transaction as a fraudulent conveyance and to divest the estate of the assets which were conveyed to NorthWestern in that transaction (the "Fraudulent Transfer Proceeding").

15.     As a result of Plaintiffs' litigation against NorthWestern, the U.S. Trustee removed both Magten and Law Debenture from the Creditors' Committee.

16.     NorthWestern moved to dismiss the complaint in the Fraudulent Transfer Proceeding, arguing that Plaintiffs lacked standing to sue because they are not creditors of CFB due to the fact that CFB was released from its obligations to the QUIPs holders pursuant to the Going Flat Transaction.

17.     In its Decision dated August 20, 2004, the Bankruptcy Court agreed with NorthWestern and held that CFB's obligations to Plaintiffs were released pursuant to the Going Flat Transaction, and that Plaintiffs lacked standing to bring a fraudulent conveyance action

---

[2]     *Magten Asset Management Corp. & Law Debenture Trust Co. of New York v. NorthWestern Corp.*, Adversary Proceeding No. 04-53324 (Bankr. D. Del.) (JLP).

against the Debtor. The Court held that the only possible way in which Plaintiffs could maintain their action against the Debtor is if they proved that CFB's release of obligations pursuant to the Going Flat Transaction was obtained through actual fraud or a fraudulent scheme.

18.    By Order dated December 7, 2004 (the "December 7, 2004 Order"), this Court stayed the Fraudulent Transfer Proceeding pending the outcome of the Confirmation Order Appeal, due to the fact that the claims in the Fraudulent Transfer Proceeding involved issues which were encompassed in the Confirmation Order Appeal. Plaintiffs' claim in the Fraudulent Transfer Proceeding is considered a "disputed claim" against the estate. A true and correct copy of the December 7, 2004 Order is attached hereto as Exhibit B.

### Confirmation of the Plan

19.    NorthWestern's Plan was heavily negotiated with the participation of numerous stakeholders, including a myriad of creditors, investors, and other parties in interest. An overwhelming majority of the Debtor's creditors voted in support of the Plan. Both Magten and Law Debenture vigorously opposed the Plan, and were actively involved throughout the confirmation process, filing objections in opposition to each reorganization plan proposed by NorthWestern.[3]

20.    The Bankruptcy Court commenced confirmation hearings on August 25, 2004, over the objections of Magten and Law Debenture, which hearings were continued on October 6, 2004 and by teleconference on October 8, 2004, at which time the Bankruptcy Court, Hon. Charles G. Case, issued a decision confirming the Plan, and overruled each of Magten and Law Debenture's objections.

---

[3]    For example, on May 25, 2004, NorthWestern filed its revised First Amended Plan of Reorganization and Disclosure Statement with the Bankruptcy Court, to which Magten filed an Objection on August 9, 2004. On August 19, 2004, NorthWestern filed its Second Amended Plan of Reorganization and Disclosure Statement, to which Magten filed an Objection on August 25, 2004. On August 31, 2004, NorthWestern filed its revised Second Amended and Restated Plan and revised Second Amended and Restated Disclosure Statement, to which Magten filed an Objection on September 21, 2004.

8

21.    On October 19, 2004, the Bankruptcy Court entered the Confirmation Order. A true and correct copy of the Confirmation Order is attached hereto as Exhibit C.

22.    Under Section 7.5 of the Plan, NorthWestern was required to set aside a reserve (the "Disputed Claims Reserve") for the purpose of satisfying disputed claims against the estate. A true and correct copy of the Plan is attached hereto as Exhibit D. The Disputed Claims Reserve would consist of shares of common stock (the "New Common Stock") which would be issued by the reorganized NorthWestern (the "Reorganized Debtor") after the effective date of the Plan. At the time of the Confirmation Order, the value of each share of the New Common Stock was estimated at $20 per share.

23.    With respect to the claims of QUIPs holders, including the Plaintiffs, the Plan provided for the election of one, but not both, of two options: (1) to waive their right to litigate claims against the estate and receive a guaranteed distribution of a pro rata share of 505,591 shares of New Common Stock; or (2) to pursue litigation of their claims against the estate in the Fraudulent Transfer Proceeding, and, if successful in obtaining a judgment, receive a distribution of New Common Stock for the amount of such judgment in the same manner as Class 9 claims holders (i.e., a 63% recovery). (Exhibit D, Plan at § 4.8(b)(ii).)

## Magten's Appeal of the Confirmation Order

24.    Three days after entry of the Confirmation Order, Magten filed an Emergency Motion in the Bankruptcy Court, on October 22, 2004 (the "First Emergency Motion"), asking the Bankruptcy Court to stay the Confirmation Order pending Magten's anticipated appeal to the United States District Court for the District of Delaware (the "District Court"). The Bankruptcy Court held a hearing on October 25, 2004, and denied Magten's First Emergency Motion.

2354514v8

25.     On October 25, 2004, Magten filed a Notice of Appeal of the Confirmation Order to the District Court. (Exhibit E.) The next day, Magten filed another Emergency Motion (the "Second Emergency Motion"), this time in the District Court, asking it to stay the Bankruptcy Court's Confirmation Order. Magten's Second Emergency Motion attacked the Confirmation Order on a variety of grounds, including: (1) that the Plan provided inadequate recovery for the holders of QUIPs claims such as Magten, whose interests were allegedly unfairly compromised under the Plan, including the forced election of remedies under Section 4.8(b)(ii) thereof (that is, the QUIPs holders' choice between litigating their claims against the estate and waiving their claims in order to receive a recovery); and (2) that the entire reorganization improperly relied upon assets which Magten argues were fraudulently transferred to the Debtor in the Going Flat Transaction, which Plaintiffs seek to set aside in the Fraudulent Transfer Proceeding and which Plaintiffs assert are subject to a constructive trust in favor of CFB's creditors. A true and correct copy of Magten's Second Emergency Motion is attached hereto as Exhibit F.

26.     The District Court, Hon. Kent A. Jordan, presiding, held a hearing on Magten's Second Emergency Motion on October 29, 2004, and denied Magten's request to stay the Confirmation Order. A true and correct copy of relevant excerpts from the Transcript of the October 29, 2004 Hearing (the "Oct. 29, 2004 Transcript") is attached hereto as Exhibit G. As an initial matter, the District Court noted that the Bankruptcy Court had taken a dim view of the merits of Magten's underlying claim against the estate, believing that Magten's arguments that it held a constructive trust upon the assets transferred to NorthWestern in the Going Flat Transaction "don't hold any water." (Exhibit G, Oct. 29, 2004 Transcript at pp. 20, 22-23.)

27.     In addition, the District Court held that a stay of the Confirmation Order was not justified because "the risk here of harm to many, many stakeholders is very substantial,

10

exceedingly so," (Exhibit G, Oct. 29, 2004 Transcript at p. 47), essentially putting the entire

reorganization at risk, including the potential loss of exit financing. (Id. at 40-42.) As the

District Court remarked:

> "[The] purpose of the Bankruptcy Code is to maximize the value
> of the debtor. Enormous sums of money and effort, including the
> judicial effort of a skilled and respected bankruptcy judge have
> gone into figuring out how to do that. Having gone through that
> entire process, and [Magten] having come up short, it's not in the
> public interest to put the results of all that effort at risk because one
> participant doesn't like it." (Exhibit G, Oct. 29, 2004 Transcript at
> p. 27.)

28.    Magten's Appeal of the Confirmation Order remains pending in the

District Court.  On March 10, 2005, NorthWestern moved to Dismiss the Confirmation Order

Appeal on the grounds of equitable mootness, given that the Plan has been substantially

consummated.  A true and correct copy of NorthWestern's Motion to Dismiss the Confirmation

Order Appeal is attached hereto as Exhibit H.  NorthWestern's motion to dismiss the

Confirmation Order Appeal remains pending in the District Court.

### The Debtor's Efforts to Estimate the Amount of Disputed
### Claims and the Establishment of the Disputed Claims Reserve

29.    Throughout the period both before and after the Confirmation Order was

entered, the Debtor engaged in extensive efforts to estimate the amount of the disputed claims

which were being asserted against the estate.  This process included negotiations with the claims

holders, as well as filing motions in the Bankruptcy Court seeking orders fixing the amount of

outstanding disputed claims.  Through these efforts, the Debtor attempted to estimate the likely

amount of the disputed claims on which the estate might be required to make distributions, which

estimate would serve as a basis for determining the amount of New Common Stock to be placed

in the Disputed Claims Reserve.

30.    In furtherance of this estimation process, the Debtor filed a Motion for Estimation of Magten's Claim on August 20, 2004, and a Motion to Estimate the Claims of Law Debenture on September 17, 2004 (collectively, the "Estimation Motions"), true and correct copies of which are attached hereto as Exhibit I and Exhibit J, respectively. Simultaneously, the Debtor engaged in negotiations with the Plaintiffs to resolve the Estimation Motions pursuant to agreement.

31.    Similarly, the Debtor filed a Motion to estimate another large disputed claim, that of PPL Montana LLC ("PPL"), which had asserted a $140 million claim against the estate. Pursuant to a stipulation entered into on October 4, 2004, the Debtor agreed to establish within the Disputed Claims Reserve a $50 million segregated reserve, which would be used solely for the purpose of satisfying a potential recovery by PPL on its claim against the estate.[4]

32.    On October 25, 2004, after entry of the Confirmation Order, the Debtor filed a Notice of Establishment of Claim Reserve Pursuant to Section 7.5 of the Plan (the "Notice of Reserve"). A true and correct copy of the Notice of Reserve is attached hereto as Exhibit K. The Notice of Reserve stated that "the Debtor shall establish an initial reserve of 13.5% of New Common Stock allocated to Class 7 and Class 9 for the Disputed Claims Reserve and such reserve is subject to adjustment prior to the Effective Date pursuant to Section 7.5 of the Plan." (Exhibit K at p. 1.)

33.    The Notice of Reserve further reflected that the process of estimating disputed claims was ongoing and not yet completed, and specifically referred to the negotiations with the Plaintiffs, stating: "...the Debtor and Law Debenture have conducted settlement

---

[4]    PPL and NorthWestern recently reached a settlement in principle of PPL's claim, which, subject to Bankruptcy Court approval, would entirely extinguish PPL's claim against the estate. The PPL reserve will be released into the general Disputed Claims Reserve (and become available to other claims holders), and PPL will, in fact, pay NorthWestern approximately $9 million.

12

discussions which have resulted in the circulation of a draft stipulation. No settlement of the Debtor's [Estimation Motions]…has been finalized." The Notice of Reserve further stated that "the Debtor has included in the initial reserve…a claim of $25 million to address the claims of the QUIPS Litigation Claims holders." (Exhibit K at pp. 1-2.)

34.    Magten filed an Objection to the Notice of Reserve on October 28, 2004, a true and correct copy of which is attached hereto as Exhibit L.

35.    On October 29, 2004, a Stipulation and Order Establishing a Disputed Claims Reserve (the "Stipulation") was entered by and between the Debtor and Law Debenture (on behalf of the QUIPs claims holders, including Magten). A true and correct copy of the Stipulation is attached hereto as Exhibit M. In the Stipulation, NorthWestern agreed to set aside a portion of the initial reserve of New Common Stock in the Disputed Claims Reserve "solely to satisfy in full a $25 million class 9 claim" of the QUIPs claims holders, which would obtain the same treatment afforded to class 9 general unsecured claims under the Plan, that is, a 63% recovery of the eventual allowed amount of such claim. (Exhibit M, Stipulation at ¶ 1.)

36.    The Stipulation provides that, if the QUIPs claims holders obtained a "final non-appealable order" in an amount less than $25 million, the balance of the segregated reserve would be released into the general Disputed Claims Reserve. Conversely, if the QUIPs claims holders obtained a judgment in excess of $25 million, they would "be entitled to draw on any assets remaining in the Disputed Claim Reserve," but "[t]he Debtor has no obligation to replenish the Disputed Claim Reserve."[5] (Exhibit M, Stipulation at ¶ 3.)

37.    The Stipulation was "So-Ordered" by the Bankruptcy Court on November 3, 2004.

---

[5]    Under the Plan, after Class 9 distributions are completed, any assets remaining in the Disputed Claims Reserve are released to Class 7. (Exhibit D, Plan at § 4.8(b)(ii).)

13

38.     Magten did not object to the Stipulation and did not pursue any further challenge to the funding of the Disputed Claims Reserve or the segregated reserve of $25 million for the QUIPs claims which was provided for in the Stipulation.

### Substantial Consummation of the Plan

39.     The effective date of the Plan was November 1, 2004 (the "Effective Date").

40.     On or about the Effective Date, the Reorganized Debtor finalized its senior credit agreement and issued the $225 million senior secured notes (the "Senior Notes") portion of its exit financing. The Reorganized Debtor also paid all Allowed CSFB Financing Claims (approximately $390 million, paid to Credit Suisse First Boston) and Bank One DIP Financing Claims (approximately $15 million in letters of credit, plus $35 million in terminated unfunded financing commitments) pursuant to the Debtor's exit financing facility. In addition to the Senior Notes, a syndicated $225 million credit facility (the "Senior Credit Facility") involving approximately ten lenders was entered into by the Reorganized Debtor. As a result of these transactions, a significant number of outside investors, including, but not limited to, Lehman Brothers Inc., Credit Suisse First Boston LLC and Deutsche Bank Securities Inc., as initial purchasers of the Senior Notes, and the syndicate of lenders under the Senior Credit Facility, have relied upon Confirmation of the Plan.

41.     Pursuant to the Plan, the Reorganized Debtor also effectuated the registration of its New Common Stock on the NASDAQ Stock Market Exchange. As of June 1, 2005, such New Common Stock is being publicly traded at a market value of over $28 per share, with 35 million outstanding shares and a total market value of approximately $1 billion.

14

42.    As of the Effective Date, the Reorganized Debtor established the Disputed Claims Reserve, discussed above, from which the Debtor has already made distributions to holders of allowed Class 9 claims, and also the D&O Trust, to which indemnification claims of certain protected parties will be channeled and paid by available insurance under the Plan.

43.    On December 29, 2004, the Debtor filed a Notice of Substantial Consummation of the Plan, a true and correct copy of which is attached hereto as Exhibit N. As described more fully therein, following the Effective Date, NorthWestern substantially consummated the Plan approved by the October 19, 2004 Confirmation Order.  This included the matters discussed above and other actions through which the Debtor accomplished:  (i) the transfer of substantially all of the property proposed by the Plan to be transferred; (ii) the assumption of substantially all of the property dealt with by the Plan; and (iii)  the completion of distributions to holders of allowed claims under the Plan, including holders of Class 7, 8(a), 8(b) and 9 allowed claims.

44.    The substantial consummation of the Plan is undisputed, and has been acknowledged by this Court in its recent Memorandum Opinion issued March 10, 2005.  (Exhibit P, at p. 5.)

### Plaintiffs' 9019 Motion to Enforce the Proposed Settlement with NorthWestern and the Court's March 10, 2005 Order Denying the Motion

45.    On January 27, 2005, the terms of a proposed settlement (the "Proposed Settlement") between the Debtor and Plaintiffs was reduced to writing in a letter (the "Settlement Letter").  The Settlement Letter expressly provided that it was subject to Bankruptcy Court approval, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure ("Rule 9019").

46.    The Proposed Settlement provided that the QUIPs claims holders would obtain the entire amount of the segregated reserve which has been set aside for them within the Disputed Claims Reserve -- i.e., an amount sufficient to cover a $25 million Class 9 claim (as if

they had obtained a final judgment in that amount) -- plus additional stock and warrants from amounts that were to be paid out to Class 7 and 9 claimants by operation of Section 4.8(b)(ii) of the Plan, and additional stock to be paid out of the balance of the general Disputed Claims Reserve, essentially giving Plaintiffs a settlement with a value of $28 million. (Exhibit 0, at p. 77.)

47.    In reliance upon the Settlement Letter, the Debtor took steps to notify interested parties that a global settlement with Magten and Law Debenture had been reached, and advised the Bankruptcy Court of the Proposed Settlement at a status conference on February 10, 2005.

48.    In response, the Debtor received numerous objections from various parties, including the Plan Committee and holders of Class 7 Claims, who opposed the Proposed Settlement and asserted that it violated the terms of the substantially consummated Plan.

49.    As a result of such objections, NorthWestern determined that it could not proceed with implementation of the Proposed Settlement and advised Magten and Law Debenture that it was withdrawing from the Settlement Letter.

50.    Thereafter, Magten and Law Debenture filed a Motion under Rule 9019 (the "9019 Motion") seeking to enforce the terms of the Settlement Letter.

51.    On March 8, 2005, a hearing (the "9019 Hearing") was held in the Bankruptcy Court with respect to the 9019 Motion. A true and correct copy of the Transcript of the 9019 Hearing is attached hereto as Exhibit 0. Representatives of the Plan Committee and the Ad Hoc Committee of Class 7 creditors objected to the Proposed Settlement, asserting that it violated the terms of the Plan and challenging the amount and reasonableness of the settlement, including the impact the distribution of shares to Magten would have on Class 7 and Class 9 creditors.

2354514v8

52.    Specifically, the objectors argued that the Proposed Settlement violated the express terms of the Plan because it improperly granted Magten the benefit of both options offered to QUIPs holders under the Plan, and improperly awarded Magten shares in the Reorganized Debtor that belonged to Class 7 and 9 claimants as provided by section 4.8(b)(ii) of the Plan.  To the extent that Magten suggested at the hearing that alternative sources of assets could be used to fund the Proposed Settlement in order to avoid violating the terms of the Plan's distribution scheme, such as a cash payment by the Debtor or a significantly more substantial "dip" into the balance of funds not yet distributed from the general Disputed Claims Reserve, the objectors also opposed such proposals on the grounds that Magten had not properly provided notice of such alternative terms, which could also possibly violate the Plan and adversely impact other holders of class 9 disputed claims, and such proposals were not properly before the Bankruptcy Court.  In addition, the objectors pointed out that, under the Plan, those QUIPS holders who had chosen the option of litigating their claims against the estate (rather than waiving litigation and obtaining a guaranteed distribution), had agreed to a $25 million segregated reserve in the Disputed Claim Reserve pursuant to the Stipulation and that it would be unfair to allow them to recover in excess of their segregated reserve by dipping into the balance of the general Disputed Claims Reserve so early in the disputed claims distributions process ahead of other Class 9 disputed claims holders.

53.    At the hearing, Magten argued that the Stipulation permitted the litigating QUIPs holders to obtain a recovery in excess of their $25 million segregated reserve (although such recovery was not guaranteed by specifically segregated funds), in the event that they obtained a higher judgment on their claims in the pending litigation – which could be satisfied by "assets remaining in the Disputed Claims Reserve." (Exhibit M, Stipulation at ¶ 3.)  Magten further maintained that, in spite of the fact that the Stipulation acknowledged a $25 million

17

QUIPs claim for the purpose of establishing the reserve, the Debtor should have funded the Disputed Claims Reserve with enough to cover the possibility that the QUIPs holders might obtain a final judgment in the entire amount they originally asserted, notwithstanding the provisions of the Stipulation which stated that the Debtor had no obligation to replenish the Disputed Claims Reserve in that event. (Exhibit M, Stipulation at ¶3; Exhibit O, at p. 77-78.)

54.    On March 10, 2005, this Court issued its Memorandum Opinion Denying the 9019 Motion (the "March 2005 Decision"). A true and correct copy of the March 2005 Decision is attached hereto as Exhibit P. The Court held that the Proposed Settlement had to be rejected because it violated the Plan, which had already been substantially consummated and could no longer be modified pursuant to Section 1127(b) of the Bankruptcy Code. (Exhibit P., at p. 5.) The Court also noted that allowing the Debtor to "dip into" the general Class 9 Disputed Claims Reserve in excess of the $25 million reserve specifically segregated for the QUIPs holders would be "imprudent" in light of the potential impact upon other disputed claims. (Exhibit P, at p. 6.)

55.    Despite Plaintiffs' suggestion at the 9019 Hearing that the Debtor had improperly underestimated their claim and/or insufficiently funded the Disputed Claims Reserve, the Court's March 2005 Decision makes no finding that the Disputed Claims Reserve was under-funded or that the Debtor incorrectly or improperly estimated the amount of disputed claims. Magten has appealed the March 2005 Decision.

### The April 15, 2005 Complaint to Revoke the Confirmation Order

56.    After this Court's March 2005 decision denying the 9019 Motion, Plaintiffs commenced the instant Adversary Proceeding against defendants on April 15, 2005, at which time they filed the Complaint to revoke the Confirmation Order pursuant to Section 1144 of the Bankruptcy Code ("Section 1144"). (Exhibit A.) In the Complaint, filed 178 days after

18

entry of the Confirmation Order -- just two days short of the expiration of the applicable filing period -- Plaintiffs seek revocation of the Bankruptcy Court's October 2004 Confirmation Order and NorthWestern's discharge -- the same relief requested in the pending Appeal of the Confirmation Order.

57.    The Complaint alleges that the Confirmation Order was procured by "fraud," and should be revoked under Section 1144. Asserting serious accusations of fraud or at least recklessness on the part of the Debtor, Plaintiffs allege that the Debtor failed to adequately fund the Disputed Claims Reserve, and that such conduct was a "fraud" upon the Bankruptcy Court.

58.    Specifically, Plaintiffs allege that in connection with obtaining the Confirmation Order, the Debtor "promised" the Bankruptcy Court that it would place enough New Common Stock in the Disputed Claims Reserve to cover 100% of the amount of all disputed claims, but failed to do so when it established the reserve after the Confirmation Order.

59.    Relying in part upon statements made by parties who objected to the Proposed Settlement at the 9019 Hearing, Plaintiffs allege that it is "now known" that the amount of stock which NorthWestern placed in its initial reserve when it established the Disputed Claims Reserve in October 2004 was "insufficient to satisfy all Disputed claims" which were outstanding against the estate, if such disputed claims had been estimated at 100% of the amount asserted by the various holders of those claims. (Exhibit A, Complaint ¶ 4 and pp. 56-57.)

60.    Plaintiffs do not assert that the alleged underfunding of the Disputed Claims Reserve has resulted in the failure to make any required distributions to any claims holders pursuant to the Plan and there have been no such holders of allowed claims which have been denied payment because of any insufficiency in the Disputed Claims Reserve.

19

## ARGUMENT

### I.

### THIS ACTION SHOULD BE STAYED BECAUSE THE BANKRUPTCY COURT IS DIVESTED OF JURISDICTION DUE TO MAGTEN'S PENDING APPEAL OF THE CONFIRMATION ORDER, WHICH IS CURRENTLY UNDER APPELLATE REVIEW IN THE DISTRICT COURT

Due to the fact that the Confirmation Order is currently under appellate review in the District Court, by virtue of Magten's own appeal of that Order, this Court is divested of jurisdiction to adjudicate the claims in this Adversary Proceeding, which seek revocation of the same Confirmation Order. Accordingly, this Court must stay the Adversary Proceeding until such time as the District Court has rendered its decision on the Confirmation Order Appeal.

As discussed above, Magten's appeal of the Confirmation Order asserts that the order should not have been granted, and that the Bankruptcy Court erred on more than half a dozen grounds in its various rulings and determinations which overruled Magten's numerous objections to the Plan. Indeed, the issues raised in the Confirmation Order Appeal go to the very heart of NorthWestern's Plan – including the procedures for distribution and percentage of recovery on claims out of the Disputed Claims Reserve, as well as whether the assets conveyed to NorthWestern in the Going Flat Transaction were properly at the disposal of the estate for use in the reorganization. If successful, Magten's appeal would revoke the Confirmation Order as well as NorthWestern's discharge. Although the District Court denied Magten's Emergency Motion for a Stay of the Confirmation Order pending appeal, the appeal itself remains pending in the District Court. NorthWestern has filed a Motion to Dismiss the Confirmation Order Appeal on the grounds of equitable mootness given the fact that the Plan has already been substantially consummated, which motion is also *sub judice* in the District Court. (Exhibit H.)

2354514v8

This Court already determined that it is divested of jurisdiction to consider any

matters relating to the Confirmation Order in its December 7, 2004 Order, which stayed the

Fraudulent Transfer Proceeding. (Exhibit B.) As this Court stated, quoting Magten's own brief

opposing NorthWestern's motion to dismiss the Fraudulent Transfer Proceeding:

> "the filing of a notice of appeal is an event of jurisdictional
> significance – it confers jurisdiction on the court of appeals and
> divests the district court of its control over those aspects of the case
> involved in the appeal." *Seminole Tribe of Florida v. Florida*, 517
> U.S. 44, 114 n.10 (1996) [*quoting Griggs v. Provident Consumer
> Discount Co.*, 459 U.S. 56, 58 (1982)].

(Exhibit B, December 7, 2004 Order at p. 3.)

Just as this Court found that the issues presented in the Fraudulent Transfer

Proceeding encompass issues presented in the Confirmation Order Appeal, so is there an even

more direct relationship between the issues presented in this Adversary Proceeding and the

Confirmation Order Appeal -- both of which seek to examine the merits of whether confirmation

of the Plan was properly granted and to potentially revoke and discharge the Confirmation Order.

The well-established jurisdictional principle recognized by this Court is beyond dispute. *Main

Line Fed. Sav. & Loan Ass'n v. Tri-Kell, Inc.*, 721 F.2d 904 (3d Cir. 1983) ("Filing a notice of

appeal automatically transfers jurisdiction from the district court to the appellate courts…[A]

district court (or a bankruptcy court acting as a district court) [only] retains such jurisdiction as is

necessary to aid the higher court in consideration of its appeal.") The operation of this rule in the

bankruptcy context has been explained as follows:

> The filing of a timely notice of appeal has the effect of
> immediately transferring jurisdiction from the bankruptcy court to
> the district court or bankruptcy appellate panel with respect to any
> matters involved in the appeal. This rule is the same as that which
> governs appeals taken from the district court to the court of
> appeals. The bankruptcy court is divested of authority to proceed
> further with respect to such matters, except in aid of the appeal, or
> to correct clerical mistakes….Thus, after a notice of appeal is

> timely filed, the bankruptcy court has no power to...reexamine the
> order from which the appeal is pending, or to vacate its decision.

*10 Collier on Bankruptcy* (15th ed. 2005), ¶8001.04, at p. 8001-9. *See also Bialac v. Harsh Inv.*

*Corp. (In re Bialac),* 694 F.2d 625, 627 (9th Cir. 1982) (holding that bankruptcy court lacked

jurisdiction to enjoin foreclosure sale of note where appeal was pending from decision granting

relief from automatic stay, stating: "[e]ven though a bankruptcy court has wide latitude to

reconsider and vacate its own prior decisions, not even a bankruptcy court may vacate or modify

an order while on appeal").

　　　　Accordingly, consistent with its December 7, 2004 decision staying the

Fraudulent Transfer Proceeding, this Court must also stay this Adversary Proceeding on the

ground that it lacks jurisdiction to make any determination concerning the Confirmation Order

during the pendency of the Confirmation Order Appeal in the District Court.[6]

## II.

### THE COMPLAINT SHOULD BE DISMISSED ON THE GROUNDS OF EQUITABLE MOOTNESS BECAUSE THE PLAN HAS ALREADY BEEN SUBSTANTIALLY CONSUMMATED

　　　　Even if the Confirmation Order were not currently under appellate review,

thereby divesting this Court of jurisdiction concerning matters relating to the Confirmation

Order, the claims presented by Plaintiffs in this Adversary Proceeding seeking revocation of the

Confirmation Order are moot. Accordingly, the Complaint must be dismissed.

　　　　As noted above, the Effective Date of the Plan was November 1, 2004. Both the

Bankruptcy Court and the District Court denied Magten's two Emergency Motions to Stay the

Confirmation Order pending its appeal in October 2004. Accordingly, the Plan went into effect

on schedule, seven months ago. The Debtor closed on its exit financing, paid millions of dollars

---

[6]    Defendants further reserve their right to move to withdraw the reference in this Adversary Proceeding.

2354514v8

in distributions to creditors and issued $225 million in Senior Notes. In addition, the

Reorganized Debtor issued its New Common Stock, which was registered on NASDAQ and is

currently being publicly traded. The Debtor filed its Notice of Substantial Consummation of the

Plan more than five months ago, on December 29, 2004.

Under these circumstances, even if Plaintiffs were successful in proving the

allegations of their Complaint, the relief requested in this Adversary Proceeding – revocation of

the Confirmation Order, and undoing NorthWestern's already-implemented reorganization plan,

would be virtually impossible, and certainly inequitable. Therefore, this action must be

dismissed as moot.

The doctrine of equitable mootness has been expressly found applicable in actions

seeking revocation of a Confirmation Order on the grounds of fraud under Section 1144.

*Almeroth v. Innovative Clinical, Ltd. (In re Innovative Clinical, Ltd.)*, 302 B.R. 136, 141 (Bankr.

D. Del. 2003) (granting motion to dismiss claim under Section 1144 to revoke Confirmation

Order on grounds of fraud, under equitable mootness doctrine); *In re Circle K. Corp.*, 171 B.R.

666, 669 (Bankr. D. Ariz. 1994), *aff'd*, 242 F.3d 380 (9th Cir. 2000)) (same). The doctrine of

equitable mootness is premised on the principle that federal courts hear only live controversies.

If the court were to find in favor of the plaintiff, but it is impossible to grant effective relief, then

the court will not proceed, but will dismiss the matter as moot. *Innovative Clinical*, 302 B.R. at

141; *Circle K*, 171 B.R. at 669.

The facts presented in *Circle K* are particularly apposite here. In that case, a

creditor brought an action under Section 1144 to revoke a confirmation order on the grounds that

the Debtor committed fraud during the confirmation process by concealing the fact that the

debtor's management would hold an equity stake in the reorganized debtors after confirmation,

and by falsely representing the value of the Debtor. The Court accepted the allegations as true

23

for purposes of deciding the motion to dismiss, but held that the complaint had to be dismissed on the grounds of equitable mootness because the plan had already been substantially consummated, and thus "effective relief cannot be fashioned, even if plaintiffs prevail." 171 B.R. at 670. The Court noted that "the effect of Section 1144 is to revoke the discharge and place [the debtor] in the position it occupied before confirmation." *Id.* However, the debtor's plan had already been implemented in that case, including the disbursement of newly issued stock in the reorganized debtors, and millions of dollars in distributions to creditors. The Court observed that, in such circumstances, "It is difficult to envision how the Court could vacate the order and protect the numerous entities which relied on confirmation." Accordingly, the doctrine of equitable mootness required dismissal. *Id.*[7]

Similarly, in *Innovative Clinical*, the plaintiffs sought revocation of a confirmation order under Section 1144, alleging fraudulent conduct by the debtor for failure to disclose conflicts of interest and business relationships, and for other alleged "vote procurement misconduct" which allegedly enabled the debtors to achieve approval of the plan to promote personal interests. The court dismissed the complaint on the grounds of equitable mootness, citing *Circle K*, given that the plan had already been substantially consummated "far past that point of no return." 302 B.R. at 142.

The Third Circuit adopted the doctrine of "equitable mootness" in its seminal decision in *In re Continental Airlines*, 91 F.3d 553 (3d Cir. 1996), holding that dismissal is appropriate in circumstances where "even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable." *Id.* at 558-59. In *Continental*, the Third Circuit instructed that the courts should undertake a "discretionary balancing of

---

[7]    In *Circle K*, as here, the same plaintiffs who filed the Section 1144 Complaint had also appealed the Confirmation Order, which appeal was also dismissed on the grounds of equitable mootness. The Ninth Circuit

2354514v8

equitable and prudential factors" in applying the equitable mootness doctrine in the bankruptcy context, and identified the following five factors that should be considered:

    1. whether the plan has been substantially consummated;

    2. whether a stay of the effect of the confirmation order has been obtained;

    3. the effect of the relief on third parties;

    4. the effect of the relief on the "success of the plan;" and

    5. the public policy of promoting finality in bankruptcy cases.

*Continental*, 91 F.3d at 560. *Accord, Nordhoff Invs., Inc. v. Zenith Elecs. Corp., (In re Zenith Elecs. Corp.)*, 250 B.R. 207, 214 (D.Del. 2000), *aff'd* 258 F.3d 180, 185 (3d Cir. 2001); *In re PWS Holding Corp.*, 228 F.3d 224, 236-237 (3d Cir. 2000).

      All five factors weigh in favor of dismissing this Adversary Proceeding under the doctrine of equitable mootness. The first factor -- whether the plan has been substantially consummated -- is by far the most significant of the five factors. *Continental,* 91 F.3d at 561. *Accord, Innovative Clinical*, 302 B.R. at 140 (the "foremost consideration has been whether the reorganization plan has been substantially consummated"). In the case at bar, that factor heavily weighs in favor of NorthWestern, since the Plan was substantially consummated over six months ago,[8] a fact which is undisputed and which this Court has already acknowledged in its March 2005 Decision.

---

affirmed the dismissal of both the confirmation order appeal, as well as the 1144 revocation action, on the grounds of equitable mootness. *In re Circle K. Corp.*, 242 F. 3d 380 (9th Cir. 2000).

[8]  As defined in Section 1101(2) of the Bankruptcy Code, "substantial consummation" means: "transfer of all or substantially all of the property proposed by the plan to be transferred; assumption by the debtor of the business or management of the property dealt with by the plan; and commencement of distribution under the plan." All of these elements have been satisfied in this case: common stock has been issued in exchange for the allowed claims held by unsecured creditors, secured debt has been reinstated, and common stock existing prior to the Effective Date has been cancelled.

2354514v8

As discussed above, following entry of the Confirmation Order, NorthWestern issued $225 million in Senior Notes; entered into a syndicated $225 million Senior Credit Facility with ten lenders; paid $390 million to the Allowed CFSB Financing Claims; paid $15 million in letters of credit plus $35 million in terminated unfunded financing commitments on the Bank One DIP Financing Claims; established the D&O Trust; funded the Disputed Claims Reserve and made distributions from it; and completed distributions to holders of allowed claims under the Plan. In addition, the Reorganized Debtor issued its New Common Stock, which is registered on the NASDAQ Stock Market Exchange and is currently being publicly traded.[9] These transactions cannot possibly be reversed. *Continental*, 91 F.3d at 566-567 (equitable mootness doctrine applied where "numerous irrevocable transactions have been completed as a result of the consummation of the Plan"). *See also Zenith*, 250 B.R. at 214 (exchange of publicly traded bonds which were sold after consummation could not be easily "reversed;" dismissal granted on grounds of equitable mootness).

The second factor – whether a stay was obtained – also weighs in favor of NorthWestern, since both the Bankruptcy Court and the District Court refused to grant Magten's requests to stay the Confirmation Order in October 2004. In denying the stay, the District Court specifically found that the "risk here of harm to many, many stakeholders is very substantial, exceedingly so" if the confirmed Plan did not proceed to be implemented. (Exhibit G, Oct. 29, 2004 Transcript at p. 47.) As a result of the Courts' decision to refuse to stay the Confirmation Order pending Magten's Appeal, the Plan became effective on November 1, 2004, and has been substantially consummated. Magten's continued attempt at this point in time to undo what has already been done must be rejected on the basis of mootness.

---

[9] As of June 1, 2005, such New Common Stock is being publicly traded at approximately $28 per share, with 35 million outstanding shares and a total market value of approximately $1 billion.

2354514v8

The third factor, concerning the effect of the requested relief upon third parties, also clearly weighs in favor of dismissal. In this case, just as in the *Circle K* decision, the relief requested by Plaintiffs would cause significant harm to a vast number of third parties who have relied upon the Confirmation Order and the ensuing implementation of the Plan, which has already taken place. This includes not only lenders from whom the Debtor obtained exit financing and creditors who have already received distributions under the Plan, but also public investors -- who were never involved in the bankruptcy proceedings -- who have purchased and sold NorthWestern's publicly traded stock on the open market since the Plan became effective last year. The absurdity of "reversing" the already-consummated Plan in this case is particularly striking when considering the effect upon such public investors. Even if it could be done, the impact would be draconian and unjustified. *See Zenith*, 250 B.R. at 214 ("reversal" of already-completed exchanges in publicly traded bonds would "impact the rights of investors that were not involved in the bankruptcy proceedings."). Revoking the Confirmation Order at this time would cause incalculable harm to such innocent third parties without any justification, and dismissal on the basis of equitable mootness is clearly warranted under this factor.

The fourth factor -- the effect on the success of the plan -- also weighs in favor of dismissal. Revoking the Confirmation Order would likely land NorthWestern "back into bankruptcy," *Continental*, 91 F.3d at 561, by requiring it to "unscramble" the complex transactions that transpired on and after the Effective Date. *Zenith*, 258 F.3d at 185. Despite Plaintiffs' allegations that the Debtor may have underestimated the value of certain disputed claims, there is no allegation or evidence that the Plan has not been successful to date. Indeed, following the Effective Date the complex transactions contemplated by the Plan were all effectuated. The Disputed Claims Reserve, in actuality, is sufficiently funded; and no holders of

27

allowed claims have failed to receive distributions to which they are entitled under the Plan from the Disputed Claims Reserve.

Lastly, the fifth factor -- the public policy of finality in bankruptcy cases – also weighs in favor of rejecting Plaintiffs' belated attempt at revocation. This factor, "better described as the lens through which the other equitable mootness factors should be viewed," *Zenith*, 250 B.R. at 219, will only be served by denying the relief Plaintiffs have requested. Their attempt to unravel NorthWestern's Plan of Reorganization months after it was implemented and substantially consummated would wreak havoc upon the interests of innumerable third parties who have relied upon the Confirmation Order and would destroy NorthWestern's successful emergence from Chapter 11. Revocation is wholly unjustified and must not be permitted.[10]

Clearly, every equitable and prudential factor identified by the Third Circuit weighs in favor of applying the doctrine of equitable mootness in this case. *Continental*, 91 F.3d at 567. Accordingly, the Adversary Proceeding must be dismissed.

## III.

### THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM UNDER SECTION 1144 OF THE BANKRUPTCY CODE

In addition to the jurisdictional and prudential considerations which prohibit this action from going forward, the Complaint must be dismissed as a matter of law because Plaintiffs have failed to state a claim under Section 1144. The express provisions of Section 1144 authorize a court to take the extraordinary action of revoking an order confirming a Chapter

---

[10]  Plaintiffs' request that, as an "alternative" to revocation and discharge, this Court should require NorthWestern "to adequately fund the Disputed Claims Reserve" must also be rejected. *See Innovative Clinical*, 302 B.R. at 143 (declining to fashion alternative remedy other than revocation, which is the sole relief contemplated by Section 1144).

2354514v8

11 plan in only one specific and limited circumstance: that is, *"if and only if such order was procured by fraud."[11]* 11 U.S.C. § 1144 (emphasis added). This requires "actual" as opposed to constructive fraud; thus, the debtor must have committed *actual, intentional fraud upon the Bankruptcy Court* in procuring the Confirmation Order. *In re Longardner & Assocs., Inc.*, 855 F.2d 455, 461 (7th Cir. 1998). *See also 8 Collier on Bankruptcy*, ¶1144.05[3] at p. 1144-10.

Plaintiffs have not alleged and cannot allege facts which would sustain a claim under Section 1144. Northwestern did not defraud the Bankruptcy Court in procuring the Confirmation Order. This court is well aware of the history in these bankruptcy proceedings, in which the Plaintiffs have filed every imaginable objection, opposition and accusation against the Debtor. Frustrated once again, this time at the Court's March 2005 Order denying their 9019 Motion to "enforce" the Proposed Settlement negotiated with the Debtor, Plaintiffs have now brought this action to keep up the pressure on NorthWestern until they obtain a recovery on their disputed claim against the estate. The allegations are both baseless and insufficient to warrant revocation.

It is well settled that dismissal should be granted if the plaintiff's allegations, taken as true, along with any inferences that reasonably flow from them, are insufficient as a matter of law to establish grounds for relief. *Official Comm. of Unsecured Creditors v. Credit Swiss First Boston (In re Exide Technologies, Inc.)*, 299 B.R. 732, 739-40 (Bankr. D. Del. 2003). Although the allegations are to be taken as true, the Court "[n]eed not 'credit a complaint's "bald assertions" or "legal conclusions" when deciding a motion to dismiss." *Exide*, 299 B.R. at 740.

---

[11]    Even if actual fraud with intent is found to have occurred, the Court is <u>not mandated</u> to revoke the Confirmation Order. Section 1144 expressly provides that the court "may" revoke the order, which will depend upon the totality of circumstances, including the question of mootness after substantial consummation, as discussed in Point II, above. *Collier on Bankruptcy*, at ¶ 1144.03[4] at p. 1144-5.

2354514v8

In order to state a claim under Section 1144 for revocation of a Confirmation Order, the Plaintiffs must satisfy the following five-part test:

> 1. The debtor made a false representation that was material regarding its compliance with Section 1129 (which lists the elements that must be established to confirm a plan);
>
> 2. The debtor knew the representation was false, or lacked a belief in the truth of the statement, or made the statement with reckless disregard for its truth;
>
> 3. The false statement was made for the purpose of inducing the court to rely on it;
>
> 4. The court did in fact rely on it; and
>
> 5. The court confirmed the plan as a consequence of such reliance.

*Tenn-Fla Partners v. First Union Nat'l Bank of Florida (In re Tenn-Fla Partners)*, 226 F.3d 746, 750 (6th Cir. 2000) (intentional scheme to defraud the court found where the debtor concealed a higher bidder for its sole asset, instructed the bidder to postpone making its bid until after confirmation, and then sold the asset to the higher bidder). Although Section 1144 does not define "fraud," the courts require a showing of "actual fraudulent intent" on the part of the debtor in order to sustain a claim under this provision. *Longardner*, 855 F.2d at 461-62 (employing five part test for fraud in Section 1144 action, stating: "to support a complaint for revocation, the plaintiff must prove each of the elements of a traditional cause of action for deceit.").[12]

Merely showing inaccuracies or mistake on the part of the debtor is not sufficient to show "fraud" within the meaning of Section 1144. The point is well illustrated in *Longardner*, in which the court specifically declined to order revocation under Section 1144 where a creditor alleged that the debtor's "disclosure statements are grossly inaccurate and inconsistent and that

---

[12]    There is no reported decision by the Third Circuit which has considered the requirements of a claim under Section 1144 of the Bankruptcy Code. However, the lower courts in this circuit have followed the Seventh Circuit's decision in *Longardner*, including the requirement of actual fraud. *See Z.A.K. Constr. v. Port Liberte Partners (In re Port Liberte Partners)*, 1995 WL 11186 (D.N.J. 1995).

they require explanation" but did not offer any evidence of "the debtor's intent to defraud the

court." 855 F.2d at 462. The court described the creditor's allegations in that case as follows:

> The creditor states broadly that the debtor filed false or fraudulent
> financial statements and invites the bankruptcy court to examine its
> objections to the amended disclosure statement and its objections
> to the reorganization plan to determine for itself 'whether the
> debtor has engaged in fraud.'...In those objections, the creditor
> complains that the debtor incorrectly stated facts, and it seeks
> explanations for changes or inconsistencies in numbers. The
> creditor alleges that 'gross and serious inconsistencies' between
> the disclosure statement and the debtor's financial records raise
> 'insurmountable questions concerning the accuracy of the
> disclosure statements and the plans submitted to the court.'

*Longardner*, 855 F.2d at 462. On those facts, the Seventh Circuit held that Section 1144 was not

satisfied, and revocation was not justified, affirming the rulings of both the district court and the

bankruptcy court, since the creditor had failed "to show specific acts involving fraudulent intent"

on the part of the debtor. *Id. See also Chicago Truck Drivers v. Zolner (In re Zolner)*, 249 B.R.

287, 294 (N.D. Ill. 2000) (dismissing Section 1144 revocation action where creditor accused

debtor of fraudulently obtaining its consent to vote in favor of plan by making an assignment of

malpractice claim that was void under state law and was subsequently retracted, where the debtor

"had never given a definitive specific statement" that was false).

    The Complaint herein simply presents no circumstances reflecting intentional

fraud upon the Bankruptcy Court by NorthWestern in procuring the Confirmation Order. In

order to state a claim under Section 1144, Plaintiffs must show that NorthWestern: (1) made a

specific false representation to the Court that was material concerning its compliance with

Section 1129; (2) that NorthWestern knew such representation was false or lacked a belief in it

or made the statement with reckless disregard for the truth; (3) that the statement was made for

the purpose of inducing the Bankruptcy Court to rely on it; (4) that the Bankruptcy Court did in

31

fact rely upon such statement; and (5) that as a consequence of such reliance, the Bankruptcy Court confirmed the plan.

The crux of Plaintiffs' Complaint herein is that the Debtor did not adequately fund the Disputed Claims Reserve after Confirmation in an amount sufficient to cover a hypothetical recovery of 100% of the amount of all disputed claims which were being asserted against the estate, at the rate of recovery afforded to allowed Class 9 claims, after "promising" to the Bankruptcy Court that it would do so.[13] At best, this is an accusation that, *after confirmation,* the Debtor did not live up to its obligations under the Plan, or that the assumptions used by the Debtor in arriving at its calculations were incorrect. To conclude that the Debtor acted with actual intent to deceive the Bankruptcy Court at the outset, or pursued a fraudulent scheme throughout the course of the confirmation proceedings, requires an inference of malfeasance that is wholly unjustified.

By definition, in order to "procure" a Confirmation Order by fraud, the specific misrepresentation at issue must have been made **before** the Confirmation Order was obtained. Thus, only statements prior to the Confirmation Order, which was entered on October 19, 2004, could be relevant in determining whether the order was "procured" by fraud.

In fact, Plaintiffs do not identify a single misrepresentation made by the Debtor to the Bankruptcy Court; rather, Plaintiffs charge that at the time the Debtor proposed that 13.5% of its New Common Stock would be set aside for the Disputed Claims Reserve, its estimate of the amount which the estate could reasonably expect to distribute on the disputed claims was incorrect.

---

[13] Defendants dispute Plaintiffs' characterization of both the requirements regarding estimation of disputed claims under the Plan, as well as the purported representations made to the Bankruptcy Court.

32

It must be remembered that the total amount of the disputed claims had not been determined as of the date of the Confirmation Order. The Plan itself acknowledged that the amounts of the disputed claims were subject to being estimated and fixed, either by an Order of the Bankruptcy Court or by agreement of the parties. (Exhibit D at § 7.5.) Throughout the period before and after the Confirmation Order was entered, the Debtor was actively engaged in negotiations with the holders of disputed claims to fix such amounts, as well as in filing Motions with the Bankruptcy Court to obtain estimation orders fixing the amount of such claims.[14]  In fact, the Debtor filed two Motions for Estimation of the Plaintiff's claims against the estate in August and September 2004, which were not resolved until they entered into the Stipulation on October 29, 2004, just one day prior to the Effective Date of the Plan.

The Debtor's Notice of Establishment of Claim Reserve, which was filed on October 25, 2004, reflects that the estimation process was still ongoing, and specifically refers to negotiations concerning the estimation of Plaintiffs' claims, stating: "the Debtor and Law Debenture have conducted settlement discussions which have resulted in the circulation of a draft stipulation..." (Exhibit K.) The Notice of Reserve further stated that the Debtor had "included in the initial reserve of 13.5% of New Common Stock a claim of $25 million to address the claims of the QUIPS Litigation Claims holders." (Exhibit K, p. 2.) True to form, Magten filed an Objection to the Notice of Reserve; three days later, a Stipulation was executed between the Debtor and Law Debenture (on behalf of all QUIPs claims holders), which -- consistent with the Notice of Reserve – provided for a specific, segregated reserve of shares of New Common Stock sufficient to cover a Class 9 allowed claim of $25 million, which was specifically earmarked within the Disputed Claims Reserve for Plaintiffs' claims. (Exhibit M.)

---

[14]  The debtor recently reached a settlement in principle with PPL, which had asserted a $140 million disputed claim against the estate, whose claim will be entirely extinguished once the settlement is finalized and approved by the Bankruptcy Court. The PPL segregated reserve will be released into the balance of the general Disputed

Clearly, the entire period prior to and just after the Confirmation Order was marked by fast-paced, constantly-evolving circumstances – not the least of which included Plaintiffs' constant stream of objections, motions and threats to obstruct confirmation of the Debtor's plan. In calculating the value of disputed claims, and the corresponding amount to be placed in the Disputed Claims Reserve, the Debtor was dealing with a situation in flux, with ongoing negotiations to estimate and fix the amount of the claims by stipulation or court order. In that context, the Debtor made its best efforts to arrive at a reasonable and accurate calculation of the likely amount of the disputed claims on which the estate would be required to make distributions out of the Disputed Claims Reserve.

Thus, even if the allegations of the Complaint were true – i.e., that the Debtor incorrectly estimated the amount of the disputed claims when it calculated the amount of New Common Stock that should be placed into the Disputed Claims Reserve – that would not rise to the level of intentional fraud on the Bankruptcy Court, and would not warrant revocation of the Confirmation Order. Plaintiffs' allegations of "fraud" are mere second-guessing of the Debtor's best estimates of disputed claims at a certain point in time. In reality, the appropriateness of the estimates underlying the initial funding of the Disputed Claims Reserve have been borne out by subsequent events, as shown by the continued resolution of disputed claims since confirmation, and have not negatively impacted or caused harm to any parties. No claims holder has been denied a distribution to which it is entitled; the continued settlement and resolution of disputed claims has resulted in a decrease in the total amount asserted against the estate (as the Debtor expected); and the total amount in the Disputed Claims Reserve is sufficient to cover all disputed claims which are currently pending against the estate.

---

Claims Reserve for the benefit of other claims holders, and PPL will be <u>paying</u> approximately $9 million to NorthWestern.

2354514v8

Accordingly, Plaintiffs have failed to allege facts sufficient to sustain a claim for revocation under Section 1144. The Complaint must be dismissed.

### IV.

### PLAINTIFFS HAVE WAIVED ANY CLAIMS REGARDING THE FUNDING OF THE DISPUTED CLAIMS RESERVE AND ARE ESTOPPED FROM ALLEGING "FRAUD" IN THIS ACTION

As noted above, in order to facilitate the process of establishing the Disputed Claims Reserve, the Debtor filed several Estimation Motions seeking orders of the Bankruptcy Court to fix the amount of the disputed claims. At the same time, the Debtor engaged in negotiations to resolve the estimation motions by agreement. The Debtor filed an Estimation Motion with respect to Magten and one with respect to Law Debenture, seeking a determination by the Bankruptcy Court as to the amount of the QUIPs claims which should be included in the Disputed Claims Reserve. (Exhibits I, J.) On October 29, 2004, Law Debenture entered into a Stipulation with the Debtor, in which Law Debenture agreed that the Debtor would "set aside a portion of its initial reserve of 13.5% of New Common Stock solely to satisfy in full a $25 million Class 9 claim of the QUIPS Litigation Claims holders (the "QUIPS Litigation Claims Reserve")." (Exhibit M, Stipulation at ¶ 1.) Magten did not object to the Stipulation, and it was "So-Ordered" by the Bankruptcy Court on November 3, 2004.

While the Stipulation did not preclude the QUIPs claims holders from obtaining a recovery in excess of the $25 million segregated reserve in the event they obtained judgment in their favor in a higher amount, the Stipulation did not guarantee that the Disputed Claims Reserve would be funded with any additional amount to ensure recovery on such larger judgment. To the contrary, the Stipulation expressly states that the QUIPS holders would "be

entitled to draw on any assets remaining in the Disputed Claim Reserve," but "[t]he Debtor has no obligation to replenish the Disputed Claim Reserve." (Exhibit M, Stipulation at ¶ 3.)

In accordance with the Stipulation, it is undisputed that the Debtor did in fact set aside in the Disputed Claims Reserve a segregated reserve of shares of New Common Stock sufficient to cover a Class 9 allowed claim of $25 million, which was specifically earmarked for distribution to the QUIPs claims holders in the event they obtained judgment in their favor. Neither Law Debenture, which executed the Stipulation, nor Magten, which did not object to it, can complain now of any fraud on the part of the Debtor in funding the Disputed Claims Reserve, since the Debtor fully complied with the terms of this Stipulation.

The intent and purpose of the Stipulation was to fix the amount of the QUIPs claim for purposes of establishing the Disputed Claims Reserve. Plaintiffs fully understood the purpose of the Stipulation, having been active participants throughout the confirmation proceedings. The Stipulation fixed the amount of the QUIPs claim at $25 million, and required the Debtor to set aside a reserve to cover an allowed Class 9 claim in this amount. The Debtor complied with its obligations pursuant to the terms of the Stipulation. There was no fraud, no mistake, and no malfeasance on the part of the Debtor in this regard. Having agreed to the terms of Stipulation, and the establishment of a $25 million reserve for the QUIPs holders, Law Debenture is estopped from asserting that the Debtor should have reserved more to cover the QUIPS claims in the Disputed Claims Reserve. Having failed to object to the Stipulation, which controlled the treatment of its claims against the estate, Magten is also bound by its terms.

Accordingly, Plaintiffs' claims against the Defendants should be dismissed in their entirety on the grounds of waiver and estoppel.

2354514v8

### V.

### ALL CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS
### NAMED IN THIS PROCEEDING MUST BE DISMISSED

The Complaint names five individual defendants in this Adversary Proceeding,

Gary G. Drook, Michael J. Hanson, Brian B. Bird, Thomas J. Knapp, and Roger P. Schrum, who

have served as officers or in other management positions at NorthWestern at some time in the

last two years. It is clear that these individuals are named for sheer *in terrorem* effect, because

the Complaint fails to allege a single fact concerning the specific role, actions, or inaction taken

by any of these individuals.

First, it should be noted that Plaintiffs do not seek relief against the Individual

Defendants with respect to the "First Cause of Action," for revocation under Section 1144.

(Exhibit A, Complaint at ¶¶ 51-60.) Nor could they, since the sole relief provided under Section

1144 is limited to revocation of a Confirmation Order, and this provision does not provide

grounds for any claim or relief against the Individual Defendants. *See e.g., Circle K*, 242 F.3d

380 (affirming dismissal of action to revoke confirmation order under Section 1144 on the

grounds of equitable mootness, and rejecting alternative request for damages under Section 105

of the Bankruptcy Code, which pertains to the Bankruptcy Court's general power to issue orders

to carry out purposes of the Bankruptcy Code, as that section "does not create a private remedy

for damages arising out of fraud alleged in connection with the confirmation of a reorganization

plan.").

Plaintiffs do assert claims against the Individual Defendants in the Complaint's

"Second Cause of Action," which alleges breach of fiduciary duty. (Exhibit A, Complaint at ¶¶

61-65.) Yet here again, the Complaint does nothing more than make the barest, passing

reference to the Individual Defendants. There are absolutely no factual allegations concerning

any specific conduct or actions on the part of the Individual Defendants, much less a showing of

37

how they possibly breached a "fiduciary duty" to Plaintiffs. There is no allegation of how

Plaintiffs were damaged. Under even the most liberal pleading standards, the Complaint simply

fails to state a claim for relief against the Individual Defendants. *See Yonkers Contracting Co. v.*

*General Star Nat. Ins.,* 14 F. Supp.2d 365 (S.D.N.Y. 1998) (complaint which consists of

conclusory allegations unsupported by factual assertions fails even the liberal standard of the rule

governing motions to dismiss for failure to state a claim).

      Reading the general allegations in the Complaint concerning the funding of the

Disputed Claims Reserve, it is hard to fathom how the Individual Defendants breached any

fiduciary duty to the Plaintiffs. Under Delaware law, the fiduciary duty of a corporation's

officers and directors "runs not directly to the creditors but to the 'community of interest,' which

"requires the board to maximize the corporation's long-term wealth creating capacity." *Official*

*Comm. of Hechinger Inv. Co. of Del. v. Fleet Retail Finance Group (In re Hechinger Inv. Co. of*

*Del.),* 274 B.R. 71, 89-90 (Bankr.D.Del. 2002). This will require the officers and directors to

chose among competing interests, including those of shareholders and creditors, and "choose a

course of action that best serves the entire corporate enterprise rather than any single group..."

*Geyer v. Ingersoll Publ. Co.,* 621 A.2d 784, 789 (Del. Ch. 1992). *See also Prod. Res. Group,*

*L.L.C. v NCT Group, Inc.,* 863 A.2d 772, 791-92 (Del. Ch. 2004) ("the mere fact that directors of

an insolvent firm favor certain creditors over others of similar priority does not constitute a

breach of fiduciary duty, absent self-dealing). Cases involving breach of fiduciary duty to

creditors generally involve situations of self-dealing, conflict of interest, or unjust enrichment on

the part of the officer or director to the detriment of the creditor. *See Official Comm. Of*

*Unsecured Creditors v. Forman (In re Forman Enters.),* 273 B.R. 408, 413-14 (Bankr. D. Pa.

2002) ("[Directors] may not exercise their powers for their own benefit and to the detriment of

the corporation's creditors…The test of liability for breach of fiduciary duty is whether a director was unjustly enriched by his or [her] actions").  No such circumstances exist in this case.

In the absence of any factual allegations pertaining to the Individual Defendants and no showing of circumstances that would support a claim for breach of fiduciary duty, Plaintiffs have failed to state a claim as to these five individuals, and the Complaint must be dismissed against them in its entirety.

2354514v8

## CONCLUSION

For the reasons set forth above, this Adversary Proceeding must be stayed

pending the District Court's decision on Magten's Appeal of the Confirmation Order, or, in the

alternative, the Complaint must be dismissed in its entirety, with prejudice.

Dated:  Wilmington, Delaware
        June 13, 2005

                                      Respectfully submitted,
CURTIS, MALLET-PREVOST,
  COLT & MOSLE LLP
Joseph D. Pizzurro
Steven J. Reisman
Nancy E. Delaney
Miriam K. Harwood
101 Park Avenue
New York, New York  10178
Telephone:  (212) 696-6000
Facsimile:  (212) 697-1559

- and -

GREENBERG TRAURIG, LLP

By: _____
Scott D. Cousins (No. 3079)
William E. Chipman, Jr. (No. 3818)
Dennis A. Meloro (No. 4435)
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, Delaware  19801
Telephone:  (302) 661-7000
Facsimile:  (302) 661-7360

*Co-Counsel for Defendants*

2354514v8

**EXHIBIT A**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re:<br><br>NORTHWESTERN CORPORATION,<br><br>Debtor. | )<br>)<br>)<br>)<br>)<br>)<br>) | Chapter 11<br><br>Case No. 03-12872 (JLP) |
| MAGTEN ASSET MANAGEMENT CORPORATION<br>AND LAW DEBENTURE TRUST COMPANY<br>OF NEW YORK,<br><br>Plaintiff,<br>v.<br><br>NORTHWESTERN CORPORATION, GARY G.<br>DROOK, MICHAEL J. HANSON, BRIAN B. BIRD,<br>THOMAS J. KNAPP and ROGER P. SCHRUM.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Adv. No. 05-_____ |

## COMPLAINT TO REVOKE ORDER OF CONFIRMATION PURSUANT TO SECTION 1144 OF THE BANKRUPTCY CODE AND RULE 7001(5) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND FOR BREACH OF FIDUCIARY DUTY

Magten Asset Management Corporation ("Magten"), together with Law Debenture Trust Company of New York ("Law Debenture" and collectively with Magten the "Plaintiffs"), in its capacity as Trustee under the Indenture for the Unsecured Subordinated Debt Securities Relating to Trust Securities dated November 1, 1996, for this complaint (the "Complaint") alleges as follows:

- 1 -

## **INTRODUCTION**

1.      This adversary proceeding has been commenced because the order confirming NorthWestern Corporation's Second Amended and Restated Plan of Reorganization, entered by this Court on October 19, 2004, was procured by fraud, with the aid and complicity of certain of the senior management of NorthWestern Corporation ("NorthWestern") (collectively, the "Defendants").

2.      In the haste to usher NorthWestern out of chapter 11 in the shortest possible time, many Claims[1] were left unresolved on the Effective Date.  However, in order to provide a mechanism to protect the holders of Disputed Claims, and to ensure that such holders were not prejudiced by NorthWestern's Second Amended and Restated Plan of Reorganization (the "Plan"), NorthWestern was required to assume, unless otherwise agreed or estimated by this Court, that the full amount of a Disputed Claim would become an Allowed Claim.  Specifically, to ensure the protection of holders of Disputed Claims, the Plan required that NorthWestern set aside sufficient New Common Stock to ensure that once Disputed Claims are Allowed, they would receive same distribution as claims that were allowed at the time of confirmation.  In other words, in order to proceed with the confirmation of the Plan before all of the Claims against NorthWestern had been Allowed, NorthWestern promised to place a sufficient amount of New Common Stock in the Disputed Claims Reserve to provide the holders of Disputed Claims with the full recovery to which they were entitled once such Disputed claims became Allowed.

3.      If NorthWestern had not agreed to set aside an adequate reserve of New Common Stock, NorthWestern would not have been able to obtain confirmation of its Plan.

---

[1]      All capitalized terms not expressly defined herein shall have the meaning ascribed to them in the Plan.

4.  Upon confirmation of the Plan, NorthWestern determined to set aside 13.5% of New Common Stock in the Disputed Claims Reserve to satisfy the requirements of the Plan, which amount is now known to be insufficient to satisfy all Disputed claims as Allowed Claims.

5.  On March 2, 2005, only four months after the Plan became effective and only two months after filing notice of substantial confirmation of the Plan, NorthWestern advised this Court that contrary to its obligation under the Plan and this Court's direction in the order confirming the Plan (the "Confirmation Order"), it placed insufficient stock in the Disputed Claims Reserve.  In addition, this Court found that although NorthWestern had estimated Disputed Claims to total $140 million, this amount was insufficient to satisfy even NorthWestern's largest Disputed Claims, no less the approximately 190 other Disputed Claims still unresolved.

6.  In acknowledgement of this fraudulent conduct, this Court, counsel for the Creditors' Committee, counsel for the ad hoc committee of Class 7 claimants and NorthWestern have recognized that although only 2 of the approximately 200 Disputed Claims have been settled, there is insufficient New Common Stock in the Disputed Claims Reserve to satisfy the Disputed Claims in full, as required by the Plan.

7.  NorthWestern obtained the Confirmation Order on the basis that it was reserving sufficient stock to satisfy all Disputed Claims in full.  Instead, NorthWestern has knowingly and willfully underfunded the Disputed Claims Reserve and, in doing so, committed a fraud upon this Court in the procurement of that Order.  Therefore, Plaintiffs seek the entry of an order (i) revoking the Confirmation Order and NorthWestern's discharge or, in the alternative, requiring NorthWestern to adequately fund the Disputed Claims Reserve in accordance with the

- 3 -

terms of the Plan and declaring that because of the gross negligence or willful misconduct in underfunding the Disputed Claims Reserve, no party or entity is entitled to exoneration or exculpation pursuant to Section 10.1 of the Plan; (ii) finding that the Defendants breached their fiduciary and other duties to Plaintiffs; (iii) awarding Plaintiffs damages, costs and reasonable attorney's fees; and (iv) granting such other relief as this Court deems just and proper.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334.

9.     This proceeding constitutes a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (J), and (L).

10.    Venue properly lies in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

11.    Magten is a corporation validly organized and doing business under the laws of the State of Delaware.

12.    Magten holds in excess of 33% of the Series A 8.45% Quarterly Income Preferred Securities (the "QUIPS").

13.    Law Debenture is a limited purpose trust company duly organized under the laws of the State of New York.

14.    On September 14, 2003, NorthWestern filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

15.    NorthWestern is a corporation validly organized under the laws of the State of Delaware, with its headquarters and principal place of business in South Dakota.

- 4 -

16.    NorthWestern owns and operates utility companies in the United States. The Debtor and its direct and indirect nondebtor energy subsidiaries comprise one of the largest providers of electricity and natural gas in the upper Midwest and Northwest regions of the United States, serving approximately 600,000 customers throughout Montana, South Dakota and Nebraska.

17.    Gary G. Drook ("Drook") was Chief Executive Officer of NorthWestern from January 2003 until March 2005. Drook was also the President of NorthWestern from August 2003 until March 2005.

18.    Michael J. Hanson ("Hanson") was the Chief Operating Officer of NorthWestern from August 2003 until March 2004. Beginning in March 2004, Hanson became President of NorthWestern.

19.    Brian B. Bird ("Bird") has been the Chief Financial Officer of NorthWestern since December 2003.

20.    Thomas J. Knapp ("Knapp") has been General Counsel of NorthWestern since November 2004.

21.    Roger P. Schrum ("Schrum") has been NorthWestern's Vice-President of Human Resources and Communications since December 2003.

## BACKGROUND

### The Fraudulent Conveyance Proceeding

22.    In January 2004, Plaintiffs each timely filed proofs of claim asserting, among other things, claims against NorthWestern for damages resulting from the fraudulent transfer of certain Montana utility assets to NorthWestern.

23.    On April 16, 2004, after this Court granted Plaintiffs relief from the automatic stay, they filed a complaint against NorthWestern in the Bankruptcy Court on behalf

- 5 -

of the holders of the QUIPS seeking to set aside the fraudulent conveyance of the Montana utility assets to NorthWestern (the "Fraudulent Conveyance Proceeding").

24.     On May 14, 2004, NorthWestern filed a motion to dismiss the Fraudulent Conveyance Proceeding.  Following completion of briefing, on August 20, 2004, the Court, denied NorthWestern's motion to dismiss.  At the time the Plan was filed (and later confirmed), the Fraudulent Conveyance Proceeding had not been resolved and, as a result, the QUIPS Litigation Claim was treated as a Disputed Claim.

**The Establishment of the Disputed Claims Reserve**

25.     On August 31, 2004, NorthWestern filed the Plan and disclosure statement in support of the Plan (the "Disclosure Statement").  In the Plan, NorthWestern required that the holders of the QUIPS choose between (i) a 14.3% recovery and forfeit their right to pursue the Fraudulent Conveyance Proceeding or (ii) pursuing the Fraudulent Conveyance Proceeding, which, if successful, would result in those holders receiving an Allowed Class 9 Claim to be satisfied from the Disputed Claims Reserve. Plan at p. 37, § 4.8(b)(ii).

26.     Section 7.5 of the Plan, entitled "Establishment and Maintenance of Reserve for Disputed Claims" required NorthWestern to "maintain the Disputed Claims Reserve equal to the aggregate of any distributable amount of Cash and New Common Stock equal to the relevant percentage of Distributions to which holders of Disputed Claims would be entitled under this Plan if such Disputed Claims were Allowed Claims in the amount of such Disputed Claim or such lesser amount as required by Final Order."  The Plan further provided that the only method by which an amount less than the full amount of a Disputed Claim could be reserved by NorthWestern was if either the Bankruptcy Court estimated the amount of such Disputed Claim or NorthWestern and the holder of a Disputed Claim agreed in writing. Plan at p. 59, § 7.5.

- 6 -

27.    In papers filed with this Court, NorthWestern specifically represented that the Plan met the requirements of the Bankruptcy Code and did not unfairly discriminate against those holders of the QUIPS that chose to pursue the Fraudulent Conveyance Proceeding.  See Memorandum of Law in Further Support of Confirmation of Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code and in Response to Supplemental Objections to Confirmation, at p. 13.  For a plan of reorganization not to discriminate against a dissenting class, the members of the dissenting class must be provided with the value provided to all other similarly situated classes.  Thus, the holders of the QUIPS that chose to pursue the Fraudulent Conveyance Proceeding hold a Disputed Class 9 Claim such that, if successful in the Fraudulent Conveyance Proceeding, the holders of the QUIPS Litigation Claims must be provided with the same value as the other holders of Allowed Class 9 Claims.

28.    During the confirmation hearing on October 6, 2004, counsel for NorthWestern represented to this Court that consistent with its obligation under the Plan, it would "put into the Class 9 reserve an amount for the claim that would hold back a certain level of the stock for the eventuality that the litigation may well result in a favorable judgment for those QUIP holders that are pursuing the litigation."  Transcript of October 6, 2004 Hearing at pp. 233-234.

29.    In its oral ruling confirming the Plan held on October 8, 2004 (the "Oral Ruling"), this Court found that the QUIPS Litigation Claim was an disputed unsecured claim that was entitled to a reserve consistent with Section 7.5 of the Plan, such that if the Fraudulent Conveyance Proceeding is successful, holders of the QUIPS Litigation Claim will receive the distribution provided to holders Allowed Class 9 Claims.  See Transcript of Hearing Held on October 8, 2004 at pp. 30, 39.

- 7 -

30.    On October 13, 2004, counsel for NorthWestern submitted a certification of counsel and draft confirmation order to this court (the "Draft Confirmation Order"). This Draft Confirmation Order, required NorthWestern to "establish an initial reserve of 13.5% of New Common Stock allocated to Class 7 and Class 9 for the Disputed Claims Reserve. . .pursuant to Section 7.5 of the Plan." Draft Confirmation Order at ¶ 27. At all times during the confirmation hearing and the confirmation process, the information regarding the methodology for establishing the reserve and the sufficiency of the reserve was solely in NorthWestern's possession and control.

31.    The 13.5% reserve proposed by NorthWestern in the Draft Confirmation Order was predicated on representation that 13.5% of the stock was an amount equal to the relevant percentage of Distributions to which the holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in the amount of such Disputed Claim or such lesser amount as required by Final Order, as required by Section 7.5 of the Plan.

32.    On October 19, 2004, this Court entered the Confirmation Order, which like the Draft Confirmation Order suggested by NorthWestern, required NorthWestern to "establish an initial reserve of 13.5% of New Common Stock allocated to Class 7 and Class 9 for the Disputed Claims Reserve. . .pursuant to Section 7.5 of the Plan." Confirmation Order at ¶ 27.

33.    Only four months after confirmation, counsel for NorthWestern disclosed that the 13.5% reserve did not represent an amount sufficient to comply with Section 7.5 of the Plan.   Despite NorthWestern's promise in the plain language of Section 7.5 of the Plan and despite its repeated representations to this Court, NorthWestern did not set the Disputed Claims Reserve at 100%.   Instead, the Disputed Claims Reserve was set based on NorthWestern's

- 8 -

general estimation of "all contingent, unliquidated claims at 50% of the face amount of the stated claim" and the placing of New Common Stock sufficient to satisfy an Allowed Claim in that amount in the Disputed Claims Reserve. 9019 Objection at ¶ 66 (as defined in ¶ 46, below).

34.    Upon entry of the Confirmation Order, Magten sought a stay pending appeal to prevent the Plan from becoming effective. In denying Magten's motion for a stay pending appeal, this Court again found that "just like any other Creditor of claimant of an unsecured nature in class 9, that [the QUIPS Litigation Claims holders] would be entitled to have a disputed claim reserve amount determined, either by stipulation or by the Court in accordance with Section 7.5 of the Plan." Transcript of Hearing Held on October 25, 2004, at p. 28.

35.    This Court also went on to find that because the holders of the QUIPS Litigation Claims were being protected by being included in the Disputed Claims, Reserve, Magten and the other holders of the QUIPS were being treated fairly and "for that reason there is – there has been an inadequate showing of irreparable harm..." Transcript of Hearing Held on October 25, 2004, at p. 29. Thus, this Court expressly relied on NorthWestern's assertions that a 13.5% reserve was sufficient to fully fund the Disputed Claims reserve in accordance with the Plan not only when it entered the Confirmation Order, but also when it denied Magten's motion for a stay pending appeal.

36.    On October 25, 2004, NorthWestern filed its Notice of Establishment of Claim Reserve Pursuant to Section 7.5 of Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code and Paragraph 27 of the Confirmation Order (the "Notice of Claim Reserve"). In the Notice of Claim Reserve, NorthWestern acknowledged that pursuant to Section 7.5 of the Plan and Paragraph 27 of the Confirmation Order, NorthWestern was required to "maintain a Disputed Claim Reserve equal to the aggregate

- 9 -

of any distributable amounts of New Common Stock equal to the relevant percentage of the Distributions to which holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in the amount of such Disputed Claim or such lesser amount as required by Final Order." Notice of Claim Reserve at p. 1.

37.     On October 29, 2004, in connection with Magten's further pursuit of a stay pending appeal, counsel for NorthWestern represented to the United States District Court for the District of Delaware that "there is more than enough reserve being set aside in the Class 9 reserve pool for Class 9 unsecured claims." See Transcript of District Court Hearing Held on October 29, 2004 at p. 35.

38.     Also, on October 29, 2004, NorthWestern and Law Debenture entered into the Stipulation, whereby NorthWestern agreed to set aside a portion of the Disputed Claims Reserve "solely to satisfy in full a $25 million Class 9 claim of the QUIPS Litigation Claims holders (the "QUIPS Claims Reserve")" and set forth the rights of the QUIPS Litigation Claims holders to recover on account of an Allowed Claim in excess of that amount. Stipulation at p. 2 ¶ 1. By its express terms, the Stipulation did not cap the recovery on account of the QUIPS Litigation Claim at $25 million claim. The Stipulation provided that an Allowed Claim in excess of $25 million would be satisfied from the Disputed Claims Reserve.

39.     Law Debenture entered into the Stipulation in reliance on NorthWestern's assertions that the Disputed Claims Reserve was sufficiently funded to comply with the terms of the Plan and the Confirmation Order and provide the holders of the QUIPS Litigation Claims with the same recovery accorded to holders of Allowed Class 9 Claims.

40.     The Plan became effective on November 1, 2004.

- 10 -

**The Disclosure of the Fraud**

41.    On December 29, 2004, NorthWestern filed a <u>Notice of Substantial</u> <u>Consummation of the Debtor's Second Amended and Restated Plan of Reorganization Under</u> <u>Chapter 11 of the Bankruptcy Code</u> (the "Substantial Consummation Notice"). In Section 4(b) of the Substantial Consummation Notice, NorthWestern claims to have reserved 4,409,100 shares of New Common Stock in accordance with Section 7.5 of the Plan.

42.    On January 27, 2005, Magten, Law Debenture as Indenture Trustee for the QUIPS and NorthWestern executed a settlement agreement whereby the Fraudulent Conveyance Proceeding and all other litigation between the parties would come to an end (the "Settlement Agreement"). Pursuant to the terms of the Settlement Agreement, the holders of the QUIPS were to receive (i) 382,732 shares of common stock at the reorganization plan value of $20.00 per share ("Plan Value") and the 710,449 warrants and (ii) the shares segregated as the QUIPS Claims Reserve plus an additional $300,000 of common stock of reorganized NorthWestern at Plan Value. The Settlement Agreement provided the holders of the QUIPS with a less than they would be entitled to recover if the Fraudulent Conveyance Proceeding is successful.

43.    Based on the terms of the Settlement Agreement, if approved, the holders of the QUIPS Litigation Claims would have received a total of 1,252,732 shares of New Common Stock (excluding warrants), with a Plan Value of $25,054,640. This amount represents a 50.1% recovery on account of the QUIPS Litigation Claim, significantly below the 63% recovery that the holders of such claims would recover if their Disputed Claims were Allowed in full.[2] The Settlement Agreement not only provided the holders with the QUIPS with a recovery significantly less than the full $50 million Allowed Claim to which they would have been

---

[2]    Although the Disclosure Statement in support of the Plan (the "Disclosure Statement") estimated that holders of Allowed Claims would likely receive a 68% recovery on account of those claims, ultimately, holders of Allowed Claims actually received an approximately 63% recovery on account of those claims.