entitled if the Fraudulent Conveyance Proceeding was successful, but also settled nine other outstanding litigations between NorthWestern, Plaintiffs, and related parties.

44.    After NorthWestern disavowed the Settlement Agreement, Plaintiffs filed a joint motion seeking this Court's approval of the Settlement Agreement pursuant to Bankruptcy Rule 9019 (the "9019 Motion"), in order to enforce the terms of the Settlement Agreement.

45.    On March 8, 2005, this Court held a hearing on the 9019 Motion (the "9019 Hearing") wherein the Debtor acknowledged that it has approximately 200 claims that are seeking recovery from the Disputed Claims Reserve such that the 382,732 shares of common stock that were the primary subject of NorthWestern's 9019 Objection could not be allocated to the holders of the QUIPS from the Disputed Claims Reserve. Transcript of 9019 Hearing at p. 44.

46.    Based upon NorthWestern's objection to the 9019 Motion (the "9019 Objection") and the arguments presented at the hearing, it became apparent that in establishing and funding the Disputed Claims Reserve, NorthWestern failed to reserve the maximum claim amount asserted by holders of Disputed Claims, as required by the Plan. Specifically, NorthWestern acknowledged at the hearing that there were over 200 Disputed Claims awaiting resolution. As of the Confirmation Date, 2 holders of Claims had agreed to estimate their Claims at approximately 50% for the purposes of setting up the reserve, resulting in segregated disputed claims reserves within the total $140 million Disputed Claims Reserve of $25 million and $70 million, respectively. Other significant Claims against NorthWestern included Mr. Hylland's $30 million Claim and rejected pension plans Claims of approximately $15 million. Thus, for

- 12 -

those 4 claims alone, the disputed claims Reserve should have held $140 million. That does not account for the 196 or so remaining Disputed claims.[3]

47.    Thus, without accounting for the more than 190 other Disputed Claims, on the Effective Date, the Disputed Claims Reserve should have contained sufficient New Common Stock to satisfy $295 million of Disputed Claims. Instead, upon information and belief, the Disputed Claims Reserve contained only enough New Common Stock to satisfy $140 million of Disputed Claims. Thus, it appears that in blatant violation of the Plan, NorthWestern fraudulently "estimated all contingent, unliquidated claims. . . at 50% of the face amount of the stated claim" and only placed enough New Common Stock sufficient to satisfy half of the Allowed Claims in the Disputed Claims Reserve, not the 100% promised by the Plan and in open Court. 9019 Objection at ¶ 66.

48.    The inadequacy of the Disputed Claims Reserve led to counsel for the ad hoc committee of Class 7 Claimants to state that it was apparent that "there just isn't enough stock in Class 9." Transcript of 9019 Hearing at p. 74.

49.    On March 10, 2004 this Court denied the 9019 Motion, in part, because the Disputed Claims Reserve, as established by NorthWestern, did not contain enough stock to distribute any stock in excess of a $25 million claim to the holders of the QUIPS, despite the clear language of the Plan and the Confirmation Order, resulting in a "financial dilemma" that led to the failure of the Settlement Agreement. 9019 Opinion at p. 6.

---

3    In addition, on the Effective Date of the Plan, Cornerstone Propane, L.P. ("Cornerstone") held a Disputed Claim in the amount of $130 million. Although NorthWestern had filed a motion to approve a settlement between NorthWestern and Cornerstone whereby Cornerstone would receive an Allowed Claim of $19.5 million, this settlement was not approved until after the Effective Date. As a result, because Section 7.5 of the Plan permits NorthWestern to reserve an amount less than the full amount of a Disputed Claim only by Order of this Court or by written agreement of the parties, on the Effective Date, the Disputed Claims Reserve should have contained sufficient New Common Stock to satisfy Cornerstone's asserted Claim of $130 million.

- 13 -

50.    Specifically, this Court found that the Stipulation recognized the $50 million QUIPS Litigation Claim and reserved 50% of that claim, or a $25 million claim of Class 9 reserved shares.  This Court further found that pursuant to the Stipulation, "to the extent that the [QUIPS] litigation claim exceeded $25 million, 'the holders of such claims shall have any deficiency satisfied out of the general Disputed Claims Reserve' described in the Plan." 9019 Opinion at p. 4-5 (citing the Stipulation).

### FIRST CAUSE OF ACTION

**(NorthWestern Procured the Confirmation Order by Fraud by Knowingly and Wilfully Failing to Properly Fund the Disputed Claims Reserve in Accordance with the Provisions of the Plan and the Confirmation Order)**

51.    Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 50 as if fully set forth here.

52.    Section 1144 of the Bankruptcy Code provides as follows:

On request of a party in interest at any time before 180 days after the date of the entry of the order of confirmation and after notice and a hearing, the court may revoke such order if and only if such order was procured by fraud.  An order under this section revoking an order of confirmation shall –

(1) contain such provisions as are necessary to protect an entity acquiring such rights in good faith and on reliance on the order of confirmation ; and

(2) revoke the discharge of the debtor.

11 U.S.C. § 1334.

53.    Plaintiffs, parties in interest to NorthWestern's chapter 11 case, have filed this complaint within 180 days of the entry of the Confirmation Order.

54.    In order to procure this Court's approval of the Plan, NorthWestern represented to this Court that it would establish a Disputed Claims Reserve with a sufficient amount of New Common Stock to satisfy all Disputed Claims as if those claims were allowed.

- 14 -

55.    In establishing the Disputed Claims Reserve, NorthWestern asserted that by setting aside 13.5% of New Common Stock, the Disputed Claims Reserve would contain sufficient New Common Stock to ensure that the holders of Disputed Claims would receive a 63% recovery once such claim became an Allowed Claim, as required by the Plan.

56.    On March 2, 2005, in its 9019 Objection, NorthWestern admitted that, contrary to the requirements of the Plan and the Confirmation Order, the Disputed Claims Reserve may not contain enough New Common Stock to satisfy the relevant percentage of recovery to which the holder of a QUIPS Litigation Claim would be entitled if such claim were found to be an Allowed Claim.

57.    On March 8, 2005, at the 9019 Hearing, NorthWestern and other parties in interest made known that contrary to the requirements of the Plan and the Confirmation Order, the Disputed Claims Reserve does not contain enough New Common Stock to satisfy the relevant percentage of recovery to which the holder of a QUIPS Litigation Claim would be entitled if such claim were found to be an Allowed Claim.

58.    On March 10, 2005, this Court acknowledged that NorthWestern faced a "financial dilemma" because the Disputed Claims Reserve may not contain enough New Common Stock to satisfy the relevant percentage of recovery to which the holder of a QUIPS Litigation Claim would be entitled if such claim were found to be an Allowed Claim.

59.    NorthWestern made fraudulent misrepresentations in the Plan and in the Confirmation Order submitted by it and entered by this Court, that the Disputed Claims Reserve was funded in accordance with the requirements of Section 7.5 of the Plan.    These misrepresentations were made with the intent that this Court (and NorthWestern's creditors) rely

on them to the Court's and the creditors' detriment. The approval of the Plan and the entering of the Confirmation Order were based on intentionally false and misleading information.

60.    The Court and NorthWestern's creditors, including Plaintiffs, relied upon NorthWestern's representations and were damaged as a result.

## SECOND CAUSE OF ACTION

### (Breach of Fiduciary Duty)

61.    Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 60 as if fully set forth here.

62.    NorthWestern owed fiduciary duties of loyalty, good faith and candor this Court and to NorthWestern's creditor constituency.

63.    Drook, Hanson, Bird, Knapp and Schrum owed fiduciary duties of loyalty, good faith and candor to NorthWestern's creditor constituency.

64.    The Defendants breached their duties when they grossly underfunded the Disputed Claims Reserve, thereby violating the terms of the Plan.

65.    NorthWestern's creditor constituency, including Plaintiffs, were damaged as a result of Defendants' failure to fully fund the Disputed Claims Reserve with sufficient stock to satisfy the QUIPS Litigation Claim as an Allowed Claim.

## THIRD CAUSE OF ACTION

### (For Declaratory Judgment)

66.    Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 65 as if fully set forth here.

67.    Pursuant to Section 10.1 of the Plan "none of the [Exculpated Parties] shall have to incur any liability to any holder of the Claim or Equity Interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Case, the preparation or

- 16 -

formulation of the Plan, the pursuit of confirmation of this Plan, the consummation of this Plan or the administration of this Plan or the property to be distributed under this Plan, <u>except for willful misconduct or gross negligence</u>…" (emphasis added).

68.    The actions and omissions detailed above could only have occurred because willful misconduct or gross negligence in either failing to adequately fund the Disputed Claims or failing to adequately supervise the establishment of the Disputed Claims Reserve.

69.    Upon information and belief, the Exculpated Persons do not and will not concede that their actions and omissions were the product of willful misconduct or gross negligence.  Accordingly, a controversy exists between the parties as to whether such parties are entitled to exculpation.

70.    Plaintiffs are entitled to a declaratory judgment resolving whether the Exculpated Parties have acted with willful misconduct or gross negligence with respect to the controversy surrounding the adequacy of the Disputed Claims Reserve.

71.    Because the Confirmation Order was intentionally procured by acts of fraud, Plaintiffs are entitled to a declaratory judgment permitting Plaintiffs to seek damages for the fraud from the Exculpated Parties.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment as follows:

(a)    Revoking the Confirmation Order and NorthWestern's discharge, or in the alternative, requiring NorthWestern to adequately fund the   Disputed Claims Reserve in accordance with the terms of the Plan and declaring that because of the gross negligence or willful misconduct in underfunding the Disputed Claims Reserve, the Exculpated Parties are not entitled to exoneration or exculpation pursuant to Section 10.1 of the Plan;

- 17 -

(b)    Finding that the Defendants breached their fiduciary and other duties to

Plaintiffs;

(c)    Awarding Plaintiffs damages, costs, and reasonable attorneys fees; and

(d)    Awarding such other relief as may be just and proper.

Dated:  Wilmington, Delaware
       April 15, 2005

**BLANK ROME LLP**

Mark J. Packel (DE No. 4048)
Elio Battista, Jr. (DE No. 3814)
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone:  (302) 425-6400
Facsimile:  (302) 425-6464

- and -

**FRIED, FRANK, HARRIS, SHRIVER &**
    **JACOBSON LLP**
Bonnie Steingart
Gary Kaplan
One New York Plaza
New York, NY 10004
Telephone:  (212) 859-8000
Facsimile:  (212) 859-4000

Counsel for Magten Asset Management
    Corporation
    - and -

**SMITH, KATZENSTEIN & FURLOW, LLP**


   /s/ Kathleen M. Miller
Kathleen M. Miller (DE No. 2898)
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE  19899
Telephone: (302) 652-8400
Facsimile:  (302) 652-8405

- 18 -

- and -

**NIXON PEABODY LLP**
Amanda D. Darwin (BBO No. 547654)
John V. Snellings (BBO No. 548791)
Lee Harrington (DE No. 4046)
100 Summer Street
Boston, MA 02110
Telephone: (617) 345-1000
Facsimile: (617) 345-1300

Attorneys for Law Debenture Trust Company of
New York

- 19 -

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| NORTHWESTERN CORPORATION, | ) |
| | ) Case No. 03-12872 (JLP) |
| Debtor. | ) |
| | ) |
| | ) |
| MAGTEN ASSET MANAGEMENT | ) |
| CORPORATION AND LAW | ) |
| DEBENTURE TRUST COMPANY OF | ) |
| NEW YORK, | ) |
| Plaintiffs, | ) Adv. Proc. No. 04-53324 (JLP) |
| | ) |
| v. | ) |
| | ) |
| NORTHWESTERN CORPORATION, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| NORTHWESTERN CORPORATION, | ) |
| | ) |
| Plaintiff, | ) Adv. Proc. No. 04-55051 (JLP) |
| | ) |
| v. | ) |
| | ) |
| MAGTEN ASSET MANAGEMENT | ) |
| CORPORATION, and TALTON R. | ) |
| EMBRY, | ) |
| | ) |
| Defendant. | ) |

## ORDER

In these cases, Plaintiff/Defendant Magten Asset Management Corporation and Embry

("Magten") have moved the U.S. District Court to withdraw the reference on each cause and

contemporaneously filed a "Motion and Memorandum of Law in Support of Motion for Stay of

Adversary Proceedings Pending Resolution of Motion to Withdraw the References to Bankruptcy Court." NorthWestern Corporation ("NOR") filed a memorandum opposing the stay motion.

Both causes are at issue, and a scheduling order entered November 2, 2004 set trial of each cause for February 7, 2005 after pre-trial discovery and filing of a final pre-trial order.

Also pending in Cause No. 04-53324 is NOR's motion to dismiss in part certain claims for relief set forth in Magten's amended complaint, specifically dealing with claims arising under the Public Utility Holding Company Act ("PUHCA") on grounds said claims were settled adversely to Magten in the court's order confirming NOR's amended Chapter 11 Plan of Reorganization. Memoranda have been filed by both parties on the motion of NOR. The Court has the motion under advisement.

However, in Magten's objection and memorandum in opposition to NOR's motion to dismiss the PUHCA related claims, which are an integral part of Magten's claim for relief in its amended complaint, Magten argues on pp. 12-13 of its memo: "If the Confirmation Order addresses these issues [the PUHCA claims], this Court is divested of jurisdiction because of the pending appeal." Magten filed a notice of appeal of the confirmation order and thereafter a "Statement of Issues to be Presented" on appeal. Exhibit "A" attached hereto and by reference made a part hereof.

Magten's First Amended Complaint at ¶ 9 states:

By this complaint, Plaintiffs seek, among other things, (i) a declaration that because the Debtor violated PUHCA, all contracts relating to the Montana Utility Assets and the Transfer that were executed between the filing of the Application and the date of the Transfer are void, (ii) the avoidance of the Transfer, (iii) a declaration that the assets that were fraudulently transferred are not the property of the Debtor's estate in its chapter 11 case, (iv) the imposition of a constructive trust over the transferred assets for the benefit of the Trust, and (v) the return of such

assets to Clark Fork.

In the order of confirmation, the court on pp. 44-46 stated:

e. Magten and Law Debenture also asserted in rem property interests in the
Montana Assets and that such assets were being held in a constructive trust for the
benefit of the QUIPS holders. The Court finds that neither Magten nor Law
Debenture took any action to impose a constructive trust on the Montana Assets
and presented no evidence whatsoever as to why they should be entitled to a
constructive trust with respect to the Montana Assets.

\* \* \* \*

Accordingly, the Court finds that no constructive trust has been established and
that money damages are an appropriate remedy for the holders of QUIPS
Litigation Claims. The Court also finds that QUIPS Litigation Claims will be
treated in the same manner as disputed unsecured claims under Section 7.5 of the
Plan. Whatever claims may be asserted in the QUIPS Litigation are nothing more
than general unsecured claims against the Debtor's estate and are treated as such.

\* \* \* \*

Accordingly, the Court hereby overrules the Magten and Law Debenture
Objections in their entirety.

f. Law Debenture also belatedly raised an objection to confirmation of Debtor's
Plan based on PUHCA. Neither Magten nor Law Debenture presented any
evidence in connection with their PUHCA objections. Accordingly, the Court
hereby overrules the Magten and Law Debenture objections in their entirety.

Magten's brief in opposition to the motion to dismiss certain claims, including PUHCA

and constructive trust allegations, correctly cited the applicable authority that "the filing of a

notice of appeal is an event of jurisdictional significance - it confers jurisdiction on the court of

appeals and divests the district court of its control over those aspects of the case involved in the

appeal." *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 114 n.10 (1996).

Since issues on appeal are also now presented for decision to this Court, and, indeed, the

pending litigation encompasses those issues, this Court is without jurisdiction to try Cause No.

3

04-53324 until there has been final resolution of those issues at the appellate level. I might also add that the U.S. District Court, if the reference is withdrawn, would act as a bankruptcy court and face the same jurisdictional problem.

Cause No. 04-55051 does not have that jurisdictional barrier, as the issues in that cause are not remotely connected to the confirmed plan matters, but the allegations in the complaint arise totally independent of the Plan and issues on appeal. The same is true of NOR's counterclaim in Cause No. 53324, which will be severed from such action.

IT IS ORDERED that Adversary No. 04-53324 is stayed pending final resolution of Magten's and Law Debenture's appeal of the Order confirming the Second Amended Plan of Reorganization.

IT IS FURTHER ORDERED that Adversary No. 04-55051 and the counterclaim in Cause No. 04-53324 shall proceed to trial pursuant to the Scheduling Order entered November 2, 2004.

Dated: December 7, 2004

Honorable John L. Peterson
United States Bankruptcy Judge

4

**EXHIBIT C**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NORTHWESTERN CORPORATION, | Case No. 03-12872 (CGC) |
| Debtor. | |

## ORDER CONFIRMING DEBTOR'S SECOND AMENDED AND RESTATED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

NorthWestern Corporation, a Delaware corporation (the "Debtor" or "NOR"), having filed with

this Court its voluntary petition for relief under Chapter 11 of Title 11, United States Code, 11

U.S.C. §§ 101 et seq. (the "Bankruptcy Code") on September 14, 2003 (the "Petition Date"); and

the Debtor having filed with this Court its First Amended Plan of Reorganization Under Chapter

11 of the Bankruptcy Code dated May 24, 2004 (the "First Amended Plan") and Second

Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code dated

August 18, 2004 [Dkt. No. 2020] (as thereafter modified, the "Second Amended Plan" or

"Plan")[1]; and

(i) the Debtor having filed with this Court the First Amended Disclosure Statement Pursuant to

Section 1125 of the Bankruptcy Code for the Plan of Reorganization of the Debtor dated May

17, 2004 (the "First Amended Disclosure Statement"), Second Amended and Restated

Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code for the Plan of

Reorganization of the Debtor dated August 18, 2004 [Dkt. No. 2021] (the "Second Amended

Disclosure Statement" or "Disclosure Statement") and Summary Disclosure Statement Pursuant

to Section 1125 of the Bankruptcy Code dated August 18, 2004 [Dkt. No. 2023] (the "Summary

Disclosure Statement"); and

---

[1] Any capitalized term used herein but not otherwise defined shall have the meaning ascribed to such term in the Plan.

(ii) the First Amended Disclosure Statement having been approved as containing "adequate information," as such term is defined in Section 1125 of the Bankruptcy Code, by Order of this Court dated May 26, 2004 [Dkt. No. 1373] (the "Disclosure Statement Approval Order"); and

(iii) the Disclosure Statement Approval Order having, (1) authorized the Debtor to solicit acceptances or rejections of the First Amended Plan, (2) approved the form of ballots to be transmitted with the First Amended Plan and First Amended Disclosure Statement for voting purposes, (3) fixed August 2, 2004 at 5:00 p.m. (PDT) as the deadline for submitting ballots accepting or rejecting the Plan (the "Voting Deadline"), (4) fixed August 2, 2004 at 4:00 p.m. (EDT) as the deadline for objections to confirmation of the First Amended Plan to be filed and served (the "Objection Deadline"), (5) fixed August 13, 2004 at 4:00 p.m. (EDT) as the deadline for the Debtor to file and serve any response to an objection to confirmation and (6) approved the form and manner of notice of the Confirmation Hearing (as defined below) and of the Voting and Objection Deadlines; and this Court having scheduled a hearing (as such hearing may be continued, the "Confirmation Hearing") pursuant to Section 1128 of the Bankruptcy Code for August 25, 2004 to consider confirmation of the Plan pursuant to Section 1129 of the Bankruptcy Code; and

(iv) the Debtor having solicited votes on the First Amended Plan by transmitting copies of the First Amended Plan, First Amended Disclosure Statement, the Disclosure Statement Approval Order, a notice of the Confirmation Hearing (the "Confirmation Hearing Notice") and an appropriate ballot to all impaired creditors entitled to vote on the First Amended Plan; and the Court having considered the Declaration of Voting Agent Regarding Tabulation of Votes in Connection with Debtor's First Amended Plan of Reorganization [Dkt. No. 1930] (the "Voting Agent Declaration"); and

(v) it appearing that due notice of the Voting Deadline, the Confirmation Hearing and the Objection Deadline has been given by the Debtor to creditors and other parties-in-interest in accordance with the Disclosure Statement Approval Order, the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure as evidenced by the affidavits of mailing and of publication filed with this Court; and the Disclosure Statement and Summary Disclosure Statement having been approved as containing "adequate information," as such term is defined in Section 1125 of the Bankruptcy Code, by Order of this Court dated September 2, 2004 [Dkt. No. 2033] (the "Resolicitation Order"); and

(vi) the Resolicitation Order having, (1) authorized the Debtor to resolicit acceptances or rejections of the Plan of Class 7, 8, and 9 claim holders, (2) approved the form of ballots to be transmitted with the Summary Disclosure Statement for voting purposes, (3) fixed September 29, 2004 at 5:00 p.m. (PDT) as the deadline for submitting ballots accepting or rejecting the Plan (the "Resolicitation Voting Deadline"), (4) fixed September 15, 2004 at 4:00 p.m. (EDT) as the deadline for objections to confirmation of the Plan to be filed and served, (5) approved the form and manner of notice of the continued Confirmation Hearing and of the Resolicitation Voting Deadline; and this Court having continued the Confirmation Hearing to October 6, 2004 to consider confirmation of the Plan pursuant to Section 1129 of the Bankruptcy Code; and

(vii) the Debtor having resolicited votes on the Plan by transmitting copies of the Summary Disclosure Statement, the Resolicitation Order, notice of the continued Confirmation Hearing (the "Continued Confirmation Hearing Notice") and an appropriate ballot to all impaired creditors entitled to vote on the Plan; and the Court having considered the Declaration of Voting Agent Regarding Tabulation of Votes in Connection with the Debtor's Second Amended Plan of Reorganization [Dkt. No. 2170]; and

(viii) it appearing that due notice of the Resolicitation Voting Deadline and the continued Confirmation Hearing has been given by the Debtor to creditors and other parties-in-interest in accordance with the Resolicitation Order, the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure as evidenced by the affidavits of mailing and publication filed with this

Court; and

(ix) the Debtor having filed with this Court a Memorandum of Law in Support of Confirmation of the Debtor's Second Amended and Restated Plan of Reorganization under Chapter 11 of the Bankruptcy Code [Dkt. No. 1928] and Memorandum of Law in Further Support of Confirmation of Debtor's Second Amended and Restated Plan of Reorganization under Chapter 11 of the Bankruptcy Code and in Response to Supplemental Objections to Confirmation [Dkt. No. 2145] (the "Supplemental Brief") filed in response to the Supplemental Objection of Magten Asset Management Corporation to Confirmation of the Debtor's Second Amended and Restated Plan of Reorganization [Dkt. No. 2105] (the "Magten Objection") and the Supplemental Objection of Law Debenture Trust Company of New York to Confirmation of the Debtor's Second Amended Plan of Reorganization [Dkt. No. 2104] (the "Law Debenture Objection"); and

(x) it appearing that the objections to confirmation filed by certain parties-in-interest have been resolved, withdrawn or overruled; and

(xi) this Court having conducted the Confirmation Hearing on August 25, 2004 and the continued Confirmation Hearing on October 6, 2004, and after due deliberation and consideration and having reviewed all pleadings, proceedings and evidence heretofore presented in this Chapter 11 case and at the respective confirmation hearings and sufficient cause appearing therefore; and

4

IT HAVING BEEN FOUND AND DETERMINED by this Court that:

A. <u>Findings of Fact and Conclusions of Law</u>. The findings of fact and conclusions of law set forth herein and on the record of the Confirmation Hearing constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rule 7052 and 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. This Order incorporates the Court's oral ruling issued in the Debtor's Chapter 11 Case on October 8, 2004, which Order, among other things, confirmed the Plan in all respects and overruled all objections to confirmation not otherwise withdrawn or resolved as identified by the Debtor in Exhibit A to the Debtor's Memorandum of Law in Support of Confirmation of Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Dkt. No. 1928], as amended, Notice of Filing of Amended Exhibit A to the Memorandum of Law in Support of Confirmation of Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Dkt. No. 2156].

B. <u>Judicial Notice</u>. Pursuant to Federal Rule of Evidence 201, the Bankruptcy Court takes judicial notice of the documents included in the Debtor's Request to Take Judicial Notice of Certain Pleadings and Related Documents Filed with the Court filed on August 18, 2004 [Dkt. No. 1929] (the "<u>Debtor's Request for Judicial Notice</u>"). To the extent not included in the Debtor's Request for Judicial Notice, the Bankruptcy Court, pursuant to Federal Rule of Evidence 201, takes judicial notice of the docket of this Chapter 11 Case maintained by the Clerk of the Bankruptcy Court, including, without limitation, all pleadings and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at the various hearings held before the Bankruptcy Court during the pendency of the Debtor's Chapter 11 Case.

C. <u>Offer of Proof</u>. The Bankruptcy Court takes judicial notice of the Debtor's Offer of Proof and Outline of Evidence in Support of Adequacy of Debtor's Procedures and Notice in Conjunction with its Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Dkt. No. 1932, Debtor's Exh. 15] (the "<u>Offer of Proof</u>"). The Bankruptcy Court enters into evidence Debtor's Exhibits 1-90, 114-121, 127-139, 142-146 and 150, identified on the Notice of Designation of Exhibits to be Used with Respect to the Confirmation Hearing filed on August 20, 2004 [Dkt. No. 1961], as such revised exhibits were introduced at the Confirmation Hearing, Exhibits 1-6 of the Creditors' Committee, identified on the Confirmation Hearing Amended Exhibit List of the Official Committee of Unsecured Creditors filed on August 23, 2004 [Dkt. No. 1970] and Exhibits 1 and 2 of the Equity Holders introduced into evidence at the Confirmation Hearing.

Pursuant to Federal Rule of Evidence 201, the Bankruptcy Court takes judicial notice of

the Supplemental Offer of Proof and Outline of Evidence in Support of the Adequacy of the

Debtor's Procedures and Notice in Conjunction with its Second Amended and Restated Plan of

Reorganization under Chapter 11 of the Bankruptcy Code and Request to Take Judicial Notice of

Certain Pleadings Filed with the Court [Dkt. No. 2166] (the "Supplemental Offer of Proof").

The Bankruptcy Court enters into evidence Debtor's Exhibits 151-166, 180 and 185, as such

revised exhibits were introduced at the Confirmation Hearing.

D. Jurisdiction and Venue. This Court has jurisdiction over this Chapter 11 Case and the
subject matter of the Confirmation Hearing pursuant to 28 U.S.C. §§ 157 and 1334. The
Confirmation Hearing is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2) and this
Court has jurisdiction to enter a final order with respect thereto. Venue of this Chapter
11 Case in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

E. Background.

    1.    Petition. On September 14, 2003 (the
"Petition Date"), the Debtor filed its voluntary petition for relief
under Chapter 11 of the Bankruptcy Code [Dkt. No. 1]. The
Debtor continues to operate its businesses and manage its
properties as a debtor-in-possession pursuant to Sections 1107 and
1108 of the Bankruptcy Code. No request has been made for the
appointment of a trustee or examiner in the Chapter 11 Case. The
Creditors' Committee was appointed by the Office of the United
States Trustee on September 30, 2003.

    2.    Appointment of the Creditors' Committee.
On October 2, 2003, the United States Trustee appointed a nine (9)
member Creditors' Committee in this Chapter 11 Case pursuant to
Section 1102 of the Bankruptcy Code to represent the interest of
all holders of unsecured claims. The members of the Creditors'
Committee were: (i) OCM Opportunities Fund IV, LP; (ii) Law
Debenture Trust Company of New York, as successor Indenture
Trustee to The Bank of New York; (iii) Franklin Templeton
Mutual Series Fund; (iv) Wilmington Trust Co.; (v) HSBC Bank
USA; (vi) Rocky Mountain Contractors, Inc.; (vii) Avenue Capital
Management; (viii) AG Capital Recovery Partners III, LP; and (ix)
Comanche Park, LLC [Dkt. No. 122]. By notice dated November
25, 2003, the United States Trustee added Magten Asset
Management Corp. to the Creditors' Committee following Rocky
Mountain Contractors, Inc. declining to serve on the Creditors'
Committee [Dkt. No. 449]. By notice dated May 6, 2004, the
United States Trustee removed Magten Asset Management Corp.
and Law Debenture Trust Company of New York from the
Creditors' Committee [Dkt. No. 1223]. By notice dated May 7,
2004, the United States Trustee removed Comanche Park, LLC
from the Creditors' Committee [Dkt. No. 1238]. By notice dated
July 27, 2004, the United States Trustee filed the Seventh

Amended Notice of Appointment reflecting OCM Opportunities Fund IV, L.P.'s resignation from the Creditors' Committee effective July 19, 2004 [Dkt. No. 1764]. By written notice to the United States Trustee dated October 8, 2004, AG Capital Recovery Partners III, L.P., resigned from the Creditors' Committee effective October 8, 2004.

As of the date of this Order, the Creditors' Committee was comprised of: (i) Franklin

Templeton Mutual Series Fund; (ii) Wilmington Trust Co.; (iii) HSBC Bank USA; and (iv)

Avenue Capital Management.

3.    Bar Date Order and Notice Thereof. The Court entered an order establishing January 15, 2004 at 5:00 p.m. (Pacific Standard Time) as the deadline for non-governmental creditors, and establishing April 15, 2004 at 5:00 p.m. (Pacific Standard Time) as the deadline for governmental creditors (collectively, the "Bar Date"), to file proofs of claim for each claim they assert against the Debtor that arose before the Petition Date [Dkt. No. 197, Debtor's Exh. 21] (the "Bar Date Order"). The notice of the Bar Date was mailed to all known creditors of the Debtor and published in numerous regional and national newspapers in accordance with the Bar Date Order. As described in the Affidavit of Service of Bar Date Notice, sworn to by Angela M. Lo on November 17, 2003 [Dkt. No. 406, Debtor's Exh. 22] (the "Lo Affidavit"), copies of: (i) the Notice of Deadlines for Filing Proofs of Claims and a personalized Proof of Claim were served on the creditors listed on Exhibit A to the Lo Affidavit; (ii) copies of the Notice of Deadlines for Filing Proofs of Claims and a blank Proof Claim were served upon the 2002 Service List attached as Exhibit B to the Lo Affidavit; and (iii) the Notice of Deadlines for Filing Proofs of Claim was served on the list attached as Exhibit C to the Lo Affidavit. The Court hereby finds that: (i) the transmittal of the Notice of Deadlines for Filing Proofs of Claim was adequate and sufficient under the circumstances of this Chapter 11 Case; (ii) such notice was provided in compliance with the Bar Date Order, the Bankruptcy Code and the Bankruptcy Rules; and (iii) no other or further notice is required.

F.    Debtor's Property Rights, Title and Interests in Executory Contracts, Leases, and Rights of Way. On July 16, 2004, the Debtor filed its Notice of Contracts the Debtor intends to Assume and/or Reject Pursuant to Section IV.F of the Debtor's First Amended Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code for the Plan of Reorganization [Dkt. No. 1700] and on August 9, 2004, the Debtor filed its Notice of Amendment to Schedules of Contracts the Debtor Intends to Assume and/or Reject Pursuant to Section IV.F of the Debtor's First Amended Disclosure Statement [Dkt. No.

1866].  Pursuant to the notices, the Debtor indicated its intent to assume certain executory contracts, leases, and rights of way.  On September 22, 2004, the Debtor filed its Omnibus Motion for Court Approval to Assume Certain Executory Contracts Pursuant to Section 365 of the Bankruptcy Code and Granting Related Relief [Dkt. No. 2108].

G. Class Action Settlement.  On or about April 28, 2004, the Debtor filed its Motion for Order Pursuant to Bankruptcy Rule 9019 Approving Memorandum of Understanding [Dkt. No. 1169, Debtor's Exh. 53] (the "MOU Motion").  On July 14, 2004, the Court held a hearing on the MOU Motion and on October 7, 2004 this Court entered its Memorandum Decision overruling the objection of Magten Asset Management Corporation approving the proposed settlement and finding that the proposed settlement meets the requirements of Bankruptcy Rule 9019 and applicable case law [Dkt. No. 2175].

H. The Plan.

1.    The First Amended Plan.  On May 25, 2004, the Debtor filed its proposed First Amended Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code for the Plan of Reorganization of the Debtor [Dkt. No. 1352, Debtor's Exh. 1], which amended the First Amended Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code for the Plan of Reorganization of the Debtor filed on May 14, 2004.  Also on May 25, 2004, the Debtor filed its proposed First Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Dkt. No. 1351, Debtor's Exh. 2], which amended the First Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code filed on May 14, 2004.  After due notice and a hearing held on May 17, 2004, this Court entered on May 26, 2004 an Order (I) Approving First Amended Disclosure Statement, (II) Authorizing the Solicitation of Votes, (III) Scheduling a Hearing on Confirmation of the Plan of Reorganization, (IV) Establishing Notice Requirements Regarding the Confirmation Hearing and Approving the Form and Manner of Notice and (V) Granting Related Relief Respecting the Debtor's First Amended Plan of Reorganization [Dkt. No. 1373, Debtor's Exh. 3] finding that the First Amended Disclosure Statement contained "adequate information" within the meaning of Section 1125 of the Bankruptcy Code and established procedures for the Debtor's solicitation of votes on the First Amended Plan.  In accordance with the Disclosure Statement Order, on or about June 4, 2004 the Debtor commenced the solicitation of votes on the First Amended Plan [Dkt. No. 1469, Debtor's Exh. 31], Affidavit of Service of Solicitation Materials.

2.    The Second Amended Plan.  On August 18, 2004, the Debtor filed its Second Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Dkt. No. 1924, Debtor's Exh. 6], Second Amended Disclosure Statement Pursuant

to Section 1125 of the Bankruptcy Code for the Plan of
Reorganization of the Debtor [Dkt. No. 1926, Debtor's Exh. 8],
and Summary Amended Disclosure Statement Pursuant to Section
1125 of the Bankruptcy Code [Dkt. No. 1921, Debtor's Exh. 11].
On August 25, 2004, after due notice, the Court held a
confirmation hearing on the Debtor's Second Amended Plan. On
August 31, 2004, following the hearing, the Debtor filed its revised
Second Amended Plan [Dkt. No. 2020], Second Amended
Disclosure Statement [Dkt. No. 2021] and Summary Disclosure
Statement [Dkt. No. 2023]. After due notice, this Court entered on
September 2, 2004 an Order (A) Approving the Debtor's Second
Amended and Restated Disclosure Statement and Summary
Disclosure Statement, (B) Setting a Record Date for Voting
Purposes, (C) Authorizing Resolicitation of Votes, (D) Scheduling
a Continued Hearing on Confirmation of Second Amended and
Restated Plan of Reorganization, (E) Establishing Notice
Requirements Regarding the Continued Confirmation Hearing and
Approving the Form and Manner of Notice, and (F) Granting
Related Relief finding that the Second Amended Disclosure
Statement and Summary Disclosure Statement contained
"adequate information" within the meaning of Section 1125 of the
Bankruptcy Code and established procedures for the Debtor's
resolicitation of votes on the Second Amended Plan [Dkt. No.
2033]. In accordance with the Resolicitation Order, on or about
September 8, 2004 the Debtor commenced the resolicitation of
votes on the Second Amended Plan [Dkt. No. 2126].

I. Notice.

1.     Compliance with Disclosure Statement
Approval Order. In accordance with the Disclosure Statement
Approval Order, the Bankruptcy Code and the Bankruptcy Rules,
as described in the Affidavit of Service, sworn to by Chris
Schepper on June 14, 2004 [Dkt. No. 1469, Debtor's Exh. 31] (the
"Schepper Affidavit"), the Debtor timely: (a) mailed (i) notice of
the date, time, and place of the Confirmation Hearing, (ii) notice of
the deadline and procedures for filing objections to confirmation of
the Plan, and (iii) an appropriate ballot for voting on the Plan, upon
the parties set forth in the Disclosure Statement Approval Order;
and (b) published notice of the Confirmation Hearing in each of
the following (i) Argus Leader, (ii) Billings Gazette, (iii) Great
Falls Tribune, (iv) the Missoulian, (v) New York Times, (vi) Rapid
City Journal, (vii) USA Today, and (viii) The Wall Street Journal
as required by the Disclosure Statement Approval Order [Debtor's
Exh. 23-31]. The Court hereby finds that: (i) the transmittal of the
Notice of the Confirmation Hearing and Ballots was adequate and
sufficient under the circumstances of this Chapter 11 Case; (ii) such
notice was provided in compliance with the Disclosure Statement

Order, the Bankruptcy Code and the Bankruptcy Rules; and (iii) no other or further notice is required.

        2.    Compliance with the Resolicitation Order. In accordance with the Resolicitation Order, the Bankruptcy Code and the Bankruptcy Rules, as described in the Affidavit of Service, sworn to by Chris Schepper on September 27, 2004 [Dkt. No. 2126, Debtor's Exh. 155] (the "Schepper Resolicitation Affidavit"), the Debtor timely (a) mailed: (i) notice of the date, time, and place of the continued Confirmation Hearing, (ii) the Summary Disclosure Statement; and (iii) an appropriate ballot for voting on the Plan, upon the parties set forth in the Resolicitation Order; and (b) caused to be published notice of the continued Confirmation Hearing in each of the following (i) Great Falls Tribune, (ii) the Missoulian, (iii) New York Times, (iv) Rapid City Journal, (v) USA Today, (vi) The Wall Street Journal, (vii) Billings Gazette; and (viii) Argus Leader as required by the Resolicitation Order [Dkt. Nos. 2128 - 2135, Debtor's Exh. 156 - 163]. The Court hereby finds that: (i) the transmittal of the Notice of the Continued Confirmation Hearing and Ballots for resolicitation was adequate and sufficient under the circumstances of this Chapter 11 Case; (ii) such notice was provided in compliance with the Resolicitation Order, the Bankruptcy Code and the Bankruptcy Rules; and (iii) no other or further notice is required.

J.   Tabulation of Votes. As described in the Declaration of Voting Agent Regarding Tabulation of Votes in Connection with Debtor's First Amended Plan of Reorganization (the "Voting Agent Declaration") [Dkt. No. 1930, Debtor's Exh. 32], sworn to by Jonathan A. Carson on August 17, 2004, Kurtzman Carson Consultants LLC (the "Balloting Agent") distributed the solicitation packages as set forth in the Schepper Affidavit. The Balloting Agent received and tabulated the Ballots as follows: (a) each returned Ballot was opened and inspected at the Balloting Agent's office; (b) Ballots were date stamped, sorted according to Plan class, and scanned into the Bankruptcy Administration System; (c) all Ballots received by the Voting Deadline were then entered into the Bankruptcy Administration System and tabulated in accordance with the tabulation rules outlined in the Disclosure Statement Order. Voting Agent Declaration, ¶12. Classes 7, 9 and 12 accepted the First Amended Plan with respect to both numerosity and amount. Class 8 voted to reject the First Amended Plan.

K.   Tabulation of Votes in Connection with the Releases. The Voting Agent Declaration sets forth the following results in connection with the releases provided under the First Amended Plan:

| Impaired Class | Total Members Voting | Members Released | Members Not Released | Abstentions | % Released |
|---|---|---|---|---|---|
| | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Class 7 | 261 | 215 | 46 | 264 | 82.38% |
| Class 8 | 2150 | 1429 | 721 | 266 | 66.47% |
| Class 9 | 24 | 18 | 6 | 7 | 75.00% |
| Class 12 | 28 | 20 | 8 | 0 | 71.43% |

See Voting Agent Declaration, ¶ 16.

L.  Tabulation of Votes in Connection with Resolicitation.  As described in the Declaration
of Voting Agent Regarding Tabulation of Votes in Connection with Debtor's Second
Amended Plan of Reorganization (the "Voting Agent Resolicitation Declaration") [Dkt.
No. 2170, Debtor's Exh. 185], sworn to by Christopher Schepper on October 5, 2004, the
Balloting Agent distributed the resolicitation packages as set forth in the Schepper
Resolicitation Affidavit.  The Balloting Agent, with the assistance of the Bondholder
Communication Group ("BCG"), received and tabulated the Ballots as follows:  (a) each
returned Ballot was opened and inspected; (b) Ballots were date stamped, sorted
according to Plan class, and scanned into the Bankruptcy Administration System; (c) all
Ballots received by the voting deadline were then tabulated in accordance with the
tabulation rules outlined in the Resolicitation Order.  Voting Agent Resolicitation
Declaration, ¶ 10-15.  Classes 7, 8(a), 9 and 12 accepted the Second Amended Plan with
respect to both numerosity and amount.  Class 8(b) voted to reject the Second Amended
Plan.

M.  Tabulation of Class 8(b) Options.  The Voting Agent Resolicitation Declaration sets forth
the following results in connection with the holders of Class 8(b) options:

| Members Voted | # Members for Option 1 | # Members for Option 2 | Shares for Option 1 | Shares for Option 2 |
|---|---|---|---|---|
| 532 | 439 | 93 | 631,622 | 253,221 |

N. <u>Tabulation of Votes in Connection with Releases on Resolicitation</u>. The Voting Agent Resolicitation Declaration sets forth the following results in connection with the releases provided under the Second Amended Plan:

| Impaired Class | Total Members Voting | Members Released | Members Not Released | Abstentions | % Released |
|---|---|---|---|---|---|
| Class 7 | 423 | 390 | 33 | N/A | 92.20% |
| Class 8(a) | 2593 | 1963 | 630 | N/A | 75.70% |
| Class 8(b) | 656 | 499 | 157 | N/A | 76.07% |
| Class 9 | 41 | 29 | 8 | 4 | 70.73% |

<u>See</u> Voting Agent Declaration, ¶ 19.

O. <u>Objections</u>

1. Objection of Stephen R. Heflin [Dkt. No.

1779]. The objection of Stephen R. Heflin failed to provide any

basis for the objection and is overruled.

2. Limited Objection of Wells Fargo, National

Association ("Wells Fargo"), in its Capacity as Indenture Trustee,

to Debtor's First Amended Plan of Reorganization Under Chapter

11 of the Bankruptcy Code re: Docket No. 1351 [Dkt. No. 1780]

and Limited Objection of U.S. Bank, National Association ("U.S.

Bank"), in its Capacity as Indenture Trustee, to Debtor's First

Amended Plan of Reorganization Under Chapter 11 of the

Bankruptcy Code re: Docket No. 1351 [Dkt. No. 1781]. Wells

Fargo sought clarifying language in connection with Section 5.17

of the First Amended Plan as well as the defined terms "Secured

Bonds" and "South Dakota Pollution Control Bonds," Sections

1.158 and 1.164 of the First Amended Plan, respectively. U.S.

Bank sought clarifying language in connection with Section 5.17

of the First Amended Plan as well as Section 5.5 of the First

Amended Plan. The Court hereby finds that both objections have

been resolved pursuant to revisions made to the Second Amended

Plan and the objections are overruled. See, Plan §§ 1.168 (Secured

Bonds), 1.174 (South Dakota Pollution Control Bonds), 1.175

(South Dakota Pollution Control Claims), 5.5(b) (Cancellation and

Surrender of Existing Securities Agreements, and 5.18 (Indenture Trustees Charging Lien).

      3.    Limited Objection of PPL Montana LLC ("PPLM") to Confirmation of the Debtor's First Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Dkt. No. 1784].

      a.    The following documents have been filed in connection with PPLM's claim: (i) PPLM's proof of claim, Claim No. 714, as amended on August 3, 2004 (the "PPLM Claim"); (ii) Debtor's Objection to Claim of PPL Montana, LLC Pursuant to 11 U.S.C. § 502(b) and Fed. R. Bankr. P. 3007 [Dkt. No. 1658, Debtor's Exh. 85]; (iii) Motion of PPL Montana for Abstention or in the Alternative for an Order Directing that Resolution of the Objection to PPL Montana, LLC's Proof of Claim be Determined by the United States District Court for the District of Montana [Dkt. No. 1859]; (iv) Order Granting Abstention [Dkt. No. 2159]; (v) Motion Pursuant to Sections 105(a), 363(b) and 502(c) of the Bankruptcy Code for Estimation of PPL Montana LLC's Claim and to Establish Disputed Claim Reserve [Dkt. No. 2056]; and (vi) Stipulation and Order Resolving Section III of the Limited Objection of PPL Montana, LLC to Confirmation

of the Debtor's First Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code and the Debtor's Motion Pursuant to Sections 105(a), 363(b) and 502(a) of the Bankruptcy Code for Estimation of PPL Montana LLC's Claim and Establish a Disputed Claim Reserve [Dkt. No. 2183] (the "PPLM Stipulation").

      b.     PPLM objected to the First Amended Plan because it asserted that the injunctions provided for in the First Amended Plan attempted to extinguish its setoff rights. Section 10.5(b)(i) of the Second Amended Plan provides that "[n]otwithstanding any provision of this Plan to the contrary, this Plan: (i) shall not enjoin or extinguish any rights or claims asserted by [PPLM] in its proof of claim dated January 13, 2004 (as may be amended) or asserted in any other manner, including, without limitation, [PPLM's] counterclaims and right of setoff." The Court hereby finds that the language in Section 10.5(b)(i) resolves PPLM's objection in connection with the reservation of its counterclaims and right of setoff; therefore, PPLM's objection to the injunctions provided in the Plan is hereby overruled.

      c.     PPLM also objected to the implementation of the provisions of the Plan regarding the

establishment of the Disputed Claims Reserve because the
Debtor made inadequate provision for the manner and
timing of establishing reserves for Disputed Claims. The
Debtor and PPLM entered into the PPLM Stipulation
whereby the Debtor will establish a segregated reserve that
will be used solely for the purpose of any distributions to
be made for the PPLM Claim. The segregated reserve will
be funded by shares of common stock equal to the value of
$50,000,000, valued as of the Effective Date, pursuant to
the terms of the PPLM Stipulation. As the Debtor and
PPLM have reached a stipulation in connection with
PPLM's objection, PPLM's objection is resolved pursuant
to the PPLM Stipulation.

4.    Objection of Indenture Trustee to
Confirmation of Debtor's First Amended Plan of Reorganization
[Dkt. No. 1789] (the "Wilmington Trust Objection") and Objection
by Harbert Management to Confirmation of the Debtor's First
Amended Plan of Reorganization Under Chapter 11 of the
Bankruptcy Code [Dkt. No. 1790] (the "Harbert Objection"). The
Wilmington Trust and Harbert Objections to confirmation have
been withdrawn pursuant to a settlement agreement reached
between the parties and incorporated into the Plan. Wilmington
Trust's and Harbert's withdrawals of their objections to

confirmation have been filed with the Court. <u>See</u> Dkt. Nos. 1994 and 1982, respectively.

    5.    <u>Objection of Official Committee of Unsecured Creditors in Chapter 11 Case of Touch America Holdings, Inc. (the "TA Committee") to Debtor's First Amended Plan of Reorganization.</u> The TA Committee objected to the First Amended Plan to the extent that it enjoined, limited or released any rights, claims or interests held by the TA Debtors that may arise under any of the D&O Policies and does not release any claims the TA Debtors may hold against any D&O Protected Party to the extent that such claim is against an individual in his or her capacity as a former director or officer of any of the TA Debtors or their present or former affiliates or predecessors. The Second Amended Plan provides that the D&O Insurance Entity Injunction shall not enjoin any rights of the TA Debtors that may arise under any of the D&O Policies. <u>See</u> Plan, § 6.9(c). The Second Amended Plan also provides that "D&O Protected Party" shall exclude any individual who previously served as an officer or director of any of the TA Debtors, or their present or former predecessors, in such individual's capacity as an officer or director of such TA Debtor. <u>See</u> Plan, § 1.49. The Court hereby finds that the objection has been resolved pursuant to revisions made to the Second Amended Plan and the objection is overruled.

6.    Limited Objection of Touch America

Holdings, Inc., et al., Debtors in Possession, to Debtor's First
Amended Plan of Reorganization Under Chapter 11 of the
Bankruptcy Code [Dkt. No. 1872]. The TA Debtors object to the
Plan to the extent that it limits the TA Debtors' ability to receive
distributions as a Class 9 claimant on account of the portion of its
claims classified as general unsecured claims. Section 1.95 of the
Plan provides that to the extent a creditor holds a claim that is not
an Administrative Claim, Fee Claim, Priority Tax Claim,
Unsecured Priority Claim, Bank One DIP Financing Claim, CSFB
Financing Claim, Secured Claim, Unsecured Note Claim,
Unsecured Subordinated Note Claim, Unsecured Convenience
Claim, D&O Trust Claim, Other Equity Interest, Securities Claim,
Opt-Out Securities Claim or Environmental Claim, such claim
shall be a General Unsecured Claim. The TA Debtors objection
also sought to ensure that the Disputed Claim Reserve was
adequate to pay any potential Class 9 or Class 12 claims asserted
by the TA Debtors. The Court hereby finds that pursuant to
Section 1.95 of the Plan, to the extent the TA Debtors hold an
Allowed General Unsecured Claim under the Plan such claim shall
receive distributions as a Class 9, General Unsecured Claim. The
Court also finds that Sections 7.5 and 7.6 of the Plan provides for
the Disputed Claim Reserve and procedures for distributions to

Disputed Claims that become Allowed Claims. Accordingly, the Court finds that the objection of the TA Debtors has been resolved or is addressed by Sections 7.5 and 7.6 of the Plan.

       7.    <u>Limited Objection of Richard R. Hylland to Confirmation of the Debtor's First Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Hylland Objection").</u>

       a.    The Hylland Objection objects to Section 13.1 of the Plan which provides that the Bankruptcy Court will retain exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Case and the Plan. Excluding the arbitration proceedings initiated by Hylland and currently stayed, which proceedings will be permitted to proceed once the automatic stay is dissolved, the Court hereby finds that continuing jurisdiction, as provided for in the Plan, is appropriate, necessary and consistent with applicable law.

       b.    The Hylland Objection also asserts that Section 10.5 of the First Amended Plan impermissibly impairs Hylland's setoff rights. Section 10.5(b)(iii) of the Second Amended Plan provides that "[n]otwithstanding any provision of this Plan to the contrary, this Plan: . . . (iii) shall not affect any setoff

19

rights, if any, of Richard Hylland." The Court hereby finds
that the language in Section 10.5(b)(iii) resolves this
portion of the Hylland Objection and such objection is
overruled

     c.  The Hylland Objection also
objects to the Plan to the extent that the Plan does not
provide that claims not paid by the D&O Trust receive the
treatment provided to Class 7 and Class 9. The Court finds
that Section 524(e) of the Bankruptcy Code does not limit
the equitable power of the Court to enjoin suits against
third parties where the injunction is necessary to the plan
and workable reorganization. Based upon the pleadings
filed in connection with the Class Action settlement, the
provisions of the Plan and the support of the Creditors'
Committee and other parties-in-interest, including the
MPSC, the Court finds that the Plan represents a global
agreement among the parties in this case, premised on all
of the mutually interdependent elements, including the
formation and funding of the D&O Trust and the D&O
Injunctions necessary to implement the D&O Trust. See
Memorandum Decision Approving the Class Action
Settlement [Dkt. No. 2175] and Order Approving the
Stipulation and Settlement Agreement Among Debtor,

Montana Public Service Commission and Montana
Consumer Counsel Pursuant to Sections 105(a) and
1129(a)(4) of the Bankruptcy Code and Rule 9019 of the
Bankruptcy Rules [Dkt. No. 1706]. Upon consideration of
the provisions of the Second Amended Plan, the D&O
Trust Documents and the arguments and evidence
presented at the Confirmation Hearing, the Court overrules
Hylland's objection finding that the Debtor's transfer of its
interest in the insurance policies to the D&O Trust as
provided in Section 6.6 of the Second Amended Plan and
the Insurance Assignment Agreement provides sufficient
and adequate consideration for the channeling injunction,
that the D&O Trust is properly capitalized and that limiting
the recovery on D&O Claims to the D&O Trust provides
fair and adequate treatment to D&O Trust Claimants who
have received the benefit of the releases set forth in
Sections 6.9 and 10.5(c) of the Plan and Class Action
Settlement Documents, as consideration for the transfer of
the D&O Policies to the D&O Trust and the D&O Trust
Channeling Injunction. The Court finds the Debtor's
argument that the first in, first out ("FIFO") method of
distribution is consistent with the distribution of D&O
insurance policy proceeds being utilized to fund the D&O

21

Trust persuasive and hereby finds that access to the D&O

Trust as the only remedy available to a Director or Officer

for reimbursement of costs and related indemnification

claims is appropriate, necessary and consistent with the

Bankruptcy Code. Therefore, the Hylland Objection to the

injunctions provided in the Plan is hereby overruled.

   d.  The Hylland Objection also

objected to the Debtor's agreement to contribute up to $2.5

million to pay Defense Costs incurred by current Officers

and Directors only (in the event the D&O Trust is

exhausted). The Debtor has presented evidence that the

agreement to contribute up to $2.5 million to pay Defense

Costs incurred by current Officers and Directors is in

recognition of the Debtor's statutory and contractual

indemnity obligations to its current Officers and Directors,

and additional consideration to the current Officers and

Directors who have continued to serve the Debtor during

this Chapter 11 Case. Upon consideration of the arguments

and evidence, the Court declines to accept the objector's

position. The Court hereby finds that Section 5.1 of the

Plan is appropriate and consistent with all applicable laws,

and the Hylland Objection to the allocation of the $2.5

million to pay Defense Costs incurred by current Officers

and Directors only in the event the D&O Trust is exhausted is overruled.

    e.  The Hylland Objection urged the Court to find that to the extent his claims are classified as a Class 9 claim, Mr. Hylland's claims related to the D&O Proceedings are not properly classified and are being excluded from the D&O Trust. The evidence clearly shows that Mr. Hylland's claims are properly classified and Mr. Hylland received ballots for both Class 9 and Class 12 claims, but only returned the Class 9 ballot. See Declaration of Voting Agent Regarding Ballots of Richard R. Hylland in Connection with Debtor's First Amended Plan of Reorganization [Dkt. No. 2037]. Moreover, the Plan provides in Section 4.9 to the extent that Mr. Hylland holds Class 9 Claims that are not D&O Trust Claims and are ultimately determined to be Allowed General Unsecured Claims, Mr. Hylland will receive the same treatment as any other holder of an Allowed Class 9 Claim. Based on the evidence presented, the Court declines to accept Mr. Hylland's arguments and hereby overrules the Hylland Objection alleging improper classification. Based on the arguments of counsel and the evidence presented and after due deliberation, the Court hereby finds that

         23

Section 4.9 of the Plan provides that the portion of Mr.
Hylland's Claims that may qualify as an Allowed D&O
Trust Claims shall be treated as D&O Trust Claims and
channeled to the D&O Trust and the portion of Mr.
Hylland's Claims that may be determined to be an Allowed
Class 9 Claim shall be treated as a Class 9 Claim.

8.     Objection of Goldman. Sachs & Co.

("Goldman Sachs") to Confirmation of Debtor's First Amended

Plan of Reorganization [Dkt. No. 1795] and Objection of Milbank,

Tweed, Hadley & McCloy LLP ("Milbank Tweed") to the

Debtor's Second Amended Disclosure Statement [Dkt. No. 1986]

(the "Milbank Objection"). Goldman Sachs and Milbank Tweed

filed similar objections asserting that to the extent that the D&O

Trust Channeling Injunction could be construed to impair their

rights against non-Debtor parties such injunction was improper.

Section 10.9 of the Plan provides that the Plan shall not enjoin,

release or otherwise impair any claim of Goldman Sachs or

Milbank Tweed against any person or entity other than the Debtor

and the Reorganized Debtor or otherwise limit any defense, setoff,

counterclaim or cross claim either Goldman Sachs or Milbank

Tweed may have against any entity, except that any recovery by

Goldman Sachs and Milbank Tweed on such counterclaim or cross

claim against the Debtor or Reorganized Debtor shall be limited by

24

the Plan. Upon consideration of the evidence and the revisions to the Plan, the Court hereby finds that the objections have been resolved and are hereby overruled.

The Milbank Objection also asserts that the Plan cannot determine whether the MPC Policies are part of the Debtor's estate. First, the insurance policies whose proceeds are subject to the Insurance Assignment Agreement do not include the MPC Policies. See Insurance Assignment Agreement, Exh. A. Second, the Debtor has acknowledged that its interests in the MPC Policies are disputed. See Plan, Exh. C. Moreover, to the extent the McGreevey Litigation settlement is approved, the Debtor will be transferring and assigning its rights and interest in the MPC Policies. Neither the Plan nor this Confirmation Order seek to determine whether the MPC Policies are part of the Debtor's estate; therefore, Milbank Tweed's objection regarding the MPC Policies is overruled.

9.    Objection of the United States of America to Confirmation of the Debtor's First Amended Plan of Reorganization dated May 17, 2004 [Dkt. No. 1897]. The United States of America (the "United States") asserts that the Debtor owes undisputed pre-petition and post-petition fees under certain permits with the United States Department of Agriculture, Forest Service. The Debtor has represented that it intends to assume the obligations related to the permits. See Notice of Contracts the Debtor Intends to Assume and/or Reject Pursuant to Section IV.F of the Debtor's First Amended Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code for the Plan of

Reorganization which indicated its intent to perform the obligations related to the permits [Dkt. No. 1700] (the "Assumption Notice"). The United States also filed an objection to preserve its rights in the event there is a dispute regarding the terms of the assumption of certain contracts with the Bonneville Power Administration. The Debtor has filed a Omnibus Motion for Court Approval to Assume Certain Executory Contracts Pursuant to Section 365 of the Bankruptcy Code and Granting Related Relief [Dkt. No. 2108] (the "Assumption Motion"). Moreover, in Section 8.1 of the Plan, the Debtor provided a procedure to object to the cure amounts as provided in the Assumption Notice. The United States also objected to the First Amended Plan to the extent it did not preserve the United States' common law right to setoff mutual debts. The Second Amended Plan provides for the preservation of the United States' setoff rights. Plan §10.5(b). Upon consideration of the objection, the evidence presented and representations of counsel, the Court hereby finds that the objections of the United States have been fully resolved.

10. Objection of Montana Power Benefit Restoration Plan Participants (the "BRP Participants") to Debtor's First Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Dkt. No. 1959]. The BRP Participants assert

that the Montana Power Benefit Restoration Plan (the "BRP") is
not an executory contract that can be rejected. As of the continued
Confirmation Hearing, no motion is before the Court seeking to
reject the BRP. The BRP Participants also objected to the
implementation of the provisions of the Plan regarding the
establishment of the Disputed Claims Reserve because the Debtor
made inadequate provision for the manner and timing of
establishing reserves for Disputed Claims. All rights of the Debtor
and the BRP Participants, including the one BRP Participant
seeking relief to assert a late-filed claim, and such relief is granted
herein, are reserved and the policies at issue shall not be affected
or terminated without further order of this Court. Accordingly, the
objection of the BRP Participants is overruled in its entirety.

Objection of the Equity Holders.[2] The Equity Objections urge the Court to find that the Plan
violates the absolute priority rule because Class 13 shareholders are recovering substantially less
than the value of their equity interests.

The testimony elicited by the Debtor and the Creditors'
Committee at the August 25, 2004 Confirmation Hearing support
the treatment afforded to the Equity Holders as well as Class 8(b).
As discussed in greater detail below, this Court finds persuasive

---

[2] The following objections were filed by various equity holders: (i) Objection to Plan of RCG Carpathia Master
Fund, Ltd. and Kellogg Capital Group, LLC f/k/a Performance Capital (the "Equity Holders") to Debtor's First
Amended Plan of Reorganization (Dkt. No. 1797) and (ii) Objection of David Fishel to Debtor's First Amended Plan
of Reorganization and Joinder of David Fishel to Objection of RCG Carpathia Master Fund, Ltd. and Kellogg
Capital Group, LLC f/k/a Performance Capital to Debtor's First Amended Plan of Reorganization (Dkt. No. 1800)
(collectively, the "Equity Objections").

the testimony and evidence presented by the Debtor and the

Creditors' Committee regarding valuation and, as such, the Plan

complies with the "absolute priority rule" set forth in Section

1129(b)(2) because there are no claimants junior to either Equity

Holders or Class 8(b) that will receive or retain any property under

the Plan. See 11 U.S.C. § 1129(b)(2)(B)(ii). Moreover, under the

Plan, no senior class will receive more than full compensation for

its claims. See Plan, Article 4.

Both Lazard Freres & Co. LLC ("Lazard") and Houlihan,

Lokey, Howard & Zukin, Inc. ("Houlihan") used the three standard

valuation approaches: (i) precedent transaction analysis; (ii)

discounted cash flow approach; and (iii) comparable public

company analysis. See Transcript of Confirmation Hearing Before

the Honorable Charles G. Case, II, United States Bankruptcy

Judge, dated August 25, 2004 at 237 (the "Confirmation Hearing

Transcript") (testimony of Andrew Yearley). Cf. Confirmation

Hearing Transcript at 311-312, 317, 319 (testimony of Bradley

Geer); see also, Debtor's Exh. 139 and 141-146. Using these

generally recognized valuation methodologies, Lazard determined

that the Enterprise Value of the Reorganized Debtor approximated

the midpoint of the range of these methodologies, $1.5 billion.

Confirmation Hearing Transcript at 237 (testimony of Andrew

Yearley). Using the same methodologies, Houlihan independently

arrived at a range of value for the Reorganized Debtor of approximately $1.4 billion to 1.67 billion. See Confirmation Hearing Transcript at 315 and 325 (testimony of Bradley Geer). The valuations prepared by Lazard and Houlihan were based upon the Debtor's business plan which Lazard determined to be "reasonable" and "achievable." Confirmation Hearing Transcript at 242 (testimony of Andrew Yearley). Moreover, each of the Debtor's witnesses, William Austin, Mike Hanson and Brian Bird testified that the Debtor's business plan was reasonable and achievable. Confirmation Hearing Transcript at 106-108 (testimony of William Austin); Confirmation Hearing Transcript at 169 (testimony of Mike Hanson); Confirmation Hearing Transcript at 217 (testimony of Brian Bird). The Court finds the testimony of Mr. Yearley and Mr. Geer to be reasonable and persuasive; accordingly, the Court finds that the value of the Reorganized Debtor based on the generally recognized methodologies to be a range of approximately $1.4 to $1.67 billion.

As the testimony at the Confirmation Hearing indicated, both Lazard and Houlihan made downward adjustments to their valuations equal to the "present value of the QF liabilities," or $140 million, to take into consideration losses associated with the Debtor's QF liabilities that were reflected on the Debtor's income statements but not captured in any of the earnings figures.

Confirmation Hearing Transcript at 241, 298 (testimony of Andrew Yearley); Confirmation Hearing Transcript at 323 (testimony of Bradley Geer). Upon a review of the Disclosure Statement, the Plan and upon consideration of the testimony at the Confirmation Hearing, the Court finds that the downward adjustment to the valuation of the Reorganized Debtor was reasonable and appropriate.

Lazard and Houlihan independently concluded that the total claims threshold plus post-petition interest was approximately $2.2 to $2.3 billion. Confirmation Hearing Transcript at 250-251 (testimony of Andrew Yearley); Confirmation Hearing Transcript at 325 (testimony of Bradley Geer). The witnesses testified that at these claims levels, there would be approximate negative equity value in the Reorganized Debtor of at least $586 million to $700 million. Confirmation Hearing Transcript at 325 (testimony of Bradley Geer); Confirmation Hearing Transcript at 240 (testimony of Andrew Yearley). Moreover, Mr. Yearley testified that in order to reach a valuation where there would be positive equity several factors must be assumed including using only the discounted cash flow approach, not deducting the QF liability, and higher growth rates. Confirmation Hearing Transcript at 254 (testimony of Andrew Yearley). The Court finds that reaching a valuation where

there would be positive equity assumes factors that are not

supported by the evidence or the testimony.

The Equity Holders' financial advisor, Seneca Financial

Group ("Seneca"), through James Harris, testified that Seneca

relied almost exclusively on the discounted cash flow analysis and

provided no weight to the comparable transactions and the market

multiples methodologies. Confirmation Hearing Transcript at 350-

351 (testimony of James Harris). The Court finds that Seneca's

primary reliance on the discounted cash flow analysis was not

reasonable because Seneca wholly disregarded generally

recognized market-based methodologies in determining valuation.

The discounted cash flow analysis relied on by Mr. Harris is a

projection based analysis which requires a variety of assumptions

and cannot be relied upon as the sole methodology for determining

valuation. Mr. Harris also testified that, despite the fact that the

Debtor's management had included all relevant information in its

projections, Seneca chose not to rely on the key elements of the

Debtor's business plan. As such, Seneca failed to deduct the

Debtor's QF liabilities and made several assumptions regarding tax

rates, higher growth and terminal value. Confirmation Hearing

Transcript at 391 (testimony of James Harris); Confirmation

Hearing Transcript at 254 (testimony of Andrew Yearley). Mr.

Harris failed to interview management or talk to Lazard or

Houlihan about the assumptions underlying the Debtor's business plan. Confirmation Hearing Transcript at 392 (testimony of James Harris). In particular, the Court finds that Mr. Harris' use of a higher growth rate to be speculative, not historically-based, and not based on management's projections. Moreover, Mr. Harris failed to demonstrate why Seneca chose not to deduct the Debtor's QF liabilities notwithstanding the recordation of a $140 million liability on the Debtor's balance sheet. Confirmation Hearing Transcript at 394 (testimony of James Harris). The Court also finds that Mr. Harris' reliance on the Standard & Poor Report (Equity Holders Exh. 1) was unreasonable as such report was not prepared for valuation purposes. Accordingly, the Court finds that Mr. Harris' testimony as to valuation lacks credibility and is not substantial because he chose to ignore the Debtor's business plan and the projections on which the business plan is based.

Upon consideration of the evidence and the testimony at the Confirmation Hearing, the Court finds that the Plan complies with the "absolute priority rule" set forth in Section 1129(b)(2) because there are no claimants junior to either Equity Holders or Class 8(b) that will receive or retain any property under the Plan. See 11 U.S.C. § 1129(b)(2)(B)(ii). Accordingly, the objections of the Equity Holders and David Fishel are overruled in their entirety.

32

Magten and Law Debenture object to the classification of
claims under the Plan because the Plan (i) separately
classifies holders of TOPrS and QUIPS and (ii) classifies
the claims of the holders of the QUIPS with respect to their
claim for principal plus interest together with causes of
actions asserted by the holders of the QUIPS in the QUIPS
Litigation. The Plan segregates the claims based on the
TOPrS into Class 8(a) and the claims based on the QUIPS
into Class 8(b). See Plan, § 4.8. The Court finds that the
claims based on the TOPrS Indenture and the QUIPS
Indenture are not "substantially similar" since the claims
relating to the TOPrS and the claims related to the QUIPS
are not similar in legal character or effect. See Plan, §4.8.
Both Class 8(a) and Class 8(b) will receive the same
distribution if each respective class accepts the Plan;
accordingly, the Court finds that the Plan does not provide
for disparate treatment of Class 8(a) and Class 8(b). See
Plan, §4.8. As the Plan reflects, the Debtor reached a
settlement with Wilmington Trust Company, as indenture
trustee under the TOPrS Indenture, and Harbert
Management Corporation whereby the PUHCA[3]-related
litigation claims were settled and released in connection
with the increased distributions. See Plan, §4.8.

---

[3] The Public Utility Holdings Company Act of 1935 ("PUHCA").

Consistent with the treatment provided to Class 8(a), the

Plan provides the holders of QUIPS the same opportunity

to settle their QUIPS Litigation claims that was provided to

the holders of TOPrS to settle their PUHCA-related claims.

Moreover, upon consideration of the Plan and evidence, but

for the settlement being offered, the holders of TOPrS and

QUIPS would not be entitled to a distribution because

under the express terms of the TOPrS Indenture and the

QUIPS Indenture, the TOPrS and QUIPS claims are

subordinated to the claims of Class 7. Upon review of the

Plan, the pleadings, testimony and arguments of counsel,

the Court hereby finds that there is a reasonable basis for

the Plan's classification scheme with regard to Class 8(a)

and Class 8(b) because the claims by holders of TOPrS are

substantially similar to other claims in Class 8(a) and the

claims by holders of the QUIPS are substantially similar to

other claims in Class 8(b).

In addition, the Court finds that the Options provided to Class 8(b) under the Plan are appropriate. The Court hereby finds that the "going flat" transaction is all one transaction and but for the "going flat" transaction the Debtor would have no liability on the QUIPS Notes. The QUIPS Litigation Claims and the QUIPS Notes Claims are mutually exclusive and not cumulative claims; therefore, requiring Class 8(b) holders to opt for either Class 8(b) treatment or preserving their QUIPS Litigation Claims as disputed Class 9 Claims does not unfairly discriminate against such holders.

The two claims cannot coexist. As such, requiring Class 8(b) holders to pay for the option of seeking a higher monetary reward through the QUIPS Litigation is not unfairly discriminatory. The Court hereby finds that requiring Class 8(b) holders to choose either Option 1 or Option 2 is appropriate and reasonable.

Moreover, the Court finds that the classification scheme was not proposed to manipulate class voting. The voting results show that Class 8(a) accepted the Plan in both number and amount. Voting Agent Resolicitation Declaration ¶ 16 [Dkt. No. 2170, Debtor's Exh. 185]. In the event the two sub-classes were combined, the Debtor would not be required to take advantage of the cram-down provisions of Section 1129(b) and Magten and Law Debenture's vote to reject would have been subsumed by the far larger claims of the holders of TOPrS. Accordingly, the Court