# NORTHWESTERN CORPORATION
## 2002 SERVICE LIST

John P. Coyle, Esquire
*Duncan & Allen*
1575 Eye Street, NW., Suite 300
Washington, DC 20005-1175

Robert A. Nelson, Esquire
*Montana Consumer Counsel*
616 Helena Avenue
Helena, MT 59620-1703

Maxon R. Davis, Esquire
*Davis, Hatley Haffeman & Tighe, P.C.*
P.O. Box 2103
Great Falls, Montana 59403-2103

Gary L. Barnhart, Esquire
*Missouri Department of Revenue*
General Counsel's Office
301 W. High Street, Room 670
P.O. Box 475
Jefferson City, MO 65105-0475

Natalie D. Ramsey, Esquire
Baldo M. Carnecchia, Esquire
Simon E. Fraser, Esquire
*Montgomery McCracken Walker &*
*Rhoads, LLP*
123 South Broad Street, 24th Floor
Avenue of the Arts
Philadelphia, PA 19109

Michael P. Massad, Jr., Esquire
*Hunton & Williams LLP*
Energy Plaza, 30th Floor
1601 Bryan Street
Dallas, TX 75201

Scott H. Clark, Esquire
*Ray Quinney & Nebeker*
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, UT 84145-0385

Carolyn R. Hancock, Esquire
(James Donnell and Jennifer Gore)
*Andrews Kurth LLP*
600 Travis, Suite 4200
Houston, TX 77002

John R. Harney, Esquire
National Pension Fund and International
Training Fund
*O'Donoghue & O'Donoghue LLP*
4748 Wisconsin Avenue, N.W.
Washington, DC 20016

Mr. Richard Hylland
P.O. Box 88708
Sioux Falls, SD 57109

Colleen E. McManus, Esquire
*Piper Rudnick, LLP*
203 North LaSalle Street, Suite 1800
Chicago, IL 60601

*IOS Capital, LLC*
Bankruptcy Administration
1738 Bass Road
P.O. Box 13708
Macon, GA 31208-3708

Michael R. Enright, Esquire
*Robinson & Cole LLP*
280 Trumbull Street
Hartford, CT 06103

Thomas A. Lee III, Esquire
*Becket and Lee, LLP*
P.O. Box 3001
Malvern, PA 19355-0701

Matthew W. Morrison, Esquire
Kim J. Sabo, Esquire
*U.S. Department of Justice -*
*Environmental and Natural Resources Division*
P.O. Box 7611
Washington, DC 20044

Henry Elsen, Esquire
*U.S. Environmental Protection Agency*
8MO Operations Office Federal Building
10 West 15th Street, Suite 3200
Helena, MT 59626

Michael McGrath, Esquire
Rob Collins, Esquire
Office of the Attorney General
*Montana Department of Justice*
215 North Sanders Street, 3rd Floor
P.O. Box 201401
Helena, MT 59620-1401

# NORTHWESTERN CORPORATION
## 2002 SERVICE LIST

Rex D. Rainach
3622 Government Street
Baton Rouge, LA  70806-5720

Patricia Schrage, Esquire
*Securities & Exchange Commission*
New York District Office
Branch of Reorganization
Woolworth Building
233 Broadway
New York, NY  10279

Charles E. Boulbol, Esquire
26 Broadway 17th Floor
New York, NY  10004

Vernon E. Inge, Jr., Esquire
Christopher A. Jones, Esquire
*LeClair Ryan*
707 East Main Street, Suite 1100
Richmond, VA  23219

Michael W. Spence, Esquire
*Ray Quinney & Nebeker*
6 South State Street
P.O. Box 45385
Salt Lake City, UT  84145-0385

John J. Fries, Esquire
*Ryley Carlock & Applewhite*
One North Central Avenue, Suite 1200
Phoenix, AZ  85004

Laura Davenport Demman, Esquire
Special Assistant Attorney General
*Nebraska Public Service Commission*
1200 N Street, Suite 300
P.O. Box 94927
Lincoln, NE  68509-4927

George Psomas
*Goldsmith Agio Helms*
430 Park Avenue, 12th Floor
New York, NY  10022-3505

Helen Kautsky
*Bennett Management, Corp.*
2 Stamford Plaza, Suite 1501
Stamford, CT  06901

Meagan E. Costello, Esquire
*Fried, Frank, Harris, Shriver & Jacobson LLP*
One New York Plaza
New York, NY  10004

900200.00001/40133305v1

**EXHIBIT F**

10/26/2004    16:51    GREENBERG TRAURIG WILMINGTON → 912123194090    NO.323    0002

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| NORTHWESTERN CORPORATION, | : | Case No. 03-12872 (CGC) |
| Debtor. | : | |
| | : | |
| MAGTEN ASSET MANAGEMENT CORPORATION, | : | C.A. No. _____ |
| Appellant, | : | |
| v. | : | |
| NORTHWESTERN CORPORATION, | : | |
| Appellee. | : | |

### EMERGENCY MOTION OF MAGTEN ASSET MANAGEMENT CORPORATION FOR A STAY PENDING APPEAL OF THE ORDER CONFIRMING THE DEBTOR'S SECOND AMENDED AND RESTATED PLAN OF REORGANIZATION

Magten Asset Management Corporation ("Magten"), by and through its undersigned

counsel, hereby respectfully moves (this "Motion") this Court on an emergency basis pursuant to

Rule 8005 of the Federal Rules of Bankruptcy Procedure and Rule 62 of the Federal Rules of

Civil Procedure for a Stay of the Order Confirming the Debtor's Second Amended and Restated

Plan of Reorganization pending Magten's appeal from that order.

1

120087.01600/40146473v1

Magten submits the accompanying brief in support of this Motion.

Dated:  Wilmington, Delaware
       October 26, 2004

                            BLANK ROME LLP

                            Mark J. Packel (DE No. 4048)
                            Elio Battista, Jr. (DE No. 3814)
                            1201 Market Street, Suite 800
                            Wilmington, DE 19801
                            Telephone:   (302) 425-6400
                            Facsimile:   (302) 425-6464

                                -and -

                            FRIED, FRANK, HARRIS, SHRIVER &
                              JACOBSON LLP
                            Bonnie Steingart, Esq.
                            Gary L. Kaplan, Esq.
                            One New York Plaza
                            New York, NY 10004
                            Telephone:  (212) 859-8000
                            Facsimile:  (212) 859-4000

                            Counsel for Magten Asset Management
                              Corporation

2

10/26/2004   16:57    GREENBERG TRAURIG WILMINGTON → PHJW                    NO.324   D002

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
| NORTHWESTERN CORPORATION, | : | Case No. 03-12872 (CGC) |
| Debtor. | : | |
| | : | |
| MAGTEN ASSET MANAGEMENT CORPORATION, | : | C.A. No. _04cv 1389_ |
| Appellant, | : | |
| v. | : | |
| NORTHWESTERN CORPORATION, | : | |
| Appellee. | : | |

---

**BRIEF IN SUPPORT OF EMERGENCY MOTION OF MAGTEN
ASSET MANAGEMENT CORPORATION FOR A STAY PENDING
APPEAL OF THE ORDER CONFIRMING THE DEBTOR'S SECOND
AMENDED AND RESTATED PLAN OF REORGANIZATION**

---

**FRIED, FRANK, HARRIS, SHRIVER
   & JACOBSON LLP**
Bonnie Steingart, Esq.
Gary L. Kaplan, Esq.
One New York Plaza
New York, NY 10004
Telephone: (212) 859-8000

Counsel for Magten Asset Management
   Corporation

**BLANK ROME LLP**
Mark J. Packel (DE No. 4048)
Elio Battista, Jr. (DE No. 3814)
1201 North Market Street
Suite 800
Wilmington, DE 19801
Telephone: (302) 425-6400

Dated: October 26, 2004

10/26/2004    16:57    GREENBERG TRAURIG WILMINGTON → PHJW                    NO.324   P003

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................3

JURISDICTION AND VENUE ............................................................................................7

RELIEF REQUESTED..........................................................................................................7

I.   The Court Should Stay The Confirmation Order In Its Entirety.......................................7

    A.   Magten Will Likely Succeed on the Merits of its Appeal from the
Confirmation Order.............................................................................................8

    B.   Magten Will Suffer Irreparable Harm if a Stay is Not Granted............................13

    C.   Granting a Stay Will Not Substantially Injure Other Parties ...............................14

    D.   A Stay Pending Appeal Would Serve the Public Interest .......................................15

II.  Even If The Court Is Not Willing To Stay The Confirmation Order In Its Entirety, Certain
Portions Of The Confirmation Order Must Be Stayed To Protect The Rights Of QUIPS
Holders ...........................................................................................................16

NO BOND SHOULD BE REQUIRED..................................................................................17

CONCLUSION....................................................................................................................19

120087.01600/40146474v1

10/26/2004    16:57    GREENBERG TRAURIG WILMINGTON → PHJW    NO.324    ₱004

## TABLE OF AUTHORITIES

**Cases**                                                                                                **Page(s)**

In re AOV Indus., Inc.,
    792 F.2d 1140 (D.C. Cir. 1986)............................................................10

In re Abbotts Dairies of Pa., Inc.,
    788 F.2d 143 (3d Cir. 1986)..............................................................13

In re America's Voice, Inc.,
    No. 00-1408 (ESH), 2000 U.S. Dist. LEXIS 14761 (D.D.C. Oct. 4, 2000) ...................9

In re Byrd,
    172 B.R. 970 (Bankr. W.D. Wash. 1994) ..........................................17, 18

Citizens Nat'l Bank (In re Turner),
    207 B.R. 373 (B.A.P. 2d Cir. 1997)...........................................................9

In re Columbia Gas Sys.,
    Civil Action No. 92-127-SLR, 1992 U.S. Dist. LEXIS 3253
    (D. Del. Mar. 10, 1992)..............................................................7, 8

In re Combined Metals Reduction Co.,
    557 F.2d 179 (9th Cir. 1977)..............................................................13

Consol. Rock Prods. Co. v. Du Bois,
    312 U.S. 510 (1941).......................................................................11

Country Squire Assocs. of Carle Place, L.P. v. Rochester Cmty. Sav. Bank
(In re Country Squire Assocs. of Carle Place, L.P.),
    203 B.R. 182 (B.A.P. 2d Cir. 1996).........................................................13

In re Del. & Hudson Ry. Co.,
    90 B.R. 90 (Bankr. D. Del. 1988) ..........................................................7

In re Edwards,
    228 B.R. 573 (Bankr. E.D. Pa. 1999) .......................................................8

Evans v. Buchanan,
    435 F. Supp. 832 (D. Del. 1997).............................................................7

Evans v. Buchanan,
    455 F. Supp. 705 (D. Del. 1978)............................................................8

In re Farrell Lines, Inc.,
    761 F.2d 796 (D.C. Cir. 1985)..............................................................17

iii

10/26/2004    16:57    GREENBERG TRAURIG WILMINGTON → PHJW    NO.324    ᴾ005

Goldstein v. Miller,
     488 F. Supp. 156 (D. Md. 1980), aff'd, 649 F.2d 863, aff'd sub nom.
     Overbook Egg Nog Corp. v. Miller, 649 F.2d 864 (4th Cir. 1981) ....................................8

In re Hellesen,
     BK No. 97-11695-MWV, Chapter 13, 1999 Bankr. LEXIS 1891
     (Bankr. D.N.H. Jan. 11, 1999) ....................................................................................9

Hirschfeld v. Bd. of Elections,
     984 F.2d 35 (2d Cir. 1993)..........................................................................................9

John Doe Agency v. John Doe Corp.,
     488 U.S. 1306 (1989)................................................................................................13

In re Mariner Post-Acute Network, Inc.,
     267 B.R. 46 (Bankr. D. Del. 2001) ..............................................................................9

Morgan v. Polaroid Corp. (In re Polaroid Corp.),
     Civil Action No. 02-1353 (JJF), 2004 U.S. Dist. LEXIS 1917
     (D. Del. Feb. 9, 2004) .................................................................................................8

O'Bryan v. Estelle,
     691 F.2d 706 (5th Cir. 1982) .......................................................................................8

Official Comm. of Unsecured Creditors v. Columbia Gas Sys., Inc.
(In re Columbia Gas Sys., Inc.),
     997 F.2d 1039 (3d Cir. 1993).......................................................................................9

Pension Benefit Guar. Corp. v. Sharon Steel Corp. (In re Sharon Steel Corp.),
     159 B.R. 730 (Bankr. W.D. Pa. 1993) ..........................................................................8

Providence Journal Co. v. FBI,
     595 F.2d 889 (1st Cir. 1979) ......................................................................................13

In re Public Serv. Co.,
     116 Bankr. 347 (Bankr. D.N.H. 1990)...........................................................................8

Republic of the Phil. v. Westinghouse Elec. Corp.,
     949 F.2d 653 (3d Cir. 1991)........................................................................................7

In re Sentry Operating Co.,
     264 B.R. 850 (Bankr. S.D. Tex. 2001) .......................................................................12

In re Sovereign Group 1985-27, Ltd.,
     142 B.R. 702 (E.D. Pa. 1992) ....................................................................................12

In re Sphere Holding Corp.,
     162 B.R. 639 (E.D.N.Y. 1994) ..............................................................................17, 18

120087.01600/40146474v1

10/26/2004    16:57    GREENBERG TRAURIG WILMINGTON → PHJW    NO.324    P006

In re Theatre Holding Corp.,
    22 B.R. 884 (Bankr. S.D.N.Y. 1982) .............................................................18

In re Toy & Sports Warehouse, Inc.,
    37 B.R. 141 (Bankr. S.D.N.Y. 1984) .............................................................11

In re United Merchs. & Mfgs., Inc.,
    138 B.R. 426 (D. Del. 1992) .............................................................13, 18

In re Westwood Plaza Apartments, Ltd.,
    150 B.R. 163 (Bankr. E.D. Tex. 1993) .............................................................17

## Federal statutes

28 U.S.C. § 158 (1993 & Supp. 2004) .............................................................7

28 U.S.C. § 1334 (1993 & Supp. 2004) .............................................................7

28 U.S.C. § 1408 (1993) .............................................................7

28 U.S.C. § 1409 (1993) .............................................................7

## Federal rules

Fed. R. Bankr. P. 8005 .............................................................17

## States Statutes

Mont. Code Ann. § 31-2-339 (2004) .............................................................10

Mont. Code Ann. § 72-33-219 (2004) .............................................................9

v

Pursuant to Rule 8005 of the Federal Rules of Bankruptcy Procedure and Rule 62 of the Federal Rules of Civil Procedure, Magten Asset Management Corporation ("Magten"), by and through its undersigned counsel, hereby submits this Brief in Support of its Emergency Motion (the "Motion") seeking a Stay of the Order (the "Confirmation Order") Confirming the Debtor's Second Amended and Restated Plan of Reorganization (the "Plan") pending Magten's appeal from that order.

## INTRODUCTION

1.     By its Motion, Magten is seeking a stay of the Confirmation Order in order to prosecute an appeal from that order. Unless a stay of the Confirmation Order is granted, Magten and the holders of the Series A 8.45% Quarterly Income Preferred Securities (the "QUIPS") face a substantial risk that once the Plan is effective they will be deprived of their rights with no recourse, as any subsequent appeal of the Confirmation Order may be rendered moot.[1]

2.     The holders of the QUIPS are victims of a scheme orchestrated by the Debtor to defraud the creditors of Clark Fork and Blackfoot LLC ("Clark Fork"), the Debtor's subsidiary, and deprive such creditors of any recourse for this fraudulent scheme. In November 2002, the Debtor transferred certain electric, natural gas and propane utility assets (the "Montana Utility Assets") for inadequate consideration at a time when it was insolvent and was not financially capable of performing its obligations under the indenture governing the QUIPS notes. The public, however, was not apprised of the Debtor's true financial condition until six months after the transfer when the Debtor publicly admitted that the financial statements available at the time of the transfer of the assets were significantly overstated. Due to the Debtor's insolvency and false financials, holders of the QUIPS were denied their right to seek a full recovery against the transferred assets.

---

[1]    Magten does not in any way argue or concede that once the Plan is effective, Magten's appeal will be moot.

1

3.     Throughout the Debtor's chapter 11 case, Magten, on behalf of the trust holding the QUIPS, has sought to avoid the fraudulent conveyance of the Montana Utility Assets, and Magten and Law Debenture Trust Company of New York ("Law Debenture"), as Indenture Trustee for the Indenture governing the QUIPS, filed a complaint seeking to avoid the fraudulent transfer of the Montana Utility Assets (the "Adversary Proceeding"). As a result of the Bankruptcy Court's decision denying in part the Debtor's motion to dismiss the Adversary Proceeding, holders of the QUIPS continued to pursue an equitable remedy for the fraudulent conveyance of the Montana Utility Assets. The Debtor's Plan, however, discharges the equitable rights and remedies of the QUIPS holders, thereby depriving QUIPS holders of a remedy for the harms caused by the Debtor's fraudulent conveyance. Specifically, the Plan dispenses with the requirements of Section 1129 of the Bankruptcy Code by forcing the holders of the QUIPS to choose between (i) a *de minimus* recovery on account of their QUIPS holdings and forego any claim or right with respect to the Adversary Proceeding, or (ii) a disputed litigation claim that, if allowed, will provide only a $.69 recovery in common stock. A stay of the Confirmation Order is necessary in order to ensure that the holders of the QUIPS are not deprived of their rights to the Montana Utility Assets without any appellate review.

4.     Furthermore, although the Court should stay the Confirmation Order in its entirety pending Magten's appeal, at a minimum, the Court should stay the Confirmation Order to the extent that it would deprive QUIPS holders of their equitable right to recover on account of the fraudulent conveyance of the Montana Utility Assets. By staying the provisions in the Plan and Confirmation Order that compromise the rights the QUIPS holders, the Plan can go effective without causing any injury to the Debtor, its creditors, or its customers, while at the same time protecting those creditors of Clark Fork who are the victims of the Debtor's fraud.

2

120087.01600/40146474v1

## BACKGROUND

### Chapter 11 Proceeding

5.      The Debtor is a publicly traded Delaware corporation that was incorporated in 1923. The Debtor, together with its direct and indirect non-debtor subsidiaries, comprise one of the largest providers of electricity and natural gas in the upper Midwest and Northwest regions of the United States, serving approximately 608,000 customers throughout Montana, South Dakota and Nebraska

6.      Magten holds in excess of 40% of the QUIPS issued by Montana Capital I (the "Trust"). The Trust is a business trust established pursuant to the Delaware Business Trust Act. The Trust was established by The Montana Power Company ("Montana Power"), predecessor in interest to Clark Fork (f/k/a NorthWestern Energy, LLC), as a financing vehicle. The only assets of the Trust are the 8.45% Junior Subordinated Debentures due 2036 issued by Montana Power.

7.      On September 29, 2000, Montana Power entered into a unit purchase agreement with the Debtor, pursuant to which the Debtor agreed to purchase the Montana Utility Assets. In order to facilitate the assets sale to the Debtor, Montana Power created a subsidiary, Montana Power Company LLC.

8.      On November 15, 2002, the Debtor orchestrated the transfer of substantially all of the utility assets of its directly owned subsidiary, Clark Fork to the Debtor for inadequate consideration (the "Transfer"). Though the Clark Fork assets had a value well in excess of $1 billion, the total consideration received for the Transfer was the assumption of approximately $700 million of liabilities by the Debtor. As a result of this Transfer, Clark Fork was rendered insolvent.

3

120087.01600/40146474v1

9.    On April 16, 2003, the Debtor reported its financial results for the fiscal year ended ("FYE") 2002 – the year in which the Transfer occurred. These filings included a restatement of the previously unaudited quarterly results for the first three quarters of FYE 2002. Specifically, the Debtor's restated financials indicated an additional $878.5 million in previously unreported "negative charges." See Exhibit A. Immediately thereafter, the United States Securities and Exchange Commission (the "SEC") launched an informal investigation into the Debtor's financial restatements. This investigation became a formal investigation in December 2003, and has not yet been conclusively resolved. See Exhibit B, Second Amended and Restated Disclosure Statement at Art. III §M ¶15.

10.    On September 14, 2003, the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor continues to operate its business and manage its property as a debtor in possession.

11.    On March 11, 2004, the Debtor filed its initial plan of reorganization and disclosure statement with the Bankruptcy Court, as well as its motion in support of the Disclosure Statement.

12.    On May 14, 2004 the Debtor filed its First Amended Plan and Disclosure Statement with the Bankruptcy Court, and on May 25, 2004, the Debtor filed its revised First Amended Plan and Disclosure Statement. On May 26, 2004, the Bankruptcy Court approved the revised First Amended Disclosure Statement.

13.    On August 9, 2004, Magten filed an objection to the Debtor's First Amended Plan of Reorganization. See Exhibit C.

4

14.     On August 19, 2004, four business days before the scheduled confirmation hearing, the Debtor filed its Second Amended Plan and Disclosure Statement.

15.     On August 25, 2004, Magten filed an objection to the Second Amended Plan and Disclosure Statement. That same day, over the objections of Magten and Law Debenture, the Bankruptcy Court held a hearing with respect to the Debtor's disclosure statement and began the confirmation hearing.

16.     On August 31, 2004, the Debtor filed its revised Second Amended and Restated Plan (see Exhibit D) and revised Second Amended and Restated Disclosure Statement, and on September 2, 2004, the Bankruptcy Court entered an order approving the Second Amended and Restated Disclosure Statement.

17.     On September 21, 2004, Magten filed an objection to the Plan (See Exhibit E), and on October 6, 2004, the Bankruptcy Court continued the confirmation hearing with respect to the Plan. Subsequently, on October 8, 2004, the Bankruptcy Court held a teleconference during which the Bankruptcy Court confirmed the Plan over Magten and Law Debenture's objections. See Exhibit F.

18.     On October 19, 2004, the Bankruptcy Court entered the Confirmation Order. See Exhibit G.

19.     On October 22, 2004 Magten filed with the Bankruptcy Court an Emergency Motion (the "Emergency Motion") for a Stay Pending Appeal of the Order Confirming the Debtor's Second Amended and Restated Plan of Reorganization. See Exhibit H. On October 25, 2004, the Bankruptcy Court held a hearing on the Emergency Motion and denied Magten's Emergency Motion. See Exhibit S.

5

20.    On October 25, 2004, Magten filed a notice of appeal of the Confirmation Order with the Bankruptcy Court. See Exhibit I.

The Adversary Proceeding Seeking to Avoid the Transfer

21.    After the Debtor filed its chapter 11 petition, the extent of the harm to the creditors of Clark Fork became clear. Instead of receiving a full recovery on account of their claim as they would have if the Transfer had never occurred, it became clear that holders of the QUIPS would receive a minimal recovery under the Debtor's Plan.

22.    On March 17, 2004, Magten filed its motion for relief from the automatic stay to commence an adversary proceeding seeking to avoid the fraudulent transfer. On April 8, 2004, the Bankruptcy Court granted Magten's motion, thereby allowing Magten and Law Debenture to commence this adversary proceeding against the Debtor.

23.    On April 16, 2004, Magten, together with Law Debenture, filed a complaint (the "Complaint") on behalf of the holders of the QUIPS against the Debtor in the Bankruptcy Court seeking to set aside the fraudulent conveyance of the Montana utility assets. See Exhibit J.

24.    On May 14, 2004, the Debtor filed a motion to dismiss the Complaint, and on June 16, Magten and Law Debenture submitted an objection to that motion and a memorandum of law in support of its objection. On June 28, 2004, the Debtor filed a reply in further support of its motion to dismiss the Complaint.

25.    On August 20, 2004, the Bankruptcy Court entered a decision denying in part the motion to dismiss on the ground that Magten and Law Debenture have standing as creditors of Clark Fork if Magten and Law Debenture can prove under applicable law that the release provided in Section 1102 of the Indenture was obtained through actual fraud or as part of a fraudulent scheme. See Exhibit K.

6

120087.01600/40146474v1

26.    Magten and Law Debenture are pursuing the Adversary Proceeding and seek a full recovery on account of the fraudulent conveyance of the Montana Utility Assets.

## JURISDICTION AND VENUE

27.    The Court has jurisdiction over this matter as a core proceeding under 28 U.S.C. §§1334 and 158. The relief requested herein is predicated on Rule 8005 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). Venue in this district is proper pursuant to 28 U.S.C. §§1408 and 1409.

## RELIEF REQUESTED

### I.    The Court Should Stay The Confirmation Order In Its Entirety

28.    Bankruptcy Rule 8005 empowers the Court to stay any judgment or order pending appeal. "[A] stay may be appropriate in a case where the threat of irreparable injury to the applicant is immediate and substantial, the appeal raises serious and difficult questions of law in an area where the law is somewhat unclear and the interests of the other parties and the public are not harmed substantially." Evans v. Buchanan, 435 F. Supp. 832, 844 (D. Del. 1997).

29.    In determining whether to stay the Confirmation Order, the Court must consider: (1) whether Magten is likely to succeed on the merits; (2) whether Magten will be irreparably harmed if a stay is not issued; (3) whether the issuance of a stay will substantially injure other parties; and (4) whether the public interest is affected. Republic of the Phil. v. Westinghouse Elec. Corp., 949 F.2d 653, 658 (3d Cir. 1991); see also In re Del. & Hudson Ry. Co., 90 B.R. 90, 91 (Bankr. D. Del. 1988); In re Columbia Gas Sys., Inc., Civil Action No. 92-127-SLR, 1992 Dist. LEXIS 3253, at *3-4 (D. Del. 1992). See Exhibit L. In assessing whether Magten has satisfied its burden of showing that a stay pending appeal is warranted, no one factor should be isolated rather, the Court must balance and weigh all relevant factors. Evans v. Buchanan, 455

7

F. Supp. 705, 708 (D. Del. 1978); In re Edwards, 228 B.R. 573 (Bankr. E.D. Pa. 1999) (balancing all factors in making the determination whether to grant a stay); Pension Benefit Guar. Corp. v. Sharon Steel Corp. (In re Sharon Steel Corp.), 159 B.R. 730, 733 (Bankr. W.D. Pa. 1993) (finding that the bankruptcy court can balance the factors "in light of the overall circumstances of the case"). As discussed below, given the Plan's explicit violations of the Bankruptcy Code and the substantial harm that will befall Magten, all four factors are satisfied and entry of a stay pending appeal is warranted.

### A.    Magten Will Likely Succeed on the Merits of its Appeal from the Confirmation Order

30.    The first prong of the standard – a likelihood of success on the merits – requires the movant to have a "'substantial case,' or a strong case on appeal." In re Columbia Gas Sys., 1992 U.S. Dist. LEXIS 3253 at *4 (D. Del. Mar. 10, 1992)(citation omitted)(quoting In re Public Serv. Co., 116 Bankr. 347, 349 (Bankr. D.N.H. 1990)); Morgan v. Polaroid Corp. (In re Polaroid Corp.), Civil Action No. 02-1353 (JJF), 2004 U.S. Dist. LEXIS 1917 at *4 (D. Del. Feb. 9, 2004). See Exhibit M. The "likelihood-of-success" standard, however, "does not mean that the trial court needs to change its mind or develop serious doubts concerning the correctness of its decision in order to grant a stay pending appeal." Goldstein v. Miller, 488 F. Supp. 156, 172 (D. Md. 1980), aff'd, 649 F.2d 863, aff'd sub. nom. Overbrook Egg Nog Corp. v. Miller, 649 F.2d 864 (4th Cir. 1981). See also O'Bryan v. Estelle, 691 F.2d 706, 708 (5th Cir. 1982) (movant need not always show probability of success; substantial case on merits and serious legal question, coupled with balance of equities, weighs heavily in favor of granting stay). This prong merely reflects a court's "intent to restrict appellate review to those parties with colorable claims while at the same time conserving judicial resources by eliminating frivolous appeals." See

8

Citizens Nat'l Bank (In re Turner), 207 B.R. 373, 376-77 (B.A.P. 2d Cir. 1997)(citation

omitted)(citing Hirschfeld v. Bd. of Elections, 984 F.2d 35 (2d Cir. 1993)).

31.    The Plan should not have been confirmed because the primary assets upon which

the Debtor seeks to reorganize – the Montana Utility Assets – are not property of the Debtor's

estate.[2]   Under Montana state law, because the assets were transferred in a fraudulent

conveyance, the Montana Utility Assets are held in constructive trust and should be returned to

Clark Fork, the Debtor's non-debtor subsidiary.[3]  Because the Montana Utility Assets are being

held in constructive trust for the holders of the QUIPS, those assets are not property of the

Debtor's estate pursuant to Section 541 of the Bankruptcy Code.  See Official Comm. of

Unsecured Creditors v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.), 997 F.2d 1039,

1059 (3d Cir. 1993) ("Congress clearly intended the exclusion created by section 541(d) to

include not only funds held in express trust, but also funds held in constructive trust."(footnote

omitted));  In re America's Voice, Inc., No. 00-1408 (ESH), 2000 U.S. Dist. LEXIS 14761

(D.D.C. Oct. 4, 2000) (finding that because Debtor held property in a fiduciary capacity under

constructive trust the property cannot constitute property of the estate) See Exhibit N; In re

Mariner Post-Acute Network, Inc., 267 B.R. 46 (Bankr. D. Del. 2001) (stating that property held

by a debtor in constructive trust for another cannot be used by the debtor to pay its creditors); In

re Hellesen, BK No. 97-11695-MWV, Chapter 13, 1999 Bankr. LEXIS 1891, at *20 (Bankr.

D.N.H. Jan. 11, 1999).("Constructive trust property never becomes property of the estate because

it belongs to someone else.") See Exhibit O.

---

[2]    By this Motion, Magten reserves all of its objections with respect to the Confirmation Order.
[3]    Pursuant to MCA § 72-33-219, "A constructive trust arises when a person holding title to property is
subject to an equitable duty to convey it to another on the ground that the person holding title would be
unjustly enriched if he were permitted to retain it."

9

32.    The Plan, however, is flawed because it grants liens on the Montana Utility assets,
purports to revest those assets in the Debtor free and clear of liens claims and interests, and
provides for a distribution scheme predicated upon the Montana Utility Assets being property of
the Debtor's estate. See Exhibit D, Sections 1.157, 5.2 and 5.7. If the Plan becomes effective as
currently proposed, the Debtor will obtain clear title to property that does not belong to it, and
the holders of the QUIPS will be deprived of their interest in that property.

33.    Furthermore, the Plan should not have been confirmed because the causes of
action asserted in the Adversary Proceeding are not dischargeable upon the Debtor's emergence
from chapter 11 because they are not "claims" under Section 101(5) of the Bankruptcy Code.
Because there is no available monetary remedy for a fraudulent conveyance under Montana state
law,[4] the causes of action asserted in the Adversary Proceeding should not be deemed "claims"
and, therefore, survive the Debtor's emergence from bankruptcy.

34.    In addition, the Plan vitiates the requirements in Section 1129 of the Bankruptcy
Code. In particular, the Debtor required the QUIPS holders to choose between a recovery on
each right – a $.14 recovery on account of their claim for principal plus interest or the right to
recover up to $.69 of common stock in the Adversary Proceeding. See Exhibit D, Section 4.8 (b).
Forcing holders of the QUIPS to choose between recoveries is inappropriate as it requires
holders of the QUIPS to forego one of their separate rights.[5] Bundling these two rights and
requiring the holders of the QUIPS to choose between two separate recoveries to which they are
entitled violates Section 1122 of the Bankruptcy Code. See In re AOV Indus., Inc., 792 F.2d

---

[4]    MCA § 31-2-339, which governs the remedies available to creditors in seeking to set aside a fraudulent
conveyance, provides for remedies that are all equitable in nature but not for any form of monetary relief.

[5]    Magten recognizes that it is not entitled to more than a 100% recovery on account of the QUIPS.
Therefore, to the extent that the holders of the QUIPS receive a 100% recovery in the fraudulent
conveyance action, such recovery would be reduced by any recovery that the QUIPS holders receive under
the Plan.

120087.01600/40146474v1

10/26/2004    16:57    GREENBERG TRAURIG WILMINGTON → PHJW    NO.324    P017

1140, 1152 (D.C. Cir. 1986) (finding that "[i]t is disparate treatment when members of a common class are required to tender more valuable consideration – be it their claim against specific property of the debtor or some other cognizable chose in action – in exchange for the same percentage of recovery").

35.    The Bankruptcy Court held that the election of remedies is appropriate because the two remedies – a recovery on the notes and a recovery on the fraudulent conveyance – are mutually exclusive. See Exhibit F at 31-34. According to the Bankruptcy Court, if the fraudulent conveyance is proven, there is a rescission and the holders of the QUIPS do not have a claim against the Debtor on account of the QUIPS notes but have a claim against Clark Fork. See id. at 33-34. On the other hand, if there was no fraudulent conveyance, the holders of the QUIPS only get a recovery on the QUIPS and are not entitled to a recovery on account of the fraudulent conveyance. Id. This reasoning, however, is inherently inconsistent because if there is rescission, the Montana Utility Assets must be returned to Clark Fork. While the Bankruptcy Court recognized that the fraudulent conveyance is a separate and distinct remedy, its decision deprives the QUIPS holders of realizing a full recovery on account of that cause of action.

36.    Additionally, because Class 8(b) voted to reject the Plan, the Debtor was required to seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code, thereby cramming down the Plan on Class 8(b). See Exhibit G at ¶NN. The Plan, however, does not satisfy the requirements of section 1129(b) because, among other things, it discriminates unfairly against class 8(b) and provides distributions to equity holders and creditors whose claims are subordinate to creditors in Class 8(b). See In re Toy & Sports Warehouse, Inc., 37 B.R. 141, 151-52 (Bankr. S.D.N.Y. 1984) (quoting Consol. Rock Prods. Co. v. Du Bois, 312 U.S. 510 (1941)) (noting that the doctrine of absolute priority provides that "creditors and shareholders

11

120087.01600/40146474v1

may participate in the debtor's assets only in accordance with their respective priorities, and that senior classes must receive full compensation for their claims before other classes can participate"(citation omitted)); In re Sovereign Group 1985-27, Ltd., 142 B.R. 702, 705 (E.D. Pa. 1992) ("Under current law, failure to comply with the absolute priority rule is fatal to the proposed plan of reorganization.").

37.    Moreover, the Bankruptcy Court confirmed the Plan on the basis that all distributions going to junior creditors are a "gift" from senior creditors. See Exhibit G at ¶12(a). That reasoning, however, ignored the fact that the distribution being made to the holders of the QUIPS is a distribution pursuant to the Plan from the Debtor, not creditors in senior classes. The Debtor cannot circumvent the confirmation requirements set forth in the Bankruptcy Code by claiming that distributions made to creditors are a "gift" from other creditors when, in actuality, it is the Debtor who is making the distributions pursuant to the Plan. In re Sentry Operating Co., 264 B.R. 850, 864-65 (Bankr. S.D. Tex. 2001) (rejecting a creditor's argument that the plan does not unfairly discriminate by paying a greater recovery to one class of creditors over another class of creditors of equal rank because such an argument "does not address specific statutory confirmation requirements" and "is a siren's song that is insufficient as a foundation for plan confirmation"). Thus, while the Bankruptcy Court determined that the distributions under the Plan do not discriminate unfairly because senior creditors are free to "give up" a portion of their proceeds to unsecured creditors (see Exhibit G at ¶¶12(a) and NN), there is no authority under the Bankruptcy Code to support the Bankruptcy Court's decision.

38.    At a minimum, for the reasons set forth above, Magten has established a strong likelihood of success on the merits with respect to the Bankruptcy Court's erroneous approval of

12

10/26/2004    16:57    GREENBERG TRAURIG WILMINGTON → PHJW    NO.324    D019

the Confirmation Order. As such, there is sufficient basis for the Court to conclude that Magten will likely succeed on appeal.

### B.    Magten Will Suffer Irreparable Harm if a Stay is Not Granted

39.    If a stay is not granted, Magten will suffer substantial harm. The Debtor has indicated its intent to make the Plan effective as early as November 1, 2004. See Exhibit P at ¶14. Even if expedited, an appeal from the Confirmation Order will not be resolved by that date. If the Plan becomes effective before Magten's appeal can be decided, the Debtor will likely assert that Magten's appeal will be rendered moot because the Plan has been substantially consummated and the appropriate remedy – a return of the Montana Utility Assets – more difficult or even impossible to fashion. See In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 150 n.6 (3d Cir. 1986) ("[A]ppeal must be dismissed as moot when an event occurs that prevents the appellate court from granting any effective relief."(citations omitted)). But see In re United Merchs. & Mfrs., Inc., 138 B.R. 426, 429 (D. Del. 1992) (citing In re Combined Metals Reduction Co., 557 F.2d 179 (9th Cir. 1977) ("[S]ubstantial consummation does not sufficiently justify dismissal for mootness in all circumstances."(citations omitted)).

40.    Such loss of appellate review has been recognized as the consummate form of irreparable injury. See, e.g., John Doe Agency v. John Doe Corp., 488 U.S. 1306, 1309 (1989); Providence Journal Co. v. FBI, 595 F.2d 889, 890 (1st Cir. 1979); Country Squire Assocs. of Carle Place, L.P. v. Rochester Cmty. Sav. Bank (In re Country Squire Assocs. of Carle Place, L.P.), 203 B.R. 182, 183 (B.A.P. 2d Cir. 1996). The only way to prevent such irreparable injury is by staying the Confirmation Order until Magten's appeal is addressed.

41.    Moreover, pursuant to the terms of the Plan, QUIPS holders pursuing the Adversary Proceeding will receive a maximum recovery of $.69 in common stock only if they

120087.01600/40146474v1

prevail on the causes of action asserted in the Adversary Proceeding. See Exhibit D, Section 4.8(b). Absent the inappropriate provisions of the Plan, Magten would be able to receive 100 cents on the dollar in cash. Unless the Plan is stayed, Magten may forever be deprived of its rightful remedy. Additionally, to the extent the QUIPS holders do not prevail, QUIPS holders that have elected to pursue the Adversary Proceeding are left with *no* recovery on account of their rights, while other creditors that are *pari passu* with the QUIPS are receiving a $.14 recovery on their note holdings.

42.    Ultimately, through the terms of the Plan, the Debtor has unfairly and unnecessarily forced the holders of the QUIPS to receive substantially less than they are rightfully entitled to receive. Because the harm to be visited upon Magten in the absence of a stay will be both unjustified and irreparable, the Court should stay the Confirmation Order pending its appeal.

## C.    Granting a Stay Will Not Substantially Injure Other Parties

43.    A stay of the Confirmation Order pending Magten's appeal will not cause any substantial harm to any of the parties in the bankruptcy proceeding. The Debtor will not suffer any substantial harm by simply delaying, until the appeal is decided, the distributions of the new common stock and cash called for by the Plan. Moreover, the Debtor's creditors will not suffer a material harm because the value of the stock they are to receive should not decrease as a result of the stay.

44.    The Debtor will likely assert that a stay of the Confirmation Order will prevent the Debtor from securing its commitment for exit financing. The Debtor has previously stated that its commitment for exit financing will expire at the end of October and that any delay in going effective *may* adversely affect interest rates. See Exhibit P at ¶ 14. The Debtor's concerns

14

10/26/2004    16:57    GREENBERG TRAURIG WILMINGTON → PHJW    NO.324    D021

with respect to its exit financing are exaggerated as the Debtor should be able to obtain an extension on its financing commitment. The Debtor remains one of the largest providers of electricity and natural gas in the upper Midwest and Northwest regions of the United States and, without difficulty, obtained favorable terms on its post-petition financing. Accordingly, there is no reason to think that a delay of confirmation should affect the Debtor's ability to secure adequate exit financing upon reasonable terms. As such, it is unreasonable for the Debtor to allege that it, or its creditors, will be "substantially harmed" as a result of a stay.

45.    In addition, to the extent the Court grants Magten's request for a stay, Magten will expedite the appellate process in whatever manner the Court directs so as to limit any potential harm to the Debtor by the imposition of a stay.

D.    A Stay Pending Appeal Would Serve the Public Interest

46.    The imposition of a stay pending appeal would undoubtedly benefit the public interest because there is an obvious concern in ensuring that the rights of creditors are not disregarded by the fraudulent actions of large corporations. Fraudulent conveyance statutes, like the Uniform Fraudulent Transfer Act (the "UFTA"), are fundamental to the protection of a creditor's rights. The purpose of the UFTA is primarily to protect unsecured creditors against transfers and obligations injurious to their rights. A debtor cannot transfer assets with the intention to defraud its creditors. Allowing the Debtor's Plan to go forward without fully protecting the rights of the QUIPS holders would permit the Debtor to benefit from its deceptive actions. Ultimately, this would have grand implications – by engaging in deliberate and wide-ranging fraud, a company can deprive its creditors of their rights and claims.

47.    Moreover, in the wake of the numerous recent accounting frauds committed by various corporate giants, there is a strong public interest to protect creditors from such fraud.

15

When the Debtor orchestrated the Transfer of the Montana Utility Assets from Clark Fork, the Debtor was hopelessly insolvent and had no realistic ability to perform Clark Fork's obligations under the QUIPS' Indenture. Indeed, less than six months after its assumption of Clark Fork's obligations, the Debtor retroactively restated its earnings and publicly repudiated its obligation to make payments to holders of the QUIPS, and less than a year after the Transfer it commenced the above-captioned Chapter 11 case. The public interest will be served by ensuring that the rights of creditors are not trampled by the fraudulent actions of the Debtor.

48.    In addition, a stay will further public policy goals because there is a legitimate interest in seeing that a debtor's plan of reorganization conforms to the requirements of the Bankruptcy Code: otherwise the public confidence in the bankruptcy process will be undermined.

## II.    Even If The Court Is Not Willing To Stay The Confirmation Order In Its Entirety, Certain Portions Of The Confirmation Order Must Be Stayed To Protect The Rights Of QUIPS Holders

49.    Notwithstanding the fact that consideration of the above factors in this case weigh heavily in favor of granting a stay pending appeal of the Confirmation Order, to the extent that the Court determines not to stay the Confirmation Order, the Court should stay those portions of the Confirmation Order that compromise the rights of the QUIPS holders and limit their rightful recovery. Essentially, all provisions in the Confirmation Order that limit the QUIPS holders recovery and affect their rights should be stayed pending a resolution of the appeal.

50.    As previously stated, the Plan disregards the requirements of Section 1129 of the Bankruptcy Code and forces QUIPS holders to take a significantly smaller recovery then what they are entitled to. The Plan inappropriately cuts off the rights of the QUIPS holders in the Montana Utility Assets and, at a minimum, the Court should ensure that the rights of the QUIPS

16

holders are protected pending an appeal. The Debtor could easily issue additional stock or set

aside sufficient cash to enable Magten and the holders of the QUIPS to fully recover on any

judgment received in the Adversary Proceeding,[6] and have the Plan go effective without causing

any injury to the Debtor, its creditors, or its customers, while at the same time protecting those

creditors of Clark Fork who are the victims of the Debtor's fraud.   Therefore, to the extent that

the Court is reluctant to stay the Confirmation Order, those portions of the Confirmation Order

that affect the rights of the QUIPS should be stayed.

### NO BOND SHOULD BE REQUIRED

51.     Bankruptcy Rule 8005 allows the Court, in its *discretion*, to condition a stay

pending appeal on the filing of a bond. Fed. R. Bankr. P. 8005. See, e.g. In re Farrell Lines,

Inc., 761 F.2d 796 (D.C. Cir. 1985) (involuntary debtor's appeal to district court was not

dismissed for failure to post a bond); In re Byrd, 172 B.R. 970, 974 (Bankr. W.D. Wash. 1994)

(holding that posting of a bond is discretionary, and thus, not a prerequisite to granting a stay

pending appeal); In re Sphere Holding Corp., 162 B.R. 639, 644-45 (E.D.N.Y. 1994) (debtor

would not be required to file bond as condition to obtaining injunctive relief against creditors'

pursuit of collection); In re Westwood Plaza Apartments, Ltd., 150 B.R. 163 (Bankr. E.D. Tex.

1993) (HUD would be granted stay pending appeal without posting supersedeas bond, subject to

conditions requested by debtor).

52.     Because the requirement of posting a bond is discretionary, courts have relieved

appellants of the obligation to post security for a stay where little or no injury or prejudice to

---

[6]     The Debtor, upon its emergence from bankruptcy, will have in excess of $2 billion in claims. The total
face amount of the QUIPS is $69 million plus accrued interest. The Debtor has testified on several
occasions that it can feasibly set aside cash to satisfy the claims of the holders of the QUIPS and still have
ample funds to fully operate its business and successfully emerge from chapter 11, See Exhibit Q. In fact,
according to the Debtor's monthly operating report for the period of August 2004, the Debtor had
approximately $112 million of unrestricted cash. See Exhibit R. Indeed, the Debtor can set aside a mere
$50 million in cash to secure the full recovery of those QUIPS holders that succeed in their litigation.

appellees will occur. In re United Merchs. & Mfrs. Inc., 138 B.R. 426, 427 (D. Del. 1992) (stay of further distributions pursuant to confirmed chapter 11 plan would not be conditioned upon filing of a bond because the debtor would not suffer any loss as a result of the stay pending appeal). See also In re Sphere Holding Corp., 162 B.R. at 644 (recognizing that the posting of a bond is discretionary). In addition, "the court is free to fashion a remedy other than requiring the posting of a supersedeas bond where the appellant's financial condition prevents it from obtaining such a bond." In re Byrd, 172 B.R. at 974 (citations omitted). It would be an undue burden to require creditors who have already been harmed by the Debtor's fraud and face losing their legal rights to post a bond in order to stay the Confirmation Order. Moreover, to the extent that only the appropriate provisions in the Confirmation Order stayed, the Debtor cannot show that either itself or its creditors will suffer any damage or injury that would necessitate the posting of a bond. In re Sphere Holding Corp., 162 B.R. at 644; see also In re Theatre Holding Corp., 22 B.R. 884, 885-86 (Bankr. S.D.N.Y. 1982) (the only compensable damages to a party opposing the appeal are those which are the "natural and proximate" result of the stay). Likewise, the Court can fashion other appropriate relief to protect all parties in interest, including requiring the Debtor to set aside $50 million in value to ensure that the rights of the holders of the QUIPS are preserved. The limited relief sought by Magten – the protection of the QUIPS' holders rights – will not jeopardize the Debtor's ability to consummate the Plan and will have no detrimental affect on the ongoing operations of the Reorganized Debtor.

18

## CONCLUSION

53.    WHEREFORE, Magten respectfully requests that the Court enter an order staying the Confirmation Order or, in the alternative, ensure that the Confirmation Order protects the rights and interest of the holders of the QUIPS and grants such other and further relief as the Court may deem proper.

Dated:  Wilmington, Delaware
       October 26, 2004

                  BLANK ROME LLP

                  Mark J. Packel (DE No. 4048)
                  Elio Battista, Jr. (DE No. 3814)
                  1201 Market Street, Suite 800
                  Wilmington, DE 19801
                  Telephone:  (302) 425-6400
                  Facsimile:   (302) 425-6464

                         – and –

                  FRIED, FRANK, HARRIS, SHRIVER &
                     JACOBSON LLP
                  Bonnie Steingart, Esq.
                  Gary L. Kaplan, Esq.
                  One New York Plaza
                  New York, NY 10004
                  Telephone:  (212) 859-8000
                  Facsimile:  (212) 859-4000

                  Counsel for Magten Asset Management
                    Corporation

479233

19

## CERTIFICATE OF SERVICE

I, Elio Battista, Jr. certify that I am not less than 18 years of age, and that on October 26, 2004, I caused service of the attached *Brief In Support of Emergency Motion of Magten Asset Management Corporation for a Stay Pending Appeal of the Order Confirming the Debtor's Second Amended and Restated Plan of Reorganization* to be made on the parties listed below as indicated.

Under penalty of perjury, I declare that the foregoing is true and correct.

_____
Elio Battista, Jr.

**BY HAND DELIVERY**

Scott D. Cousins, Esquire
William E. Chipman, Jr., Esquire
*Greenberg Traurig, LLP*
1000 West Street, Suite 1530
Wilmington, DE 19801

*(Counsel for Debtor)*

**BY FEDERAL EXPRESS**

Jesse J. Austin, Esquire
Karol K. Denniston, Esquire
Paul, Hastings, Janofsjy & Walker LLP
600 Peachtree Street
Suite 2400
Atlanta, GA 30308

*(Counsel for Debtor)*

20

**EXHIBIT G**

1

```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                 IN AND FOR THE DISTRICT OF DELAWARE

 3                            - - -

 4    NORTHWESTERN CORPORATION,      :      CIVIL ACTION
                                     :
 5                Debtor.            :
      ----------------------------------
 6    MAGTEN ASSET MANAGEMENT CORP., :
                                     :
 7                Appellant,         :
                                     :
 8         v                         :
                                     :
 9    NORTHWESTERN CORPORATION,      :
                                     :
10                Appellee.          :      NO. 04-1389 (XXX)

11                            - - -

12                     Wilmington, Delaware
                Friday, October 29, 2004 at 11:00 a.m.
13
                               - - -
14
      BEFORE:        HONORABLE KENT A. JORDAN, U.S.D.C.J.
15
                               - - -
16    APPEARANCES:

17
                  GREENBERG TRAURIG, LLP
18                BY:  SCOTT D. COUSINS, ESQ., and
                       WILLIAM E. CHIPMAN, JR., ESQ.
19
                       and
20
                  PAUL HASTINGS JANOFSKY & WALKER, LLP
21                BY:  JESSE H. AUSTIN, ESQ., and
                       KAROL DENNISTON, ESQ.
22                     (Atlanta, Georgia)

23                       Counsel for Debtor and Appellee

24
                                   Brian P. Gaffigan
25                                 Registered Merit Reporter
```

```
 1   APPEARANCES: (Continued)

 2
              BLANK ROME, LLP
 3            BY:  ELIO BATTISTA, JR., ESQ.

 4                 and

 5            FRIED FRANK HARRIS SHRIVER & JACOBSON
              BY:  BONNIE STEINGART, ESQ., and
 6                 GARY L. KAPLAN, ESQ.
                   (New York, New York)
 7
                        Counsel for Appellant
 8

 9            THE BAYARD FIRM
              BY:  ERIC MICHAEL SUTTY, ESQ.
10
                   and
11
              PAUL WEISS RIFKIND WHARTON & GARRISON, LLP
12            BY:  MARGARET A. PHILLIPS, ESQ., and
                   EPHRAIM DIAMOND, ESQ.
13                 (New York, New York)

14                      Counsel for the Official
                        Creditors Committee
15

16            BIFFERATO BIFFERATO &  GENTILOTTI
              BY:  JOSEPH KENDALL KOURY, ESQ.
17
                   and
18
              DEWEY BALLENTINE, LLP
19            BY:  IRENA GOLDSTEIN, ESQ.

20                      Counsel for Exit Financing Banks

21

22

23

24

25
```

1    Let's look at what we're talking about.  Let's look at the

2    magnitude of the estate.  Let's look at the relief that

3    actually needs to be imposed if we were to preserve the

4    rights of the holders of the QUIPS to have relief based on

5    the fraud that was done.

6            At this point in the proceedings, your Honor, the

7    debtors under the confirmation plan are required to have a

8    disputed claim reserve.  So the status quo, your Honor, as

9    we speak is that the confirmation order requires them to set

10   aside a reserve that would pay to the full extent permitted

11   under Class 9, assuming for the moment that the fraudulent

12   conveyance claim would be treated in Class 9.  If the change

13   went without any change by this Court, the remaining QUIPS,

14   which are $50 million of QUIPS that did not take the

15   proposal, $50 million goes into Class 9.

16           Now, under the plan, Class 9 gets treatment of

17   69 cents on the dollar.  So if we round up, and I don't mean

18   to round up too much but let's say we round up to 70 cents.

19   So 70 percent of $50 million is $35 million.  Under the terms

20   of the plan, as confirmed, the debtors are already required

21   to set aside stock or cash or whatever currency is approp-

22   riate of $35 million of the $50 we think this Court needs to

23   reserve in order to protect the rights of the QUIPS holders.

24           THE COURT:  So what I hear you saying --

25           MS. STEINGART:  So what we're talking about --

1  the appeal, though, doesn't it?  Maybe I'm wrong but I get

2  this sense that you want me to blow past the stay issue and

3  --

4          MS. STEINGART:  No.

5          THE COURT:  -- and say in effect put the $15

6  million in.

7          MS. STEINGART:  Well, I think that what the

8  stay is, you know, there is the actual adversary that is

9  being pursued but what the stay deals with is whether it's

10  appropriate for the debtor not to have, pending the determ-

11  ination of the adversary proceeding and other issues and the

12  issues that are on appeal, whether it's appropriate for the

13  debtor not to reserve an amount that would be sufficient to

14  pay the QUIPS 100 cents on the dollar in any form.

15          THE COURT:  I thought that was the appeal.  See,

16  I don't know that that -- to me, that is a distinction with a

17  difference.  I take your appeal to be we should have a full

18  amount in that pot in case we win.

19          MS. STEINGART:  Correct, your Honor.

20          THE COURT:  I take your motion for a stay pending

21  appeal to be don't let this plan go forward until you have a

22  chance to consider whether or not the plan should be amended

23  to say all that money needs to be in the pot so we can be

24  made whole if we are successful in our adversary.  So that

25  is why I'm suggesting to you that I have the feeling you are

1  pulling me past the stay when you say all you need to do is

2  make them put another $15 million in, because it feels like

3  you are telling me decide this appeal on the merits right

4  now on this record, and then you don't have to have a stay.

5  Correct me if I'm wrong.

6          MS. STEINGART:  I think if the Court was able

7  to expedite its consideration so that it could conclude,

8  before the plan went effective, whether the money should be

9  set aside on the merits, that would be true.  But assuming

10  that the plan will become effective on Monday, because I

11  think that is not a possibility, then the only stay we're

12  asking for is a stay that would require the debtors, in going

13  effective with the plan, to have available in some form

14  enough so that if the QUIPS prevailed they got 100 percent.

15  And what I'm explaining, and the thing I'm addressing in

16  terms of the $15 million number, your Honor, is that the only

17  difference in the plan as it exists now and the impact that

18  this Court's stay would have, and the impact would only be as

19  long as the appeal were pending, would be for the debtors to

20  have, in one form or another, $15 million available so that

21  if the QUIPS were successful, they could get a full recovery.

22          They already need to reserve $35 million.  So

23  it's a di minimis -- as far as we can understand it, it's a

24  di minimis number.  $15 million in the world of numbers is

25  a lot of money; I don't want to denigrate its importance;

1    sentence.  It says:

2          "... a primary point of the Magten position and

3    the Law Debenture position is that the Montana utility assets

4    are not property of the estate because they are subject in

5    effect to a constructive trust in favor of Magten as

6    plaintiff in the fraudulent conveyance case."  Going over to

7    the top of page 27.

8          He accurately described your position, right?

9          MS. STEINGART:  Yes, your Honor.

10         THE COURT:  He goes on and says:

11         "Everyone agrees that there has been no action

12   yet actually taken to impose a constructed trust.  At this

13   point, we only have the allegations, which as noted, have

14   narrowly survived a motion to dismiss with a high burden

15   placed on the plaintiff even to stay in the game at this

16   point."

17         Then he goes on, if recollection serves, and

18   notes that your claims about a automatic constructive trust

19   don't hold a lot of water in his view -- don't hold any water

20   in his view, in fact.  He was pretty emphatic in saying "that

21   view would put at risk every transaction that was done until

22   such time as the statute of limitations would run," unquote

23   at page 28.

24         I want you to speak directly to those points,

25   those rulings made by Judge Case when he was weighing the

1          THE COURT:  Okay.  Let's get to the fraud

2   issue here.  The assertion as I understand it is that you

3   believe, what Judge Case characterized as a piece of an

4   overall transaction, you believe is in itself a fraudulent

5   conveyance, this so-called going flat transaction; right?

6          MS. STEINGART:  Your Honor, it is a separate

7   transaction.  There was not, in terms of the response and the

8   motion to dismiss the adversary, any indication that somehow

9   these transactions in tax language were going to be stepped

10  and merged.  It is one transaction.  There were several

11  disclosures for this transaction, several releases for the

12  transaction, separate consideration for the transaction but

13  we don't have to litigate that here.

14          THE COURT:  No, but you do have to persuade me

15  that if I stay this, you have a reasonable likelihood of

16  succeeding on the ultimate appeal; all right?

17          MS. STEINGART:  Yes.

18          THE COURT:  The ultimate appeal being that,

19  in fairness, $50 million should be in that pot.

20          MS. STEINGART:  Yes, your Honor.

21          THE COURT:  Because you've got a great claim that

22  ought to be addressed; right?

23          MS. STEINGART:  Right.

24          THE COURT:  And I take Judge Case's remarks to be

25  saying you don't have such a great claim.  You are going to

1    be lucky to get past what I still left for you, if I read him

2    right.

3                    MS. STEINGART:  Right.

4                    THE COURT:  And that's what I'm trying to have

5    you address to me specifically when it comes to likelihood of

6    success on the merits.

7                    MS. STEINGART:  Right.  I respectfully disagree

8    with that because, first of all, I don't think the trans-

9    actions will be stepped; and there was no argument that

10   they should be combined at any point before we saw it in the

11   opinion.  That is number one.

12                   Number two, what Judge Case held, when he

13   refused to grant the motion to dismiss, is that what Law

14   Debenture, Magten had to show was fraud and then fraudulent

15   consideration.  Okay?  And as to fraud, your Honor, we have

16   a step up here.  And the step up is that the financials that

17   were given to the trustee, in connection with the going

18   flat transaction, misstated the assets of this debtor by

19   $900 million.  There is no dispute about that.  They have

20   admitted it.  And the SEC has a formal investigation and that

21   investigation is ongoing.

22                   The other thing that we've also provided in the

23   exhibit is that the public statements about the value of the

24   assets and the value of the liabilities assumed at the time

25   of the transaction show that there was a disconnect as to

1    It doesn't mean we just have a claim for a postpetition claim.

2    It means that the transaction never came into existence.  So

3    within the Court's own rulings in terms of disposing of the

4    QUIPS, which I think the Court was too eager to do, the Court

5    made a ruling that was internally inconsistent.  So if there

6    is recision and if the transaction never occurred, it means

7    the assets don't belong to this debtor.

8              THE COURT:  All right.

9              MS. STEINGART:  We're not saying you have to take

10    all the assets away.  I'm saying it's not unfair.

11             THE COURT:  Well, let's get back to point four.

12    We covered one, two and three.  You were starting down the

13    road of point four and I heard your argument.  I want you

14    to -- and obviously folks on the other side will speak for

15    themselves but I can imagine an argument something like

16    this:  That purpose of the Bankruptcy Code is to maximize

17    the value of the debtor.  Enormous sums of money and effort,

18    including the judicial effort of a skilled and respected

19    bankruptcy judge have gone into figuring out how to do that.

20    Having gone through that entire process, and having come up

21    short, it's not in the public interest to put the results of

22    all that effort at risk because one participant doesn't like

23    it.

24             Now, what is the come back to that?

25             MS. STEINGART:  The come back to that, your Honor,

1    to.  And that is not whether the appeal is going to be some-

2    thing that other people like or don't like if I ultimately

3    decide that's a good appeal but whether the stay itself is

4    going to cause real damage to people.  I've heard debtor's

5    counsel say it puts the whole bankruptcy at risk.  I've heard

6    Ms. Steingart say it doesn't put anything a risk.  I want you

7    to tell me what you think and why.

8                    MS. PHILLIPS:  I think the creditors would

9    certainly disagree with Ms. Steingart's position that this

10   does not put the bankruptcy, the plan at risk.

11                    THE COURT:  Why?

12                    MS. PHILLIPS:  This was a heavily negotiated

13   plan.  And as the judge found at trial, by the valuation

14   evidence, this was a so-called gift plan where that the value

15   of the assets here was such that creditors that were junior

16   creditors to Class 7 were not going to get anything unless

17   Class 7 gave them something, and in this instance they did

18   in order to get this plan, a plan in place.

19                    THE COURT:  And what would happen if I said,

20   well, I think more money ought to be there?  What happens to

21   the plan?  What will the behavior be of the parties in the

22   real world if I were to give Ms. Steingart the remedy that

23   she is looking for on behalf of Magten?

24                    MS. PHILLIPS:  Well, our understanding is based

25   on the representations in the affidavit filed by the exit

1   lenders is that it will impact the timing on the implement-

2   ation of the plan, if it gets implemented at all.  And that

3   is obviously going to impair the value of these creditors'

4   recovery that voted overwhelmingly in support of the plan.

5   And that is simply unfair, especially when you have a sit-

6   uation here where Magten came to the table here well after

7   the purported fraud in connection with the going flat

8   transaction.  They purchased three QUIPS at deep discount

9   and here they are today holding up everyone else and no one

10  else can receive their recovery if the stay is put in place

11  and that is substantial harm.

12              THE COURT:  All right.  And what do you think

13  about a bond?

14              MS. PHILLIPS:  We agree with the debtor's number

15  and we certainly think that in this situation, there has to

16  be a bond posted by Magten.

17              THE COURT:  Okay.  Thanks very much.

18              MS. PHILLIPS:  Thank you.

19              THE COURT:  Ms. Steingart, I'll give you a chance,

20  just a couple minutes to hit whatever rebuttal points -- oh,

21  I'm sorry.

22              MS. GOLDSTEIN:  That's okay.

23              THE COURT:  My bad.

24              MS. GOLDSTEIN:  I filed the skinniest papers.

25              THE COURT:  Skinny papers sometimes are good.

1          MS. GOLDSTEIN:   Irena Goldstein on behalf of the

2   bank exit financing.  Am I admitted?

3          MR. KOURY:   Your Honor, I apologize for the

4   inconvenience.  Ms. Goldstein was not admitted in the main

5   case.

6          THE COURT:   All right.

7          MR. KOURY:   I do have a motion.

8          THE COURT:   That's great.  If you will hand it up

9   and we'll just go ahead and proceed, I'll grant the motion

10  orally right now.

11         MR. KOURY:   Again, my apologies.

12         THE COURT:   That's fine.  I appreciate your

13  taking care of it here today.

14         All right.  If you would please, Ms. Goldstein.

15         MS. GOLDSTEIN:   Basically, Magten's counsel

16  asserts that a limited stay would not harm the exit financing

17  facility, would not prevent the exit financing banks from

18  closing, and I don't know how she can possibly say that.

19  The condition precedent to closing is that the confirmation

20  order is in full force and effect.  There is a question as

21  to whether or not this would be material change.  There is a

22  question as to whether an opinion could be issued.  This has

23  already gone to market.  We planned to close on Monday and

24  this is a significant development.

25         THE COURT:   If I hear you saying that as a matter

1        Nor am I in a position to say that the movant
2    will suffer irreparable harm.  Because in order to say that,
3    I would have to assume that not only would Magten win but it
4    would win in the amount it says it would win.  And again, I'm
5    just not in a position to say, well, yes, I think that is
6    going to be the outcome here and, therefore, if they're short
7    31 cents on the dollar, they're irreparably injured.

8        Third and fourth are perhaps things which are the
9    most overwhelming to me here.  It occurs to me, after having
10   heard the arguments and read the things that I've read, that
11   the risk here of harm to many, many stakeholders is very
12   substantial, exceedingly so.  And that the assertion -- I
13   mean the phrase which counsel for Magten used in wrapping
14   up.  Given the flexibility here, I think goes right to the
15   heart of it.  Whether they were artful in the way they put
16   it all together and therefore maneuvered it in a way that is
17   artificial or not, I don't know, but I believe them when they
18   say we have the legal right to pull out and we will.  And
19   when the exit finance folks say that, that's a meaningful
20   statement.

21       When counsel for the debtor points out that this
22   is carefully negotiated and that all of the interests in play
23   here worked hard and negotiated hard to get to where they
24   were, the fact that one interest holder is unhappy doesn't
25   make it anything less than substantial harm to everybody

# **EXHIBIT H**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| NORTHWESTERN CORPORATION, | ) | Bankruptcy Case No. 03-12872 (JLP) |
|  | ) |  |
| Reorganized Debtor. | ) |  |
|  | ) |  |
| MAGTEN ASSET MANAGEMENT | ) |  |
| CORPORATION, | ) |  |
|  | ) |  |
| Appellant, | ) | CA 04-1389-JJF |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| NORTHWESTERN CORPORATION, | ) |  |
|  | ) |  |
| Appellee. | ) |  |

---

## DEBTOR'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS CONSOLIDATED APPEALS OF MAGTEN ASSET MANAGEMENT CORPORATION

---

**PAUL, HASTINGS, JANOFSKY & WALKER LLP**
Jesse H. Austin, III
Karol K. Denniston
Carolyn Chayavadhanangkur
600 Peachtree Street
Suite 2400
Atlanta, GA 30308
Telephone: (404) 815-2400

- and -

**GREENBERG TRAURIG, LLP**

Adam D. Cole
885 Third Avenue
New York, NY 10022
Telephone: (212) 801-2100

- and -

**GREENBERG TRAURIG, LLP**
Scott D. Cousins (No. 3079)
William E. Chipman, Jr. (No. 3818)
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, DE 19801
Telephone: (302) 661-7000

Dated: March 10, 2005
Wilmington, Delaware

*Co-Counsel for NorthWestern Corporation*

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION AND PRELIMINARY STATEMENT ............................................ 1

II. STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS ........................ 6

III. SUMMARY OF ARGUMENT ............................................................... 9

IV. STATEMENT OF FACTS ..................................................................... 10

    A.   Creditor Support of Debtor's Plan ............................................... 10

    B.   The Confirmation Hearings and Ruling on Confirmation ................................... 11

        1.   The Confirmation Order .................................................... 12

        2.   The Bankruptcy Court Order Denying Stay Pending Appeal .................. 12

        3.   This Court's Denial of the Stay Pending Appeal ....................................... 12

    C.   Magten's Claims and Treatment Under the Plan ................................... 13

        1.   Magten's Claims ................................................................ 13

        2.   Legal Remedies Provided to QUIPS Holders Under the Plan ................ 13

        3.   QUIPS Litigation Claims .................................................... 14

            (a)   Initiation of the Adversary Proceeding ....................................... 14

            (b)   The Motion to Dismiss................................................... 15

            (c)   Magten's Confirmation Objections Overruled in Their Entirety ................................................................. 16

    D.   The Memorandum of Understanding................................................ 17

        1.   Approval of the Memorandum of Understanding.................................. 17

        2.   Treatment of Claims Related to Class Action Under the Plan................ 18

        3.   Magten's Objections to the MOU........................................... 19

        4.   Issues Raised by the Appeal of the MOU Order are Identical to the Appeal of the Confirmation Order ........................................... 20

    E.   The Debtor Has Substantially Consummated the Plan ....................................... 21

V.  ARGUMENT AND CITATION OF LEGAL AUTHORITY ....................................... 23

    A.   Magten's Appeal Should be Dismissed as Being Equitably Moot ................... 23

        1.   Substantial Consummation .................................................. 25

        2.   Whether a Stay Has Been Obtained............................................. 29

        3.   Reliance by Third Parties .................................................... 33

**TABLE OF CONTENTS**
(continued)

Page

| | 4. | Whether the Relief Requested Would Affect the Success of the Plan | 37 |
| | 5. | The Public Policy of Affording Finality to Bankruptcy Judgments | 39 |
| B. | | Magten's Statement of Issues to be Presented on Appeal | 41 |
| | 1. | Magten's Issues Presented on Appeal of Confirmation Order | 42 |
| | 2. | Magten's Issues Presented on Appeal of MOU Order | 48 |
| VI. | CONCLUSION | | 50 |

# TABLE OF AUTHORITIES

## CASES

In re AOV Industrial,
    792 F.2d 1140 (D.C. Cir. 1986) ............................................................................24

In re Block Shim Development Co. - Irving,
    939 F.2d 289 (5th Cir. 1991) ...............................................................................35

Central States, Southeast & Southwest Areas Pension Fund v. Central Transport
    Inc.,
    841 F.2d 92 (4th Cir. 1988) ...........................................................................24, 35

In re Chateaugay Corp.
    988 F.2d 322 (2d Cir. 1993) ................................................................................24

In re Club Associates,
    956 F.2d 1065 (11th Cir. 1992) ...........................................................................23

In re Continental Airlines,
    91 F.3d 553 (3d Cir. 1996) ...........................................................23, 24, 25, 26,
                                                 29, 33, 34, 38, 40

In re Continental Airlines,
    203 F.3d 203 (3d Cir. 2000) ..........................................................................10, 24

In re Ellingsen MacLean Oil Co.,
    834 F.2d 599 (6th Cir. 1987), cert. denied, 488 U.S. 817 (1988) ......................35

In re Envirodyne Industrial,
    29 F.3d 301 (7th Cir. 1994) .................................................................................35

In re Exide Techs.
    2004 WL 1465760 ........................................................................................41, 42

Krasnov v. Dinan,
    465 F.2d 1298 (3d. Cir. 1972) .............................................................................42

In re Manges,
    29 F.3d 1034 (5th Cir. 1994), cert. denied, 513 U.S. 1152 (1995) ........23, 33, 34, 37

Miami Ctr. Ltd. Partnership v Bank of New York,
    820 F.2d 376 (11th Cir. 1987), cert. denied, 488 U.S. 823 (1988) .....................35

Nordhoff Investments v. Zenith Electric Corp.,
    258 F.3d 180 (3d Cir. 2001) ........................................................24, 25, 33, 38

# TABLE OF AUTHORITIES
## (Continued)

In re PWS Holding Corp.,
    228 F.3d 224 (3d Cir. 2000)................................................................................24, 25, 38

In re Public Serv. Co.,
    963 F.2d 469 (1st Cir. 1992), cert. denied, 506 U.S. 908 (1992) ................................23, 35

In re Roberts Farms Inc.,
    652 F.2d 793 (9th Cir. 1981) ................................................................................24

In re Specialty Equip Cos.,
    3 F.3d 1043 (7th Cir. 1993) ................................................................................23

In re Stein,
    314 B.R. 306 (D.N.J. 2004) ................................................................................42

In re UNR Industrial,
    20 F.3d 766 (7th Cir. 1994) ................................................................................29, 30, 36

United States v. U.S. Gypsum Co.,
    333 U.S. 364, 68 S. Ct. 525 (1948)................................................................................42

In re Zenith Electronics Corporation,
    250 B.R. 207 (D. Del 2000), aff'd, 258 F.3d 180 (3d Cir., 2001)..................26, 27, 30, 37, 39, 40

In re Zepecki,
    277 F.3d 1041 (8th Cir. 2002) ................................................................................42

# STATUTES

11 U.S.C. §§ 101-1330 ................................................................................2

11 U.S.C. § 1101(2) ................................................................................2, 25

11 U.S.C. § 1127(b) (2000) ................................................................................25

15 U.S.C. §§ 79-79z-6 ("PUHCA")................................................................................2, 16

## I.    INTRODUCTION AND PRELIMINARY STATEMENT[1]

The appellee NorthWestern Corporation ("**NorthWestern**" or the "**Reorganized Debtor**") hereby moves the Court, pursuant to Bankruptcy Rule 8011 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for an order dismissing the appeal of Magten Asset Management Corporation ("**Magten**")[2] of: (i) the Order dated October 19, 2004 (the "**Confirmation Order**") of the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") Confirming the Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code dated August 18, 2004 (as modified, the "**Plan**")[3] [Magten, Exh. 163];[4] and (ii) the Order

---

[1]    On or about December 30, 2004, the Court entered its Order Granting Motion of NorthWestern Corporation and Magten Asset Management Corporation to Consolidate the Appeals. Under the order, the appeal of the Confirmation Order has been consolidated with Magten's appeal of the Memorandum of Understanding under Civ. No. 04-1389. In addition, under the Court's Standing Order dated July 23, 2004, a special master/mediator, Collins J. Seitz, was appointed to conduct the mandatory mediation of Magten's appeals. While NorthWestern understands that parties are not required to respond to the motion and the appeals cannot be decided until the mandatory mediation has occurred, NorthWestern hopes that this Memorandum of Law in Support of Motion to Dismiss Consolidated Appeals of Magten Asset Management Corporation will be of assistance to the mediator and all parties involved in the anticipated mediation.

[2]    In January 2005 NorthWestern negotiated the terms of a proposed settlement with Magten and Law Debenture (as defined below) that was reduced to writing in a settlement letter dated as of January 27, 2005. Following the announcement of the proposed settlement, NorthWestern received objections from the Plan Committee and holders of Classes 7 and 9 Claims regarding the proposed terms of the settlement. NorthWestern determined that it could not continue to pursue the proposed settlement because, absent the consent of the Plan Committee and certain holders of Classes 7 and 9 Claims, the proposed settlement was fatally flawed structurally from a legal basis to the extent it nonconsensually altered the substantially consummated Plan's distribution scheme. Magten and Law Debenture filed a motion pursuant to Bankruptcy Rule 9019 seeking approval of the proposed settlement. The Bankruptcy Court held a hearing on the motion on March 8, 2005 and on March 10, 2005 entered an order denying the motion based, in part, on the fact that the Plan had been substantially consummated and could not now be modified.

[3]    Any capitalized terms used herein but not otherwise defined shall have the meaning ascribed to such term in the Plan.

[4]    Exhibit references related to items identified in Magten Asset Management Corporation's Amended Designation of Items to be Included in the Record on Appeal and Statement of Issues to be Presented on Appeal from the Order Confirming the Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Docket No. 2335] are referred to herein as "Magten, Exh. ___." Exhibit references related to the exhibits identified in the Reorganized Debtor's
(continued on next page)

dated October 14, 2004, approving Memorandum of Understanding (the **"MOU Order"**)[5] [Magten, Exh. 201].

Magten's appeal of the Confirmation Order and MOU Order is now moot for several reasons. First, on November 1, 2004, the Effective Date, the Plan was substantially consummated within the meaning of Section 1101(2) of The Bankruptcy Reform Act of 1978, as codified in title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (the **"Bankruptcy Code"**). On November 1, 2004, the Debtor filed its Notice of (A) Entry of Order Confirming the Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code and (B) the Occurrence of the Effective Date (the **"Effective Date Notice"**) [Magten, Exh. 217]. The Effective Date Notice was served on November 8, 2004 via first class mail to holders of Class 9 and 12 claims and on the 2002 service list in the Debtor's bankruptcy proceeding. See Affidavit of Service of Christopher R. Schepper dated December 1, 2004 (the **"Schepper Affidavit"**). On or about November 11, 2004, the Effective Date Notice was sent via overnight delivery to the Record Holders (as defined in the Schepper Affidavit) for distribution to the beneficial holders of the Debtor's debt and equity securities in Classes 7, 8(a), 8(b) and 13, who held securities as of October 20, 2004. See Schepper Affidavit, ¶¶5-6. In addition, the Effective Date Notice was published on November 11, 2004 in the

---

(continued from previous page)

Designation of Additional Documents for the Record and Objection to Statement of Issues on Appeal [Docket No. 2364] are referred to herein as "Debtor, Exh. ____."

[5]     The issues to be presented on appeal of the MOU Order, as set forth in Magten's Designation of Items to be Included in the Record on Appeal from the Order Approving the Memorandum of Understanding Entered on October 18, 2004, dated November 5, 2004, are directly related to the Plan and involve many of the same issues presented by Magten in connection with its appeal of the Confirmation Order. As the appeal of the MOU Order is directly tied to the Plan and Magten's appeal of the Confirmation Order, the arguments set forth herein apply equally to the appeal of the MOU Order. As set forth in greater detail below, Magten's appeal of both the Confirmation Order and the MOU Order is moot.

following publications: (i) the Argus Leader; (ii) the Billings Gazette; (iii) the Great Falls Tribune; (iv) the Missoulian; (v) the New York Times; (vi) the Rapid City Journal; (vii) USA Today; and (viii) the Wall Street Journal.

Second, Magten attempted but failed to obtain a stay of the consummation of the Plan despite its knowledge that the Effective Date for the Plan was scheduled to occur on November 1, 2004.[6] Specifically, Magten failed not once but twice to stay the Confirmation Order because it was wholly unable to satisfy any of the requirements for the issuance of a stay pending appeal in connection with its Emergency Motion of Magten Asset Management Corporation for a Stay Pending Appeal of the Confirmation Order (the **"Emergency Motion for Stay"**).[7] Transcript of Telephone Conference Before The Honorable Charles G. Case, II, United States Bankruptcy Judge (Bankr. D. Del., Oct. 25, 2004) at 30 (**"October 25 Transcript"**) ("in my view they have not satisfied the likelihood of success prong or the irreparable harm prong. And further, I think the public interest prong also fails in favor of the Debtors and the other proponents of the Plan in order to promote the reorganization of this company."). Transcript of

---

[6]     See Debtor's Brief in Opposition to the Emergency Motion of Magten Asset Management Corporation for a Stay Pending Appeal of the Order Confirming the Debtor's Second Amended and Restated Plan of Reorganization (D. Del., Oct. 27, 2004) at pp. 1, 9, 12, 15, 27 and 30; Amended Affidavit of Brian Bird (the **"Initial Bird Affidavit"**) dated October 25, 2004 at ¶ 8 ("To obtain the funding of the notes to exit Chapter 11 by November 1, the Debtor must price the senior secured notes pursuant to this schedule.") [Magten, Exh. 215]; Stay Pending Appeal Ruling at 42 (statement of Irena Goldstein, counsel for exit financing banks, "We plan to close on Monday and [the granting of a stay pending appeal would be] a significant development."); Objection of the Debtor to the Emergency Motion of Magten Asset Management Corporation for a Stay Pending Appeal of the Order Confirming the Debtor's Second Amended and Restated Plan of Reorganization (Bankr. D. Del., Oct. 25, 2004) at pp. 4, 6, 10 and 20 [Magten, Exh. 208]; Transcript of Telephone Conference Before The Honorable Charles G. Case, II, United States Bankruptcy Judge (Bankr. D. Del., Oct. 25, 2004) at 17 (statement of Jesse H. Austin, III, counsel for the Reorganized Debtor "As our papers have pointed out and is supported by Brian Bird's affidavit, the Chief Financial Officer, the Debtor has been and continues to work diligently to go effective on its Plan on November the 1st. The Debtor will meet this goal, assuming no stay is issued.") [Magten, Exh. 218].

[7]     Magten did not even attempt to obtain a stay of the MOU Order.

Proceedings Before the Honorable Kent A. Jordan, U.S.D.C.J., dated October 29, 2004 at 46 (the "**Stay Pending Appeal Ruling**") ("it's my finding that Magten hasn't satisfied any of the four factors on the showing of the likelihood of success on the merits.") (emphasis added) [Debtor, Exh. 22].

On or about December 29, 2004, the Debtor filed its Notice of Substantial Consummation of the Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "**Notice of Substantial Consummation**") [Docket No. 2519].[8]  As set forth in the Notice of Substantial Consummation, as of November 1, 2004, the Debtor transferred substantially all of the property proposed by the Plan to be transferred including delivery of all the Trust Assets to the D&O Trust. In addition, as of November 1, 2004, the Reorganized Debtor assumed substantially all of the property dealt with by the Plan. Also, on the Effective Date, all Allowed CSFB Financing Claims and Bank One DIP Financing Claims were paid pursuant to the Debtor's exit financing facility. Moreover, as of December 29, 2004, the Debtor had substantially completed distribution to holders of allowed claims under the Plan. In implementing the Plan, the Reorganized Debtor made distributions to holders of allowed Class 7, 8(a), 8(b) and 9 claims, as set forth in greater detail below.

Third, the reversal of the Confirmation Order and/or the MOU Order on appeal, whether in whole or in part, would severely affect the rights of creditors and interest

---

[8]    The Notice of Substantial Consummation was sent via first class mail to holders of Class 9 and Class 12 claims and to parties-in-interest who have requested service pursuant to Bankruptcy Rule 2002 on or about January 6, 2005.  The Notice of Substantial Consummation was sent via overnight to the brokerage firms, agents and banks to distribute to the Beneficial Holders of the Debtor's debt and equity in Classes 7, 8(a), 8(b) and 13 as of October 20, 2004 on January 10, 2005. On January 11, 2005, sufficient copies of the Notice of Substantial Consummation were sent to the brokerage firms, agents and banks to distribute to the Beneficial Holders of the Debtor's debt and equity in Classes 7, 8(a), 8(b) and 13 as of the Record Date.

holders not before the Court who have received their distributions under the Plan. The reversal of either order would deny the creditors and interest holders of the Reorganized Debtor the benefits they negotiated and have received under the terms of the Plan. As was true when this Court found that there would be "substantial harm" inflicted on the Reorganized Debtor and its creditors if this Court were to grant the Emergency Motion for Stay, Stay Pending Appeal Ruling at 47-48, so too would there be substantial harm to parties not before this Court if this Court were to reverse the Confirmation Order on appeal. Any reversal – even if possible now that the Plan has been substantially consummated – would have a deleterious effect on the Plan and call into question the conversion of approximately $1.2 billion in senior and subordinated unsecured public debt obligations and other claims for New Common Stock in the Reorganized Debtor, not to mention the issuance of New Common Stock to unsecured creditors in Classes 7, 8(a), 8(b) and 9, and payment of cure amounts and convenience class claims.

Fourth, the relief requested by Magten in the appeal, if granted, would negatively affect the success of the Plan. Through its appeal, Magten seeks to rewrite the Plan by ultimately removing a substantial portion of the estate's assets under a variety of theories that have been flatly rejected by the Bankruptcy Court.

Finally, for the reasons noted above, the relief requested by Magten, if granted, in light of the Reorganized Debtor's substantial consummation, would undermine the public policy of affording finality to bankruptcy orders and would be contrary to all notions of equity, fairness and due process. Accordingly, the Reorganized Debtor respectfully requests that this Court dismiss Magten's consolidated appeal in its entirety.

## II.    STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS

NorthWestern was incorporated in 1923 and is a publicly traded Delaware corporation. NorthWestern and its direct and indirect energy subsidiaries comprise one of the largest providers of electricity and natural gas in the upper Midwest and Northwest regions of the United States, serving approximately 608,000 customers throughout Montana, South Dakota and Nebraska. The Reorganized Debtor, a transmission and distribution regulated utility entity, has generated and distributed electricity in South Dakota and has distributed natural gas in South Dakota and Nebraska through its energy division, NorthWestern Energy, since the Reorganized Debtor's formation in 1923. As a regulated utility, the Reorganized Debtor is regulated by the Federal Energy Regulatory Commission and the public service commissions of Montana, South Dakota and Nebraska. See Affidavit of William M. Austin in Support of First Day Motions filed with the Bankruptcy Court on September 14, 2003 [Magten, Exh. 1].

On September 14, 2003 (the **"Petition Date"**), NorthWestern filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the **"Chapter 11 Case"**). In the Chapter 11 Case, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors in the Debtor's bankruptcy proceeding (the **"Committee"**) on September 30, 2003.

On the Effective Date, the Reorganized Debtor substantially consummated the Plan thereby effectuating its exit from the Chapter 11 Case. See Effective Date Notice. On or about the Effective Date, the Reorganized Debtor finalized its senior credit agreement and offering memorandum for the $225 million senior secured notes portion of its exit financing. In addition, Reorganized Debtor effectuated the registration of its common stock on the NASDAQ Stock Market Exchange. The Debtor also paid all