Allowed CSFB Financing Claims and Bank One DIP Financing Claims pursuant to the

Debtor's exit financing facility on the Effective Date.

In connection with implementation of the Plan, the Reorganized Debtor made the

following distributions:

a.  Class 7 Distributions.  On or about November 1, 2004, consistent with
    Section 4.7 of the Debtor's Plan, 28,250,900 shares of New Common
    Stock were issued to the Depository Trust Company ("**DTC**") for credit in
    book-entry form to the accounts of the DTC participants representing
    holders of Class 7 Allowed Claims.  On or about November 5, 2004, these
    shares were credited by DTC to the accounts of the above-referenced DTC
    participants.

b.  Class 8(a) Distributions.

    (a) On or about November 1, 2004, consistent with Section 4.8(a) of
        the Debtor's Plan, 2,278,769 shares were issued to DTC for credit
        in book entry form to the accounts of the DTC participants
        representing holders of Class 8(a) Allowed Claims.  On or about
        November 5, 2004, these shares were credited by DTC to the
        accounts of the above-referenced DTC participants.

    (b) On or about November 1, 2004, consistent with Section 4.8(a) of
        the Debtor's Plan, 4,366,092 warrants were issued to DTC for
        credit in book-entry form to the accounts of the DTC participants
        representing holders of Class 8(a) Allowed Claims.  On or about
        November 5, 2004, these warrants were credited by DTC to the
        accounts of the above-referenced DTC participants.

    (c) On November 1, 2004, consistent with Section 5.18 of the
        Debtor's Plan, 55,640 shares were issued to DTC for credit to
        Wilmington Trust Company pursuant to its exercise of its
        Indenture Trustee Charging Lien.

c.  Class 8(b) Distributions.  On or about December 23, 2004, mindful of its
    obligations to deliver shares of Common Stock and Warrants to holders of
    Class 8(b) claims who elected, or were deemed to have elected, Option 1
    under Section 4.8(b) of the Debtor's Plan and Law Debenture Trust
    Company of New York's ("**Law Debenture**") exercise of its Indenture
    Trustee Charging Lien, the Debtor authorized its transfer agent, LaSalle
    Bank National Association, to transfer (i) physical stock certificates issued
    in the name of "Law Debenture Trust Company of New York"
    representing 136,965 shares of Common Stock and (ii) physical warrant

certificate in the name of "Law Debenture Trust Company of New York" representing 254,241 Warrants to purchase shares of Common Stock pursuant to Section 4.8(b) and Section 5.18 of the Debtor's Plan.

d.    Class 9 Distributions.   The following actions have been taken by the Debtor with respect to Allowed Class 9 claims:

   (a)    Issuance of a physical certificate to Comanche Park LLC in the amount of 23,620 shares for its Allowed Class 9 Claim;

   (b)    Establishment of a Disputed Claims Reserve.   Consistent with Section 7.5 of the Debtor's Plan, the Debtor reserved 4,409,100 shares for potential future distribution to holders of Allowed Class 9 Claims.  This Disputed Claims Reserve includes specific reserves as follows: (i) shares of Common Stock equal to the value of $50,000,000, valued as of the Effective Date, in connection with PPL Montana LLC's disputed claim; and (ii) a $25,000,000 Class 9 claim in connection with the disputed QUIPS Litigation Claims.

   (c)    Issuance to DTC of 614,125 shares for credit to the account of CRT Capital Group LLC, in resolution of the $19,500,000 allowed Class 9 claims of the Cornerstone Propane entities.

e.    Class 10 Distribution.  The Debtor made 100% of the payments to holders of Allowed Convenience Class Claims pursuant to Section 4.10 of the Debtor's Plan.  The Debtor has paid approximately $954,443.89 to holders of Allowed Convenience Class Claims.

f.    Cure Payments in Connection with Assumed Contracts.  The Debtor made 100% of the undisputed cure payments in connection with assumed contracts pursuant to Section 8.1 of the Debtor's Plan.  The Debtor has paid approximately $2,170,341.64 in undisputed cure payments in connection with assumed contracts.

g.    Special Recognition Grants.  On or about December 7, 2004, consistent with Section 9.3 of the Debtor's Plan in connection with the Special Recognition Grants, physical certificates in the amount of (i) 103,360 shares of Common Stock were issued to certain executive officers, members of the extended leadership team and executive-level key managers (not subject to tax withholding at that time); and (ii) 7,630 shares of Common Stock were issued to non-executive-level key managers (subject to tax withholding at that time).  The Debtor withheld 3,174 shares of Common Stock to satisfy the tax withholding liability of the individuals comprising the non-executive-level key manager group resulting from the stock issuance.

See Notice of Substantial Consummation.

Under Section 4.8(b)(ii) of the Plan, any New Common Stock which otherwise would have been distributable to a holder of a Class 8(b) Claim if such holder had chosen Option 1 shall be distributed pro rata to Class 7 and Class 9, and the Warrants which otherwise would have been distributable will be canceled. On February 16, 2005, NorthWestern issued instructions to its transfer agent regarding the distribution of 368,626 shares of Common Stock which otherwise would have been distributable to a holder of a Class 8(b) Claim if such holder had chosen Option 1. The transfer agent was instructed that the pro rata share of the Common Stock allocated to holders of Allowed Class 7 Claims were to be issued to DTC for credit in book entry form to the accounts of the DTC Participants representing holders of Class 7 Allowed Claims as of the Record Date. The transfer agent was further instructed that 44,492 shares of Common Stock to be distributed to holders of Allowed Class 9 Claims were to be deposited in the Disputed Claims Reserve for future issuance in connection with Class 9 claims. In connection with these instructions, the 684,265 Warrants, which otherwise would have been distributable to a holder of a Class 8(b) Claim if such holder had chosen Option 1, were to be cancelled.

## III.    SUMMARY OF ARGUMENT

Because the Plan has been substantially consummated, Magten is not entitled to and cannot be granted any relief on appeal even if Magten is successful. Even if any relief could conceivably be fashioned, implementation of that relief would be inequitable because: (1) Magten failed to obtain a stay pending appeal; (2) the Plan has been substantially consummated; (3) the relief requested would adversely impact the material rights of creditors and other third parties under the Plan terms who are not before the Court and who have received their Plan distributions; and (4) the relief requested would

negatively affect the success of the Plan and undermine the public policy of affording finality to bankruptcy orders.  Accordingly, Magten's consolidated appeal should be dismissed because it is equitably moot.  See In re Continental Airlines, 203 F.3d 203 (3d Cir. 2000).

## IV.    STATEMENT OF FACTS[9]

### A.    Creditor Support of Debtor's Plan

As the voting tabulation set forth below shows, an overwhelming majority of the Debtor's creditors voted in support of the Plan.  Even Class 8(b), of which Magten is a part, voted in support of the Plan. This Class reached the numerosity requirement but failed on dollar amount as Magten held approximately 40% of the total class.

As illustrated below, the results of voting in connection with the Plan showed the overwhelming acceptance of the Plan in both number and amount by all classes entitled to vote, except Class 8(b):

[remainder of page intentionally blank]

---

[9]    The facts are drawn from documents filed of record in the Debtor's bankruptcy case.

| | | | | | | |
|---|---|---|---|---|---|---|
| Class 7 Unsecured Note Claims | 580 | 568 (97.93%) | 12 (2.07%) | N/A | $681,067,015.00 (99.17%) | $5,712,815.00 (0.83%) |
| Class 8a Unsecured Subordinated Note Claims | 2761 | 2160 (78.23%) | 601 (21.77%) | N/A | 5,475,271 shares (90.42%) | 580,141 shares (9.58%) |
| Class 8b Unsecured Subordinated Note Claims | 734 | 604 (82.29%) | 130 (17.71%) | N/A | 730,310 shares (36.16%) | 1,289,548 shares (63.84%) |
| Class 9 General Unsecured Claims | 41 | 32 (78.05%) | 9 (21.95%) | 0 | $5,955,802.22 (80.46%) | $1,446,645.57 (19.54%) |
| Class 12 D&O Trust Claims | 28 | 28 (100.00%) | 0 (0.00%) | 0 | $28.00 (100.0%) | $0.00 (0.0%) |

Affidavit of Christopher R. Schepper Regarding Tabulation of Votes in Connection with the Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code at ¶ 16 [Magten, Exh. 192].

### B.    The Confirmation Hearings and Ruling on Confirmation

On August 25, 2004 and again on October 6, 2004, the Bankruptcy Court held hearings to consider, among other things, confirmation of the Plan (the **"Confirmation Hearing"**). Significantly, at the Confirmation Hearing Magten presented no evidence and failed to examine or cross-examine any witnesses in its opposition of the Plan. On October 8, 2004, the Bankruptcy Court orally issued its findings of fact and conclusions of law confirming the Plan in all respects and overruling all objections to confirmation not otherwise withdrawn or resolved, specifically including Magten's objections. Transcript of Proceedings Before the Honorable Charles G. Case, II, United States Bankruptcy Judge, dated October 8, 2004 at 27 (**"Confirmation Ruling"**) [Magten, Exh.

213]. In confirming the Plan, the Confirmation Ruling specifically found that: the Plan is a "gift plan" and that Magten as a subordinated unsecured creditor was afforded an adequate remedy at law for its claims, including the QUIPS Litigation discussed below.

### 1. The Confirmation Order

On October 19, 2004, the Bankruptcy Court entered an Order Confirming Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code. A copy of the Confirmation Order is attached hereto as Exhibit A.

### 2. The Bankruptcy Court Order Denying Stay Pending Appeal

Following an emergency teleconference with the Bankruptcy Court on October 25, 2004, on October 26, 2004, the Bankruptcy Court entered its Order Denying Emergency Motion of Magten Asset Management Corporation for a Stay Pending Appeal of the Order Confirming the Debtor's Second Amended and Restated Plan of Reorganization (the "Bankruptcy Court Order Denying Stay Pending Appeal") [Docket No. 2274]. In denying the Emergency Motion for Stay, the Bankruptcy Court found "There has been no new evidence to suggest – or new arguments to suggest that the decisions that were decided adversely to Magten at the time of the confirmation hearing are likely to be reversed on appeal." October 25 Transcript at 29-30 [Magten, Exh. 218].

### 3. This Court's Denial of the Stay Pending Appeal

This Court also denied Magten's request for a stay pending appeal on October 29, 2004 finding that Magten failed to satisfy any of the four factors on the showing of the likelihood of success on the merits. Stay Pending Appeal Ruling at 46.

### C.    Magten's Claims and Treatment Under the Plan

#### 1.    Magten's Claims

Magten is a distress investor that acquired a substantial position in certain of the Debtor's 8.45% Quarterly Income Preferred Securities (the **"QUIPS"**) long after and with the knowledge of the Going Flat Transaction (as defined below). The QUIPS were issued by Montana Power Capital I (the **"Trust"**), a business trust established pursuant to the Delaware Business Trust Act. The Trust's sole assets are the 8.45% Junior Subordinated Debentures due 2036.

#### 2.    Legal Remedies Provided to QUIPS Holders Under the Plan

QUIPS holders are provided for in Class 8(b) of the Plan.[10] Because of the existence of an adversary proceeding (the "QUIPS Litigation") described below, the Debtor's Plan provided QUIPS holders with two options. QUIPS holders electing "Option 1" received, or will receive when Law Debenture, the QUIPS indenture trustee, distributes the shares that have been transferred to it by the Debtor's transfer agent, a pro rata share of 505,591 shares of the New Common Stock (such 505,591 shares representing 1.4% of the New Common Stock issued and outstanding on the Effective Date prior to any dilution resulting from shares of New Common Stock issued pursuant to a new incentive plan and exercise of the Warrants), plus Warrants exercisable for an additional 2.3% of the New Common Stock. QUIPS holders electing Option 1 were required to release any claims arising out of or related to the QUIPS Litigation. See Plan, §4.8(b).

---

[10]    The structure of the Plan is simple – conversion of approximately $1.2 billion of senior and subordinated unsecured debt claims in exchange for 35.5 million shares of newly issued common stock (the "New Common Stock"). The QUIPS represent only $69.0 million of the debt being exchanged for equity.

QUIPS holders electing "Option 2" received a Class 9 general unsecured claim and a pro rata share of recoveries, if any, upon resolution of the QUIPS Litigation. The QUIPS holders electing Option 2 also received the benefit of the Class 9 Reserve for Disputed Claims established pursuant to Section 7.5 of the Plan.[11] Option 1 and Option 2 allowed QUIPS Claims holders to (1) choose a distribution of New Common Stock and Warrants, or (2) preserve their litigation claims as part of the QUIPS Litigation and be treated as Class 9 unsecured claimants for any damages ultimately awarded to claimants participating in the QUIPS Litigation. See Plan, §4.8(b).

### 3. QUIPS Litigation Claims

#### (a) Initiation of the Adversary Proceeding

On April 16, 2004, just over eight months after initiation of the Debtor's Chapter 11 case and after the Debtor had timely filed its initial proposed reorganization plan, Magten and Law Debenture (Law Debenture together with Magten, the **"Plaintiffs"**) initiated the QUIPS Litigation, challenging a pre-petition transfer of certain energy and natural gas transmission and distribution assets (the **"Montana Utility Assets"**) by a wholly-owned subsidiary of the Debtor, to the Debtor as part of the Debtor's acquisition of The Montana Power Company's transmission and distribution assets. The Plaintiffs assert that the transfer, sometimes referred to as the **"Going Flat Transaction,"** was a fraudulent conveyance and that the assets transferred to the Debtor are not property of the

---

[11] On or about November 3, 2004, the Bankruptcy Court entered an order approving the Stipulation and Order Establishing a Disputed Claims Reserve between NorthWestern and Law Debenture which provided that the Reorganized Debtor shall set aside a portion of its initial reserve of 13.5% of New Common Stock solely to satisfy in full a $25 million Class 9 claim of the QUIPS Litigation Claims holders. Any claim by a QUIPS Litigation claimant is to be afforded the treatment accorded Class 9 General Unsecured Claims, as set forth in the Plan [Debtor, Exh. 6].

Debtor's estate. The Plaintiffs further assert that a constructive trust should be imposed on the transferred assets.

The Debtor vehemently denies all of the Plaintiffs' allegations. As the Bankruptcy Court held, simply asserting the existence of a fraudulent conveyance claim and a constructive trust does not make them so. Moreover, Magten made no effort to enforce its wholly unsubstantiated allegations into any form of legal remedy either pre-petition or post-bankruptcy filing. As reflected by the Bankruptcy Court's Confirmation Ruling, the Going Flat Transaction was nothing more than the last stage of the Debtor's acquisition of The Montana Power Company assets, an acquisition that was initiated in February 2002 and completed with the closing of the Going Flat Transaction in November 2002. The Bankruptcy Court found:

> in reviewing all of the underlying transaction documents in connection with the going-flat transaction, it is clear to me -- and the applicable law, it is clear to me that this was really all one transaction.

See Confirmation Ruling at 33.

(b)    The Motion to Dismiss

On May 14, 2004, Northwestern filed its Motion and Supporting Brief to Dismiss the Complaint for Failure to State a Claim Upon Which Relief Can Be Granted (the **"Motion to Dismiss"**) [Magten, Exh. 225]. On August 20, 2004, the Bankruptcy Court issued its Under Advisement Decision re: Motion to Dismiss (the **"Opinion"**) granting in part and denying in part the Debtor's Motion to Dismiss. In its Opinion, the Bankruptcy Court held that in order to pursue a recovery Magten and Law Debenture would need to prove under applicable law that one of the releases given in connection with the Going

Flat Transaction <u>was obtained through actual fraud or as part of a fraudulent scheme.</u>

Confirmation Ruling at 26 (emphasis added).[12]

                (c)      Magten's Confirmation Objections Overruled in Their Entirety

On August 9, 2004, Magten filed objections to confirmation of the Plan (**"Magten Confirmation Objections"**) [Magten, Exh. 110]. On September 21, 2004, Magten filed supplemental objections to confirmation of the Plan (**"Magten Supplemental Confirmation Objections,"** and together with the Magten Confirmation Objections, the **"Magten Objections"**) [Magten, Exh. 180]. In the Magten Objections, Magten argued that the Plan could not be confirmed because the principal assets of the Debtor's estate, the Montana Utility Assets, were being held by NorthWestern in constructive trust for the benefit of the QUIPS holders. Magten also argued that the Montana Utility Assets were not the property of the Debtor's estate. Finally, Magten claims that because Debtor's PUHCA exemption application was not allegedly filed in good faith that certain senior debt obligations incurred by the Debtor after February 14, 2002 were void.

As set forth in the Confirmation Ruling and Confirmation Order, Magten's Objections were overruled in their entirety. The Bankruptcy Court held that "all objections not previously resolved in accordance with my opening comments are overruled in accordance with this oral ruling." <u>See</u> Confirmation Ruling at 45 and Confirmation Order at 33-47. In particular, the Court ruled that

---

[12]     On October 4, 2004, the Plaintiffs amended the Complaint (the **"Amended Complaint"**). The Amended Complaint added a count seeking a declaration that all documents executed in furtherance of the alleged fraudulent transfer are void under the Public Utility Holding Company Act of 1935, as codified in title 15 of the United States Code, 15 U.S.C. §§ 79-79z-6 (**"PUHCA"**). The Debtor has moved to dismiss this portion of the Amended Complaint.

> there was not a shred of evidence presented by Law Debenture or
> Magten on this [PUHCA issues], and there's no basis to determine,
> no evidentiary basis at all to determine that the senior debt should
> be voided or subordinated. So, that objection is overruled.

Confirmation Ruling at 42.

### D.    The Memorandum of Understanding

#### 1.    Approval of the Memorandum of Understanding

On or about April 28, 2004, NorthWestern filed its Motion for Order pursuant to Bankruptcy Rule 9019 Approving Memorandum of Understanding requesting entry of an order approving the Memorandum of Understanding (the **"MOU"**) providing for settlement (the **"Settlement"**) and dismissal with prejudice of all claims against all parties in the consolidated securities class action styled In re NorthWestern Corporation Securities Litigation, Case No. CIV-03-4049, including Golman Family Trust v. NorthWestern Corp., Case No. CIV-03-4226 (collectively, the **"Securities Litigation"**) and In re NorthWestern Derivative Litigation, Case No. 03-4091 (the **"Derivative Litigation"**, collectively with the Securities Litigation, the **"Class Action"**), all pending in the United States District Court for the District of South Dakota (the **"Class Action District Court"**) [Magten, Exh. 32].

Under the Settlement, a settlement fund was established in the amount of $41 million, $37 million of which was contributed by certain D&O Policies and $4 million of which was contributed by other persons and parties. NorthWestern's only obligations under the Settlement were to cause its insurers under the D&O Policies to deliver $37 million in full settlement and compromise of the Class Action and to provide the releases set forth in the Settlement documents.

On or about October 7, 2004, the Bankruptcy Court issued its memorandum decision overruling objections and finding that the proposed settlement of the Class Action met the requirement of approval under Bankruptcy Rule 9019 and the applicable case law (the **"MOU Memorandum Decision"**) [Magten, Exh. 194].  On or about October 14, 2004, the Bankruptcy Court entered the MOU Order.  On or about October 26, 2004, Magten filed its notice of appeal of the MOU Order.

On or about January 14, 2005, the Class Action District Court entered its Final Judgment and Order of Dismissal with Prejudice of the Securities Litigation.  On or about January 14, 2005, the Class Action District Court also entered its order in the Derivative Litigation holding that the approval of the Settlement would be held in abeyance until a bankruptcy court order is obtained vacating the order preliminarily enjoining prosecution of the Derivative Action.  On or about February 15, 2005, the Bankruptcy Court entered the Stipulation and Order Terminating the Preliminary Injunction and the Automatic Stay in connection with the Derivative Action.  The Bankruptcy Court order has been submitted to the District Court and the parties are currently waiting for entry of an order approving the Settlement in the Derivative Litigation by the Class Action District Court.

### 2.    Treatment of Claims Related to Class Action Under the Plan

Under Section 4.14 of the Plan, Class 14 Claims, claims of holders of claims pursuant to the Settlement, will be discharged and the holders thereof shall be barred from seeking to recover any payment on their Securities Claims from the Debtor, the Reorganized Debtor, or the Released Parties.[13]

---

[13]    The Plan provides that in the event the Settlement was not approved and does not become effective: (a) the Plan and any proposed Order confirming the Plan (i) will not release any non-Debtor for that matter from the claims asserted or to be asserted in the Securities Litigation and (ii) will not affect, in
(continued on next page)

Under Sections 4.14 and 4.15 of the Plan, holders of Securities Claims who elect to refuse to accept the proposed treatment provided in the Settlement preserved their rights to proceed against the Debtor in the Class Action District Court in accordance with the Settlement. Upon receipt of a Final Order, such holders of Securities Claims shall be channeled to the D&O Trust.

### 3.    Magten's Objections to the MOU

Magten objected to the MOU, asserting that any distribution under the Settlement would violate the absolute priority rule by making distributions to junior stakeholders while paying less than 100% of the claims of more senior creditors. In its MOU Memorandum Decision, the Bankruptcy Court overruled Magten's objection in its entirety. In particular, the Bankruptcy Court, focusing on the use of the Debtor's interest in insurance policies to effectuate the settlement, ruled that:

> Here, the primary purpose of the policies is to protect the directors and officers from claims such as those asserted by the plaintiffs . . . payment of the proceeds to the plaintiffs on account of claims against the directors and officers does not implicate property of the estate.

MOU Memorandum Decision, pp. 4-5. The Bankruptcy Court also held:

> Resolution of this complex and expensive litigation at no direct cost to the estate is fair and reasonable, is in the best interests of the estate and its creditors, significantly enhances the Debtor's ability to emerge from these proceedings with a confirmed plan of reorganization, and is the result of arm's length negotiation.

MOU Memorandum Decision, p. 6.

---

(continued from previous page)

any way, the Class Claimants' rights to obtain relief for their claims in the Securities Litigation; (b) the lead Plaintiffs and the Class Claimants shall retain their rights to pursue their claims and access the proceeds of any available D&O policies that provide coverage for the claims asserted in the Securities Litigation; and (c) the Debtor's current and former officers and directors, financial advisors, accountants, auditors, agents or professionals will not be released and discharged from any cause of action in connection with the Class Action.

Magten also objected to the MOU, asserting that the proceeds of the D&O

Policies were not property of the Debtor's estate where the derivative actions belong to

the Debtor. The Bankruptcy Court held:

> The critical issue raised by Magten's objection is whether the
> settlement payments made from the D&O Policies are in fact
> distributions of estate property in the first instance. The Court
> concludes they are not.

MOU Memorandum Decision, p. 5 (footnote omitted).

In connection with the derivative actions, the Bankruptcy Court held as follows:

> Any claims that the Debtor may have (for example, derivative
> claims brought on behalf of the company) are not covered by these
> policies because of the "insured versus insured" exception
> contained in them . . . Thus, whether the Debtor could or could not
> prevail is not relevant to this settlement because the policies at
> issue would not provide a source of recovery even if successfully
> prosecuted.

MOU Memorandum Decision, p. 5.

### 4. Issues Raised by the Appeal of the MOU Order are Identical to the Appeal of the Confirmation Order

The issues raised by Magten in its appeal are identical to the issues raised in its

appeal of the Confirmation Order. Magten asserts two issues to be presented to the Court

in its appeal of the MOU Order:

> a. Whether the Bankruptcy Court erred in approving a
> settlement that provides for payment of equity interests when more
> senior creditors are not being paid in full and are only receiving a
> minimal recovery under the Debtor's Second Amended and
> Restated Plan of Reorganization.

> b. Whether the Bankruptcy Court erred in finding that the
> proceeds of the D&O Insurance Policy are not property of the
> Debtor's estate when the derivative actions belong to the Debtor
> and not the shareholders and all damages awarded in a derivative
> suit inure directly to the corporation.

The issues presented by Magten in the appeal of the MOU Order are directly related to the confirmation and implementation of NorthWestern's Plan. As discussed above, the Bankruptcy Court overruled Magten's objections to the approval of the MOU holding that the payment of the proceeds to the plaintiffs in the Class Action on account of claims against the directors and officers does not implicate property of the estate. See MOU Memorandum Decision, pp. 4-5. In addition, the Bankruptcy Court held that the "[a]ny claims that the Debtor may have (for example, derivative claims brought on behalf of the company) are not covered by these policies because of the "insured versus insured" exception contained in them." Id. at 5.

In its Confirmation Ruling, the Bankruptcy Court held that "the proceeds [from the policies] are not property of the estate so that does not implicate, therefore, the absolute priority rule." See Confirmation Ruling, p. 39. The Bankruptcy Court also specifically held that "consistent with applicable law the D&O channeling trust injunction and the releases are appropriate and do not require that the plan not be confirmed." See Confirmation Ruling, p. 41. The issues presented by Magten in its appeal of the MOU Order are identical to issues presented in its appeal of the Confirmation Order and were decided adversely to Magten not once, but twice, by the Bankruptcy Court.

### E.    The Debtor Has Substantially Consummated the Plan

As set forth in the Notice of Substantial Consummation, the Debtor has substantially consummated its Plan, thereby effectuating its exit from Chapter 11. As set forth in the Notice of Substantial Consummation, the Debtor: (i) transferred substantially all of the property proposed by the Plan to be transferred including delivery of the Trust

Assets to the D&O Trust; (ii) assumed substantially all of the property dealt with by the Plan; and (iii) completed distributions to holders of allowed claims under the Plan, including distributions to holders of Class 7, 8(a), 8(b) and 9 allowed claims.[14]

On or about the Effective Date, the Reorganized Debtor finalized its senior credit agreement and issued the $225 million senior secured notes portion of its exit financing. On the Effective Date, the Reorganized Debtor also paid all Allowed CSFB Financing Claims (approximately $390 million) and Bank One DIP Financing Claims (approximately $15.0 million in letters of credit and terminated unfunded financing commitments of approximately $35 million) pursuant to the Debtor's exit financing facility. In addition, the Reorganized Debtor effectuated the registration of its common stock on the NASDAQ Stock Market Exchange. Pursuant to the Plan, on the Effective Date, the Reorganized Debtor established a trust to which indemnification claims of certain of the Debtor's current and former directors and officers (the **"Protected Parties"**) will be channeled and paid by available insurance under the Debtor's Plan (the **"D&O Trust"**).

Moreover, pursuant to Section 7.5 of the Plan, the Reorganized Debtor established a Disputed Claim Reserve equal to the aggregate New Common Stock equal to the relevant percentage of the Distributions to which holders of Disputed Claims would be entitled under this Plan if such Disputed Claims were Allowed Claims in the amount of such Disputed Claim or such lesser amount as required by a Final Order. To the extent that the MOU Order was overturned, the Securities Claims would be treated as Class 12 D&O Trust Claims under the Plan and subject to the first in, first out distributions

---

[14]    The MOU has also been substantially consummated. As set forth above, the District Court has now approved the MOU in the Securities Litigation and the Settlement is being implemented.

provided for under the D&O Trust.  Any such reversal would adversely affect third

parties not before the Court, including, but not limited to, parties seeking to recover from

the D&O Trust.

## V.    ARGUMENT AND CITATION OF LEGAL AUTHORITY

Because the Plan has been substantially consummated, Magten is not entitled and

cannot be granted the very relief it now seeks.  First, the Plan has been substantially

consummated and what is done cannot now be undone.  Second, if such relief could

conceivably be fashioned, the requested relief is not supported by controlling authority

and implementation of any such relief granted would be wholly inequitable.  In short,

Magten is not entitled to any of the relief it now seeks because: (1) the Plan has been

substantially consummated; (2) Magten failed to obtain a stay pending appeal; (3) the

relief requested would adversely impact the material rights of creditors and third parties

not before the Court; and (4) the relief requested would negatively affect the success of

the Plan and undermine the public policy affording finality to bankruptcy orders.  See In

re Continental Airlines, 91 F.3d 553, 560 (3d Cir. 1996).

### A.    Magten's Appeal Should be Dismissed as Being Equitably Moot

The Third Circuit Court of Appeals adopted the doctrine of equitable mootness in

In re Continental Airlines, 91 F.3d 553 (3d Cir. 1996) (en banc).  After conducting a

survey of case law from other circuits,[15] the court described the equitable mootness

doctrine as follows:

---

[15]    Indeed, virtually every circuit court of appeals has recognized this doctrine.  See In re Manges, 29 F.3d 1034, 1038-39 (5th Cir. 1994), cert. denied, 513 U.S. 1152 (1995) (doctrine of equitable mootness "is a recognition by the appellate courts that there is a point beyond which they cannot order fundamental changes in reorganization actions."); In re Specialty Equip Cos., 3 F.3d 1043, 1048 (7th Cir. 1993); In re Public Serv. Co., 963 F.2d 469, 471-72 (1st Cir. 1992), cert. denied, 506 U.S. 908 (1992); In re Club
(continued on next page)

> Under this widely recognized and accepted doctrine, the courts have held that '[a]n appeal should . . . be dismissed as moot when, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable.'

Id. at 558-559 (quoting In re Chateaugay Corp., 988 F.2d 322, 325 (2d Cir. 1993)); see also In re Continental Airlines, 203 F.3d at 209 ("Under the doctrine of equitable mootness, an appeal should be dismissed, even if the court has jurisdiction and could fashion relief, if the implementation of that relief would be inequitable."). The equitable mootness doctrine provides "a vehicle whereby the court can prevent substantial harm to numerous parties." Id. at 209.

In Continental, the en banc Court identified five factors other courts had considered in determining whether the merits of a bankruptcy appeal should be considered: "(1) whether the reorganization plan has been substantially consummated, (2) whether a stay has been obtained, (3) whether the relief requested would affect the rights of parties not before the court, (4) whether the relief requested would affect the success of the plan, and (5) the public policy of affording finality to bankruptcy judgments." Id. at 560 (citations omitted), accord, e.g., Nordhoff Invs. v. Zenith Elec. Corp., 258 F.3d 180, 185 (3d Cir. 2001); In re PWS Holding Corp., 228 F.3d 224, 236 (3d Cir. 2000). Applying these factors, the Continental court concluded that the district court did not abuse its discretion by dismissing the appeal before it on equitable mootness grounds. See Continental, 91 F.3d at 566-567.

(continued from previous page)
Assocs., 956 F.2d 1065, 1069 (11th Cir. 1992); Central States, Southeast & Southwest Areas Pension Fund v. Central Transp. Inc., 841 F.2d 92, 95-6 (4th Cir. 1988); In re AOV Indus., 792 F.2d 1140, 1147 (D.C. Cir. 1986); In re Roberts Farms Inc., 652 F.2d 793, 796-97 (9th Cir. 1981).

The "foremost consideration," of course, "is whether the reorganization plan has been substantially consummated." PWS Holding, 228 F.3d at 236.  As the Third Circuit has stated, "the equitable mootness doctrine prevents a court from unscrambling complex bankruptcy reorganizations when the appealing party should have acted before the plan became extremely difficult to retract." Nordhoff, 258 F.3d at 185.

### 1.    Substantial Consummation

Substantial consummation is specifically defined in the Bankruptcy Code as follows:

> (a) transfer of all or substantially all of the property proposed by the plan to be transferred; (b) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan, and (c) commencement of distribution under the plan.

11 U.S.C. § 1101(2).  The issue of "substantial consummation" is to be decided under the definition set forth in Section 1102(2) of the Bankruptcy Code.  Continental, 91 F.3d at 561.[16]

In Continental, the court noted that this factor is typically the "foremost consideration" in an equitable mootness analysis.  Id. at 560.  This is particularly true when the plan "involves intricate transactions . . . or where outside investors have relied on the confirmation of the plan."  Id. at 560-561.  Substantial consummation may include such acts as the infusion of cash into the post-confirmation estate and/or completion of all elements of the plan, without considering the pay-out of unsecured creditors.  Id. at 561.

---

[16]    Equitable mootness is a judicially-created doctrine; it is not statutory.  The definition of "substantial consummation" provided in Section 1101 is applicable to the determination of whether a plan proponent or reorganized debtor may seek to modify a confirmed plan of reorganization.  See 11 U.S.C. § 1127(b) (2000).  This same definition has been incorporated into the equitable mootness inquiry.  See Continental, 91 F.3d at 561.

In <u>Continental</u>, the court noted that "numerous irrevocable transactions [had] been completed as a result of the consummation of the Plan." <u>Id.</u> at 566-567. Those transactions included the merging of 53 other debtors with and into Continental, the investment of $110 million in cash by two outside investors, and the transfer by foreign governments of various route authorities. <u>Id.</u> at 567.

Similarly, in <u>In re Zenith Electronics Corporation</u>, 250 B.R. 207 (D. Del 2000), <u>aff'd</u>, 258 F.3d 180 (3d Cir. 2001), the district court granted the debtor's motion to dismiss an equity holder's appeal as equitably moot. In comparing the facts of its case with the facts in <u>Continental</u>, the <u>Zenith</u> court observed the following:

> By contrast, Zenith is still Zenith. It did not merge with any other entity. Though an assembly plant was transferred to LGE— formerly Zenith's majority shareholder and now its only shareholder—there does not appear to be any reason why, if need be, ownership of the plant could not be transferred back to Zenith. Similarly, LGE's exchange of debt for stock could be reversed if necessary. And it appears that Citicorp was a major creditor before, during, and after the bankruptcy proceedings. Thus, "reversal" of the Citicorp refinancing appears to be feasible. The exchange of the bonds, however, would seem to present a more difficult problem. The bonds are publicly traded. Many of these bonds may have already been sold, perhaps more than once since consummation. It would likely be difficult to "reverse" the bond exchange, and such "reversal" would almost certainly impact the rights of investors that were not involved in the bankruptcy proceedings. Still, reversal of these transactions would not likely be quite as daunting a task as the "unmerging" of 54 debtors and the return of the outside investors' investments in Continental.

<u>Id.</u> at 214.[17]

---

[17]    The same analysis applies in NorthWestern's case. Prior to the Effective Date, the "Debtor anticipates pricing the notes after the close of the financial markets on Monday, October 25. To obtain the funding of the notes to exit Chapter 11 by November 1, the Debtor must price the senior secured notes pursuant to this schedule. Further, once pricing of the senior secured notes occurs, the Debtor must then fund the notes within a limited period, but in any event no later than five business days following the pricing." Initial Bird Affidavit, ¶8. At this time, the notes have been funded and investors, including
(continued on next page)

Notwithstanding the apparent unwindable nature of the transactions effected through consummation of the plan, the court went on to state that, "[a]lthough some of the Plan transactions could conceivably be 'reversed,' this would not be easy to accomplish, and other transactions may not be reversible at all. This factor, therefore, weighs heavily in favor of dismissal, at least to the extent that the court could not fashion relief that would not result in the dismantling of the Plan," and went on to find that indeed the plan had been substantially consummated. Id. The Zenith court went on to analyze the remaining factors from Continental and find the following: (1) the plan had been substantially consummated, (2) no stay was obtained, (3) the relief requested would affect parties not before the appellate court, (4) the relief requested would adversely affect the success of the plan, and (5) the facts supported the policy of finality in bankruptcy judgments. Id. at 214-20.

In this case, following the Confirmation Ruling, the Debtor undertook to complete the offering memorandum for the $225 million senior secured notes portion of the proposed exit financing. The offering memorandum was completed on October 14, 2004 and the roadshow to sell the senior secured notes to appropriate investors began on October 18, 2004. As of October 25, 2004, the roadshow was completed and the senior secured notes offering was over subscribed. The notes were priced on October 25, 2004 and, following the Effective Date, the Debtor funded the notes. The funds generated from the issuance of the senior secured notes were used to repay Credit Suisse First Boston in connection with Allowed CSFB Financing Claims. The senior notes are

---

(continued from previous page)

Credit Suisse First Boston LLC, Lehman Brothers Inc. and Deutsche Bank Securities Inc., have relied on the finality of the transactions which closed on the Effective Date.

currently publicly traded.  In addition to the senior notes, a syndicated $225 million credit facility involving approximately ten lenders was entered into by the Reorganized Debtor. In light of the transactions implementing the Plan, it is clear that a significant number of outside investors, including, but not limited to, Lehman Brothers Inc., Credit Suisse First Boston LLC and Deustche Bank Securities Inc., as initial purchasers of the notes and the syndicate of lenders under the senior credit facility, are now relying on the confirmation of the Plan.  See Initial Bird Affidavit, ¶ 8 [Magten, Exh. 215] and Statement of Exit Finance Banks in Connection with Emergency Motion of Magten Asset Management Corporation for a Stay Pending Appeal of the Order Confirming the Debtor's Second Amended and Restated Plan of Reorganization [Docket No. 10].

Following these transactions and as set forth in the Notice of Substantial Consummation, the Debtor has substantially consummated its Plan, thereby effectuating its exit from Chapter 11.  With regard to the Plan, the Debtor has: (i) transferred substantially all of the property proposed by the Plan to be transferred including delivery of the Trust Assets to the D&O Trust; (ii) assumed substantially all of the property dealt with by the Plan; and (iii) completed distributions to holders of allowed claims under the Plan, including distributions to holders of Class 7, 8(a), 8(b) and 9 allowed claims.  In addition, the Reorganized Debtor has paid all Allowed Bank One DIP Financing Claims and Allowed CSFB Financing Claims pursuant to the Debtor's exit financing facility.

As discussed above, with regard to actions taken by the Debtor necessary to implement the Plan, numerous underwriters and investors were involved in Plan transactions on the Effective Date.  These transactions cannot possibly be reversed.  In addition, Reorganized Debtor effectuated the registration of its common stock on the

NASDAQ Stock Market Exchange. Pursuant to the Plan, on the Effective Date, the Reorganized Debtor established the D&O Trust to which indemnification claims of the Protected Parties will be channeled and paid by available insurance under the Debtor's Plan.

Finally, as required by Section 7.5 of the Plan, the Reorganized Debtor established a Disputed Claim Reserve equal to the aggregate of New Common Stock equal to the relevant percentage of the Distributions to which holders of Disputed Claims would be entitled under this Plan if such Disputed Claims were Allowed Claims in the amount of such Disputed Claim or such lesser amount as required by a Final Order.[18]

### 2.    Whether a Stay Has Been Obtained

Denial of a stay request is a factor that weights in favor of dismissal for equitable mootness when a plan has been substantially consummated. The court in Zenith stated as to this factor:

> To the extent that this is viewed as a "prudential" factor, it would seem to be largely duplicative of the "substantial consummation" factor already discussed. That is, it would seem that a Plan would typically be "substantially consummated" only if the appellant had failed to obtain a stay. Further, as a "prudential" factor, it is difficult to distinguish between a stay not sought and a stay sought but not obtained. See Continental, 91 F.3d at 562 (noting that seeking a stay may not be enough to prevent an appeal from becoming equitably moot because "'a stay not sought, and a stay sought and denied, lead equally to the implementation of the plan'") (quoting In re UNR Indus., 20 F.3d 766, 770 (7th Cir. 1994)). . . . As an "equitable" factor, however, the failure to even

---

[18]    On or about November 3, 2004, the Bankruptcy Court entered an order approving the Stipulation and Order Establishing a Disputed Claims Reserve between NorthWestern and Law Debenture which provided that the Reorganized Debtor shall set aside a portion of its initial reserve of 13.5% of New Common Stock solely to satisfy in full a $25 million Class 9 claim of the QUIPS Litigation Claims holders. Any claim by a QUIPS Litigation claimant is to be afforded the treatment accorded Class 9 General Unsecured Claims, as set forth in the Plan [Debtor, Exh. 6].

seek a stay would seem to have significance beyond the mere failure to obtain a stay.

Zenith, 250 B.R. 207, 215.[19]

Magten tried, not once but twice, to obtain a stay, and was flatly rejected each time by the Bankruptcy Court and the District Court.[20]    The Bankruptcy Court determined that Magten has

> not satisfied the likelihood of success prong or the irreparable harm prong. And further, I think the public interest prong also falls in favor of the Debtors and the other proponents of the Plan in order to promote the reorganization of this company.

October 25 Transcript, p. 30.  This Court properly denied Magten's attempt to obtain a stay finding that that "Magten hasn't satisfied any of the four factors on the showing of the likelihood of success on the merits."  Stay Pending Appeal Ruling at 46 (emphasis added) [Debtor, Exh. 22].

On the next business day following this Court's denial of Magten's stay request, the Debtor made the Plan effective, formally noticed the Effective Date and implemented the Plan.  The Plan was substantially consummated shortly thereafter.  On the Effective Date, the Debtor and/or the Reorganized Debtor took the following actions:

(i)    transferred of all of the property proposed by the Plan to be transferred, including delivery of all the Trust Assets to the D&O Trust;

---

[19]    Magten failed to seek any stay of the MOU.  Notably, however, the Zenith court held that "in particular, the Appellants' failure to even seek a stay as the Plan was being substantially — if not entirely — consummated outweighs the court's concerns." 250 B.R. at 222.  While the absence of a stay certainly is included within the Continental factors, the appropriate question is not whether a stay was requested, but whether the reorganization plan was stayed.  In re UNR Indus., Inc., 20 F.3d 766, 769-70 (7th Cir. 1994) ("requesting a stay is not a mandatory step" and "[a] stay not sought, and a stay sought and denied, lead equally to the implementation of the plan"), cert. denied, 513 U.S. 999 (1994).  "The significance of an application for a stay lies in the opportunity it affords to hold things in stasis, to prevent reliance on the plan of reorganization while the appeal proceeds."  Id.

[20]    As to the MOU Order, Magten did not even attempt to obtain a stay.

(ii)     assumed substantially all of the property dealt with by the Plan;

(iii)    closed a $225 million exit financing facility and issuance of the accompanying new first mortgage bonds;

(iv)    issued $225 million senior secured notes portion of the exit financing facility;

(v)     registered its newly issued stock with NASDAQ;

(vi)    paid all Allowed CSFB Financing Claims pursuant to the exit financing facility (approximately $390 million); and

(vii)   paid all Allowed Bank One DIP Financing Claims (approximately $15 million of letter of credit and terminating approximately $35 million of unfunded credit availability).

Shortly after the Effective Date: the following distributions completed the substantial consummation of the Debtor's Plan:

(i)     Class 7 Distributions. On or about November 1, 2004, consistent with Section 4.7 of the Debtor's Plan, 28,250,900 shares of New Common Stock were issued to DTC for credit in book-entry form to the accounts of the DTC participants representing holders of Class 7 Allowed Claims. On or about November 5, 2004, these shares were credited by DTC to the accounts of the above-referenced DTC participants.[21]

(ii)    Class 8(a) Distributions.

(a)    On or about November 1, 2004, consistent with Section 4.8(a) of the Debtor's Plan, 2,278,769 shares were issued to DTC for credit in book entry form to the accounts of the DTC participants representing holders of Class 8(a) Allowed Claims. On or about November 5, 2004, these shares were credited by DTC to the accounts of the above-referenced DTC participants.

---

[21]    Under Section 4.8(b)(ii) of the Plan, any New Common Stock which otherwise would have been distributable to a holder of a Class 8(b) Claim if such holder had chosen Option 1 shall be distributed pro rata to Class 7 and Class 9, and the Warrants which would have been otherwise distributable will be cancelled. On February 16, 2005, NorthWestern issued instructions to its transfer agent regarding the distribution of 368,626 shares of Common Stock which otherwise would have been distributable to a holder of a Class 8(b) Claim if such holder had chosen Option 1 under the Plan. The transfer agent was instructed that the pro rata share of the Common Stock allocated to holders of Allowed Class 7 Claims were to be issued to DTC for credit in book-entry form to the accounts of the DTC Participants representing holders of Class 7 Allowed Claims as of the Record Date.

(b)    On or about November 1, 2004, consistent with Section 4.8(a) of the Debtor's Plan, 4,366,092 warrants were issued to DTC for credit in book-entry form to the accounts of the DTC participants representing holders of Class 8(a) Allowed Claims.  On or about November 5, 2004, these warrants were credited by DTC to the accounts of the above-referenced DTC participants.

(c)    On November 1, 2004, consistent with Section 5.18 of the Debtor's Plan, 55,640 shares were issued to DTC for credit to Wilmington Trust Company pursuant to its exercise of its Indenture Trustee Charging Lien.

(iii)    Class 8(b) Distributions.  On or about December 23, 2004, mindful of its obligations to deliver shares of Common Stock and Warrants to holders of Class 8(b) claims who elected, or were deemed to have elected, Option 1 under Section 4.8(b) of the Debtor's Plan and Law Debenture Trust Company of New York's exercise of its Indenture Trustee Charging Lien, the Debtor authorized its transfer agent, LaSalle Bank National Association, to transfer (i) physical stock certificates issued in the name of "Law Debenture Trust Company of New York" representing 136,965 shares of Common Stock and (ii) physical warrant certificate in the name of "Law Debenture Trust Company of New York" representing 254,241 Warrants to purchase shares of Common Stock pursuant to Section 4.8(b) and Section 5.18 of the Debtor's Plan.

(iv)    Class 9 Distributions.  The following actions have been taken by the Debtor with respect to Allowed Class 9 claims:

(a)    Issuance of a physical certificate to Comanche Park LLC in the amount of 23,620 shares for its Allowed Class 9 Claim;

(b)    Establishment of a Disputed Claims Reserve.  Consistent with Section 7.5 of the Debtor's Plan, the Debtor reserved 4,409,100 shares for potential future distribution to holders of Allowed Class 9 Claims. This Disputed Claims Reserve includes specific reserves as follows: (i) shares of Common Stock equal to the value of $50,000,000, valued as of the Effective Date, in connection with PPL Montana LLC's disputed claim; and (ii) a $25,000,000 Class 9 claim in connection with the disputed QUIPS Litigation Claims.

(c)    Issuance to DTC of 614,125 shares for credit to the account of CRT Capital Group LLC, in resolution of the $19,500,000 allowed Class 9 claims of the Cornerstone Propane entities.

(v)    Class 10 Distribution. The Debtor made 100% of the payments to holders of Allowed Convenience Class Claims pursuant to Section 4.10 of the

Debtor's Plan. The Debtor has paid approximately $954,443.89 to holders of Allowed Convenience Class Claims.

(vi)    Cure Payments in Connection with Assumed Contracts. The Debtor made 100% of the undisputed cure payments in connection with assumed contracts pursuant to Section 8.1 of the Debtor's Plan. The Debtor has paid approximately $2,170,341.64 in undisputed cure payments in connection with assumed contracts.

(vii)    Special Recognition Grants. On or about December 7, 2004, consistent with Section 9.3 of the Debtor's Plan in connection with the Special Recognition Grants, physical certificates in the amount of (i) 103,360 shares of Common Stock were issued to certain executive officers, members of the extended leadership team and executive-level key managers (not subject to tax withholding at that time); and (ii) 7,630 shares of Common Stock were issued to non-executive-level key managers (subject to tax withholding at that time). The Debtor withheld 3,174 shares of Common Stock to satisfy the tax withholding liability of the individuals comprising the non-executive-level key manager group resulting from the stock issuance.

See Notice of Substantial Consummation.

Implementation of the Plan was not stayed and NorthWestern has now substantially consummated the Plan preventing this Court from "unscrambling" the actions taken by the Debtor, its creditors, investors and others in connection with implementing the Plan consistent with its terms. Nordhoff, 258 F.3d at 185.

### 3.    Reliance by Third Parties

"High on the list of prudential considerations taken into account by courts considering whether to allow an appeal following a consummated reorganization is the reliance by third parties, in particular investors, on the finality of the transaction." Continental, 91 F.3d at 562 (citing In re Manges, 29 F.3d 1034, 1039 (5th Cir. 1994), cert. denied, 513 U.S. 1152 (1995)). "The concept of 'mootness' from a prudential standpoint protects the interests of non-adverse third parties who are not before the reviewing court but who have acted in reliance on the plan as implemented." Id. (quoting Manges, 29

F.3d at 1039)). This is particularly important here as numerous underwriters, investors, and banks, including Bank One, N.A., Credit Suisse First Boston, through its Cayman Islands Branch, as agent under the CSFB Facility, Lehman Brothers Inc., Deutsche Bank Securities, and Credit Suisse First Boston LLC, are now relying on the finality of their respective transactions which closed on the Effective Date.

In _Continental_, the reliance interests of the two outside investors weighed heavily in the court's equitable mootness analysis. See _Continental_, 91 F.3d at 562-565. The court accepted the district court's findings that the outside investors relied on the unstayed confirmation order in making their $450 million investment, and that the relief requested by the appellants would undermine the grounds upon which the investors relied. Id. at 564 ("By the time the district court ruled on the appeal, it was no longer possible to restore the parties to their earlier positions because the investment had been made, and the option to withdraw was no longer available to the Investors").

Unlike the situation in _Continental_ where distributions to unsecured creditors had not yet been completed at the time of the appeal, 91 F.3d at 561, here NorthWestern has substantially completed its distributions to holders of allowed Class 7, 8(a), 8(b) and 9 claims but for distributions to be made from the Disputed Claims Reserve as and when Disputed Claims are determined. In addition, NorthWestern has paid the obligations owed and terminated commitments outstanding under the Bank One, N.A. DIP Financing Order and the DIP Loan Documents and have paid the debt owed to the lenders under the CSFB Facility, each of which thereby released liens against the Reorganized Debtor's assets. In addition, the Reorganized Debtor has completed distributions to holders of Class 10 Convenience Class Claims and made all undisputed cure payments in

connection with the assumption of contracts pursuant to Section 8.1 of the Debtor's Plan[22].

Moreover, courts have been particularly hesitant to grant relief which would "adversely affect investors in the reorganized [company] who acted in legitimate reliance on the order of confirmation in the absence of a stay." In re Public Serv Co., 963 F.2d 469, 475 (1st Cir.), cert. denied, 506 U.S. 908 (1992) (dismissing appeal as moot in part based upon investors' reliance upon unstayed confirmation order).  See also In re Envirodyne Indus., 29 F.3d 301, 304 (7th Cir. 1994) (court must consider "effects of the relief on innocent third parties . . . if modification of a plan of reorganization would upset legitimate expectations, it may be refused" (citations omitted)); In re Block Shim Dev. Co. - Irving, 939 F.2d 289, 291 (5th Cir. 1991) (dismissing as moot bankruptcy appeal seeking relief which would adversely "affect third parties' rights"); Central States, Southeast & Southwest Areas Pension Fund v. Central Transp., Inc., 841 F.2d 92, 96 (4th Cir. 1988); Miami Ctr. Ltd. P'ship v Bank of New York, 820 F.2d 376, 380 (11th Cir. 1987), cert. denied, 488 U.S. 823 (1988).

Particularly in large cases such as this Chapter 11 Case, Chapter 11 debtors often require outside investors to reorganize.  Yet there is often a "natural reluctance to deal with a bankrupt firm." In re Ellingsen MacLean Oil Co., 834 F.2d 599, 604 (6th Cir. 1987), cert. denied, 488 U.S. 817 (1988).  If investors (or asset purchasers or lenders) cannot rely upon an unstayed confirmation order, this reluctance will be magnified. Third party investors as well as creditors will be unwilling to commit to transactions and

---

[22]     In connection with the MOU, the Class Action District Court has approved the Settlement and issued orders dismissing the Securities Litigation with prejudice. The Debtor has also filed substantially all of its claim objections. The only remaining claim objections are subject to ongoing settlement negotiations.

make concessions that are essential for a successful reorganization until every unresolved issue has been finally decided by a court of appeals or the Supreme Court. As the Seventh Circuit has explained:

> [I]t is the reliance interests engendered by the plan, coupled with the difficulty of reversing the critical transactions, that counsels against attempts to unwind things on appeal. Every incremental risk of revision on appeal puts a cloud over the plan of reorganization, and derivatively over the assets of the reorganized firm. People pay less for assets that may be snatched back or otherwise affected by subsequent events. Self protection through the adjustment of prices may affect the viability of the reorganization . . . . By protecting the interests of persons who acquire assets in reliance on a plan of reorganization, a court increases the price the estate can realize ex ante, and thus produces benefits for creditors in the aggregate.

In re UNR Indus., Inc., 20 F.3d at 770. On the Effective Date, a number of third parties were involved, including, but not limited to, Bank One, N.A., Credit Suisse First Boston, through its Cayman Islands Branch, as agent under the CSFB Facility, Credit Suisse First Boston LLC, Lehman Brothers Inc. and Deutsche Bank Securities Inc., in the $225 million exit financing facility provided by new lenders and the Debtor's issuance of $225 million in new senior secured notes. All of the parties involved in each of the transactions closed and implemented on the Effective Date relied on the unstayed Confirmation Order.

Third parties have also relied on the MOU Order as has the Class Action District Court in subsequently approving the MOU and permitting the Settlement to be implemented. The claims administrator in the Securities Litigation provided notice of the Settlement and mailed proofs of claim to appropriate persons in connection with the January 18, 2005 bar date. The Class Action District Court issued orders dismissing with prejudice the Securities Litigation. In this case, the parties to the Class Action relied on

the unstayed MOU Order in moving forward with implementing the Settlement and dismissal of the Class Action. Any reversal of the Confirmation Order or the MOU Order would adversely affect the interests of the MOU claimants and possibly impair their right to receive the settlement payments to which they are entitled under the terms of the MOU.

Because the Debtor implemented the Plan on the Effective Date, creditors, investors and others have relied to their detriment on the finality of both the unstayed Confirmation Order and the MOU Order. It would be "nothing short of a disaster for the bankruptcy court and the parties before it" for this Court to grant relief in connection with Magten's appeal of either the Confirmation Order or the MOU Order. Manges, 29 F.3d at 1043.

### 4.    Whether the Relief Requested Would Affect the Success of the Plan

Additional harm may come to third parties because the reversal of the Plan would prohibit its success. This is certainly the case here as reversal would cause the Plan to fail and the Reorganized Debtor's and the Debtor's creditors and interest holders to suffer irreparable injury. When considering the harm to the success of a plan, courts are to consider whether any alternate plan provisions, or even a new plan, is offered by the appellant. See Zenith, 250 B.R. at 218. As a result, an appellant must be prepared to demonstrate alternatives to the disputed plan because reversal and possible conversion are insufficient because of the irreparable injury that would be caused to third party creditors, investors and interest holders. Id.

To be sure, as set forth more fully in the Notice of Substantial Consummation, if this Court permits the Magten appeal to go forward, this could have the affect of

"knock[ing] the props out from under the authorization for every transaction that has taken place and creat[ing] an unmanageable, uncontrollable situation" with respect to the Plan. PWS Holding, 228 F.3d at 236. These transactions include:

(i)    the transfer of all the property proposed by the Plan to be transferred, including delivery of all the Trust Assets to the D&O Trust;

(ii)   the assumption of substantially all of the property dealt with by the Plan;

(iii)  the closing of a $225 million exit financing facility and issuance of the accompanying new first mortgage bonds;

(iv)   the issuance of the $225 million senior secured notes portion of the exit financing facility;

(v)    the registration of the Reorganized Debtor's newly issued stock with NASDAQ;

(vi)   its payment of all Allowed CSFB Financing Claims pursuant to the exit financing facility (approximately $390 million); and

(vii)  its payment of all Allowed Bank One DIP Financing Claims (approximately $15 million of letter of credit and terminating approximately $35 million of unfunded credit availability).

As in Continental, the reversal of the order confirming the Plan likely would land the Reorganized Debtor "back into bankruptcy," Continental, 91 F.3d at 561, and require the Reorganized Debtor to attempt to "unscramble" the complex transactions that transpired on the Effective Date. Nordhoff, 258 F.3d at 185. In this case, on or shortly after the Effective Date, the Debtor entered into an exit financing facility, issued senior secured notes and accompanying new first mortgage bonds, established the D&O Trust, distributed shares to holders of allowed Class 7, 8(a), 8(b) and 9 claims, and paid all Allowed CSFB Financing Claims and Allowed Bank One DIP Financing Claims. Each of the parties or beneficiaries to the transactions would be irreparably injured were the Plan to be unscrambled, and the injury would be so great as to likely prevent any future

reorganization.   Moreover, the Class Action District Court has entered an order

dismissing the Securities Litigation with prejudice.   To attempt to "unscramble" such

transactions would substantially harm any reorganization of the Reorganized Debtor

because the financing implemented on the Effective Date is no longer available, and the

senior notes would have to be recalled without any realistic possibility of reissuance –

much less reissuance on the same terms and conditions.

> **5.     The Public Policy of Affording Finality to Bankruptcy
> Judgments**

The public policy of affording finality to bankruptcy judgments is "better

described as the lens through which the other equitable mootness factors should be

viewed." <u>Zenith</u>, 250 B.R. at 219.

In <u>Continental</u>, the court discussed this public policy in the context of explaining

the proper inquiry under the third factor — third party reliance on the Plan.   After

accepting the district court's finding that outside investors had committed to investing

$450 million in the reorganized debtor in reliance on the unstayed confirmation order, the

court rejected the proposition that the court should focus on whether such reliance was

"reasonable."   The court explained:

> Our inquiry should not be about the "reasonableness" of the
> Investors' reliance or the probability of either party succeeding on
> appeal.   Rather, we should ask whether we want to encourage or
> discourage reliance by investors and others on the finality of
> bankruptcy confirmation orders.   The strong public policy in favor
> of maximizing debtors' estates and facilitating successful
> reorganization, reflected in the Code itself, clearly weighs in favor
> of encouraging such reliance.   Indeed, the importance of allowing
> approved reorganizations to go forward in reliance on bankruptcy
> court confirmation orders may be the central animating force
> behind the equitable mootness doctrine.   Where, as here, investors
> and other third parties consummated a massive reorganization in
> reliance on an unstayed confirmation order that, explicitly and as a
> condition of feasibility, denied the claim for which appellate

> review is sought, the allowance of such appellate review would
> likely undermine public confidence in the finality of bankruptcy
> confirmation orders and make successful completion of large
> reorganizations like this more difficult. This is true regardless of
> whether the Investors' reliance was "reasonable" or based on a
> 30%, 60%, or 100% probability of success on appeal . . . .

Continental, 91 F.3d at 565 (citations omitted).

In Zenith, noting that the majority shareholder was not an "outside investor" that

could have chosen not to "walk away from the deal" without incurring substantial losses

and, in fact, had financial incentives to take steps to facilitate a successful reorganization,

the court stated:

> Nevertheless, the Plan does substantially reduce Zenith's debt
> burden. And, it cannot be disputed that Zenith had been incurring
> substantial losses for many years, and that it would have had great
> difficulty meeting its obligations to creditors without a financial
> restructuring of some sort. Thus, while LGE does stand to benefit
> under the Plan, the Plan did facilitate a successful reorganization.
> Further, the implementation of the Plan has affected LGE's
> operations . . . . Thus, refusing to respect LGE's reliance on the
> unstayed confirmation order in this case would be contrary to the
> public policy of encouraging actions — by outsiders and investors
> alike — that facilitate successful reorganizations. Moreover,
> public policy is furthered by encouraging Zenith's customers,
> vendors, and employees to continue their relationships with Zenith
> in reliance on an unstayed confirmation order.

Zenith, 250 B.R. at 220.

Both Continental and Zenith apply here. One has only to consider the exit

financing and senior note issuance, each involving numerous third parties to appreciate

how devastating a reversal would be on the Debtor, the Reorganized Debtor and their

collective creditors, investors and interest holders.

**B.**   **Magten's Statement of Issues to be Presented on Appeal**

Magten presents nine issues to be presented on appeal.   See Magten Asset Management Corporation's Amended Designation of Items to be Included in the Record on Appeal and Statement of the Issue to be Presented on Appeal from the Order Confirming Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code Entered in October 19, 2004 [Docket No. 2238], at pp. 17-19 ("**Magten's Issues Presented on Appeal**").[23]

Magten's nine issues to be presented on appeal cannot overcome the Bankruptcy Court's findings of fact and conclusions of law.[24]   See NorthWestern Corporation's Designation of Additional Documents for the Record and Objection to Statement of the Issues on Appeal, pp. 3-9.[25]   On their face, the Bankruptcy Court's findings of fact and conclusions of law preclude any argument that the findings of fact are clearly erroneous or that the Bankruptcy Court erred in its rulings as a matter of law.[26]

Most, if not all, of Magten's issues to be presented on appeal challenge specific findings of fact made by the Bankruptcy Court in its Confirmation Ruling, MOU

---

[23]    On November 5, 2004, Magten filed its Designation of Items to be Included in the Record on Appeal from the Order Approving the Memorandum of Understanding Entered on October 18, 2004 [Docket No. 2333] ("**Magten's Issues Presented on Appeal of MOU Order**").   On or about November 15, 2004, NorthWestern filed its Designation of Additional Documents for the Record and Objection to Statement of the Issues on Appeal [Docket No. 2364].   NorthWestern's Designation of Additional Documents for the Record and Objection to Statement of the Issues on Appeal in connection with the MOU Order is summarized below.

[24]    The two issues presented in Magten's Issues Presented on Appeal of MOU Order are substantially similar to the issues presented in Magten's Issues Presented on Appeal.

[25]    NorthWestern's Designation of Additional Documents for the Record and Objection to Statement of the Issues on Appeal in connection with the Confirmation Order is summarized below.

[26]    See Confirmation Ruling; see also In re Exide Techs, 2004 WL 1465760, at *1 (on appeal, district court applies clearly erroneous standard to bankruptcy court's findings of fact and plenary standard to legal conclusions).

Memorandum Decision, and Confirmation Order. See Magten's Issues Presented on Appeal, Nos. 1-9. In order for a District Court to disturb a bankruptcy court's factual findings, the district court must find the findings to be "clearly erroneous." In re Exide Techs., No. 02-11125-KJC, 2004 WC1465760, at *1 (D. Del. June 25, 2004). Moreover, a "finding of fact is clearly erroneous 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" Id. (citing United States v. U.S. Gypsum Co., 333 U.S. 364, 365, 68 S.Ct. 525 (1948). Indeed, a finding of fact "is clearly erroneous if it is either 'completely devoid of minimum evidentiary support displaying some hue of credibility or . . . bears no rational relationship to the supportive evidentiary data.'" In re Stein, 314 B.R. 306, 309 (D.N.J. 2004) (citing Krasnov v. Dinan, 465 F.2d 1298, 1302-03 (3d. Cir. 1972)).

Magten cannot overcome the clear and precise findings of fact set forth in the Bankruptcy Court's Confirmation Ruling. See, e.g., In re Zepecki, 277 F.3d 1041, 1045 (8th Cir. 2002) (In order to be clearly erroneous, "a decision must strike us as wrong with the force of a five-week-old, unrefrigerated dead fish.") (citations omitted). In addition, when reviewing a mixed question of law and fact, the court should apply the clearly erroneous standard to all findings of fact and exercise plenary review over the bankruptcy court's choice and interpretation of the law. In re Exide, 2004 WL 1465760, at *1.

### 1.    Magten's Issues Presented on Appeal of Confirmation Order

As shown below, each of Magten's nine issues to be presented on appeal are either based on mischaracterizations of the Bankruptcy Court's rulings or ignores the substance of those rulings. Moreover, the language of the Bankruptcy Court's rulings shows that there is no error at issue.

ATL/1072152.9                    -42-                    DEBTOR'S MEMORANDUM OF LAW

1.    Magten's first statement of issues to be presented is as follows:

> Whether the Bankruptcy Court erred in determining that the
> Montana Utility Assets (the "*Montana Utility Assets*"), which were
> transferred to the Debtor from Clark Fork and Blackfoot LLC
> ("*Clark Fork*"), the Debtor's non-debtor subsidiary, are not held in
> constructive trust for the creditors of Clark Fork even though
> creditors of Clark Fork have brought an action seeking to set aside
> the transfer of the Montana Utility Assets as a fraudulent
> conveyance and have sought recognition that a constructive trust
> has been imposed over those assets.

In its Confirmation Ruling, the Bankruptcy Court clearly explains its examination

and conclusions concerning whether assets should be held in constructive trust.   The

Bankruptcy Court specifically held:

> There's <u>nothing in the remedy section</u> that I found of the Montana
> fraudulent conveyance law that gives rise to an automatic
> constructive trust upon the mere filing of a lawsuit, and as my
> colloquy with counsel during the course of the proceeding
> indicated, I would find that to be an extraordinary provision
> indeed.  <u>That would put at risk virtually every transaction that was
> ever done until such time as the statute of limitations would run.</u>

Confirmation Ruling, p. 28 (emphasis added).

The Bankruptcy Court goes on to hold that:

> [T]he imposition of any constructive trust is contrary to basic
> principles of ratable distribution and <u>is generally disfavored in the
> bankruptcy context because of the adverse impact on other
> creditors</u>, particularly where there are ways of fashioning remedies
> that would protect the plaintiffs or those asserting fraudulent
> conveyance theories.

<u>Id.</u> at p. 29.

2.    Magten's second statement of issues to be presented is as follows:

> Whether the Bankruptcy Court erred in finding that the right to
> recover on account of the fraudulent conveyance cause of action is
> a "claim" under section 101(5) of the Bankruptcy Code when (i)
> the exclusive remedy sought as a result of the fraudulent transfer of
> the Montana Utility Assets is an equitable remedy that does not
> "give rise to a right to payment" and, (ii) §31-2-339 of the

Montana Code Annotated, which governs the remedies available to creditors in seeking to set aside a fraudulent conveyance, only provides for remedies that are equitable in nature and does not provide for any form of monetary relief.

In its Confirmation Ruling, the Bankruptcy Court shows its ruling to be well-founded under existing law and further indicates the absence of law to the contrary. The Bankruptcy Court specifically held:

> There's been no Montana case cited to support this interpretation, and indeed there was no case from any other jurisdiction with a similarly situated or structured law. And upon closer examination, there is nothing arcane or extraordinary about the remedies available under Montana law. Montana has, similarly to most jurisdictions around the country, adopted the Uniform Fraudulent Transfer Act of which the section in question, which is 31 to 339, is Section 7. . . . And, specifically, Section 7(a) which is 339(a) provides that remedy is the avoidance, quote, "to the extent necessary to satisfy the creditor's claim", close quote. That clearly contemplates money damages.

Confirmation Ruling, p. 28 (emphasis added).

3.      Magten's third statement of issues to be presented is as follows:

> Whether the Bankruptcy Court erred in finding that that Plan complies with sections 1122 and 1129(a)(1) of the Bankruptcy Code where there was no legitimate business reason for separately classifying the claims of the holders of the TOPrS and the QUIPS for principal plus interest.

In its Confirmation Ruling, the Bankruptcy Court shows its ruling to be well-founded under existing law and shows a clear application of the facts of this case to that law. The Bankruptcy Court specifically held:

> Section 1122 does not require that all claims of similar priority be placed in the same class, rather only if claims are placed in the same class that they have to be substantially similar. The case law was developed to limit excessive classes primarily because of attempts to create a consenting impaired class to satisfy 1129(a)(10) so that a non-consenting and usually much larger class of similar priority may be crammed down. That's not what's happening here. Indeed, a ballot report suggests that if 8-A and 8-

B were aggregated the class would accept the plan, and we wouldn't have a cram-down situation at all. Here the separate classification protects the rights of the Quips, which is the smaller debt issue rather than adversely effecting those rights by allowing a larger debt issue to Toppers to dominate. There are many essential differences. These are different issues of debt, different issuers, different trustees, and more importantly there are different litigation rights.

Confirmation Ruling, p. 34-35 (emphasis added).

4.    Magten's fourth statement of issues to be presented is as follows:

Whether the Bankruptcy Court erred in finding that it is appropriate to force the holders of the QUIPS to forego their right to pursue the fraudulent conveyance litigation in order to receive their rightful recovery for principal plus interest on account of their QUIPS notes, while other creditors with claims of equal rank were not required to relinquish their litigation claims.

By applying the facts of the case, the Bankruptcy Court shows the clear underlying reasoning behind its decision on this issue, holding:

The question here is whether these two claims can in fact co-exist. . . . The two particular kinds of remedies are in fact completely inconsistent. And it is consistent with election of remedies law that you have to choose which path you're going to go down. In addition here, where a class does not have a vested right to a certain treatment, the 8 percent, it is not unreasonable or unfair to make it pay for the option of seeking a higher return based upon a legal theory which if correct would disqualify them even from getting the gift.

Confirmation Ruling, p. 31-32.

5.    Magten's fifth statement of issues to be presented is as follows:

Whether the Court erred in determining that the Plan did not discriminate unfairly against holders of the QUIPS because the distributions to the QUIPS holders were a "gift" from senior creditors despite the fact that there is no authority under the Bankruptcy Code to support this line of reasoning and it is the Debtor, not the creditors, making the distributions pursuant to the Plan.

The Bankruptcy Court explained and supported its decision concerning gift status, as follows:

> with the hurdle rates that I have found, that would leave both the equity and the sub-debt out of the market - - excuse me, out of the money, and that even at the high end of the Houlihan analysis, which does include the non-core assets, the sub-debt remains out of the money by over $200 million.

Confirmation Ruling, p. 25-26. The Bankruptcy Court goes on to hold:

> Well, I've already found that based upon the valuation that this is indeed what can be fairly called a gift case, that is to say that there is not an absolute entitlement to the 8 percent or the 13 percent in warrants that has been set aside here for Class 8, but rather that is money that is money that is coming out of the recoveries that would otherwise be available to Class 7 and 9 as non-subordinated unsecured creditors.

Confirmation Ruling, p. 31.

6.    Magten's sixth statement of issues to be presented is as follows[27]:

> Whether the Court erred in determining that the Plan is "fair and equitable" when subordinated holders of equity interests receive a distribution under the Plan while more senior creditors are not being paid in full and are only receiving a minimal recovery under the Plan.

Again, the Bankruptcy Court provides clear reasoning on this issue, stating:

> the proceeds[from the policies] are not property of the estate so that does not implicate, therefore, the absolute priority rule.

Confirmation Ruling, p. 39.

7.    Magten's seventh statement of issues to be presented is as follows[28]:

---

[27]    The first statement of issues set forth in Magten's Issues Presented on Appeal of MOU Order is substantially similar to this item and states as follows: "Whether the Court erred in approving a settlement that provides for payment of holders of equity interests when more senior creditors are not being paid in full and are only receiving a minimal recovery under the Debtor's Second Amended and Restated Plan of Reorganization."

[28]    The second statement of issues set forth in Magten's Issues Presented on Appeal of MOU Order is identical to this statement.

> Whether the Court erred in finding that the proceeds of the D&O
> Insurance Policy are not property of the Debtor's estate when the
> derivative actions belong to the Debtor and not the shareholders
> and all damages awarded in a derivative suit inure directly to the
> corporation.

The Bankruptcy Court's decision on this matter shows that Magten mischaracterizes the nature of the Bankruptcy Court's ruling as well as the underlying issue:

> Where the coverage focuses on third parties, here the directors and
> officers, the proceeds are not property of the estate. . . . Here, the
> primary purpose of the policies is to protect the directors and
> officers from claims such as those asserted by the plaintiffs.

MOU Memorandum Decision, p. 4.

In connection with derivative actions, the Bankruptcy Court also held as follows:

> any claims that the Debtor may have (for example, derivative
> claims brought on behalf of the company) are not covered by these
> policies because of the "insured versus insured" exception
> contained in them . . . . Thus, whether the Debtor could or could
> not prevail is not relevant to this settlement because the policies at
> issue would not provide a source of recovery even if successfully
> prosecuted.

MOU Memorandum Decision, p.5.

8.    Magten's eighth statement of issues to be presented is as follows:

> Whether the Court erred in determining that the Debtor is not
> relinquishing value to the estate when the Debtor, through its
> release and waiver of all "Causes of Action of any nature," is
> abandoning every potential colorable claim and cause of action
> that may ultimately result in substantial value to the Debtor's
> estate.

Magten's statement of issue notwithstanding, the Bankruptcy Court provides clear support and reasoning behind its treatment of the releases provided for in the Plan:

> As established at the hearing on the MOU Motion, each of the
> Debtor's D&O Policies includes an express "insured versus
> insured" exclusion. It is clear that in the absence of any insurance

> coverage, any claims the Debtor may have against its Officers and Directors would be essentially valueless. The Court hereby finds that the releases provided for in the Plan, including, but not limited to, the D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction are appropriate, necessary and consistent with the Bankruptcy Code and all applicable law.

Confirmation Order, p. 42-43.

9.    Magten's ninth statement of issues to be presented is as follows:

> Whether the Bankruptcy Court erred in finding that the senior debt should not be voided or subordinated despite the fact that the Debtor's application for exemption from the Public Utility Holding Company Act ("PUHCA") was not filed in good faith and, under PUHCA, the rights of a party to a contract made while there was a PUHCA violation – including lack of good faith filing in an application for a PUHCA exemption – are void.

As the Bankruptcy Court explains, Magten asserts this issue on appeal despite an

absolute failure to present any evidence support its PUHCA contention:

> there was not a shred of evidence presented by Law Debenture or Magten on this, and there's no basis to determine, no evidentiary basis at all to determine that the senior debt should be voided or subordinated.

Confirmation Ruling, p. 42.

### 2.    Magten's Issues Presented on Appeal of MOU Order

1.    Magten's first statement of issues to be presented is as follows:

> Whether the Court erred in approving a settlement that provides for payment of holders of equity interest when more senior creditors are not being paid in full and are only receiving a minimal recovery under the Debtor's Second Amended and Restated Plan of Reorganization.

The Bankruptcy Court held as follows:

> Here, the primary purpose of the policies is to protect the directors and officers from claims such as those asserted by the plaintiffs. . . payment of the proceeds to the plaintiffs on account of claims against the directors and officers does not implicate property of the estate.

MOU Memorandum Decision, p. 4-5. The Bankruptcy Court also held that:

> resolution of this complex and expensive litigation at no direct cost to the estate is fair and reasonable, is in the best interests of the estate and its creditors, significantly enhances the Debtor's ability to emerge from these proceedings with a confirmed plan of reorganization, and is the result of arm's length negotiation.

MOU Memorandum Decision, p. 6.

2.    Magten's second statement of issues to be presented is as follows:

> Whether the Court erred in finding that the proceeds of the D&O Insurance Policy are not property of the Debtor's estate when the derivative actions belong to the Debtor and not the shareholders and all damages awarded in a derivative suit inure directly to the corporation.

On the issue of the proceeds of the insurance policies, the Bankruptcy Court stated as

follows:

> The critical issue raised by Magten's objection is whether the settlement payments made from the D&O policies are in fact distributions of estate property in the first instance. The Court concludes they are not.

MOU Memorandum Decision, p. 4 (footnote omitted). In connection with derivative

actions, the Bankruptcy Court also held as follows:

> any claims that the Debtor may have (for example, derivative claims brought on behalf of the company) are not covered by these policies because of the "insured versus insured" exception contained in them . . . . Thus, whether the Debtor could or could not prevail is not relevant to this settlement because the policies at issue would not provide a source of recovery even if successfully prosecuted.

MOU Memorandum Decision, p. 5.

[concluded on next page]

## VI.    CONCLUSION

Magten cannot satisfy the significant burden it must overcome when challenging the Bankruptcy Court's findings of fact and law as to the Confirmation Order or the MOU Order.  For the reasons set forth herein, NorthWestern requests that this Court grant its Motion to Dismiss the Consolidated Appeals of Magten Asset Management Corporation and dismiss Magten's appeal of both the Confirmation Order and the MOU Order in their entirety.

Dated:  March _10_ 2005
         Wilmington, Delaware

Respectfully submitted,

PAUL, HASTINGS, JANOFSKY &
    WALKER LLP
Jesse H. Austin, III
Karol K. Denniston
600 Peachtree Street
Suite 2400
Atlanta, GA 30308
Telephone: (404) 815-2400

- and -

GREENBERG TRAURIG, LLP

Adam D. Cole
885 Third Avenue
New York, NY 10022
Telephone: (212) 801-2100

- and -

GREENBERG TRAURIG, LLP

Scott D. Cousins (No. 3079)
William E. Chipman, Jr. (No. 3818)
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, DE 19801
Telephone: (302) 661-7000

*Co-Counsel for NorthWestern
Corporation*

**EXHIBIT I**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **NORTHWESTERN** | ) | |
| **CORPORATION,** | ) | Case No. 03- 12872 (CGC) |
| | ) | |
| | ) | **Hearing Date: September 15, 2004, 2004 at 9:30 a.m.** |
| Debtor. | ) | **Objection Deadline: September 3, 2004 at 4:00 p.m.** |
| | ) | |

## MOTION PURSUANT TO SECTIONS 105(a), 363(b) AND 502(c) OF THE BANKRUPTCY CODE FOR ESTIMATION OF MAGTEN ASSET MANAGEMENT'S CLAIM AND TO ESTABLISH DISPUTED CLAIM RESERVE

NorthWestern Corporation, a Delaware corporation (**"NorthWestern"** or the **"Debtor"**),

for its Motion Pursuant to Sections 105(a), 363(b) and 502(c) of the Bankruptcy Code for

Estimation of Magten Asset Management's Claim and to Establish Disputed Claim Reserve (the

**"Motion"**). In support of this Motion, the Debtor respectfully represents as follows:

### JURISDICTION

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of

this Chapter 11 case and this Motion are proper before this Court pursuant to 28 U.S.C. §§ 1408

and 1409.

### BACKGROUND

2.      On September 14, 2003 (the **"Petition Date"**), NorthWestern filed its voluntary

petition for relief under chapter 11 of The Bankruptcy Reform Act of 1978, as codified in title 11

of the United States Code, 11 U.S.C. §§ 101-1330 (the **"Bankruptcy Code"**). Pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code, NorthWestern continues to operate its

business and manage its properties as debtor-in-possession.

3.    No request has been made for the appointment of a trustee or examiner in this case. The Official Committee of Unsecured Creditors (the **"Committee"**) was appointed by the Office of the United States Trustee on September 30, 2003.

4.    NorthWestern is a publicly traded Delaware corporation which was incorporated in 1923. NOR and its direct and indirect nondebtor energy subsidiaries comprise one of the largest providers of electricity and natural gas in the upper Midwest and Northwest regions of the United States, serving approximately 608,000 customers throughout Montana, South Dakota and Nebraska.[1]

## THE BAR DATE

5.    By Order dated October 10, 2003, this Court established January 15, 2004 at 5:00 p.m. (Pacific Standard Time) (the **"Bar Date"**) as the deadline for creditors to file proofs of claim for each claim they assert against the Debtor that arose before the Petition Date. Notice of the Bar Date was mailed to all known creditors of the Debtor and published in numerous regional and national newspapers.

6.    To date, approximately 1100 proofs of claim have been filed against the Debtor in this case.

## MAGTEN'S PROOF OF CLAIM

7.    Magten filed a Proof of Claim, designated claim number 842 by the Debtor's claims agent (the **"Magten Claim"**). The Magten Claim asserts unliquidated claims against the Debtor's estate for: (i) damages resulting from the alleged fraudulent transfer of the utility assets of NorthWestern Energy, LLC to the Debtor on November 15, 2002 (the **"Transfer"**); and (ii) the face amount of the QUIPS (as defined below) held by Magten as of the Petition Date.

---

[1]    For a more extensive overview, see the Affidavit of William M. Austin in Support of First Day Motions (Docket Entry No. 2).

## THE DEBTOR'S CLAIMS AGAINST MAGTEN

8.    Upon request of Magten, by notice dated November 25, 2003, the Office of the United States Trustee for the District of Delaware (the **"U.S. Trustee"**) appointed Magten to the Committee. Magten was represented on the committee by its 100% principal, Talton R. Embry (**"Embry"** and together with Magten, the **"Defendants"**).

9.    Thereafter, on April 16, 2004, Magten and Law Debenture Company of New York filed an adversary proceeding to avoid the transfer of assets of Clark Fork and Blackfoot LLC (f/k/a NorthWestern Energy LLC) (**"Clark Fork"**) to the Debtor in November 2002 pursuant to what is generally referred to as the "going flat" transaction (the **"Magten Adversary Proceeding"**)[2].

10.    The Magten Adversary Proceeding resulted in an inherent conflict between the Defendants and the Committee. Accordingly, in a letter dated May 6, 2004, the U.S. Trustee removed Magten from the Committee stating the relief sought in the Magten Adversary Proceeding "is inconsistent with Magten's . . . fiduciary duty to the Committee's constituents, the general unsecured creditors of NorthWestern Corporation."

11.    On August 20, 2004, the Debtor initiated an adversary proceeding by filing and serving a complaint against the Defendants (the **"Complaint"**) including an objection to the Magten Claim (the **"Objection"**). A copy of the Complaint is attached hereto as Exhibit A and incorporated herein by reference.

12.    The Complaint relates to the Defendants' misappropriation and use of material, non-public, information in purchasing approximately 40% of the Debtor's Series A 8.45%

---

[2]    On May 14, 2004, the Debtor filed a motion the dismiss the Magten Adversary Proceeding which has been fully briefed and is currently under advisement by this Court.

Quarterly Income Preferred Securities (the **"QUIPS"**).    As members of the Committee,

Defendants were vested with legal, contractual, and fiduciary duties not to misappropriate non-

public information for their own self interest.    The Defendants breached each of these duties in

connection with their purchase of more than 100,000 QUIPS after becoming members of the

Committee and receiving material, non-public information concerning the Debtor.

13.    Through the adversary proceeding, the Debtor seeks damages and equitable relief

relating to Defendants' improper trading activity.    In particular, the Debtor seeks damages

(including disgorgement of any ill-gotten gains) to compensate itself and its creditors for the

Defendants' breach of fiduciary duty, breach of contract, and violation of an express Court order

prohibiting the very trading activity in which the Defendants engaged.

14.    Based upon the same inequitable and self interested conduct, the Debtor also

objected to, and seeks subordination of, the Magten Claim in this Chapter 11 case under sections

502(b) and 510(c) of the Bankruptcy Code.    Furthermore, notwithstanding the outcome of this

Motion, pursuant to section 502(d) of the Bankruptcy Code, the Court must temporarily disallow

the Magten Claim, pending the resolution of the Complaint.

### THE DEBTOR'S CONFIRMATION HEARING

15.    On May 17, 2004, the Debtor filed with the Bankruptcy Court, among other

things, its First Amended Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code

(the **"Disclosure Statement"**), in connection with its proposed First Amended Plan of

Reorganization (the **"Plan"**).

16.    On May 26, 2004, the Bankruptcy Court entered its Order (i) Approving the

Debtor's First Amended Disclosure Statement, (ii) Authorizing Solicitation of Votes, (iii)

Scheduling a Hearing on Confirmation of the Plan of Reorganization, (iv) Establishing Notice

Requirements Regarding the Confirmation Hearing and Approving the Form and Manner of Notice, and (v) Granting Related Relief Respecting the Debtor's First Amended Plan of Reorganization (the **"First Amended Disclosure Statement Order"**).

17.    As a result of a settlement with certain parties, on August 18, 2004, the Debtor filed it's Second Amended and Restated Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code (the **"Second Amended Disclosure Statement"**) in connection with its proposed Second Amended and Restated Plan of Reorganization (the **"Second Amended Plan"**).

18.    Also on August 18, 2004, the Debtor filed a Motion of Northwestern Corporation for an Order (A) Approving Debtor's Second Amended Disclosure Statement and Summary Disclosure Statement; (B) Establishing Procedures for Limited Resolicitation and Tabulation of Votes on Debtor's Second Amended and Restated Plan of Reorganization; (C) Approving the form and Manner of Notice; and (D) Granting Related Relief (the **"Resolicitation Motion"**).

19.    The Bankruptcy Court has scheduled a hearing on confirmation of the Plan for August 25, 2004 (the **"Confirmation Hearing"**).

20.    At the Confirmation Hearing, the Debtor will seek approval of the Resolicitation Motion and confirmation of the Second Amended Plan, subject only to resolicitation of certain classes of creditors pursuant to the Resolicitation Motion.

21.    Pursuant to the Resolicitation Motion, the Debtor has requested a continued Confirmation Hearing (the **"Continued Hearing"**), depending upon the Court's availability, be held on or about September 23, 2004.

## THE DISPUTED CLAIMS RESERVE UNDER THE PLAN

22.     Pursuant to the Second Amended Plan, the Debtor is required to maintain a

**"Disputed Claims Reserve"** equal to the aggregate of any distributable amounts of Cash[3] and

New Common Stock equal to the relevant percentage of the Distributions to which holders of

Disputed Claims would be entitled under the Second Amended Plan if such Disputed Claims

were Allowed Claims in the amount of such Disputed Claim or such lesser amount as required

by a Final Order.

23.     Pursuant to Section 7.5 of the Plan, the Disputed Claims Reserve provides as

follows:

> Establishment and Maintenance of Reserve for Disputed Claims.
> Reorganized Debtor shall maintain the Disputed Claims Reserve equal to
> the aggregate of any distributable amounts of Cash and New Common
> Stock equal to the relevant percentage of the Distributions to which
> holders of Disputed Claims would be entitled under this Plan if such
> Disputed Claims were Allowed Claims in the amount of such Disputed
> Claim or such lesser amount as required by a Final Order. For the
> purposes of effectuating the provisions of this Section and the
> Distributions to holders of Allowed Claims, the Debtor may, at any time
> and regardless of whether an objection to the Disputed Claim has been
> brought, request that the Bankruptcy Court estimate, set, fix or liquidate
> the amount of Disputed Claims pursuant to Section 502(c) of the
> Bankruptcy Code, in which event the amounts so estimated, fixed or
> liquidated shall be deemed the Allowed amounts of such Claims for
> purposes of distribution under this Plan. In lieu of estimating, fixing or
> liquidating the amount of any Disputed Claim, the Bankruptcy Court may
> determine the amount to be reserved for such Disputed Claim (singularly
> or in the aggregate), or such amount may be fixed by an agreement in
> writing by and between the Debtor and the holder of a Disputed Claim.

24.     On August 9, 2004, Magten filed it's Objection to Confirmation of the Debtor's

First Amended Plan of Reorganization (the **"Magten Objection"**).    In the Magten Objection,

---

[3]     Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

Magten reasserts the claims contained in the Magten Claim and in the Magten Adversary Proceeding, seeking damages in the amount of approximately $69 million. In paragraph 23 of the Magten Objection, Magten requests that "the Debtor should be required to reserve approximately $69 million in cash to secure [Magten's claims]" if the Court permits confirmation of the Debtor's Plan if the Magten Adversary Proceeding is not resolved.

## RELIEF REQUESTED

25.    For the reasons set forth above and in the Complaint, by this Motion, the Debtor respectfully requests, pursuant to sections 105(a), 363(b) and 502(c) of the Bankruptcy Code, Bankruptcy Rule 9019 and Section 7.5 of the Second Amended Plan, that this Court estimate the amount of the Magten Claim for all purposes, including for purposes of distribution under the Second Amended Plan.

## BASIS FOR RELIEF

26.    Section 502(c) of the Bankruptcy Code provides in pertinent part that "[t]here shall be estimated for purpose of allowance under this section — (1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case." 11 U.S.C. § 502(c).

27.    A court may authorize the estimation and approximation of the value of a claim using "whatever method is best suited to the circumstances" at issue and recognizing that absolute certainty is not possible. In re Brints Cotton Marketing, Inc., 737 F.2d 1338, 1341 (5th Cir. 1984). Although the court is bound by the legal rules that govern the ultimate value of the claim, it has wide discretion in establishing the method to be used to arrive at an estimate of the value of a claim or claims. Id.; Bittner v. Borne Chemical Co., 691 F.2d 134, 135 (3d Cir. 1982) (estimation requires only "sufficient evidence on which to base a reasonable estimate of the claim"); In re Windsor Plumbing Supply Co., Inc., 170 B.R. 503, 521 (Bankr. E.D.N.Y. 1994)

(advocating use of probabilities in estimation of claims rather than more simplistic all or nothing approach); In re Baldwin-United Corp., 55 B.R. 885, 898 (Bankr. S.D. Ohio 1985) (estimation "does not require that a bankruptcy judge be clairvoyant").

28.    Bankruptcy courts have wide discretion in choosing the process for estimating a claim.  The methods used by courts include summary trials (Baldwin, 55 B.R. at 899), a review of written submissions of proposed facts (Windsor, 170 B.R. at 517), and a review of the pleadings and briefs. In re Lane, 68 B.R. 609, 613 (Bankr. D. Hawaii 1986); see also Baldwin, 55 B.R. at 898 (court estimated certain claims at $0 for purposes of allowance under 502(c) based on a prior opinion in Multi-District Litigation and a hearing on the merits of the claims); In re Zolner, 173 B.R. 629, 633 (Bankr. N.D. Ill. 1994), aff'd, 249 B.R. 287 (N.D. Ill. 2000) (estimation of union contract claims based upon testimony and arguments, in addition to briefing and submission of affidavits); In re Apex Oil Co., 92 B.R. 843, 845 (Bankr. E.D. Mo. 1988) (applying summary trial brief on each claim subject to estimation).  Whatever the procedure the bankruptcy court chooses to estimate a claim, it must be consistent with the policy underlying chapter 11, that a "reorganization must be accomplished quickly and efficiently." Bittner, 691 F.2d at 137 (citing 124 Cong. Rec. H 11101-H 11102 (daily ed. Sept. 28, 1978)). See also, In re Enron Corp. et al., Docket No. 4737, Order (I) Approving Procedures for Disputing Estimation in Connection With Estimation of Claims of Certain Former Employees Arising from Termination of Employment and (II) Approving Form and Manner of Notice, dated June 24, 2002.

29.    Just as bankruptcy courts have wide discretion in choosing the process for estimating a claim, bankruptcy courts have similar latitude in determining the process for hearing any counterclaim.  Bankruptcy Rule 3007 provides that, whenever a claim for affirmative relief

(e.g. a counterclaim) is included in an objection to a proof of claim, the objection is automatically converted to an adversary proceeding. *See* FED. R. BANKR. P. 3007. As an adversary proceeding, the Section VII rules apply to the Objection, including Rule 7016 concerning pre-trial procedures. *See* FED. R. BANKR. P. 7001 and 7016.

30.    Bankruptcy Rule 7016 makes applicable Rule 16 of the Federal Rules of Civil Procedure. Pursuant to Rule 16, trial courts have broad authority to enter orders to "provide for the prompt litigation and disposition of every adversary proceeding and to require strict adherence to the Scheduling Order." See In re Bonfiglio, 231 B.R. 197, 198 (Bankr. S.D.N.Y. 1999). Rule 16 is designed to give the trial court a "firm hand" with which it can control the litigation before it. See Campania Management Company v. Rooks, Pitts, & Poust, 290 F.3d 843, 851-52 (7th Cir. 2002). Rule 16 also gives the trial court the powers it needs to "achieve the orderly and expeditious disposition of cases." See Link v. Wabash Railroad Co., 370 U.S. 626, 630-31 (1962), reh'g denied, 371 U.S. 873 (1962); Spain v. Board of Education, 214 F.3d 925, 930 (7th Cir. 2000). These powers include the ability of the trial court to conduct pre-trial conferences to force the litigants to refine the issues and particularize their claims. See Berkovitz v. Home Box Office, Inc., 89 F.3d 24, 28-29 (1st Cir. 1996). If after conducting such pre-trial conferences the trial court is convinced that summary judgment is proper, the court is empowered to *sua sponte* dispose of those claims. Id. ("there is no reason to require that the elimination of non-trialworthy claims await a formal motion for summary judgment.")

31.    Specifically, Rule 16 grants authority for trial courts to issue orders to:

   a. Limit the time available for discovery and the types of discovery to be used (F.R.C.P. 16(b)(3), (c)(6));

   b. Formulate and simplify the issues, including the elimination of frivolous claims or defenses (F.R.C.P. 16(c)(l)); Berkowitz, 89 F.3d at 28-

29.

c.  Avoid unnecessary proof and cumulative
    evidence and place limitations or restrictions on
    the use of expert testimony (F.R.C.P. 16(c)(4));

d.  Examine the appropriateness of summary
    adjudication under Rule 56 (F.R.C.P. 16(c)(5));

e.  Schedule the exchange of pre-trial briefs
    (F.R.C.P. 16(c)(7));

f.  Employ special procedures to assist in resolving
    the dispute when authorized by statute or local
    rule (F.R.C.P. 16(c)(9)), including the use of
    mini-trials and summary trials, (1993 Notes of
    Advisory Committee to Rule 16, ¶ 10);

g.  Establish limits on the time allowed for
    presenting evidence (F.R.C.P. 16(c)(15)); and

h.  Facilitate in the "just, speedy, and inexpensive
    disposition of the action." (F.R.C.P. 16(c)(16).

32.    Likewise, section 105 of the Bankruptcy Code grants bankruptcy courts wide

latitude to "issue any order, process, or judgment that is necessary or appropriate to carry out the

provisions of [the Bankruptcy Code or] . . . making any determination necessary or appropriate

to enforce or implement court orders or rules, or to prevent an abuse of process." 11 U.S.C. §

105(a). For example, the authority granted by F.R.C.P. 16 and section 105 permits a bankruptcy

court to issue an order precluding contribution and indemnification claims against a settling

defendant in an adversary proceeding brought by the chapter 11 debtor. See In the Matter of

Munford, Inc., 97 F.3d 449, 455 (11th Cir. 1996).

33.    As more fully set forth in the Complaint, as members of the Committee,

Defendants were vested with a fiduciary duty to all unsecured creditors, among other things, to

act with due care, not to act in furtherance of their self-interests to the potential detriment of

other creditors, to maintain confidentiality, and to guide their actions so as to safeguard the rights

of minority as well as majority creditors. The Defendants breached each of these duties in

connection with their purchase of more than 100,000 QUIPS after becoming members of the Committee and after receiving material, non-public information concerning the Debtor.

34.    The Magten Claim is a Disputed Claim under the Second Amended Plan. If the Magten Adversary Proceeding is not resolved prior to the Confirmation Hearing, the Debtor may be required to fund the Disputed Claims Reserve with Cash and New Common Stock equal to the relevant percentage of the Distributions to which Defendants would be entitled under the Second Amended Plan, as if the Magten Claim were an Allowed Claim. In its objection to confirmation, Magten has sought to have the Debtor reserve $69 million in the Disputed Claims Reserve.

35.    Because of the actions described herein and in the Complaint, the Debtor believes that the Magten Claim should be subordinated under section 510(c) of the Bankruptcy Code to the level of Class 13 Equity Interests. Class 13 Equity Interests are not entitled to receive any Distributions under the Second Amended Plan. Therefore if the Magten Claim is subordinated, Magten would not be entitled to any Distributions and the Debtor should not be required to reserve anything for Magten's Claim.

36.    Furthermore, through the Complaint, the Debtor seeks damages and equitable relief relating to Defendants' improper trading activity. In particular, the Debtor seeks damages (including disgorgement of any ill-gotten gains) to compensate itself and its creditors for the Defendants' breach of fiduciary duty, breach of contract, and violation of an express Court order prohibiting the very trading activity in which the Defendants engaged. The Court should at the very minimum consider the Defendants actions complained of in the pleadings and limit the Magten Claim to the amount that Magten paid for the QUIPS. See In re Lane, 68 B.R. 609, 613 (Bankr. D. Hawaii 1986)

37.    In light of the express authority granted in F.R.C.P. 16 and sections 105(a), 363(b) and 502(c) of the Bankruptcy Code, for the reasons set forth above and in the Complaint, the Debtor respectfully requests that this Court estimate the amount of the Magten Claim for all purposes, including for purposes of distribution under the Second Amended Plan.

**NOTICE**

38.    Notice of this Motion has been given to (i) the Office of the United States Trustee, (ii) counsel for the Debtor's Pre-Petition Lenders; (iii) counsel for the Debtor's proposed Post-Petition Lenders; (iv) counsel for the Informal Committee, (v) counsel for the Official Committee of the Unsecured Creditors; (vi) the Securities and Exchange Commission; (vii) the Federal Energy Regulatory Commission; (viii) the Montana Public Service Commission; (ix) the South Dakota Public Utilities Commission; (x) the Nebraska Public Service Commission; and (xi) all other entities that have filed requests for notice pursuant to Bankruptcy Rule 2002. The Debtor respectfully submits that such notice is sufficient, and requests that this Court find that no further notice of the relief requested herein is required.

**PRIOR RELIEF**

39.    No previous motion for the relief herein requested has been made to this or any other Court.

[CONCLUDED ON NEXT PAGE]

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order in the form annexed hereto, granting the relief requested herein and such other and further relief as the Court may deem appropriate.

Dated:  Wilmington, Delaware
        August 20, 2004

                            Respectfully submitted,

                            PAUL, HASTINGS, JANOFSKY & WALKER LLP
                            600 Peachtree Street
                            Suite 2400
                            Atlanta, GA 30308
                            Jesse H. Austin, III
                            Karol K. Denniston
                            Telephone: (404) 815-2400

                            and

                            GREENBERG TRAURIG, LLP


                            Scott D. Cousins (No. 3079)
                            William E. Chipman, Jr. (No. 3818)
                            The Brandywine Building
                            1000 West Street, Suite 1540
                            Wilmington, DE 19801
                            Telephone: (302) 661-7000

                            *Co-Counsel for the Debtor and Debtor-in-Possession*

# EXHIBIT J

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **NORTHWESTERN** | ) | |
| **CORPORATION,** | ) | Case No. 03- 12872 (CGC) |
| | ) | |
| | ) | **Hearing Date: October 6, 2004 at 9:00 a.m.** |
| Debtor. | ) | **Objection Deadline: September 27, 2004 at 4:00 p.m.** |
| | ) | |

## MOTION PURSUANT TO SECTIONS 105(a), 363(b) AND 502(c) OF THE BANKRUPTCY CODE FOR ESTIMATION OF CLAIMS OF LAW DEBENTURE TRUST COMPANY OF NEW YORK AND TO <u>ESTABLISH DISPUTED CLAIM RESERVE</u>

NorthWestern Corporation, a Delaware corporation (**"NorthWestern"** or the **"Debtor"**),

for its Motion Pursuant to Sections 105(a), 363(b) and 502(c) of the Bankruptcy Code for

Estimation of Claims of Law Debenture Trust Company of New York (**"Law Debenture"** or the

**"Indenture Trustee"**) and to Establish Disputed Claim Reserve (collectively, the **"Motion"**).

In support of this Motion, the Debtor respectfully represents as follows:

### JURISDICTION

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of

this Chapter 11 case and this Motion are proper before this Court pursuant to 28 U.S.C. §§ 1408

and 1409.

### BACKGROUND

2.      On September 14, 2003 (the **"Petition Date"**), NorthWestern filed its voluntary

petition for relief under chapter 11 of The Bankruptcy Reform Act of 1978, as codified in title 11

of the United States Code, 11 U.S.C. §§ 101-1330 (the **"Bankruptcy Code"**).  Pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code, NorthWestern continues to operate its

business and manage its properties as a debtor-in-possession.

3.      No request has been made for the appointment of a trustee or examiner in this case. The Official Committee of Unsecured Creditors (the **"Committee"**) was appointed by the Office of the United States Trustee on September 30, 2003.

4.      NorthWestern is a publicly traded Delaware corporation which was incorporated in 1923. NOR and its direct and indirect nondebtor energy subsidiaries comprise one of the largest providers of electricity and natural gas in the upper Midwest and Northwest regions of the United States, serving approximately 608,000 customers throughout Montana, South Dakota and Nebraska.[1]

## THE BAR DATE

5.      By Order dated October 10, 2003, this Court established January 15, 2004 at 5:00 p.m. (Pacific Standard Time) (the **"Bar Date"**) as the deadline for creditors to file proofs of claim for each claim they assert against the Debtor that arose before the Petition Date. Notice of the Bar Date was mailed to all known creditors of the Debtor and published in numerous regional and national newspapers.

6.      To date, approximately 1100 proofs of claim have been filed against the Debtor in this case.

## LAW DEBENTURE'S CLAIMS

7.      Law Debenture, is the successor Trustee to the Bank of New York, under that certain Indenture (the **"QUIPS Indenture"**) dated as of November 1, 1996, as amended, pursuant to which the Montana Power Company (**"Montana Power"**) issued certain 8.45% Junior Subordinated Debentures (the **"Debentures"**) to Montana Capital I, which in turn issued the Debtor's Series A 8.45% Quarterly Income Preferred Securities (the **"QUIPS"**).

---

[1]      For a more extensive overview, see the Affidavit of William M. Austin in Support of First Day Motions (Docket Entry No. 2).

2

8.    Law Debenture is also the successor guarantee trustee (the **"Guarantee Trustee"**) under that certain Guarantee Agreement, dated as of November 1, 1996 (the **"Guarantee Agreement"**). Pursuant to the terms of the Guarantee Agreement, Montana Power, predecessor in interest to NorthWestern, provided a limited guarantee of obligations with respect to the QUIPS.

9.    On April 16, 2004, Magten Asset Management (**"Magten"**) and Law Debenture filed an adversary proceeding to avoid the transfer of assets (the **"Montana Utility Assets"**) of Clark Fork and Blackfoot LLC (f/k/a NorthWestern Energy LLC) (**"Clark Fork"**) to the Debtor in November 2002 pursuant to what is generally referred to as the "going flat" transaction (the **"Magten Adversary Proceeding"**)[2].

10.    The Magten Adversary Proceeding was filed in an attempt to avoid the transfer of the Montana Utility Assets to the Debtor. As a result, Law Debenture and Magten assert that they have unique rights in the Montana Utility Assets arising from the alleged fraudulent transfer and seek not less than $69 million in damages.

11.    On January 14, 2004, the Indenture Trustee filed two Proofs of Claim, designated claim numbers 653 and 729 by the Debtor's claims agent (the **"Law Debenture Claims"**).

12.    Claim number 653 asserts an unsecured non-priority claim in the liquidated amount of $69,512,463.89 for: (i) unpaid principal balance of the Debentures in the liquidated amount of Sixty-Seven Million, Ten Thousand, Three Hundred Twenty Five and 00/100 Dollars

---

[2]    On May 14, 2004, the Debtor filed a motion the dismiss the Magten Adversary Proceeding (the **"Motion to Dismiss"**). On August 20, 2004, this Court issued an Under Advisement Decision re: Motion to Dismiss (the **"Decision"**) granting in part and denying in part the Motion to Dismiss. The Debtor has filed this Motion based upon certain of the holdings made by the Court in the Decision.

3

($67,010,325.00); (ii) unpaid interest accrued an unpaid on the Debentures as of the Petition

Date in the liquidated amount of Two Million, Five Hundred Two Thousand, One Hundred

Thirty-Eight and 89/100 Dollars ($2,502,138.89); (iii) other unliquidated amounts for interest

and other charges due under the Indenture; (iv) unliquidated claims of the QUIPS holders under

the Guarantee Agreement for the aggregate amount of accrued and unpaid Distributions (as such

term is defined in the Guarantee Agreement); and (v) unliquidated claims arising in law or equity

as a result of the Transfer that is the subject of the Magten Adversary Proceeding.

13.    Claim number 729 asserts a liquidated claim in the amount of One Thousand

Dollars ($1,000.00) and unliquidated claims for reasonable compensation, expenses,

disbursements and advances, including reasonable fees and disbursements of counsel due under

the QUIPS Indenture as of the Petition Date.

## THE DEBTOR'S CONFIRMATION HEARING

14.    On May 17, 2004, the Debtor filed with the Bankruptcy Court, among other

things, its First Amended Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code

(the **"Disclosure Statement"**), in connection with its proposed First Amended Plan of

Reorganization (the **"Plan"**).

15.    On May 26, 2004, the Bankruptcy Court entered its Order (i) Approving the

Debtor's First Amended Disclosure Statement, (ii) Authorizing Solicitation of Votes, (iii)

Scheduling a Hearing on Confirmation of the Plan of Reorganization, (iv) Establishing Notice

Requirements Regarding the Confirmation Hearing and Approving the Form and Manner of

Notice, and (v) Granting Related Relief Respecting the Debtor's First Amended Plan of

Reorganization.

16.     As a result of a settlement with certain parties, on August 18, 2004, the Debtor filed it's Second Amended and Restated Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code (the **"Second Amended Disclosure Statement"**) in connection with its proposed Second Amended and Restated Plan of Reorganization (the **"Second Amended Plan"**).

17.     Also on August 18, 2004, the Debtor filed a Motion of Northwestern Corporation for an Order (A) Approving Debtor's Second Amended Disclosure Statement and Summary Disclosure Statement; (B) *Establishing Procedures for Limited Resolicitation and Tabulation of Votes on Debtor's Second Amended and Restated Plan of Reorganization*; (C) Approving the form and Manner of Notice; and (D) Granting Related Relief (the **"Resolicitation Motion"**).

18.     On August 25, 2004, the Bankruptcy Court held a hearing on confirmation of the Plan (the **"Confirmation Hearing"**).    At the Confirmation Hearing, the Debtor received approval of the Resolicitation Motion.

19.     Pursuant to the Resolicitation Motion, the Debtor received, among other things: (i) approval of the Second Amended Disclosure Statement, as modified; (ii) authorization to resolicit votes on the Second Amended Plan; and (iii) a continued confirmation hearing date on October 6, 2004 (the **"Continued Hearing"**).

## THE DISPUTED CLAIMS RESERVE UNDER THE PLAN

20.     Pursuant to the Second Amended Plan, the Debtor is required to maintain a **"Disputed Claims Reserve"** equal to the aggregate of any distributable amounts of Cash[3] and New Common Stock equal to the relevant percentage of the *Distributions* to which holders of

---

[3]     Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Second Amended Plan.

Disputed Claims would be entitled under the Second Amended Plan if such Disputed Claims were Allowed Claims in the amount of such Disputed Claim or such lesser amount as required by a Final Order.

       21.     Pursuant to Section 7.5 of the Plan, the Disputed Claims Reserve provides as follows:

> Establishment and Maintenance of Reserve for Disputed Claims. Reorganized Debtor shall maintain the Disputed Claims Reserve equal to the aggregate of any distributable amounts of Cash and New Common Stock equal to the relevant percentage of the Distributions to which holders of Disputed Claims would be entitled under this Plan if such Disputed Claims were Allowed Claims in the amount of such Disputed Claim or such lesser amount as required by a Final Order. For the purposes of effectuating the provisions of this Section and the Distributions to holders of Allowed Claims, the Debtor may, at any time and regardless of whether an objection to the Disputed Claim has been brought, request that the Bankruptcy Court estimate, set, fix or liquidate the amount of Disputed Claims pursuant to Section 502(c) of the Bankruptcy Code, in which event the amounts so estimated, fixed or liquidated shall be deemed the Allowed amounts of such Claims for purposes of distribution under this Plan. In lieu of estimating, fixing or liquidating the amount of any Disputed Claim, the Bankruptcy Court may determine the amount to be reserved for such Disputed Claim (singularly or in the aggregate), or such amount may be fixed by an agreement in writing by and between the Debtor and the holder of a Disputed Claim.

       22.     On August 9, 2004, Magten filed it's Objection to Confirmation of the Debtor's First Amended Plan of Reorganization (the **"Magten Objection"**). In the Magten Objection, Magten reasserts the claims contained in Magten's proof of claim and in the Magten Adversary Proceeding, seeking damages in the amount of approximately $69 million. In paragraph 23 of the Magten Objection, Magten requests that "the Debtor should be required to reserve approximately $69 million in cash to secure [Magten's claims]" if the Court permits confirmation of the Debtor's Second Amended Plan if the Magten Adversary Proceeding is not resolved.

6

23.     On August 9, 2004, Law Debenture filed it's Memorandum of Law in Support of its Objection to Debtor's First Amended Plan of Reorganization (the **"Law Debenture Objection"**).    The Law Debenture Objection asserts that unless the Magten Adversary Proceeding is resolved prior to confirmation of the Debtor's Second Amended Plan, to the extent the Second Amended Plan purports to modify Law Debenture's unique rights in the Montana Utility Assets, it is contrary to 1129(a)(1) and cannot be confirmed.   Because Law Debenture believes the Second Amended Plan cannot be confirmed until the Magten Adversary Proceeding is resolved, the Debtor has filed this Motion seeking to estimate for all purposes the Law Debenture Claims.    Furthermore, in paragraph 13 of the Law Debenture Objection, Law Debenture requests that "the Debtor set aside not less than $69 million (the approximate amount plus accrued interest and other charges due under the QUIPS Indenture)("QUIPS Claims") to secure any judgment obtained by the Indenture Trustee."

## THE MOTION TO DISMISS

24.     On August 20, 2004, this Court issued it's Decision granting in part and denying in part the Motion to Dismiss the Magten Adversary Proceeding.

25.     In the Decision, this Court concluded that: (i) Magten purchased its share of the QUIPS after the "going flat" transfer; (ii) Law Debenture and Magten are not creditors of Clark Fork by way of the Guarantee Agreement; and (iii) Law Debenture and Magten lack standing to pursue the Magten Adversary Proceeding against the Debtor because of the Section 1102 release, unless they can prove that the release was obtained through actual fraud or as a part of a fraudulent scheme.

7