1  of New York.

2        THE COURT:  Thank you.

3        MS. DENNISTON:  Okay, if -- Your Honor, I could

4  approach, I'd like to have the comptroller's claim marked as

5  Exhibit #1.

6        THE COURT:  Have you supplied these to Counsel?

7        MS. DENNISTON:  This is the one that they filed, Your

8  Honor.  It's been a document --

9        THE COURT:  I know.  But -- Counsel, I've been

10  submitted a Proof of Claim filed on January the 6th, 2005 by

11  the Comptroller of the City of New York as Exhibit-1 for debt

12  due July 1 -- 2001, through December of 2004 as a (indiscern.)

13  secured, non-priority claim in the amount of $2,597,484.21.  Do

14  you have any objection to that exhibit being received by the

15  Court?

16        MS. MORETTI:  No, I do not.

17        THE COURT:  All right.

18    (Debtor's Exhibit-1 marked for identification)

19        MS. MORETTI:  Barbara Moretti for the Comptroller for

20  the City of New York, I do not oppose.

21        THE COURT:  Thank you.  Exhibit-1, that'll be

22  admitted.

23    (Debtor's Exhibit-1 admitted into evidence)

24        MS. DENNISTON:  Thank you, Your Honor.  In connection

25  with Exhibit #1, which the Debtor also notes has been marked on

13

1   the claim ledger as Claim #253, the Court can see that if the

2   Court looks at the substance of the claim, it is identical to

3   the request for relief being sought in terms of the hearing

4   that the Office of the Comptroller has indicated that it wishes

5   to have.   Nominally just a summary letter of the claim, which

6   is the second page of exhibit dated December 29th, 2004, set

7   forth the identical facts and circumstances and causes of

8   action.   The face of the claim and the complainant list are

9   identical.

10         THE COURT:  All right.

11         MS. DENNISTON:  With that, Your Honor, I think there's

12   two important things to note about the face of this claim.   It

13   has not preserved any enforcement under the police act or the

14   regulatory exception to the stay, nor does it preserve any

15   governmental or sovereign immunity.   In light of the holding in

16   In Re:   Kaiser Group, it's the Debtor's position that despite

17   all of the other holdings out there that are in conflict as to

18   whether or not a stay would be appropriate, in this

19   circumstance this claimant has filed a claim and submitted to

20   the exclusive jurisdiction of this Bankruptcy Court, and under

21   the recent precedent from the Third Circuit, the Debtor

22   believes this matter should be stayed.   As a practical matter,

23   the Netexit Debtors have filed a Disclosure Statement.   They

24   have filed it for post Plan of Reorganization.   The hearing on

25   the Disclosure Statement has been set for the April 5th

1  hearing, Your Honor.  And the Debtors are in the process of

2  objecting to all of the claims.  The Debtor does not intend to

3  delay its claim objection, either to the comptroller's claims

4  or the individual claims.  Those will be timely filed and we

5  expect to file them before the April 5th hearing.  The other

6  thing is that consistent with the papers, there have been and

7  continued to be settlement negotiations as the Debtors hope

8  that at some point these matters can be amicably resolved.

9  But, aside from the practicalities and the progress being made

10  in the Debtor's case, it is clear to the Debtor under In Re:

11  Kaiser, that this matter has been submitted to this Court for

12  determination and that the Bankruptcy Court has exclusive

13  jurisdiction.  Because of that exclusive jurisdiction, the

14  adjudication of this claim should go forward in this Court and

15  the Debtor should not be burdened with additional litigation in

16  terms of responding to the hearing notice by the Comptroller of

17  the City of New York.  And with that, we would ask that unless

18  the Court has further questions, that the Court enter the

19  preliminary injunction, that the Court enter that injunction

20  for a period of time to run through the end of May, so that the

21  Debtor can file its claim objection, this matter can be

22  adjudicated and heard before this Court.

23           THE COURT:  Counsel for Comptroller?

24           MS. MORETTI:  Barbara Moretti, Corporation Counsel,

25  City of New York, appearing for the Comptroller of the City of

1  New York.  The Comptroller of the City of New York is asking
2  that the Order to Show Cause be denied in its entirety.
3  There's absolutely no merit to Debtor's claim that in
4  scheduling this hearing, this comptroller violated the
5  automatic stay of the Bankruptcy Code.  Section 362(b)(4)
6  specifically accepts actions undertaken to enforce a
7  governmental unit's police or regulatory powers.  And the cases
8  have uniformly held that this exception applies to actions to
9  fix the amount of damages for past conduct, whether or not that
10  such said conduct is continuing.  Courts have expressed that
11  these actions must not be used as actions undertaken to
12  vindicate private rights, but rather as deemed of enforcing the
13  policies underlying the labor laws.  And for this reason, Your
14  Honor, the comptroller argues that the request for injunctive
15  relief must also be denied.  First of all, the Debtor has not
16  made the proper showing.  He -- the Debtor alleges an
17  irreparable harm, which seems to consist of some unspecified
18  extra expenses or expenditure of time that would be devoted
19  towards prosecuting this in two forms.  But what the Debtor
20  fails to address is the fact that these necessary facts would
21  have to be developed whether they were in the claims resolution
22  process or whether it is a tribunal -- with a particular
23  expertise to try these types of matters.  The Debtor also
24  ignores the fact that actions to enforce a police or regulatory
25  powers cannot properly be removed to a Bankruptcy Court.  And

1   that it does not violate the policy and -- mandates of the

2   Bankruptcy Court by allowing an action to proceed in front of

3   the tribunal, where it properly belongs.  Now, the other thing

4   is that the Debtor seems to imply that perhaps this can be

5   settled with individual claimants.  But the truth is,

6   individual claimants, the employees -- any settlement or even

7   any resolution of the claims in Bankruptcy Court does not bind

8   the comptroller because under New York law, the comptroller is

9   not limited to seeking compensation for these wage violations

10  from the Debtor itself, but may go after substantially

11  affiliated entities or successors.  And this particular case --

12  this contract involves a public works contract that was

13  commenced in 2001.  There are allegations that a successor

14  entity is liable for -- is in fact identical to expandants, and

15  its whole purpose of the labor laws prevailing rate allowance -

16  - allowing the City to go after successor entities, is to

17  enforce prevailing wage law and not allow someone to get around

18  it or sidestep it by creating shadow entities or subsequent

19  successors and interests.  So basically, it's the comptroller's

20  position that it would be an abuse of discretion for this Court

21  to grant the injunction.  There is no irreparable and -- harm

22  demonstrated by the Debtor, and that this matter should be

23  allowed to proceed.

24          THE COURT:  Are we going to run into a situation,

25  Counsel, where we're going to have two tribunals deciding same

1   facts relative to the amount of the claim that's owed, if any,

2   by this Debtor to these Claimants and/or to the comptroller?

3   If you get your decision out and then this Court has to hear

4   the objections on your claim, which you have submitted to the

5   jurisdiction of this Court, we could end up with two adverse

6   judgments.

7        MS. DENNISTON:  Barbara Moretti for the City of New

8   York.  Your Honor, that is not really a possibility.  The Court

9   may consider -- first of all, as far as whether there was a

10  prevailing wage violation, that is in a particular expertise of

11  the tribunal of the Court.  And even if the Court were to find

12  that the resolution of -- even if it -- no matter what happens

13  here, even this were settled, or -- that whatever amount they

14  took the comptroller may continue this prosecution.  There are

15  non-Debtor entities that are involved.  And this can be

16  continued against them.  And so, a few facts must be

17  established.  Because there is an allegation that these -- that

18  the entities -- the non-Debtor entities that are continuing the

19  contract, may be also liable for these labor law violations.

20  And the comptroller is charged with enforcing waging -- the,

21  you know, wage violation laws.  And seeking to determine

22  whether or not such violation was willful, with respect to

23  awarding future contracts.  And there's a very, very strong

24  public policy argument that is in favor of allowing these

25  prosecutions to proceed.  And in addition, we believe that the

18

1 -- these are not matters that are properly tried in front of a
2 Bankruptcy Court.

3      THE COURT:  Well, I don't have any problem with you
4 going after the non-Debtor entities.  It's the question of
5 going after the present Chapter 11 Debtor, and seeking the
6 judgment against them.  I don't think the stay binds you
7 against the non-Debtors.  And certainly any restraining Order
8 that I -- that the Court may issue, would not run against any
9 non-Debtor entities which maybe asking to the subterfuge now,
10 because of the violations. .

11      MS. MORETTI:  Barbara Moretti for the City of New
12 York.  Your Honor, it is impossible to separate the actions of
13 the Debtor.  The Debtor has not ·-- first of all, the Debtor
14 claims it doesn't even have these documents anymore.  They're
15 all in the possession of someone else.  So, the Debtor would
16 have to appear, even subsequent in this.  Even subsequent to
17 this, even if there was a total discharge in bankruptcy, this
18 matter would go forward, the Debtor would still be involved.

19      THE COURT:  Counsel?

20      MS. MORETTI:  And we believe --

21      MS. DENNISTON:  If I could respond --

22      MS. MORETTI:  -- that the law is clear that --
23 strictly, you know, injunction is not proper under these
24 circumstances.

25      THE COURT:  Have you read this Ninth Circuit case --

1  or Third Circuit case on <u>Kaiser</u>?

2      MS. MORETTI:  I'm not quite sure, Your Honor.  I read

3  so many of 'em.

4      THE COURT:  I haven't either, so --

5      MS. MORETTI:  And I don't believe that --

6      THE COURT:  -- we're even.

7      MS. MORETTI:  I'm sorry.

8      THE COURT:  We're both even there.

9      MS. MORETTI:  Barbara Moretti again, Your Honor.  I

10  believe perhaps that we're comparing apples and oranges with

11  that particular decision, because the fact that the comptroller

12  has -- can submit itself to the jurisdiction of the Bankruptcy

13  Court, but that would not be the Bankruptcy Court's

14  jurisdiction to hear a case involving the enforcement of the

15  state's -- enforcement powers.

16      THE COURT:  You may respond.

17      MS. DENNISTON:  Thank you, Your Honor, Karol Denniston

18  on behalf of the Netexit Debtors.  First and foremost, the

19  comptroller here has voluntarily consented to the exclusive

20  jurisdiction of this Bankruptcy Court by filing the claim.

21  There are no reservations set forth on the face of the claim as

22  to their governmental, police, or regulatory powers or any

23  immunity.  The Debtor believes that this is properly before the

24  Bankruptcy Court as a result of their consent to this Court's

25  exclusive equitable jurisdiction.  The Debtor is in agreement

1   with the Court as to the irreparable harm component, that there

2   is a risk of conflicting resolution.  Now, as to the last part.

3   And this is what makes this situation very complicated and very

4   important to the Debtor.  Those entities that the comptroller

5   is referring to as successor entities, or the entities that

6   have -- or the subsequent buyers of the former Exponets assets.

7   AS this Court knows, Exponets was sold to Avaya, then Avaya

8   entered into a subsequent sale to a third party of the assets

9   that are referred to in New York and those assets that the

10  comptroller is actively pursuing collections from the third

11  buyer of the assets.  So, we also have, as the Netexit Debtors,

12  indemnification claims filed by Avaya in connection with the

13  activities of the comptroller.  Those indemnification claims

14  are also gonna be heard by this Court in terms of setting those

15  claims and deeming them allowed, or not allowed or fixing them

16  so that they're no longer contingent liabilities.  Every

17  component of this wage an hour dispute is gonna be addressed in

18  the context of this bankruptcy case in the next three months in

19  the context of allowing claim.  We believe that the issuance of

20  a preliminary injunction will not only make that process more

21  efficient, it will give the Debtors a vehicle to discuss not

22  only with the individual claimants, but the Office of the

23  Comptroller the resolution of these issues.  And that's why the

24  Debtor seeks the relief.

25          THE COURT:  Counsel, is this matter still set before

1  the comptroller for March the 18th?

2  MS. MORETTI:  Barbara Moretti.  Your Honor, it's

3  adjourned, I think your resolution -- pending resolution of

4  this matter --

5  THE COURT:  It has been adjourned.

6  MS. MORETTI:  At this time, pending resolution of

7  these Orders --

8  THE COURT:  Oh, oh, okay.  And that's without any

9  further date set?

10  MS. MORETTI:  There's a tentative date three weeks

11  from this hearing.

12  THE COURT:  All right.  Well, Counsel, I'd like you to

13  get a memorandum out relative to your newly discovered case

14  here, and submit it to the Comptroller's Office within the next

15  two days, and then I'll give you another five days, Counsel, to

16  submit your response to that memorandum.  And as long as

17  they've got a few days from -- before March 18th to get this

18  Order out, we can consider both matters and then I'll get out

19  an Order.  All right?  Thank you, Counsel.

20  MS. MORETTI:  Thank you.  Your Honor?

21  THE COURT:  Yes.

22  MS. MORETTI:  One further thing.  There -- in the

23  Order to Show Cause, there was an adversary complaint.  I have

24  not answered it, because I'm assuming that the motion addresses

25  the adversary complaint.  So I would like some time to, you

22

1    know, answer it at that time --

2            THE COURT:  How much time do you need?

3            MS. MORETTI:  I would like to have a certain amount of

4    time after the motion is resolved to answer --

5            THE COURT:  All right.  The -- your answer to the --

6    or response to the adversary complaint will be continued until

7    after the Order of the Court, and I'll set a date in there for

8    you to respond if we maintain jurisdiction.

9            MS. MORETTI:  Thank you, Your Honor.

10           THE COURT:  Thank you.

11           MS. DENNISTON:  Your Honor, from the Debtor's

12   perspective in terms of scheduling with regard to whatever way

13   this Court may ultimately rule, the Debtor would request at

14   least a 30-day notice in terms of the issuance of a hearing

15   were this Court to deny the preliminary injunction.  So that it

16   has 30 days to address the other issues and prepare for the

17   hearing.

18           THE COURT:  All right.  That all the matters on

19   Netexit?

20           MS. DENNISTON:  That does conclude the Agenda on

21   Netexit, Your Honor.

22       (Pause in proceedings)

23           THE COURT:  I have now the Northwestern Corporation

24   03-12872.  I have an amended notice of Agenda matters

25   scheduled.  First of all are the fee applications.

23

1       MS. DENNISTON:  That's correct, Your Honor.  Two of

2  the fee applications have been continued.  Those will be the

3  final fee applications for Lazard Frares and Houlihan Lokey.

4  The two that are proceeding today are Pearl Meyer and

5  PriceWaterhouseCoopers.

6       THE COURT:  We'll take up the matter with regard to

7  Warren Smith.

8       MS. DENNISTON:  Thank you.

9       THE COURT:  Have a fee application for a period of

10  retention from March 2004 to the present, showing the total

11  hours of 1,936.6 hours, which is rather greater than $113.73.

12  The request is for $220,240 and expenses of $1,766.92.  The

13  Court will grant the application and award fees in the sum of

14  $220,240 and expenses of $1,766.92.  In the matter of Pearl

15  Meyer Partners, we have an application for $150,256.25 and

16  expenses of $5,744.97.  It appears to the Court that Pearl

17  Meyer did not follow the local rules in preparing their fee

18  application, and they're missing a summary of their services

19  and the certification that the application complies with the

20  local rules.  The billing is by quarter-hour, rather than by

21  tenth of the hour, as required by Rule 16 -- 2016.  There are a

22  number of time entries which are lumped -- they hired an

23  outside Counsel to perform actuarial services, which is Pearl

24  Meyer's sister company, in the sum of $1,230.  And they have

25  charged first-class airfare due to back problems and duration

1  of flight, which is excessive -- in the sum of $1461.10.  The

2  total items are listed in the expense column.  Their retention

3  letter caps Pearl Meyer's fees at $150,000.  And they have

4  exceeded that retention letter cap.  All that is considered, I

5  will award Pearl Meyer the reasonable fee of $150,000 pursuant

6  to the retention letter.  The expenses will be reduced by

7  $2,691.10 per the auditor's report, leaving a net payment of

8  $3,053.80.  Take up now PriceWaterhouse, their total fee

9  application is $920,880.  They seek expenses of $163,546.  We

10  received the auditor's report, Pearl Meyer -- or

11  PriceWaterhouse has filed a Motion for Limited Waiver of local

12  Rule 2016(2)(d) in docket #2825.  The problem is that before --

13  as reported by the auditor, before January 5th, 2004,

14  PriceWaterhouse did not provide activity descriptions for any

15  of its professional time billed to this case.  Instead, Pearl -

16  - PriceWaterhouse provided a summary of the number of hours

17  billed by each professional during each month.  There is fee

18  detail supporting $438,122.50 of the requested fees.  Thus the

19  fees for which the activities description have not been

20  provided total $462,697.  The auditor asked for PriceWaterhouse

21  to explain why fee detail was not provided for the majority of

22  fees sought by the accounting firm.  In this regard, the

23  auditor requested PriceWaterhouse to refer to the applicable

24  Court Orders and any documents relative to this issue.  I must

25  say that this application was granted on a nunc pro tunc Order

1  whereby the Court specifically stated that the fee would be

2  judged in accordance with Rule -- or with Section 330 of the

3  Bankruptcy Code.  The auditor noted that the presence in the

4  electronic case file of the Order -- of the nunc pro tunc Order

5  and it said that it appears that PriceWaterhouse was to serve

6  as an ordinary course professional.  But with a $50,000 limit

7  on the limited fees and expenses that may be billed in a single

8  month without further Court oversight.  However, the nunc pro

9  tunc Order also stated that sections -- that the application

10  would be examined under Rule -- under Section 330.  The Order

11  states that if any ordinary course professional fees and

12  disbursements exceed a total of 50,000, or 600,000 annually in

13  the aggregate, and the payments of such professionals in the

14  excess amounts shall be subject to approval in accordance with

15  Section 330 and 331 of the Code of Federal Rules of Bankruptcy

16  Procedure, the local rules of bankruptcy procedure of United

17  States District Court for the District of Delaware, and Orders

18  of this Court.  And the fee guidelines promulgated by the

19  executive office of the United States Trustee.  This limit was

20  exceeded in the first month, September 2003, in which

21  PriceWaterhouse fees and expenses totaled $200,000.  So it'd

22  appear that, notwithstanding the ordinary course professional

23  Order, PriceWaterhouse should have kept detailed activity

24  records from the inception of the case.  The auditor noted that

25  the application to pay 17 refers to ordinary course appointment

1  objection as well as the Touch America Corporation objection in
2  early 2004, regarding PriceWaterhouse professional appointment.
3  PriceWaterhouse responded accordingly. {Quote}
4  "PriceWaterhouse was initially retained as an ordinary course
5  professional. Because of its retention in that matter, it did
6  not keep detailed time records. In January 2004, the Debtor
7  filed a separate application to retain PriceWaterhouse. To
8  address the time period from September 15th, 2003 through
9  December 31st, 2003, PriceWaterhouse filed a Motion for Limited
10 Waiver of requirements of local Rule 2016(d), a copy of which
11 was attached" {unquote}. The auditor reviewed the reference
12 motion, but -- and until the motion is granted, must perform
13 the review in accordance with the operative Orders of the
14 Court. And that the ordinary course professional Order, a
15 total of 200,000 of fees and expenses through September and
16 December, 2003, which are post-petition period expenses,
17 appears to be exempt from review by the Court, and exempt from
18 the application of the Court's Order including a fee auditor's
19 Order. Because $4,062.69 in expenses sought for 2003 total
20 $575,066.16, PriceWaterhouse has exceeded the $200,000 limit
21 imposed by the ordinary course professional Order by a total of
22 $375,066.16. The auditor therefore recommends the reduction of
23 that amount to the fees and expenses in the absence of a
24 waiver, and accordingly recommends the total reduction of
25 $375,066.16 split pro rata between fees and expenses 80% --

27

1   80.5% vs. 19.5%.  Thus the fee auditor recommends a reduction

2   of $301,928.26 in fees and $73,137.90 in expenses.  There are

3   some other -- according to the reductions -- in $375 in fees

4   and thus the total recommendation of the examiner is for an

5   approval of fees in the sum of $608,498.24 and expenses of

6   $88,979.09 for the services of the applicant from September

7   15th, 2003 through October 31st, 2004.  The Court is disposed

8   to granting the auditor report, and denying the application for

9   the waiver of Rule 2016(d)(1) -- (d)(2), and we'll enter an

10  appropriate Order.  Number -- item #2.  I guess the other one,

11  Lazard Freres and Houlihan Lokey are continued until April 5th.

12          MS. DENNISTON:  That's --

13          THE COURT:  I still have outstanding a fee request on

14  the Browning firm --

15          MS. DENNISTON:  That's correct, Your Honor.

16          THE COURT:  -- who was supposed to be -- information

17  to me about their ability to hire the appraisers?

18          MS. DENNISTON:  That's correct.  We spoke with them

19  yesterday, and I know they're in the process of gathering

20  information that the Court had requested so that the Order can

21  be submitted.

22          THE COURT:  All right.  Pre-trial conference in the

23  Complaint for Declaratory and permanent injunctive relief by

24  Northwestern against the Carpenters Pension Trust of Southern

25  California.

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

1    MS. DENNISTON:  Yes, Your Honor.  We would request

2  that this be vacated.  The Court entered an Order on February

3  10th dismissing this adversary proceeding, so we no longer need

4  to carry this on the Agenda.

5        THE COURT:  The motion will be continued.

6        MR. SMITH:  Your Honor, excuse me.  This is Warren

7  Smith, the fee auditor.  If there's no more fee matters, I --

8        THE COURT:  I don't think so, Warren, you're

9  excused --

10       MS. DENNISTON:  Your Honor, I've just been advised --

11       MR. SMITH:  Thank you, Your Honor.

12       MS. DENNISTON:  -- that somebody would like to speak

13  to the PWC application.

14       THE COURT:  Just a moment, Warren.

15       MR. SMITH:  Okay.

16       MS. MILLER:  Good morning, Your Honor, Kathy Miller on

17  behalf of PWC.  Your Honor, just in connection with the Motion

18  for Relief from 2016.  I'm not sure -- we did file the motion

19  and the fee auditor did see that.  And we did agree with all

20  the other reductions that the fee auditor had requested -- to

21  supply the additional information with respect to some time

22  entries and some expenses.  But on the time period from

23  September through December -- maybe a little background might

24  be beneficial.  PWC was engaged to help with some control

25  processes with the Debtor prior to this bankruptcy.  It was not

1   hired in connection with the bankruptcy.   They were doing work

2   with Sarbanes Oxley, having to do that through -- prior to this

3   petition and then continuing the work.   So that's why they were

4   keeping their time records -- understood that they continue to

5   keep their time records the way they did prior to the petition,

6   and for that timeframe.   As things developed, it became

7   apparent that they should then file -- the Debtor should file

8   separate retention.   And that's the reason why the records were

9   not kept -- what you would normally see for someone who is

10  engaged in the bankruptcy.   So, because of the nature of the

11  work, with people given specific tasks each week, we can get a

12  little further detail on what people were doing.   To sit this

13  many months beyond -- and even back in January, to sit and try

14  to figure out what they did on September 20th, would be, you

15  know, very difficult -- if not impossible to do.   But we can

16  give a little more detail on what the people were doing through

17  the process, if that may be more benefit to -- maybe the Court

18  to consider the 2016 Motion.   And we request to do that -- the

19  expense detail, they actually do have that, because they are

20  required to keep that in any event.   You know, we do have that

21  further detail on that and we can submit that to the fee

22  auditor and to the Court.

23          THE COURT:   Why did your client think the $50,000 a

24  month cap for ordinary course professional Orders meant?

25          MS. MILLER:   Your Honor, they were submitting their

1  bills in ordinary course, but I don't know why the Debtor paid
2  the full amount.  I mean, PWC didn't have any control -- they
3  were submitting what they were supposed to be submitting, the
4  work wasn't limited to that.  Maybe the payment should have
5  only been a certain amount.  The payments did stop, because
6  somewhere that was caught, and said, "oh, you know, these are
7  beyond the limits and let's proceed in a different matter."
8  But PWC was submitting its bill for its work -- if the work
9  wasn't limited to the $50,000, the payment should have been and
10 then maybe 'cause the work did go beyond it, that's when it was
11 realized.  And I was not involved at the time, Your Honor.  I
12 don't know all of it, but what we can piece together is, after
13 receiving a couple of first bills, realizing that it was gonna
14 go over beyond the cap, that they ought to go ahead and retain
15 them in the case.  But PWC was just giving its bill the way it
16 had prior to the petition, and I believe the Order said they
17 can keep -- continue to bill in the normal course what they
18 were doing prior to the bankruptcy.  So that's what PWC was
19 doing, and I can't speak to why the payment was made beyond the
20 scope, but it wasn't -- PWC wasn't trying to get more out of
21 the Estate, it was just following its ordinary course, and then
22 somewhere along the way it was flagged that this is not working
23 in the right manner, so then the separate retention was filed
24 in January.  So --
25          THE COURT:  Anything further?

31

1    MS. MILLER: Well, just a request that we can give the
2 Court and the fee auditor the further detail on what the type
3 of work that people were doing. But again, to go back and try
4 to do -- you know, break down each day -- that wouldn't be
5 possible. But could we have permission to go ahead and submit
6 that, if that would help Your Honor.

7    THE COURT: All right. I appreciate your comments,
8 but my Order is going to stand.

9    MS. MILLER: Okay. Thank you, Your Honor.

10    MS. DENNISTON: Your Honor, as to matter #2, I just
11 wanted to be sure that that has been vacated.

12    THE COURT: I said that was continuing.

13    MS. DENNISTON: Well actually --

14    THE COURT: The matter's continued right through item
15 9, right?

16    MS. DENNISTON: No, I think there may be some
17 confusion, Your Honor. And hopefully it's not mine. We filed
18 a motion to -- for a stipulation to dismiss this adversary
19 that's represented by matter #2, which is the Amended Verified
20 Complaint for Declaratory temporary permanent injunctive relief
21 by Northwestern. That complaint was filed in connection with
22 the Securities litigation which was settled under the
23 Memorandum of Understanding. And we submitted a stipulation
24 last month which the Court entered, asking that the matter be
25 dismissed and the stay lifted so that the settlement could be

32

1  implemented.

2         THE COURT:  All right.

3         MS. DENNISTON:  So, that matter just needs to be

4  vacated and reflected accordingly.  And I apologize for the

5  inaccuracy in the Agenda, which is inconsistent, because it

6  also says it should be continued.  Matter #3 is the Motion to

7  Approve Memorandum of Understanding.  This we would request be

8  continued to the next hearing.

9         THE COURT:  Very well..

10        MR. SMITH:  Your Honor, again this is Warren Smith,

11 I'd like to be excused.

12        THE COURT:  Now you can go, Warren.

13        MR. SMITH:  Thank you very much, Your Honor.

14        THE COURT:  All right.

15        MS. DENNISTON:  Your Honor, should I proceed with the

16 next matter?

17        THE COURT:  Yes.

18        MS. DENNISTON:  The Motion for Order Declaring the

19 automatic stay to be inapplicable or for modification of

20 automatic stay to permit prosecution payment of workers'

21 compensation claims.  As we have indicated that we are still in

22 the process of finalizing a settlement stipulation, we'd like

23 to hand up a stipulation today continuing -- adjourning this

24 motion until the April 5th hearing, and extending the deadline

25 to file a response to March 22nd.  Also adjourning the claims

33

1  objection here -- or the filing of a claim objection until

2  April 5th.  And we believe that we were close to finalizing the

3  settlement stipulations and be able to present a proposal to

4  the Plan Committee and then subsequently to the Court.  And if

5  I could approach with the stipulation --

6      THE COURT:  Very well.

7  (Pause in proceedings)

8      THE COURT:  Stipulation is approved.

9      MS. DENNISTON:  Thank you, Your Honor.  Matters #5 and

10 6 have been addressed by the approval of the stipulation for

11 matter #4, and we'd requested they be continued to the April

12 Omnibus hearing as well.

13     THE COURT:  They'll be continued.

14     MS. DENNISTON:  Thank you, Your Honor.  Matter #7 is

15 the Omnibus Motion for Court Approval to Assume certain

16 executory contracts.  The Debtor continues to work with the

17 individuals and entities reflected through -- A through F and

18 we've requested this matter be continued to the next Omnibus

19 hearing.

20     THE COURT:  Very well.  It will continue.

21     MS. DENNISTON:  Debtor has the same request, Your

22 Honor, for matter #8, which is the Request for Administrative

23 Expenses pursuant to 11 USC Section 503 by Law Debenture.  That

24 that be continued to the next Omnibus hearing.

25     THE COURT:  That'll be continued.

34

1       MS. DENNISTON:  Thank you, Your Honor.  And matter #9

2   is the Motion pursuant to 105(A) of 363 to Terminate certain

3   unqualified plans.  Debtor is requesting that that be continued

4   to the next Omnibus hearing.

5       THE COURT:  They'll be continued.

6       MS. DENNISTON:  Thank you.  That brings us to matter

7   #10, Your Honor, which is the Joint Motion of Magten Asset

8   Management Company and Law Debenture, and I will turn the

9   podium over to the Movant.

10      MS. STEINGART:  Good morning, Your Honor.  I'm Bonnie

11  Steingart from Fried Frank on behalf of Magten.  Your Honor,

12  Magten and Law Debenture are here today to seek Court approval

13  of the Settlement Agreement entered into with Northwestern.

14  That approval is sought under Rule 9019.  AS this Court already

15  knows, on February 10th, the Court heard from the Reorganized

16  Debtor, Northwestern, that a settlement of a number of

17  litigations and appeals was reached between Magten, Law

18  Debenture, and Northwestern.  The Court further held that the

19  agreement was reduced to writing, that the agreement was

20  executed by Magten, Law Debenture, and Northwestern.

21  Northwestern issued a press release in which Mr. Drook, the

22  president and CEO, said the Settlement Sgreement is in the best

23  interest of the company.  Indeed, in its opposition papers just

24  recently filed, Northwestern said in paragraph 13:

25  "Northwestern had a good faith belief that the terms of the

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

1  proposed settlement were fair and reasonable and in the best

2  interest of the Estate."  In paragraph 48, "Northwestern

3  continues to believe a settlement is in the best interest of

4  the Debtor.  But for the objections, the settlement would

5  conclusively resolve all the litigation."  Paragraph 56:  "The

6  Debtor, believing the settlement was reasonable and in the

7  Estate's best interest, took the initial step to implement this

8  settlement."  Paragraph 61:  "The settlement was entered into

9  in good faith, the settlement terms make economic sense.  They

10  are in Northwestern's best interest, in the best interest of

11  the Creditor body as a whole, given the expected cost to the

12  Estate from protracted litigation."  What we have here then, is

13  an agreement that was entered into in good faith.  That

14  Northwestern, the reorganized Debtor, still believes is in the

15  best interest of Northwestern and makes economic sense.  But

16  now Northwestern argues that because the settlement cannot be

17  done without plan amendment, it can no longer seek approval.

18  So, we know that it's in the best interest.  We know that it

19  was negotiated in good faith, reasonable, makes economic sense.

20  So the thrust of the issue here -- and I think, the initial

21  issue to deal with is that the settlement can be achieved

22  without plan amendment.  Thereafter we will talk about how the

23  settlement is a binding agreement entered into by the

24  Rreorganized Debtor, who didn't need Court approval under 363

25  to be bound.  Third, we'll talk about how the Courts reviewed

36

1  the settlement agreement under these circumstances, under 9019,
2  is --
3      THE COURT:  How can it be binding when it required the
4  approval of the Court?
5      MS. STEINGART:  Well, Your Honor, there are a number
6  of cases that talk about how Bankruptcy Courts look at whether
7  Settlement Agreements are binding.  And those cases are
8  uniform.  And these are Third Circuit cases, which indicate
9  that were there an agreement, whether a settlement agreement
10 that's reached that is binding upon the parties is determined
11 under State law.
12     THE COURT:  But we're dealing here with litigation
13 that's ongoing before this Court.  For this Court and the
14 District Court, relative to the appeal of the Order
15 confirmation, relative to the Magten suit against Northwestern.
16 And those matters have to be resolved by this Court.
17     MS. STEINGART:  Yes, Your Honor.
18     THE COURT:  And so this argument that it's binding
19 without the Order of the Court, I'm not going to buy.
20     MS. STEINGART:  Well --
21     THE COURT:  I want to go, however, right to the merits
22 -- whether or not this -- the settlement, and the amount of the
23 settlement relative to the disposition and the payment vis-a-
24 vis the stock, is it contrary to the plan.  If it isn't
25 contrary to the plan, I'm disposed to approving the settlement.

1  If it is contrary to the plan, I don't think I've got any

2  recourse but to reject it.  I think that is has a lot of merit,

3  to dispose of all this litigation and get rid of the cases, and

4  get Northwestern onto the final era of the reorganization.

5  But, the objections that I read, all 120 pages of it, come down

6  to whether or not the agreement relative to this 382,732 shares

7  and 710,449 warrants to Magten is consistent with the plan that

8  has been confirmed by the Court.  Now, in that regard, one of

9  the matters which I think has been kind of passed over -- it

10  had been mentioned in one of the briefs, but I find of some

11  relevance is that when there was a Stipulation and Order

12  establishing the dispute claims reserved for this particular

13  Plaintiff -- Magten and Law Debenture.  And it was done after

14  notice.  It said that upon approval of the stipulation and in

15  accordance with the issues and the terms of the confirmation

16  Order, and consistent with the disputed claims reserve notice,

17  the Reorganized Debtor shall set aside a portion of its initial

18  reserve of 13½% of new common stock solely to satisfy in full a

19  $25 million Class 9 claim of QUIPSS litigation claimholders for

20  the purpose hereof any claim by any QUIPSS litigant claimant

21  will be afforded treatment according to Class 9 general

22  unsecured claims as set forth in the plan.  And here's the

23  language that I think is somewhat important.  To the extent

24  that the allowed QUIPSS litigation claim ultimately exceeds $25

25  million, the holders of such claim shall have the deficiency

1  satisfied out of the general disputed claims reserve as such is
2  described in the Pplan and the Cconfirmation Order.  It goes on
3  later and says likewise to the extent the QUIPSS litigation
4  claims against the QUIPSS litigation claims reserve is more
5  than $25 million, QUIPSS litigation claimants shall be entitled
6  to draw on any assets remaining in the disputed claim reserve.
7  Now I don't know what the situation is with regard to the total
8  amount in that reserve, except that I -- except what's in the
9  plan.  And I understand that there have been two claimants that
10 have been settled out of that reserve.  And that there are
11 remaining claims to be settled out of that reserve.  But one of
12 the remaining claims has to be Magten, under this stipulation
13 and Order.

14         MS. STEINGART:  That's correct, Your Honor.

15         THE COURT:  So how is it that the 382,732 shares would
16 violate the plan?

17         MS. STEINGART:  Well, Your Honor, it's our view that
18 it doesn't violate the plan.  And the Court is correct in
19 focusing on the 382, because other than those 382,000 shares
20 and a certain number of warrants, there is no dispute that the
21 other amounts in terms of the settlement agreement do not raise
22 any questions with respect to the terms of the confirmed plan.

23         THE COURT:  Well, that raises the question as to plan
24 committee or ad hoc committee saying that it's not reasonable
25 under any circumstances.  That it's too high, it's too large,

1  that it shouldn't be done, that this litigation should continue

2  and I guess Northwestern bear the expense of doing that.  And

3  that in regard it's still attacked.

4       MS. STEINGART:  Well that's --

5       THE COURT:  The entire -- the amount of the settlement

6  is still under attack.

7       MS. STEINGART:  That's a different issue.  Whether the

8  settlement can be accomplished under the plan, Your Honor.  I

9  think it's clear.  This settlement can be accomplished under

10  the plan.

11       THE COURT:  Well, the issue is, does the Class 7

12  Creditor have to consent.  Now, to the payment out of that

13  reserve, the 382,732 shares and the warrants.

14       MS. STEINGART:  Your Honor, the Class 7 Creditors

15  never get to consent.  They only get to object.  And the plan

16  provisions are very clear about that.  The plan committee has

17  the ability to file an objection.  Magten, Law Debenture and

18  all the QUIPSSholders are members of Class 9.  The presumptive

19  benefit of the reserves established by Class 9 reserve --

20  belong to the QUIPSS.  What Class 7 gets is what's left after

21  Class 9 is distributed.  The plan therefore gives them the

22  right to object.  Not the right to consent.  They have

23  nothing --

24       THE COURT:  Well, you seem to --

25       MS. STEINGART:  -- to say about what goes --

40

1    THE COURT:  I agree, that was the former position.

2    And the plan committee now has amended the by-laws.

3    MS. STEINGART:  Well, I think that the amendment of

4    the by-laws is really too late, #1.  I don't think that it has

5    retroactive effect.  I think it's an admission by the plan

6    committee that they indeed had nothing to say about the

7    Debtor's ability to construct settlements that came within the

8    parameters of Class 9 and Your Honor, the settlement with the

9    QUIPSSholders is well within the parameters of Class 9.  It's

10    less than the QUIPSSholders would receive if they prevailed, so

11    if they prevailed and on their Class 9 -- which is at least 50

12    million.  Indeed, it's probably more than 50 million.  But the

13    least they would get if they prevailed is about $35 million.

14    If you look at the settlement, taking both pieces -- both the

15    382,000 piece and the Class 9 piece, it comes to under $28

16    million which still in America is less than $35 million.  And

17    so, the settlement amount is well below the maximum amounts the

18    QUIPSSholders would be entitled to under Class 9 if they

19    prevail.  The parameters of the settlement -- the total

20    economic deal made by Northwestern -- who certainly knew the

21    plan better than anybody -- was well within the claim that the

22    QUIPSS were given in Class 9 as a result of the confirmation

23    hearing.  We were made a Class 9, unsecured Creditor with a

24    disputed claim, and once the claim was allowed or agreed to, we

25    were entitled to at least 63% of it.  So the amount is

1  certainly within the plan, there's no problem with the plan, in

2  giving the entire economic agreement -- which is an agreement

3  that was reached in the -- between the parties.

4       THE COURT:  Well, but Northwestern says that they

5  cannot dip into the claim 9 reserve in excess of the reserve

6  set aside from Adchem, despite the language I just read.  And

7  they said that there is no excess stock in Class 9 reserve to

8  pay over the 382 plus shares.

9       MS. STEINGART:  Well, Your Honor, I think that as we

10  point out in our brief, that --

11       THE COURT:  I wanted to tell you one thing about your

12  brief.  There's not going to be any cash paid.  That's not even

13  contemplated by the agreement.

14       MS. STEINGART:  No, and it --

15       THE COURT:  Your brief says, "Well, that's okay, if

16  it's not in the reserve, then they can pay it out of their $100

17  million cash."  That's not in the agreement.  That's not part

18  of the settlement.

19       MS. STEINGART:  Your Honor, I think that --

20       THE COURT:  If you -- you can't stand there and say

21  this is a good settlement, this is what the terms are, and then

22  come here in Court and say, "Oh, by the way, if you have --

23  want returns, just give us the cash."  That's not going to be

24  done.

25       MS. STEINGART:  Your Honor, that is not usually the

42

1   way in which Courts determine impossibility.  But I don't think

2   that we need --

3           THE COURT:  That's not a possibility.  We might well

4   get rid of that.

5           MS. STEINGART:  Right.  It's not impossibility and to

6   the extent that there's a binding agreement, and what the Court

7   said, Your Honor, in United Shipment is that the difference --

8   that Courts look at different things in determining whether an

9   agreement is formed and determining whether a Court should

10  approve an agreement.  And certainly here, all the elements of

11  whether an agreement was formed are present, because it's

12  executed and it says it's binding.  And there's an economic

13  deal in there.  And to the extent that the Debtor is capable of

14  delivering -- or the reorganized entity, because that's an

15  important distinction here, Your Honor.  To the extent that the

16  reorganized entity is capable of delivering the economic deal

17  consistent with the plan, there can be no impossibility.  And

18  yes, they can deliver the economic deal from Class 9.  Just

19  because they say they don't wanna -- they don't wanna give us

20  more than 63% of 25 million from Class 9 -- that's not

21  impossibility, Your Honor.  As the stipulation you read makes

22  clear and as the plan itself makes clear, we are entitled to a

23  Class 9 claim, and if we prevail we would get 63% of that

24  claim.  Not 63% of 25 million.  Indeed 63% of 50 million, and

25  upwards of 50 million.  The Debtor made a really good deal.

1   The Debtor capped our Class 9 claim at a number that was
2   something that would leave it additional resources for other
3   claimants.  Now the Debtor has other claims in Class 9 and the
4   Debtor will have to deal with them.  But that doesn't mean that
5   there isn't more than sufficient stock in Class 9 for the
6   Debtor to satisfy this economic deal.  That given the terms of
7   the agreement, and the fact that it's a binding agreement, that
8   they're required to satisfy the economic deal -- unless this
9   Court finds that somehow this agreement was procured by fraud.
10  That somehow this agreement was entered into in bad faith.  And
11  I just don't think that's on the table, Your Honor.  So here,
12  because the recovery to QUIPSSholders agreed to in the
13  settlement agreement is well within the parameters of what a
14  Class 9 claim is, the Class 7 Creditors have nothing to say.
15  They wanna file an objection -- they wanna say we're getting
16  paid too much, great.  They wanna file an objection and say
17  that when Northwestern or its representatives settled with us,
18  they should have settled at a different number, great.  We can
19  deal with that, because the number was cheap, our claims are
20  good, the adviser said there was a disparity in the assets --
21  we can get there.  But there's no -- there can be no dispute
22  that the economic terms of this settlement can be accomplished
23  well within the parameters of the plan.
24          THE COURT:  All right, I'm going to hear now from
25  Northwestern.

44

1          MS. STEINGART:    Excuse me.

2          MS. DENNISTON:    Thank you, Your Honor, Karol Denniston

3    on behalf of Northwestern.  Let's turn to the -- and I'd like

4    to follow up and respond to the Court's inquiries first.  Let's

5    turn to the issue of the disputed claim reserve.  As the Court

6    noted that the reserve was set conceptually by notice, the

7    Magten reserve or disputed QUIPSS reserve was set by

8    stipulation and Order.  There were no objections to the setting

9    of either the general disputed claims reserve, the Magten

10   stipulation, or the one we've referred to as the QUIPSS

11   litigation, or another substantial reserve which was set for

12   PPL, all of which we've highlighted in our papers.  But the

13   real gist, I think, of the inquiry here on what's going on with

14   the disputed claim reserve is that that reserve is designed to

15   address all of the Class 9 claims.  Only two of which have been

16   resolved at this point and deemed allowed and paid.  At this

17   point, the Debtor still has approximately 200 claims that are

18   subject to that.  Not only is Magten, Law Debenture and the

19   other QUIPSSholders in that reserve, PPL is in that reserve, as

20   are all of the objections that this Court has seen filed by the

21   Debtor on February 1st.  The settlement letter was very

22   specific in terms of how this deal could be structured.

23   Because at the point in time, knowing that we're looking down

24   the road at the claim objection process for all of the claims

25   except for the two that have been allowed, the Debtor wasn't in

1  a position to allocate that large a portion of the reserve by
2  way of settlement.  It's a timing question, Your Honor.  It's
3  certainly not a question as to whether the reserve is there,
4  whether the reserve is appropriate, or whether the reserve
5  should be utilized for this at some point in the future.  But
6  given the claim pool and the Debtor's need to administer that
7  reserve, get through the claim objection process, the Debtor
8  couldn't put the reserve on the table in the amount that Magten
9  would now suggest to this Court would be appropriate.  We
10  couldn't -- we weren't in a position as of the date the
11  settlement letter was entered into, to offer up more of the
12  claim reserve than had been allocated to Magten.  And I think
13  that as -- is a timing question, it's certainly not an adequacy
14  question, but that wasn't the settlement term that was
15  negotiated.

16          THE COURT:  Well, what was the $382,000 to come from
17  if it wasn't --

18          MS. DENNISTON:  Well, that's how we --

19          THE COURT:  -- out of the reserve?

20          MS. DENNISTON:  Your Honor, that's how we get into the
21  issue of why this settlement can't proceed.  There's a plan
22  provision -- it's Article 4, Section 4.8, {paren} (B) {close
23  paren}, {paren} (little I, or two little I,) {close paren}.
24  That plan provision basically said in connection with how we're
25  gonna treat the QUIPSS litigation holders and the QUIPSS

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

1  claimants.  That they could have one of two options but not
2  both.  The first option would be to take a distribution of
3  shares as set forth in the plan.  The second option would
4  become a Class 9 claim, and be subject to the QUIPSS litigation
5  reserve.  Where the settlement fails is because of the
6  objection.  Without the consent of the Class 7 holders, we
7  can't proceed because the plan provides either or.  In other
8  words, there is a mutual mistake at the time the settlement was
9  struck, as to whether or not those shares could be distributed.
10  And the real problem, Your Honor, is that to the extent that
11  there were shares left over from 8(b) for those QUIPSSholders
12  that didn't elect to take the distribution, those shares were
13  to be distributed to Class 7 and 9 on a pro rata sharing.  And
14  that is also an expressed provision in the plan.  So unless
15  those parties that were to receive the excess distribution from
16  the QUIPSSholders that didn't elect option #1, are willing to
17  consent to this settlement, it can't proceed under the terms
18  that that it was negotiated.  Now I think all of the parties at
19  the time of the settlement, as Magten's Counsel has indicated,
20  had a good faith belief that not only the settlement was
21  reasonable but it could be implemented.  The objections that
22  have been brought forth have grown in magnitude.  It's clear
23  that not only is the amount of the settlement under attack, the
24  very structure of the settlement is under attack, because the
25  Class 7 holders are not going to consent to the proposed

47

1   structure of the settlement, i.e.  the distribution of the

2   excess that would have gone to 8(a) option 1 had everyone

3   accepted the plan, that now under the terms of the plan has to

4   be distributed to Class 7 and Class 9 on a pro rata sharing

5   basis.  Those are our material terms of the plan.  They hit on

6   the distribution, of which the holders are entitled to.

7   Without their consent, we can't approve the settlement over

8   their objection.  And their objection has been vociferous, if

9   anything.  I think that we should also focus on the fact that

10  the amendment of the by-laws is really a red herring here.

11  This doesn't change any of the parties' rights in connection

12  with the settlement process.  I mean, what we have going on

13  here is the 9019 process working the way it's supposed to work,

14  that the Debtor presents a proposed settlement, that that

15  settlement is considered, that the Creditors have an

16  opportunity to object, and that the cases -- and I'm happy to

17  go through the cases and --

18          THE COURT:  No, I've read them -- I've read most of

19  them.

20          MS. DENNISTON:  -- I think the Court has a sense that

21  a Debtor proceeding in good faith when the facts change or you

22  have serious Creditor objection has to be candid with the Court

23  about whether or not a settlement can be approved over the

24  objecting Creditors' position.  And that's what we have here.

25  We have a good faith settlement, we have terms that are clear.

1  Unfortunately, the terms cannot be enforced without the consent

2  of Class 7 and we don't have that consent, Your Honor.

3            THE COURT:  All right.

4            MR. SNELLINGS:  Your Honor, John Snellings for Law

5  Debenture.  May I be heard?

6            THE COURT:  You bet.

7            MR. SNELLINGS:  Thank you, Your Honor.  We joined

8  Magten in their arguments that they made today and in the

9  papers and I'll try not to repeat that.  I wanna respond

10  quickly to some issues regarding this disputed plan reserve,

11  and as well as discuss something that I don't believe comes out

12  in anyone's papers.  With regard to the disputed plan reserve,

13  that was subject to a lot of discussion and -- both outside the

14  Court as well as in the Court as to how that reserve was gonna

15  work.  And in the discussion with Judge Cates, there was a

16  fairly clear understanding that this reserve was gonna be a

17  setup, not the reserve for specifically for Law Debenture but

18  the general claim reserve, and that there was a sense in which

19  it was gonna be an amount that could be eaten up by

20  settlements.  That there was gonna be a race of settlements to

21  be satisfied by that reserve.  That the Debtor was gonna do a

22  good faith effort in trying to reserve that amount.  So when we

23  entered the negotiations with regard to a specific amount with

24  regard to the litigation reserve and it was pegged at 25

25  million, we were concerned that one, we might have a claim

1  that's greater than 25 million, and that there wouldn't be

2  sufficient amount of money there.  And so there was two

3  portions and you pointed to both of 'em in this stipulation

4  that was key to our entry into this stipulation.  One was that

5  the 25 million was not a cap and two -- actually, let's make it

6  three.  Two, that no other claim resolution could invade that

7  25 million, that that was identified and segregated purely for

8  our litigation.  And three, that if we had a claim greater than

9  25 million once the litigation was done or settled that the

10  rest of the reserve would be available to us if it was there.

11  It's there, it should be made available to us.

12      THE COURT:  They say it's not there.

13      MR. SNELLINGS:  I -- no, I don't think --

14      THE COURT:  I mean, that's --

15      MR. SNELLINGS:  -- they're saying that.  I think

16  they're saying it's a matter of timing, not an impossibility.

17  I think that, I mean, the amount of reserve -- they've only

18  settled two claims.  I think they're saying that it is there.

19  Now they have other claims that they have to deal with, just

20  like they have to deal with ours.  And -- but the stipulation

21  that they entered, and this Court approved and there were no

22  objections, was the fact that if we come up with a settlement

23  that is greater than 25 million that that reserve would be made

24  available to that.  And that's all that, you know, we're asking

25  for today.  The structure of the settlements you have before

1 you suggested -- again, and this is something that came out of

2 those negotiations that that initial 382,000 would come out of

3 that Class 8 amount.  If that's, you know -- cannot be done

4 because it objects to the plan, there is no reason why we

5 cannot still enjoy the economic benefit of this settlement by

6 getting the same stock of equivalent value out of Class 9.

7 It's there, it's in the reserve.  And the timing issue was

8 something that had been discussed before Judge Cates and out in

9 the hall and just because we stand here before you trying to

10 settle and resolve 10 different pieces of litigation for the

11 benefit of the Estate, and the Estate says it's in the best

12 interest of the Estate, we should be able to look to that

13 reserve to get the benefit of this bargain.  My second point,

14 Your Honor, is one that the Indentured Trustee asked me to make

15 sure that its perspective with regard to the settlement as

16 presented to you.  And when you read the papers -- one, you

17 know, from the distance of just reading the papers, you might

18 think that this is just an argument between two investment

19 firms trying to figure out who's gonna get the last stock in

20 this company.  Is it gonna be Magten, or is it gonna be

21 Harvard.  But I assure you that -- and the Indentured Trustee

22 does not want the Court to forget that there are hundreds of

23 individuals who own these QUIPSS.  And whether they chose

24 choice 1 -- option 1, or option 2, they still have a dog in

25 this fight.  And they -- this settlement is very important to

1    them as well.  With regard to the option 2 holders -- those who

2    chose the litigation or were deemed to have chosen litigation,

3    it's quite clear.  They took the litigation option, they have a

4    Class 9 claim, and this settlement addresses what we feel is a

5    fair and just settlement.  The option 1 holders also have a

6    stake here.  And the question might be, why.  They voted for

7    the plan, it was a specific amount of warrants and stock that

8    had been distributed.  However, they have not seen any of that

9    yet.  They have not seen one dime, not one stock, not one

10   warrant.  And that is because of -- we have not been able to

11   make such a distribution.  Because part of what is being

12   settled here is the objection to the Trustee's fees.  Now under

13   the plan, it was explicitly stated that the Indentured Trustees

14   -- whether you're the indentured to the QUIPSS or the Toppers

15   or the Senior notes -- would be paid by the Debtor in cash on

16   the effective date.  Wilmington Trust and Harvard got their

17   millions of dollars.  HSBC got their hundreds of thousands of

18   dollars -- without Court review and with minimal, if any, real

19   review by the Debtor.  The only objection to the fees of any

20   Indentured Trustee was lodged against Law Debenture.  Now at

21   the time in which -- at the time of confirmation, when we were

22   discussing our fees and the payment of those with the Debtor,

23   we were told that we would not be nickeled and dimed.  We have

24   not seen a nickel or a dime yet.  And because of that we have

25   had to exercise our charging lien against any distribution.

1  And that's where the impact against the option 1 holders plays

2  out in this settlement.  The option 1 holders have not been

3  able to get a distribution.  The primary reason is that we're

4  four months after the effective date, and the Debtor has yet to

5  be able to identify who voted for option 1.  We don't know who

6  they are out there.  So mechanically we have been unable to

7  make any distribution.  But also, we have been unable to make a

8  full distribution even if we could get over the mechanics,

9  because our charging lien is there for our fees, pursuant to

10  our indenture and also pursuant to our plan.  Our charging lien

11  will dilute the recovery of those option 1 takers by 50%.  What

12  went on in this settlement -- and this is what is important.

13  I'm not the type of person who wants -- I'm not complaining

14  about not getting paid.  My partners complain to me about not

15  getting paid.  I'm here looking out for those people who

16  thought that they had made a deal to get a certain amount of

17  warrants in stock that happened.  And they also thought that

18  the Debtor was going to pay us in cash on the effective date so

19  that we could make that distribution.

20        THE COURT:  Well, let me get something clear about

21  your statements here.  You say that the option one stock or

22  potential stockholder would be diluted by 50%, that is if you

23  have to pay the fee out of their share?

24        MR. SNELLINGS:  Yes, yes.

25        THE COURT:  But if the fee was paid by Northwestern --

1        MR. SNELLINGS:  -- but if --

2        THE COURT:  -- then they get full payment.

3        MR. SNELLINGS: That's correct.  Just like the senior

4 Noteholders did in most of the topics.  And this is why the

5 settlement is important.  Again, the litigation was ongoing.

6 The Debtor in Magten were toe to toe.  There was a signal that

7 a settlement might be possible.  Now, as an Indenture Trustee,

8 we have been playing some shuttle diplomacy between the parties

9 trying to bring them to settlement.  One of the tripping

10 stones, one of the stumbling blocks has been the payment of our

11 fees in cash pursuant to the Plan, and that was always on the

12 table.  And what has occurred during those discussions was, to

13 accommodate the alleged cash needs of the Debtor and to try to

14 move this to settlement, was that Law Debenture agreed to take

15 its fees in part of the stock distribution from the settlement

16 agreement and this would have a very positive effect on the

17 option one takers because then it would severely reduce the

18 effect and dilution of their shares because it would be shared

19 pro rata among all QUIPSS.  So, consequently, by giving this

20 and accommodating the Debtor, we have tried to bring more than

21 just that piece of litigation to closure, but also, to fulfill

22 out obligations to the option ones to get the best possible

23 deal that they could possibly get without any dilution from the

24 charging lien or at least a minimal dilution.  In that

25 perspective, the Indenture Trustee felt that this was a very

Case 1:04-cv-01389-JJF   Document 89-28   Filed 09/08/2008   Page 43 of 53

1  fair settlement done in the best interest of QUIPSS, done in

2  the best interest of the Debtor and willing to give up its

3  claim for payment in cash of its fees. And it is in that

4  light, that we were willing to move forward with this

5  settlement. We still believe that it's in the best interest of

6  our QUIPSSholders. There are many QUIPSSholders out there,

7  Your Honor, who bought these instruments at par value. They

8  were farmers, we have heard from them and people in Montana,

9  some of them could be your neighbors who --

10        THE COURT:  I hope not.

11        MR. SNELLINGS:  -- yeah -- who do not believe that --

12  who believe that they had invested in a utility company that

13  had substantial capitalization that was swept up and stolen

14  from them by Northwestern. Now, they would like to see 100

15  cents on the dollar. And, but we believe, the Indenture

16  Trustee believes that this a fair settlement and should be

17  approved and the Debtor should be ordered to implement. Thank

18  you.

19        THE COURT:  Thank you. We'd better hear from some of

20  the Class 7 Creditors or someone else that -

21        MR. KORNBERG:  Your Honor, good morning, Alan Kornberg

22  of Paul Weiss Rifkind Wharton & Garrison. We are counsel to

23  the Plan Committee. Your Honor, before I address a number of

24  issues that I had on my mind, let me address Your Honor's

25  question. I think where we are today, a fair reading of the

1    reply papers filed by the Movants, and I think a fair reading
2    of the argument today is that the settlement agreement as
3    described in the letter violates the consummated plan.   And
4    again, it directly violates it because as written, it says that
5    Magten and the QUIPSSholders can get option one and option two.
6    That violates the Plan because, and this was an issue, Your
7    Honor, that was litigated quite heavily at confirmation.   The
8    issue was, can you force the QUIPSSholders to make a choice
9    between option one and option two.   The counsel on my left
10   said, "No, you can't force the choice."   Judge Case ruled
11   otherwise, the Plan was confirmed.   It says, "choose option one
12   or option two and if you choose option two, the stock reserve
13   for you under option one goes, not just to Class 7, but also to
14   Class 9 Claimants."   Your Honor, starting this morning by
15   saying, "Well, could we give," and I think the Movants said,
16   "Well you can give us the economic effect.   Give us all of the
17   stock that's in the Class 9 reserve, we're treated as Class 9
18   Creditors."   I think Your Honor is quite right that they're not
19   limited to the $25 million claim, there's other stock in that
20   reserve.   Well, Your Honor, that is a different settlement.   To
21   say, "Okay, we can't give you the stock that was allocated in
22   option one because that has to go to Creditors in Class 7 and
23   Class 9, instead we'll give you all of, or nearly all of the
24   Class 9 reserve."   Your Honor, I don't think we can proceed on
25   that basis.   First of all, there is a major due process issue

1  and that is, you have many other Creditors asserting claims

2  against that Class 9 reserve.  You have PPL with a $70 million

3  claim.  You have $45 million of other claims.  You have the

4  holders of non-qualified Benefit Pension Plan claims.  You have

5  Mr. Lewis, you have Mr. Hillan.  The intent here was to

6  dissipate the Class 9 reserve for the QUIPSS, I think they need

7  to be told that and that's not what they were told by this

8  motion.  This motion said there's gonna be a settlement and the

9  settlement is, "We're gonna give them the stock reserve in

10  option one, we're gonna give them the stock reserve for them in

11  option two and we're going to throw in another $300,000 of

12  stock for good measure."  That's not what was disclosed to

13  these other Creditors who are looking to Class 9 for their

14  recoveries.  It can't be dissipated totally for the benefit of

15  the Quipsholders, certainly not on these motion papers which

16  have not given notice to anybody of that settlement.  And in

17  fact, Your Honor, that really is an alternative settlement.

18  Maybe it will come before the Court someday.  I certainly --

19          THE COURT:  Well, let me ask you this --

20          MR. KORNBERG:  -- hope not.

21          THE COURT:  -- it brings up an interesting point.

22  You're comment, well we've got PPL out there with 70 million.

23  You've got another claimant out there for 12, 15, 38.  And what

24  if they come in and try to settle now over and above that

25  reserve?

57

```
1          MR. KORNBERG:  Your Honor, that's --
2          THE COURT:   When we ever get any settlement?
3          MR. KORNBERG:  Your Honor, that's exactly my point.  I
4   think that they, of course, were limited by the totality of the
5   reserves --
6          THE COURT:  What is it?
7          MR. KORNBERG:  -- and --
8          THE COURT:  What is it?
9          MR. KORNBERG:  $140 million, of which $25 million was
10  allocated for -- the QUIPSSholders with the opportunity to
11  spillover.  Your Honor, let me just take a step back.  The Plan
12  Committee, and we have said this repeatedly.  We will say this
13  everyday.  We encourage a settlement, but it can't be a
14  settlement that violates the Plan or that violates other
15  parties' right.  So, if you were to take -- we have this $140
16  million -- it was calculated $140 million worth of claim
17  reserve, if you were to not only give the 25 million allocated
18  to the QUIPSSholders, but the rest of their recovery out of
19  that Class 9 reserve, I think you have to give the other
20  claimholders that are looking to that reserve, an opportunity
21  to come in and be heard.  And this settlement motion did not do
22  that.  They said very clearly the additional 382,000 shares was
23  coming from option one which wouldn't frankly have affected
24  those other Creditors, at least not directly.  Your Honor, at
25  the end of the day, the reserves were set, they were the best
```

1   estimate possible to deal with the claims that are out there,

2   and we believe, when the Plan Committee meets with the Debtor

3   regularly, they are making process in resolving those claims.

4   And there will be settlements, I predict in this case, but

5   they're gonna have to be satisfied out of that Class 9 reserve.

6   Let me address a few --

7          THE COURT:  Well, what about that counsel just raised

8   for Law Indenture, that the option one people who voted for the

9   Plan overwhelmingly, have been now held hostage?

10         MR. KORNBERG:  Your Honor --

11         THE COURT:  They can't get their stock?  They can't

12  get their royalties and all you're doing is holding them up.

13         MR. KORNBERG:  Your Honor, it's not the Plan Committee

14  that's holding --

15         THE COURT:  Well, somebody is.

16         MR. KORNBERG:  Well, it's a dispute of their fees.

17  They have --

18         THE COURT:  Well, but --

19         MR. KORNBERG:  Excuse - Your Honor, they have very

20  substantial fees here.  If they're willing to let Your Honor

21  rule on the reasonableness of their fees and be bound by that,

22  there's no reason why the distributions couldn't be made.  It

23  doesn't seem -- I think it's regrettable that the QUIPSSholders

24  haven't gotten their distributions.  But the issue is not the

25  Debtor's reluctance.  It is a dispute over the reasonableness

1   of this Indenture Trustee's fees.  And there should be a

2   mechanism to resolve that, Your Honor.

3          THE COURT:  How about the issue that you raised that

4   you can't even identify among those option one holders, who

5   they are?

6          MR. KORNBERG:  Your Honor, I've never heard of that

7   issue before.  That's surprising to me because on the ballots

8   that were submitted, people did have to elect option one or

9   option two.  To the extent there may be back off those issues

10  there, I really cannot comment on them.  I certainly -- we take

11  no pleasure in knowing that option one QUIPSSholders have not

12  gotten their distributions.  And Our Honor, I don't really see

13  how the settlement before Court today, frankly will resolve

14  that issue.

15         THE COURT:  I won't.

16     (Laughter)

17         MR. KORNBERG:  Your Honor, I want to address a couple

18  of other issues that are not stressed in our papers, but I

19  think they're -- they're quite important.

20         THE COURT:  Well, let me ask you this.  What does the

21  Plan Committee want to do?

22         MR. KORNBERG:  Your Honor, as I said in --

23         THE COURT:  You want to keep litigating?

24         MR. KORNBERG:  Not at all.  Your Honor, I said in a

25  rather heated --

60

1    THE COURT:  Well what is a rational answer here?

2    MR. KORNBERG:  We do want to have a settlement and the

3    question is at what price?  What is a reasonable settlement?

4    If -- let's turn to merits for a minute, Your Honor.

5    THE COURT:  Well, I've got another suggestion, but I

6    don't think anybody'll take it.

7    MR. KORNBERG:  Well, we're all ears, Your Honor.

8    THE COURT:  There is a couple of hundred thousand

9    dollars of stock in this Plan or someplace for the officers or

10   directors and something and why don't they just contribute it

11   and everybody could just settle on that amount.

12   MR. KORNBERG:  I'll let the Debtor comment on that,

13   Your Honor.  Let's talk about the issues that --

14   THE COURT:  You mean we're talking -- 200, I think

15   it's 212,000 or is it 382.  It seems to be that'll be a good

16   compromise.  Silence has now arisen.

17   (Laughter)

18   MR. KORNBERG:  I don't think anyone represents --

19   THE COURT:  I know it's not your position either to

20   make that commitment then, I just --

21   MR. KORNBERG:  It doesn't --

22   THE COURT:  -- I just threw out.

23   MR. KORNBERG:  It doesn't effect my clients, Your

24   Honor, quite frankly.

25   THE COURT:  It affects somebody.

1    MR. KORNBERG:  Let's talk about the issues that would

2  get resolved here because I think you can't avoid a discussion

3  - everybody can sign on to the desirability of let's end

4  litigation.  Let's end the litigation expense.  Let's get the

5  distributions out.  I think we can all support that.  But what

6  are we paying for here?  There's the QUIPSSholders, Magten's

7  appeal of confirmation.  Your Honor, I'm sure you had an

8  opportunity to review Judge Case's --

9    THE COURT:  I read it three or four times.

10    MR. KORNBERG:  -- recent decision below.  He denied a

11  stay to Magten.  He found that they did not have a reasonable

12  likelihood of success on appeal and so did District Judge

13  Jordan.  If you look at Exhibits L and M to our objections,

14  Judge Jordan specifically found that Magten did not have a

15  reasonable likelihood of success on the merits of its appeal.

16  So, from the Plan Committee's perspective, we don't value the

17  appeal as very valuable, and Your Honor, particularly because

18  this Plan has been substantially consummated, I think there's

19  little question that the appeal will be moot.  So, the appeal

20  is not --

21    THE COURT:  Well, I can tell you --

22    MR. KORNBERG:  -- a valuable plan.

23    THE COURT:  -- though counsel, it's had an impact upon

24  the effective resolution of that underlying litigation of

25  Magten vs. Northwest because it forced me to set aside the

62

1  trial date that I had set, so this thing would have been over

2  with.

3          MR. KORNBERG:  Well, Your Honor, the trial date I

4  think was actually a Northwestern's Adversary --

5          THE COURT:  No, I had both of them set for trial, both

6  cases.

7          MR. KORNBERG:  Oh, it was my understanding that it was

8  stayed -- the other one was stayed because --

9          THE COURT:  Well, I had to vacate the other one

10  because they raised the issue that the same issues were on

11  appeal and therefore I had no jurisdiction.

12          MR. KORNBERG:  Right, but the --

13          THE COURT:  But so the appeal did have -- did have an

14  effect upon getting a resolution of the adversary proceedings.

15          MR. KORNBERG:  Well, we could always engage in

16  settlement discussions on the underlying claim, Your Honor.  I

17  think you would agree that's not stayed.  The next issue that

18  they would resolve is the appeal of the Memorandum of

19  Understanding that resolved the securities fraud actions.

20  That's one of the items listed in the exhibit to Mr. Kaplan's

21  affidavit, which lists the things that are being settled.

22  Well, Your Honor, that was actually ruled upon by Judge Case.

23  He issued a written decision, that's Exhibit-E to our

24  objection, and he held that Magten's argument was without

25  substantial analysis.  I don't think that that's - that's a

63

1  quote from page 4 and 5 of his decision.  I don't think we
2  should pay a lot for that.  Then there's the appeal of the
3  Court's refusal to disqualify Paul Hastings.  There, also Judge
4  Case found that Magten's position was, and it's Exhibit-G to
5  our objection, he said that there -- they had a "novel theory
6  that does not withstand scrutiny."  And then he denied their
7  Motion for Reconsideration and he found that their position was
8  without merit, Exhibit-H to our objection.  Your Honor, that
9  issue has largely become moot.  This bankruptcy case is pretty
10  much over.  Why should the Estate and Creditors, in particular,
11  pay to resolve that appeal to disqualify Paul Hastings?  Let's
12  turn to the -- the Gully-Platt transaction adversary proceeding
13  which is the matter Your Honor just referred to that would be
14  tried at the end of the day if we don't reach a settlement.
15      First of all, Your Honor, let me voice my strong objection
16  to including in Magten's papers, or Movant's papers, a
17  privileged and confidential memorandum that our firm prepared
18  for the Official Creditor's Committee analyzing that claim
19  which is a legal memo, obviously a legal memo marked privileged
20  and confidential, was subject to confidentiality restraints
21  when Magten was on the Committee in which they attached their
22  motion papers and I strongly object to it.  Although,
23  ironically, the subject, the content doesn't help them one bit.
24  But that -- the Complaint in the adversary proceeding, let's
25  remember where we are.  The Debtor, with the Committee's

1   joinder was almost entirely successful in dismissing the

2   Complaint and I know Your Honor is familiar with Judge Case's

3   very thoughtful decision.  He kept alive one claim and that was

4   that he said they would have standing if they could prove that

5   a particular release was obtained through fraud or actual fraud

6   or as part of a fraudulent scheme.  Now, at confirmation,

7   here's how Judge Case thought about that and this is a direct

8   quote from his ruling at confirmation.  {Quote} "I largely

9   accepted the Debtor's Defendant's arguments with regard to the

10  lack of standing by Magten to bring the action, except if

11  Magten can show that there was actual fraud that occurred in

12  the context of the transaction itself."  That's his, the

13  transcript of his decision as page 26.  On the next page, he

14  went on to say, and this is a direct quote, "As noted, Magten

15  narrowly survived a motion to dismiss with a high burden placed

16  on the Plaintiff even to stay in the game at this point."  So,

17  he gave them the opportunity to plead actual fraud.  They've

18  never done that, Your Honor.  In the middle of a confirmation

19  trial on October 4, 2004, and Judge Case rendered his decision,

20  I believe on October 6th, two days later, they filed -- I'm

21  sorry.  There were four days to go, it's October 8.  They filed

22  an Amended Complaint and what did they do?  They inserted,

23  inserted an entirely new claim that the going flat, so called,

24  going flat transaction violated PUCCA.  That came out of the

25  blue, was not what was contemplated by Judge Case's ruling and