65

1  there are a lot of problems with that -- with that claim, Your

2  Honor.  I don't think we'll actually ever get to a trial, even

3  if we don't settle, because first it's time barred as a matter

4  of bankruptcy law.  That claim, this new PUCCA claim was

5  asserted nine months after the bar date in this case which was

6  January 15, 2004, and I hope you won't question me extensively

7  on this because I have to crib this from our PUCCA expert.  He

8  tells us that the claim is time barred as a matter of PUCCA law

9  because the PUCCA Statute of Limitations requires that you file

10 the claim a year after the event and the event here was the

11 PUCCA exemption application that the Debtor filed in February

12 2002.  So, the Statute of Limitations would have expired in

13 February '03 and of course, they did nothing to assert this

14 claim until October 2004.  So, Your Honor, should that claim be

15 settled?  Yes, but we don't think that we should pay, the

16 Creditors should pay a lot for it.  Let me turn to other

17 matters that get settled.  An action against Mike Hanson and

18 other officers of Clark Fork and Blackfoot.  Your Honor, I

19 don't think those claims have any value, but can somebody tell

20 me why the Creditors of Northwestern should pay for liabilities

21 alleged against officers of a non-Debtor company?  Why should

22 Northwestern's Creditors pick up the tab to settle a claim

23 against a non-Debtor affiliate's officers?  We shouldn't pay

24 one red cent for that.  Then there's Magten's action against

25 Paul Hastings for aiding and abetting the going flat

66

1   transaction, again, a liability of a non-Debtor party.  Why
2   should Northwestern's Creditors pay to settle a claim against
3   Paul Hastings?  And by the way, I think that claim has
4   absolutely no merit.  But the reasonableness of this settlement
5   cannot be built on settling a claim against non-Debtor parties.
6   Then there's Magten's objection to Paul Hasting's final fee
7   application.  Well, Your Honor, the merits of this settlement
8   should not be tied to allowance or disallowance of Paul
9   Hasting's fees for the hard work in this Chapter 11 case.  The
10  Court will rule on Paul Hastings is entitled to.  Creditors
11  should not be giving up value to resolve a fee application.
12  So, this is a very unusual settlement hearing because --here's
13  on a number of respects: number one, many -- the case law also
14  says Your Honor doesn't need to canvass the issues.  You don't
15  have to; Judge Case ruled on virtually all of them.  And time
16  and time again, he said that the Magten claims were
17  unsubstantiated, they were not supported by the case law and
18  that they were not sustainable.  So, you have that record.  So,
19  what we have in the balance is their appeal from confirmation,
20  and Your Honor, I maintain that that appeal will be found to be
21  moot because this Plan has been substantially consummated.
22          THE COURT:  What's the status of it?
23          MR. KORNBERG:  Your Honor, the distributions, the --
24          THE COURT:  No, I know.  No, what is status before the
25  District Court?

1    MR. KORNBERG:  The Debtor has not yet filed that
2  motion.  Mr. --

3    MR. AUSTIN:  I can speak to that quickly, Your Honor.
4  The Debtor, assuming the settlement is not ordered to be
5  implemented today, we will be filing the Motion to Dismiss the
6  appeal no later than Friday of this week.  It had not yet been
7  filed because we were engaged in these resolutions, but we are
8  gonna be moving to dismiss both the appeal of confirmation
9  order and the appeal of the order on the Memorandum of
10  Understanding.

11    MR. KORNBERG:  So, Your Honor, we don't think the
12  appeal is entitled to an enormous economic settlement, and then
13  you have the going flat transaction adversary proceeding and as
14  I said a moment ago, there are serious, serious issues with
15  those claims which we believe are time barred.  But I want to
16  go back to some of the points addressed by the Movants early
17  on.  They basically say you shouldn't listen to what the Plan
18  Committee has to say.  Well, Your Honor, that is preposterous.
19  The Plan Committee was established by Section 7.9 of the Plan,
20  {quote} "for the purpose of overseeing the remaining claims
21  reconciliation and settlement process."  I don't know how we
22  have a more direct role and/or louder voice in this case.  Let
23  me also say that contrary to the allegations made in the
24  Movant's paper, the Plan Committee was actually not involved in
25  the negotiations of the settlement and did not acquiesce in it

68

1   and indeed, there's no great mystery as to why the bylaws were

2   amended.  We amended them so we wouldn't have this situation

3   again. We said to Northwestern, "You've got to come to us

4   sooner rather than later because there were obvious problems in

5   the settlement."  Your Honor, I maintain that you should listen

6   to us more carefully than anybody else in this Courtroom today.

7   First of all, there is major issue as to whether Magten has

8   standing to bring a 9019 Motion.  And Your Honor, I'm

9   respectful of the Court's order.

10          THE COURT:  Well, I invited it.

11          MR. KORNBERG:  I know you did.

12          THE COURT:  Look, I'm in a position where on February

13  the 7th or 8th, I was told this matter would be settled and

14  there was gonna a 9019 filing.  I get some extraneous letters

15  that are not in the file, they weren't even filed in the case

16  saying that something's blowing up on the deal.  I said well

17  file an order to get the 9019 in there and we'll find out what

18  the situation is.  And so I'm not gonna listen to any argument

19  about whether they got standing.  I created the standing to get

20  it before the Court and I'll take that responsibility and if it

21  was a mistake, it's the first one I've made.

22          MR. KORNBERG:  Well, Your Honor, I think -- and I'm

23  very respectful of that and I think that we needed a catalyst

24  to get these issues before the Court today.  I mean be briefed

25  that issue, I'll let it lie there.  But I think -- let me get

1  to the substance of why I don't think what they have to say

2  should carry the day.  In the cases where someone other than

3  the Debtor has brought a 9019 Motion, Your Honor, it's been

4  where they were -- there were special circumstances.  And the

5  special circumstances were, one, that they pursue interests

6  common to all Creditors.  And no matter how you re-cut this

7  settlement, they are not pursuing the interests of all

8  Creditors because if they get the settlement as written,

9  they're taking away stuff that belongs to Class 7 and Class 9

10  Claimants under the Plan or if it's re-written, to give them

11  the entire or most of the claims reserve, they're pursuing

12  interests that are adverse frankly to other Class 9 Creditors.

13  And the second special circumstance is that Magten's interest

14  would have to be consistent with maximizing the Estate for the

15  benefit of all Creditors and that also is not the case.  Our

16  view, again, we would like to see a settlement, but we think

17  that this deal is a windfall.  And Your Honor, you have to

18  remember that they came into this case as out of the money

19  subordinated debtholders.  If you go back to Judge Case's

20  decision, he specifically found after a contested confirmation

21  hearing where he had three experts testify as to valuation of

22  the company, that the QUIPSSholders were out of the money.  He

23  ruled it was a gift plan.  We don't have a problem giving them

24  settlement that's reasonable, that that gift should not turn

25  into a windfall.  Your Honor, I also think that –

70

1          THE COURT:  Well, they were -- they were still

2    included in the Plan.

3          MR. KORNBERG:  It was a gift, Your Honor, and we said,

4    "You can take option one, which you're not entitled to on

5    evaluation basis, or if you wanna roll the dice and litigate,

6    you go into Class 9."  And that was the deal that was struck

7    and we did not have an absolute priority plan.  But my point

8    is, that in terms of Creditor entitlements, I don't think

9    they're the ones that should be heard as loudly and clearly as

10   Class 7 and Class 9 allowed claims, whose rights would be

11   violated here.

12          Let me also say that the Debtor, we all acknowledge, is in

13   somewhat of an awkward position.  They did participate in these

14   negotiations.  They did cut this deal.  And for all their hard

15   work and effort, what they got was everybody yelling and

16   screaming at them, including many Creditors.  Your Honor,

17   frankly, the people you should listen to are those represented

18   by the Plan Committee, because we -- our constituents are the

19   ones with the economic stake.  The Debtor isn't proposing to

20   pay Magten from other resources, they're planning to settle

21   using stock that was issued under the plan and reserved for

22   Class 7 and Class 9.  So, we are the ones that are really

23   funding this settlement.  And we're the ones whose views, I

24   think, need to be considered most importantly.

25          Second, as I said a moment ago, I think that the Movants

1  have put the Debtor in a very, very difficult position when it

2  comes to making a decision.  And that's why we of course have

3  to rely on Your Honor because amongst the lawsuits that are

4  being settled are objections to Paul Hastings' fees, an appeal

5  of an order where the Bankruptcy Court refused to disqualify

6  Paul Hastings, actions against Mike Hanson and other officers

7  and directors, an action against Paul Hastings for aiding and

8  abetting a fraudulent transfer or a breach of fiduciary duty.

9  I understand that the parties want to see those issues go away.

10  I wanna see those issues go away.  But I think that Your Honor

11  really has to pay attention to what the Creditors are saying,

12  because they're the ones that are being called upon to fund

13  this settlement out of distributions that would otherwise go to

14  them.  And again, if there was another settlement that said,

15  "We're gonna whack up the Class 9 reserve in some other way," I

16  would suggest that you have to give notice to all the affected

17  parties of that settlement.  What they got for today's hearing

18  was, "We're giving option one and option two, and $300,000

19  worth of stock."  That, they may be very differently than, "Oh,

20  by the way, we're dedicating most of the Class 9 reserve to the

21  QUIPS holders."

22          THE COURT:  Thank you.

23          MR. KORNBERG:  Thank you very much, Your Honor.

24          MR. MAYER:  Thank you, Your Honor.  My name is Tom

25  Mayer and I'm a partner, Kramer Levin, and I represent the ad

72

1  hoc committee of Class 7 claimants.  That's eight institutions

2  that collectively hold over 50% of the Class 7 claims.  As our

3  2019 filing shows, we also hold about 35% of the stock of this

4  company on a reorganized basis.  And so, if I may echo Mr.

5  Kornberg for a moment, it is our money that's being played with

6  on both sides of the equation, both in terms of the money

7  that's being taken out of the Class 7 -- stock that's being

8  taken out of the Class 7 holders claims, and any value that

9  would come out of the company or benefit to the company on the

10  other side we are conscious of as shareholders.  I won't repeat

11  the arguments that have been made, I wanna play a little

12  cleanup and I wanna end with our proposition on the merits.

13  Because I have not been here before -- before Your Honor, we

14  have been following the case, and we are puzzled.

15     First, one small point.  The settlement that was cut not

16  only involved taking stock out of the hands of the Class 7

17  Creditors who would get it out of option one, it also involved

18  the distribution of warrants that was supposed to go to option

19  one Creditors.  And under the terms of the plan, those warrants

20  are to be canceled and there's no way to reconstruct the

21  settlement out of stock in Class 9 that gives affect to the

22  cancellation of those warrants.  I think mutual mistake is a

23  good way of putting it.  Second, we wanna stress that it was

24  the Creditors' pockets that were being used to pay for this

25  settlement, and the plan does provide for a substantial role

1  for the Plan Committee and indeed for Creditors generally.

2      If you take a look at Section 4.8(b), it provides that no

3  distribution of any kind goes to Magten and the other

4  dissenting QUIPS holders until there is a final, non-appealable

5  order with respect to their claims unless the Debtor and the

6  Committee consent.  So this was clearly a proceeding where

7  people were supposed to come in and have their say as to

8  whether or not this makes sense.  Now I wanna cut to whether or

9  not it makes sense.  And I'm conscious of Your Honor's

10 preliminary remarks here.  But, I think a party that wants a

11 settlement approved -- other than the party who's benefitting -

12 - the party who's making the payment, the party who's paying

13 for the cost of the settlement -- you have to hear from that

14 party as to why it makes sense.

15     Well, Your Honor, put yourself in my clients' positions.

16 We're 50-plus percent of Class 7.  We go through the whole

17 case, and we hear that Magten's claims -- they lose before the

18 Bankruptcy Court confirmation -- all of those proceedings are

19 set forth in the papers.  I won't repeat them here.  And then

20 all of a sudden we're told they're gonna be settled out at 75%

21 of the $50 million face amount of claims that Magten holds.

22 Well, there's nothing in the record before, Your Honor, to

23 justify that 75%.  You've heard from Magten say it's a great

24 deal.  Of course they think it's a great deal.  But you haven't

25 heard from anyone else.  Yes, you've heard the Debtor say that

74

1  at the time they cut the deal, they in good faith believed it
2  made sense.  Frankly, Your Honor, we believe one, there was a
3  mutual mistake.  They were cutting it with stock and warrants
4  that they didn't have.  And two, they were solving their
5  problems with other people's money.  I won't belabor the point,
6  but it is true that there are officers, directors, and counsel
7  whose problems go away and we end up footing the bill.  And we
8  don't understand why 75% of the face amount -- value equaled
9  75% of the face amount of Magten's claims -- why that's a good
10 settlement.  And frankly, Your Honor, in today and in the
11 papers, I don't think the Court has anything to show why it's a
12 good deal.
13      And at the end of the day, somebody who's responsible for
14 paying that 75% -- they have to stand up and they say, "Yes, we
15 think this is a good deal."  And you haven't heard that from
16 anyone today.  All you've heard is that the Debtor signed a
17 Settlement Agreement because it thought it was dealing with
18 stock and warrants it didn't have to deal with.  With respect
19 to Class 9, as we do the math, it simply isn't enough stock.
20 If you take the stock that's reserved for PP&L, which can't be
21 invaded any more than the Magten 25 million couldn't be invaded
22 by third parties -- you put that aside, I believe Cornerstone
23 may be in Court today -- and you take the stock that was
24 allocated to them.  You do all the math, turns out there just
25 isn't enough stock in Class 9.

75

1    But in any event, our basic objection -- and the reason
2  that we're here is that it's 75%.  Well, Your Honor, I do a
3  little litigating from time to time.  It's not my native forum.
4  I mostly do deals.  But when a client comes to me and says,
5  "What do you think the chances of success are?"  My own rule of
6  thumb is that there's no litigation that's got an 80% chance of
7  victory -- or better than an 80% chance of victory, because
8  life is uncertain.  And these people are getting 75% of the way
9  home on a set of claims that have been effectively trashed
10  every time a preceding Bankruptcy Judge took a look at them.
11  Now, I'm sure there is some number that we can get to.  But
12  one, we don't think it's 75% and two, we have never been told
13  anything that would make us believe it is 75%.  Three, we don't
14  believe the Court has been told anything that justifies 75% as
15  a reasonable settlement.  Beyond that, I have nothing further,
16  unless the Court has questions.

17    THE COURT:  What if the settlement was structured at
18  the amount of the reserve?

19    MR. MAYER:  At the $25 million number?  Your Honor, I
20  would have to touch base with the eight clients that I
21  represent --

22    THE COURT:  No, I just want your -- you know, I'm not
23  binding it.  You were very particular about the 75% being too
24  high, and that there's a reserve here, so that's not taking
25  anybody else's money.  Is it?

1    MR. MAYER:  Well, yes, Your Honor, because --

2    THE COURT:  It is.  So you want part of the reserve

3 too?

4    MR. MAYER:  Your Honor, frankly, with the way we

5 looked at this -- and the odd part of this is that the largest

6 of my clients -- Harvard -- went on the Plan Committee to

7 accelerate the settlement process.  It did not believe it was

8 going -- it wanted to be on to decelerate it, because this

9 settlement, frankly, came out of the blue for us.  We thought

10 that the range of settlement alternatives was, frankly, between

11 a zero claim and a $25 million claim.  And we woke up to find

12 that the settlement went past the 25 million.  That's where we

13 were.  Now, maybe we were wrong, but were we looking to settle

14 in the zero to 25 range?  Yes, and somebody could come to us

15 and make a case as to why it made sense both from the

16 perspective of a Class 7 Creditor -- which Harvard is by far

17 the largest Class 7 Creditor -- and from the perspective of a

18 shareholder of Northwestern.  Harvard is by far the largest

19 shareholder of Northwestern.  So we sit here saying, "Somebody

20 make a case that this makes sense."  But we haven't heard it.

21 And I don't think Your Honor has either.

22    Now, it may make sense to settle at 25 million, but we

23 can't fathom how there's authority to settle at more, and we'd

24 have to be convinced that going all the way to 25 made sense.

25 And I'm not saying you can't be convinced.  After all, to the

1   extent there's shares coming out of the reserve, it comes back

2   to Class 7.  And we see no reason to tie those up for three

3   years in litigation.  If you take a look at Section 4.8(b), it

4   says that there's no distribution without a Final Order.  This

5   thing could be up -- all these litigations could be up for a

6   long time.  My people have no interest in that.  But we also

7   have no interest in seeing settlement approved that's in excess

8   of the maximum amount we thought was under discussion.  And

9   that's where we are.

10        THE COURT:  All right, thank you.  Now, let's have the

11  final response.

12        MS. STEINGART:  Thank you, Your Honor.  A couple of

13  points.  First of all, as to Class 9.  Everyone has conceded

14  that Class 9 is supposed to be there so that claims can be

15  fixed and settled.  This 75% number is pure fiction.  Our Class

16  9 claim -- the QUIPS Class 9 claim is not a gift.  Indeed, the

17  QUIPS who objected got no gift.  That was the whole point.  And

18  our Class 9 claim is at a minimum $50 million.  This

19  settlement, including the warrants and including the stock, has

20  an economic value of 28 million.  So the 75 million is fiction.

21  And if Mr. Mayer is such a sophisticated guy, he could read the

22  stipulation that Law Debenture entered into with the Debtor,

23  and indeed is charged with knowing that.  Saying that is being

24  -- that a reserve is being fixed for a $25 million claim, but

25  to the extent that the claim is more than that, it's coming out

1  of that reserve.  SO there is nothing in the Confirmation

2  Order, there's nothing in the stipulation that says that it's

3  25, or that any claim of ours is limited to 25 million.

4      Class 9 claim reserve is in excess of $140 million, Your

5  Honor.  Mr. Kornberg said, "Give 'em -- you know, they want the

6  whole reserve."  I, so far -- I don't hear us asking for 140

7  million.  If Mr. Kornberg thinks maybe that's what we should be

8  asking for, I will.  But, it's just not on the table.  We were

9  getting out of the reserve approximately 18 million.  There's a

10  little bump up because of the other shares, and it's not a

11  material amount when you look at the overall reserve.  The fact

12  that the Debtor has to settle a bunch of claims from that; well

13  the Debtor was responsible as a fiduciary under the plan to put

14  enough in.  It asked for the claim reserve, it gave us a Class

15  9 claim, it knew who else was in there, it had to put in more.

16  If the Debtor intentionally underreserved for Class 9 after the

17  representations made to the Court, then it's in trouble under

18  1144.

19      Let's go on to the shares.  The shares are fundable.

20  Shares and warrants are fundable -- whether it comes out of

21  8(b), whether it comes out of Class 9.  Your Honor, this

22  company has a market cap of $1 billion.  Can anyone tell me

23  that the fact that we settled the QUIPS for 28 instead of 18

24  million is material to a $1 billion market capital company?

25  Whereas that difference in amount is extremely material to each

1  of the hundreds of QUIPS holders.  That material -- that amount
2  is not even material to Class 9.  So, the arguments here -- it
3  should go down to 17, it shouldn't go down to 17 -- the 28
4  million number is fair.  It's a $50 million claim, and it's
5  certainly far less than 60%.

6       The disinterest.  Do you know, the arguments here we have
7  about the disinterest of either Paul Hastings or the directors
8  is sort of a little too little and a little too late.  So,
9  according to the Committee, the directors can't settle these
10 claims, but they could settle the MOU claims?  And they could
11 settle the McGreevey claims?  And they could settle a slew of
12 other claims during the bankruptcy?  If the directors and the
13 management are conflicted here, they were conflicted there.  We
14 had no complaints about that.  Now, the reason Magten
15 complained about Paul Hastings being conflicted is because they
16 represented both Clark Fork and the Debtor in connection with
17 the going flat transaction.  And that's why -- and that was the
18 basis of the Disqualification Motion.  Mr. Kornberg and his
19 committee opposed that motion.  They said there's no conflict.
20 And at that time, there was a lawsuit pending.  And they said
21 that Paul Hastings is disinterested.  All right.  Having told
22 the Court already that Paul Hastings is disinterested, even
23 though the lawsuit was pending, and the Motion to Disqualify
24 was made, they cannot now get up here and tell you that Paul
25 Hastings couldn't in good faith negotiate this settlement.

1    Getting to the merits, all these litigations are so foolish.

2    Well the litigations are out there, Magten's standing and Law

3    Debenture's standing has never been ruled on to the

4    satisfaction or in favor of what Mr. Kornberg says.  Okay, and

5    the Committee's own investment adviser said there was a

6    significant disparity in the value of assets transferred and

7    liabilities assumed.  Houlihan Lokey said there were hundreds

8    of millions of dollars in assets taken without consideration to

9    Clark Fork.  And, as in the documents we produced to Your

10   Honor, Northwestern itself admitted that the financial

11   statements used to effectuate the transaction were overstated

12   by $800 million.  Now, I think that's fraud, I think it's a

13   fraudulent scheme.  It's in our amended complaint.  They have a

14   lot to worry about.  So --

15           THE COURT:  There's another argument to that, but --

16           MS. STEINGART:  I won't go more down that road --

17           THE COURT:  -- I don't think we have to go into that.

18   Let me ask this, everybody tells me in their briefs that when

19   this plan was confirmed, most of the stock was pegged at a

20   value of $19.77.

21           MS. STEINGART:  $20, Your Honor.

22           THE COURT:  20 bucks.  And now somebody told me it's

23   running up to $28.  And I don't look at those sheets in the

24   paper everyday, because I don't look at it any day, but if it's

25   $28 and you're getting that bonus at this time, why don't you

1  take that figure and discount it down to the shares and settle

2  at that amount?  In other words, why don't you discount down $8

3  a share?

4          MS. STEINGART:  Your Honor, if -- because the

5  economics of the settlement --

6          THE COURT:  Not economics.  That's what you get today.

7          MS. STEINGART:  Right.

8          THE COURT:  Not what you got -- could have got before

9  the -- at the time of the reorganization.

10          MS. STEINGART:  Right.  Everyone knew what the --

11          THE COURT:  All right, just a suggestion about coming

12  down to a number that somebody might accept.

13          MS. STEINGART:  Well, the settlement was predicated on

14  everyone's understanding of what the stock was in the market.

15  So, it's not as if people didn't understand both ends of what

16  it was worth and had decided that, given the structure of the

17  plan and the nature of the claims, and the nature of the costs

18  and exposure -- indeed Northwestern has said that these

19  litigations are material to it, and disclosed that in their SEC

20  filings.  So, Mr. Kornberg's views that these are not important

21  is certainly belied by Northwestern's own statements about

22  these to the public.  I think that the settlement, Your Honor,

23  is a good one.  I think that they're getting a bargain, and I

24  don't think that the QUIPS holders should be chiseled down from

25  the amount that they were able to get after all this time, all

1  of this effort.  So, it's fair and it's the right thing to do,

2  Your Honor.  Thank you.

3         THE COURT:  All right.  I'll take the matter under

4  advisement.  Do you have any comments?

5         MS. DENNISTON:  Yeah.  Yes, Your Honor, I have four

6  very brief points I'd like to make.  The Court posed a few

7  questions that I would like to answer.  The first one being the

8  identity of the holder issue that was posed by Law Debenture in

9  terms of who voted in support of the plan.  That issue is a

10 somewhat complicated issue, Your Honor.  And it runs directly

11 to DTC and the use of master ballots.  The Debtor has been

12 working with the parties and will be filing by the end of this

13 week a motion asking for this Court's assistance in an order to

14 disclose the holders.  That is an issue that the Debtor didn't

15 have any control over when the parties elected to use master

16 ballots.  So they voted by indenture number and we will have

17 that motion on file by the end of this week.

18      The second thing that I just wanted to note for the Court

19 is that the Debtor has at all times believed the reserve was

20 set in good faith.  The reason that this settlement term

21 doesn't deal with the reserve is because of the Debtor's

22 fiduciary duties in administering the reserve.  I think that

23 the 9019 process has worked the way it's supposed to, in the

24 sense that everybody has shown up and has been heard and notice

25 was given on specific terms that are set forth in the January

83

1  27th letter.  The other interesting thing is that it appears

2  that all of the constituents involved in this appear interested

3  in some sort of resolution.  Just not this deal.  And where we

4  are today is that this settlement can't be approved absent the

5  consent of Class 7.  It also can't be modified because of the

6  reasons that Mr. Kornberg argued, but that the letter is also

7  specific as to where the shares are coming from.  That's not to

8  say, though, at some point in the future that another

9  settlement arrangement could not be presented.

10       Lastly, there's been some comment back and forth about the

11  disinterestedness of Paul Hastings.  I just wanna make it clear

12  for the Court, two points.  Paul Hastings had proposed

13  initially that if it would make a settlement more powerful to

14  those involved, that it would withdraw any consideration or any

15  settlement as to the issues that affected Paul Hastings.  In

16  other words, those would have been deleted from the exhibit to

17  the settlement agreement, number one.

18       Number two, Paul Hastings is on record saying that it is

19  not seeking indemnification for the Debtor, for the claims

20  asserted against Paul Hastings.  And so to the extent that this

21  Court had any concerns based on the comments raised today about

22  Paul Hastings' disinterestedness, I wanted to make sure that

23  the Court was aware that Paul Hastings had agreed to come out

24  of the deal if anybody had concerns, number one, and number

25  two, that we have also communicated to the Debtor that we will

1   not be seeking indemnification for our claims.  And with that,

2   I think that Paul Hastings, on behalf of the Debtor, has asked

3   that this agreement not be approved because of the opposition

4   to it and because it violates the plan and that at this point

5   it appears that this Court is being asked to approve a modified

6   Settlement Agreement that is not reflected by the January 27th

7   Settlement Agreement, and we'd ask that this Court deny that

8   request as well.

9   THE COURT:  All right.  That concludes the argument.

10  I'll take the matter under advisement and hopefully you'll have

11  an order out by Friday.  Thank you.  Continue now with the

12  agenda.

13  MS. DENNISTON:  Thank you, Your Honor.

14  MR. MAYER:  Your Honor, certain of us were here only

15  for that item.  May we be excused?

16  THE COURT:  Oh, yes.  Yes.  Anyone who wants to leave,

17  I might join you.

18  (Laughter)

19  MS. DENNISTON:  With that in mind, Your Honor, should

20  we just continue the other matters --

21  THE COURT:  No, go ahead.

22  MS. DENNISTON:  -- or does the Court want to proceed?

23  All right.  Matter #12 is the Motion for Order Determining core

24  non -- non-core status of the Debtor's 16th Omnibus objection

25  to claims.  Your Honor, we've received responses to this.  This

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

1    is a matter that has been required to be filed in order to

2    comply with the local rules here in Delaware dealing with those

3    claims that involve personal injury and wrongful death in

4    connection with their withdrawal of the reference to the

5    District Court, and we are asking that the Court enter an order

6    determining the non-core status of those claims so that they

7    can be transferred to the District Court.

8        I wanna note for the Court that this is also related to

9    Matter #15, which is the motion that was filed for relief from

10   stay and abstention in favor of the Second Judicial Circuit

11   Court for Silver Bow County, Montana, filed in connection with

12   the Douglas Nelson and Sheila Fisher cases.  And those also

13   involve personal injury suits and the need to transfer those to

14   an appropriate Court where they can be heard.

15            THE COURT:  You don't have any objection to the Motion

16   for Relief of Stay?

17            MS. DENNISTON:  No, Your Honor, we don't.  I don't

18   think that the Debtor could have a well-rounded objection at

19   this point, recognizing that it's a personal injury case that

20   needs to be tried by a jury.

21            THE COURT:  All right.

22            MS. DENNISTON:  So we would ask for two things.  The

23   entry of the Order confirming the non-core status and then that

24   the stay be lifted and we'll address the claims in the

25   appropriate jurisdiction as to the Fishers.

1    THE COURT:  Do you have an order?  Does anyone here

2  have opposition --

3    MR. BURNHAM:  Your Honor, I'd like to be heard on the

4  matter.

5    THE COURT:  -- to #12?

6    MR. BURNHAM:  Pardon?

7    THE COURT:  Anyone in response to #12?

8    MR. BURNHAM:  Yes, Your Honor.

9    THE COURT:  All right.

10    MS. DENNISTON:  Your Honor, in response to your

11  question, I do have an order.  And I've just been reminded that

12  we had one other response filed by the Roars and their matter

13  was already transferred to the District Court in Montana.

14    THE COURT:  Counsel?

15    MR. BURNHAM:  Noel Burnham from Montgomery McCracken

16  Walker and Rhoads on behalf of Roger and Carol Roar.  Debtor's

17  correct.  In fact, it's not only in the Federal District Court

18  -- that Court has remanded it to Silver Bow County State

19  action, and as to the Roars, I believe that this particular

20  motion is moot.  We're already there, and we'll see what the

21  liquidated amount is when that Court so rules.  So, we'd ask --

22    THE COURT:  I'm sure you'll get a just result.

23    MR. BURNHAM:  As to the motion itself, yes.  We don't

24  have any objection to it, other than the fact that we believe

25  it's moot on behalf of the Roars.

87

1      THE COURT:  Okay.

2      MR. SULLIVAN:  Good morning, Your Honor.  Bill

3  Sullivan on behalf of Douglas Nelson and Sheila Fisher.  We

4  filed the Motion for Relief from Stay that is #15.  And, Your

5  Honor, I've got a -- I don't know if you have a Form of Order -

6  -

7      THE COURT:  I think --

8      MR. SULLIVAN:  There was one included with the motion,

9  but I've got another here.

10     THE COURT:  I've got an order here somewhere.

11     (Pause in proceedings).

12     THE COURT:  I don't.

13     MR. SULLIVAN:  Your Honor, can I --

14     THE COURT:  Yes, if you want to submit it to me.

15     MR. SULLIVAN:  Sure.

16     THE COURT:  Okay.  Thank you.

17     MR. SULLIVAN:  Your Honor, that was the order that was

18  submitted with the original motion and we --

19     THE COURT:  Very good.  There's no opposition to that

20  order.

21     MS. DENNISTON:  That's correct, Your Honor.

22     MR. SULLIVAN:  Thank you, Your Honor.

23     THE COURT:  Thank you.

24     MS. DENNISTON:  And if I could approach, Your Honor, I

25  have the order on the non-core status.

88

1        THE COURT:  All right.

2    (Pause in proceedings)

3        THE COURT:  Okay.  Next matter?

4        MS. DENNISTON:  Your Honor, Matter #15 is the Debtor's

5    Motion for -- excuse me, it's the Debtor's Motion to Dismiss

6    the Adversary Proceeding, Northwestern Corporation v. Magten

7    Asset Management with prejudice.  As set forth in the

8    pleadings, after looking at the state of discovery, the Debtor

9    had determined that it is no longer cost efficient or

10   productive to continue to pursue this adversary proceeding and

11   seeks by motion to dismiss it with prejudice and to amend the

12   answer in the adversary proceeding which has been referred to

13   as the going flat adversary.  The amendment has been attached,

14   which is simply to remove from that the allegations that were

15   identical to the allegations set forth in the complaint in

16   Northwestern's adversary so that the pleadings are consistent

17   with Northwestern's request to dismiss this matter with

18   prejudice.  We received no responses to this, and would ask

19   that the Court enter the order at this time.

20       MR. KAPLAN:  Your Honor, there was an objection filed

21   last night -- timely filed by Magten.  It was a limited

22   objection, was filed, so --

23       MS. DENNISTON:  I'm sorry, Your Honor.

24       THE COURT:  I did get something here this morning.

25       MS. DENNISTON:  I've not seeing it.

1      MR. KAPLAN:  No, it was on short notice, Your Honor,

2  and it was filed last night --

3      THE COURT:  I did get a limited objection by Magten,

4  stating that they don't have any problem having the dismissal

5  as long as you pay them some fees.

6      MS. DENNISTON:  Well, I think as we indicated in our -

7  - I have not seen the pleading, Your Honor.  But as we

8  indicated in our papers, we do not believe an award of fees or

9  cost is appropriate under the circumstances and we'd be happy

10  to take that up at a further hearing if the Court deemed that

11  appropriate.

12      MR. KAPLAN:  Your Honor, may I be heard for a second?

13  Your Honor, our limited objection did not actually seek the

14  payment of fees today.  We were okay with the Debtor dismissing

15  the complaint but wanted the order to specifically provide a

16  reservation of rights for us to come back and seek our fees.

17  So, I don't think that our order is inconsistent with what

18  Counsel for Northwestern just said.  Your Honor, in short, and

19  I won't belabor the point, because it's already been a long

20  morning, from the outset of this case, it's been very clear

21  that there was no facts to suggest that Magten had any material

22  non-public information.  Northwestern had the trading records

23  before they filed the complaint.  They were able to see from

24  the face of the trading records that the trades that were in

25  question occurred before Magten ever showed up to a Committee

1  meeting or they occurred after Magten was no longer on the

2  Committee.  The Debtor had filed its Plan of Disclosure

3  statement and the Debtor had filed its 10-Q with the SEC.

4  There was never any hint or suggestion that Magten had material

5  non-public information when this complaint was filed.

6      The Debtor's argument always was, "But let's let the facts

7  come out in discovery."  And in fact the Motion to Dismiss, in

8  response to it, that was their argument.  And Your Honor's

9  decision was, "You've made the claim and let's let -- see what

10 happens in discovery.  Let's see what comes out."  We can't --

11 an important point to note, Your Honor, and the reason why

12 we're seeking fees, the Debtor never even bothered to seek from

13 the Committee any information concerning what was given to

14 Magten.  They didn't do it before they filed the complaint.

15 They didn't do it after.  The only parties that sought any

16 evidence from the Committee was Magten and its principal, Mr.

17 Ambrose.  Magten is the one who subpoenaed the members of the

18 Committee.  Magten is the one who subpoenaed Counsel to the

19 Committee and the financial advisers to the Committee.  When

20 the Committee stonewalled on providing information, Magten --

21 the defendant, who didn't have to prove a thing -- was the one

22 who was before Your Honor, repeatedly asking to waive the

23 privilege, asking for us to be able to get to the facts and get

24 to the truth.

25     And Your Honor, all the facts and the truth showed at the

1   end of the day was that there was nothing.  There was never
2   anything -- there was never a hint of evidence to suggest that
3   there was a meritable claim here and all we did was waste a
4   whole lot of time and money and a lot of this Court's time in
5   dealing with this claim.  And all we're seeking today again is
6   our right to seek fees.

7       And one point I don't wanna lose sight of, Your Honor, is
8   if Your Honor approves the settlement, this goes away as well.
9   This whole litigation is wrapped up in the settlement.  The
10  fees and risk and trouble that Magten went through in this
11  litigation is part and parcel of the distributions going to
12  Magten under the settlement would take care of these fees.
13  Thank you, Your Honor.

14          THE COURT:  Well, just so we won't piecemeal it, why
15  don't you make a response to the limited objection and then
16  I'll hold the Order for Dismissal until I see what your request
17  -- now, you have to -- let's see.  You don't have any request
18  for monetary amount here.

19          MR. KAPLAN:  Your Honor, all we sought again is to
20  preserve our rights to come back for fees.  And the order --
21  the Proposed Order that we have simply preserves our right to
22  file such motion seeking fees.

23          MS. DENNISTON:  If I might, Your Honor, I think the
24  Debtor and Magten could work on an order carving that out for
25  further motion.  I think Magten would have the burden of

1   presenting a request, which the Debtor would then respond to.

2         MS. STEINGART:  That would be fine.  That would be

3   perfectly fine.

4         THE COURT:  All right.  I'll take that matter under

5   advisement.

6         MS. DENNISTON:  All right, thank you, Your Honor.

7         THE COURT:  That it?

8         MS. DENNISTON:  That's it.  That's all for the Agenda

9   on Northwestern today.  Thank you for the Court's time.

10        THE COURT:  Oh, I have one question.  I had a memo

11  sent to me by Nancy saying that -- it was from Mr. Chipman,

12  saying that, "Pursuant to the plan a Confirmation Order will be

13  filed with approximately 38 claims objections on Monday --

14  that's February 2nd ad we need to set hearings for these.  Would

15  you like to have the status conference at the February 10th

16  hearing?  This didn't occur.  All right, now we are estimating

17  a need for seven full days and in addition our Omnibus hearing

18  on April the 5th, we would like to get at least two full days

19  to start certain employee-related claims."  Now what's the plan

20  of attack here?

21        MS. DENNISTON:  Yeah, Your Honor, we have moved sort

22  of beyond that.  We received on Monday a number of written

23  responses to claim objections.  We've also received a number of

24  requests for continuance and a number of parties have indicated

25  serious interest in resolving -- to reach a consent-based

93

1    allowed claim.  With the need for increased communication with

2    the Plan Committee, the Debtor's gonna need some extra time, so

3    we were intending -- and compliant with the Court's rules, the

4    Chamber rules -- to file a Motion Seeking a Continuance of the

5    April 15th hearing to reset that so that we could work through

6    with the Plan Committee the responses to the settlement request

7    and the objections that were filed yesterday.

8              THE COURT:  All right.

9              MS. DENNISTON:  So we'll file that motion and I update

10   the Court as to where we are with the responses and the request

11   for hearing dates.

12             THE COURT:  All right.

13             MS. DENNISTON:  If that would be agreeable.  Thank

14   you, Your Honor.

15             THE COURT:  All right, we'll be adjourned.

16        (Court adjourned)

17

18                       CERTIFICATION
     I certify that the foregoing is a correct transcript from the
19   electronic sound recording of the proceedings in the above-
     entitled matter.
20

21   _____          3-16-05
     Signature of Transcriber                Date
22

23

24

25

**<u>EXHIBIT P</u>**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                              )
                                    )
NORTHWESTERN CORPORATION,           )    Case No. 03-12872 (JLP)
                                    )
        Reorganized Debtor.         )    Re: Docket No. 2832
                                    )
_____)

## MEMORANDUM OPINION DENYING JOINT MOTION OF MAGTEN ASSET MANAGEMENT CORPORATION AND LAW DEBENTURE TRUST COMPANY OF NEW YORK

Magten Asset Management Corporation ("Magten") and Law Debenture Trust Company

of New York as Indenture Trustee (the "Indenture Trustee") submitted, pursuant to this Court's

direction, a motion for entry of an order under Federal Rule of Bankruptcy Procedure 9019[1]

approving a proposed settlement agreement (the "Settlement Agreement") with Northwestern

Corporation (the "Debtor") involving litigation and claims by each of the parties [Docket No.

2832] (the "Motion"). Prior to the filing of the Motion, the Debtor had received correspondence

from the Plan Committee, which was established under section 7.9 of the Debtor's Confirmed

Amended Chapter 11 Plan of Reorganization,[2] and certain other creditors objecting to the terms

of the proposed settlement. On February 16, 2005, the Debtor advised Magten and the Indenture

Trustee that it would not honor or comply with the proposed Settlement Agreement on grounds

---

[1] Federal Rule of Bankruptcy Procedure 9019 invokes the authority of the court to approve a compromise or settlement upon motion by the trustee. Under 11 U.S.C. § 1107, a debtor-in-possession in a chapter 11 case has the power of a trustee. However, in this case, the plan of reorganization has been confirmed, and under section 1141(b), the confirmation of the plan vests all of the property of the estate in the debtor. Thus, there is no longer a debtor-in-possession, *i.e.*, trustee. The present motion is filed pursuant to the terms of the settlement agreement and the Court may, under these circumstances, adopt and utilize the criteria commonly employed to approve or reject compromise agreements.

[2] The Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code was approved on October 29, 2004 [Docket No. 2238].

that the agreement required consent of the Class 7 creditors and that such consent could not be obtained.

After the Court signed an order directing Magten *et al.* to file a motion for approval of the settlement agreement, the Motion was set for hearing for March 8, 2005. In response to the Motion, objections to approval of the Settlement Agreement were filed by the Debtor, the Plan Committee and the Ad Hoc Committee of Class 7 Creditors.[3] To these objections, Magten and the Indenture Trustee filed a joint reply. At the hearing, counsel for the respective parties presented oral argument in support of their respective positions.

The Settlement Agreement arises from a series of ongoing litigation between Magten, the Debtor, the Debtor's officers and counsel involving ten separate, but interrelated, matters. At the outset, I determine that the pending matter is properly before the Court, as the Court invited the present motion to resolve NorthWestern's representations at a prior hearing that a settlement had been reached and required formal application for court approval. I further determine that Magten's argument that the agreement is binding on the parties without court approval is without merit. Indeed, the settlement documents plainly state that the agreement was subject to Bankruptcy Court approval. Thus, case authority dealing with section 363 of the Bankruptcy Code[4] (sale of property of the estate outside the ordinary course of business), *Northview Motors, Inc. v. Chrysler Motors Corp.*, 186 F.3d 346 (3d Cir. 1999), or the fact that the Plan has vested

---

[3] The Ad Hoc Committee consists of Avenue Capital Partners, Drawbridge Special Opportunities Advisors LLC, Greenwich International Ltd., Harbert Distressed Investment Master Fund, Ltd., SOF Investments, L.P., Nationwide Life Insurance Company, Nationwide Mutual Insurance Company, and P. Schoenfeld Asset Management LLC.

[4] Unless otherwise indicated, all citations to statutory sections are to the Bankruptcy Code ("Code"), 11 U.S.C. § 101 *et seq.*

2

the property in the Debtor and there is no longer a debtor-in-possession, *In re W.R.M.J. Johnson Fruit Farm, Inc.*, 107 B.R. 18 (Bankr. W.D. N.Y. 1989); *In re Nelson Co.*, 117 B.R. 813 (Bankr. E.D. Pa. 1990), are beside the point. Indeed, the issues raised by the objections make clear that the Court must decide whether the Settlement Agreement violates or is consistent with the terms of the Confirmed Plan in order to approve or reject the agreement. This is particularly true because section 7.9 of the Confirmed Plan provides that the Plan Committee was created for "the purpose of overseeing the remaining Claims reconciliation and settlement process," and if a settlement exceeds $100,001, which the present settlement surely does, the Debtor must settle in accordance with the Plan Committee By-Laws, "which provides the Plan Committee with, among other things, the right to object [to] such claims." Finally, it is clear from oral argument that the settlement provisions do impact the rights of Class 7 and Class 9 creditors, and thus court supervision is essential to protect such rights.

The present argument essentially involves the application of claims arising under unsecured subordinated notes called QUIPS, which were allowed in the Plan in the amount of $69,537,873.00. The Indenture Trustee administers such notes and Magten is one of the holders of such notes. Article IV, section 4.8(b)(ii) of the Plan provides that QUIPS note claimants may opt to receive payment of their notes in full under one of two options, but not both, namely:

> (1) a Pro Rata Share of 505,591 shares of New Common Stock . . ., plus Warrants exercisable for an additional 2.3% of New Common Stock (collectively, "Option 1"); or
>
> (2) a Pro Rata Share of recoveries, if any, upon resolution of the QUIPS Litigation ("Option 2").

Option 2 is involved in the settlement language. Under Option 2, such holders of claims shall be treated as a Class 9 General Unsecured Claim, "subject to estimation and reserves of Disputed

3

Claims as provided in section 7.5 of the Plan, with Distributions to holders of Class 8(b) Unsecured Subordinated Note Claims which choose Option 2 being made, if at all, only upon entry of a Final Order resolving the QUIPS Litigation (unless otherwise agreed to by the Debtor and the Committee); . . . ."

The QUIPS Litigation involves an action by Magten and the Indenture Trustee seeking to upset a transfer of assets to the Debtor from an entity known as Clark Fork and Blackfoot LLC, under circumstances alleged to occur through actual fraud (Adv. Pro. No. 04-53324). Allied with this adversary action is Magten's and the Indenture Trustee's appeal of the confirmation order, actions against an officer of the company, action against counsel for the Debtor and objections to the award of attorney's fees of said counsel, among other pending matters.

The settlement proposal calls for termination of all litigation and provides allocation and payment of the following by NorthWestern to Magten and the Indenture Trustee: (1) distribution of 382,732 shares of common stock at the reorganization plan value of $20.00 per share, plus 710,449 warrants at a value of $4.50 each; and (2) distribution of those shares of common stock of set aside in a disputed claim reserve pursuant to a stipulation and court order establishing such reserve [Docket No. 2298, November 1, 2004], having a Plan value of $17.1 million, plus $300,000 of common stock from the general reserve set aside for Class 9 claimants. From these distributions, Magten and the Indenture Trustee would pay their own attorney's fees and costs (over $2 million) from the sale of such shares, the parties would execute mutual releases and all litigation would come to an end.

In the stipulation approved November 1, 2004, the parties agreed that Magten's proof of claim of $50 million would result in a reserve of 50% of the proof of claim, equaling $25 million of the Class 9 reserved shares, but to the extent that the litigation claim exceeded $25 million,

4

the "holders of such claims shall have any deficiency satisfied out of the general Disputed

Claims Reserve" described in the Plan. That general Class 9 reserve set aside $140 million of

shares for over forty disputed claims, only two of which have been resolved.

While the Plan Committee and the Ad Hoc Committee challenge the amount, and

therefore the reasonableness of the settlement, the crux of the real objection comes from the

manner in which Magten's shares are being distributed, its impact on Class 7 and Class 9

creditors and the violation of section 4.8(b)(ii) of the Plan.

The Plan provides that to the extent shares allocated to Class 8(b) are not distributed to

Option 2 holders, those shares are to be distributed to Class 7 and Class 9 creditors. *See*

Debtor's Second Amended and Restated Plan of Reorganization, Section 4.8(b)(ii). Thus,

Magten and the other non-accepting QUIPS holders who took Option 2 received only a Class 9

claim, not a distribution from the 505,591 shares allocated to Option 1 holders. To grant, as the

Settlement Agreement does, both types of recovery requires the consent of the Class 7 and Class

9 creditors, either by way of amendment to the Plan or absence of any objections from those

classes. But a plan amendment is not legally available because the Plan has been substantially

consummated and objection to the distribution has been presented vigorously by Class 7.

A confirmed plan may be modified or amended after confirmation, but only before

substantial consummation has taken place. Section 1127(b) provides: "The proponent of a plan

or the reorganized debtor may modify such plan at any time after confirmation of such plan and

before substantial consummation of such plan . . . ." Indeed, Notice of Substantial

Consummation of the Plan was filed on December 29, 2004 [Docket No. 2519], and the notice

received widespread publication.

5

As to consent by Class 7 creditors, as set forth in the Ad Hoc Committee objection, their veto right to the settlement has been clearly stated. Moreover, it is clear that the parties to the settlement realized that the Debtor could not, as it states, "dip into" the Class 9 disputed claim reserve, which is in excess of the Magten reserve of $25 million, to distribute stock to Magten and the Indenture Trustee for the benefit of Magten. Yet, it is admitted that this general reserve is clearly where the 382,732 shares must come from. To do so would not only set Options 1 and 2 on their head after confirmation, and therefore violate the Plan, but would, according to the Debtor, have a serious potential adverse impact on the reserve for other disputed claims. For example, PPL Montana's disputed claim of $140 million was reserved at $50 million by stipulation, claims from rejection of pension plan exceed $12 to $15 million, and Hyland's claim of $30 million is still unresolved. To date, Cornerstone's claim of $19.5 million and Comanche Park of $750,000 have been resolved, with distributions made from the general reserve. To resolve the remaining claims, which have an asserted amount of $120 million, there remains 3,720,600 shares with a Plan value of $74,412,000. Such financial dilemma surely means that it is imprudent to distribute the 382,732 shares to Magten from the Class 9 reserve over and above the reserve fixed by the November 1, 2004 Stipulation.

I conclude that the Debtor and Magten *et al.* entered into the Settlement Agreement in good faith, knowing nevertheless that the Plan provisions required the consent of the Class 7 and Class 9 creditors, and certainly both later realized the Plan, at this late date, cannot be amended to accommodate the settlement terms.

Had the settling parties agreed upon a settlement amount which equaled the amount of the Magten/Indenture Trustee reserve of $25 million, the agreement may have been able to carry the day, for the parties recognize that approval of a proposed settlement is within the "sound

6

discretion" of the Court, and the Court is not burdened to decide numerous questions of law or fact, but rather canvases the issues and circumstances attending the litigation, including cost, to determine whether the agreement falls below the lowest point in range of reasonableness. *In re Martin*, 91 F.3d 389 (3d Cir. 1996); *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983).

Since the Debtor has now concluded the settlement is not in the best interests of the estate, that it violates express provisions of the Plan and therefore cannot be implemented, particularly where Class 7 and Class 9 creditors vigorously object, as does the Plan Committee, the only conclusion for the Court is that the proposed Settlement Agreement must be rejected for the reasons set forth above. This memorandum does not foreclose further settlement negotiations, and indeed it may be in the best interest of all parties to revisit the present proposal within the limits of the Magten/Indenture Trustee reserve, with a potential supplement from other sources of new common stock, particularly where one of the objectors have taken note that an officer of the company was also the beneficiary of the proposed settlement.[5]

For the reasons set forth above, the Joint Motion of Magten and Law Debenture to approve the Settlement Agreement is DENIED without prejudice. A separate order denying the Motion shall enter.

Dated: March 10, 2005

The Honorable John L. Peterson
United States Bankruptcy Judge

---

[5] One unsettling fact, as stated at the hearing by counsel for the Indenture Trustee, is that the Option 1 bond holders who overwhelmingly voted in favor of the Plan have not received distribution of their shares of new Common Stock due to the dispute over payment and allocation of the Indenture Trustee's attorney's fees. Thus, that class is being held hostage by the continuing litigation, which apparently does not bother the objecting parties.

7

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| NORTHWESTERN CORPORATION, | ) | |
| | ) | Case No.: 03-12872 (JLP) |
| Debtor. | ) | |

| | | |
|---|---|---|
| MAGTEN ASSET MANAGEMENT | ) | |
| CORPORATION AND LAW DEBENTURE | ) | |
| TRUST COMPANY OF NEW YORK, | ) | |
| | ) | |
| Plaintiffs, | ) | Adv. Pro. No. 05-50866 (JLP) |
| | ) | |
| v. | ) | |
| | ) | |
| NORTHWESTERN CORPORATION, | ) | |
| GARY G. DROOK, MICHAEL J. HANSON, | ) | |
| BRIAN B. BIRD, THOMAS J. KNAPP AND | ) | |
| ROGER P. SCHRUM, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>ORDER</u>

Upon consideration of the motion (the "Motion") of Northwestern Corporation, Gary G. Drook, Michael J. Hanson, Brian B. Bird, Thomas J. Knapp and Roger P. Schrum (collectively "Defendants") in the above-captioned adversary proceeding ("Adversary Proceeding No. 05-50866") to: (1) stay Adversary Proceeding No. 05-50866 pending resolution of the Appeal in the United States District Court for the District of Delaware, styled <u>Magten Asset Management Corp. v. NorthWestern Corp.</u>, 04-CV-01389 (JJF) (the "Confirmation Order Appeal"); or, in the alternative, (2) dismiss the complaint (the "Complaint") filed in Adversary Proceeding No. 05-50866, it is hereby

2383087v1

ORDERED that the Motion is granted; and it is further

(1)    ORDERED that Adversary Proceeding No. 05-50866 is hereby stayed pending resolution of the Confirmation Order Appeal.

[ -or- ]

(2)    ORDERED that the Complaint filed in Adversary Proceeding No. 05-50866 is dismissed in its entirety, with prejudice.


Dated: _____, 2005
       Wilmington, Delaware


                                    _____
                                    HONORABLE JOHN L. PETERSON
                                    UNITED STATES BANKRUPTCY JUDGE

2383087v1