# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NORTHWESTERN CORPORATION, | : | |
| | : | Case No. 03-12872 (JLP) |
| Debtor. | : | |
| | : | |
| | : | |
| MAGTEN ASSET MANAGEMENT CORP. | : | |
| | : | |
| Appellant, | : | |
| v. | : | CA NO. 04-1389 (JJF) |
| | : | |
| NORTHWESTERN CORPORATION, | : | |
| | : | |
| Appellee. | : | |

## OPENING BRIEF OF APPELLANT

**FRIED, FRANK, HARRIS, SHRIVER
& JACOBSON LLP**
Bonnie Steingart, Esq.
Gary L. Kaplan, Esq.                    -and-
Evan S. Jacobson, Esq.
One New York Plaza
New York, NY 10004
Telephone: (212) 859-8000

**BLANK ROME LLP**
Mark J. Packel (DE No. 4048)
Elio Battista, Jr. (DE No. 3814)
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 425-6400

Counsel for Magten Asset Management Corporation

Dated: July 15, 2005
Wilmington, Delaware

# **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................................1

BASIS OF APPELLATE JURISDICTION..............................................................................2

ISSUES PRESENTED................................................................................................................2

STANDARD OF APPELLATE REVIEW................................................................................4

STATEMENT OF THE CASE...................................................................................................4

    I.   PARTIES .........................................................................................................................4

        A.   NorthWestern ........................................................................................................4

        B.   Magten..................................................................................................................4

    II.  THE FRAUDULENT TRANSFER...............................................................................5

    III. NORTHWESTERN'S BANKRUPTCY CASE .........................................................6

        A.   The Chapter 11 Proceeding ..................................................................................6

        B.   The Fraudulent Transfer Proceeding....................................................................8

        C.   The Plan................................................................................................................9

ARGUMENT ............................................................................................................................11

    I.   THE BANKRUPTCY COURT ERRED IN CONFIRMING THE PLAN
        BECAUSE THE PLAN DID NOT MEET THE REQUIREMENTS OF
        SECTIONS 1122 AND 1129 OF THE BANKRUPTCY CODE......................................11

        A.   The Plan Fails to Comply with Sections 1122 and 1129(a)(1) of the Bankruptcy
            Code Because the QUIPS' Claims Are Not Properly Classified ..............................11

            i.   The Claims of the QUIPS on Account of Principal and Interest and the
               Fraudulent Transfer Proceeding are not Substantially Similar..............................12

            ii.  The Claims of the TOPrs and the QUIPS for Principal and Interest are
               Substantially Similar..............................................................................................14

        B.   The Plan Fails to Satisfy the Requirements of Section 1129(b) of the Bankruptcy
            Code ............................................................................................................................17

i

# TABLE OF CONTENTS

(continued)

Page

    i.  The Plan Violates Section 1129(b) of the Bankruptcy Code by Discriminating Unfairly Because Creditors in Class 8(b) do not Receive the Same Treatment as Similarly Situated Creditors, When Compared With the Priorities of all Other Unsecured Creditor Classes ...............17

    ii.  The Plan Violates Section 1129(b) of the Bankruptcy Code By Discriminating Unfairly Because the Distributions Made to the Holders of the QUIPS are Not a "Gift" ...................................................................19

    iii.  The Plan Violates Section 1129(b) of the Bankruptcy Code Because the Plan is not Fair and Equitable and Violates the Absolute Priority Rule ........................................................................................................................21

II.  THE BANKRUPTCY COURT ERRED IN CONFIRMING THE PLAN BEFORE RESOLUTION OF THE FRAUDULENT TRANSFER PROCEEDING ................................................................................................................24

  A.   The Plan Improperly Treats the Montana Utility Assets as Property of the Estate ..24

  B.   The Fraudulent Transfer Proceeding is not a "Claim" and Cannot be Discharged in Bankruptcy ................................................................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re AOV Industrial Inc.,*
  792 F.2d 1140 (D.C. Cir. 1986) ...................................................................16

*Alstrin v. St. Paul Mercury Insurance Co.,*
  179 F. Supp. 2d 376 (D. Del. 2002).............................................................22

*In re America's Voice Inc.,*
  2000 U.S. Dist. LEXIS 14761 (D.D.C. Oct. 4 2000)...................................25

*In re Armstrong World Industrial,*
  320 B.R. 523 (E.D. Pa. 2005) ..............................................2, 20, 21, 23

*Bank of America National Trust & Savings Association*
  *v. 203 N. LaSalle St. P'ship,*
  526 U.S. 434 (1999).......................................................................................21

*In re Bloomingdale Partners,*
  170 B.R. 984 (Bankr. N.D. Ill. 1994) .........................................................12

*Boston Post Road Ltd. P'ship v. Federal Deposit Insurance Corp. (In re Boston*
  *Post Road Ltd. P'ship),*
  21 F.3d 477 (2d Cir. 1994)............................................................................15

*In re Bugg,*
  172 B.R. 781 (E.D. Pa. 1994) .......................................................................11

*In re County Seat Stores Inc.,*
  280 B.R. 319 ( Bankr. S.D.N.Y. 2002).......................................................23

*In re D &W Realty Corp.,*
  165 B.R. 127 (S.D.N.Y. 1994)................................................................11, 15

*In re Drexel Burnham Lambert Group Inc.,*
  138 B.R. 723 (Bankr. S.D.N.Y. 1992)........................................................11

*In re Fairfield Executive Associates,*
  161 B.R. 595 (D.N.J. 1993) ...........................................................................11

*Goldin v. Primavera Familienstiftung (In re Granite Partners LP),*
  194 B.R. 318 (Bankr. S.D.N.Y. 1996) ........................................................22

120087.01600/40155208v1

*In re Greystone III Joint Venture,*
  995 F.2d 1274 (5th Cir. 1991) ............................................................11, 16

*In re Hellesen,*
  1999 Bankr. LEXIS 1891 (Bankr. D.N.H. Jan. 11 1999) ............................25

*In re Ionosphere Clubs Inc.,*
  17 F.3d 600 (2d Cir. 1994)...................................................................22

*In re John Hancock Mutual Life Insurance Co.,*
  987 F.2d at 158 .................................................................................16

*In re Levitz Furniture Inc.,*
  267 B.R. 516 (Bankr. D. Del. 2000) ......................................................24

*In re Mariner Post-Acute Network Inc.,*
  267 B.R. 46 (Bankr. D. Del. 2001) ........................................................25

*In re Martin's Aquarium Inc.,*
  98 Fed. Appx. 911 913 (3d Cir. 2004).....................................................4

*In re Mcorp Finance Inc.,*
  137 B.R. 219 (Bankr. S.D. Tex. 1992) ...................................................18

*In re Mcorp. Finance Inc.,*
  160 B.R. 941 (S.D. Tex. 1993) .............................................................20

*Official Committee of Unsecured Creditors v. Columbia Gas System Inc. (In re
  Columbia Gas System Inc.),*
  997 F.2d 1039 (3d Cir. 1993)...............................................................24

*In re PPI Enterprises(U.S.) Inc.,*
  324 F.3d 197 (3d Cir. 2003)...................................................................4

*In re Resorts International Inc.,*
  145 B.R. 412 (Bankr. D.N.J. 1990) ...................................................21, 22

*In re Sentry Operating Co. Inc.,*
  264 B.R. 850 (Bankr. S.D. Tex. 2001) ...................................................20

*In re Sovereign Group 1985-27 Ltd.,*
  142 B.R. 702 (E.D. Pa. 1992) ..............................................................24

*In re Toy & Sports Warehouse Inc.,*
  37 B.R. 141 (Bankr. S.D.N.Y. 1984).......................................................21

iv

*In re Trans World Airlines Inc.,*
    145 F.3d 124 (3d Cir. 1998)........................................................................4

*In re Unicom Computer Corp.,*
    13 F.3d 321 (9th Cir. 1994) ....................................................................24

*In re Zenith Electrics Corp.,*
    241 B.R. 92 (Bankr. D. Del. 1999) ..........................................................18

## OTHER AUTHORITIES

11 U.S.C. 101(5) .......................................................................12, 13, 14, 26

11 U.S.C. § 1122(a) ...................................................................................11

11 U.S.C. §1141(d)(1) ...............................................................................25

11 U.S.C. § 541 .........................................................................................24

28 U.S.C. § 158(a)(1)...................................................................................2

124 Cong. Rec. H11090.............................................................................26

124 Cong. Rec. S17406 (daily ed. Oct. 6 1978) .......................................26

Alan N. Resnick, <u>Bankruptcy Law Manual</u> §9.58 (5th Ed. 2002).....................18

Fed. R. Bankr. P. 8001(a) ...........................................................................2

## PRELIMINARY STATEMENT

This consolidated appeal (the "Appeal") arises from the orders of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), (i) Confirming NorthWestern's Second Amended and Restated Plan of Reorganization (the "Plan"), entered on October 19, 2004 (the "Confirmation Order"), and (ii) Approving the Memorandum of Understanding, entered on October 18, 2004 (the "MOU Order").[1]  Both orders violate the express provisions of title 11 of the United States Code (the "Bankruptcy Code") and should be reversed.[2]

As described below, one of the central issues in the chapter 11 case of NorthWestern Corporation ("NorthWestern") was the claims asserted by creditors of NorthWestern's wholly-owned subsidiary, Clark Fork & Blackfoot LLC ("Clark Fork") on account of the fraudulent transfer of the utility assets of Clark Fork (the "Montana Utility Assets") to NorthWestern (the "Transfer") for admittedly inadequate consideration.  The Transfer was done at a time that NorthWestern had overstated its revenue in its public financial statements by $878 million. Magten Asset Management Corporation ("Magten"), on behalf of the trust holding the Series A 8.45% Quarterly Income Preferred Securities (the "QUIPS"), and Law Debenture Trust Company of New York ("Law Debenture"), as Indenture Trustee for the Indenture governing the QUIPS, filed a complaint in the Bankruptcy Court (the "Complaint") seeking relief (the "Fraudulent Transfer Proceeding") as a result of the Transfer.  Although the Complaint survived a motion to dismiss, through the Plan, NorthWestern inappropriately deprived the holders of the QUIPS of an appropriate remedy.

In confirming the Plan, the Bankruptcy Court ignored the fact that the Plan violated numerous provisions of the Bankruptcy Code by, among other things, requiring the holders of

---

[1]  The appeal of the Confirmation Order (the "Confirmation Order Appeal") and the appeal of the MOU Order (the "MOU Order Appeal") were consolidated, pursuant to this Court's order dated December 30, 2004.

[2]  Pursuant to this Court's order dated June 6, 2005, the parties have briefed the Motion to Dismiss this Appeal and the merits of this Appeal separately.  As such, in accordance with this Court's order, Magten, in this Appeal, does not address the merits of the Motion to Dismiss this Appeal, which was addressed in a separate brief filed with this Court on June 30, 2005.

the QUIPS to choose to (i) receive twelve cents on the dollar on account of their QUIPS holdings and forego any right with respect to the Fraudulent Transfer Proceeding ("Option 1"), or (ii) pursue the Fraudulent Transfer Proceeding, receive no distribution on account of their QUIPS holdings, and receive sixty-three cents on the dollar on any judgment obtained in the Fraudulent Transfer Proceeding ("Option 2"). Instead of the one hundred percent recovery to which it and other holders of the QUIPS are entitled as a result of the imposition of a constructive trust, Magten received a disputed litigation claim that could only receive up to sixty-three cents on the dollar.

In addition to improperly limiting the QUIPS recovery, the Plan improperly classified the QUIPS claims, and unfairly discriminated against the holders of the QUIPS. Moreover, as demonstrated by the recent decision in In re Armstrong World Indus., 320 B.R. 523 (E.D. Pa. 2005), the Plan violated the absolute priority rule by making a distribution to holders of interests junior to the holders of the QUIPS. Therefore, the Confirmation Order should be reversed.

## BASIS OF APPELLATE JURISDICTION

This is a consolidated appeal of the Confirmation Order, as well as the MOU Order. In accordance with Fed R. Bankr. P. 8001(a) and 8002, on October 25, 2004, Magten timely filed its Notice of Appeal of the Confirmation Order, and on October 26, 2004, timely filed its Notice of Appeal of the MOU Order. This Court, therefore, has jurisdiction over this case pursuant to 28 U.S.C. § 158(a)(1) and Fed. R. Bankr. P. 8001(a).

## ISSUES PRESENTED

There are two main issues presented in this Appeal. The first issue is whether the Bankruptcy Court erred in confirming the Plan and entering the Confirmation Order, specifically in finding that the Plan meets the requirements of sections 1122 and 1129 of the Bankruptcy Code. This issue includes the following sub-issues:

2

a.      Whether the Bankruptcy Court erred in finding that that Plan complies with sections 1122 and 1129(a)(1) of the Bankruptcy Code where there was no legitimate business reason for separately classifying the claims of the holders of the TOPrS and the QUIPS for principal plus interest.

b.      Whether the Bankruptcy Court erred in forcing the holders of the QUIPS to forego their right to pursue the fraudulent transfer litigation in order to receive their rightful recovery for principal plus interest on account of their QUIPS notes.

c.      Whether the Bankruptcy Court erred in determining that the Plan did not discriminate unfairly against the holders of the QUIPS because the distributions to the QUIPS holders were a "gift" from senior creditors despite the fact that there is no authority under the Bankruptcy Code to support this line of reasoning and it is NorthWestern, not the creditors, making the distributions pursuant to the Plan.

d.      Whether the Bankruptcy Court erred in determining that the Plan is "fair and equitable" when subordinated holders of equity interests received a distribution under the Plan while more senior creditors are not being paid in full and are only receiving a minimal recovery under the Plan.

e.      Whether the Bankruptcy Court erred in finding that the proceeds of NorthWestern's D & O insurance policy were not property of NorthWestern's estate when the derivative actions belonged to NorthWestern and not its shareholders and all damages awarded in a derivative suit inure directly to a corporation.

The second issue is whether the Bankruptcy Court erred in confirming the Plan and entering the Confirmation Order before final resolution of the Fraudulent Transfer Proceeding.[3] This issue specifically asks the following questions:

a.      Whether the Bankruptcy Court erred in failing to impose a constructive trust on the Montana Utility Assets which were transferred to NorthWestern from a non-debtor subsidiary (Clark Fork), even though the subsidiary's creditors brought an action seeking to set aside the transfer of the Montana Utility Assets as fraudulent and sought recognition that a constructive trust has been imposed over those assets.

---

[3] Magten has decided not to pursue the following issues that were included in its Designation of Items to be Included in the Record on Appeal and Statement of the Issues to be Presented: (i) whether the Bankruptcy Court erred in determining that NorthWestern was not relinquishing value to the estate when NorthWestern, through its release and waiver of all "Cause of Action of any nature," abandoned every potential colorable claim and cause of action that may have ultimately resulted in substantial value to NorthWestern's estate, and (ii) whether the Bankruptcy Court erred in finding that the senior debt should not be voided or subordinated despite the fact that NorthWestern's application for exemption from the Public Utility Holding Company Act ("PUHCA") was not filed in good faith, and, under PUHCA, the rights of a party to a contract made while there was PUHCA violation, including lack of good faith filing in an application for a PUHCA exemption, are void.

3

b.    Whether the Bankruptcy Court erred in finding that the right to recover on account of the fraudulent transfer cause of action is a "claim" under section 101(5) of the Bankruptcy Code when (i) the exclusive remedy sought as a result of the fraudulent transfer of the Montana Utility Assets is an equitable remedy that does not "give rise to a right to payment" and (ii) §31-2-339 of the Montana Code Annotated, which governs the remedies available to creditors in seeking to set aside a fraudulent transfer, only provides for remedies that are equitable in nature and does not provide for any form of monetary relief.

## STANDARD OF APPELLATE REVIEW

All of the issues presented pertain to the Bankruptcy Court's rulings and conclusions of law, which are subject to review de novo. See In re Martin's Aquarium, Inc., 98 Fed. Appx. 911, 913 (3d Cir. 2004) ("[W]e review the Bankruptcy Court's legal determinations de novo."); see also In re PPI Enters.(U.S.) Inc., 324 F.3d 197 (3d Cir. 2003); In re Trans World Airlines, Inc., 145 F.3d 124, 131 (3d Cir. 1998).

## STATEMENT OF THE CASE

### I.    PARTIES

A.    *NorthWestern*

NorthWestern is a publicly traded Delaware corporation that was incorporated in 1923. NorthWestern, together with its direct and indirect non-debtor subsidiaries, comprise one of the largest providers of electricity and natural gas in the upper Midwest and Northwest regions of the United States, serving approximately 608,000 customers throughout Montana, South Dakota, and Nebraska. As discussed in further detail below, on September 14, 2003, NorthWestern filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

B.    *Magten*

Magten holds in excess of 40% of the QUIPS issued by Montana Capital I (the "Trust"). The Trust is a business trust established pursuant to the Delaware Business Trust Act. The Trust was established by The Montana Power Company ("Montana Power"), predecessor in interest to

4

Clark Fork (f/k/a NorthWestern Energy, LLC), as a financing vehicle. The only assets of the Trust are the 8.45% Junior Subordinated Debentures due 2036 issued by Montana Power.

## II.    THE FRAUDULENT TRANSFER

On September 29, 2000, Montana Power entered into a unit purchase agreement with NorthWestern pursuant to which NorthWestern agreed to purchase the Montana Utility Assets. In order to facilitate the assets sale to NorthWestern, Montana Power created a subsidiary, Montana Power Company LLC.

On November 15, 2002, NorthWestern orchestrated the Transfer of substantially all of the utility assets of its directly owned subsidiary, Clark Fork, to NorthWestern for inadequate consideration. Though the Montana Utility Assets had a value well in excess of $1 billion, the total consideration received for the Transfer was NorthWestern's assumption of approximately $700 million of liabilities. As a result of the Transfer, Clark Fork was rendered insolvent.

At the time of the Transfer, NorthWestern's public filings contained misleading statements with respect to, among other things, loans totaling approximately $200 million made by NorthWestern to its non-utility subsidiary, Expanets Inc. ("Expanets"). Magten Ex. 227, Ex. 4.[4] Although a portion of these loans were made as early as December 31, 2001, NorthWestern did not disclose these loans until September 2002, when it restated its financials for the fiscal year of 2001 and the first and second quarters of 2002. In October of 2002, despite knowing that it should have written down the value of its loans to Expanets, NorthWestern completed a common stock offering and failed to disclose this information in its prospectus in connection with its securities offerings.

---

[4] References to items identified in Magten's Amended Designation of Items to be Included in the Record on Appeal and Statement of Issues to be Presented on Appeal from the Order Confirming Debtor's Second Amended and Restated Plan of Reorganization under Chapter 11 of the Bankruptcy Code Entered on October 19, 2004 [Bankr. Docket No. 2335], are referred to as "Magten Ex. __". References to items identified in NorthWestern's Designation of Additional Documents for the Record and Objection to Statement of Issues on Appeal [Bankr. Docket No. 2365], are referred to as "NorthWestern Ex. __".

NorthWestern's wrongdoing in failing to disclose the loans is exacerbated by the fact that NorthWestern signed its 10K for 2001 and 10Q's for the first three quarters of 2002 under certification that the financials fully complied with the Sarbanes-Oxley Act. On April 16, 2003, NorthWestern reported its financial results for the fiscal year ended ("FYE") 2002 – the year in which the Transfer occurred – and finally restated its previously unaudited quarterly results for the first three quarters of FYE 2002. Appx. Ex. A (NorthWestern's 10K for the fiscal year ended Dec. 31, 2002).[5] NorthWestern admitted that its financial statements were materially false and misleading because they failed to include $878.5 million in previously unreported "negative charges," including the write down of the $205.7 million in loans to Expanets. Magten Ex. 227, Ex. 4, and Appx. Ex. A. Immediately thereafter, the United States Securities and Exchange Commission launched an informal investigation into NorthWestern's financial restatements. This investigation became a formal investigation in December 2003, and is continuing. Magten Ex. 164, p. 47.

## III.    NORTHWESTERN'S BANKRUPTCY CASE

### A.    *The Chapter 11 Proceeding*

On September 14, 2003, NorthWestern filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.

On March 11, 2004, NorthWestern filed its initial plan of reorganization and related disclosure statement with the Bankruptcy Court, as well as its motion in support of the disclosure statement. Magten Exs. 13 and 14, respectively. In this version of the Plan, the holders of the QUIPS and the TOPrS were placed in the same class. Id.

On April 28, 2004, NorthWestern filed its Motion for Order Pursuant to Bankruptcy Rule 9019 seeking entry of the MOU Order (the "MOU Motion"), in order to settle the securities class action litigation pending against NorthWestern and certain of its officers and directors. Magten

---

[5] Magten and NorthWestern are in discussions regarding the filing of a joint motion to designate additional items that may not have originally been included in the record of the MOU Appeal and the Confirmation Order Appeal. All references to items not specifically listed in Magten's or NorthWestern's designation of record are included in the appendix and referred to as "Appx. Ex __".

6

Ex. 32. On May 5, 2004, Magten filed its Objection to the MOU Motion. Magten Ex. 41.

On May 14, 2004 NorthWestern filed its First Amended Plan and related Disclosure Statement with the Bankruptcy Court (Magten Exs. 49 and 50, respectively), and on May 25, 2004, NorthWestern filed its revised First Amended Plan and Disclosure Statement. Magten Exs. 57 and 58, respectively. As in the first filed version of the Plan, in this version of the Plan, the holders of the QUIPS and the TOPrS were placed in the same class. Id.

On May 26, 2004, the Bankruptcy Court approved the revised First Amended Disclosure Statement. Magten Ex. 59. On August 9, 2004, Magten filed an objection to NorthWestern's First Amended Plan of Reorganization. Magten Ex. 110.

On August 19, 2004, four business days before the scheduled confirmation hearing, NorthWestern filed its Second Amended Plan and related Disclosure Statement, which included substantive changes, such as the separation of the claims of the QUIPS and the TOPrS into two separate classes. Magten Exs. 128 and 129, respectively. On August 25, 2004, Magten filed an objection to the Second Amended Plan and Disclosure Statement. Magten Ex. 158. That same day, over the objections of Magten and Law Debenture, the Bankruptcy Court held a hearing with respect to NorthWestern's disclosure statement and began the confirmation hearing.

On August 31, 2004, NorthWestern filed the Plan and revised Second Amended and Restated Disclosure Statement (Magten Exs. 163 and 164, respectively), and on September 2, 2004, the Bankruptcy Court entered an order approving the Second Amended and Restated Disclosure Statement. Magten Ex. 167.

On September 21, 2004, Magten filed an objection to the Plan (Magten Ex. 180), and on October 6, 2004, the Bankruptcy Court continued the confirmation hearing with respect to the Plan. Magten Ex. 202. Subsequently, on October 8, 2004, the Bankruptcy Court held a teleconference during which the Bankruptcy Court confirmed the Plan over the objections of Magten and Law Debenture. Magten Ex. 213.

On October 18, 2004, the Bankruptcy Court, over Magten's objection, entered the MOU Order (Magten Ex. 201), and on October 19, 2004, the Bankruptcy Court entered the

7

Confirmation Order. Magten Ex. 203.

On October 22, 2004 Magten filed its Emergency Motion for a Stay Pending Appeal of the Confirmation Order (the "Emergency Motion") to prevent the Plan from becoming effective. Magten Ex. 205. On October 25, 2004, the Bankruptcy Court held a hearing on the Emergency Motion, and denied the Emergency Motion. Magten Ex. 218. Immediately thereafter, on October 26, 2004, Magten filed with this Court a motion to be heard on an emergency basis seeking to stay the Confirmation Order. Appx. Ex. B (Emergency Motion for Stay Pending Appeal of the Order Confirming the Debtor's Second Amended and Restated Plan of Reorganization, filed Oct. 26, 2004). On October 29, 2004, after oral argument, this Court denied Magten's motion for a stay of the Confirmation Order. On November 1, 2004, NorthWestern's Plan became effective (Magten Ex. 217), and on December 29, 2004, NorthWestern filed a Notice of Substantial Consummation of the Plan. Appx. Ex. C (Notice of Substantial Consummation, Bankr. Dkt. No. 2519).

Magten timely filed its Notice of Appeal of the Confirmation Order with the Bankruptcy Court on October 25, 2004 (Magten Ex. 209), and thereafter timely filed its designation of record and statement of issues to be presented on appeal. Magten timely filed its Notice of Appeal of the MOU Order with the Bankruptcy Court on October 26, 2004 (Magten Ex. 214), and thereafter timely filed its designation of record and statement of issues to be presented on appeal. The MOU Order Appeal was docketed with this Court at CV-04-1508 on December 9, 2004, and the Confirmation Order Appeal was docketed with this Court at CV-04-1389 on December 10, 2004. On December 22, 2004, Magten and NorthWestern filed a joint motion seeking to consolidate the Confirmation Order Appeal and the MOU Order Appeal as CV-04-1389, which was so ordered by this Court on December 30, 2004.

B.    *The Fraudulent Transfer Proceeding*

On March 17, 2004, Magten filed its motion for relief from the automatic stay to commence an adversary proceeding seeking to avoid the Transfer. Magten Ex. 17. On April 8, 2004, the Bankruptcy Court granted Magten's motion, thereby allowing Magten and Law

8

Debenture to commence the Fraudulent Transfer Proceeding against NorthWestern. Magten Ex. 56, pp. 85-87.

On April 16, 2004, after this Court granted Magten and the Indenture Trustee relief from the automatic stay, Magten, together with the Indenture Trustee, filed a complaint against NorthWestern in the Bankruptcy Court on behalf of the holders of the QUIPS seeking to set aside the Fraudulent Transfer. Magten Ex. 30. The Fraudulent Transfer Proceeding asserts that Northwestern wrongfully appropriated certain assets of a subsidiary and that the holders of the QUIPS (as direct creditors of that subsidiary as well as NorthWestern) had the right to have their claims paid in full before those assets could be made available to satisfy the claims of NorthWestern's other creditors.

On October 4, 2004, Magten filed an amended complaint in the Fraudulent Transfer Proceeding. Magten Ex. 232. The Bankruptcy Court has stayed the Fraudulent Transfer Proceeding pending resolution of this appeal. As such, at the time the Plan was filed as well as confirmed, the Fraudulent Transfer Proceeding had not been resolved and, as a result, the QUIPS litigation claim was treated as a disputed claim.

C.    *The Plan*

In general terms, the Plan provides that all administrative claims, priority claims, and secured claims would be paid in full. The backbone of the Plan is a debt for equity swap that provides for the distribution of one hundred percent of 91% of the equity of the reorganized NorthWestern (the "New Common Stock") to holders of NorthWestern's senior unsecured debt and general unsecured claims, and 8% to holders of NorthWestern's allegedly junior unsecured debt— the holders of the QUIPS and the TOPrS.[6] Magten Ex. 163, pp. 33-38. Under the Plan, parties receiving the New Common Stock also received warrants with a strike price of $28 for additional shares of New Common Stock. Id.

---

[6] As discussed in further detail below, the amount distributed to the holders of the QUIPS was conditioned on selecting Option 1 under the Plan.

9

Specifically, the Plan divided claims and equity interests into sixteen classes. The Plan provides that holders of priority claims (Classes 1 and 2), NorthWestern's DIP financing lender (Class 3), and all other holders of secured claims (Classes 4, 5, and 6), would receive payment in full on account of their claims. Id. at 32- 33. Holders of unsecured note claims (Class 7) received 91% of new common stock of reorganized NorthWestern (the "New Common Stock"), which was shared pro rata with holders of general unsecured claims (Class 9), creating a 63% recovery for both classes of claims. Id. at 33-34, 37-38; Magten Ex. 164, pp. 7-8, 10-11. The holders of the TOPrS were placed in Class 8(a), which received 6.6% of the New Common Stock, as well as warrants exercisable for another 10.6% of New Common Stock, creating a 12% recovery. Magten Ex. 163, p. 35; Magten Ex. 164, p. 9.

Holders of the QUIPS were placed in Class 8(b), which did not receive the same recovery as the holders of NorthWestern's other junior subordinated debt (the TOPrS), but instead were required to choose between (i) Option 1 — a recovery on account of their QUIPS holdings and no claim or right with respect to the Fraudulent Transfer Proceeding and (ii) Option 2 — a recovery in the Fraudulent Transfer Proceeding and no distribution on account of their QUIPS holdings.[7] Magten Ex. 163, pp. 35-37. If Magten had selected Option 1, it would have received its pro rata share of 1.4% of the New Common Stock, plus warrants exercisable for an additional 2.3% of New Common Stock, a 15.3% recovery. Id.; Magten Ex. 164, p. 9. Because Magten chose Option 2, it received a Class 9 unsecured claim and a pro rata share of recoveries, if any, upon resolution of the Fraudulent Transfer Proceeding; the 1.4% of New Common Stock Class 8(b) would have received was allocated pro rata to Class 7 and Class 9. Magten Ex. 163, pp. 36-38.[8]

---

[7] Although the right to recover in the Fraudulent Transfer Proceeding is separate and apart from the right to be compensated in bankruptcy on account of the QUIPS claims, NorthWestern forced the QUIPS holders to choose between two recoveries to which they are rightfully entitled. This was a choice other similarly situated creditors were not required to make.

[8] Unsecured convenience claims of $20,000 or less (Class 10), environmental claims (Class 11), and claims held by parties in the securities class action suits (Class 14), all received payment in full on account of their claim, while holders of equity interests received no recovery. Magten Ex. 163, pp. 38-40, 41-42. Holders of D&O Trust Claims (Class 12) may receive a recovery on account of claims arising from certain D & O proceedings.

120087.01600/40155208v1

## ARGUMENT

I.  **THE BANKRUPTCY COURT ERRED IN CONFIRMING THE PLAN BECAUSE THE PLAN DID NOT MEET THE REQUIREMENTS OF SECTIONS 1122 AND 1129 OF THE BANKRUPTCY CODE**

A.  *The Plan Fails to Comply with Sections 1122 and 1129(a)(1) of the Bankruptcy Code Because the QUIPS' Claims Are Not Properly Classified*

Section 1129(a)(1) of the Bankruptcy Code requires that in order for a plan to be confirmed, a plan must comply with the applicable provisions of the Bankruptcy Code. In turn, section 1122 of the Bankruptcy Code requires, in pertinent part, that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). Moreover, although not explicitly stated in section 1122, separate classification of substantially similar claims "must be justified by a legitimate business reason or some legitimate difference in the treatment of creditors that are classified separately under a debtor's plan of reorganization." In re D &W Realty Corp., 165 B.R. 127, 128 (S.D.N.Y. 1994) (citing John Hancock Mutual Life Ins. Co. v. Route 37 Bus. Park Assocs., 987 F.2d 154, 158 (3d Cir. 1993)). The Bankruptcy Court erred in confirming the Plan because the Plan failed to satisfy section 1122's requirements with respect to the classification of the claims of the holders of the QUIPS.

A chapter 11 plan proponent must demonstrate that there is a reasonable basis for the plan's classification and must show that all claims within a class are substantially similar. In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992). Cf. In re Bugg, 172 B.R. 781, 783-84 (E.D. Pa. 1994) (holding that secured creditors with secured interests in distinct properties must be classified separately). Courts have defined "substantially similar claims" as those claims that share a common priority status and other legal rights against the debtor's assets. In re Fairfield Executive Assocs., 161 B.R. 595, 600 n.6 (D.N.J. 1993); See also In re Greystone III Joint Venture, 995 F.2d 1274, 1278 (5th Cir. 1991) ("'[S]ubstantially similar claims,' those which share common priority and rights against the debtor's estate, should be placed in the same class."). Therefore, unless NorthWestern showed that the claims of the

11

QUIPS for principal and interest and the "claims" arising from the Fraudulent Transfer Proceeding were "substantially similar," the "claims" were required to be separately classified pursuant to the plain language of section 1122(a). See In re Bloomingdale Partners, 170 B.R. 984, 997 (Bankr. N.D. Ill. 1994).

The Bankruptcy Court erred in confirming the Plan, because the Plan placed two different types of claims – a claim for principal plus accrued interest on the QUIPS and the Fraudulent Transfer Action, in the same class and separately classified substantially similar claims – the claims of the holders of the TOPrS and the QUIPS on account of their respective notes.

      i.    *The Claims of the QUIPS on Account of Principal and Interest and the Fraudulent Transfer Proceeding are not Substantially Similar*

The Bankruptcy Court erred in confirming the Plan because the causes of action set forth in the Fraudulent Transfer Proceeding are not "claims" within section 101(5) of the Bankruptcy Code and, therefore, survive confirmation of a Plan. Because the causes of action in the Fraudulent Transfer Proceeding are not "claims," they could not have been placed in any class of claims, yet the Plan treated such "claims" as if they were part of Class 8(b). In order for the causes of actions set forth in the Fraudulent Transfer Proceeding to be treated as "claims" under 11 U.S.C. 101(5), such "claims" had to be classified in Class 9 of the Plan – not Class 8 – because such claims were not substantially similar to the claims of the QUIPS with respect to value of the QUIPS Notes.

As described above, the Plan provided that a QUIPS holder could either (i) choose Option 1 and receive its pro rata share of the distribution of New Common Stock and Warrants and release any claims or rights it has with respect to the Fraudulent Transfer Proceeding, or (ii) choose Option 2 and receive no distribution on account of its QUIPS holdings and only receive a recovery in the Fraudulent Transfer Proceeding that would be treated as a Class 9 claim. While claims with respect to the QUIPS notes are subordinated due to contractual subordination, the causes of action asserted in the Fraudulent Transfer Proceeding are not subordinated and could

not be treated as subordinated in the same manner as the claims based on the QUIPS notes. Moreover, the claims related to the value of the QUIPS notes are claims rooted in bankruptcy, while the causes of action related to the Transfer are claims rooted in equity. The causes of action related to the Fraudulent Transfer Proceeding are not substantially similar to the claims related to the QUIPS notes.

Because the holders of the QUIPS have a separate right with respect to the Fraudulent Transfer Proceeding, the Plan could not bundle that right with the right to be compensated in bankruptcy on account of the QUIPS claims. The Fraudulent Transfer Proceeding is separate and apart from any recovery due to the holders of the QUIPS on account of their holdings. In fact, the Plan provides that recovery pursuant to Option 2, the Fraudulent Transfer Proceeding, shall be treated as a Class 9 General Unsecured Claim – thereby acknowledging that a recovery on the Fraudulent Transfer Proceeding is independent from a recovery on the QUIPS notes. Moreover, the Bankruptcy Court recognized this, noting, "Certainly Class 9 is not treated better than the fraudulent conveyance claim, because I found that the fraudulent conveyance claim should be in 9 and should be treated as 9." Magten Ex. 213, p. 39. Despite the fact that the Plan and the Bankruptcy Court acknowledged that the claims arising from the Fraudulent Transfer Proceeding were distinct from the claims on account of the QUIPS debt, the Bankruptcy Court mistakenly confirmed a Plan that had the claims for principal and interest in the same class as the "claims" for the Fraudulent Transfer Proceeding.

Not only did the Plan wrongly classify the QUIPS' claim for principal and interest together with the Fraudulent Transfer Proceeding, but also required the QUIPS holders to choose between recoveries on each right. Forcing holders of the QUIPS to choose between recoveries was inappropriate as it required holders of the QUIPS to forego one of their separate rights. This is no different than a plan that classifies a secured claim and a deficiency claim in the same class and then forces the secured creditor to choose between the two recoveries to which it is both entitled. The Bankruptcy Court simply ignored this, noting that the "two particular kinds of remedies are in fact completely inconsistent" and are "exclusionary and not cumulative." Id. at

13

32, 34. The Bankruptcy Court failed to recognize the counterintuitive nature of its own argument — if the Fraudulent Transfer Proceeding is unsuccessful and the Transfer is determined to be legally valid, the holders of the QUIPS who selected Option 2 will be left with no recovery on account of their valid claim against NorthWestern, despite the fact that, as the Bankruptcy Court recognized, "[i]f there wasn't a fraudulent conveyance, then the Quips are in fact owed the money." Id. at 32. The remedies are not "completely inconsistent," nor are they "exclusionary and not cumulative"; by aggregating all claims asserted by the holders of the QUIPS into one class – Class 8(b) – and then requiring claimants in that class to choose between two separate recoveries to which they are entitled, the Plan did not comply with section 1122 of the Bankruptcy Code, and therefore could not have been confirmed in accordance with section 1129(a)(1) of the Bankruptcy Code.

In addition, because QUIPS holders were forced to choose between two rightful recoveries, claimants within the same class – Class 8(b) – received non-consensual disparate treatment. Section 1123(a)(4) of the Bankruptcy Code requires that a plan provide the same treatment to each claim or interest in a class "unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim." By forcing QUIPS holders to choose between one of two recoveries, claimants in Class 8(b) were treated differently depending upon which recovery they choose, whether they voted to accept the Plan and whether the Plan was accepted by the class. Moreover, pursuant to the Plan, because Class 8(b) rejected the Plan, QUIPS holders that did not vote on the Plan were forced to accept Option 2 and only recover in the Fraudulent Transfer Proceeding. Without the consent of a QUIPS holder, the Plan could not have determined to provide one treatment to some holders and a different treatment to others. The non-consensual varying treatment of claimants within Class 8(b) violated section 1123(a)(4) of the Bankruptcy Code.

        ii.     *The Claims of the TOPrs and the QUIPS for Principal and Interest are Substantially Similar*

In defending earlier versions of the Plan, NorthWestern repeatedly stated that the claims

120087.01600/40155208v1

of the holders of the TOPrS and the QUIPS were substantially similar and that there was no basis to separately classify them. NorthWestern filed three prior versions of its plan of reorganization (as well as three prior versions of its disclosure statement in support of each plan), and each prior version classified the claims of the holders of the TOPrS together with the claims of the holders of the QUIPS. Through NorthWestern's own actions – classifying together the claims of the holders of the TOPrS and the QUIPS for principal plus accrued interest – NorthWestern acknowledged that those claims are the same.

The confirmed version of the Plan, however, separately classified the claims of the holders of the QUIPS and the TOPrS, and forced the holders of the QUIPS to release their rights and claims in the Fraudulent Transfer Proceeding in order to obtain a recovery for principal and interest on the QUIPS notes, ultimately denying the holders of the QUIPS their rightful recovery on account of their claim. As discussed in further detail above, to the extent that Magten's rights with respect to the Fraudulent Transfer Proceeding are "claims," they rightly belonged in Class 9, not Class 8, a fact recognized by both the Bankruptcy Court and NorthWestern. Properly viewed, Magten's Class 8(b) claims are for principal and interest on account of their contractually subordinated QUIPS, which are *pari passu* with the claims on account of the TOPrs notes. The treatment afforded to Class 8(b) under the Plan was nothing more than a coercive effort by NorthWestern to leave QUIPS holders with no recovery if they chose to pursue the Fraudulent Transfer Proceeding – a right that is separate and apart from the underlying QUIPS' claim. The Plan could not separately classify the holders of the QUIPS because they have different rights and claims than the holders of the TOPrS and, at the same time, force the holders of the QUIPS to choose between two treatments, both of which they are entitled to.

Courts have made it clear "that substantially similar claims may not be placed in separate classes for the sole purpose of affecting or 'gerrymandering' the voting with respect to the debtor's proposed plan of reorganization under section 1129(a) of the Bankruptcy Code." In re D &W Realty Corp., 165 B.R. at 128; see also Boston Post Rd. Ltd. P'ship v. Fed. Deposit Ins.

Corp. (In re Boston Post Rd. Ltd. P'ship), 21 F.3d 477, 483 (2d Cir. 1994) (the proponent of a plan may separately classify substantially similar claims provided there is a legitimate business reason for the separate classification other than to manipulate the vote); In re John Hancock Mutual Life Ins. Co., 987 F.2d at 158 (recognizing that the "Code was not meant to allow a debtor complete freedom to place substantially similar claims in separate classes" because the critical requirements set forth in the Bankruptcy Code would be "seriously undermined if a debtor could gerrymander classes"); In re Greystone III Joint Venture, 995 F.2d at 1278-79 ("[O]ne clear rule that emerges from otherwise muddled case law on §1122 claims classification [is] thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan.").

In light of the fact that section 1123(a)(4) of the Bankruptcy Code mandates that a plan shall "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to less favorable treatment of such particular claim or interest," the Plan separately classified the holders of the TOPrS and the QUIPS on account of their claims for principal plus interest in an effort to affect the treatment provided to the holders of the QUIPS.  Under section 1123(a)(4), so long as the holders of the TOPrS and the QUIPS were placed in the same class, NorthWestern was required to provide the same treatment to both classes of creditors; an identical recovery on account of their claims for principal plus interest on their respective notes.  Under the previous classification scheme, NorthWestern could not have forced the holders of the QUIPS to relinquish their recovery on account of their contract claim in order to recover in the Fraudulent Transfer Proceeding because section 1123(a)(4) does not permit the holders of the QUIPS to receive worse treatment than other creditors of the same class.  See In re AOV Indus., Inc., 792 F.2d 1140 (D.C. Cir. 1986) (finding that "[i]t is disparate treatment when members of a common class are required to tender more valuable consideration – be it their claim against specific property of the debtor or some other cognizable chose in action – in exchange for the same percentage of recovery.").  In an effort to circumvent section 1123(a)(4) and, consequently, deprive the QUIPS holders of their rightful recovery for principal

16

plus accrued interest on account of their QUIPS holdings in addition to a recovery for the Fraudulent Transfer Proceding, NorthWestern manipulated the classification scheme by separately classifying the holders of the QUIPS and aggregating all of their claims into one class. The Bankruptcy Court erred in confirming the Plan despite these deficiencies.

      B.    *The Plan Fails to Satisfy the Requirements of Section 1129(b) of the Bankruptcy Code*

The Bankruptcy Court also erred in finding that the Plan met the requirements of section 1129(b) of the Bankruptcy Code. One impaired class – Class 8(b) –voted to reject the Plan. As such, in order to cramdown the Plan on this dissenting class of creditors, NorthWestern had to satisfy the requirements of section 1129(b) of the Bankruptcy Code, which states in pertinent part, that:

> Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan *does not discriminate unfairly*, and is *fair and equitable*, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan. (emphasis added)

Pursuant to section 1129(b), in order to confirm the Plan, the Bankruptcy Court had to find (i) that creditors in Class 8(b) would receive the same treatment as similarly situated creditors, when compared with the priorities of all other unsecured creditor classes; and (ii) that no junior interests would receive any distributions or that Class 8(b) claims would be paid in full. The Plan did not meet these requirements, and as such, should not have been confirmed.

      i.    *The Plan Violates Section 1129(b) of the Bankruptcy Code by Discriminating Unfairly Because Creditors in Class 8(b) do not Receive the Same Treatment as Similarly Situated Creditors, When Compared With the Priorities of all Other Unsecured Creditor Classes*

Section 1129(b) of the Bankruptcy Code mandates that a plan may not "discriminate unfairly" with respect to each impaired class of creditors or interest holders that does not accept the plan. "The essence of this requirement is that a dissenting class must be treated equally with

17

respect to other classes of equal rank." Alan N. Resnick, Bankruptcy Law Manual, §9.58, at p. 1037 (5th ed. 2002). The Bankruptcy Court confirmed the Plan, notwithstanding the fact that it discriminated unfairly against creditors in Class 8(b).

As explained above, the TOPrS and the QUIPS are of equal rank with respect to their claims for principal plus accrued interest. In fact, NorthWestern represented to the Bankruptcy Court that the initial classification of the holders of the TOPrS and the QUIPS was appropriate because their claims for principal plus interest are *pari passu*. See Magten Exs. 13 and 49. Instead of providing the holders of the QUIPS with a recovery *pari passu* to the recovery provided to the holders of the TOPrS, the Plan discriminated unfairly against the holders of the QUIPS by forcing them to relinquish their recovery on account of their contract claim for principal and interest in order to recover in the Fraudulent Transfer Proceeding. The Bankruptcy Court's main justification for approving the disparate treatment of *pari passu* claims stemmed from its view that the holders of the TOPrs and the QUIPS have "different litigation rights." Magten Ex. 213, p. 35. However, as discussed above, and recognized by the Bankruptcy Court, the "claims" arising from the Fraudulent Transfer Proceeding" are truly Class 9 claims, not Class 8(b) claims. As such, because the TOPrS and the QUIPS are of equal rank with respect to the payment of principal and interest, the treatment of Class 8(b) under the Plan violated section 1129(b) of the Bankruptcy Code.

In addition, the Plan further discriminated unfairly among similarly situated creditors – Classes 8(a) and 8(b) – by providing QUIPS holders that voted against the Plan and selected Option 2 with no recovery for the principal and interest owed under the QUIPS. See In re Mcorp Fin., Inc., 137 B.R. 219 (Bankr. S.D. Tex. 1992) ("There is no authority in the Bankruptcy Code for discriminating against classes who vote against a plan of reorganization") (citing In re Allegheny Int'l, Inc., 118 B.R. 282, 304 n.15 (Bankr. W.D. Pa. 1990) (finding that a provision in a plan that provided that if any class of equity holders rejected the plan, that class and any junior class would not receive any distribution was discriminatory)). But see In re Zenith Elecs. Corp., 241 B.R. 92, 105 (Bankr. D. Del. 1999) (holding that "[t]here is no prohibition in the Code

18

against a Plan proponent offering different treatment to a class depending on whether it votes to accept or reject the Plan."). This deprives the holders of the QUIPS from receiving the same treatment — payment of principal and interest — afforded to other creditors of equal rank.

QUIPS holders that selected Option 2 were given nothing more than the right to pursue the Fraudulent Transfer Proceeding. The Plan failed to acknowledge that the right to recover in the Fraudulent Transfer Proceeding has always been a right available to the QUIPS holders notwithstanding the Plan. Thus, NorthWestern manipulated the vote in Class 8(b) so as to affect a cramdown on that class while, at the same time, depriving the holders of the QUIPS of the recovery on account of their QUIPS claims to which they are entitled. Nothing in the Bankruptcy Code permitted NorthWestern to preclude the holders of the QUIPS from receiving a distribution for both the Fraudulent Transfer Proceeding as well as their contractual claim on account of their holdings in the QUIPS. Hence, recovery for the holders of QUIPS should not have been an "either/or" option, rather, the holders of the QUIPS should have received a recovery for their Class 8(b) claim *as well* as a separate recovery for the fraudulent conveyance action. As such, the Plan discriminated unfairly against Class 8(b), thereby violating section 1129(b) of the Bankruptcy Code.

ii.     *The Plan Violates Section 1129(b) of the Bankruptcy Code By Discriminating Unfairly Because the Distributions Made to the Holders of the QUIPS are Not a "Gift"*

NorthWestern attempted to justify the Plan's discriminatory treatment of the holders of the QUIPS by arguing that any distributions made to the QUIPS are a "gift" from senior creditors. Specifically, in its Memorandum of Law in Support of Confirmation of its Second Amended and Restated Plan filed with the Bankruptcy Court on August 18, 2004, NorthWestern claimed that the Plan does not discriminate unfairly because the recovery that Classes 8(a) and 8(b) are projected to receive is the direct result of Class 7's decision to contribute to these classes in order to effectuate a settlement with members. Magten Ex. 132, p. 43. As such, NorthWestern claimed that no unfair discrimination exists because senior creditors allocated to a class of junior creditors certain value that belonged to senior creditors. Id. at 48. Similarly,

19

NorthWestern claimed that any distributions provided to Magten and the holders of the QUIPS were a mere "gift" from senior creditors. Inexplicably, the Bankruptcy Court agreed.

The Bankruptcy Court ignored the Plan's explicit failure to comply with section 1129(b)(2)(B)(ii) of the Bankruptcy Code and agreed with NorthWestern that such distributions were in actuality "gifts" from Class 7.[9] The Bankruptcy Court ignored the fact that the distribution being made to Class 8(b) in the Plan is a distribution pursuant to the Plan from NorthWestern, not creditors in Class 7. Furthermore, there is simply no legal basis for the Bankruptcy Court to circumvent the confirmation requirements set forth in the Bankruptcy Code by finding that distributions made to creditors are a "gift" from other creditors when, in actuality, NorthWestern made the distributions pursuant to the Plan. In re Sentry Operating Co., Inc., 264 B.R. 850, 864-65 (Bankr. S.D. Tex. 2001) (rejecting a creditor's argument that the plan does not unfairly discriminate by paying a greater recovery to one class of creditors over another class of creditors of equal rank because such an argument "does not address specific statutory confirmation requirements" and "is a siren's song that is insufficient as a foundation for plan confirmation"). A District Court in this Circuit recently held that the Bankruptcy Code provides no authority for "gifts." See In re Armstrong World Indus., 320 B.R. 523, 540 (E.D. Pa. 2005) (denying confirmation of a "gift plan" after finding no legal authority to ignore requirements of section 1129(b)(2)(B)(ii) of the Bankruptcy Code through use of a "gift plan"). Accordingly, the Plan "discriminates unfairly" because any distributions being made to junior creditors – i.e. Classes 8(a) and 8(b) – pursuant to the Plan were distributions that came from NorthWestern and were not simply a "gift" from senior creditors.

While this chapter 11 case is not the first case in which a debtor has argued that distributions under a plan do not discriminate unfairly because senior creditors are free to "give up" a portion of its proceeds to unsecured creditors, (See, e.g., In re Mcorp. Fin., Inc., 160 B.R.

---

[9] The Bankruptcy Court noted that "Magten suggested even if this is a so-called gift case, that the requirements of the Code would nevertheless apply with regard to the fairness of the treatment. As a general proposition, I don't agree with that, but I do think that there might be circumstances under which a treatment could be so substantially unfair that notwithstanding the fact that it's a gift that it would be subject to inquiry by the Court, but I don't think that set of facts and circumstances arises here." Magten Ex. 163, p. 31.

20

941 (S.D. Tex. 1993)), there is simply no authority under the Bankruptcy Code to support this line of reasoning. Sections 1123 and 1129 of the Bankruptcy Code contain specific requirements that NorthWestern had to meet in order for the Bankruptcy Court to find the Plan confirmable as a matter of law. For purposes of complying with such requirements, it is irrelevant whether certain creditor constituencies are actually entitled to a recovery under the Plan. Rather, when determining whether the Plan provides for fair and equitable treatment to a dissenting class of creditors, it is only relevant that the recovery to that class complies with the requirements of the Bankruptcy Code.

iii.    *The Plan Violates Section 1129(b) of the Bankruptcy Code Because the Plan is not Fair and Equitable and Violates the Absolute Priority Rule*

The requirement that a plan be "fair and equitable," more commonly known as the doctrine of absolute priority, provides that "creditors and shareholders may participate in the debtor's assets only in accordance with their respective priorities, and that senior classes must receive full compensation for their claims before other classes can participate." In re Toy & Sports Warehouse, Inc., 37 B.R. 141, 151-152 (Bankr. S.D.N.Y. 1984) (quoting Consol. Rock Prods. Co. v. DuBois, 312 U.S. 510 (1941)). See also Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434 (1999).

Pursuant to the Plan, holders of equity interests that filed securities law and other claims against NorthWestern are classified in Class 12 and Class 14. Although these claims are subordinated under section 510(b) of the Bankruptcy Code, the Plan provides that the holders of will receive more than $37 million in distributions of estate property. However, the doctrine of absolute priority is clear that a class of senior creditors that rejects a plan must receive full compensation for their claims before other classes can participate in the plan. See Armstrong, 320 B.R. at 536 ("[A] plan is not 'fair and equitable' if a class of creditors [or stockholders] that is junior to the class of unsecured creditors receives debtor's property because of its ownership interest in the debtor while the allowed claims of the class of unsecured creditors have not been paid in full."); In re Resorts Int'l, Inc., 145 B.R. 412, 483 (Bankr. D.N.J. 1990) ("Implicit in this

rule is that stockholders cannot participate in a reorganization plan unless it is established that the debtor is solvent.").

In justifying why the distribution to Classes 12 and 14 did not violate the absolute priority rule, the Bankruptcy Court erroneously found that NorthWestern was somehow capable of making a distribution under the Plan to members of Classes 12 and 14 from some source other than property of the estate. The Bankruptcy Court noted, "I've already found in connection with my memorandum decision for the MOU that the proceeds are not property of the estate so that does not implicate, therefore, the absolute priority rule." Id. However, the Bankruptcy Court erred because it is well settled law that claims brought in a derivative action belong to NorthWestern's estate (see, e.g., Goldin v. Primavera Familienstiftung (In re Granite Partners, LP), 194 B.R. 318, 328 (Bankr. S.D.N.Y. 1996) (finding that claims deemed to be a shareholders' derivative action becomes property of the estate in bankruptcy)), and any damages recovered in such action inure directly to NorthWestern's estate and not the shareholders. See In re Ionosphere Clubs, Inc., 17 F.3d 600, 606 (2d Cir. 1994) (reasoning that that if damages were paid to "Preferredholders" rather than the bankruptcy estate, the "Preferredholders would receive compensation for their foregone dividends while claimants senior in priority to them went unpaid, thus defeating the Bankruptcy Code's system of priorities."). As such, by virtue of the derivative nature of the claims held by NorthWestern's shareholders, such claims are property of the estate and should benefit all of NorthWestern's creditors and not exclusively holders of equity interests. Here, NorthWestern was not solvent and the Plan did not provide for payment in full of claims senior to Classes 12 and 14, yet, those classes received distributions.

Moreover, in confirming the Plan, the Bankruptcy Court determined that the $37 million of D&O insurance proceeds being distributed to holders of Class 12 and 14 claims was not property of the estate. The Bankruptcy Court did this despite clear precedent that the proceeds of an insurance policy may inure to the benefit of a bankruptcy estate if a bankruptcy estate representative, i.e., a trustee, brings such claims and acts to distribute the proceeds to the debtor's estate. See Alstrin v. St. Paul Mercury Ins. Co., 179 F.Supp.2d 376, 404 (D. Del. 2002) (finding

"that the 'insured v. insured' exclusion should not apply to claims brought by a bankruptcy

Estate Representative against the former directors and officers of the Debtor where the Debtor is

the insured entity, because the Debtor's Estate Representative . . . and the Debtor . . . are separate

entities."); See also In re County Seat Stores, Inc., 280 B.R. 319 ( Bankr. S.D.N.Y. 2002)

(holding that because a bankruptcy trustee is a legal entity separate and distinct from the debtor,

the trustee was not subject to the "insured v. insured" exclusions and could thus bring its claims

against the debtor's directors and officers). In light of this judicial precedent and the absolute

priority rule, the holders of the QUIPS should have received the proceeds from NorthWestern's

D&O insurance policy prior to any distribution from such proceeds to equity interests in Classes

12 and 14.

    The Bankruptcy Court erred in determining that NorthWestern's violation of the absolute

priority rule was justified because the Plan was a "gift plan".[10] As a District Court in this Circuit

recognized, there simply is no basis in law for this proposition, notably, "the available legislative

history demonstrates that Congress did not intend for the Bankruptcy Code to allow a senior

class to sacrifice its distribution to a junior class when a dissenting intervening class had not been

fully compensated." Armstrong, 320 B.R. at 536. Moreover, "Congress anticipated, but

ultimately rejected this possibility . . . . [ultimately deciding that] 'a senior class will not be able

to give up value to a junior class over the dissent of an intervening class unless the intervening

class receives the full amount, as opposed to value, of its claims or interest.'" Id. (quoting 124

Cong. Rec. H. 32408 (Sept. 28, 1978) (remarks of Rep. Edwards)).

    Ultimately, distributing property to junior creditors – i.e., Class 12 and Class 14 – before

senior creditors who oppose the Plan – i.e., Class 8(b) – are paid in full, violates the absolute

priority rule and, therefore, should have been fatal to the Plan. See Armstrong, 320 B.R. at 526,

540 (denying confirmation of a plan of reorganization because the "gift" distribution of warrants

---

[10] "Why is it fair for the Quips to lose that recovery if they choose also to pursue the fraudulent conveyance? Well,
I've already found that based upon the valuation that this is indeed what can be fairly called a gift case, that is to say
that there is not an absolute entitlement to the 8 percent or the 13 percent in warrants that has been set aside here for
Class 8, but rather that is money that is coming out of the recoveries that would otherwise be available to Classes 7
and 9 as non-subordinated unsecured creditors." Magten Ex. 213, pp. 30-31.

23

to equity holders "violates the 'fair and equitable' requirement of 11 U.S.C. § 1129(b)(2)(B)(ii), a codification of the absolute priority rule" where unsecured creditors were not paid in full, and noting that "[b]luntly put, no amount of legal creativity or counsel's incantation to general notions of equity . . . supports judicial rewriting of the Bankruptcy Code"); In re Sovereign Group 1985-27 Ltd., 142 B.R. 702, 705 (E.D. Pa. 1992) ("Under current law, failure to comply with the absolute priority rule is fatal to the proposed plan of reorganization."). As such, the distributions provided to Classes 12 and 14 rendered the Plan unconfirmable as a matter of law.

## II.    THE BANKRUPTCY COURT ERRED IN CONFIRMING THE PLAN BEFORE RESOLUTION OF THE FRAUDULENT TRANSFER PROCEEDING

### A.    *The Plan Improperly Treats the Montana Utility Assets as Property of the Estate*

The Bankruptcy Court erred in confirming the Plan because it violates section 1129(a)(1) of the Bankruptcy Code by including property, the Montana Utility Assets, that was not property of the estate pursuant to section 541 of the Bankruptcy Code. The Montana Utility Assets were not property of the estate because, as a matter of Montana law, they were being held in constructive trust for the holders of the QUIPS.

Section 541 of the Bankruptcy Code provides a detailed list of the property comprising a bankruptcy estate, as well as property that is explicitly excluded from the estate. See 11 U.S.C. § 541. The Third Circuit Court of Appeals has held that "Congress clearly intended the exclusion created by section 541(d) to include not only funds held in express trust, but also funds held in constructive trust." Official Comm. of Unsecured Creditors v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.), 997 F.2d 1039, 1059 (3d Cir. 1993); See also In re Levitz Furniture, Inc., 267 B.R. 516, 522 (Bankr. D. Del. 2000) ( "[T]he Bankruptcy Code recognizes constructive trusts as exceptions to the definition of property of the estate."). Because section 541 of the Bankruptcy Code excludes property held in constructive trust, a debtor cannot use such property to satisfy claims of the estate. See In re Unicom Computer Corp., 13 F.3d 321 (9th Cir. 1994) (recognizing that "something held in trust by a debtor for another is neither property of the bankruptcy estate under section 541(d), nor property of the debtor for purposes of section

24

547(b)"); In re America's Voice, Inc., 2000 U.S. Dist. LEXIS 14761 (D.D.C. Oct. 4, 2000) (finding that because Debtor held property in a fiduciary capacity under constructive trust the property cannot constitute property of the estate); In re Mariner Post-Acute Network, Inc., 267 B.R. 46 (Bankr. D. Del. 2001) (stating that property held by a debtor in constructive trust for another cannot be used by the debtor to pay its creditors); In re Hellesen, 1999 Bankr. LEXIS 1891, at * 20 (Bankr. D.N.H. Jan. 11, 1999) ("Constructive trust property never becomes property of the estate because it belongs to someone else.").

Because the Plan granted liens on the Montana Utility Assets, purported to revest those assets in NorthWestern free and clear of liens claims and interests, and included a distribution scheme based on the assumption that the Montana Utility Assets were property of NorthWestern's estate, the Plan violated section 1129(a)(1) and section 541 of the Bankruptcy Code and, therefore, could not have been confirmed.

B.   *The Fraudulent Transfer Proceeding is not a "Claim" and Cannot be Discharged in Bankruptcy*

Additionally, the Bankruptcy Court erred in confirming the Plan because the Fraudulent Transfer Proceeding is not a claim and cannot be discharged through the Confirmation Order. Only "debts" are discharged in Bankruptcy. See 11 U.S.C. §1141(d)(1). A "debt" under section 101(12) of the Bankruptcy Code is defined to mean a "liability on a claim." Therefore, only "claims" are discharged upon a debtor's emergence from chapter 11.

Accordingly, the causes of action asserted in the Fraudulent Transfer Proceeding were not dischargeable upon NorthWestern's emergence from chapter 11 because they are not "claims" under section 101(5) of the Bankruptcy Code. Section 101(5) of the Bankruptcy Code defines a "claim" as:

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (B) right to an *equitable remedy* for breach of performance if such breach gives rise to a right to payment,

25

> whether or not such right to an *equitable remedy* is reduced to
> judgment, fixed, contingent, matured, unmatured, disputed,
> undisputed, secured, or unsecured. 11 U.S.C. § 101(5)(A)-(B).
> (emphasis added).

Thus, because the equitable remedy does not give rise to a right to payment, it is not a claim that

can be discharged.

The Fraudulent Transfer Proceeding seeks the imposition of a constructive trust and the

return of the Montana Utility Assets to Clark Fork as a result of a fraudulent transfer, but does

not seek a monetary payment. MCA § 31-2-339, which governs the remedies available to

creditors in seeking to set aside a fraudulent transfer, provides for remedies that are all equitable

in nature but not for any form of monetary relief. Because there is no available monetary remedy

for a fraudulent conveyance under Montana state law, the causes of action asserted in the

Fraudulent Transfer Proceeding are not "claims" and, therefore, survive NorthWestern's

emergence from bankruptcy. See 124 Cong. Rec. H11090 (daily ed. Sept. 28, 1978); 124 Cong.

Rec. S17406 (daily ed. Oct. 6, 1978) ("[R]ights to an equitable remedy for a breach of

performance with respect to which such breach does not give rise to a right to payment are not

'claims' and would therefore not be susceptible to discharge in bankruptcy."). The Bankruptcy

Court erred in determining that the causes of action in the Fraudulent Transfer Proceeding were

dischargeable claims.

26

# CONCLUSION

For the foregoing reasons, Magten respectfully requests this Court reverse the

Confirmation Order and grant such other and further relief as it deems appropriate.

Dated:  July 15, 2005

BLANK ROME LLP

_Mark J. Packel (DE No. 4048)_
Elio Battista, Jr. (DE No. 3814)
Chase Manhattan Centre
1201 Market Street, Suite 800
Wilmington, DE 19801
Phone:  (302) 425-6400
Facsimile:  (302) 425-6464

- and -

FRIED, FRANK, HARRIS, SHRIVER &
    JACOBSON LLP
Bonnie Steingart
Gary L. Kaplan
Evan S. Jacobson
One New York Plaza
New York, NY  10004-1980
Phone: (212) 859-8000
Fax:    (212) 859-4000

Co-Counsel for Appellant, Magten

120087.01600/40155208v1