The Other Debt includes a $35.0 million subordinated note payable to Avaya. In April 2000, Expanets completed a transaction to purchase the Lucent GEM business and, as part of the transaction, Expanets issued Avaya a $35.0 million subordinated note and a $15.0 million convertible note. The $15.0 million note converted into Series D Preferred Stock of Expanets prior to the end of 2001. On March 13, 2003, Avaya cancelled the $35.0 million subordinated note due 2005 and the $15 million Series D Preferred Stock. The subordinated note was non-interest bearing and had a carrying value of $27 million as of December 31, 2002.

***Mandatorily Redeemable Preferred Securities of Subsidiary Trust.*** We have established four wholly owned, special-purpose business trusts, NWPS Capital Financing I, NorthWestern Capital Financing I, NorthWestern Capital Financing II and NorthWestern Capital Financing III, to issue common and preferred securities and hold subordinated debentures that we issue and The Montana Power Company established Montana Power Capital I (Trust) as a wholly owned business trust to issue common and preferred securities and hold subordinated debentures that it issued. We assumed the obligations of The Montana Power Company under the subordinated debentures that it issued to Montana Power Capital I on November 15, 2002. The sole assets of these trusts are the investments in our subordinated debenture obligations. The trusts use the interest payments received on the subordinated debentures to make quarterly cash distributions on the preferred securities. These subordinated debentures are unsecured and subordinated to all of our other liabilities and rank equally with the guarantees related to the other trusts. We guarantee payment of the dividends on the preferred securities only if we have made the required interest payments on the subordinated debentures held by the trusts. We have also agreed to pay all of the expenses of the trusts. In addition, we own all of the common securities of each trust, equivalent to approximately 3% of the capital of each trust. Five years from the date of each issuance, and earlier in some circumstances if changes in law occur, we have the option to redeem some or all of the subordinated debentures at 100% of their principal amount plus any accrued interest to the date of redemption. All of the subordinated debentures have maturities in excess of 20 years.

We have the right, on one or more occasions, to defer interest payments in the subordinated debentures for up to 20 consecutive quarterly periods unless a default under the subordinated debentures has occurred and is continuing. If we defer interest payments on the subordinated debentures, cash distributions on our trust preferred securities will also be deferred. During this deferral period, distributions will continue to accumulate on both the trust preferred securities and deferred distributions at their respective annual rates. During any period in which we defer interest

payments on the subordinated debentures, we will not, with some exceptions, be permitted to pay any dividends or distributions in respect of our capital stock; redeem, purchase or make liquidation payments on our capital stock; make principal, premium or interest payments or repurchase or redeem any of our debt securities that rank equal with or junior to the subordinated debentures; or make any payments with respect to any guarantee of debt securities of any of our subsidiaries, including other guarantees, if such guarantee ranks equal with or junior to the subordinated debentures. Given our significant debt, our board of directors will review the appropriateness of each periodic interest payment under the subordinated debentures in light of, among other factors, the progress of our turnaround plan and our liquidity needs.

At December 31, 2002, NWPS Capital Financing I, NorthWestern Capital Financing I, NorthWestern Capital Financing II, NorthWestern Capital Financing III and Montana Power Capital I had 1.3 million, 2.2 million, 4.27 million, 4.44 million and 2.6 million shares of preferred securities outstanding, respectively, accrued distributions at the annual rate of 8.125%, 7.2%, 8.25%, 8.1% and 8.45%, respectively, of their liquidation preference value of $25 per security, and had assets of approximately $33.5 million, $56.7 million, $110.1 million, $114.4 million and $67 million of our subordinated indebtedness, respectively.

***Other Contractual Obligations.*** Many of Blue Dot's acquisitions have involved the issuance of Blue Dot

capital stock to the sellers of the acquired businesses. In connection with certain acquisitions, the sellers can elect under certain circumstances to exchange their shares for cash at a predetermined rate. The aggregate amount of exchange obligations as of December 31, 2002 was $3.9 million, of which $2.1 million was presented for exchange on March 31, 2003 and remains unpaid.

For certain other acquisitions, Blue Dot entered into call option agreements giving Blue Dot the right to repurchase these shares at a price that will vary, and may be greater or less than the original issue price, based upon the performance of the designated business unit over a specified time. Certain of these agreements grant the holder the right to put such shares to Blue Dot at their adjusted book value if there has not been an initial public offering of Blue Dot by a specified date or at the lesser of the initial public offering price and the current market price shortly after the public offering occurs. For certain agreements, if the shareholder has not exercised his put or has been subject to the exercise of a put or call, the shareholder may be entitled to receive certain payments under earnout arrangements. These earnouts will vary depending upon the performance of the designated business unit over time. The maximum aggregate obligation in respect of these arrangements was approximately $50.0 million as of December 31, 2002, of which $2 million and $4.4 million was due as of March 31, 2003 and June 30, 2003, respectively. Our subsidiary, NorthWestern Growth Corporation, may be required to provide support for certain of the exchange, call option and earnout obligations by providing, at its election, either cash and/or shares of our registered common stock in an amount equal to such obligation in the event Blue Dot fails to perform. Blue Dot is prohibited under its credit agreement from making such payments with its own funds. We have advised Bue Dot that no additional funds will be provided to support such obligations. Blue Dot is attempting to negotiate extensions or other arrangements to satisfy these obligations. Blue Dot's failure to pay these obligations, and NorthWestern Growth's failure to provide support, may result in liability to such shareholders and additional defaults under Blue Dot's credit agreement.

Similar to Blue Dot, many of Expanets' acquisitions involved the issuance of Expanets capital stock to sellers of acquired businesses. In connection with certain of these acquisitions, the sellers can elect to exchange their Expanets stock for cash at a predetermined exchange rate. NorthWestern Growth Corporation may be required to support Expanets' repurchase obligations. As of March 31, 2003 exchange obligations totaling $6.0 million had been presented to Expanets for payment and $0.8 million of such obligations have been paid. Unless Expanets or NorthWestern Growth satisfies the payment obligations to shareholders under the exchange agreements, such shareholders may pursue enforcement

---

of the obligations, including through litigation. NorthWestern has subsequently indicated that no additional funds will be provided to Expanets or NorthWestern Growth for these purposes.

As discussed in "Critical Accounting Policies and Estimates—Minority Interest in Consolidated Subsidiaries", Blue Dot had exchange obligations totaling $3.9 million and Expanets had exchange agreement obligations totaling $6.0 million that are reflected as Minority Interests at December 31,2002 and may be required to be paid during 2003.

We are required to provide audited financial statements under several of our debt instruments, pension plans and other instruments and arrangements within 90 days after the end of our fiscal year. We have not provided audited financials as of the date of this report and are, therefore, in technical default of these requirements. We intend to satisfy our financial statement delivery requirements promptly following filing of this report.

***Employment Contracts.*** Several, but not all, of our senior executive officers have comprehensive employment agreements with terms through 2004 to 2006. For information about these employment contracts, see "Employment Contracts" at Item 11 of this Report.

***Defined Benefit Pension and Postretirement Benefit Plans.*** With the acquisition of our Montana operations, our pension and other postretirement benefit obligations significantly increased. Our reported costs of providing pension and other postretirement benefits, as described in Note 13 of "Notes to the Consolidated Financial Statements" contained in Item 8, are dependent upon numerous factors resulting from actual plan experience and assumptions of future experience.

Pension and other postretirement benefit costs, are impacted by actual employee demographics, including age and compensation levels, the level of contributions we make to the plan, earnings on plan assets, and health care cost trends. Changes made to the provisions of such plans may also impact current and future benefit costs. Benefit costs may also be significantly affected by changes in key actuarial assumptions, including anticipated rates of return on plan assets and the discount rates used in determining the postretirement benefit obligation and postretirement costs.

As a result of the factors listed above, significant portions of pension and other postretirement benefit costs recorded in any period do not reflect, and are generally greater than, the actual benefits provided to plan participants.

Our pension and other postretirement benefit plan assets are primarily made up of equity and fixed income investments. Fluctuations in actual equity market returns as well as changes in general interest rates may result in increased or decreased pension and other postretirement benefit costs in future periods. Likewise, changes in assumptions regarding current discount rates and expected rates of return on plan assets could also increase or decrease recorded pension and other postretirement benefit costs.

Due to the sharp declines in United States equity markets since the third quarter of 2000, the value of the assets held in the plans' trusts to satisfy the obligations of the other postretirement plans has decreased significantly. At December 31, 2002 our accumulated benefit obligation exceeded plan assets by approximately $119.1 million for our pension plans. In addition, our projected benefit obligation for other postretirement benefit plans exceeded plan assets by $98.6 million; however, we have life insurance contracts on certain employees with cash surrender values totaling approximately $30 million to partially offset this $98.6 million obligation. Additional contributions may be required in the near future to meet the requirements of the plan to pay benefits to plan participants. To the extent such additional contributions are reflected in the ratemaking process to determine the rates billed to customers, such amounts will be treated as regulatory assets. For the year ended December 31, 2002, contributions to our pension and other postretirement benefit plans were $7.4 million. No contributions were made during 2001. The increase in contributions for fiscal 2002 was the result of the acquisition of The Montana Power, LLC and the excess of our accumulated benefit obligations over plan assets in

---

2001. We expect contributions for pension and other postretirement benefit plans to be at least $17.4 million in 2003.

## NEW ACCOUNTING STANDARDS

In June 2001, the Financial Accounting Standards Board issued SFAS No. 143, *Accounting for Asset Retirement Obligations,* which was effective January 1, 2003. The statement provides accounting and disclosure requirements for retirement obligations associated with long-lived assets. The statement requires the present value of future retirement costs for which the Company has a legal obligation be recorded as liabilities with an equivalent amount added to the asset cost and depreciated over the asset life.

We have completed an assessment of the specific applicability and implications of SFAS No. 143. We have identified, but have not recognized, asset retirement obligation, or ARO, liabilities related to our electric and

natural gas transmission and distribution assets. Many of these assets are installed on easements over property not owned by the Company. The easements are generally perpetual and only require retirement action upon abandonment or cessation of use of the property for the specified purpose. The ARO liability is not estimable for such easements as we intend to utilize these properties indefinitely. In the event we decide to abandon or cease the use of a particular easement, an ARO liability would be recorded at that time.

Our regulated utility operations have, however, previously recognized removal costs of transmission and distribution assets as a component of depreciation in accordance with regulatory treatment. To the extent these amounts do not represent SFAS No. 143 legal retirement obligations, they are to be disclosed as regulatory liabilities upon adoption of the statement. As of December 31, 2002, we have estimated accrued removal costs related to our Montana transmission and distribution operations in the amount of $111.0 million and $4.5 million, for our South Dakota and Nebraska operations, respectively, all of which are included in accumulated depreciation.

For our generation properties, we are in the process of evaluating the associated retirement costs as defined by SFAS No. 143 and what the prescribed accounting treatment will be under FERC rules. We have accrued decommissioning costs since the generating units were first put into service in the amount of $11.4 million, which is classified as an other noncurrent liability. Preliminary estimates indicate that this amount would be sufficient to cover the legally required retirement obligations.

SFAS No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets,* was issued in October 2001 and establishes a single accounting model for long-lived assets to be disposed of by sale. SFAS No. 144 requires that long-lived assets to be disposed of by sale be measured at the lower of the carrying amount or fair value less cost to sell, whether reported in continuing operations or discontinued operations. SFAS No. 144 also expands the reporting of discontinued operations to include components of an entity that have been or will be disposed of rather than limiting such discontinuance to a segment of a business. Our accounting for the discontinued operations of CornerStone as described in Note 6, "Discontinued Operations", followed the provisions of SFAS No. 144. We adopted SFAS No. 144 effective January 1, 2002. The adoption of SFAS No. 144 did not have a material impact on our consolidated results of operations, financial position, or cash flows as the long-lived asset impairment provisions of SFAS No. 144 effectively carried over the provisions of SFAS No. 121.

SFAS No. 145, *Rescission of FASB Statements No. 4, 44, and 64, Amendment of FASB Statement No. 13, and Technical Corrections*, was issued in April 2002. SFAS No. 145 eliminates the requirement that gains and losses from the extinguishments of debt be aggregated and classified as extraordinary items, net of the related income tax. It also requires sale-leaseback treatment for certain modifications of a capital lease that result in the lease being classified as an operating lease. We will adopt SFAS No. 145 on January 1, 2003. As a result of the adoption, effective January 1, 2003, we will be required

---

to reflect the extraordinary loss on debt extinguishments of $13.5 million, net of tax, incurred in 2002 as part of continuing operations.

SFAS No. 146, *Accounting for Costs Associated with Exit or Disposal Activities*, was issued in June 2002. SFAS No. 146 requires companies to recognize costs associated with exit or disposal activities when they are incurred rather than at the date of a commitment to an exit or disposal plan, including lease termination costs and certain employee termination benefits that are associated with a restructuring, discontinued operation, plant closing or other exit or disposal activity. SFAS No. 146 will be applied prospectively and is effective for exit or disposal activities that are initiated after December 31, 2002. We will adopt SFAS No. 146 on January 1, 2003.

FASB Interpretation No. 45, *Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others* (FIN 45), was issued in November 2002. FIN 45 elaborates on the

existing disclosure requirements for most guarantees. It also clarifies that at the time a company issues a guarantee, the company must recognize an initial liability for the fair market value of the obligations it assumes under that guarantee and must disclose that information in its interim and annual financial statements. The initial recognition and measurement provisions of the FIN 45 apply on a prospective basis to guarantees issued or modified after December 31, 2002. The disclosure requirements of FIN 45 have been included in Note 19, Guarantees, Commitments and Contingencies.

SFAS No. 148, *Accounting for Stock-Based Compensation—Transition and Disclosure—an Amendment of FASB Statement No. 123*, was issued in December 2002. It provides alternative methods of transition for a voluntary change to the fair value based method of accounting for stock-based employee compensation. SFAS No. 148 is effective for fiscal years beginning after December 15, 2003. The impact of the statement on our results of operations and financial position is currently under review by management.

FASB Interpretation No. 46, *Consolidation of Variable Interest Entities* (FIN 46), was issued in January 2003. This interpretation changes the method of determining whether certain entities, including securitization entities, should be included in a company's Consolidated Financial Statements. An entity is subject to FIN 46 and is called a variable interest entity, or VIE, if it has equity that is insufficient to permit the entity to finance its activities without additional subordinated financial support from other parties, or equity investors that cannot make significant decisions about the entity's operations, or that do not absorb the expected losses or receive the expected returns of the entity. All other entities are evaluated for consolidation in accordance with SFAS No. 94, *Consolidation of All Majority-Owned Subsidiaries*. A VIE is consolidated by its primary beneficiary, which is the party involved with the VIE that has a majority of the expected losses or a majority of the expected residual returns or both. The provisions of the interpretation are to be applied immediately to VIEs created after January 31, 2003, and to VIEs in which an enterprise obtains an interest after that date. For VIEs in which an enterprise holds a variable interest that it acquired before February 1, 2003, FIN 46 applies in the first fiscal period beginning after June 15, 2003. For any VIEs that must be consolidated under FIN 46 that were created before February 1, 2003, the assets, liabilities and non-controlling interest of the VIE would be initially measured at their carrying amounts with any difference between the net amount added to the balance sheet and any previously recognized interest being recognized as the cumulative effect of an accounting change. If determining the carrying amounts is not practicable, fair value at the date FIN 46 first applies may be used to measure the assets, liabilities and non-controlling interest of the VIE. FIN 46 also mandates new disclosures about VIEs, some of which are required to be presented in financial statements issued after January 31, 2003. We have evaluated the impact of FIN 46 to determine if we have any investments qualifying as VIEs and do not believe we have any VIEs. The rules are recent and, accordingly, they contain provisions that the accounting profession continues to analyze.

---

## RISK FACTORS

You should carefully consider the risk factors described below, as well as other information included in this Annual Report on Form 10-K, before making an investment in our common stock or other securities. The risks and uncertainties described below are not the only ones facing our company. Additional risks and uncertainties not presently known or that we currently believe to be less significant may also adversely affect us.

**We have substantial indebtedness, which could adversely affect our financial condition.**

We had total consolidated indebtedness, including indebtedness with respect to mandatorily redeemable preferred securities of subsidiary trusts, of approximately $2.2 billion outstanding as of March 31, 2003.

Our indebtedness could have important consequences to you. For example, it could:

- increase our vulnerability to general adverse economic and industry conditions;

- require us to dedicate a substantial portion of our cash flow from operations to payments on our indebtedness, thereby reducing the availability of cash flow to fund working capital, capital expenditures and other general corporate purposes;

- limit our flexibility in planning for, or reacting to, changes in our business and the industries in which we operate;

- result in vendors requiring additional credit support, such as letters of credit, in order for us to utilize trade credit;

- place us at a competitive disadvantage compared to our competitors that have less debt; and

- limit our ability to borrow additional funds.

In addition, our failure to comply with any of the covenants contained in the instruments governing our indebtedness could result in an event of default which, if not cured or waived, could result in the acceleration of other outstanding indebtedness. We may not have sufficient working capital to satisfy our debt obligations in the event of an acceleration of all or a significant portion of our outstanding indebtedness.

**Our ability to implement our turnaround plan is subject to many impediments and uncertainties. A failure to completely implement our turnaround plan could have a material adverse affect on our results of operations and liquidity.**

Management is implementing a turnaround plan that includes these principal elements:

- focus on our core utility business;

- reduce our indebtedness; and

- sale or dispositions of our non-core assets.

Absent proceeds from the sale of non-core assets or significant improvements in the operating results of our non-energy businesses, we will not have the ability to materially reduce our debt. Therefore, our ability to implement this plan is subject to many impediments and uncertainties including:

- even if we receive offers from buyers, whether we will be able to sell these assets at a price that would enable us to pay down our debt after accounting for related liabilities; and

- whether we will be able to generate sufficient interest among buyers for our non-core assets under current market conditions.

The success of our turnaround plan is dependent upon reducing our debt. Absent the receipt of significant proceeds from the sale of non-core assets, the raising of additional capital or a restructuring of our debt, we will not have the ability to reduce our debt or meet our significant maturing debt obligations beginning in 2005. Our senior secured term loan contains restrictions on the sale or disposition of assets, including non-core assets, and on the prepayment of the senior secured term loan and other indebtedness. Therefore, even if we are able to generate funds

through the sale of non-core assets or equity, or cash flow from operations, we may not be able to prepay any of the debt in a timely manner.

**We will need significant additional capital to refinance our indebtedness as it matures. If we cannot sell sufficient assets or borrow new indebtedness sufficient to repay our indebtedness as it matures in future periods, our ability to fund our operations and service our substantial indebtedness will be adversely affected, and we will default on such maturing indebtedness as well as all other indebtedness that is cross-defaulted to such indebtedness thereby materially and adversely affecting our financial condition and results of operations.**

We will be required to obtain significant additional capital to meet debt obligations maturing in 2005 and beyond. Absent proceeds from the sale of non-core assets or significant improvements in the operating results of our non-energy businesses, which historically have not been cash flow contributors, we will have limited ability to reduce our debt. To the extent we do not sell sufficient assets to pay down debt as it matures, we will need to borrow money. The market for indebtedness is volatile and our ability to raise capital is dependent on a number of factors including our creditworthiness, legal proceedings we are and may be involved in, the ratings of our indebtedness, the cash flow we have available to service the interest expense relating to any new borrowings, and our ability to implement our turnaround. If we are unable to refinance our indebtedness as it matures we will default on such indebtedness and all other indebtedness that is cross-defaulted to such indebtedness. Blue Dot is in default under its credit agreement. If such defaults continue or new defaults by any of our subsidiaries occur under applicable debt instruments, then such entity could seek protection under the bankruptcy law, or its creditors could institute involuntary proceedings against such entities, and we could lose our remaining investment in such entity. Any default by us on our indebtedness will have a material and adverse affect on our financial condition and results of operations.

In addition, we may not be able to generate enough cash flow to fund our operations and meet our debt service obligations. If we can not obtain additional capital to meet such obligations, we will default on such indebtedness and all other indebtedness that is cross-defaulted to such indebtedness.

**Our internal controls and procedures need to be improved.**

We have advised our Audit Committee that, in the course of preparing our financial statements for the year ended December 31, 2002 and in connection with the corresponding audit, we noted deficiencies in internal controls relating to:

- internal accounting controls relating to the EXPERT system, including the evaluation of appropriate reserves for accounts receivable and billing adjustments at Expanets;
- supervision, staffing and training of accounting personnel;
- timely evaluation and substantiation of material account balances;
- inconsistent application of and adherence to our policies and procedures by certain personnel;

---

- absence of a functioning internal auditing department and integrated information systems limiting our ability to adequately review subsidiary financial information; and
- the inadequacy of systems integration and data reconciliation.

These weaknesses led to the restatement of our financial statements for the first three quarters of 2002. In addition, we have experienced weaknesses in procedures and documentation relating to intercompany transactions, including lapses in documenting loans or advances to our subsidiaries which could adversely affect our ability to collect such amounts and could force us to subordinate the collection of such amounts in certain circumstances. If we are unable to substantially improve our internal controls our ability to report our financial results on a timely and accurate basis will continue to be adversely affected which could have a substantial adverse affect on our ability to operate our business.

**We are one of several defendants in a class action lawsuit brought in connection with dispositions of energy assets by The Montana Power Company, including the acquisition of our Montana utility. If we do not successfully resolve this lawsuit, or enforce our indemnification claims against The Montana Power Company, our operations and financial condition may be materially harmed.**

We are one of several defendants in a class action lawsuit entitled McGreevey, et al. v. The Montana Power Company, et al. The lawsuit, which was filed by shareholders of TouchAmerica Holdings, Inc., the successor to The Montana Power Company, in connection with the disposition of energy assets by The Montana Power Company, contends, among other things, that the shareholders of The Montana Power Company have dissenters' rights under applicable state law and are entitled to damages. We believe our substantive and procedural defenses are meritorious, but we cannot predict the outcome of any such litigation. If we are held liability for any damages in this lawsuit, our operations and financial condition may be severely and materially harmed.

**The impact of ongoing class action litigation may be material. We are also subject to the risk of additional litigation and regulatory action in connection with the restatement of our 2002 quarterly financial statements, and the potential liability from any such litigation or regulatory action could harm our business.**

On April 1, 2003, we announced that we would restate our consolidated financial statements for the fiscal quarters ended March 31, 2002, June 30, 2002, and September 30, 2002. We have recorded significant charges in our full-year 2002 results.

We, and certain of our present and former officers and directors, are defendants in a purported class action litigation pending in the United States District Court for the Central District of South Dakota, Southern Division, entitled *Dana Ross, et al. v. Merle D. Lewis, et al.*; Case No. CIV03-4049, brought on behalf of shareholders of NorthWestern. The plaintiffs are seeking unspecified compensatory damages, rescission, and attorneys fees and costs as well as accountants and experts fees based on allegations that the defendants misrepresented NorthWestern's business operations and financial performance, overstated NorthWestern's revenue and earnings by, among other things, maintaining insufficient reserves for accounts receivables at Expanets, failing to disclose billing problems and lapses and data conversion problems, and failing to make full disclosures of problems (including the billing and data conversion issues) arising from the implementation of Expanets' EXPERT system. The lawsuit was recently filed and has not yet been served. We cannot currently predict the impact or resolution of this litigation, which could be material, and the initiation of this lawsuit may harm our business and financial condition. See "Item 3. Legal Proceedings" for more information.

As a result of the restatement of our quarterly results for the first three quarters of 2002, we could become subject to additional class action or other securities litigation. In addition, regulatory agencies,

---

such as the SEC, the FERC, the MPSC, and/or the New York Stock Exchange could commence a formal investigation relating to the restatement of our quarterly results. As of the date hereof, we are not aware of any additional litigation or investigation having been commenced against us related to these matters, but we cannot predict whether or not any such litigation or regulatory investigation will be commenced or, if it is, the outcome of

any such litigation or investigation. If any such investigation were to result in a regulatory proceeding or action against us, our business and financial condition could be materially adversely affected. The initiation of any additional securities litigation, together with the lawsuit described above, may also harm our business and financial condition. Until such investigation, proceeding or litigation is resolved, it may be more difficult to raise additional capital or favorably refinance or restructure our debt or other obligations. If an unfavorable result occurred in any such action, our business and financial condition could be further harmed. In addition, we are likely to incur substantial expenses in connection with any such litigation or investigation, including substantial fees for attorneys and other professional advisors. We may also be obligated to indemnify officers and directors named as defendants in such action. These expenses, to the extent not covered by available insurance, would adversely affect our cash position.

**There are a number of business challenges Expanets must address during 2003. If Expanets is not able to resolve these issues effectively, its performance will continue to be adversely affected.**

The downturn in the economy has impacted the telecommunications sector in particular. Expanets continues to see a soft market for the communications and Information Technology product industry. At the same time, Expanets plans to market a number of new solutions based on Internet protocol, or IP, technology, which is gaining more general acceptance and momentum in the market. However, Expanets can provide no specific assurance that the market will accept these solutions, which could adversely affect its performance.

---

Expanets believes that its relationship with Avaya as currently structured is positive for both companies. However, a change in its relationship with Avaya or a change in Avaya's competitive position could adversely affect Expanets' performance.

Expanets must address and resolve negative customer satisfaction issues stemming from the performance deficiencies and billing inaccuracies of the EXPERT system, which has contributed significantly toward higher than anticipated erosion of Expanets' maintenance revenue and customer base. Further delays in this process could have a significant negative effect on Expanets' operations and cash flow. In addition, management has made its best estimates of billing adjustments on which our current and ongoing reserves for accounts receivable write-offs are based. If these estimates are not accurate, and our reserves are not sufficient, our results of operations or financial condition could be harmed. If the estimates are not accurate, it could have a material effect on the business, the accuracy of periodic financial reporting and negatively impact its ability to obtain third party financing or accomplish a sale of the business.

Expanets believes that it has identified many of the numerous performance and reporting deficiencies of the EXPERT system and has established alternative procedures and processes to rely on. However, there are several modules and system information flows in the EXPERTS system that have not yet been studied as a result of more pressing issues with the EXPERT system, the study of which may lead to the identification of additional material weaknesses within the EXPERT system. Expanets currently does not have the capital resources and may not have the ability to analyze these systems and processes and make necessary improvements, which could have an adverse effect on operations and negatively impact its ability to obtain third party financing or accomplish a sale of the business.

The EXPERT system continues to require additional improvement and expense to fully realize the cost savings and functionality designed into the system. Expanets' management and consultants have identified a number of system, process and procedure improvements needed to enhance internal controls and assure functional performance and reporting accuracy. Expanets currently does not have the capital resources and ability to make these improvements. Further delays in resolving performance issues of the EXPERT system and the costs of system repairs, or the delays and costs of adopting an alternative information management system, could have a material adverse effect on Expanets' operations and cash flow and could impede NorthWestern's efforts to pursue strategic alternatives for Expanets, including the sale or disposition of the business or its assets.

**If the MPSC disallows the recovery of the costs incurred in entering into default supply portfolio contracts while we are required to act as the "default supplier," we may not be able to fully recover the costs incurred in procuring default supply contracts, which could adversely affect our net income and financial condition.**

The 1997 Montana Restructuring Act provided that customers be able to choose their electricity supplier during a transition period ending on June 30, 2007. NorthWestern Energy is required to act as the "default supplier" for customers who have not chosen an alternate supplier. The Restructuring Act provided for full recovery of costs incurred in procuring a default supply portfolio of electric power and required the default supplier to propose a "cost recovery mechanism" for electrical supply procurement costs before March 30, 2002. On October 29, 2001, the former owner of NorthWestern Energy LLC filed with the MPSC its initial default supply portfolio, containing a mix of long and short-term contracts from new and existing generators. On April 25, 2002, the MPSC approved NorthWestern Energy LLC's proposed "cost recovery mechanism" in the form filed.

On June 21, 2002, the MPSC issued a final order approving contracts meeting approximately 60% of the default supply winter peak load and approximately 93% of the annual energy requirements. As a result of the order, NorthWestern Energy has implemented a procurement strategy that involves supplying the remainder of the default supply portfolio through open market purchases. Currently,

NorthWestern Energy is making short-term purchases to fill intermediate and peak electricity needs. These short-term purchases, along with the MPSC-approved base load supply, are being fully recovered through our annual electricity cost tracking process pursuant to which rates are based on estimated electricity loads and electricity costs for the upcoming tracking period and are annually reviewed and adjusted by the MPSC for any differences in the previous tracking year's estimates to actual information. This process is similar to the cost recovery process that has been successfully utilized for more than 20 years in Montana, South Dakota and other states for natural gas purchases for residential and commercial customers. The MPSC further stated that NorthWestern Energy has an ongoing responsibility to prudently administer its supply contracts and the energy procured pursuant to those contracts for the benefit of ratepayers. The MPSC could, in any particular year, disallow the recovery of a portion of the default supply costs if it makes a determination that NorthWestern Energy acted imprudently with respect to implementation of its open market purchase strategy or that the approved supply contracts were not prudently administered. A failure to recover such costs could adversely affect our net income and financial condition.

**We are subject to extensive governmental regulations that could impose significant costs or change rates of our operations and changes in existing regulations and future deregulation may have a detrimental effect on our business and could increase competition.**

Our operations and the operations of our subsidiary entities are subject to extensive federal, state and local laws and regulations concerning taxes, service areas, tariffs, issuances of securities, employment, occupational health and safety, protection of the environment and other matters. In addition, we are required to obtain and comply with a wide variety of licenses, permits and other approvals in order to operate our facilities. In the course of complying with these requirements, we may incur significant costs. If we fail to comply with these requirements, we could be subject to civil or criminal liability and the imposition of liens or fines. In addition, existing regulations may be revised or reinterpreted, new laws and regulations may be adopted or become applicable to us or our facilities and future changes in laws and regulations may have a detrimental effect on our business.

Our utility businesses are regulated by certain state commissions. As a result, these commissions have the ability to access the regulated utility's books and records. This ability to review our books and records could result in prospective negative adjustments to our rates.

The United States electric utility and natural gas industries are currently experiencing increasing competitive pressures as a result of consumer demands, technological advances, deregulation, greater availability of natural gas-fired generation and other factors. Competition for various aspects of electric and natural gas services is being introduced throughout the country that will open these markets to new providers of some or all of traditional electric utility and natural gas services. Competition is likely to result in the further unbundling of electric utility and natural gas services as has occurred in Montana for electricity and Montana, South Dakota and Nebraska for natural gas. Separate markets may emerge for generation, transmission, distribution, meter reading, billing and other services currently provided by electric utility and natural gas providers as a bundled service. As a result, significant additional competitors could become active in the generation, transmission and distribution segments of our industry.

Proposals have been introduced in Congress to repeal the Public Utility Holding Company Act of 1935, or PUHCA. To the extent competitive pressures increase and the pricing and sale of electricity assume more characteristics of a commodity business, the economics of domestic independent power generation projects may come under increasing pressure.

---

**We may not be able to fully recover transition costs, which could adversely affect our net income and financial condition.**

Montana law required the Montana Public Service Commission, or the MPSC, determine the value of net unmitigable transition costs associated with the transformation of the former The Montana Power Company utility business from a vertically integrated electric service company to a utility providing only default supply and transmission and distribution services. The MPSC was also obligated to set a competitive transition charge, or CTC, to be included in distribution rates to collect those net transition costs. The majority of these transition costs relate to out-of-market power purchase contracts, which run through 2032, that the former owner of NorthWestern Energy LLC was required to enter into with certain "qualifying facilities" as established under the Public Utility Regulatory Policies Act of 1978. The former owner of NorthWestern Energy LLC estimated the pre-tax net present value of its transition costs over the approximate 30 year period to be approximately $304.7 million in a filing with the MPSC on October 29, 2001. On January 31, 2002, the MPSC issued an Order establishing a CTC that would recover $244.7 million on a net present value basis. While the CTC is designed to adjust and compensate for future changes in sales volumes or other factors affecting actual cost recoveries, the CTC runs through the year 2029 and therefore we cannot predict with certainty the actual recovery of transition costs. Changes in the recovery of transition costs could affect our net income and financial condition.

**Further downgrades in our credit rating could negatively affect our ability to access capital.**

S&P, Moody's and Fitch rate our senior, unsecured debt at "BB+" on CreditWatch with negative implications, "Ba1" with a negative outlook and "BB+," respectively. Credit ratings are dependent on a number of quantitative and qualitative factors. Although we are not aware of any current plans of S&P, Moody's or Fitch to further lower their respective ratings on our debt, we cannot assure you that our credit ratings will not be downgraded if we do not reduce our leverage. Although none of our debt instruments contain acceleration and repayment provisions in the event of a downgrade in our debt ratings by S&P, Moody's or Fitch, if such a downgrade were to occur, our ability to access the capital markets and utilize trade credit may be adversely affected and our borrowing costs would increase which would adversely impact our results and condition. We may also be required to provide credit support for certain major purchases (*e.g.*, electricity supply contracts, natural gas supply contracts, etc.) In addition, we would likely be required to pay a higher interest rate in future financings and our potential pool of investors and funding sources could decrease.

**We are subject to risks associated with a changing economic environment.**

In general, the financial markets have been weak and the availability and cost of capital for our business and that of our competitors has been adversely affected. Events such as the bankruptcy of several large energy and telecommunications companies have specifically contributed to this weak environment. Such economic environment, if sustained, could constrain the capital available to our industry and would adversely affect our access to funding for our operations, including the funding necessary to refinance or restructure our substantial indebtedness. In addition, the disruption on the capital markets due, in large part, to the capital structure of energy companies, could adversely impact our ability to realize cash from the sale of the Montana First Megawatts project. If our ability to access capital becomes significantly constrained, our financial condition and future results of operations could be significantly adversely affected.

**Our revenues and results of operations are subject to risks that are beyond our control, including but not limited to future terrorist attacks or related acts of war.**

The cost of repairing damage to our facilities due to storms, natural disasters, wars, terrorist acts and other catastrophic events, in excess of reserves established for such repairs, may adversely impact

---

our results of operations, financial condition and cash flows. Generation and transmission facilities, in general, have been identified as potential terrorist targets. The occurrence or risk of occurrence of future terrorist activity may impact our results of operations, financial condition and cash flows in unpredictable ways. These actions could also result in adverse changes in the insurance markets and disruptions of power and fuel markets. The availability of insurance covering risks we and our competitors typically insure against may decrease. In addition, the insurance we are able to obtain may have higher deductibles, higher premiums and more restrictive policy terms. In addition, our electric transmission and distribution, electric generation, natural gas distribution and pipeline and gathering facilities could be directly or indirectly harmed by future terrorist activity.

The occurrence or risk of occurrence of future terrorist attacks or related acts of war could also adversely affect the United States economy. A lower level of economic activity could result in a decline in energy consumption, which could adversely affect our revenues and margins and limit our future growth prospects. Also, these risks could cause instability in the financial markets and adversely affect our ability to access capital.

**Our operating results may fluctuate on a seasonal and quarterly basis.**

Our electric and gas utility business and, to a lesser extent, Blue Dot's HVAC business are seasonal businesses and weather patterns can have a material impact on their operating performance. Because natural gas is heavily used for residential and commercial heating, the demand for this product depends heavily upon weather patterns throughout our market areas and a significant amount of natural gas revenues are recognized in the first and fourth quarters related to the heating season. Demand for electricity is often greater in the summer and winter months associated with cooling and heating. Similarly, Blue Dot's business is subject to seasonal variations in certain areas of its service lines, with demand for residential HVAC services generally higher in the second and third quarters. Accordingly, our operations have historically generated less revenues and income when weather conditions are milder in the winter and cooler in the summer. In the event that we experience that unusually mild winters or summers in the future, our results of operations and financial condition could be adversely affected.

**Our announcement that we are considering strategic alternatives for, and do not intend to make additional significant investments in, Blue Dot or Expanets, together with other liquidity issues confronting Blue Dot and Expanets, may materially and adversely affect the operations and value of those entities.**

We are considering strategic alternatives for Blue Dot and Expanets, including a sale or disposition of such businesses or their assets, and we do not intend to make additional significant investments in Blue Dot or Expanets

while we examine strategic alternatives for these businesses. In connection with approval of our $390 million senior secured term loan, the Montana Public Service Commission has restricted our ability to make additional investments or commitments to our non-regulated businesses to $10 million in the aggregate unless we obtain prior approval. These initiatives, together with other liquidity issues confronting Blue Dot and Expanets, present a substantial risk of serious disruption to the businesses of Blue Dot and Expanets and may materially and adversely affect the value of those entities.

Each of Blue Dot and Expanets has limited cash to meet its obligations and will have to locate its own independent source of funds should it require additional financing. If either company is unable to obtain necessary financing or to maintain adequate bonding capacity, it may default on one or more of its obligations, which could result in a serious disruption in its business and materially and adversely impair its value. Neither of those companies has sufficient working capital to satisfy its debt obligations as they mature, or in the event of an acceleration of all or a significant portion of its outstanding indebtedness. In addition, Blue Dot is currently in default under its existing credit facility and certain

---

other material payment obligations to its minority stockholders and is prohibited as a result of the defaults under its credit facility from paying certain other outstanding obligations. NorthWestern Growth Corporation may be required to purchase or cause the purchase of certain shares of Blue Dot stock in an amount sufficient to permit Blue Dot to effect its exchange obligations under its exchange agreements with respect to its Series A Preferred Stock and honor its payment obligations under certain call and put option agreements and certain related earnout obligations with respect to its Class C Common Stock under certain circumstances; however, NorthWestern subsequently indicated that no additional funds will be provided to Blue Dot while NorthWestern pursues strategic alternatives for Blue Dot, including the sale or disposition of the business or its assets. Blue Dot's credit facility prohibits the Blue Dot from performing its obligations under its exchange agreements or any call and put agreements unless the funds or stock used to satisfy such obligations are provided to Blue Dot by NorthWestern. The existing defaults under the credit facility also prevent Blue Dot from making payments of principal and interest on certain subordinated debt and may result in defaults under other indebtedness that is cross defaulted to the credit facility. As a result of these events, Blue Dot defaulted on up to $4.1 million of the obligations under its exchange and call and put option agreements on March 31, 2003. Approximately $4.4 million is required to be paid under call and put option agreements on June 30 2003, approximately $.5 million may be required to be paid under exchange agreements on September 30, 2003. In addition, approximately $0.5 million in principal payments plus related interest on subordinated indebtedness is scheduled to become due in 2003. Blue Dot is attempting to negotiate extensions, repayment terms or other arrangements to satisfy these obligations with certain of the involved parties. Blue Dot's failure to pay these obligations has resulted in additional defaults under its credit facility, which is non-recourse to us.

These defaults and the failure of Blue Dot to pay these obligations could result in a serious disruption in Blue Dot's business and materially and adversely impact Blue Dot's value. The impacted key managers and other personnel from the impacted units might leave Blue Dot and certain stockholders may institute securities or other litigation against Blue Dot and NorthWestern Growth Corporation seeking immediate payment of these or similar obligations or other damages. In addition, other key managers from other operating units, including managers who are under similar arrangements, may leave Blue Dot or become disengaged and cause further significant disruption of the organization.

Substantial uncertainty and concern may also develop on the part of the employees, suppliers and customers of Blue Dot and Expanets. Existing employees, including key managers, and customers may elect to leave those businesses because of these issues or in anticipation of a sale of the business or its assets and it may be difficult to attract replacements. In some cases we may not have non-competition agreements or only limited ability to enforce such agreements with respect to such departing employees. Certain key employees of Blue Dot may, in particular,

be dissatisfied because of the deferrals of certain incentive compensation payments. Suppliers may elect to eliminate, restrict, reduce or impose more burdensome terms on credit, which would increase Blue Dot's and Expanets' cost of goods and create additional liquidity issues.

**Changes in commodity prices and availability of supply may increase our cost of producing and distributing electricity and distributing natural gas or decrease the amount we receive from selling electricity and natural gas, adversely affecting our financial performance and condition.**

To the extent not covered by long-term fixed price purchase contracts, we are exposed to changes in the price and availability of coal because most of our generating capacity is coal-fired. Changes in the cost of coal and changes in the relationship between those costs and the market prices of power may affect our financial results. In addition, natural gas and electricity are commodities; the market price of which can be subject to volatile changes in response to changes in the world crude oil market, refinery operations, power plant outages, weather conditions, supply or other market conditions.

---

Because state regulatory authorities set the rates at which we sell electricity and natural gas, and may modify the costs that we may pass through the fuel and gas cost adjustments, we may not be able to immediately pass on to our retail customers rapid increases in the wholesale cost of coal and natural gas, which could reduce our profitability.

We do not own any natural gas reserves and do not own electric generation assets to service our Montana operations. We own interests in generation assets that substantially cover our electric supply requirements in South Dakota. As a result, we are required to procure our entire natural gas supply and all of our Montana electricity supply pursuant to contracts with third party suppliers. In light of this reliance on third party suppliers, we are exposed to certain risks in the event a third party supplier is unable to satisfy its contractual obligation.

**We do not intend to pay dividends on our common stock, and our ability to pay dividends on our common stock is limited.**

Consistent with our turnaround plan to increase liquidity and reduce debt, the Board of Directors decided to terminate the historical practice of paying an annual cash dividend. We do not anticipate paying any cash dividends for the foreseeable future.

In addition, we are currently prohibited from paying dividends on our common stock under Delaware law. The Delaware General Corporation Law, or the DGCL, allows the Company to pay dividends only out of its surplus (as defined and computed in accordance with the provisions of the DGCL) or if the Company has no such surplus, out of its net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year. We will be unable to pay dividends on or redeem any of our capital stock until such time as we again have available surplus or net profits.

Our senior credit facility also prohibits the payment of dividends during any period of default under the agreement. To the extent that payment of a cash dividend on our common stock becomes permissible under Delaware law, we would only be able to pay a cash dividend on our common stock to the extent that all required distributions on our mandatorily redeemable preferred securities of trusts had been made.

See "Market for Registrant's Common Equity and Related Stockholder Matters" included in Item 5 hereof for additional information about our ability to pay dividends on our common stock.

**Our utility business is subject to extensive environmental regulations and potential environmental liabilities, which could result in significant costs and liabilities.**

Our utility business is subject to extensive regulations imposed by federal, state and local government authorities in the ordinary course of day-to-day operations with regard to the environment, including environmental regulations relating to air and water quality, solid waste disposal and other environmental considerations. Many of these environmental laws and regulations create permit and license requirements and provide for substantial civil and criminal fines which, if imposed, could result in material costs or liabilities. We regularly monitor our operations to prevent adverse environmental impacts and to assess potential environmental liabilities. We may be required to make significant expenditures in connection with the investigation and remediation of alleged or actual spills and the repair and upgrade of our facilities in order to meet future requirements under environmental laws.

Environmental laws and regulations require NorthWestern to incur certain costs, which could be substantial, to operate existing facilities, construct and operate new facilities, and mitigate or remove the effect of past operations on the environment. Governmental regulations establishing environmental protection standards are continually evolving, and, therefore, the character, scope, cost and availability of the measures NorthWestern may be required to take to ensure compliance with evolving laws or regulations cannot be predicted. However, NorthWestern believes that an appropriate amount of costs

---

have been accrued and potential costs related to such environmental regulation and cleanup requirements are timely estimated and recorded. To this extent that our environmental liabilities are greater than our reserves or we are unsuccessful in recovering anticipated insurance proceeds under the relevant policies, our results of operations and financial condition could be adversely affected.

**Certain subsidiaries may be subject to potential rescission rights held by their minority shareholders.**

Over the past several years, Expanets and Blue Dot issued shares of their capital stock as part of the consideration offered to owners of various companies that they acquired. None of these shares were registered under the Securities Act of 1933, as amended, in the belief that the issuance of these shares was exempt from the registration requirements of the Securities Act. It is possible that the exemptions from registration on which Expanets and Blue Dot relied were not available, and that these shares may have been issued in violation of the Securities Act. As a result, the persons who received these shares upon the sale of their companies to Expanets or Blue Dot may have the right to seek recovery from Expanets or Blue Dot damages as prescribed by applicable securities laws.

**Expanets may be ordered by the Securities and Exchange Commission or a court to register one or more classes of its capital stock under the Securities Exchange Act of 1934 and may be unable to do so. As a result we and/or Expanets may be subject to liability under the Securities Exchange Act and this may materially and adversely affect our financial position and results of operations.**

Expanets has not registered under the Securities Exchange Act of 1934, as amended, one or more classes of its capital stock issuable pursuant to certain options granted over the past several years. Expanets may be ordered to register one or more classes of stock under the Securities Exchange Act by the Securities and Exchange Commission or a court and be unable to comply or have potential liability with respect to any shares of its capital stock, if any, issued with respect to such options. The failure to comply with any order for registration could subject Expanets and us to liability under the Securities Exchange Act and materially and adversely affect our financial position and results of operations.

**In the event stockholders have derivative claims against Arthur Andersen, it is unlikely that they will able to exercise effective remedies or collect judgments against Arthur Andersen and we may incur material expenses or delays in financings or SEC filings because we changed auditors.**

Arthur Andersen LLP served as our independent accountants since 1932. On March 14, 2002, Arthur Andersen was indicted by a federal grand jury on obstruction of justice charges arising from the government's investigation of Enron Corp. We dismissed Arthur Andersen as our independent public accounting firm and retained Deloitte & Touche LLP in their stead on May 16, 2002, although Arthur Andersen has audited consolidated financial statements for the year ended December 31, 2000 contained in this Annual Report on Form 10-K. Deloitte & Touche LLP has audited our consolidated financial statements for the fiscal years ended December 31, 2001 and 2002, which are included in this Annual Report on Form 10-K. On June 15, 2002, a jury in Houston, Texas found Arthur Andersen LLP guilty of obstructing justice. In light of the jury verdict and the underlying events, Arthur Andersen has ceased practicing before the SEC. Because it is unlikely that Arthur Andersen will survive, stockholders are unlikely to be able to exercise effective remedies or collect judgments against them.

**ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURE ABOUT MARKET RISK**

We are exposed to the impact of market fluctuations associated with commodity prices and interest rates. We have policies and procedures to assist in controlling these market risks and we may utilize derivatives to manage a portion of our risk.

---

Our policy allows the use of derivative instruments as part of an overall energy price and interest rate risk management program to efficiently manager and minimize commodity price interest rate risk. We do not enter into financial instruments for speculative or trading purposes.

***Interest Rate Risk***

We use fixed and variable rate long-term debt to partially finance capital expenditures and mandatory debt retirements. These debt agreements expose us to market risk related to changes in interest rates. We manage this risk by taking advantage of market conditions when timing the placement of long-term or permanent financing. We have also historically used interest rate swap agreements to manage a portion of out interest rate risk and may take advantage of such agreements in the future to minimize such risk. As of December 31, 2002, we also have outstanding 14,810,000 shares of mandatorily redeemable preferred securities with various fixed interest rates. All of our debt has fixed interest rates, with the exception of our new senior secured term loan which bears interest at a variable rate tied to the Eurodollar rate, with a minimum floor of 3.0%. As of April 7, 2003, the applicable Eurodollar rate was 1.31%. See "—Summary of Contractual Obligations" in Item 7 hereto for additional information regarding amounts outstanding, interest rates and maturities.

The fair value of fixed-price commodity contracts were estimated based on market prices of commodities covered by the contracts. The net differential between the prices in each contract and market prices for future periods has been applied to the volumes stipulated in each contract to arrive at an estimated future value. Two contracts at December 31, 2002 existed with estimated future benefits of $0.2 million.

**ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

The consolidated financial information, including the reports of independent accountants, the quarterly financial information, and the financial statement schedules, required by this Item 8 is set forth on pages F-1 to F-58 of this Annual Report on Form 10-K and is hereby incorporated into this Item 8 by reference.

## ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

In light of events concerning Arthur Andersen LLP, on May 16, 2002, we dismissed Arthur Andersen LLP as our independent public accounting firm and retained Deloitte & Touche LLP. Arthur Andersen LLP's audit report on our consolidated financial statements as of December 31, 2001 and 2000 and for each of the three years then ended, respectively, did not contain any adverse opinion or disclaimer of opinion, nor was the report qualified or modified as to uncertainty, audit scope, or accounting principles. We have requested Arthur Andersen LLP to furnish a letter addressed to the Commission stating whether it agrees with the above statements and, if not, stating the respects in which it does not agree. A representative of Arthur Andersen LLP has informed us that Arthur Andersen LLP is no longer furnishing such letters. The decision to dismiss Arthur Andersen LLP as our independent public accounting firm was made by the audit committee of our board of directors. During our two most recent fiscal years and through the date of the dismissal, there were no disagreements between NorthWestern Corporation and Arthur Andersen LLP on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which disagreement(s), if not resolved to the satisfaction of Arthur Andersen LLP, would have caused such independent public accountants to make reference to the subject matter of the disagreement(s) in connection with their reports.

---

# Part III

## ITEM 10. DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT

Information regarding the executive officers of NorthWestern Corporation is included in Item 1A of Part I of this Annual Report on Form 10-K.

The following information is furnished with respect to the directors in Class I whose terms will expire in May 2004:

| Director | Principal Occupation or Employment | Director Since | Age on March 1, 2003 |
|---|---|---|---|
| Randy G. Darcy | Senior Vice President, Operations of General Mills, Inc. (NYSE: GIS) a consumer foods company, since 1987. | 1998 | 52 |
| Gary G. Drook | Chief Executive Officer of NorthWestern since January 2003; formerly President and Chief Executive Officer and Director of AFFINA, The Customer Relationship Company (formerly Ruppman Marketing Technologies, Inc.), a provider of customer services programs, since 1997; formerly President of Network Services (1994-1995) for Ameritech Corporation, a communications services provider. | 1998 | 58 |
| Bruce I. Smith | Attorney and partner in the law firm of Leininger, Smith, Johnson, Baack, Placzek, Steele & Allen since 1978. | 1989 | 61 |

The following information is furnished with respect to directors in Class II whose terms will expire in May 2005:

| Director | Principal Occupation or Employment | Director Since | Age on March 1, 2003 |
|---|---|---|---|
| Richard R. Hylland | President and Chief Operating Officer of NorthWestern since May 1998; Vice Chairman of NorthWestern Growth Corporation (a NorthWestern subsidiary) since January 1999; formerly Executive Vice President of NorthWestern (1995-1998) and formerly Chief Executive Officer (1998) and President & Chief Operating Officer (1994-1998) of NorthWestern Growth Corporation; Member of the Boards of Directors of LodgeNet Entertainment Corporation (NASD: LNET), a provider of entertainment, information and marketing services to the lodging industry; MDC Corporation, Inc. (NASD: MDCA), a provider of secure transaction products and services, and communications and marketing services; and Cornerstone Propane GP, Inc. (managing General partner for Cornerstone Propane Partners, L.P. (OTC: CNPP.PK), a retail propane supplier. | 1995 | 42 |

| | | | |
|---|---|---|---|
| Jerry W. Johnson | Visiting Scholar, Congressional Budget Office, U.S. Congress since June 2002; former Dean Emeritus (2001-2002), Dean and Professor of Economics (1990-2001), School of Business, University of South Dakota; Member of the Boards of Directors of Citibank (S.D.), N.A., Citibank FSB and Citibank USA. | 1994 | 62 |
| Larry F. Ness | Chairman and Chief Executive Officer of First Dakota Financial Corp., a bank holding company, and of First Dakota National Bank since 1996; formerly Vice Chairman and Chief Executive Officer of that bank (1993-1996). | 1991 | 57 |

The following information is furnished with respect to the nominee to Class III of the Board for a three-year term expiring in May 2006:

| Nominee | Principal Occupation or Employment | Director Since | Age on March 1, 2003 |
|---|---|---|---|
| Marilyn R. Seymann | Interim Chairman of the NorthWestern Board of Directors since January 2003; President and Chief Executive Officer of M ONE, Inc., a financial services consulting firm, since 1991; Member of the Boards of Directors of Beverly Enterprises, Inc. (NYSE: BEV), a healthcare service provider; and Community First Bankshares, a financial institution. | 2000 | 60 |

**Audit Committee**

The Audit Committee is composed of three non-employee directors who are financially literate in financial and auditing matters and are "independent" as defined by the Securities and Exchange Commission (the "SEC") and the New York Stock Exchange. The members of the Audit Committee are Chairman Bruce I. Smith, Jerry W. Johnson,

and Larry F. Ness. The Company's Board of Directors has determined that the Company has at least one audit committee financial expert, as defined in Item 401(h)(2) of Regulation S-K, serving on its Audit Committee, namely, Jerry W. Johnson. Mr. Johnson is independent as that term is used in Item 7(d)(3)(iv) of Schedule 14A under the 1934 Act. The Audit Committee held fifteen meetings during 2002. The functions of the Audit Committee are to oversee the integrity of NorthWestern's financial statements, NorthWestern's compliance with legal and regulatory requirements, the independent public accountant's qualifications and independence, the performance of NorthWestern's internal audit function and independent auditors, and preparation of this report and the financial statement and notes included herein, and all other reports required under the Securities Exchange Act.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Based solely upon a review of reports on Forms 3, 4 and 5 and any amendments thereto furnished to NorthWestern pursuant to Section 16 of the Securities Exchange Act of 1934, as amended, and written representations from the executive officers and directors that no other reports were required, NorthWestern believes that all of such reports were filed on a timely basis by executive officers and directors during 2002, except that the following transactions were not timely made on Form 4 for these non-employee director transactions in May 2002: (a) non-qualified stock option grants of 4,000 shares each, at an exercise price of $20.30 per share, to Randy Darcy, Gary Drook, Jerry Johnson, Larry Ness,

Marilyn Seymann, and Bruce Smith, and (b) phantom stock unit plan payouts of $10,418.64 each for 507 units to Jerry Johnson, Larry Ness, and Bruce Smith.

## ITEM 11. EXECUTIVE COMPENSATION

**Compensation of Directors and Executive Officers**

We are required by the SEC to disclose compensation earned during the last three fiscal years by (i) our Chief Executive Officer; (ii) our four most highly compensated executive officers, other than the Chief Executive Officer, who were serving as executive officers at the end of fiscal 2002; and (iii) up to two additional individuals for whom such disclosure would have been provided under clause (i) and (ii) above but for the fact that the individual was not serving as an executive officer at the end of fiscal 2002; provided, however, that no disclosure need be provided for any executive officer, other than the Chief Executive Officer, whose total annual salary and bonus does not exceed $100,000.

Accordingly, the following sections disclose information regarding compensation earned during the last three fiscal years by (i) Merle D. Lewis, our former Chief Executive Officer; and (ii) Richard R. Hylland, Michael J. Hanson, Eric R. Jacobsen and Daniel K. Newell, the four most highly-compensated executive officers, other than the Chief Executive Officer, who were serving as executive officers at the end of fiscal 2002 and whose salary and bonus exceeded $100,000. All of these officers are referred to in this Form 10-K as the "Named Executive Officers."

**Summary Compensation Table**

The following table sets forth the compensation earned during the fiscal years indicated for services in all capacities by the Named Executive Officers in 2002:

| | | Annual Compensation | | Long Term Compensation | | |
|---|---|---|---|---|---|---|
| **Name and Principal Position** | **Year** | **Salary $** | **Bonus (1)$** | **Awards (Securities Underlying Options)(2)** | **LTIP Payouts (3)($)** | **All Other Compensation(4) ($)** |
| Merle D. Lewis<br>Former Chairman & Chief Executive Officer(5) | 2002 | 786,000 | 0 | 295,000(5) | 321,712 | 57,918 |
| | 2001 | 786,000 | 150,000 | 177,511(5) | 1,284,746 | 58,680 |
| | 2000 | 734,208 | 247,000 | 278,442(5) | 80,676 | 57,764 |
| Richard R. Hylland<br>President & Chief Operating Officer | 2002 | 550,583 | 0 | 154,600 | 130,562 | 32,080 |
| | 2001 | 511,000 | 100,000 | 86,469 | 925,537 | 30,044 |
| | 2000 | 483,042 | 158,000 | 119,827 | 30,129 | 28,495 |
| Michael J. Hanson<br>President & CEO of NorthWestern Energy division | 2002 | 345,833 | 540,000 | 29,000 | 0 | 14,063 |
| | 2001 | 323,750 | 635,914 | 9,000 | 0 | 19,684 |
| | 2000 | 293,583 | 390,370 | 8,035 | 0 | 19,319 |
| Eric R. Jacobsen<br>Senior Vice President, General Counsel & Chief Legal Officer and Chief Operating Officer of NorthWestern Growth Corp. | 2002 | 304,791 | 400,000 | 44,000 | 0 | 16,447 |
| | 2001 | 280,416 | 150,000 | 28,000 | 430,757 | 17,491 |
| | 2000 | 257,042 | 44,189 | 32,831 | 0 | 13,465 |
| Daniel K. Newell<br>Sr. Vice President; President & CEO of Blue Dot Services, Inc. & Managing Director & CEO of NorthWestern Growth Corp. | 2002 | 354,000 | 0 | 36,000 | 42,979 | 19,541 |
| | 2001 | 347,333 | 80,000 | 44,500 | 861,346 | 21,600 |
| | 2000 | 311,917 | 118,000 | 39,481 | 0 | 19,170 |

(1) The amounts in this column are cash awards pursuant to NorthWestern's annual incentive plans, which are described under the "Report on Executive Compensation" which were earned in the year shown and paid in the following year.

*(Footnotes continued on the next page.)*

*(Footnotes continued from the preceding page.)*

(2) For 2000 and 2002 for all named executives, and for Mr. Hanson, Mr. Jacobsen, and Mr. Newell, in 2001, these awards are solely incentive stock options. For Mr. Lewis and Mr. Hylland in 2001, the awards included 155,000 and 75,500 incentive stock options, and 22,511 and 10,969 restricted stock awards, respectively, with the restricted stock awards accruing quarterly dividends as declared. As of December 31, 2002, Mr. Hylland's restricted stock award was valued at $64,904. As explained above, the restrictions on Mr. Lewis' restricted stock award shares were removed as part of his retirement agreement.

(3) For 2000 and 2002, the amounts in this column represent the cash payouts from NorthWestern's former phantom stock long-term incentive compensation plan at the end of the five-year periods following the dates of the awards. The payout in 2002 represents the last phantom stock units held under this former long-term

incentive plan. For 2001, the amounts represent such former phantom stock plan payouts for Messrs. Lewis, Hylland, and Newell in the following amounts: Lewis, $146,695; Hylland, $95,161; and Newell, $30,970, with the remainder of the 2001 distributions for those three executives and the distribution for Mr. Jacobsen representing vested interests in the NorthWestern Growth Corporation private equity plan.

(4) The amounts in this column include NorthWestern's contributions on behalf of the named executive officers to the Team Member Savings Plans and to the ESOP as well as the amounts paid by NorthWestern with respect to life insurance for the benefit of the executives. For the executives named in this table, for 2002 such amounts under the Team Member Savings Plans, ESOP, and life insurance under the NorthWestern term life and Family Protector Plan, respectively, were as follows: Mr. Lewis: $25,466, $27,490, and $4,962; Mr. Hylland: $17,954, $9,073, and $5,053; Mr. Hanson: $7,656, $1,746, and $4,661; Mr. Jacobsen: $10,501, $1,558, and $4,388; and Mr. Newell: $12,121, $2,999, and $4,421.

(5) Mr. Lewis retired, effective December 31, 2002. All ISOs and NQSOs granted to Mr. Lewis were forfeited as part of the terms of his retirement agreement, described elsewhere in this Report.

**Information on Options**

**Option Grants in Last Fiscal Year**

| | Individual Grants | | | | Potential Realizable Value At Assumed Annual Rates of Stock Price Appreciation for Option Term(3)($) | |
|---|---|---|---|---|---|---|
| **Name** | **No. of Securities Underlying Options Granted (#)** | **Percent of Total Options Granted to Team Members in Fiscal Year** | **Exercise or Base Price ($/Sh)(2)** | **Expiration Date** | **At 5% ($35.66 Stock Price)** | **At 10% ($56.66 Stock Price)** |
| Merle D. Lewis | 295,000 | 37.5 | 20.70 | (4) | 0 | 0 |
| Richard R. Hylland | 154,600 | 19.7 | 20.70 | 2/6/2012 | 5,216,204 | 8,288,106 |
| Michael J. Hanson | 29,000 | 3.7 | 20.70 | 2/6/2012 | 978,460 | 1,554,690 |
| Eric R. Jacobsen | 44,000 | 5.6 | 20.70 | 2/6/2012 | 1,484,560 | 2,358,840 |
| Daniel K. Newell | 36,000 | 4.6 | 20.70 | 2/6/2012 | 1,214,640 | 1,929,960 |

(1) All options granted in 2002 become exercisable in annual cumulative installments of 25%, commencing on the first anniversary of the date of grant, with full vesting occurring on the fourth anniversary date of the grant. Vesting is accelerated in the event of a change in control of NorthWestern.

(2) All options were granted at market value (the closing price of the Common Stock on the New York Stock Exchange as reported in the Midwest Edition of The Wall Street Journal) on the date of grant.

(3) The hypothetical potential gains (reported net of exercise price) are based entirely on assumed annual growth rates of 5% and 10% in the value of NorthWestern's stock price over the 10-year

life of the options (which would equal a total increase in stock price of 63% and 159%, respectively). These assumed rates of growth are mandated by rules of the Securities and Exchange Commission for illustration purposes only and are not intended to predict future stock price.

(4) All ISOs and NQSOs granted to Mr. Lewis were forfeited as part of the terms of his retirement agreement, described elsewhere in this Report.

**Fiscal Year-End Option Values**

| Name | Number of Securities Underlying Unexercised Options at Fiscal Year-End (#) | | Value of Unexercised In-the-Money Options At Fiscal Year-End ($)(1) | |
|---|---|---|---|---|
| | Exercisable | Unexercisable | Exercisable | Unexercisable |
| Merle D. Lewis | 0(2) | 0(2) | 0 | 0 |
| Richard R. Hylland | 47,968 | 407,962 | 0 | 0 |
| Michael J. Hanson | 5,811 | 51,841 | 0 | 0 |
| Eric R. Jacobsen | 833 | 126,872 | 0 | 0 |
| Daniel K. Newell | 19,293 | 146,567 | 0 | 0 |

(1) Represents the difference between $5.08 (the closing price of the Common Stock on the New York Stock Exchange as reported in the Midwest Edition of The Wall Street Journal for the close on December 31, 2002) and the option exercise price.

(2) All ISOs and NQSOs previously held by Mr. Lewis were forfeited as part of the terms of his retirement agreement, described elsewhere in this Report.

**Employment Contracts**

A number of executives, including Messrs. Hylland, Hanson, Jacobsen and Newell, have comprehensive employment agreements. Mr. Hylland's agreement was entered into on March 1, 2001 and terminates on the last day of February 2006. Mr. Hylland is entitled to receive a base salary that is subject to annual increases based on a median of comparable companies and a discretionary bonus. Mr. Hylland is also eligible to participate in NorthWestern's annual short-term cash incentive plans and long-term cash and stock incentive plans tied to the success of the organization. These long-term incentive plans include, among other things, options to purchase shares of NorthWestern common stock and the right to participate in private equity incentive plans which hold minority investments in or are otherwise tied to the performance of NorthWestern's non-regulated subsidiaries. Mr. Hylland is also entitled to participate in NorthWestern benefit plans available to executives, including, among other things, health, retirement, disability and life insurance benefits as well as an automobile allowance and country club dues. The agreement provides for the payment of accrued salary and termination benefits if Mr. Hylland's employment is terminated by NorthWestern for any reason other than Cause, due to Mr. Hylland's death or by Mr. Hylland due to a "fundamental change." A fundamental change generally occurs if there is a diminution in Mr. Hylland's responsibilities or compensation, NorthWestern relocates its primary offices more than 30 miles or there is a change in control or major transaction involving NorthWestern (each as defined in the agreement). The termination benefits include a lump sum payment equal to (1) the sum of (a) base salary, (b) the higher of either Mr. Hylland's most recent bonuses and short-term incentive awards or the average of such bonuses and awards over the preceding three calendar years and (c) the higher of either the value of Mr. Hylland's most recent options, long-term incentive awards and private equity investment returns or the average value of such options, awards and returns over the preceding three calendar years, multiplied by (2) the remaining term of the agreement plus one year. The termination benefits also include lump sum payments equal to the fair market value of Mr. Hylland's private equity interests and interests under NorthWestern's benefit plans. The payments calculated with respect to Mr. Hylland's private equity investment returns and the fair market value of his private equity interests are grossed up by an

amount sufficient to put him in the position in which he would be were such payments subject to income tax only at long-term capital gains rates. Mr. Hylland has the right to defer receipt of certain of these termination benefits

rather than receiving them as a lump sum. All equity awards granted to Mr. Hylland accelerate in full upon termination of the agreement (other than for Cause) and remain exercisable in accordance with their terms. NorthWestern has agreed to make gross-up payments to Mr. Hylland to the extent that termination benefits would be subject to the excise tax on excess "parachute payments" following a change of control. The termination benefits under these agreements are to be provided regardless of whether Mr. Hylland is able to obtain other employment. The agreement contains provisions requiring Mr. Hylland to maintain the confidentiality of NorthWestern proprietary information and restricts Mr. Hylland from competing with NorthWestern or soliciting NorthWestern employees, suppliers and customers for a period of two years following termination. NorthWestern has agreed, pursuant to the agreement, to indemnify Mr. Hylland to the fullest extent permitted by law.

Messrs. Hanson, Jacobsen and Newell entered into employment agreements as of March 1, 2001. Mr. Hanson's agreement terminates on the last day of February 2005. Mr. Jacobsen's agreement terminates on the last day of February 2004. Mr. Newell's agreement terminates on the last day of February 2005. Messrs. Hanson, Jacobsen and Newell are entitled to receive a base salary that is subject to annual increases based on the median of comparable companies and a discretionary bonus. They are also eligible to participate in NorthWestern's annual short-term cash incentive plans and long-term cash and stock incentive plans tied to the success of the organization. These long-term incentive plans include, among other things, options to purchase shares of NorthWestern common stock and the right to participate in private equity incentive plans which hold minority investments in or are otherwise tied to the performance of NorthWestern's non-regulated subsidiaries. They are also entitled to participate in NorthWestern benefit plans available to executives, including, among other things, health, retirement, disability and life insurance benefits as well as an automobile allowance and country club dues. The agreements provide for the payment of accrued salary and termination benefits if employment is terminated by NorthWestern on substaintially the same terms as described above for Mr. Hylland's agreement. The agreements contain provisions requiring them to maintain the confidentiality of NorthWestern proprietary information and restricts them from competing with NorthWestern or soliciting NorthWestern's employees, suppliers and customers for a period of two years following termination. NorthWestern has agreed, pursuant to the agreement, to indemnify each of Messrs. Hanson, Jacobsen and Newell to the fullest extent permitted by law.

The total remaining obligation under employment agreements in the ordinary course, excluding a change in control, with Messrs. Hylland, Hanson, Jacobsen and Newell are approximately $3.8 million, $1.8 million, $0.7 million and $1.9 million, respectively.

Merle Lewis retired from his employment with the Company and its subsidiaries and affiliates and resigned as the Company's Chief Executive Officer and Chairman and from all trustee, administrator or similar positions in which he served on behalf of the Company or any of its subsidiaries or affiliates, effective December 31, 2002. Mr. Lewis concurrently resigned as a member of the Board, and as an officer and director of each of the Company's subsidiaries and affiliates (other than as a member of the board of directors of CornerStone Propane G.P., Inc.) for which he served. In connection with his retirement, Mr. Lewis entered into a retirement agreement with the Company and terminated the Comprehensive Employment Agreement and Investment Program, dated June 1, 2000, which was scheduled to expire February 28, 2006. Under the Retirement Agreement, Mr. Lewis received the following, which total an aggregate of approximately $3.5 million: (1) a cash severance payment, the equivalent of one year's base salary and target annual incentive compensation for a total of $1,711,000, (2) a cash payment of $73,000 from the Company, representing his interest in the 1998 NorthWestern Energy Corporation Equity Ownership Incentive Plan, (3) full vesting of the 22,511 shares of restricted stock granted to him on March 1, 2001, originally scheduled to vest on February 4, 2005 (and all additional shares purchased with dividends declared thereon) under the Company's Stock Option and Incentive Plan (as amended on January 16, 2001), (4) payments of $500 per month until age 65 toward

---

the cost of retiree health insurance, (5) retention of the company provided leased automobile through the end of the such lease at an estimated cost of $1,000 per month, and (6) age and service credits toward benefit determination in NorthWestern's qualified and nonqualified pension plan as if he were to continue to be employed through June 30,

2006, the value of which is approximately $1.7 million on a present value basis as determined by NorthWestern's actuaries. Based upon Mr. Lewis' years of service, and the benefit elections he made under the provisions of the NorthWestern Pension Plan and Supplemental Executive Retirement Plan, with the enhanced pension benefit, Mr. Lewis began in January 2003 to receive a pension benefit of $29,470 per month. The Company agreed to insure the payment of such subsidy in the event of a change of control of the Company by obtaining a letter of credit or other financial instrument.

Mr. Lewis waived or cancelled all other rights or interests he may have had under the Stock Option and Incentive Plan, including all vested and unvested incentive stock options, non-qualified stock options and phantom stock units (including all dividends accrued thereon) granted to him under the plan. Mr. Lewis waived all of his rights and interests in the Company's short-term and long-term disability insurance coverages, term life insurance coverages and annual incentive plans for 2002. He also waived his rights and interests in the equity ownership incentive plans of NorthWestern Growth Corporation, NorthWestern Services Group, Inc., NorthWestern Public Service, NorthWestern Services Corporation, and NorCom Advanced Technologies, Inc. and assigned his rights in the membership interests of NorthWestern Capital Partners, LLC, a Delaware limited liability company, to the Company. Mr. Lewis retained all benefits vested or earned as of the date of his retirement in the Company's benefit and retirement plans in which he participated (and he waived all post retirement vesting or interests), and the Company agreed to subsidize his pension benefit payments such that his pension benefit will be calculated as if Mr. Lewis' term of service or employment with the Company terminated on June 30, 2006, notwithstanding the actual date of retirement and regardless of the date of payment of such benefits.

Mr. Lewis released the company and its affiliates and subsidiaries and their agents from all know and unknown claims that he may have in connection with his employment with the Company or as a stockholder of the Company, other than (a) his right to enforce the retirement agreement, (b) any rights or claims that arise after the date of his retirement, and (c) any claims for indemnification from the Company or any claims under the Company's Directors and Officers insurance policies, in either case, for actions or omissions in his capacity as an officer or director of the Company.

**Retirement Plan**

NorthWestern has two retirement plans, with one applicable to its Montana NorthWestern Energy team members and one applicable to its South Dakota and Nebraska NorthWestern Energy and all NorthWestern Corporation team members. All of the named executives participate in the latter plan. For that plan, effective January 1, 2000, NorthWestern offered its team members two alternatives with regard to its retirement plan. A team member could convert his or her existing accrued benefit from the existing plan into an opening balance in a hypothetical account under a new cash balance formula, or that team member could continue under the existing defined benefit formula. All team members hired after January 1, 2000 participate in the cash balance formula. The beginning balance in the cash balance account for a converting team member was determined based on the team member's accrued benefit, age and service as of January 1, 2000, 2000 eligible pay, and a conversion interest rate of 6%. Under the cash balance formula a participant's account grows based upon (1) contributions by NorthWestern made once per year, and (2) by annual interest credits based on the average Federal 30-year Treasury bill rate for November of the preceding year (6.15% for 2000). Contribution rates were determined on January 1, 2000, based on the participant's age and years of service on that date. They range from 3%-7.5% (3% for all new team members) for compensation below the taxable wage base and are doubled for compensation above the taxable wage base. Upon termination of employment with NorthWestern, a team member, or if deceased, his or her beneficiary, receives the cash balance in the account paid in a lump sum or in other permitted annuity forms of payment.

---

To be eligible for the retirement plan, a team member must be 21 years of age and have worked at least one year for NorthWestern, working at least 1,000 hours in that year. Non-employee Directors are not eligible to participate. Benefits for team members who chose not to convert to the cash balance formula will continue to be part of the defined benefit formula, which provides an annual pension benefit upon normal retirement at age 65 or

earlier (subject to benefit reduction). Under this formula, the amount of the annual pension is based upon average annual earnings for the sixty consecutive highest paid months during the 10 years immediately preceding retirement. Upon retirement on the normal retirement date, the annual pension to which an eligible team member becomes entitled under the formula amounts to 1.34% of average annual earnings up to the Covered Compensation base plus 1.75% of such earnings in excess of the Covered Compensation base, multiplied by all years of credited service.

The named executives also participate in a supplemental excess retirement plan related to both of the pension formulas, which provides benefits based on those formulas but with respect to compensation which exceeds the limits under the Code. In addition, NorthWestern has agreed to assure Mr. Hanson a pension benefit equivalent to that which would be provided by the Retirement Plan if he were given credit for his 17 years of prior service with another utility company in addition to his years of service with NorthWestern. As a result, he was credited with those additional years of service under the supplemental excess retirement plan.

Assuming the named executives reach the normal retirement age of 65, the projected annual life annuity benefits for the named executives would be: Mr. Hylland, $246,477; Mr. Hanson, $156,773; Mr. Jacobsen, $54,336; Mr. Newell, $97,279. In 2002 the cash balance accounts for the named executive officers, other than Mr. Lewis, were as follows: Mr. Hylland $376,367, Mr. Hanson $355,290, Mr. Jacobsen $60,693; and Mr. Newell $160,005.

**Other Benefits**

NorthWestern currently maintains a variety of benefit plans and programs, which are generally available to all NorthWestern team members, including executive officers, such as the 401(k) Retirement Plan under which a team member may contribute up to 13% of his or her salary (with NorthWestern matching up to 3 1/2% of the first 6% contributed by the team member), a Supplemental Variable Investment Plan (a non-qualified Supplemental 401(k) plan available to the extent participation in the 401(k) is limited by the Internal Revenue Code), a Team Member Stock Purchase Plan (Section 423 Plan) approved by shareholders and instituted in 1999, under which a team member may contribute up to $3,000 per year for the purchase of NorthWestern Common Stock (at a discount of up to 15% of market value), term life and supplemental life (Family Protector Plan) insurance coverage, the NorthWestern Employee Stock Ownership Plan (ESOP), long-term disability plan, and other general employee benefits such as emergency personal leave and educational assistance.

**Salary Continuation Plan**

NorthWestern has a non-qualified salary continuation plan for directors and selected management team members (the Supplemental Income Security Plan). In 2002, a total of 35 active team members and non-employee directors participated in this plan. The plan provides for certain amounts of salary continuation in the event of death before or after retirement or, in the alternative, certain supplemental retirement benefits in lieu of any death benefits after age 65. Generally, death benefits will vary from 45% to 75% of salary for up to 15 years, and supplemental retirement benefits from 25% to 40% of current salary. Life insurance is carried on each plan participant in favor of NorthWestern to indirectly fund future benefit payments. Part of the cost of the life insurance carried by NorthWestern is paid by team member participants in the plan. The program was designed so that if assumptions made as to mortality experience, policy dividends or credits, and other actuarial factors are realized, NorthWestern should more than recover its cost of this program. Consequently, the cost of any one individual participant cannot be properly allocated or determined because of the overall actuarial plan assumptions and the cost recovery feature of the plan. Therefore, no amount attributable to this plan has been included in the summary compensation table above.

---

**Compensation Committee Interlocks and Insider Participation**

The Compensation Committee is composed of not less than three non-employee directors. The members of the Compensation Committee are Chairman Randy G. Darcy, Marilyn R. Seymann, and Larry F. Ness. None of the persons who served as members of the Compensation Committee of the Board during fiscal year 2002 are officers or employees or former employees of NorthWestern or any of its subsidiaries.

**Director Compensation**

Non-employee Directors annually receive 1,200 shares of Common Stock of NorthWestern, are paid $2,500 each quarter for serving on the Board, and receive an attendance fee of $4,000 for attendance at each regular or special meeting of the Board. Directors are also paid $1,700 for each meeting of a committee on which such director serves and $500 for each quarter during which they serve as chairman of a committee of the Board. Directors receive one-half of the meeting fee for telephonic conference board or committee meetings. In addition, non-employee directors received stock options for 4,000 shares of Common Stock in 2002. Directors who are also officers are not separately compensated for services as a director on NorthWestern's Board.

Directors may elect to defer receipt of their cash compensation as directors until they cease to be directors. The deferred compensation may be invested in (1) an account which earns interest at the same rate as accounts in the team member savings plan or (2) a deferred compensation unit account in which the deferred compensation is converted into deferred compensation units on the basis that each unit is at the time of investment equal in value to the fair market value of one share of NorthWestern's Common Stock, sometimes referred to as "phantom stock units." Additional units based on the dividends paid on NorthWestern's Common Stock are added to the director's deferred compensation unit account. Following the director's retirement, the value of the deferred compensation is paid in cash to the former director within a period of five years.

**ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT**

**Security Ownership by Certain Beneficial Owners and Management**

The following table sets forth information, as of March 1, 2003, with respect to the beneficial ownership of shares of NorthWestern's Common Stock owned by the directors, nominees for director, the "Named Executive Officers" of NorthWestern, as described below, and by all directors and executive officers of NorthWestern as a group. Except under special circumstances, NorthWestern's Common Stock is the only class of voting securities. There are no persons known to NorthWestern who own more than 5% of the outstanding shares of Common Stock.

The "Named Executive Officers" include NorthWestern's (a) Chief Executive Officer; (b) its four most highly compensated executive officers, other than the Chief Executive Officer, who were serving as executive officers at the end of fiscal year 2002; and (c) up to two additional individuals for whom such disclosure would have been provided under clause (a) and (b) above but for the fact that the individual was not serving as an executive officer of NorthWestern at the end of fiscal year 2002; provided, however, that no disclosure need be provided for any executive officer, other than the CEO, whose total annual salary and bonus does not exceed $100,000.

Accordingly, NorthWestern's Named Executive Officers include (a) Gary G. Drook, its Chief Executive Officer; (b) Merle D. Lewis, former Chairman and Chief Executive Officer and (c) Richard R. Hylland, Daniel K. Newell, Michael J. Hanson and Eric R. Jacobsen, the four most highly-compensated executive officers, other than the Chief Executive Officer, who were serving as executive officers at the end of fiscal year 2002 and whose salary and bonus exceeded $100,000.

---

Except as otherwise noted, the persons or entities in this table have sole voting and investing power with

respect to all the shares of NorthWestern's Common Stock beneficially owned by them subject to community property laws, where applicable. The information with respect to each person specified is as supplied or confirmed by such person, based upon statements filed with the SEC, or based upon the actual knowledge of NorthWestern.

| | Amount and Nature of Beneficial Ownership(1) | |
|---|---|---|
| **Name of Beneficial Owner** | **Shares of Common Stock Beneficially Owned** | **Percent of Common Stock** |
| Randy G. Darcy | 5,811 | * |
| Gary G. Drook | 5,610 | * |
| Jerry W. Johnson | 11,326 | * |
| Larry F. Ness | 12,407 | * |
| Marilyn R. Seymann | 4,106 | * |
| Bruce I. Smith | 15,025 | * |
| Merle D. Lewis(2) | 202,079 | * |
| Richard R. Hylland | 30,221 | * |
| Daniel K. Newell | 32,009 | * |
| Michael J. Hanson | 13,146 | * |
| Eric R. Jacobsen | 8,676 | * |
| All directors & executive officers | 348,071 | 1% |

* Less than 1%.

(1) Shares shown represent both record and beneficial ownership, including shares held in the team member's (employee's) account with the Trustees of NorthWestern's Employee Stock Ownership Plan ("ESOP") and in various plans (NorthWestern's 401(k) Retirement Plan, Supplemental Variable Investment Plan, and Team Member Stock Purchase Plan, collectively the "Team Member Savings Plans"). Mr. Hanson's shares include 4,316 shares in an Individual Retirement Account. The address of each person is 125 S. Dakota Ave., Sioux Falls, SD 57104.

(2) Mr. Lewis retired as Chairman and Chief Executive Officer as of December 31, 2002.

Information regarding equity compensation plans required by this Item 12 is included in Item 5 of Part II of this report and is incorporated into this Item 12 by reference.

## ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

Gary G. Drook became our new chief executive officer on January 5, 2003. Mr. Drook does not have a written employment agreement with us. Mr. Drook received a cash payment of $600,000 on his date of hire. He will be required to repay all of that amount if his employment with us terminates before January 5, 2004 and 50% if his employment terminates before January 5, 2005. Mr. Drook also received an initial option to purchase 233,333 shares of our common stock at $4.90 per share. The option vests in three equal annual installments on the anniversary of his hire date. Mr. Drook's base salary in 2003 will be $565,000 per year and his target annual bonus is $423,750, or 75% of his base salary. His bonus will be determined by our board of directors. Mr. Drook also received long-term incentive compensation in 2003 consisting of additional options to purchase up to 339,000 shares of common stock at $4.90 per share. These options also vest in three equal annual installments on the anniversary of his hire date. We believe that Mr. Drook's cash compensation in 2003 will be approximately $988,750. As part of his compensation arrangements, Mr. Drook is also entitled to use aircraft owned by us to commute to and from our corporate offices in Sioux Falls, South Dakota and his home in Florida. We anticipate that

he will use the aircraft approximately 26 times per year, at an

annual cost to us of approximately $450,000. The approximate cost to the company of Mr. Drook's usage of the aircraft as of April 15, 2003 was $115,000. The cost to us related to Mr. Drook's use of our aircraft for commuting is treated as income to him. We have agreed to provide Mr. Drook with a tax gross up payment for all income related to personal aircraft usage. Mr. Drook is also eligible to participate in our health, welfare and retirement programs and relocation assistance.

**ITEM 14. CONTROLS AND PROCEDURES**

(a) Within the 90-day period prior to the date of this report, we carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures pursuant to Rule 13a-14 of the Securities Exchange Act of 1934 (the "Exchange Act"). As a result of this review and evaluation, which was conducted in the course of preparing our financial statements for the year ended December 31, 2002 and in connection with the corresponding audit by our independent auditors, Deloitte & Touche LLP, management determined that our internal controls have not meet our expectations and goals.

In particular, the EXPERT enterprise software system used by our subsidiary, Expanets, has significantly failed to provide the intended functionality and information. We were unable to identify billing problems and related accounting problems in a timely manner during 2002. Expanets experienced severe complications with its EXPERT enterprise software system throughout 2002, including order entry and customer fulfillment, billing and collection functions, an inability to provide timely and complete billing detail for a majority of Expanets' customers, numerous reporting deficiencies that prevented management from receiving critical accounts receivable and cash application data in a timely manner and problems relating to data migration from Avaya's system, some of which were due to underlying problems with the Avaya database and faulty data migration scripting performed by Expanets. Expanets was forced to resort to manual journal entries in many instances. Throughout 2002, Expanets has made continuing efforts to correct deficencies in the EXPERT system. As a result of these efforts, which are ongoing, Expanets identified certain maintenance billing problems with its EXPERT system that required reversal of previously recorded maintenance revenue. Further, we determined that additional revenues, accounts receivable reserves and write-offs and billing adjustments reserves were not correctly stated in previously reported unaudited quarterly results. In the course of preparing our financial statements for the year ended December 31, 2002 and in connection with the corresponding audit, we also determined that certain costs related to the EXPERT system were inappropriately capitalized and that certain accounting procedures being used with respect to revenue recognition and account receivable reserve methodology were not appropriate for Expanets.

In addition, our financial reporting infrastructure has been significantly challenged as a result of our dramatic growth, from annual revenues of approximately $200 million in 1997 to annual revenues of approximately $2 billion in 2002. We have experienced a lack of continuity and retention of qualified accounting personnel, and have had difficulties in hiring an adequate number of qualified replacements on a timely basis. We have determined that the absence of a functioning internal auditing department and integrated information systems have limited our ability to adequately review subsidiary financial information. We may have experienced inconsistent application of and adherence to our policies and procedures by certain personnel. These factors have made it clear to management that the depth and training of its accounting staff needs improvement.

We have advised our Audit Committee of our Board of Directors that, in the course of preparing our year-end 2002 financial statements and in undergoing our 2002 audit, we noted the deficiencies in internal controls described above relating to:

- the evaluation of appropriate reserves for accounts receivable and billing adjustments specifically at Expanets;

- timely evaluation and substantiation of material account balances; and
- supervision, staffing and training of accounting personnel.

Our independent auditors, Deloitte & Touche LLP, has advised the Audit Committee that these internal control deficiencies constitute reportable conditions and, collectively, a material weakness as defined in Statement on Auditing Standards No. 60. Immediately prior to the filing of this Annual Report on Form 10-K, we filed amended Quarterly Reports on Form 10-Q/A for the periods ended March 31, 2002, June 30, 2002, and September 30, 2002. The amended Quarterly Reports principally restate prior reported results and include additional disclosures in the appropriate period as a result of the foregoing weaknesses in our internal controls.

With the assistance of our advisors, we continue to evaluate methods to improve our internal controls and procedures. We have taken or plan to take corrective actions, such as the following, as necessary:

- Retained an outside consulting firm to review many aspects of the EXPERT system;
- Retained outside legal counsel and a consulting firm to evaluate the Company's existing internal controls and disclosure controls and make suggestions for improvements;
- Hired a Vice President, Audit and Controls, reporting directly to our chief executive officer, to monitor and review our internal controls;
- Improving the communication to all employees of our corporate code of conduct in a form and content complying with the Sarbanes-Oxley Act;
- Further addition of personnel to the accounting department at Expanets to provide resources to perform additional manual reconciliations, data tracking, and reporting until EXPERT system enhancements and improvements can be developed and installed;
- Adoption of improved accounting policies, procedures and internal controls for the periodic consolidated financial closing process including closer management review of subsidiary financial information, prioritization and clarification of enterprise-wide risk management responsibilities, and documentation of inter-company transactions;
- Improving the communication between operating, financial and management functions, and expanding our formal reporting procedures;
- Addition of personnel in our accounting and internal audit departments as well as more clearly defining responsibilities, supervision and training of existing personnel; and
- Performance evaluations of all members of our internal financial staff and, if deemed necessary, the taking of prompt disciplinary action as well as other appropriate action regarding our employees so as to strengthen compliance with our Sarbanes-Oxley compliance procedures.

listing of each such exhibit and are incorporated by reference. We will furnish a copy of any exhibit upon request, but a reasonable fee will be charged to cover our expenses in furnishing such exhibit.

| Exhibit Number | Description of Document |
|---|---|
| 2.1(a)* | Unit Purchase Agreement, dated as of September 29, 2000, among NorthWestern Corporation, Touch America Holdings, Inc. and The Montana Power Company with respect to all outstanding membership interests in The Montana Power, L.L.C. (incorporated by reference to Exhibit (10)(a)(1) of NorthWestern Corporation's Current Report on Form 8-K, dated August 21, 2001, Commission File No. 0-692). |
| 2.1(b)* | Amendment No. 1 to the Unit Purchase Agreement, dated as of June 21, 2001 (incorporated by reference to Exhibit (10)(a)(2) of NorthWestern Corporation's Current Report on Form 8-K, dated August 21, 2001, Commission File No. 0-692). |

| | |
|---|---|
| 3.1* | Restated Certificate of Incorporation of NorthWestern Corporation, dated November 9, 2000 (incorporated by reference to Exhibit 3(a) of NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2000, Commission File No. 0-692). |
| 3.2** | By-Laws of NorthWestern Corporation, as amended, dated January 5, 2003. |
| 4.1(a)* | General Mortgage Indenture and Deed of Trust, dated as of August 1, 1993, from NorthWestern Corporation to The Chase Manhattan Bank (National Association), as Trustee (incorporated by reference to Exhibit 4(a) of NorthWestern Corporation's Current Report on Form 8-K, dated August 16, 1993, Commission File No. 0-692). |
| 4.1(b)* | Supplemental Indenture, dated as of August 15, 1993, from NorthWestern Corporation to The Chase Manhattan Bank (National Association), as Trustee (incorporated by reference to Exhibit 4(b) of NorthWestern Corporation's Current Report on Form 8-K, dated August 16, 1993, Commission File No. 0-692). |
| 4.1(c)* | Supplemental Indenture, dated as of August 1, 1995, from NorthWestern Corporation to The Chase Manhattan Bank (National Association), as Trustee (incorporated by reference to Exhibit 4(b) of NorthWestern Corporation's Current Report on Form 8-K, dated August 30, 1995, Commission File No. 0-692). |
| 4.1(d)* | Supplemental Indenture, dated as of February 1, 2003, from NorthWestern Corporation to JPMorgan Chase Bank, as Trustee (incorporated by reference to Exhibit 4.3 of NorthWestern Corporation's Current Report on Form 8-K, dated February 10, 2003, Commission File No. 0-692). |
| 4.2(a)* | Preferred Securities Guarantee Agreement, dated as of August 3, 1995, between NorthWestern Corporation and Wilmington Trust Company (incorporated by reference to Exhibit 1(d) of NorthWestern Corporation's Current Report on Form 8-K, dated August 30, 1995, Commission File No. 0-692). |

4.2(b)* Declaration of Trust of NWPS Capital Financing I (incorporated by reference to Exhibit 4(d) of NorthWestern Corporation's Current Report on Form 8-K, dated August 30, 1995, Commission File No. 0-692).

4.2(c)* Amended and Restated Declaration of Trust of NWPS Capital Financing I (incorporated by reference to Exhibit 4(e) of NorthWestern Corporation's Current Report on Form 8-K, dated August 30, 1995, Commission File No. 0-692).

4.2(d)* Preferred Securities Guarantee Agreement, dated as of November 18, 1998, between NorthWestern Corporation and Wilmington Trust Company (incorporated by reference to Exhibit 4(g) of NorthWestern Corporation's Registration Statement on Form 8-A (Amendment No. 1), dated December 3, 1998, Commission File No. 001-14623).

4.2(e)* Certificate of Trust of NorthWestern Capital Financing I (incorporated by reference to Exhibit 4(b)(11) of NorthWestern Corporation's Registration Statement on Form S-3, dated July 2, 1998, Commission File No. 333-58491).

4.2(f)* Amended and Restated Declaration of Trust of NorthWestern Capital Financing I (incorporated by reference to Exhibit 4(e) of NorthWestern Corporation's Registration Statement on Form 8-A (Amendment No. 1), dated December 3, 1998, Commission File No. 001-14623).

---

4.2(g)* Preferred Securities Guarantee Agreement, dated as of December 21, 2001, between NorthWestern Corporation and Wilmington Trust Company (incorporated by reference to Exhibit 4.7 of NorthWestern Corporation's Registration Statement on Form 8-A, dated December 21, 2001, Commission File No. 001-16843).

4.2(h)* Restated Certificate of Trust of NorthWestern Capital Financing II (incorporated by reference to Exhibit 4(b)(12) of NorthWestern Corporation's Registration Statement on Form S-3, dated July 2, 1998, Commission File No. 333-58491).

4.2(i)* Amended and Restated Declaration of Trust of NorthWestern Capital Financing II (incorporated by reference to Exhibit 4.4 of NorthWestern Corporation's Registration Statement on Form 8-A, dated December 21, 2001, Commission File No. 001-16843).

4.2(j)* Preferred Securities Guarantee Agreement, dated as of January 31, 2002, between NorthWestern Corporation and Wilmington Trust Company (incorporated by reference to Exhibit 4.6 of NorthWestern Corporation's Registration Statement on Form 8-A, dated February 1, 2002, Commission File No. 001-31229).

4.2(k)* Restated Certificate of Trust of NorthWestern Capital Financing III (incorporated by reference to Exhibit 4(b)(13) of NorthWestern Corporation's Registration Statement on Form S-3, dated July 2, 1998, Commission File No. 333-58491).

4.2(l)* Amended and Restated Declaration of Trust of NorthWestern Capital Financing III (incorporated by reference to Exhibit 4.3 of NorthWestern Corporation's Registration Statement on Form 8-A, dated February 1, 2002, Commission File No. 001-16843).

4.2(m)* Form of Guarantee Agreement, between The Montana Power Company and The Bank of New York, as trustee (incorporated by reference to Exhibit 4(d) of The Montana Power Company's Registration Statement on Form S-3, dated October 18, 1996, Commission File No. 333-14369).

4.2(n)** Assumption of Guarantee Agreement, dated as of February 13, 2002, by The Montana Power, L.L.C. in favor of The Bank of New York, as trustee.

4.2(o)** Assumption Agreement (QUIPs Guarantee), dated as of November 15, 2002, by between NorthWestern Energy, L.L.C., as assignor, and NorthWestern Corporation, as assignee.

4.2(p)* Form of Trust Agreement of Montana Power Capital I (incorporated by reference to Exhibit 4(a) of The Montana Power Company's Registration Statement on Form S-3, dated October 18, 1996, Commission File No. 333-14369).

4.2(q)** Assignment and Assumption Agreement (QUIPs Agreements), dated as of November 15, 2002, by between NorthWestern Energy, L.L.C., as assignor, and NorthWestern Corporation, as assignee.

4.2(r)* Form of Amended and Restated Trust Agreement of Montana Power Capital I (incorporated by reference to Exhibit 4(b) of The Montana Power Company's Registration Statement on Form S-3, dated October 18, 1996, Commission File No. 333-14369).

4.2(s)* Subordinated Debt Securities Indenture, dated as of August 1, 1995, between NorthWestern Corporation and The Chase Manhattan Bank, as Trustee (incorporated by reference to Exhibit 4(f) of the Company's Current Report on Form 8-K, dated August 30, 1995, Commission File No. 0-692).

---

4.2(t)* First Supplemental Indenture to the Subordinated Debt Securities Indenture, dated as of August 1, 1995 (incorporated by reference to Exhibit 4(g) of NorthWestern Corporation's Current Report on Form 8-K, dated August 30, 1995, Commission File No. 0-692).

4.2(u)* Second Supplemental Indenture to the Subordinated Debt Securities Indenture, dated as of November 15, 1998 (incorporated by reference to Exhibit 4(f) of NorthWestern Corporation's Registration Statement on Form 8-A (Amendment No. 1), dated December 3, 1998, Commission File No. 001-14623).

4.2(v)* Third Supplemental Indenture to the Subordinated Debt Securities Indenture, dated as of December 21, 2001 (incorporated by reference to Exhibit 4.6 of NorthWestern Corporation's Registration Statement on Form 8-A, dated December 21, 2001, Commission File No. 001-16843).

4.2(w)* Fourth Supplemental Indenture to the Subordinated Debt Securities Indenture, dated as of January 31, 2002 (incorporated by reference to Exhibit 4.6 of NorthWestern Corporation's Registration Statement on Form 8-A, dated February 1, 2002, Commission File No. 001-31229).

4.2(x)* Form of Indenture, between The Montana Power Company and The Bank of New York, as Trustee (incorporated by reference to Exhibit 4(c) of The Montana Power Company's Registration Statement on Form S-3, dated October 18, 1996, Commission File No. 333-14369).

4.2(y)** First Supplemental Indenture to the Indenture, dated as of February 13, 2002, between The Montana Power, L.L.C. and The Bank of New York, as trustee.

4.2(z)** Second Supplemental Indenture to the Indenture, dated as of August 13, 2002, between The Montana Power, L.L.C. and The Bank of New York, as trustee.

4.2(aa)** Third Supplemental Indenture to the Indenture, dated as of November 15, 2002, between NorthWestern Corporation (successor to NorthWestern Energy, L.L.C., formerly known as The Montana Power, L.L.C.) and The Bank of New York, as trustee.

4.3(a)* Indenture, dated as of November 1, 1998, between NorthWestern Corporation and The Chase Manhattan Bank, as Trustee (incorporated by reference to Exhibit 4(b)(8) of NorthWestern Corporation's Registration Statement on Form S-3, dated July 12, 1999, Commission File No. 333-82707).

4.3(b)* First Supplemental Indenture to the Indenture, dated as of November 1, 1998 (incorporated by reference to Exhibit 4(b)(9) of NorthWestern Corporation's Registration Statement on Form S-3, dated July 12, 1999, Commission File No. 333-82707).

4.3(c)* Second Supplemental Indenture to the Indenture, dated as of March 13, 2002 (filed as Exhibit 4(f)(3) to NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2001, Commission File No. 0-692).

4.4(a)* Sale Agreement, dated as of June 1, 1993, between NorthWestern Corporation and Mercer County, North Dakota, related to the issuance of Pollution Control Refunding Revenue Bonds (Northwestern Public Service Company Project) Series 1993 (incorporated by reference to Exhibit 4(b)(1) of NorthWestern Corporation's Quarterly Report on Form 10-Q for the quarter ending June 30, 1993, Commission File No. 0-692).

---

4.4(b)* Loan Agreement, dated as of June 1, 1993, between NorthWestern Corporation and Grant County, South Dakota, related to the issuance of Pollution Control Refunding Revenue Bonds (Northwestern Public Service Company Project) Series 1993A (incorporated by reference to Exhibit 4(b)(2) of NorthWestern Corporation's Quarterly Report on Form 10-Q for the quarter ending June 30, 1993, Commission File No. 0-692).

4.4(c)* Loan Agreement, dated as of June 1, 1993, between NorthWestern Corporation and Grant County, South Dakota, related to the issuance of Pollution Control Refunding Revenue Bonds (Northwestern Public Service Company Project) Series 1993B (incorporated by reference to Exhibit 4(b)(3) of NorthWestern Corporation's Quarterly Report on Form 10-Q for the quarter ending June 30, 1993, Commission File No. 0-692).

4.4(d)*    Loan Agreement, dated as of June 1, 1993, between NorthWestern Corporation and the City of
Salix, Iowa, related to the issuance of Pollution Control Refunding Revenue Bonds
(Northwestern Public Service Company Project) Series 1993 (incorporated by reference to
Exhibit 4(b)(4) of NorthWestern Corporation's Quarterly Report on Form 10-Q for the quarter
ending June 30, 1993, Commission File No. 0-692).

4.4(e)**   Loan Agreement, dated as of May 1, 1993, between The Montana Power Company and the City
of Forsyth, Montana, related to the issuance of City of Forsyth Pollution Control Revenue Bonds
Series 1993A due 2023.

4.4(f)**   1993A First Supplemental Loan Agreement, dated as of September 21, 2001, between The
Montana Power Company and the City of Forsyth, Montana, related to the issuance of City of
Forsyth Pollution Control Revenue Bonds Series 1993A due 2023.

4.4(g)**   Assumption Agreement of The Montana Power, L.L.C. to Bank One, as Trustee, dated as of
February 13, 2002, related to the City of Forsyth Pollution Control Revenue Bonds Series 1993A
due 2023.

4.4(h)**   Assignment and Assumption Agreement (PCRB 1993A Loan Agreement), between
NorthWestern Energy, L.L.C., as Assignor, and NorthWestern Corporation, as Assignee, dated as
of November 15, 2002, related to the City of Forsyth Pollution Control Revenue Bonds
Series 1993A due 2023.

4.4(i)**   Loan Agreement, dated as of December 1, 1993, between The Montana Power Company and the
City of Forsyth, Montana, related to the issuance of City of Forsyth Pollution Control Revenue
Bonds Series 1993B due 2023.

4.4(j)**   1993B First Supplemental Loan Agreement, dated as of September 21, 2001, between The
Montana Power Company and the City of Forsyth, Montana, related to the issuance of City of
Forsyth Pollution Control Revenue Bonds Series 1993A due 2023.

4.4(k)**   Assumption Agreement of The Montana Power, L.L.C. to Bank One, as Trustee, dated as of
February 13, 2002, related to the City of Forsyth Pollution Control Revenue Bonds Series 1993B
due 2023.

4.4(l)**   Assignment and Assumption Agreement (PCRB 1993B Loan Agreement), between
NorthWestern Energy, L.L.C., as Assignor, and NorthWestern Corporation, as Assignee, dated as
of November 15, 2002, related to the City of Forsyth Pollution Control Revenue Bonds
Series 1993A due 2023.

---

4.5(a)*    First Mortgage and Deed of Trust, dated as of October 1, 1945, by The Montana Power Company
in favor of Guaranty Trust Company of New York and Arthur E. Burke, as trustees (incorporated
by reference to Exhibit 7(e) of The Montana Power Company's Registration Statement,
Commission File No. 002-05927).

4.5(b)* Thirteenth Supplemental Indenture to the Mortgage and Deed of Trust, dated as of December 1, 1991 (incorporated by reference to Exhibit 4(a)-14 of The Montana Power Company's Registration Statement on Form S-3, dated December 16, 1992, Commission File No. 033-55816).

4.5(c)* Fourteenth Supplemental Indenture to the Mortgage and Deed of Trust, dated as of January 1, 1993 (incorporated by reference to Exhibit 4(c) of The Montana Power Company's Registration Statement on Form S-8, dated June 17, 1993, Commission File No. 033-64576).

4.5(d)* Fifteenth Supplemental Indenture to the Mortgage and Deed of Trust, dated as of March 1, 1993 (incorporated by reference to Exhibit 4(d) of The Montana Power Company's Registration Statement on Form S-8, dated June 17, 1993, Commission File No. 033-64576).

4.5(e)* Sixteenth Supplemental Indenture to the Mortgage and Deed of Trust, dated as of May 1, 1993 (incorporated by reference to Exhibit 99(a) of The Montana Power Company's Registration Statement on Form S-3, dated September 13, 1993, Commission File No. 033-50235).

4.5(f)* Seventeenth Supplemental Indenture to the Mortgage and Deed of Trust, dated as of December 1, 1993 (incorporated by reference to Exhibit 99(a) of The Montana Power Company's Registration Statement on Form S-3, dated December 5, 1994, Commission File No. 033-56739).

4.5(g)* Eighteenth Supplemental Indenture to the Mortgage and Deed of Trust, dated as of August 5, 1994 (incorporated by reference to Exhibit 99(b) of The Montana Power Company's Registration Statement on Form S-3, dated December 5, 1994, Commission File No. 033-56739).

4.5(h)* Nineteenth Supplemental Indenture to the Mortgage and Deed of Trust, dated as of December 16, 1999 (incorporated by reference to Exhibit 99 of The Montana Power Company's Annual Report on Form 10-K for the year ended December 31, 2000, Commission File No. 001-04566).

4.5(i)* Twentieth Supplemental Indenture to the Mortgage and Deed of Trust, dated as of November 1, 2001 (incorporated by reference to Exhibit 4(u) of NorthWestern Energy, L.L.C.'s Annual Report on Form 10-K for the year ended December 31, 2001, Commission File No. 001-31276).

4.5(j)* Twenty-first Supplemental Indenture to the Mortgage and Deed of Trust, dated as of February 13, 2002 (incorporated by reference to Exhibit 4(v) of NorthWestern Energy, L.L.C.'s Annual Report on Form 10-K for the year ended December 31, 2001, Commission File No. 001-31276).

4.5(k)* Twenty-second Supplemental Indenture to the Mortgage and Deed of Trust, dated as of November 15, 2002 (incorporated by reference to Exhibit 4.1 of NorthWestern Corporation's Current Report on Form 8-K, dated February 10, 2003, Commission File No. 0-692).

---

4.5(l)* Twenty-third Supplemental Indenture to the Mortgage and Deed of Trust, dated as of February 1, 2002 (incorporated by reference to Exhibit 4.2 of NorthWestern Corporation's Current Report on Form 8-K, dated February 10, 2003, Commission File No. 0-692).