4.6(a)*  Form of Indenture, dated as of December 1, 1989, between The Montana Power Company and Citibank, N.A., as Trustee (incorporated by reference to Exhibit 4-A to The Montana Power Company's Registration Statement on Form S-3, dated November 24, 1989, Commission File No. 033-32275).

4.6(b)**  First Supplemental Indenture to the Indenture, dated as of February 13, 2002.

4.6(c)**  Second Supplemental Indenture to the Indenture, dated as of November 15, 2002.

4.7(a)**  Natural Gas Funding Trust Indenture, dated as of December 22, 1998, between MPC Natural Gas Funding Trust, as Issuer, and U.S. Bank National Association, as Trustee.

4.7(b)**  Natural Gas Funding Trust Agreement, dated as of December 11, 1998, among The Montana Power Company, Wilmington Trust Company, as trustee, and the Beneficiary Trustees party thereto.

4.7(c)**  Transition Property Purchase and Sale Agreement, dated as of December 22, 1998, between MPC Natural Gas Funding Trust and The Montana Power Company.

4.7(d)**  Transition Property Servicing Agreement, dated as of December 22, 1998, between MPC Natural Gas Funding Trust and The Montana Power Company.

4.7(e)**  Assumption Agreement regarding the Transition Property Purchase Agreement and the Transition Property Servicing Agreement, dated as of February 13, 2002, by The Montana Power, L.L.C. to MPC Natural Gas Funding Trust.

4.7(f)**  Assignment and Assumption Agreement (Natural Gas Transition Documents), dated as of November 15, 2002, by and between NorthWestern Energy, L.L.C., as assignor, and NorthWestern Corporation, as assignee.

4.8(a)*  Rights Agreement, dated as of December 11, 1996, between NorthWestern Corporation and Norwest Bank Minnesota, N.A. as Rights Agent (incorporated by reference to Exhibit 4(c)(5) of NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 1999, Commission File No. 0-692).

4.8(b)*  First Amendment to Rights Agreement, dated as of August 21, 2000, between NorthWestern Corporation and Wells Fargo Bank Minnesota, N.A., (formerly Norwest Bank Minnesota, N.A.), as Rights Agent (incorporated by reference to Exhibit 4(c)(6) of NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2000).

10.1(a)†*  NorthWestern Corporation Traditional Pension Equalization Plan, as amended and restated, effective as of January 1, 2000 (incorporated by reference to Exhibit 10(a)(2) of NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 1999, Commission File No. 0-692).

10.1(b)†*  NorthWestern Corporation Cash Balance Supplemental Executive Retirement Plan, effective as of January 1, 2000 (incorporated by reference to Exhibit 10(a)(3) of NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 1999, Commission File No. 0-692).

10.1(c)†*     NorthSTAR Annual Incentive Plan, for all eligible employees, as amended as of May 4, 1999 (incorporated by reference to Exhibit 10(a)(4) of NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 1999, Commission File No. 0-692).

10.1(d)†*     NorthWestern Executive Performance Plan, effective as of May 2, 2000 (incorporated by reference to Exhibit 10(a)(5) of NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2000, Commission File No. 0-692).

10.1(e)†*     NorthWestern Stock Option and Incentive Plan, as amended as of January 16, 2001 (incorporated by reference to Exhibit 10(a)(6) of NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2000, Commission File No. 0-692)

10.1(f)†*     Deferred Compensation Plan for Non-employee Directors, adopted as of November 6, 1985 (incorporated by reference to Exhibit 10(g)(2) of NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 1988, Commission File No. 0-692).

10.1(g)†*     Supplemental Variable Investment Plan, as amended and restated as of January 1, 2000 (filed as Exhibit 10(a)(7) to NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2001, Commission File No. 0-692).

10.1(h)†*     Comprehensive Employment Agreement and Investment Program for Merle D. Lewis, dated as of June 1, 2000 (incorporated by reference to Exhibit 10.1 of NorthWestern Corporation's Current Report on Form 8-K/A (Amendment No. 1), dated December 14, 2001, Commission File No. 0-692).

10.1(i)†**    Retirement Agreement, effective as of December 31, 2002, by and between NorthWestern Corporation and Merle D. Lewis.

10.1(j)†*     Comprehensive Employment Agreement and Equity Plan Participation Program for Richard R. Hylland, dated as of March 1, 2001 (incorporated by reference to Exhibit 10.2 of NorthWestern Corporation's Current Report on Form 8-K/A (Amendment No. 1), dated December 14, 2001, Commission File No. 0-692).

10.1(k)†*     Comprehensive Employment Agreement and Equity Plan Participation Program for Daniel K. Newell, dated as of March 1, 2001 (incorporated by reference to Exhibit 10.3 of NorthWestern Corporation's Current Report on Form 8-K/A (Amendment No. 1), dated December 14, 2001, Commission File No. 0-692).

10.1(l)†*     Comprehensive Employment Agreement and Equity Plan Participation Program for Michael J. Hanson, dated as of March 1, 2001 (incorporated by reference to Exhibit 10.4 of NorthWestern Corporation's Current Report on Form 8-K/A (Amendment No. 1), dated December 14, 2001, Commission File No. 0-692).

10.1(m)†*     Comprehensive Employment Agreement and Equity Plan Participation Program for Eric R. Jacobsen, dated as of March 1, 2001 (incorporated by reference to Exhibit 10.7 of NorthWestern Corporation's Current Report on Form 8-K/A (Amendment No. 1), dated December 14, 2001, Commission File No. 0-692).

10.1(n)†*    Supplemental Income Security Plan for Directors, Officers and Managers, as amended and restated effective as of July 1, 1999 (incorporated by reference to Exhibit 10.8 of NorthWestern Corporation's Current Report on Form 8-K/A (Amendment No. 1), dated December 14, 2001, Commission File No. 0-692).

103

---

10.1(o)†*    Form of "Tier 1" Termination Benefits Upon Change in Control Agreement (incorporated by reference to Exhibit 10(a) of The Montana Power Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2001, Commission File No. 1-4566).

10.1(p)†*    Form of "Tier 2" Termination Benefits Upon Change in Control Agreement (incorporated by reference to Exhibit 10(b) of The Montana Power Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2001, Commission File No. 1-4566).

10.1(q)†*    Form of "Tier 3" Termination Benefits Upon Change in Control Agreement (incorporated by reference to Exhibit 10(c) of The Montana Power Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2001, Commission File No. 1-4566).

10.1(r)†**    NorthWestern Capital Partners LLC Limited Liability Company Agreement, dated as of September 30, 1999.

10.1(s)†**    Form of Put Option Agreement, dated as of September 30, 1999.

10.2(a)*    Credit Agreement, dated as of January 14, 2002, among NorthWestern Corporation, Credit Suisse First Boston, ABN AMRO Bank N.V., CIBC Inc. and Barclays Capital Inc., as co-arrangers, Credit Suisse First Boston, as administrative agent, lead arranger and sole book runner, and the banks and other financial institutions parties thereto (filed as Exhibit 10(b)(1) to NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2001, Commission File No. 0-692).

10.2(b)*    Amendment No. 1 to Credit Agreement, dated as of June 20, 2002, among NorthWestern Corporation, Credit Suisse First Boston, ABN AMRO Bank N.V., CIBC Inc. and Barclays Capital Inc., as co-arrangers, Credit Suisse First Boston, as administrative agent, lead arranger and sole book runner, and the banks and other financial institutions parties thereto (incorporated by reference to Exhibit 10.2(c) of Amendment No. 1 to NorthWestern Corporation's Registration Statement on Form S-4, dated July 12, 2002, Commission File No. 333-86888).

10.2(c)*    Amendment No. 2 to Credit Agreement, dated as of August 13, 2002, among NorthWestern Corporation, Credit Suisse First Boston, ABN AMRO Bank N.V., CIBC Inc. and Barclays Capital Inc., as co-arrangers, Credit Suisse First Boston, as administrative agent, lead arranger and sole book runner, and the banks and other financial institutions parties thereto (incorporated by reference to Exhibit 10.1 of NorthWestern Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2002, Commission File No. 0-692.)

10.2(d)*    Credit Agreement, dated as of December 17, 2002, between NorthWestern Corporation and Credit Suisse First Boston, as administrative agent, lead arranger and sole book runner (incorporated by reference to Exhibit 99.2 of NorthWestern Corporation's Current Report on

Form 8-K, dated February 10, 2003, Commission File No. 0-692).

10.2(e)*    Amendment No. 1 to Credit Agreement, dated as of January 8, 2003, between NorthWestern Corporation and Credit Suisse First Boston, as administrative agent, lead arranger and sole book runner (incorporated by reference to Exhibit 99.3 of NorthWestern Corporation's Current Report on Form 8-K, dated February 10, 2003, Commission File No. 0-692).

104

10.2(f)*    Amendment No. 2 to Credit Agreement, dated as of February 10, 2003, among NorthWestern Corporation, Credit Suisse First Boston, as administrative agent, lead arranger and sole book runner, and the banks and other financial institutions parties thereto (incorporated by reference to Exhibit 99.4 of NorthWestern Corporation's Current Report on Form 8-K, dated February 10, 2003, Commission File No. 0-692).

10.2(g)*    Bond Collateral Agreement, dated as of February 10, 2003, between NorthWestern Corporation and Credit Suisse First Boston, acting through its Cayman Islands Branch, as collateral agent (incorporated by reference to Exhibit 99.5 of NorthWestern Corporation's Current Report on Form 8-K, dated February 10, 2003, Commission File No. 0-692).

10.3(a)*    Credit and Security Agreement, dated as of March 31, 2001, between Expanets, Inc. and Avaya Inc. (and NorthWestern Corporation with respect to Section 7.3 only) (filed as Exhibit 10(d)(1) to NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2001 Commission File No. 0-692).

10.3(b)*    First Amendment to Credit and Security Agreement, dated as of August 1, 2001, between Expanets, Inc. and Avaya Inc. (acknowledged by NorthWestern Corporation) (filed as Exhibit 10(d)(2) to NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2001. Commission File No. 0-692).

10.3(c)*    Second Amendment to Credit and Security Agreement; Amendment to Collateral Agreements, dated as of March 5, 2002, between Expanets, Inc. (and several affiliates of Expanets) and Avaya Inc. (and NorthWestern Corporation with respect to Sections 1(h) and 7 only) (filed as Exhibit 10(d)(3) to NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2001, Commission File No. 0-692).

10.3(d)**    Third Amendment to Credit and Security Agreement, dated as of March 5, 2003, between Expanets, Inc. (and several affiliates of Expanets) and Avaya Inc. (and NorthWestern Corporation with respect to Sections 1 and 6 only)

10.4(a)**    Credit and Security Agreement, dated as of August 30, 2002, between Blue Dot Services Inc. and U.S. Bank, N.A.

12.1**    Statement Regarding Computation of Earnings to Fixed Charges.

21**    Subsidiaries of NorthWestern Corporation.

23.1**    Consent of Independent Public Accountants

23.2**     Notice Regarding Consent of Arthur Andersen LLP

24**     Power of Attorney (included on the signature page of this Annual Report on Form 10-K)

99.1***     Certification Pursuant to 18 United States Code Section 1350, As Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

99.2***     Certification Pursuant to 18 United States Code Section 1350, As Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

---

†     Management contract or compensatory plan or arrangement.

\*     Incorporated by reference.

\*\*     Filed herewith.

\*\*\*     Pursuant to Commission Release No. 33-8212, this certification will be treated as "accompanying" this Annual Report on Form 10-K and not "filed" as part of such report for purposes of

105

---

Section 18 of the Exchange Act, or otherwise subject to the liability of Section 18 of the Exchange Act and this certification will not be deemed to be incorporated by reference into any filing under the Securities Act of 1933, as amended, or the Exchange Act, except to the extent that the registrant specifically incorporates it by reference.

All schedules for which provision is made in the applicable accounting regulations of the SEC are not required under the related instructions or are not applicable, and, therefore, have been omitted.

**(b) Reports on Form 8-K**

We filed a Current Report on Form 8-K with the SEC on October 8, 2002, to disclose under Item 5 of the Report that on October 2, 2002, we agreed to sell up to 11,500,000 shares of our common stock in an underwritten public offering and to file as an exhibit with the SEC the underwriting agreement pursuant to which such sale occurred.

We filed a Current Report on Form 8-K with the SEC on October 21, 2002, to disclose under Item 5 of the Report that we had extended the period of time during which we would issue $250 million aggregate principal amount of our $7^7/8\%$ Notes due March 15, 2007 and $470 million aggregate principal amount of our $8^3/4\%$ Notes due March 15, 2012 which were registered under the Securities Act of 1933, as amended, in exchange for $250 million aggregate principal amount of our $7^7/8\%$ Notes due March 15, 2007 and $470 million aggregate principal amount of our $8^3/4\%$ Notes due March 15, 2012, respectively, which were offered and sold on March 13, 2002 in a transaction exempt from registration under the Securities Act.

We filed a Current Report on Form 8-K with the SEC on November 7, 2002, to disclose under Item 5 of the Report a press release discussing third quarter 2002 results and a press release disclosing that Lionel W. Nowell III had resigned as a director of NorthWestern Corporation.

We filed a Current Report on Form 8-K with the SEC on November 20, 2002, to disclose under Item 5 of the

Report that we had completed the final phase of our acquisition of the Montana operations of our NorthWestern Energy LLC subsidiary by transferring substantially all of the assets and related liabilities to NorthWestern Corporation, and to cause the Asset and Stock Transfer Agreement effecting such transfer to be filed with the Securities and Exchange Commission.

We filed a Current Report on Form 8-K with the SEC on December 13, 2002, to disclose under Item 5 of the Report that we had lowered our earnings guidance for 2002 and to disclose certain year-end charges that we took relating to our implementation of SFAS No. 142.

We filed a Current Report on Form 8-K with the SEC on December 20, 2002, to disclose under Item 5 of the Report that we had entered into our new $390 million senior secured credit facility.

106

---

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this Annual Report on Form 10-K to be signed on its behalf by the undersigned, thereunto duly authorized.

**NORTHWESTERN CORPORATION**

Dated: **April 15, 2003**                    By: /s/  GARY G. DROOK

> Gary G. Drook
> *Chief Executive Officer*

## POWER OF ATTORNEY

We, the undersigned directors and/or officers of NorthWestern Corporation, hereby severally constitute and appoint Gary G. Drook and Eric R. Jacobsen, and each of them with full power to act alone, our true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution and revocation, for each of us and in our name, place, and stead, in any and all capacities, to sign any and all amendments to this Annual Report on Form 10-K, and to file or cause to be filed the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, and hereby grant unto such attorneys-in-fact and agents, and each of them, the full power and authority to do each and every act and thing requisite and necessary to be done in and about the foregoing, as fully to all intents and purposes as each of us might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, or their respective substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this Annual Report on Form 10-K has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
| --- | --- | --- |
| | | |

| /s/ MARILYN R. SEYMANN | Chairman of the Board | **April 15, 2003** |
|---|---|---|
| Marilyn R. Seymann | | |
| /s/ GARY G. DROOK | Chief Executive Officer and Director (Principal Executive Officer) | **April 15, 2003** |
| Gary G. Drook | | |
| | President, Chief Operating Officer and Director | **April 15, 2003** |
| Richard R. Hylland | | |
| /s/ KIPP D. ORME | Vice President and Chief Financial Officer (Principal Financial Officer) | **April 15, 2003** |
| Kipp D. Orme | | |
| /s/ KURT D. WHITESEL | Controller and Treasurer (Principal Accounting Officer) | **April 15, 2003** |
| Kurt D. Whitesel | | |

107

| /s/ RANDY G. DARCY | Director | **April 15, 2003** |
|---|---|---|
| Randy G. Darcy | | |
| /s/ JERRY W. JOHNSON | Director | **April 15, 2003** |
| Jerry W. Johnson | | |
| /s/ LARRY F. NESS | Director | **April 15, 2003** |
| Larry F. Ness | | |
| /s/ BRUCE I. SMITH | Director | **April 15, 2003** |
| Bruce I. Smith | | |

108

## CERTIFICATION PURSUANT TO
## 17 CFR 240. 13a-14
## PROMULGATED UNDER
## SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Gary G. Drook, certify that:

1.     I have reviewed this annual report on Form 10-K of NorthWestern Corporation;

2.     Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.     Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.     The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:

    (a)     designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

    (b)     evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

    (c)     presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.     The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

    (a)     all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

    (b)     any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6.     The registrant's other certifying officers and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Date: **April 15, 2003**

/s/ GARY G.
DROOK
_____

Gary G. Drook
*Chief Executive Officer*

109

---

**CERTIFICATION PURSUANT TO**
**17 CFR 240. 13a-14**
**PROMULGATED UNDER**
**SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Kipp D. Orme, certify that:

1.    I have reviewed this annual report on Form 10-K of NorthWestern Corporation;

2.    Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.    Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:

    (a)    designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

    (b)    evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

    (c)    presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.    The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

    (a)    all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

    (b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6.  The registrant's other certifying officers and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Date: **April 15, 2003**

/s/ KIPP D. ORME
_____

Kipp D. Orme
*Chief Financial Officer*

110

---

### INDEX TO FINANCIAL STATEMENTS AND FINANCIAL STATEMENT SCHEDULES

|  | Page |
|---|---|
| *Financial Statement* | |
| Reports of independent public accountants | F-2 |
| Consolidated statements of income (loss) for the years ended December 31, 2002, 2001 and 2000 | F-4 |
| Consolidated statements of cash flows for the years ended December 31, 2002, 2001 and 2000 | F-5 |
| Consolidated balance sheets as of December 31, 2002 and 2001 | F-6 |
| Consolidated statements of common shareholders' equity (deficit) for the years ended December 31, 2002, 2001 and 2000 | F-7 |
| Notes to consolidated financial statements | F-8 |
| *Financial Statement Schedules* | |
| Report of Independent Public Accountants | F-57 |
| Schedule II. Valuation and Qualifying Accounts | F-58 |

F-1

---

### REPORT OF INDEPENDENT AUDITORS

To the Shareholders and Board of Directors
of NorthWestern Corporation:

We have audited the accompanying consolidated balance sheets of NORTHWESTERN CORPORATION (a Delaware corporation) AND SUBSIDIARIES as of December 31, 2002 and 2001, and the related consolidated statements of income (loss), common shareholders' equity (deficit), and cash flows for the years then ended. These financial statements are the responsibility of the NorthWestern Corporation management. Our responsibility is to express an opinion on these financial statements based on our audits. The consolidated financial statements of NorthWestern Corporation and Subsidiaries as of December 31, 2000, and for the year ended December 31, 2000,

were audited by other auditors who have ceased operations. Those auditors expressed an unqualified opinion on those consolidated financial statements in their report dated May 16, 2002 and included explanatory paragraphs that described the adoption of the provisions of Statement of Financial Accounting Standards No. 133, *Accounting for Derivative Instruments and Hedging Activities*, effective July 1, 2000 and the revision of the consolidated financial statements to reflect the interest in CornerStone Propane Partners, L.P. as a discontinued operation.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of NorthWestern Corporation and Subsidiaries as of December 31, 2002 and 2001, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note 4 to the consolidated financial statements, NorthWestern Corporation and Subsidiaries changed its method of accounting for goodwill and other intangible assets in 2002.

/s/ DELOITTE & TOUCHE LLP

Minneapolis, Minnesota
April 4, 2003

F-2

---

[In accordance with the Securities and Exchange Commission's amendment of Rule 2-02 of Regulation S-X, the following report is a copy of a report previously issued by Arthur Andersen LLP, our former independent public accountants, who have ceased operations.

REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

To the Shareholders and Board of Directors
of NorthWestern Corporation:

We have audited the accompanying consolidated balance sheets of NORTHWESTERN CORPORATION (a Delaware corporation) AND SUBSIDIARIES as of December 31, 2001 and 2000, and the related consolidated statements of income, cash flows and shareholders' equity for each of the three years in the period ended December 31, 2001. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of NorthWestern Corporation and Subsidiaries as of December 31, 2001 and 2000, and the results of their

operations and their cash flows for each of the three years in the period ended December 31, 2001, in conformity with accounting principles generally accepted in the United States.

As discussed in Note 1 to the consolidated financial statements, NorthWestern Corporation adopted the provisions of Statement of Financial Accounting Standards No. 133, Accounting for Derivative Instruments and Hedging Activities, effective July 1, 2000.

As discussed in Note 6, the consolidated financial statements have been revised to reflect the Company's interest in CornerStone Propane Partners, LP as a discontinued operation.

/s/ ARTHUR ANDERSEN LLP

Minneapolis, Minnesota
May 16, 2002

F-3

## NORTHWESTERN CORPORATION

## CONSOLIDATED STATEMENTS OF INCOME (LOSS)

| | YEAR ENDED DECEMBER 31 | | |
|---|---|---|---|
| | 2002 | 2001 | 2000 |
| | (in thousands except per share amounts) | | |
| OPERATING REVENUES | $ 1,991,509 | $ 1,723,978 | $ 1,709,474 |
| COST OF SALES | 1,095,409 | 1,069,356 | 1,100,484 |
| GROSS MARGIN | 896,100 | 654,622 | 608,990 |
| OPERATING EXPENSES | | | |
| Selling, general and administrative | 771,626 | 642,379 | 536,437 |
| Goodwill and other impairment charges | 626,123 | — | — |
| Depreciation | 98,567 | 41,036 | 32,762 |
| Amortization of goodwill and other intangibles | 29,418 | 43,161 | 35,481 |
| Restructuring charge | — | 24,916 | — |
| TOTAL OPERATING EXPENSES | 1,525,734 | 751,492 | 604,680 |
| INCOME (LOSS) FROM CONTINUING OPERATIONS | (629,634) | (96,870) | 4,310 |
| Interest Expense | (129,536) | (49,248) | (37,982) |
| Investment Income and Other | (5,382) | 8,023 | 8,981 |
| Loss From Continuing Operations Before Income Taxes and Minority Interests | (764,552) | (138,095) | (24,691) |
| Benefit for Income Taxes | 798 | 42,470 | 6,467 |
| Loss From Continuing Operations Before Minority Interests | (763,754) | (95,625) | (18,224) |
| Minority Interests in Net Loss of Consolidated Subsidiaries | 14,914 | 141,448 | 67,820 |
| Income (Loss) From Continuing Operations | (748,840) | 45,823 | 49,596 |
| Discontinued Operations, Net of Taxes and Minority Interests | (101,655) | (1,291) | (43) |
| Net Income (Loss) before Extraordinary Item | (850,495) | 44,532 | 49,553 |

| | | | | | |
|---|---|---|---|---|---|
| Extraordinary Item, Net of Tax of $7,241 | | (13,447) | | — | — |
| | | | | | |
| Net Income (Loss) | | (863,942) | | 44,532 | 49,553 |
| Minority Interests on Preferred Securities of Subsidiary Trusts | | (28,610) | | (6,827) | (6,601) |
| Dividends and Redemption Premium on Preferred Stock | | (391) | | (191) | (191) |
| | | | | | |
| Earnings (Losses) on Common Stock | $ | (892,943) | $ | 37,514 | $ 42,761 |
| | | | | | |
| Average Common Shares Outstanding | | 29,726 | | 24,390 | 23,141 |
| | | | | | |
| Basic Earnings per Average Common Share: | | | | | |
| Continuing operations | $ | (26.17) | $ | 1.59 | $ 1.85 |
| Discontinued operations | | (3.42) | | (.05) | — |
| Extraordinary Item | | (0.45) | | — | — |
| | | | | | |
| Basic | $ | (30.04) | $ | 1.54 | $ 1.85 |
| | | | | | |
| Diluted Earnings per Average Common Share: | | | | | |
| Continuing operations | $ | (26.17) | $ | 1.58 | $ 1.83 |
| Discontinued operations | | (3.42) | | (.05) | — |
| Extraordinary Item | | (0.45) | | — | — |
| | | | | | |
| Diluted | $ | (30.04) | $ | 1.53 | $ 1.83 |
| | | | | | |
| Dividends Declared per Average Common Share | $ | 1.27 | $ | 1.21 | $ 1.13 |

See Notes to Consolidated Financial Statements

F-4

## NORTHWESTERN CORPORATION

## CONSOLIDATED STATEMENTS OF CASH FLOWS

| | YEARS ENDED DECEMBER 31 | | |
|---|---|---|---|
| | 2002 | 2001 | 2000 |
| | (in thousands) | | |
| **Operating Activities:** | | | |
| Net Income (Loss) | $ (863,942) | $ 44,532 | $ 49,553 |
| Items not affecting cash: | | | |
| Depreciation | 98,567 | 41,036 | 32,762 |
| Amortization | 29,418 | 43,161 | 35,481 |
| Impairment charges | 626,123 | — | — |
| Provision for uncollectible accounts | 44,764 | 13,972 | 6,844 |
| Loss on discontinued operations, net of taxes | 101,655 | — | — |
| Extraordinary item, net of taxes | 13,447 | — | — |
| Deferred income taxes | 35,643 | (33,661) | 1,877 |

| | | | |
|---|---:|---:|---:|
| Minority interests in net losses of consolidated subsidiaries | (14,914) | (141,448) | (67,821) |
| Loss on disposal of other assets | 17,783 | — | — |
| Changes in current assets and liabilities, net of acquisitions: | | | |
| Restricted cash | 4,288 | (2,369) | — |
| Accounts receivable | 41,991 | 6,353 | (149,172) |
| Inventories | 5,931 | (15,989) | (15,293) |
| Other current assets | 35,819 | (19,046) | (7,294) |
| Accounts payable | (50,694) | 50,965 | 138,247 |
| Accrued expenses | 18,349 | 63,535 | 96,813 |
| Changes in regulatory assets and liabilities | (80,629) | (369) | — |
| Other, net | 30,600 | 197 | (17,269) |
| **Cash flows provided by continuing operations** | 94,199 | 50,869 | 104,728 |
| Change in net assets of discontinued operations | (60,156) | 32,318 | (69,994) |
| **Cash flows provided by operating activities** | 34,043 | 83,187 | 34,734 |
| **Investment Activities:** | | | |
| Property, plant, and equipment additions | (115,939) | (163,857) | (61,444) |
| Proceeds from sale of assets | 33,760 | | |
| Sale (purchase) of noncurrent investments and assets, net | 2,199 | (433) | 2,873 |
| Acquisitions, net of cash received | (574,322) | (18,767) | (105,280) |
| **Cash flows used in investing activities** | (654,302) | (183,057) | (163,851) |
| **Financing Activities:** | | | |
| Dividends on common and preferred stock | (38,081) | (29,956) | (26,312) |
| Minority interest on preferred securities of subsidiary trusts | (28,610) | (6,827) | (6,601) |
| Redemption of preferred stock | (4,028) | — | — |
| Proceeds from issuance of common stock | 81,031 | 74,868 | — |
| Proceeds from exercise of warrants | — | — | 182 |
| Issuance of long term debt | 738,149 | 2,884 | 166,002 |
| Repayment of long-term debt | (313,536) | (23,766) | (11,816) |
| Line of credit borrowings, net | 123,000 | 16,931 | 53,300 |
| Repayment of discontinued operations debt | (26,059) | — | — |
| Treasury stock activity | 121 | — | — |
| Financing costs | (25,813) | — | — |
| Issuance of preferred securities of subsidiary trusts | 117,750 | 96,833 | — |
| Subsidiary repurchase of minority interests | (4,586) | (57,768) | (20,773) |
| Line of credit (repayments) borrowings of subsidiaries, net | (13,197) | (35,528) | 21,670 |
| Short-term borrowings of subsidiaries, net | — | 53,603 | (14,700) |
| Commercial paper repayments, net | — | — | (11,000) |
| Proceeds from termination of hedge | 24,898 | — | — |
| **Cash flows provided by financing activities** | 631,039 | 91,274 | 149,952 |
| Increase (Decrease) in Cash and Cash Equivalents | 10,780 | (8,596) | 20,835 |
| Cash and Cash Equivalents, beginning of period | 34,789 | 43,385 | 22,550 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Cash and Cash Equivalents, end of period | | $ | 45,569 | $ | 34,789 | $ | 43,385 |

See Notes to Consolidated Financial Statements

F-5

# NORTHWESTERN CORPORATION

## CONSOLIDATED BALANCE SHEETS

| | December 31, | |
|---|---|---|
| | **2002** | **2001** |
| | **(in thousands)** | |
| **ASSETS** | | |
| **Current Assets:** | | |
| Cash and cash equivalents | $ 45,569 | $ 34,789 |
| Restricted cash | 28,081 | 2,369 |
| Accounts receivable, net | 281,447 | 260,486 |
| Inventories | 86,650 | 79,719 |
| Regulatory assets | 15,430 | — |
| Other | 56,516 | 69,486 |
| Assets held for sale | 42,665 | 50,800 |
| Current assets of discontinued operations | — | 181,697 |
| **Total current assets** | 556,358 | 679,346 |
| **Property, Plant, and Equipment, Net** | 1,253,746 | 445,441 |
| **Goodwill** | 400,095 | 405,734 |
| **Other Intangible Assets, Net** | 118,144 | 234,856 |
| **Other:** | | |
| Investments | 85,236 | 71,419 |
| Regulatory assets | 201,075 | 8,447 |
| Deferred tax asset | — | 17,374 |
| Other assets | 58,271 | 83,871 |
| Noncurrent assets of discontinued operations | — | 695,197 |
| **Total assets** | $ 2,672,925 | $ 2,641,685 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT)** | | |
| **Current Liabilities:** | | |
| Current maturities of long-term debt | $ 57,878 | $ 356,445 |
| Accounts payable | 101,779 | 122,266 |
| Accrued expenses | 345,602 | 216,345 |
| Regulatory liabilities | 32,236 | — |
| Current liabilities of discontinued operations | — | 230,070 |

| | | |
|---|---:|---:|
| Total current liabilities | 537,495 | 925,126 |
| | | |
| Long-term Debt | 1,704,016 | 411,349 |
| Deferred Income Taxes | 173 | — |
| Noncurrent Regulatory Liabilities | 23,614 | 6,950 |
| Other Noncurrent Liabilities | 483,113 | 75,040 |
| Noncurrent Liabilities and Minority Interests of Discontinued Operations | — | 605,325 |
| | | |
| Total liabilities | 2,748,411 | 2,023,790 |
| | | |
| Commitments and Contingencies | | |
| Minority Interests | 10,340 | 30,067 |
| Preferred Stock and Preferred Securities: | | |
| Preferred stock—4$\frac{1}{2}$ series | — | 2,600 |
| Redeemable preferred stock—6$\frac{1}{2}$ series | — | 1,150 |
| Company obligated mandatorily redeemable preferred securities of subsidiary trusts | 370,250 | 187,500 |
| | | |
| Total preferred stock and preferred securities | 370,250 | 191,250 |
| | | |
| Common Shareholders' Equity (Deficit): | | |
| Common stock, par value $1.75; authorized 50,000,000 shares; issued and outstanding 37,396,762 and 27,396,762 | 65,444 | 47,942 |
| Paid-in capital | 304,781 | 240,797 |
| Treasury stock, 174,016 and 155,943 shares at cost | (3,560) | (3,681) |
| Retained earnings (deficit) | (818,604) | 112,307 |
| Accumulated other comprehensive income (loss) | (4,137) | (787) |
| | | |
| Total shareholders' equity (deficit) | (456,076) | 396,578 |
| | | |
| Total liabilities and shareholders' equity (deficit) | $ 2,672,925 | $ 2,641,685 |

See Notes to Consolidated Financial Statements

F-6

---

## NORTHWESTERN CORPORATION

## CONSOLIDATED STATEMENTS OF COMMON SHAREHOLDERS' EQUITY (DEFICIT)

| | Number of Common Shares | Number of Treasury Shares | Common Stock | Paid in Capital | Treasury Stock | Retained Earnings | Accumulated Other Comprehensive Income (Loss) | Total Shareholders' Equity (Deficit) |
|---|---:|---:|---:|---:|---:|---:|---:|---:|
| | | | | (in thousands) | | | | |
| Balance at December 31, 1999 | 23,109 | — | $ 40,438 | $ 160,028 | — | $ 94,715 | $ 5,190 | $ 300,371 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Comprehensive Income: | | | | | | | |
| Net income | — | — | — | — | — | 49,553 | — | 49,553 |
| Other comprehensive income (loss), net of tax: | | | | | | | |
| Unrealized loss on marketable securities net of reclassification adjustment | — | — | — | — | — | — | (3,896) | (3,896) |
| Issuances of common stock | 292 | — | 512 | 5,740 | — | — | — | 6,252 |
| Proceeds from exercise of warrants | 10 | — | 18 | 164 | — | — | — | 182 |
| Distributions on minority interests in preferred securities of subsidiary trusts | — | — | — | — | — | (6,601) | — | (6,601) |
| Dividends on preferred stock | — | — | — | — | — | (191) | — | (191) |
| Dividends on common stock | — | — | — | — | — | (26,121) | — | (26,121) |
| **Balance at December 31, 2000** | 23,411 | — | $ 40,968 | $ 165,932 | — | $ 111,355 | $ 1,294 | $ 319,549 |
| Comprehensive Income: | | | | | | | |
| Net income | — | — | — | — | — | 44,532 | — | 44,532 |
| Other comprehensive income (loss), net of tax: | | | | | | | |
| Unrealized loss on marketable securities net of reclassification adjustment | — | — | — | — | — | — | (2,081) | (2,081) |
| Issuances of common stock | 3,714 | — | 6,498 | 68,370 | — | — | — | 74,868 |
| Cashless exercise of warrants | 272 | — | 476 | 6,321 | — | (6,797) | — | |
| Amortization of unearned restricted stock compensation | — | — | — | 174 | — | — | — | 174 |
| Treasury stock activity | — | 156 | — | — | (3,681) | — | — | (3,681) |
| Distributions on minority interests in preferred securities of subsidiary trusts | — | — | — | — | — | (6,827) | — | (6,827) |
| Dividends on preferred stock | — | — | — | — | — | (191) | — | (191) |
| Dividends on common stock | — | — | — | — | — | (29,765) | — | (29,765) |
| **Balance at December 31, 2001** | 27,397 | 156 | $ 47,942 | $ 240,797 | (3,681) | $ 112,307 | (787) | $ 396,578 |
| Comprehensive Income: | | | | | | | |
| Net loss | — | — | — | — | — | (863,942) | — | (863,942) |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Other comprehensive income (loss), net of tax: | | | | | | | |
| Unrealized gain on marketable securities net of reclassification adjustment | — | — | — | — | — | — | 1,139 | 1,139 |
| Foreign currency translation adjustments | — | — | — | — | — | — | 5 | 5 |
| Gain on hedge termination | — | — | — | — | — | — | 5,072 | 5,072 |
| Amortization of hedge gain | — | — | — | — | — | — | (807) | (807) |
| Minimum pension liability | — | — | — | — | — | — | (8,759) | (8,759) |
| Issuances of common stock | 10,000 | — | 17,502 | 63,529 | — | — | — | 81,031 |
| Amortization of unearned restricted stock compensation | — | — | — | 455 | — | — | — | 455 |
| Treasury stock activity | — | 18 | — | — | 121 | — | — | 121 |
| Distributions on minority interests in preferred securities of subsidiary trusts | — | — | — | — | — | (28,610) | — | (28,610) |
| Dividends on preferred stock | — | — | — | — | — | (112) | — | (112) |
| Redemption premium on preferred stock | — | — | — | — | — | (278) | — | (278) |
| Dividends on common stock | — | — | — | — | — | (37,969) | — | (37,969) |
| **Balance at December 31, 2002** | 37,397 | 174 $ | 65,444 $ | 304,781 $ | (3,560) $ | (818,604) $ | (4,137) $ | (456,076) |

See Notes to Consolidated Financial Statements

F-7

---

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### 1.  Nature of Operations and Recent Developments

NorthWestern Corporation (the "Company" or "we") is one of the largest providers of electricity and natural gas in the Upper Midwest and Northwest, serving more than 598,000 customers in Montana, South Dakota and Nebraska. We have generated and distributed electricity in South Dakota and distributed natural gas in South Dakota and Nebraska since 1923 through our energy division, NorthWestern Energy, formerly NorthWestern Public Service. On February 15, 2002, we completed the acquisition of the electric and natural gas transmission and distribution business of The Montana Power Company, or Montana Power. As a result of the acquisition, from February 15, 2002 through November 15, 2002, we distributed electricity and natural gas in Montana through our wholly owned subsidiary, NorthWestern Energy LLC. Effective November 15, 2002, we transferred the energy and natural gas transmission and distribution operations of NorthWestern Energy LLC to NorthWestern Corporation and since that date, we have operated its business as part of our NorthWestern Energy division. We are operating our utility business under the common name "NorthWestern Energy" in all our service territories. The former NorthWestern Energy LLC has been renamed "Clark Fork and Blackfoot, L.L.C."

We also have made significant investments in three primary non-energy businesses, Expanets, Inc., or Expanets, a leading provider of networked communications and data services and solutions to small to mid-sized businesses nationwide, and Blue Dot Services Inc., or Blue Dot, a nationwide provider of air conditioning, heating, plumbing and related services. Through November 1, 2002, we held an economic equity interest in a subsidiary that serves as the managing general partner of CornerStone Propane Partners, L.P., or CornerStone, a publicly traded limited partnership that is a retail propane and wholesale energy related commodities distributor.

At December 31, 2002, we have a common shareholder's deficit of $456.1 million and approximately $2.1 billion in debt and trust preferred instruments outstanding. During 2002, our communications and HVAC business segments reported operating losses of $392 million and $311 million, respectively, which has severely and adversely impacted our financial performance and financial condition.

For our utility only operations, which excludes Blue Dot, Expanets, and all other unregulated entities, and absent proceeds from the sale of non-core assets, we estimate the following for the years 2003 and 2004 ($ are approximate and in millions):

|  | 2003 | 2004 |
|---|---|---|
| Cash flows from operating activities(1) | $   30 | $   80 |
| Cash flows used in investing activities(2) | (60) | (60) |
| Cash flows provided (used) in financing activities(3) | 32 | (39) |
| Increase (decrease) in cash and cash equivalents | $    2 | $   (19) |

(1)   The 2003 amount includes a net decrease in working capital of approximately $45 million and interest payments of approximately $140 million. The 2004 amount includes a net decrease in working capital of approximately $15 million and interest payments of approximately $140 million.

(2)   These amounts are comprised of capital expenditures.

F-8

(3)   The 2003 amount represents the net total of our currently anticipated financing activities for 2003 and is comprised of the following:

|  |  |
|---|---|
| Net proceeds—Senior secured term loan | $   366 |
| Repayment of outstanding debt and retirement of letters-of-credit with proceeds from senior secured loan | (280) |
| Trust preferred dividend payments | (30) |
| Other debt payments | (24) |
| Cash flows provided by financing activities | $   32 |

We have the right to defer payment of our trust preferred dividend payments for up to 20 consecutive quarters. The 2004 amount includes trust preferred dividend payments of approximately $30 million, and other debt payments of approximately $9 million.

Based on our current plans and business conditions, we expect that our available cash, cash equivalents and

investments, together with amounts generated from operations, will be sufficient to meet our cash requirements for at least the next twelve months. However, due to a decrease in cash and cash equivalents during 2004, we believe that we may need additional funding sources or proceeds from the sale of non-core assets, by the end of 2004 or early in 2005. Commencing in 2005, we face substantial debt reduction payments. Absent the receipt of significant proceeds from the sale of non-core assets, the raising of additional capital or a restructuring of our debt, we will not have the ability to reduce our debt or meet our maturing debt obligations. Even if we are successful in selling some or all of our non-core assets, we will have to restructure our debt or seek new capital prior to 2005.

Consistent with our turnaround plan to increase liquidity and reduce debt, the Board of Directors decided to terminate the historical practice of paying an annual cash dividend on our common stock. We do not anticipate paying any cash dividends for the foreseeable future. In addition, we are currently prohibited from paying dividends on our common stock under Delaware law. Our senior credit facility also prohibits the payment of dividends during any period of default under the agreement. We are not currently in default under our senior credit facility. To the extent that payment of a cash dividend on our common stock becomes permissible under Delaware law, we would only be able to pay a cash dividend on our common stock to the extent that all required distributions on our mandatorily redeemable preferred securities of trusts had been made.

We are taking steps to improve the financial position of the Company, including a focus on our core electric and natural gas utility business and a commitment to reduction of our debt. We have suspended the declaration and payment of common stock dividends, which represented approximately $38 million in distributions in 2002. Future dividend obligations will be evaluated on an ongoing basis as part of our commitment to restoring long-term financial strength. We have decided to sell certain of our non-core assets, including our Montana First Megawatts project and the Colstrip Transmission line, and we are reviewing strategic options for Expanets and Blue Dot, including the sale or disposition of each of these businesses or their assets. We will not make any additional significant investments in, or commitments to, Expanets and Blue Dot while we examine strategic alternatives for the two businesses. In addition, the Montana Public Service Commission (MPSC) has restricted our ability to make additional investments or commitments to our non-regulated businesses to $10 million in the aggregate unless we obtain prior approval. We intend to use any proceeds from sales of non-core assets and surplus cash, if any, from operations to pay down debt. We will continue to focus efforts on improving

the operating performance of Expanets and Blue Dot, including the sale or closure of certain non-core Blue Dot locations.

In February 2003, we closed and received funds from a $390.0 million senior credit term loan. The net proceeds of $366.0 million, after payment of financing costs and fees, were used to repay $259.6 million outstanding under the existing $280.0 million bank credit facility. The remaining proceeds of the term loan will be utilized to provide working capital and for other general corporate purposes. In addition, our new $390.0 million credit facility does not include any adverse rating triggers, and its covenants are linked to the performance of our core utility operations and generally excludes all of our non-energy businesses.

## 2. Significant Accounting Policies

### Basis of Consolidation

The accompanying consolidated financial statements include our accounts together with those of our wholly and majority-owned or controlled subsidiaries. The financial statements of Expanets, Blue Dot and CornerStone (CornerStone is only through November 1, 2002) are included in the accompanying consolidated financial statements by virtue of the voting and control rights, and therefore included in referencing to "subsidiaries". All significant intercompany balances and transactions have been eliminated from the consolidated financial

statements. The operations of CornerStone and our interest in CornerStone have been reflected in the consolidated financial statements as Discontinued Operations (see Note 6 for further discussion).

**Minority Interests in Consolidated Subsidiaries**

Substantially all acquisitions at Expanets and Blue Dot have involved the issuance of common and preferred stock in those subsidiaries to the sellers of the acquired businesses. Our investments in Expanets and Blue Dot are principally in the form of senior preferred stock with voting control and a liquidation preference over the common stock. We are required to consolidate the financial results of Expanets and Blue Dot because of our voting control. The common and preferred stock issued to third parties in connection with acquisitions creates minority interests which are junior to our preferred stock interests and against which operating losses have been allocated.

In connection with certain acquisitions of Expanets and Blue Dot, the sellers can elect to exchange the stock of Expanets or Blue Dot for cash at a predetermined exchange rate. Alternatively, Blue Dot, in certain circumstances, may, at its election, purchase the stock directly from the seller based on certain call or put arrangement using their choice of cash or, in certain cases, NorthWestern common stock. During 2002, Blue Dot paid $18.7 million in cash and accrued an additional $6.0 million for the purchase of Blue Dot stock issued in prior acquisitions. During 2001, Expanets paid $20.3 million in cash for the purchase of Expanets stock issued in prior acquisitions and Blue Dot paid $37.5 million in cash for Blue Dot stock issued in prior acquisitions. As of December 31, 2002, exchange agreements totaling $6.0 million for Expanets and $3.9 million for Blue Dot remained outstanding and are included in Minority Interests.

At December 31, 2002, Expanets had 120 offices located across the United States. Our investment in Expanets at December 31, 2002, consisted of $363.6 million of 12% coupon convertible and nonconvertible mandatorily redeemable Preferred Stock and $0.5 million of convertible Class B Common Stock. In addition, as of December 31, 2002 we had outstanding intercompany advances and

loans to Expanets of $205.7 million. As of December 31, 2002, our Class B Common Stock of Expanets was convertible into 40% of the originally issued Class A Common Stock equivalents of Expanets, which comprise all of the shares of Class A Common Stock ever issued, plus the shares of Class A Common Stock issuable upon the conversion of the other Common Stock of Expanets and the Preferred Stock of Expanets held by Avaya (see Note 22, "Subsequent Events", which describes our settlement discussions with Avaya that resulted in Avaya's relinquishment of its Preferred Stock). In addition, two of the series of our Preferred Stock of Expanets are convertible into shares of Class A Common Stock from time to time at our option and are redeemable at our option prior to an initial public offering or sale of Expanets and two other of the series of our Preferred Stock of Expanets are mandatorily redeemable upon an initial public offering or sale of Expanets. All of the other outstanding Preferred and Common Stock of Expanets held by third parties will be automatically converted into shares of Class A Common Stock upon an initial public offering or sale of Expanets. The aggregate percentage of Class A Common Stock of Expanets into which our holdings of Common and Preferred Stock is convertible is approximately 50% of the Class A Common Stock of Expanets on a fully-diluted basis, assuming the conversion of all other outstanding convertible securities of Expanets, other than employee options, based on the originally issued value of the Class A Common Stock of Expanets. We controlled approximately 99% of the total voting power of Expanets' issued and outstanding capital stock as of December 31, 2002. At December 31, 2002, the net recorded book value of our aggregate investment in and advances to Expanets was $89.7 million after recognition of historical net losses.

At December 31, 2002, Blue Dot provided services from over 50 subsidiary entities that provide services from locations that are primarily situated in or near major metropolitan areas across the United States. Our investment in Blue Dot at December 31, 2002, consisted of $384.3 million of 11% coupon Preferred Stock and $0.5 million of

convertible Class B Common Stock. As of December 31, 2002, our Class B Common Stock of Blue Dot was convertible into approximately 40% of the originally issued Class A Common Stock equivalents of Blue Dot, which comprise all of the shares of Class A Common Stock ever issued, excluding any shares of Class A Common Stock issued or issuable upon the conversion of the Class B Common Stock, Class C Common Stock or Series A Preferred Stock of Blue Dot. The series of our Preferred Stock of Blue Dot is mandatorily redeemable upon an initial public offering of Blue Dot. The other outstanding series of Preferred Stock of Blue Dot held by third parties will be automatically converted into shares of Class A Common Stock upon an initial public offering of Blue Dot and Blue Dot has entered into agreements with the holders of the other outstanding class of Common Stock of Blue Dot for the conversion of such Common Stock into Class A Common Stock upon an initial public offering. The aggregate percentage of Class A Common Stock of Blue Dot into which our holdings of Blue Dot Common Stock is convertible is approximately 34% of the Class A Common Stock of Blue Dot on a fully-diluted basis assuming the conversion of all other outstanding convertible securities of Blue Dot, based on the originally issued value of the Class A Common Stock of Blue Dot. However, this percentage will vary substantially based upon the initial public offering price of the Class A Common Stock and in the event the initial public offering price is substantially below the $7.50 original issued value of the Class A Common Stock, this percentage would be substantially lower. We controlled approximately 96% of the total voting power of Blue Dot's issued and outstanding capital stock as of December 31, 2002. At December 31, 2002, the net recorded book value of our aggregate investments in and advances to Blue Dot was $12.6 million after recognition of historical net losses.

F-11

The income or loss allocable to minority interests will vary depending on the underlying profitability of the consolidated subsidiaries. Losses allocable to minority interests, which include the effect of dividends on the outstanding preferred stock that we owned and applicable allocations from us, are charged to minority interests. Corporate allocations relate to certain services we provide to our subsidiaries for management services, including insurance, administrative support for employee benefits, transaction structuring, financial analysis, tax services and information technology. Corporate allocations to Blue Dot were $2.1 million, $3.0 million and $2.3 million for the years ended December 31, 2002, 2001 and 2000, respectively. Corporate allocations to Expanets were $4.2 million, $8.0 million and $4.3 million for the years ended December 31, 2002, 2001 and 2000, respectively. The decreases reflect decreased services provided by NorthWestern, which are now performed and directly expensed by each entity. Losses are allocated to minority interests to the extent they do not exceed the minority interest in the equity capital of the subsidiary, after giving effect for any exchange agreements. Losses in excess of the minority interests are allocated to us.

Losses allocated to Minority Interests were $14.9 million, $141.4 million, and $67.8 million for the fiscal years ended December 31, 2002, 2001, and 2000, respectively. Minority Interests balances were $10.3 million and $30.1 million at December 31, 2002 and 2001, respectively. We will recognize future losses of the subsidiaries to the extent these losses exceed the Minority Interest balance after the effect of exchange agreements. Accordingly, based on the capital structures of Expanets and Blue Dot at December 31, 2002, all future losses at Expanets and Blue Dot will be allocated to us.

**Use of Estimates**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America required the Company to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Estimates are used for such items as long-lived asset values and impairment charges, long-lived asset useful lives, tax provisions, uncollectible accounts, billing adjustments, environmental costs, unbilled revenues and actuarially determined benefit costs. We revise the recorded estimates when we get better information or when we can determine actual amounts. Those revisions can affect operating results. Each year we also review the depreciable lives of certain

plant assets and revise them if appropriate.

F-12

Significant estimates impacting our current year financial statements include:

- Estimating the billing adjustments and allowance for uncollectible accounts at Expanets;

- Estimating impairment charges related to goodwill and long-lived assets;

- And estimating our deferred tax asset valuation allowance.

## Revenue Recognition

For our South Dakota and Nebraska operations, as prescribed by the respective regulatory authorities, electric and natural gas utility revenues are based on billings rendered to customers. For our Montana operations, as prescribed by the MPSC, operating revenues are recorded monthly on the basis of consumption or services rendered. Customers are billed monthly on a cycle basis. Communications and HVAC revenue is recognized as services are performed and products are shipped with the exception of maintenance, construction, and installation contracts. Maintenance contract revenues are recognized over the life of the respective contracts.

Construction and installation contract revenues are generally recognized on the percentage-of-completion method, under which the amount of contract revenue recognizable at any given time during a contract is determined by multiplying the total estimated contract costs incurred at any given time to total estimated contract costs. Accordingly, contract revenues recognized in the statement of operations can and usually do differ from the amounts that can be billed or invoiced to the customer at any given point during the contract. Expanets uses the completed contract method of accounting for certain material and installation contracts due to an inability to adequately estimate gross margins for those contracts which is consistent with historical experience.

Changes in contract performance, conditions, estimated profitability, and final contract settlements may result in revisions to estimated costs and, therefore, revenues. Such revisions are frequently based on estimates and subjective assessments. The effects of theses revisions are recognized in the period in which the revisions are determined. When such revisions lead to a conclusion that a loss will be recognized on the contract, the full amount of the estimated ultimate loss is recognized in the period such conclusion is reached, regardless of what stage of completion the contract has reached. Depending on the size of a particular contract, variations from estimated project costs could have significant impact on operating results. Costs in excess of billings at Expanets were $12.8 million and $19.4 million at December 31, 2002 and 2001, respectively. Billings in excess of costs at Expanets were $2.4 million and $3.0 million at December 31, 2002 and 2001, respectively. Costs in excess of billings at Blue Dot were $6.8 million and $4.0 million at December 31, 2002 and 2001, respectively. Billings in excess of costs at Blue Dot were $4.1 million and $1.5 million at December 31, 2002 and 2001, respectively.

## Cash Equivalents

We consider all highly liquid investments with maturities of three months or less at the time of purchase to be cash equivalents.

## Restricted Cash

Restricted cash consists primarily of funds held in trust accounts to satisfy the requirements of certain stipulation agreements and insurance reserve requirements.

F-13

**Accounts Receivable, Net**

Accounts receivable are net of $15.3 million and $11.4 million of allowances for uncollectible accounts at December 31, 2002 and 2001. Receivables include accrued unbilled revenues of $30.5 million at December 31, 2002 related to our Montana operations.

**Inventories**

Natural gas inventories for the regulated energy business are stated at the lower of cost or market, using the first-in, first-out ("FIFO") method. Materials and supplies for the regulated energy business are stated at the lower of cost or market, with cost determined using the average cost method. Inventories for Expanets consist of voice and data equipment, parts and supplies held for use in the ordinary course of business and are stated at the lower of cost (weighted average) or market. Inventories for Blue Dot consist of air conditioning units and parts and supplies held for use in the ordinary course of business and are stated at the lower of cost or market using the FIFO method. Inventory by segment at December 31 is as follows (in thousands):

|  | 2002 | 2001 |
|---|---|---|
| Expanets | $ 46,803 | $ 39,085 |
| Blue Dot | 13,940 | 15,791 |
| Utility | 25,907 | 24,843 |
|  | $ 86,650 | $ 79,719 |

**Regulatory Assets and Liabilities**

Our regulated operations are subject to the provisions of Statement of Financial Accounting Standards No. 71, *Accounting for the Effects of Certain Types of Regulations* (SFAS No. 71). Regulatory assets represent probable future revenue associated with certain costs, which will be recovered from customers through the ratemaking process. Regulatory liabilities represent probable future reductions in revenues associated with amounts that are to be credited to customers through the ratemaking process.

If all or a separable portion of our operations becomes no longer subject to the provisions of SFAS No. 71, an evaluation of future recovery of the related regulatory assets and liabilities would be necessary. In addition, we would determine any impairment to the carrying costs of deregulated plant and inventory assets.

**Investments**

Investments consist primarily of fixed income municipal securities, corporate preferred stock and life insurance contracts. In addition, we have investments in various money market accounts and other items. Fixed income securities and preferred stocks are carried at market value, which approximates cost at December 31, 2002 and 2001. Life insurance contracts are carried at their cash surrender value. Approximately $30 million and $27.8 million of our fixed income securities and preferred stock investments are restricted as collateral for letters of credit as of December 31, 2002 and 2001, respectively. Investments in life insurance contracts of $22.2 million are held in trust and restricted for postretirement benefits.

Investments consisted of the following at December 31 (in thousands):

| | | |
|---|---:|---:|
| **December 31, 2002** | | |
| Preferred stocks | $ | 19,692 |
| Fixed Income securities | | 27,548 |
| Life insurance contracts & other investments | | 37,996 |
| | $ | 85,236 |
| **December 31, 2001** | | |
| Preferred stocks | $ | 31,460 |
| Fixed Income securities | | 28,855 |
| Life insurance contracts & other investments | | 11,104 |
| | $ | 71,419 |

We use the specific identification method for determining the cost basis of our investments in available-for-sale securities. Realized gains and (losses) on our available-for-sale securities were $(7.5) million, $2.3 million and $3.2 million in 2002, 2001 and 2000, respectively.

**Derivative Financial Instruments**

We manage risk using derivative financial instruments for changes in electric and natural gas supply prices and interest rate fluctuations.

We periodically use commodity futures contracts to reduce the risk of future price fluctuations for electric and natural gas contracts. Increases or decreases in contract values are reported as gains and losses in our Consolidated Statements of Income unless the commodities are specifically subject to supply tracking mechanisms within the regulatory environment.

The fair value of fixed-price commodity contracts were estimated based on market prices of commodities covered by the contracts. The net differential between the prices in each contract and market prices for future periods has been applied to the volumes stipulated in each contract to arrive at an estimated future value. Two contracts at December 31, 2002 existed with estimated future benefits of $0.2 million.

On March 28, 2002, we entered into two fair value hedge agreements, each of $125.0 million, to effectively swap the fixed interest rate on our $250 million five-year original notes to floating interest rates at the three-month LIBOR plus spreads of 2.32% and 2.52% effective as of April 3, 2002. These fair value hedge agreements were settled on September 17, 2002 resulting in $17.0 million proceeds and a deferred gain to the Company. The deferred gain is recorded in Other Noncurrent Liabilities and is being recognized as a reduction of interest expense over the remaining life of the notes.

On March 8, 2002, we settled a cash flow hedge agreement related to an interest rate swap instrument. The settlement resulted in $7.9 million, and a deferred gain to the Company. The deferred gain is recorded in Other Comprehensive Income and is being recognized as a reduction of interest expense over the remaining life of the same notes discussed above.

We are exposed to credit loss in the event of nonperformance by counter parties. Credit risk is minimized on these transactions by only dealing with leading, credit-worthy financial institutions having long-term credit ratings of "A" or better and, therefore, we do not anticipate nonperformance. In

addition, the contracts are distributed among several financial institutions, thus minimizing credit risk concentration.

**Property, Plant and Equipment**

Property, plant and equipment are stated at cost. Depreciation is computed using the straight-line method based on the estimated useful lives of the various classes of property, ranging from 3 to 40 years. We include in property, plant and equipment external and incremental internal costs associated with computer software developed for use in the businesses. Capitalization begins when the preliminary design stage of the project is completed. These costs are amortized on a straight-line basis over the project's estimated useful life once the installed software is ready for its intended use. During 2002, 2001 and 2000, we capitalized costs for internally developed software of $3.1 million, $60.7 million and $1.8 million. Internal labor and overhead costs capitalized for other property, plant and equipment were $37.6 million, $16.2 million and $8.3 million which are all in the regulated utility segment.

Depreciation rates include a provision for our share of the estimated costs to decommission three coal-fired generating plants at the end of the useful life of each plant. The annual provision for such costs is included in depreciation expense, while the accumulated provisions are included in other noncurrent liabilities. (See "New Accounting Standards" in this Note 2 regarding our asset retirement obligation and amounts collected in the rate-making process for costs of removal of regulated utility property.

All expenditures for maintenance and repairs of utility property, plant and equipment are charged to the appropriate maintenance expense accounts. A betterment or replacement of a unit of property is accounted for as an addition and retirement of utility plant. At the time of such a retirement, the accumulated provision for depreciation is charged with the original cost of the property retired and also for the net cost of removal.

When property for the communications or HVAC interests are retired or otherwise disposed, the cost and related accumulated depreciation is removed from the accounts, and the resulting gain or loss is reflected in operations. Property, plant and equipment at December 31 consisted of the following (in thousands):

| | | 2002 | | 2001 |
|---|---|---:|---|---:|
| Land and improvements | $ | 33,403 | $ | 3,159 |
| Building and improvements | | 114,582 | | 57,709 |
| Storage, distribution, transmission and generation | | 1,665,400 | | 381,910 |
| Construction work in process | | 23,100 | | 19,225 |
| Other equipment | | 270,450 | | 249,457 |
| | | 2,106,935 | | 711,460 |
| Less accumulated depreciation | | (853,189) | | (266,019) |
| | $ | 1,253,746 | $ | 445,441 |

F-16

We capitalize the cost of plant additions and replacements, including an allowance for funds used during construction (AFUDC) of utility plant. We determine the rate used to compute AFUDC in accordance with a formula established by the Federal Energy Regulatory Commission, or FERC. This rate averaged 8.7% for Montana and 6.6%, 6.9% and 6.6% for South Dakota for 2002, 2001 and 2000, respectively. Interest capitalized totaled $0.7 million in 2002 for Montana and South Dakota combined. Interest capitalized was not significant in 2001 and

2000.

We record provisions for depreciation at amounts substantially equivalent to calculations made on a straight-line method by applying various rates based on useful lives of properties determined from engineering studies. As a percentage of the depreciable utility plant at the beginning of the year, our provision for depreciation of utility plant was approximately 3.4%, 3.3% and 3.3% for 2002, 2001 and 2000 respectively.

As a result of the significant downturn in the communications technology industry and considerable declines in profitability from our Communications and HVAC segments, we reviewed the recoverability of long-lived assets. We applied the provisions of SFAS No. 144 to the property, plant and equipment of our Communications and HVAC segments and determined the carrying value of certain assets to be impaired. Accordingly, Expanets and Blue Dot recorded impairment charges of $69.6 million and $11.3 million, respectively, based on the fair value of those assets in the fourth quarter of 2002.

We also recorded a $35.7 million charge related to our construction of a 260-megawatt natural gas-fired generation project located in Great Falls, MT. Based on certain events occurring during the fourth quarter of 2002, we decided to divest of this project and the assets have been written down to expected salvage value. The remaining assets of this project have been classified as Assets Held For Sale on the Consolidated Balance Sheets. The remaining investment in this project was $42.7 million at December 31, 2002.

**Other Noncurrent Liabilities**

Other noncurrent liabilities as of December 31 consisted of the following (in thousands):

|  | 2002 | 2001 |
|---|---|---|
| Pension and other postretirement benefit liability | $ 196,521 | $ — |
| Future QF obligation, net | 143,515 | |
| Environmental liability | 36,505 | 3,214 |
| Deferred revenue | 22,866 | — |
| Customer advances | 21,996 | — |
| Other | 61,710 | 71,826 |
|  | $ 483,113 | $ 75,040 |

**Stock-based Compensation**

At December 31, 2002 we have a nonqualified stock option plan, as described more fully in Note 17. We apply the intrinsic value based method of Accounting Principles Board (APB) Opinion No. 25, *Accounting for Stock Issued to Employees*, and related interpretations in accounting for our stock option plan. No compensation cost is recognized as the option exercise price is equal to the market price of the underlying stock on the date of grant. Our pro forma net income and earnings per

---

share would have been as indicated below had the fair value of option grants been charged to compensation expense in accordance with SFAS No. 123 (in thousands except per share amounts):

|  | 2002 | 2001 | 2000 |
|---|---|---|---|

| | | | | | | |
|---|---|---|---|---|---|---|
| Earnings (losses) on common stock | | | | | | |
| As reported | $ | (892,943) | $ | 37,514 | $ | 42,761 |
| Less: Total stock-based employee compensation expense determined under fair value based method for all awards, net of related tax effects | | (409) | | (633) | | (396) |
| Pro forma | | (893,352) | | 36,881 | | 42,365 |
| Diluted earnings per share | | | | | | |
| As reported | $ | (30.04) | $ | 1.53 | $ | 1.83 |
| Pro forma | | (30.05) | | 1.51 | | 1.82 |

## Insurance Subsidiary

Risk Partners, Inc. is a wholly owned non-United States insurance subsidiary established in 2001 to insure worker's compensation, general liability and automobile liability risks. At December 31, 2002, Expanets and Blue Dot were insured through Risk Partners, Inc. In addition, NorthWestern Energy was insured through Risk Partners, Inc. for automobile liability risks at December 31, 2002. Reserve requirements are established based on actuarial projections of ultimate losses. Any losses estimated to be paid within one year from the balance sheet date are classified as accrued expenses, while losses expected to be payable in later periods are included in other long-term liabilities. Risk Partners, Inc. has purchased reinsurance policies through a third-party reinsurance company to transfer a portion of the insurance risk. Restricted cash related to this subsidiary was $10 million at December 31, 2002.

## Income Taxes

Deferred income taxes relate primarily to the difference between book and tax methods of depreciating property, amortizing tax deductible goodwill, the difference in the recognition of revenues and expenses for book and tax purposes, certain natural gas costs, which are deferred for book purposes but expensed currently for tax purposes, and net operating loss carryforwards.

## Environmental Costs

We record environmental costs when it is probable we are liable for the costs and we can reasonably estimate the liability. We may defer costs as a regulatory asset based on our expectation that we will recover these costs from customers in future rates. Otherwise, we expense the costs. If an environmental expense is related to facilities we currently use, such as pollution-control equipment, we capitalize and depreciate the costs over the life of the plant, assuming the costs are recoverable in future rates or future cash flow.

We record estimated remediation costs, excluding inflationary increases and probable reductions for insurance coverage and rate recovery. The estimates are based on our experience, our assessment of the current situation and the technology currently available for use in the remediation. We regularly adjust the recorded costs as we revise estimates and as remediation proceeds. If we are one of several designated responsible parties, we estimate and record only our share of the cost. We treat any future costs of restoring sites where operation may extend indefinitely as a capitalized cost of plant retirement.

F-18

---

The depreciation expense levels we can recover in rates include a provision for these estimated removal costs.

## Accounting for Business Combinations

In July 2001, the FASB issued Statements of Financial Accounting Standards No. 141, *Business*

*Combinations,* and No. 142, *Goodwill and Other Intangible Assets* (SFAS No. 142). These standards change the accounting for business combinations by, among other things, prohibiting the prospective use of pooling-of-interests accounting and requiring companies to stop amortizing goodwill and certain intangible assets with an indefinite useful life. Instead, goodwill and intangible assets deemed to have an indefinite useful life will be subject to an annual review for impairment. The new standards generally were effective for us in the first quarter of 2002 and for purchase business combinations consummated after June 30, 2001. For additional discussion on intangible assets and the adoption of SFAS No. 142, see Note 4.

**New Accounting Standards**

In June 2001, the Financial Accounting Standards Board issued SFAS No. 143, *Accounting for Asset Retirement Obligations,* which was effective January 1, 2003. The statement provides accounting and disclosure requirements for retirement obligations associated with long-lived assets. The statement requires the present value of future retirement costs for which the Company has a legal obligation to be recorded as liabilities with an equivalent amount added to the asset cost and depreciated over the asset life.

We have completed an assessment of the specific applicability and implications of SFAS No. 143. We have identified, but have not recognized, asset retirement obligation, or ARO, liabilities related to our electric and natural gas transmission and distribution assets. Many of these assets are installed on easements over property not owned by the Company. The easements are generally perpetual and only require retirement action upon abandonment or cessation of use of the property for the specified purpose. The ARO liability is not estimable for such easements as we intend to utilize these properties indefinitely. In the event we decide to abandon or cease the use of a particular easement, an ARO liability would be recorded at that time.

Our regulated utility operations have, however, previously recognized removal costs of transmission and distribution assets as a component of depreciation in accordance with regulatory treatment. To the extent these amounts do not represent SFAS No. 143 legal retirement obligations, they are to be disclosed as regulatory liabilities upon adoption of the statement. As of December 31, 2002, we have estimated accrued removal costs related to our Montana transmission and distribution operations in the amount of $111.0 million and $4.5 million, for our South Dakota and Nebraska operations, respectively, all of which are included in accumulated depreciation.

For our generation properties, we are in the process of evaluating the associated retirement costs as defined by SFAS No. 143 and what the prescribed accounting treatment will be under FERC rules. We have accrued decommissioning costs since the generating units were first put into service in the amount of $11.4 million, which is classified as an other noncurrent liability. Preliminary estimates indicate that this amount would be sufficient to cover the legally required retirement obligations.

SFAS No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets,* was issued in October 2001 and establishes a single accounting model for long-lived assets to be disposed of by sale.

---

SFAS No. 144 requires that long-lived assets to be disposed of by sale be measured at the lower of the carrying amount or fair value less cost to sell, whether reported in continuing operations or discontinued operations. SFAS No. 144 also expands the reporting of discontinued operations to include components of an entity that have been or will be disposed of rather than limiting such discontinuance to a segment of a business. Our accounting for the discontinued operations of CornerStone as described in Note 6, "Discontinued Operations", followed the provisions of SFAS No. 144. We adopted SFAS No. 144 effective January 1, 2002. The adoption of SFAS No. 144 did not have a material impact on our consolidated results of operations, financial position, or cash flows as the long-lived asset impairment provisions of SFAS No. 144 effectively carried over the provisions of SFAS No. 121.

SFAS No. 145, *Rescission of FASB Statements No. 4, 44, and 64, Amendment of FASB Statement No. 13, and Technical Corrections*, was issued in April 2002. SFAS No. 145 eliminates the requirement that gains and losses from the extinguishments of debt be aggregated and classified as extraordinary items, net of the related income tax. It also requires sale-leaseback treatment for certain modifications of a capital lease that result in the lease being classified as an operating lease. We will adopt SFAS No. 145 on January 1, 2003. As a result of the adoption, effective January 1, 2003, we will be required to reflect the extraordinary loss on debt extinguishments of $13.4 million, net of tax, incurred in 2002 as part of continuing operations.

SFAS No. 146, *Accounting for Costs Associated with Exit or Disposal Activities*, was issued in June 2002. SFAS No. 146 requires companies to recognize costs associated with exit or disposal activities when they are incurred rather than at the date of a commitment to an exit or disposal plan, including lease termination costs and certain employee termination benefits that are associated with a restructuring, discontinued operation, plant closing or other exit or disposal activity. SFAS No. 146 will be applied prospectively and is effective for exit or disposal activities that are initiated after December 31, 2002. We will adopt SFAS No. 146 on January 1, 2003.

FASB Interpretation No. 45, *Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others* (FIN 45), was issued in November 2002. FIN 45 elaborates on the existing disclosure requirements for most guarantees. It also clarifies that at the time a company issues a guarantee, the company must recognize an initial liability for the fair market value of the obligations it assumes under that guarantee and must disclose that information in its interim and annual financial statements. The initial recognition and measurement provisions of the FIN 45 apply on a prospective basis to guarantees issued or modified after December 31, 2002. The disclosure requirements of FIN 45 have been included in Note 19, Guarantees, Commitments and Contingencies.

SFAS No. 148, *Accounting for Stock-Based Compensation—Transition and Disclosure—an Amendment of FASB Statement No. 123*, was issued in December 2002. It provides alternative methods of transition for a voluntary change to the fair value based method of accounting for stock-based employee compensation. SFAS No. 148 is effective for fiscal years beginning after December 15, 2003. The impact of the statement on our results of operations and financial position is currently under review by management.

FASB Interpretation No. 46, *Consolidation of Variable Interest Entities* (FIN 46), was issued in January 2003. This interpretation changes the method of determining whether certain entities, including securitization entities, should be included in a company's Consolidated Financial Statements. An entity is subject to FIN 46 and is called a variable interest entity, or VIE, if it has equity that is insufficient to permit the entity to finance its activities without additional subordinated financial support from other

parties, or equity investors that cannot make significant decisions about the entity's operations, or that do not absorb the expected losses or receive the expected returns of the entity. All other entities are evaluated for consolidation in accordance with SFAS No. 94, *Consolidation of All Majority-Owned Subsidiaries*. A VIE is consolidated by its primary beneficiary, which is the party involved with the VIE that has a majority of the expected losses or a majority of the expected residual returns or both. The provisions of the interpretation are to be applied immediately to VIEs created after January 31, 2003, and to VIEs in which an enterprise obtains an interest after that date. For VIEs in which an enterprise holds a variable interest that it acquired before February 1, 2003, FIN 46 applies in the first fiscal period beginning after June 15, 2003. For any VIEs that must be consolidated under FIN 46 that were created before February 1, 2003, the assets, liabilities and non-controlling interest of the VIE would be initially measured at their carrying amounts with any difference between the net amount added to the balance sheet and any previously recognized interest being recognized as the cumulative effect of an accounting change. If determining the carrying amounts is not practicable, fair value at the date FIN 46 first applies may be used to measure the assets, liabilities and non-controlling interest of the VIE. FIN 46 also mandates new disclosures about VIEs, some of

which are required to be presented in financial statements issued after January 31, 2003. We have evaluated the impact of FIN 46 to determine if we have any investments qualifying as VIEs and do not believe we have any VIEs. The rules are recent and, accordingly, they contain provisions that the accounting profession continues to analyze.

**Related Party Transactions**

*Long-Term Incentive Program to Key Executives*

In order to provide a recruitment and retention incentive, we adopted a long-term equity incentive program in September 1999 in which certain of our key executives and key team members of NorthWestern Growth Corporation, which initiates strategic investments for us, were provided the opportunity to make personal investments. The investment entity was structured as a limited liability company, was controlled and substantially owned by us, and enabled the investors to participate in long-term capital appreciation resulting from increases in the value of our interests in Blue Dot, Expanets and CornerStone above benchmark rates of return to us approved by the independent Compensation Committee of our Board of Directors. Participants would benefit in any such capital appreciation on a pro rata basis with the other holders of equity interests in such entities after achievement of the benchmark rate of return to us. The interests of our executives in the limited liability company upon formation collectively represented a less than .05% interest in each of Blue Dot, Expanets and CornerStone. The limited liability company had no indebtedness and was consolidated in our financial statements. In the year ended December 31, 2002, there were no distributions to any of our executive officers, and in the year ended December 31, 2001, the following executive officers received distributions in respect of the transfer to us of a portion of their vested interests relating to the performance of certain entities acquired in 1998, 1999 and 2000, each of which exceeded target performance benchmarks during the 12 month period following the date of acquisition: M. Lewis, then chief executive officer, $1.1 million; R. Hylland, president, $0.8 million; D. Newell, senior vice president, $0.8 million; E. Jacobsen, senior vice president, $0.4 million; and K. Orme, chief financial officer, $0.1 million. This limited liability company was terminated and dissolved in March 2003 pursuant to a plan of dissolution and liquidation. In connection with the winding up of the entity, four participants received final liquidation payments, one of which was a named executive officer, E. Jacobsen, who received a final payment of $41,960.

F-21

*Other*

The Chief Executive Officer for Qwest Cyber Solutions ("QCS") was also a director of the Company in 2001. During that year, Expanets entered into an agreement with QCS, following a competitive bidding process, in which QCS was the lowest qualifying bidder, to provide application hosting services, consisting of computer servers and related support services. The agreement was originally valued at $52 million over a five year term. Qwest sold the QCS business unit to Corio in 2002, and the subject agreement as assigned to Corio has been substantially reduced in scope. Prior to the Corio transaction, in order to accept a position as Chief Executive Officer of NorthWestern Communications Group, the director resigned from his position at QCS and from his position on the Company's board. He now serves as Expanets' Chief Executive Officer.

**Reclassifications**

Certain 2000 and 2001 amounts have been reclassified to conform to the 2002 presentation. Such reclassifications had no impact on net income or shareholders' equity as previously reported.

**Supplemental Cash Flow Information**

| | 2002 | 2001 | 2000 |
|---|---|---|---|

|  | (in thousands) | | | | |
|---|---|---|---|---|---|
| Cash paid (received) for | | | | | |
| Income taxes | $ | (15,723) | $ | 7,297 | $ | 7,306 |
| Interest | | 176,203 | | 55,648 | | 39,937 |
| Noncash transactions for | | | | | |
| Exchange of warrants for common stock | | — | | 6,797 | | — |
| Issuance of restricted stock | | — | | 760 | | — |
| Issuance of common stock for acquisitions and repurchases of subsidiary stock | | — | | — | | 6,252 |
| Assets acquired in exchange for current liabilities and debt | | 463 | | 21,712 | | 65,118 |
| Subsidiary stock issued to third parties for acquisitions, debt, earn-outs and notes receivable | | 13,475 | | 28,738 | | 176,252 |
| Inventory purchased using short-term debt | | — | | 125,000 | | — |
| Debt and preferred securities assumed in acquisitions | | 511,100 | | — | | — |
| Discount on subordinated note | | 3,017 | | — | | — |

## 3. Acquisitions

### The Montana Power, L.L.C.

On February 15, 2002, we completed the asset acquisition of Montana Power's energy transmission and distribution business for $478.0 million in cash and the assumption of $511.1 million in existing debt and mandatorily redeemable preferred securities of subsidiary trusts (net of cash received). Acquisition costs were approximately $24.8 million. We completed this acquisition to expand our presence in the energy market. As a result of the acquisition, we are now a provider of natural gas and electricity to approximately 598,000 customers in Montana, South Dakota, and Nebraska and have the capacity to provide service to wider regions of the country. For accounting convenience, due to the burden of a mid-month closing, both parties agreed to an effective date for the sale of January 31,

F-22

2002. We obtained the services of a third-party to perform valuations and assist with the allocation of the purchase price. During the second quarter of 2002, we had preliminarily recorded the property, plant and equipment at fair value and no portion was allocated to goodwill. During the fourth quarter of 2002 we determined, based on certain regulatory considerations, the property, plant and equipment should be kept at historical book value less adjustments which reduce these assets to the amount included in utility rate base. These adjustments included a net deferred tax liability of $135 million and deferred investment tax credits of $12.7 million that existed as of the acquisition date. We also adjusted to fair value various other assets and liabilities, such as pension and other postretirement benefit obligations, the qualifying facilities liability, and regulatory assets and liabilities. The remaining excess purchase price was allocated to goodwill. Goodwill of $354.4 million is deductible for income tax purposes.

Results of operations of Montana Power have been included in the accompanying consolidated financial statements since the effective date of acquisition. The following table summarizes the final fair values of the assets acquired and liabilities assumed in connection with our acquisition of Montana Power:

(in thousands)

| | | |
|---|---|---:|
| Cash | $ | 70,601 |
| Restricted cash | | 30,000 |
| Other current assets | | 109,094 |
| Property, plant and equipment—net of deferred taxes of $147.7 million | | 908,544 |
| Regulatory assets | | 172,917 |
| Other | | 49,149 |
| Goodwill | | 400,095 |
| Total assets acquired | $ | 1,740,400 |
| Current Liabilities | $ | 218,772 |
| Regulatory liabilities | | 94,301 |
| Long-term debt | | 427,711 |
| Mandatorily redeemable preferred securities of subsidiary trusts | | 65,000 |
| Other | | 355,974 |
| Total liabilities assumed | | 1,161,758 |
| Net assets acquired | $ | 578,642 |

## Other

During the second and third quarters of 2002, Blue Dot completed five acquisitions. Consideration paid to the sellers in these acquisitions included cash consideration of $15.6 million and the issuance of Blue Dot common stock. The initial recording of the acquisitions consummated in the second quarter included a preliminary assigned value of $8.1 million to the common stock issued to the former owners. Losses of Blue Dot were allocated to these shareholders during the second quarter based on the preliminary value of the stock. During the fourth quarter of 2002, Blue Dot completed the purchase price allocation for these acquisitions and the entire value assigned to the common stock was reversed. The losses originally allocated to minority shareholders based on the preliminary value of the common stock have since been recognized by NorthWestern. Maximum contingent payments totaling $15.9 million associated with our 2002 acquisitions may be required based on earnings contingencies

over an extended period. To the extent these payments occur, they will be considered an additional cost of the acquired entity. The assets acquired and liabilities assumed have been recorded at their fair values as of the dates of acquisitions. The excess of the purchase price over the fair value of identifiable net assets acquired of approximately $9.7 million was recognized as goodwill and subsequently fully impaired. Blue Dot also recognized additional goodwill of $20.5 million related to prior acquisitions with earnings contingencies related to stock issued to sellers of acquired businesses. This goodwill was subsequently impaired as a result of our required analysis under SFAS No. 142 (see Note 4).

The following unaudited pro forma results of consolidated operations for the years ended December 31, 2002 and 2001 give effect as if all acquisitions noted above had occurred as of January 1, 2001 (in thousands except per share amounts):

|                                        | 2002          | 2001          |
|----------------------------------------|---------------|---------------|
| Revenues                               | $  2,078,875  | $  2,455,582  |
| Income (Loss) from Continuing Operations | (738,177)   | 97,383        |
| Net Income (Loss)                      | $  (853,279)  | $  93,077     |
| Diluted earnings per share             | $  (28.70)    | $  3.82       |

The pro forma results are not necessarily indicative of what actually would have occurred if the acquisition had been completed as of the beginning of each fiscal year presented, nor are they necessarily indicative of future consolidated results.

## 4.  Goodwill and Other Intangibles

We adopted the provisions of SFAS No. 142 effective January 1, 2002 and with the assistance of an independent appraiser, determined that no impairment charge was necessary upon adoption. Under SFAS No. 142, goodwill impairment is deemed to exist if the net book value of a reporting unit exceeds its estimated fair value. This methodology differs from our previous policy, as permitted under previous accounting standards, of using undiscounted cash flows on an enterprise wide basis to determine if goodwill is recoverable. Our reporting units are consistent with the operating segments underlying the segments identified in Note 23—Segment and Related Information.

We have selected October 1 as the date for our annual impairment review. For our Communications and HVAC segments, updated valuations were completed with the assistance of the same independent appraiser that was utilized during our initial review as of January 1, 2002 using a discounted cash flow approach based on forward-looking information regarding market share, revenues and costs for each reporting unit. Lower than expected performance and revised growth rate and holding period assumptions negatively impacted the fair value of our Communications and HVAC reporting units. As a result, we recorded a goodwill impairment charge of $436.6 million. Our Communications segment also recorded an impairment charge of $46.8 million related to a dealer agreement intangible asset having an indefinite life.

For our Electric and Natural Gas segments, an internal valuation completed using a discounted cash flow approach based on forward-looking information regarding revenues and costs resulted in no goodwill impairment.

F-24

A summary of changes in our goodwill for the year ended December 31, 2002 by business segment, is as follows (in thousands):

|                               | Communications | HVAC        | Electric and Natural Gas | Total        |
|-------------------------------|----------------|-------------|--------------------------|--------------|
| Balance as of December 31, 2001 | $  146,291   | $  259,443  | $                        | $  405,734   |
| Goodwill acquired             | 688            | 30,183      | 400,095                  | 430,966      |
| Impairments                   | (146,979)      | (289,626)   |                          | (436,605)    |
| Balance as of December 31, 2002 | $  —         | $  —        | $  400,095               | $  400,095   |

As of December 31, 2002 and 2001, our intangible assets, other than goodwill, and related accumulated amortization consisted of the following (in thousands):

|  | December 31, 2002 | December 31, 2001 |
|--|-------------------|-------------------|

| | Gross | Accumulated Amortization | Net | Gross | Accumulated Amortization | Net |
|---|---|---|---|---|---|---|
| Amortized intangible assets: | | | | | | |
| Customer lists and other | $ 205,113 | $ (86,969) | $ 118,144 | $ 235,448 | $ (57,564) | $ 177,884 |
| Unamortized intangible assets: | | | | | | |
| Other, primarily Dealer Agreements | — | — | — | 60,821 | (3,849) | 56,972 |
| Total Intangible Assets | $ 205,113 | $ (86,969) | $ 118,144 | $ 269,269 | $ (61,413) | $ 234,856 |

As a result of the significant downturn in the communications technology industry and considerable declines in revenue and profitability generated by Expanets, as well as the significant decline in the profitability of Blue Dot along with reduced holding period assumptions for both Expanets and Blue Dot, we reviewed the recoverability of our other intangible assets. We applied the provisions of SFAS No. 144 to our intangible assets with definite lives and determined the carrying value of certain assets to be impaired. Accordingly, Expanets and Blue Dot recorded impairment charges of $25.4 million and $0.7 million, respectively, based on the fair value of certain intangible assets.

Other amortizable intangibles primarily consist of customer lists and assembled workforce resulting from an asset acquisition of Expanets, which are amortized over their estimated periods of benefit.

Intangible asset amortization expense for the years ended December 31, 2002, 2001, and 2000 was $29.4 million, $34.6 million and $29.2 million, respectively. Based on the current amount of intangible assets subject to amortization, estimated amortization expense for each of the succeeding 5 years is as follows: 2003—$29.0 million; 2004—$26.2 million; 2005—$17.5 million; 2006—$12.1 million; 2007—$10.5 million.

F-25

The following table presents pro forma financial information assuming that SFAS No. 142 had been in effect for the years ended December 31, 2001 and 2000 (in thousands, except for per share data):

| | 2001 | 2000 |
|---|---|---|
| Reported earnings on common stock | $ 37,514 | $ 42,761 |
| Add: Goodwill amortization, net of taxes and minority interests | 8,619 | 6,271 |
| Adjusted net income | $ 46,133 | $ 49,032 |
| Basic earnings per share | $ 1.54 | $ 1.85 |
| Add: Goodwill amortization, net of taxes and minority interests | 0.35 | 0.27 |