Action"), all pending in the United States District Court for the District of South Dakota (the "Class Action District Court") [Magten, Exh. 32].

Under the Settlement, a settlement fund was established in the amount of $41 million, $37 million of which was contributed by certain D&O Policies and $4 million of which was contributed by other persons and parties. NorthWestern's only obligations under the Settlement were to cause its insurers under the D&O Policies to deliver $37 million in full settlement and compromise of the Class Action and to provide the releases set forth in the Settlement documents.

On or about October 7, 2004, the Bankruptcy Court issued its memorandum decision overruling objections and finding that the proposed settlement of the Class Action met the requirement of approval under Bankruptcy Rule 9019 and the applicable case law (the "MOU Memorandum Decision") [Magten, Exh. 194]. On or about October 14, 2004, the Bankruptcy Court entered the MOU Order. On or about October 26, 2004, Magten filed its notice of appeal of the MOU Order.

On or about January 14, 2005, the Class Action District Court entered its Final Judgment and Order of Dismissal with Prejudice of the Securities Litigation. On or about January 14, 2005, the Class Action District Court also entered its order in the Derivative Litigation holding that the approval of the Settlement would be held in abeyance until a bankruptcy court order is obtained vacating the order preliminarily enjoining prosecution of the Derivative Action. On or about February 15, 2005, the Bankruptcy Court entered the Stipulation and Order Terminating the Preliminary Injunction and the Automatic Stay in connection with the Derivative Action. The Bankruptcy Court order was submitted to the District Court and the District Court on April 26, 2005 entered an order finally approving the Settlement in the Derivative Litigation. Consistent with the orders, the payment of monies to the settlement fund has been completed.

2.  **Treatment of Claims Related to Class Action Under the Plan**

Under Section 4.14 of the Plan, Class 14 Claims, claims of holders of claims pursuant to the Settlement, will be discharged and the holders thereof shall be barred from seeking to recover any payment on their Securities Claims from the Debtor, the Reorganized Debtor, or the Released Parties.[15]

Under Sections 4.14 and 4.15 of the Plan, holders of Securities Claims who elect to refuse to accept the proposed treatment provided in the Settlement preserved their rights to proceed against the Debtor in the Class Action District Court in accordance with the Settlement. Upon receipt of a Final Order, such holders of Securities Claims shall be channeled to the D&O Trust.

D.  **Staying of Magten's Adversary Proceeding Seeking to Revoke Confirmation Order**

On or about April 15, 2005, Magten commenced an adversary proceeding against NorthWestern, and certain of its directors and officers, to revoke the Confirmation Order pursuant to Section 1144 of the Bankruptcy Code (the "Adversary Proceeding"). In the complaint, Magten alleges that the Debtor failed to adequately fund the Disputed Claims Reserve, and that such conduct was a "fraud" upon the Bankruptcy Court. On or about July 26, 2005, the Bankruptcy Court entered its Order Granting in Part and Denying in Part Defendants' Motion to Stay Adversary Proceeding Pending Resolution of Appeal of Confirmation Order or, in the

---

[15] The Plan provides that in the event the Settlement was not approved and does not become effective: (a) the Plan and any proposed Order confirming the Plan (i) will not release any non-Debtor for that matter from the claims asserted or to be asserted in the Securities Litigation and (ii) will not affect, in any way, the Class Claimants' rights to obtain relief for their claims in the Securities Litigation; (b) the lead Plaintiffs and the Class Claimants shall retain their rights to pursue their claims and access the proceeds of any available D&O policies that provide coverage for the claims asserted in the Securities Litigation; and (c) the Debtor's current and former officers and directors, financial advisors, accountants, auditors, agents or professionals will not be released and discharged from any cause of action in connection with the Class Action.

Alternative, to Dismiss Complaint [Adv. Proc. No. 05-50866, Docket No. 17] (the "Adversary Order"). In its Adversary Order, the Bankruptcy Court held that deciding collateral or tangential matters to the appeal "does not divest the appellate court of jurisdiction because the result does not and can not affect the outcome of the appeal." Adversary Order, p. 3. However, in connection with the Adversary Proceeding, the Bankruptcy Court stayed the Adversary Proceeding holding that it "simply does not have jurisdiction to consider overturning the Confirmation Order until the District Court makes a determination in the Confirmation Order Appeal." Adversary Order, p. 3.

### IV. ARGUMENT AND CITATION OF LEGAL AUTHORITY

As set forth in the Motion to Dismiss, Magten fails to establish that the Confirmation Order should be reversed in light of the substantial consummation of the Plan.[16] In short, Magten is not entitled to any of the relief it now seeks because: (1) the Plan has been substantially consummated; (2) Magten failed to obtain a stay pending appeal; (3) the relief requested would adversely impact the material rights of creditors and third parties not before the Court; and (4) the relief requested would negatively affect the success of the Plan and MOU Settlement and undermine the public policy affording finality to bankruptcy orders. See In re Continental Airlines, 91 F.3d 553, 560 (3d Cir. 1996).

Moreover, Magten failed to present any evidence at the Confirmation Hearings to establish that the Plan violated the Bankruptcy Code. Magten cannot now satisfy its significant burden of overcoming the Bankruptcy Court's findings of fact and law as to the Confirmation Order and the MOU Order where Magten presented no evidence to support its objections at the Confirmation Hearings.

---

[16] It should be noted that Magten has not been joined by Law Debenture Trust Company of New York ("Law Debenture"), indenture trustee under the QUIPS. As a result, Magten may assert arguments only on its own behalf and not on behalf of any other creditor or interest holder.

A.  **The Confirmation Order Should Be Affirmed Because the Plan Has Been Substantially Consummated**

First, in the context of a bankruptcy order which has been substantially consummated, there is a strong presumption that any appeal has been rendered moot and "it is inherently improbable . . . that an appellate court will be able to fashion effective relief." In re Texaco, Inc., 92 B.R. 38, 46 (S.D.N.Y. 1988); Upstream Energy Servs v Enron Corp. (In re Enron), 04-Civ. 8883 (VM), 2005 U.S. Dist. LEXIS 12427 (S.D.N.Y. June 23, 2005).

In its Opposition to the Motion to Dismiss, Magten readily admits that the Plan has been substantially consummated. See Opposition to Motion to Dismiss at 3, 12, and 16. Based upon this admission, this Court is not required to conduct a separate review of substantial consummation under 11 U.S.C. §1101(2) which is addressed with great specificity in NorthWestern's Motion to Dismiss.

Second, the record is clear that although Magten tried on two occasions to obtain a stay of the Confirmation Order, the Bankruptcy Court and this Court both flatly denied the requests. Magten has clearly had its day in court and in each instance was unable to sustain its burden. In this case, the Bankruptcy Court and this Court specifically denied a stay based upon the view that Magten would not succeed on the merits of its appeal and no showing of irreparable harm to Magten. October 25 Transcript, p. 30 and Stay Pending Appeal Ruling at 46 [Debtor, Exh. 22].

Third, the relief requested by Magten would cause significant harm to a vast number of third parties who have relief upon the Confirmation Order and the ensuing implementation of the Plan. This includes not only lenders from whom the Debtor obtained exit financing (which financing has now been refinanced, in part) and creditors who have already received distributions under the Plan, but also public investors who have purchased and sold NorthWestern's publicly

traded stock on the open market since the Plan became effective.[17] Revoking the Confirmation Order would cause incalculable harm to third parties without any justification.

Moreover, NorthWestern has proceeded with its claims adjudication process of certain disputed claims and in July 2005 the Bankruptcy Court entered certain Settlement Orders over the objections of Magten. The Settlement Orders authorized NorthWestern to instruct its transfer agent to distribute shares on account of the resolved disputed claims. Indeed, following entry of the Settlement Orders, NorthWestern issued transfer instructions to its transfer agent and shares have been distributed to holders of the now Allowed Claims from the Disputed Claims Reserve. Revoking the Confirmation Order would cause significant harm to the individual claimants who were granted Allowed Claims and have received distributions on account of such Allowed Claims.

### B. Magten's Statement of Issues to be Presented on Appeal

Magten has not, and indeed cannot, overcome the Bankruptcy Court's detailed and specific findings of fact and conclusions of law. On their face, the Bankruptcy Court's findings of fact and conclusions of law preclude any argument that the findings of fact are clearly erroneous or that the Bankruptcy Court erred in its rulings as a matter of law.[18] For a District Court to disturb a bankruptcy court's factual findings, the district court must find the findings to be "clearly erroneous." In re Exide Techs., No. 02-11125-KJC, 2004 WL 1465760, at *1 (D. Del. June 25, 2004). Moreover, a "finding of fact is clearly erroneous 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm

---

[17] See Nordhoff Invs., Inc. v. Zenith Elecs. Corp. (In re Zenith Elecs. Corp.), 250 B.R. 207, 214 (D. Del. 2000) ("reversal" of already completed exchanges in publicly traded bonds would "impact the rights of investors that were not involved in the bankruptcy proceedings.").

[18] See Confirmation Ruling; see also In re Exide Techs, 2004 WL 1465760, at *1 (on appeal, district court applies clearly erroneous standard to bankruptcy court's findings of fact and plenary standard to legal conclusions).

conviction that a mistake has been committed.'" Id. (citing United States v. U.S. Gypsum Co., 333 U.S. 364, 365, 68 S.Ct. 525 (1948). Indeed, a finding of fact "is clearly erroneous if it is either 'completely devoid of minimum evidentiary support displaying some hue of credibility or . . . bears no rational relationship to the supportive evidentiary data.'" In re Stein, 314 B.R. 306, 309 (D.N.J. 2004) (citing Krasnov v. Dinan, 465 F.2d 1298, 1302-03 (3d Cir. 1972)).

Magten cannot overcome the clear and precise findings of fact set forth in the Bankruptcy Court's Confirmation Ruling or the uncontroverted evidence supporting the Bankruptcy Court's findings. See, e.g., In re Zepecki, 277 F.3d 1041, 1045 (8th Cir. 2002) (In order to be clearly erroneous, "a decision must strike us as wrong with the force of a five-week-old, unrefrigerated dead fish.") (citations omitted). In addition, when reviewing a mixed question of law and fact, the court should apply the clearly erroneous standard to all findings of fact and exercise plenary review over the bankruptcy court's choice and interpretation of the law. In re Exide, 2004 WL 1465760, at *1. Moreover, there is no evidence to even remotely suggest that the Bankruptcy Court's findings were "devoid of minimum evidentiary support" or "bear no rational relationship to the supportive evidentiary data." In fact, just the opposite is true - the Bankruptcy Court made detailed and specific findings carefully tied to the supportive documentary evidence and testimony during the Confirmation Hearings. In addition, when reviewing a mixed question of law and fact, the court should apply the clearly erroneous standard to all findings of fact and exercise plenary review over the bankruptcy court's choice and interpretation of the law. In re Exide, 2004 WL 1465760, at *1.

  1. **The Plan Complies with Section 1122 and 1129(a)(1) of the Bankruptcy Code**

Magten argues that the Plan's classification of the claims under the QUIPS for principal and interest and the claims arising under the QUIPS Litigation as Class 8(b) claims violates Section 1122(a) of the Bankruptcy Code. Magten is wrong. The Plan provides that holders of

Class 8(b) could have opted to receive Option 1 under the Plan and a distribution in connection with their claims for principal and interest under the QUIPS or retention of the claims related to the QUIPS Litigation and treatment as a Class 9 creditor. The Bankruptcy Court approved the Plan holding this election was appropriate because the

> **QUIPS Litigation Claims and the QUIPS Notes Claims are mutually exclusive and not cumulative claims**; therefore, requiring Class 8(b) holders to opt for either Class 8(b) treatment or preserving their QUIPS Litigation Claims as disputed Class 9 Claims does not unfairly discriminate against such holders. The two claims cannot coexist. As such, requiring Class 8(b) holders to pay for the option of seeking a higher monetary reward through the QUIPS Litigation is not unfairly discriminatory. The Court hereby finds that requiring Class 8(b) holders to choose either Option 1 or Option 2 is appropriate and reasonable.

Confirmation Order, p. 35 (emphasis added). Indeed, even after all the litigation Magten has initiated against this Debtor it cannot identify any evidence to support its assertion that the election provided by the Plan is in violation of the Bankruptcy Code. A proposed plan of reorganization need not fully recognize creditor's legal rights, and may not be construed as declaration by its proponent as to extent of these rights; rather, it is more in nature of a settlement offer, one which creditors are free to accept or reject as they deem appropriate. In re Dow Corning Corp., 270 B.R. 393, 412 (Bankr. E.D. Mich. 2001). It is clear that there "is no prohibition in the Code against a Plan proponent offering different treatment to a class depending on whether it votes to accept or reject the Plan." In re Zenith Elecs. Corp., 241 B.R. 92, 105 (Bankr. D. Del. 1999). The election of mutually exclusive remedies does not unfairly discriminate against holders of Class 8(b) claims.

Magten also argues that the Plan separately classified the holders of the TOPrS and the QUIPS on account of their claims in order to "affect treatment provided to the holders of the QUIPS." However, the Bankruptcy Court specifically rejected this argument by holding:

> the classification scheme was not proposed to manipulate class voting. The voting results show that Class 8(a) accepted the Plan in both number and amount. In the event the two sub-classes were combined, the Debtor would not be

required to take advantage of the cram-down provisions of Section 1129(b) and Magten and Law Debenture's vote to reject would have been subsumed by the far larger claims of the holders of TOPrS. Accordingly, the Court hereby finds that the separate classification of Class 8(a) and Class 8(b) is consistent with the broad discretion afforded the Debtor in formulating the Plan, was not proposed to manipulate the vote and is consistent with the requirements of Section 1122(a) of the Bankruptcy Code and applicable law.

Confirmation Order, pp. 35-36.

A plan does not discriminate unfairly if the plan does not segregate similar claims or interests into separate classes or provide disparate treatment for those classes. See, e.g., In re Johns-Manville Corp., 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986). As established at the Confirmation Hearings, there are substantial differences between the claims under the QUIPS and TOPrS.[19] First, the claims arise under different debt instruments. Second, as presented by counsel for the trustee under the TOPrS, there is a significant dispute as to whether the QUIPS are subordinate in right to the TOPrS.[20] Moreover, the Bankruptcy Court found the separate subclass for QUIPS claims actually prevented such claims from being subsumed by the larger claims of the TOPrS. The separate classification of Class 8(a) and Class 8(b) was justified on the grounds that the claims were based on different debt instruments and the significant dispute as to subordination between the two classes. In addition, the separate classification actually protected the voting rights of the QUIPS holders in that their votes were not subsumed by the far larger claims of the TOPrS. Therefore, the claims based on the TOPrS Indenture and the QUIPS Indenture are not "substantially similar" since such claims are not "similar in legal character or effect as a claim against the debtor's assets or as an interest in the debtor." 5 Lawrence P. King,

---

[19] In its objection to confirmation of the Plan, Law Debenture specifically contradicts this position and states "[b]y virtue of the unique property interest, equitable remedies and other rights in the Montana utility assets arising from the adversary proceeding, the QUIPS' claims are fundamentally different from the claims of the TOPrS holders." Memorandum of Law in Support of Law Debenture Trust Company of New York's Objection to Confirmation of Debtor's First Amended Plan of Reorganization, pp. 9-10.

Collier on Bankruptcy ¶ 1122.03[3], at 1122-8 (15th ed. rev. 2004).[21]

### 2. The Plan Satisfies the Requirements of Section 1129(b) of the Bankruptcy Code

(a) The Plan Does Not Unfairly Discriminate Against Holders of Class 8(b) Claims

Magten also incorrectly asserts that the TOPrS and the QUIPS are of equal rank with respect to their claims for principal plus accrued interest. Once again Magten is wrong. As discussed above, the evidence presented at the Confirmation Hearing clearly establishes that the Bankruptcy Court heard and determined the dispute as to the whether such claims were *pari passu*. Counsel for the trustee under the TOPrS argued at the Confirmation Hearing:

> Magten and Law Debenture argue that the reason it's improper or a principal reason why it's improper is that they say the QUIPS have the same legal rights as the TOPrS, and therefore, its inappropriate to give them disparate treatment. . . . We agree with the debtor and the Committee that there are a variety of differences between the QUIPS' legal rights and the TOPrS' rights, for example, the fact that they arise from different instruments. And in addition that we, unlike the QUIPS, were asserting claims under PUHCA, and those claims were settled pursuant to our settlement, those are not claims the QUIPS holders were asserting until very recently and belatedly. . . . There's one additional difference . . . . And that is that if you look at the operative indentures you will find that it's quite clear from the subordination provision that governed the QUIPS and it governed the TOPrS, that the QUIPS are subordinate in right to the TOPrS. They are not pari passu.

October 6, 2004 Transcript, p. 128-129. Based on the evidence presented at the Confirmation Hearing, the Bankruptcy Court determined there are fundamental differences between the claims of the TOPrS and the QUIPS which justified the separate treatment of these claims. The

---

[20] See October 6, 204 Transcript, pp. 129-134.

[21] See also Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture), 995 F.2d 1274, 1277 (5th Cir. 1991), cert. denied, 506 U.S. 821 (1992) ("Each class of creditors will be treated in the debtor's plan of reorganization based upon the similarity of its members' priority status and other legal rights against the debtor's assets").

Bankruptcy Court found the arguments supporting separate subclasses persuasive and Magten has presented no new evidence to overcome such findings of fact and conclusions of law.[22]

    (b)  The Plan Does Not Violate the Absolute Priority Rule

Under the Bankruptcy Code, "creditors and shareholders may participate in the debtor's assets only in accordance with their respective priorities, and that senior classes must receive full compensation for their claims before other classes can participate." In re Toy & Sports Warehouse, Inc., 37 B.R. 141, 151-52 (Bankr. S.D.N.Y. 1984) (quoting Consol. Rock Prods. Co. v. DuBois, 312 U.S. 510 (1941)). Magten argues that holders of Class 12 and Class 14 under the Plan received a distribution of estate property without senior creditors being fully compensated. Magten incorrectly asserts that the $37 million in insurance policy proceeds paid in settlement of the Securities Litigation belongs to NorthWestern or its estate. The $37 million in proceeds is for the benefit of the insured under the insurance policies solely to pay for claims brought by third parties, and as to the Debtor, solely to pay for "securities claims" brought by third parties. Irrespective that NorthWestern may have succeeded to the derivative claims upon its filing Chapter 11, NorthWestern was precluded by the "insured versus insured" exclusion and applicable definitions under the operative insurance policies from recovering insurance proceeds for any derivative claims against its current and former officers and directors.[23]

---

[22] The Bankruptcy Court held as follows:

> Here the separate classification protects the rights of the Quips, which is the smaller debt issue rather than adversely effecting those rights by allowing a larger debt issue to Toppers to dominate. There are many essential differences. These are different issues of debt, different issuers, different trustees, and more importantly there are different litigation rights.

Confirmation Ruling, p. 35.

[23] The Bankruptcy Court held as follows:

> Here, the primary purpose of the policies is to protect the directors and officers from claims such as those asserted by the plaintiffs. . . . payment

In a non-bankruptcy setting, NorthWestern would not be able to bring derivative claims against its officers and directors and recover under the applicable insurance policies on such claims. See, e.g., American Casualty Company of Reading, Pennsylvania v. Federal Deposit Insurance Corporation, 16 F.3d 152 (7th Cir. 1994); Levy v. National Union Fire Insurance Co. of Pittsburgh, PA, 889 F.2d 433 (2d Cir. 1989).

The bankruptcy case which most clearly focuses on this issue is Cohen v. National Union Fire Insurance Company of Pittsburgh, PA, 280 B.R. 319 (Bankr. S.D.N.Y 2002). The Cohen court addressed the question of whether a trustee appointed in a bankruptcy case could pursue a claim against the debtor's officers and directors and former officers and directors and have such claim covered by D&O insurance. National Union Fire Insurance Company of Pittsburgh, PA ("National Union") asserted that the trustee was covered by the "insured versus insured" exclusion because it was, in essence, the successor to County Seat Stores, Inc. ("County Seat"), the former debtor-in-possession. Overruling National Union's argument and allowing the trustee to pursue claims, the Cohen court specifically noted that the status of a trustee in bankruptcy affords a trustee "dissimilar treatment of that afforded others, including debtors-in-possession". 280 B.R. at 326 (emphasis added), citing Young v. Paramount Communication Inc. (In re Wingspread Corp.), 178 B.R. 938, 943 (Bankr. S.D.N.Y. 1995) (a debtor-in-possession is not the functional equivalent of a trustee); accord, In re C&R Beer & Soda Inc., 186 B.R. 173, 178 (Bankr. E.D.N.Y. 1995) (a trustee is an independent, disinterested person; a debtor-in-possession is neither independent nor disinterested). In so ruling, the Cohen court specifically noted that if the debtor (County Seat) had not been in bankruptcy and brought the same claims as asserted by the trustee, "without doubt, the insured versus insured exclusion would apply to bar the claim

---

> of the proceeds to the plaintiffs on account of claims against the directors
> and officers does not implicate property of the estate

because County Seat is insured under the policy and is the 'Company' identified in the policy". 280 B.R. at 326. The implicit ruling of the Cohen court is that a debtor-in-possession is precluded by the "insured versus insured" exclusion from recovering on a D&O policy for derivative claims.

The Cohen analysis applies in NorthWestern's case – NorthWestern cannot recover on derivative claims under its D&O insurance policy. While the derivative claims may have become property of NorthWestern's estate upon its filing bankruptcy, the "insured versus insured" exclusion and operative definitions under the insurance policies, and the ruling from the Cohen case clearly show that none of the proposed $37 million from the applicable insurance policies with respect to the Securities Litigation and establishment of the D&O Trust could be paid over or otherwise belong to NorthWestern's estate.[24]

### 3. The Bankruptcy Court Did Not Err in Confirming the Plan Prior to Resolution of the QUIPS Litigation

Magten again incorrectly argues that the Bankruptcy Court erred in confirming the Plan because the Montana Utility Assets were not property of the estate but were held in a constructive trust for the holders of the QUIPS. Neither Magten nor Law Debenture initiated any actions, prior to the Petition Date, to pursue or perfect their alleged constructive trust remedy in the Montana Utility Assets. Short of alleging the existence of a constructive trust, neither Magten nor Law Debenture took any affirmative steps to effectuate this remedy and impose a constructive

---

MOU Memorandum Decision, p. 4-5.

[24] In connection with derivative actions, the Bankruptcy Court also held as follows:

> any claims that the Debtor may have (for example, derivative claims brought on behalf of the company) are not covered by these policies because of the "insured versus insured" exception contained in them. . . . Thus, whether the Debtor could or could not prevail is not relevant to this settlement because the policies at issue would not provide a source of recovery even if successfully prosecuted.

trust.[25]

A constructive trust arises under Montana state law when a person holding title to property is subject to an equitable duty to convey it to another on the ground that the person holding title would be unjustly enriched if he were permitted to retain it. In re Estate of McDermott, 51 P.3d 486, 491 (Mont. 2002) (citing 72 Mont. Code Ann. § 33-319). Constructive trusts are involuntary in nature and arise by operation of law. Johnson v. Kenneth D. Collins Agency, Inc., 865 P.2d 312, 313 (Mont. 1993). It is well established under Montana law, however, that "in order to recover upon the theory of a resulting or constructive trust, the proof must be clear, satisfactory, convincing and practically free from doubt." Boatman v. Berg, 577 P.2d 382, 385 (Mont. 1978).

Magten has provided no evidence to meet this burden of proof and its bare allegations are

---

MOU Memorandum Decision, p. 5.

[25] In determining that no constructive trust existed, the Bankruptcy Court expressly held:

> Magten strongly relies, frankly without citation, upon Montana law from the notion that there is no remedy at law but only equitable remedies that do not give rise to money damages. . . . There's been no Montana case cited to support this interpretation, and indeed there was no case from any other jurisdiction with a similarly situated or structured law. . . . There's nothing in the remedy section that I found of the Montana fraudulent conveyance law that gives rise to an automatic constructive trust upon the mere filing of a lawsuit, and as my colloquy with counsel during the course of the proceeding indicated, I would find that to be an extraordinary provision indeed. That would put at risk virtually ever transaction that was ever done until such time as the statute of limitations would run. On the other hand, I do think that the general Montana law on constructive trust, which was cited by the debtors, that's Montana Code 33319 would apply and that does require clear and satisfactory and convincing proof that is practically clear from doubt as stated by the Montana case interpreting that particular statute. Thus, I think, what the law provides is that a constructive trust is the exception and not the rule whether under Montana law or generally.

Confirmation Ruling, p. 28-29.

wholly insufficient to justify the imposition of this extreme remedy.[26] Accordingly, because Magten and Law Debenture failed to take any steps pre- or post-petition to actually provide "clear satisfactory, convincing and practically free from doubt" proof of their entitlement to a constructive trust over the alleged "in rem" assets, the claims of holders of QUIPS who elected under Option 2 to preserve their claims in the QUIPS Litigation are properly categorized as Class 9 General Unsecured Claims.

Moreover, Magten and Law Debenture argue that because the QUIPS Litigation seeks an equitable remedy, the imposition of a constructive trust, such cause of action is not a claim that can be discharged. However, Magten and Law Debenture have admitted that there is an adequate remedy at law, namely the setting of a claim reserve as provided for in Sections 7.5 and 7.6 of the Plan, to satisfy their claims and, as such, are not entitled to the imposition of a constructive trust

---

[26] It is well settled that constructive trusts are at odds with the general goals of the bankruptcy process and are a disfavored form of remedy. See, e.g., Shubert v. Jeter (In re Jeter), 171 B.R. 1015 (Bankr. W.D.Mo. 1994), aff'd, 73 F.3d 205 (8th Cir. 1996) (approving denial of constructive trust based on equality considerations as well as strong arm powers); Haber Oil Co., Inc. v. Swinehart (In re Haber Oil Co., Inc), 12 F.3d 426, 436 (5th Cir. 1994) ("Because the constructive trust doctrine can wreak such havoc with the priority system ordained by the Bankruptcy Code, courts are generally reluctant 'to impose constructive trusts without a substantial reason to do so'"); Torres v. Eastlick (In re North Am. Coin & Currency, Ltd.), 767 F.2d 1573, 1575 (9th Cir. 1985), cert. denied, 475 U.S. 1083 (1986) (finding insufficient fraud and stating: "[W]e cannot accept the proposition that the bankruptcy estate is automatically deprived of any funds that state law might find subject to a constructive trust."). See also Sholer v. Carmichael (In re PKR, P.C.), 220 B.R. 114 (B.A.P. 10th Cir. 1998) (noting conflict with bankruptcy policy and declining on facts to impose constructive trust); Airwork Corp. v. Markair Express, Inc. (In re Markair Express, Inc.), 172 B.R. 638, 642 (B.A.P. 9th Cir. 1994) ("Because it is a remedy, a constructive trust cannot affect rights in the res until it is imposed."); Tekinsight.com, Inc. v. Stylesite Mktg., Inc. (In re Stylesite Mktg., Inc.), 253 B.R. 503, 511 ("a court may refuse to grant a constructive trust where it operates to impair the interests of the debtor's other creditors") (citation omitted); Allen-Bradley Co., Inc. v. Commodore Bus. Machs., Inc. (In re Commodore Bus. Machs., Inc.), 180 B.R. 72 (Bankr. S.D.N.Y. 1995) (denying constructive trust on facts and observing denial furthers Code's goal of equality among creditors); Research-Planning, Inc. v. Segal (In re First Capital Mortgage Loan Corp.), 60 B.R. 915, 918 (Bankr. D. Utah 1986) ("[I]n dealing with fraud-based applications of the constructive trust doctrine, the court must be mindful of the basic bankruptcy policy of treating general creditors equally.").

on the Montana Utility Assets.[27]  Without clear evidence supporting Magten's assertions regarding the establishment of a constructive trust, the Montana Utility Assets were properly included in the bankruptcy estate.

Magten requests that Plan confirmation should have awaited the entry of a final, non-appealable order in the QUIPS Litigation. There remains no basis to grant Magten a remedy that is tantamount to a stay pending appeal while it litigates meritless claims. The court in Continental recognized how unfair it would be to withhold payments to creditors while a large claim is being liquidated disallowing the claim of a labor union against the airline and valuing it at zero for voting purposes in order to facilitate the expeditious administration of the chapter 11 cases and plan confirmation. In re Continental Airlines Corp., 60 B.R. 903, 905-06 (Bankr. S.D. Tex. 1986). The Plan provides for a reserve for Class 9 claims, and as such, provides sufficient protection for any allowed claim which may result from the QUIPS Litigation.

## V.   CONCLUSION

Magten's appeal is a classic example of being "all hat and no cattle." Irrespective of Magten's continuous harping, it cannot change the fact that the Plan and the MOU Settlement have been substantially consummated and Magten is not entitled and cannot be granted any relief on appeal. Magten failed to present any evidence at the Confirmation Hearings to support its objections and, indeed, Magten failed to present or cross-examine any witnesses at the Confirmation Hearings when it had the chance. Magten cannot now satisfy the significant burden it must overcome when challenging the Bankruptcy Court's detailed findings of fact and law as to the Confirmation Order or the MOU Order. For the reasons set forth herein, NorthWestern requests that this Court affirm the Confirmation Order and MOU Order, and dismiss Magten's

---

[27] Indeed, Law Debenture, on behalf of all QUIPS claims holders, entered into a stipulation which provided for a specific segregated reserve of shares of sufficient to cover a Class 9 allowed claim of $25 million.

Appeal, and grant such other and further relief as it deems appropriate.

Dated: August 12, 2005
      Wilmington, Delaware

Respectfully submitted,

PAUL, HASTINGS, JANOFSKY &
   WALKER LLP
Jesse H. Austin, III
Karol K. Denniston
600 Peachtree Street
Suite 2400
Atlanta, GA 30308
Telephone: (404) 815-2400

GREENBERG TRAURIG, LLP

_____
Victoria Watson Counihan (No. 3488)
William E. Chipman, Jr. (No. 3818)
Dennis A. Meloro (No. 4435)
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, DE 19801
Telephone: (302) 661-7000
GREENBERG TRAURIG, LLP

*Co-Counsel for NorthWestern Corporation*